# 12-4547-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————

THE AUTHORS GUILD, INC., THE AUSTRALIAN SOCIETY OF AUTHORS
LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS,
ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES
SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON,
THE AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND
COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK
FAGLITTERAER FORFATTERO OG OVERSETTERFORENING,
THE WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK
GRUNDSTROM, HELGE RONNING, JACK R. SALAMANCA,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*
————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR PLAINTIFFS-APPELLANTS

EDWARD H. ROSENTHAL
JEREMY S. GOLDMAN
ANNA KADYSHEVICH
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

*Attorneys for Plaintiffs-Appellants*

v.

HATHITRUST, CORNELL UNIVERSITY, MARY SUE COLEMAN, President,
University of Michigan, MARK G. YUDOF, President, The University of
California, KEVIN REILLY, President, The University of Wisconsin System,
MICHAEL MCROBBIE, President, Indiana University,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE,
BLAIR SEIDLITZ, COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

The undersigned, counsel for Plaintiffs-Appellants, certifies that none of the Plaintiffs-Appellants have any parent corporation and no publicly-held corporation owns 10% or more of any of the Plaintiffs-Appellants' stock.

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By: _____s/ Edward H. Rosenthal_____
　　Edward H. Rosenthal
　　Jeremy S. Goldman
　　Anna Kadyshevich

488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .............................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 3

STATEMENT OF ISSUES PRESENTED AND STANDARD OF REVIEW ....... 4

STATEMENT OF THE CASE ............................................................... 5

STATEMENT OF FACTS .................................................................... 7

    The Mass Digitization Program .................................................. 7

    HathiTrust ............................................................................... 9

    The Orphan Works Project ....................................................... 10

SUMMARY OF ARGUMENT ........................................................... 11

ARGUMENT .................................................................................. 12

I. THE CLAIM TO ENJOIN THE ORPHAN WORKS PROJECT IS RIPE ........ 12

    A.    The Claim to Enjoin the OWP is Ripe Under *Abbott Labs* and
        Its Progeny ...................................................................... 14

        1.    The Issues Presented by the OWP Are Fit for Judicial
            Decision ................................................................ 14

        2.    Refusal to Rule on the Legality of the OWP Creates a
            Serious Hardship to the Authors ........................... 15

    B.    The Copyright Act Does Not Permit Defendants to Copy,
        Distribute and Display Full Copies of Copyright-Protected
        Books17

II. THE DISTRICT COURT ERRED IN DETERMINING THAT THE
    MASS DIGITIZATION PROGRAM MAKES FAIR USE OF
    AUTHORS' COPYRIGHT-PROTECTED BOOKS .................................. 18

A.    The District Court Erred in Failing to Consider the Express
      Limitations of Section 108 In its Evaluation of Fair Use ................. 18

      1.    Congress Specifically Addressed the Fair Use of Library
            Copying in Section 108 ........................................................... 19

            (a)    The Gentlemen's Agreement of 1935 .......................... 19

            (b)    Technological Change Prompts the Need for
                   Specific Limitations on Copying by Libraries and
                   Archives .................................................................... 20

            (c)    The Limits of Library Copying Under Section 108 ...... 21

            (d)    The Fair Use Savings Clause ...................................... 23

            (e)    Congress Balances the Incredible Promise and
                   Inherent Risk Brought  by the Digital Revolution ........ 24

      2.    The Mass Digitization Program Exceeds the Express
            Limitations of Section 108 ...................................................... 25

            (a)    The Libraries are Using Books for a Commercial
                   Purpose in Violation of Section 108(a) ........................ 25

            (b)    The Libraries are Not Exempt Under Sections
                   108(b) or (c) for Digitizing Virtually Every Book
                   in Their Collection Without Regard to Any Book's
                   Physical Condition or Commercial Availability ........... 26

            (c)    The Libraries' Creation, Storage and Wide
                   Dissemination of at Least Five Digital Copies
                   Exposes the Authors' Books to Security Risks ............. 27

            (d)    The MDP is Not Permitted By Sections 108(d) or
                   (e) Because the Digital Copies Are Made Without
                   a User Request ........................................................... 29

B.    The Mass Digitization Program Does Not Constitute Fair Use
      Under Section 107 of the Copyright Act ......................................... 29

      1.    The Libraries' Violations of Section 108 Should Weigh
            Heavily Against a Finding of Fair Use ................................... 29

2.    The Four Factors Enumerated in Section 107 Weigh Against Fair Use ..................................................................... 30

(a)    Purpose and Character of the Use ................................ 30

(i)    The Libraries' Preservation Purpose is Not Transformative................................................... 31

(ii)    Even if Copying Millions of Books to Facilitate Search is Transformative, There is No Justification for Storing Multiple Copies of the Image and Text Files Online ................... 32

(iii)    Making Digital Copies of Copyrighted Works Available for Print-Disabled Users is Not Transformative........................................... 33

(b)    Nature of the Copyrighted Works ............................... 35

(c)    Amount and Substantiality of the Use.......................... 35

(d)    The Effect of the Use Upon the Market for or Value of the Work ...................................................... 38

(i)    Each Unlicensed Digital Copy Represents a Lost Sale ............................................................ 38

(ii)    The Works are Exposed to Unlimited Piracy ..... 40

(iii)    The Authors Will Lose Licensing Revenues ...... 40

III. THE DISTRICT COURT ERRED IN FINDING THAT THE ASSOCIATIONAL PLAINTIFFS LACK STATUTORY STANDING............................................................................. 44

IV. HATHITRUST IS NOT AN "AUTHORIZED ENTITY" AND THE BOOKS ARE NOT IN A "SPECIALIZED FORMAT" UNDER SECTION 121 ......................................................................... 48

A.    The Legislative History of the Chafee Amendment Supports a Narrow Definition of "Authorized Entity" and "Specialized Formats" ......................................................................... 48

B.   HathiTrust's Provision of Access to the Print-Disabled Does Not Comply With the Chafee Amendment or Fair Use ................... 49

    1.   HathiTrust is Not an Authorized Entity ................................. 49

    2.   The Digitized Texts and Images are Not in Specialized Formats .................................................................................. 50

    3.   The HDL's Uses For the Blind Are Not Protected Fair Use ....................................................................................... 51

CONCLUSION ................................................. 52

CERTIFICATE OF COMPLIANCE ................................................ 54

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001)........................................................................26

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967)......................................................................................14

*American Geophysical Union v. Texaco Inc.*,
   60 F.3d 913 (2d Cir. 1994)......................................................................passim

*Authors Guild v. Google, Inc.*,
   770 F. Supp. 2d 666 (S.D.N.Y. 2011) .....................................................10, 15

*Authors Guild v. Google, Inc.*,
   282 F.R.D. 384 (S.D.N.Y. 2012)..................................................................44

*Banff, Ltd. v. Federated Dept. Stores, Inc.*,
   841 F.2d 486 (2d Cir. 1988).........................................................................16

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994)...............................................................................passim

*Cartoon Network, LP, LLLP v. CSC Holdings, Inc.*,
   536 F.3d 121 (2d Cir. 2008).........................................................................37

*Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*,
   150 F.3d 132 (2d Cir. 1998)............................................................29, 34, 35

*CBS Broad., Inc. v. EchoStar Comms. Corp.*,
   450 F.3d 505 (11th Cir. 2006)......................................................................46

*Chevron U.S.A. v. Traillour Oil Co.*
   987 F.2d 1138 (5th Cir. 1993)......................................................................15

*Desiderio v. National Ass'n of Securities Dealers, Inc.*,
   191 F.3d 198 (2d Cir. 1999).........................................................................16

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
   697 F.2d 27 (2d Cir. 1982)...........................................................................46

v

*Ehrenfeld v. Mahfouz*,
  489 F.3d 542 (2d Cir. 2007)..................................................................14

*Encyclopaedia Britannica Educational Corp. v. Crooks*,
  542 F. Supp. 1156 (W.D.N.Y. 1982)......................................................26

*Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*,
  528 U.S. 167 (2000)..............................................................................17

*Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock*,
  93 F.3d 68 (2d Cir. 1996)......................................................................14

*Golan v. Holder*,
  132 S. Ct. 873 (2012)............................................................................15

*Harper & Row Publishers, Inc. v. Nation Enter.*,
  471 U.S. 539 (1985)..............................................................................29

*Hunt v. Wash. State. Apple Adver. Comm'n*,
  432 U.S. 333 (1977)..................................................................44, 45, 46

*Infinity Broad. Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998)..............................................................32, 36

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003).............................................................33, 37

*Lawton v. Bd. of Med. Examiners*,
  143 Cal. App. 2d 256 (1956)..................................................................43

*Matthew Bender & Co., Inc. v. West Pub. Co.*,
  240 F.3d 116 (2d Cir. 2001)..................................................................15

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992)..............................................................................30

*Olan Mills, Inc. v. Linn Photo Co.*,
  795 F. Supp. 1423 (N.D. Iowa 1991), *rev'd on other grounds*, 23 F.3d
  1345 (8th Cir. 1994)..............................................................................46

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
  461 U.S. 190..........................................................................................15

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007).........................................................33

*Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*,
  288 F.3d 478 (2d Cir. 2002)...........................................................49

*Reed Elsevier, Inc v. Muchnick*,
  559 U.S. 154 (2010)......................................................................47

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)................................................................38, 51

*Southern Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of
  Illinois*,
  326 F.3d 919 (7th Cir. 2003).........................................................46

*Thomas v. Union Carbide Agr. Prods. Co.*,
  473 U.S. 568................................................................................16

*Town of Rye, N.Y. v. Skinner*,
  907 F.2d 23 (2d Cir. 1990)............................................................14

STATUTES

17 U.S.C. § 101 ............................................................................34

17 U.S.C. § 107 ......................................................................passim

17 U.S.C. § 108...................................................................... passim

17 U.S.C. § 121 ......................................................................passim

17 U.S.C. § 501(b)................................................................4, 12, 45

17 U.S.C. § 502(a).........................................................................17

28 U.S.C. § 1291.............................................................................3

28 U.S.C. § 1338(a) .........................................................................3

Americans With Disabilities Act, 42 U.S.C. § 12101............................49

## LEGISLATIVE HISTORY

142 CONG. REC. S. 9763, 9764, Sept. 3, 1996 ......................................................48

H.R. REP. NO. 94-1476 (1976) ..................................................................21, 23, 51

S. REP. NO. 91-519 (1969) ..................................................................................20

S. REP. NO. 105-190 (1998) ................................................................................25

## OTHER AUTHORITIES

Eric Pfanner, *Google Has Deal in France For Book-Scanning Project*, N.Y.
   TIMES, June 12, 2012 ................................................................................42, 43

Final CONTU Report (July 31, 1978) ..................................................................37

*Intellectual Property and the National Information Infrastructure*, Sept.
   1995 .........................................................................................................48, 49

Laura N. Gasaway, *America's Cultural Record*, 40 HOUS. L. REV. 643
   (2003) ............................................................................................................28

MARY RASENBERGER & CHRIS WESTON, OVERVIEW OF THE LIBRARIES AND
   ARCHIVES EXCEPTION IN THE COPYRIGHT ACT (2005) ..............................19, 20

Nicole Perlroth, *Some Victims of Online Hacking Edge Into the Light*, N.Y.
   TIMES, February 20, 2013 ..............................................................................40

Office of the Register of Copyrights, *Legal Issues in Mass Digitization*
   (2011) ............................................................................................................18

PETER B. HIRTLE ET AL., COPYRIGHT & CULTURAL INSTITUTIONS (2009)...............24

Peter B. Hirtle, *Digital ILL and the Open Library*, October 23, 2007...................22

Pierre Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105 (1990) .......31

RECOMMENDATION OF THE REGISTER OF COPYRIGHTS (October 27, 2003) ......19, 22

REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS,
   LIBRARY REPRODUCTION OF COPYRIGHTED WORKS (17 U.S.C. 108)
   (1983) .......................................................................................................24, 30

REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS ON THE
GENERAL REVISION OF THE U.S. COPYRIGHT LAW (1961)..................................20

*Statement of the AAP*, Feb. 8, 1996.................................................................39, 48

## PRELIMINARY STATEMENT

Plaintiffs-Appellants, authors and rights organizations from six countries (collectively, the "Authors"), brought this action for copyright infringement to enjoin the Defendants-Appellees, a group of state university libraries (the "Libraries") from continuing to engage in their extraordinary and unprecedented mass digitization program ("Mass Digitization Program" or "MDP"). The Libraries, in partnership with Google Inc. ("Google"), have digitized, reproduced and made various uses of millions of copyright-protected books without seeking or obtaining the permission of the books' authors or other rights-holders. The Authors would label the MDP an exercise in eminent domain, but that would give the program too much credit: states must compensate owners for taking their property; neither the Libraries nor Google have offered or paid authors a penny for taking their literary property.

The Libraries went where other libraries dared not go. The Library of Congress declined Google's invitation to participate in the MDP. Harvard University also turned Google down. Google's luck changed when it approached the University of Michigan ("UM"), which, unlike Harvard, enjoys the protection of sovereign immunity. Google found in UM a partner willing to allow the technology giant to digitally replicate millions of copyright-protected books in return for delivering a vast and free digital library to UM.

This mass digital taking also enabled UM to leverage its sovereign immunity to pursue another, even more aggressive seizure of property rights: UM's Orphan Works Project ("OWP"). When the Authors filed this lawsuit, UM was on the

verge of making complete, unauthorized digital versions of "orphan works" – copyrighted works whose authors or other owners UM purportedly could not readily locate – available for viewing and downloading by tens of thousands of UM students, faculty and other library users.  This bold attempt to circumvent Congress's role in balancing the rights of copyright owners and users failed miserably.  Shortly after the Authors filed suit, owners of many "orphan works" were quickly identified. UM then "suspended" the program, but only *after this suit was filed and owners of purported orphan works were located.*  At the same time, UM announced that it planned to re-launch the program once problems with the identification process were fixed.  This simple step, temporarily "suspending" but never abandoning their project that would deprive authors of their literary property rights, has effectively denied rights-holders their day in court.  The District Court held that the Orphan Works Project was not ripe for adjudication.

Thus, Google and the Libraries have succeeded in inverting copyright's protections.  Authors and their heirs from all over the world must now keep an eye on a state university website for news of the possible forfeiture of their rights.  If one of their works appears on an "orphan works" list, they bear the burden of "opting out" to prevent the seizure of their literary rights.  If they sue to stop the entire project, the state library may neatly sidestep the legal issue by "suspending" the project.  This plainly is not just, and copyright-owners and users alike are being deprived of the benefits of legal clarity on the propriety of state-run orphan works projects.

Even if the Libraries agreed to permanently shelve the irredeemably flawed Orphan Works Project, the continued digitization, reproduction, online storage and

2

use of millions of copyright-protected books constitute additional violations of the Authors' exclusive right to control their works.  In dismissing the Authors' claims arising from the MDP under the flag of "fair use," the District Court disregarded that Congress, in Section 108 of the Copyright Act, set forth specific, detailed rules governing the circumstances under which libraries may reproduce entire books. The District Court also ignored the Libraries' failure to comply with the specific provisions and restrictions in Section 121 of the Copyright Act, which Congress enacted to facilitate access to print-disabled readers without jeopardizing the rights of authors.  Moreover, the District Court failed to take into account that the Libraries could have accomplished the goals the District Court found to be transformative without keeping multiple copies of the entire digital library online, where the works are susceptible to ongoing security risks that are inherent to the digital format, including theft and widespread distribution.

The Libraries' actions subvert the fundamental premises of copyright law and, unless enjoined, threaten to decimate existing and developing markets for literary works.  Congress has long debated, weighed and balanced the competing interests of copyright creators, libraries and users.  It is up to Congress, not the Libraries, to determine if this balance needs to be changed.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1338(a) (original jurisdiction) because it arises under the copyright laws of the United States.  Dkt_4(¶9).  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because the Order issued on October 10, 2012 and

the Judgment entered on October 12, 2012 granted summary judgment dismissing all of the claims in the case.

The Notice of Appeal was timely filed on November 8, 2012. Dkt_167.

## STATEMENT OF ISSUES PRESENTED AND STANDARD OF REVIEW

1.    Did the District Court err when it held that the Authors' claim with respect to the Libraries' OWP is not ripe for judicial review because the Libraries "suspended" the OWP shortly after this lawsuit was commenced?

Standard of Review:  *De Novo*

2.    Did the District Court err when it held that the Libraries' unauthorized digitization, copying, storage and use of millions of copyright-protected literary works as part of the MDP funded and operated by Google is fair use under the Copyright Act, notwithstanding that the MDP far exceeds the special exemptions granted to libraries in Section 108 of the Copyright Act?

Standard of Review:  *De Novo*

3.    Did the District Court err by failing to recognize that the Libraries' online storage of multiple copies of the unauthorized digital library goes far beyond what is necessary to accomplish any transformative purpose of the MDP?

Standard of Review:  *De Novo*

4.    Did the District Court err when it held that Section 501(b) of the Copyright Act precludes an association of authors from bringing a copyright claim on behalf of its members to enjoin the Libraries from digitizing and making various use of their members' works without authorization?

Standard of Review:  *De Novo*

4

5.    Did the District Court err when it held that the Libraries' mass digitization activities are permitted under Section 121 of the Copyright Act despite the fact that the Libraries are not "authorized entities" and the works were not provided in "specialized formats" as required by that statute?

Standard of Review:  *De Novo*

## STATEMENT OF THE CASE

Plaintiff-Appellant The Authors Guild, Inc. ("The Authors Guild") is a not-for-profit corporation that, along with its predecessor organization, has been a leading advocate for authors' copyright and contractual interests for the past 100 years.  The Authors Guild and seven other authors' rights organizations from around the world, along with twelve individual authors, commenced this action for copyright infringement in the United States District Court for the Southern District of New York (Baer, J.) in the Fall of 2011.  The defendants are UM, the University of California, the University of Wisconsin, Indiana University, Cornell University, and HathiTrust,[1] a UM service in which the defendant Libraries and other institutions participate.

The Authors brought this lawsuit to enjoin UM's Orphan Works Project and the Libraries' unauthorized digitization and use of more than seven million copyright-protected literary works as part of a mass digitization program undertaken in partnership with Google.  The Authors sought declaratory and prospective injunctive relief, but did not seek monetary damages against the

---

[1] In the case of each defendant other than Cornell and HathiTrust, the named defendant is the President of the university.

5

Libraries, most of which likely are immune from damages due to their sovereign status.

The Libraries answered the amended complaint in December 2011[2] and, shortly thereafter, filed a motion for partial judgment on the pleadings on the ground that the Plaintiff  associations (the "Associational Plaintiffs") lacked standing to assert copyright claims based upon the rights of their members and that the Authors' claims with respect to the OWP were not ripe because the Libraries suspended the project shortly after the lawsuit was filed (and after it became clear that the Libraries' list of orphan candidates included works whose owners easily could be found, including several Authors).  The Libraries also argued that the Authors lacked standing to challenge the OWP because none of the works owned by the Authors had actually been made available to the Libraries' users.

The Authors then moved for partial judgment on the pleadings on the ground that the Libraries' admissions in their answer established that none of the Libraries' affirmative defenses, including the defense of fair use, could stand as a matter of law.  Following briefing and oral argument, the District Court reserved decision on the various motions and the parties each proceeded to file motions for summary judgment.  Oral argument was held on August 6, 2012.

In an Opinion and Order dated October 10, 2012 ("Op."), the District Court granted the motions by the Libraries and Intervenors for summary judgment.

---

[2] In December 2011, the National Federation of the Blind and three individuals (the "Intervenors") filed a motion to intervene on behalf of defendants in the case, which was granted without opposition.  No claims were asserted against the Intervenors.

Dkt_156.  In its decision, the District Court determined that the MDP is protected by fair use and that making works available for the visually-disabled is permitted by Section 121 of the Copyright Act.  The District Court also held that the Associational Plaintiffs located in the United States, Canada and Australia did not have statutory standing to assert claims on behalf of their members and that the Authors' claims with respect to the OWP were not ripe for adjudication.

<h2 style="text-align:center">STATEMENT OF FACTS</h2>

**The Mass Digitization Program**

The genesis of the Mass Digitization Program is the "Google Library Project," pursuant to which Google sought to "create an online database of all of the world's books, beginning with agreements with major libraries in the United States."  Dkt_114-96.  Unlike similar efforts to create digital archives by entities such as Microsoft [Dkt_114-4(24:9-17)], Google did not limit its digital library to public domain books, but instead decided to digitize *all* books, including those protected by copyright.  Dkt_125-5(54:8-21).  To this end, Google approached the Library of Congress ("LOC") and asked permission to scan all of its books. Dkt_116(#1).  The LOC declined, citing "copyright issues relevant to mass scanning" and offered to let Google scan public domain works only.  *Id.*

Apparently frustrated by the refusal of the LOC, and then Harvard [Dkt_125-5(119:12-14)], to permit Google to scan in-copyright works, Google met with defendant UM and other Libraries and offered to digitize as much of their library collections as possible.  Dkt_125-5(54:8-21).  Google then began to work

with various libraries, including UM, to "digitally scan from their collections so that users worldwide could search for them in Google." Dkt_114-96.

Each of the Libraries entered into "Cooperative Agreements" with Google [Dkt_125-9-13] that allowed Google to convert millions of books in the Libraries' print collections into digital format. *E.g.*, Dkt_125-7(¶2.4). Each digital replica would include a set of image files representing every page of the work and a text file of the book's words generated through an optical character recognition process. *Id.*(¶2.5). Google assumed virtually all of the Libraries' expenses for the project, including providing trucks to transport the books, setting up scanning centers, and "reimbursing" the Libraries millions of dollars for their staff's labor in pulling books off the shelves. *Id.*(¶3.2); Dkt_125-3(p.64); Dkt_125-4(pp.138-140); Dkt_125-5(p.56); Dkt_114-92.

The Cooperative Agreements permit Google to keep a digital copy of every work scanned [Dkt_125-7(¶¶4.5-4.6)], positioning Google as the only search engine that permits users to search the content from millions of "offline" materials protected by copyright. Dkt_125-6(117:4-20). Thus, the Libraries provide an enormous commercial and competitive benefit to Google, which uses the digital works to increase traffic to its search engine, improve the experience of Google users, and generate additional revenue through advertising on search result pages. Dkt_125-2(52:3-25); Dkt_125-5(pp.131-132); Dkt_125-1(98:3-99:12); Dkt_125-6(117:4-20); Dkt_125(¶88). In exchange, the Libraries receive their own digital copies of the works to store and use. Dkt_23(¶52). Given the high costs of digitization, the value to the Libraries resulting from their partnership with Google

8

can be measured in the hundreds of millions of dollars.  Dkt_125-10(57:20-58:5);

Dkt_23(¶53); Dkt_125-5(99:4-8,102:11).

The Libraries did not discriminate when determining which books to

digitize.  Dkt_116(#29-43).  For the most part, Google had unfettered discretion to

select whichever works it wanted.  *Id.*  A majority of books were selected via "bulk

pulls," a process by which all of the books in a particular library building were

pulled shelf-by-shelf in bar code order, placed onto carts and loaded onto Google's

trucks.  Dkt_114-73(#2); Dkt_114-75(#2); Dkt_125-1(65:8-24, 77:19-78:25).  No

attempt was made to limit Google's scanning to books that were no longer

protected by copyright, or were unpublished, out-of-print, damaged or

deteriorating.  Dkt_23(¶50); Dkt_125-6(pp.47-50); Dkt_125-1(68:18-70:15, 76:3-

77:12); Dkt_125-4(135:2-16, 152:16-153:9).  None of the "fair use" factors set

forth in 17 U.S.C. § 107 were considered – for example, no one considered the

nature of the book, whether the book was available for purchase, the importance of

the book to any educational or scholarly purpose, or the harm that scanning might

cause to the author or rights-holder.  Dkt_125-1(145:20-149:14); Dkt_125-

4(227:13-229:14).  And no one asked any copyright owner for permission to copy

his or her book.  Dkt_116(#173).

**HathiTrust**

On October 13, 2008, UM and other schools announced the launch of the

HathiTrust Digital Library (the "HDL"), a shared digital repository for the millions

of books digitized as part of the Google Library Project and other mass digitization

programs.  Dkt_23(¶62).  In addition to the copies retained by Google, four digital

copies of each book are maintained in the HDL, with two such copies stored on servers located in Michigan and Indiana and two additional copies stored on backup tapes. *Id.*(¶¶64-66).

**The Orphan Works Project**

The issue of whether special rules should be applied to increase the availability and utility of orphan works has been the subject of discussion and debate for many years, as well as the subject of various legislative solutions proposed in, but not yet enacted by, Congress. *See Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 677 (S.D.N.Y. 2011) (the "Google Books" case). Indeed, a mechanism to help resolve the orphan works issue was one of the key aspects of the attempted settlement of the Google Books case. *Id.* But the Amended Settlement Agreement ("ASA") was rejected by Judge Chin, who stated that "the establishment of a mechanism for exploiting unclaimed books is a matter better suited for Congress than this Court." *Id.* The court observed that requiring authors to "opt out" is "incongruous with the purpose of the copyright laws to place the onus on copyright owners to come forward to protect their rights when Google copied their works without first seeking their permission." *Id.* at 682.

Unhappy with Judge Chin's decision, UM decided to take the law into its own hands by unilaterally initiating its own program. Dkt_125-2(141:22-144:20). Under the Orphan Works Project, if UM is unable to locate the copyright holder of a book, the book is included on a list of "orphan candidates" published on UM's website. Dkt_23(¶74). If no copyright owner emerges and claims rights in the

10

book within 90 days, the book is made available for display and download to tens of thousands of UM students, faculty and library users.  *Id.*; Dkt_125-2(146:7-20).

After UM published its first list of orphan candidates, various copyright holders whose works had been listed as orphan candidates and were about to be made available for free by UM came forward.  Dkt_125-2(159:12-19, 173:8-23); Dkt_125-5(241:24-242:14); Dkt_82(¶23).  The OWP was suspended after the Authors filed this action and shortly before the first supposed orphan works were to have been made available to UM users.  UM admitted that it had made "a number of errors, some of them serious," resulting in several books whose authors could have been easily located being wrongfully included in this list of orphan candidates.  Dkt_114-94.

## SUMMARY OF ARGUMENT

As shown in **Point I** below, the Authors' claim regarding to the Orphan Works Project is ripe for judicial review.  UM has made clear that it intends to proceed with releasing copyright-protected books to the public.  UM's alleged re-evaluation of its process for identifying orphan candidates does not affect the ripeness of the OWP claim, as there is no way to make the unauthorized publication of the full text of copyright-protected books permissible.

**Point IIA** demonstrates that in its fair use analysis, the District Court failed to consider the express limitations of Section 108 of the Copyright Act, in which Congress carefully balanced the rights of authors and libraries by brokering a compromise provision that details the circumstances under which libraries may digitize copyrighted-protected books.  The District Court ignored that the Mass

11

Digitization Project runs roughshod over almost every limitation imposed by that provision, a fact that must weigh heavily against a finding of fair use. While Section 108 includes a fair use "savings clause," that general provision cannot be read to swallow the specific rules of Section 108. In **Point IIB**, the Authors show that even if the Copyright Act is interpreted to disregard or discount Section 108, the MDP does not meet the standard of fair use set forth in Section 107. Moreover, even if certain of the Libraries' uses are deemed transformative, their online storage of multiple digital duplicates of the books goes far beyond what is necessary to fulfill that purpose.

**Point III** demonstrates that the District Court erred in holding that Section 501(b) of the Copyright Act precludes the Associational Plaintiffs from bringing this lawsuit for prospective, injunctive relief on behalf of their members who are the legal or beneficial owners of copyrights the Libraries are infringing.

Finally, **Point IV** discusses the problems with the District Court's analysis of the defenses asserted by the Intervenors, who represent the interests of the visually-impaired. The Authors do not object to the use of the HDL by the blind, but the digital books are not being used in accordance with the carefully-negotiated safeguards of Section 121 of the Copyright Act.

<u>**ARGUMENT**</u>

**I**

<u>**THE CLAIM TO ENJOIN THE ORPHAN WORKS PROJECT IS RIPE**</u>

At the time this litigation was commenced, UM was on the verge of making the full text of supposedly orphaned copyrighted works available for viewing and

download by tens of thousands of UM users.  While UM abruptly "suspended" the Orphan Works Project in the face of irrefutable evidence that it included works owned by easily-identifiable individuals, including Plaintiffs, UM has made clear that it will reinstate the OWP, including releasing works to the public, after making adjustments to the identification process.  Dkt_125-5(241:24-242:14); Dkt_125-2(158:20-25, 161:6-10); Dkt_23(¶78).  The District Court declined to hear the Authors' challenge to the legality of the OWP, finding that the claim was not ripe because the court could not know "what the program will look like should it come to pass and whom it will impact."  Op. at 11.  The District Court suggested that when the Libraries released details of a new OWP, the Authors could request relief.  *Id.*

The District Court misses the fundamental point of the Authors' claim, which will not change based upon the particular procedures that UM ultimately employs to identify orphan works.  Dkt_125-5(241:24-242:14) (UM characterizing "errors" in OWP process as "errors in execution of management," meaning that steps that had been designed were not followed, so "closer management" is required).  Any iteration of the OWP under which copyrighted works are made available for public view and download violates the Copyright Act.  The pure legal question that was presented to the District Court is the same as it will always be:  Is it ever lawful to take an entire copyright-protected book and make it widely available for display and download without permission?

## A.    The Claim to Enjoin the OWP is Ripe Under *Abbott Labs* and Its Progeny

Two elements determine whether a claim is ripe for judicial review: "(1) 'the fitness of the issues for judicial decision' and (2) 'the hardship to the parties of withholding court consideration.'"  *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 546 (2d Cir. 2007) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).  Under this standard, the claim to enjoin the OWP was ripe for adjudication.

### 1.    The Issues Presented by the OWP Are Fit for Judicial Decision

Under the first prong of the analysis, questions that are "purely legal" weigh in favor of judicial review.  *See Abbott Labs.*, 387 U.S. at 149.  The legality of the OWP does not depend upon the specific means the Libraries ultimately employ to identify orphan candidates or the time the Libraries wait before making works available.  Rather, any iteration of the OWP that results in the publication of complete copyrighted works is an infringement of copyright.  Because these issues "may be decided without further factual development," they are fit for judicial review.  *Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock*, 93 F.3d 68, 72 (2d Cir. 1996); *see also Town of Rye, N.Y. v. Skinner*, 907 F.2d 23, 24 (2d Cir. 1990) (notwithstanding uncertainty of funding for airport project, challenge to project was fit for review because "there is nothing else for the FAA to do in evaluating the [project's] environmental impact").

Delayed resolution of this issue would impede one of the primary goals of copyright law, which is to clarify the boundaries of the Copyright Act and allow the parties to proceed accordingly, without the continuing threat of both

14

infringement and litigation.  *See Matthew Bender & Co., Inc. v. West Pub. Co.*, 240 F.3d 116, 122 (2d Cir. 2001) ("[C]opyright law benefits from the resulting clarification of the doctrine's boundaries.") (quoting *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 140 F.3d 70, 75 (1st Cir. 1998)).  *See also Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 202 (challenge to statute is ripe where "delayed resolution would frustrate one of the key purposes of the [] Act") (internal quotation omitted); *Chevron U.S.A. v. Traillour Oil Co.* 987 F.2d 1138, 1154 (5th Cir. 1993) (finding ripeness where, *inter alia*, "judicial resolution . . . is consistent with the purpose of Declaratory Judgment Act itself," which is "to settle actual controversies before they ripen into violations of law or breach of some contractual duty") (internal quotations omitted).  Despite clear indications by courts and the Copyright Office that the treatment of orphan works should be left to Congress,[3] the Libraries insist that the OWP is legal.  Thus, the impact of the OWP is sufficiently direct and immediate, and of a legal nature that is fit for review.

### 2.    Refusal to Rule on the Legality of the OWP Creates a Serious Hardship to the Authors

The District Court declined to hear the Authors' challenge to the OWP, holding that they would suffer no hardship from litigating this claim "after

---

[3] In the Google Books case, Judge Chin held that "[t]he establishment of a mechanism exploiting unclaimed works is a matter more suited for Congress."  770 F. Supp. 2d at 677; *see also Golan v. Holder*, 132 S. Ct. 873, 893-94 (2012) (despite "the difficulties would-be users of copyrightable materials may face in identifying or locating copyright owners," orphan works issues are appropriately addressed by "overarching legislation").

15

Defendants release the details of their new OWP and a revised list of Orphan Work Candidates." Op. at 11. This conclusion ignores the fact that UM refused to suspend the program until after the Authors had commenced litigation, and owners of supposed orphan works had been identified. Dkt_114-94. Given the expense of litigation and the sovereign immunity of the Libraries, there is nothing to stop the Libraries from reinstituting the OWP and then, if owners of the listed works come forward, suspending it again.

This Court has held that "[a]s a general rule, in a case involving an allegation that defendant has engaged in illegal activity, a court's power to hear and decide the matter is not terminated when defendant voluntarily ceases its illegal conduct. That is, such cessation does not necessarily make a case moot." *Desiderio v. National Ass'n of Securities Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999). Indeed, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 581 (1985) (quoting *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143 (1974) (internal quotations omitted)); *see also Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 493 (2d Cir. 1988) (based on defendant's "intention and ability" to use the potentially infringing marks at issue "there is an actual controversy ripe for adjudication"). Rather, "if the injury is certainly impending, that is enough." *Thomas*, 473 U.S. at 581 (quotations omitted).

Authors and other copyright owners should not be required to play an expensive game of "Whac-A-Mole" in order to protect their copyrights. It is simply not fair to require copyright owners to wait to see what the Libraries will do, then bring new claims against defendants immune from monetary damages,

16

and then face the possibility that the Libraries will again seek to end any litigation by suspending the OWP while they seek to work out additional bugs in their program.[4]

## B. The Copyright Act Does Not Permit Defendants to Copy, Distribute and Display Full Copies of Copyright-Protected Books

Given its determination that the OWP was not ripe for adjudication, the District Court did not reach the issue of whether any publication of orphan works without permission would violate copyright law. Plainly, existing copyright law does not permit the copying and distribution of the entirety of copyright-protected works to tens of thousands of users, irrespective of whether it might be difficult to locate the rights-holder.[5] The Libraries are not entitled unilaterally to impose their own solution to this complex issue.

---

[4] The court also did not consider the Libraries' contention that Plaintiffs lacked standing to challenge the OWP or that their claims were moot because no orphan work was ever published. However, an allegation of an "imminent" injury is sufficient for standing under Article III. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 180 (2000). Indeed, Section 502 of the Copyright Act explicitly gives courts the power to issue injunctions to *prevent* infringement of a copyright. 17 U.S.C. § 502(a). UM has indicated that it could reinstate the OWP at any time. *See Friends of the Earth, Inc.*, 528 U.S. at 189 ("A case might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness.") (quotations omitted).

[5] The Authors do not seek to enjoin the OWP to the extent it complies with Section 108(h) of the Copyright Act, pursuant to which libraries are permitted to reproduce and distribute certain out-of-print works that are in the last twenty years of their copyright term provided that various statutory conditions are met.

## II

### THE DISTRICT COURT ERRED IN DETERMINING THAT THE MASS DIGITIZATION PROGRAM MAKES FAIR USE OF AUTHORS' COPYRIGHT-PROTECTED BOOKS

Two fundamental analytical errors fueled the District Court's conclusion that the Mass Digitization Program is protected fair use. *First*, the court wrongly interpreted Section 108's "fair use savings clause" in a manner that effectively reads Section 108 out of the Copyright Act by failing to weigh as an important part of its fair use analysis the fact that the Libraries violated nearly every privilege accorded to them under Section 108. *Second*, in analyzing whether the Mass Digitization Program is fair use under Section 107, the District Court failed to consider whether the Libraries could have made the uses the court found to be transformative – facilitating search and access for the print-disabled – without keeping multiple copies of the Authors' works online and subjecting them to unauthorized access and widespread distribution.

### A.  The District Court Erred in Failing to Consider the Express Limitations of Section 108 In its Evaluation of Fair Use

In *American Geophysical Union v. Texaco Inc.*, this Court recognized that "Congress has thus far provided scant guidance for resolving fair use issues involving photocopying, *legislating specifically only as to library copying*[.]"  60 F.3d 913, 917 (2d Cir. 1994) (emphasis added).  Thus, as the Copyright Office recently recognized, "[a]ny review of mass book digitization would need to consider, if not compare, the activities that currently are, or should be, permissible for libraries under Section 108."  Office of the Register of Copyrights, *Legal Issues in Mass Digitization* (2011), http://www.copyright.gov/docs/massdigitization/

18

USCOMassDigitization_October2011.pdf; *see also* RECOMMENDATION OF THE REGISTER OF COPYRIGHTS (October 27, 2003) 51, *at* http://www.copyright.gov/ 1201/docs/registers-recommendation.pdf ("2003 Copyright Office Recommendation") ("Because §108 was enacted specifically to address reproduction by libraries and archives, and was amended by the Digital Millennium Copyright Act to address certain digital issues, analysis of noninfringing archival and preservation activities logically begins with that section.").[6]

## 1.    Congress Specifically Addressed the Fair Use of Library Copying in Section 108

Congress added Section 108 to U.S. copyright law after decades of contentious debate and negotiation among stakeholders in the literary marketplace, including academics, authors, librarians, and publishers.[7]  Given the absence of *any* prior case law applying Section 108, in order to properly adjudicate the novel and important issues raised by the MDP, it is critical to understand the competing interests – of libraries and rights-holders – that Congress carefully balanced when it enacted and then amended Section 108.

### (a)    The Gentlemen's Agreement of 1935

---

[6] The Copyright Office's interpretations of Section 108, discussed throughout this brief, should be given deference.  *See WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 284 (2d Cir. 2012).

[7] For an excellent description of the legislative history and background of Section 108, *see* MARY RASENBERGER & CHRIS WESTON, OVERVIEW OF THE LIBRARIES AND ARCHIVES EXCEPTION IN THE COPYRIGHT ACT (2005), *at* http://section108.gov/docs/108BACKGROUNDPAPER%28final%29.pdf ("SECTION 108 OVERVIEW").

The story begins with the "Gentlemen's Agreement," a non-binding, voluntary agreement entered into by a publishing association and a libraries' committee in 1935.  *See* SECTION 108 OVERVIEW at 3.  The agreement, prompted by the advent of early photo-duplication technology, permitted libraries to "deliver a single photographic reproduction or reduction of a part thereof" upon the written request of a library patron.  *Id.* at 4.  For over thirty years, the Gentlemen's Agreement helped define the extent to which a library could permissibly reproduce a copyright-protected work in its collection, and it provides the basis for today's Sections 108(d) and (e) governing library copying in response to user requests.  *Id.* at 3-6.

(b)    <strong>Technological Change Prompts the Need for Specific Limitations on Copying by Libraries and Archives</strong>

A far more transformative technological change, the proliferation of high-speed photocopiers, provided the impetus for the introduction and eventual passage of Section 108.  Although both librarians and rights-holders initially opposed a statutory scheme governing library photocopying, each side content with its own view of "fair use," the Copyright Office pushed for new legislation with the general concept that "photocopying should not be permitted where it would compete with the publisher's market."  REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW 26 (1961) ("1961 Copyright Report").  Libraries supported a blanket right to photocopy works for noncommercial purposes, S. REP. NO. 91-519, at 8-9 (1969), but Congress rejected that approach, instead opting for a regime, embodied in Section 108 of the Copyright Act, that carefully delineates the rules under which

20

libraries may duplicate and distribute copyrighted works without permission, and within Congress's calculation of what constitutes fair uses when it comes to library copying.

### (c)    The Limits of Library Copying Under Section 108

"[S]ection 108 of the Copyright Act narrowly circumscribes the conditions under which libraries are permitted to make copies of copyrighted works." *Texaco*, 60 F.3d at 931.

In **Section 108(a)**, Congress laid out three threshold requirements to qualify for the Section 108 exemptions: (1) you must be a "library or archives," (2) any copying and distribution must be "made without any purpose of direct or indirect commercial advantage," and (3) any copies must bear proper notice.  The statute does not define what constitutes "direct or indirect commercial advantage," but Congress indicated that it intended to prohibit libraries from making copies in response to a patron request with the knowledge that the copies were to be used for that *patron*'s commercial advantage.  *See* H.R. REP. NO. 94-1476, at 74 (1976) (copies made for "indirect commercial advantage" include "photocopying done *by or for* libraries or archival collections within industrial, profit-making, or proprietary institutions") (emphasis added).  Congress further explained that "[i]t would not be possible for a non-profit institution, by means of contractual arrangements with a commercial copying enterprise, to authorize the enterprise to carry out copying and distribution functions that would be exempt if conducted by the non-profit institution itself."  *Id.*

21

In **Section 108(b)**, Congress carefully delineated when a library may permissibly copy books in its collection for preservation purposes. Notably, Congress declined to grant libraries a general preservation right, instead allowing preservation copying only where a work is *unpublished*, and only after the library has determined that a copy of that work is not available for purchase at a fair price. *See* 17 U.S.C. §108(b). *See* 2003 Copyright Office Recommendation at 52 ("Section 108(c) does not authorize generalized preservation activities; it is limited by its terms.").

Under **Section 108(c)**, Congress permitted libraries to make one copy (later increased to three) of a book in their collection, but only to replace a book that is (or was) damaged, deteriorating, lost or stolen, and only *after* the library had made a determination that it could not obtain a new copy of the book at a fair price. Congress included this requirement in order to protect and promote the book publishing market. *See* Peter B. Hirtle, *Digital ILL and the Open Library*, October 23, 2007, *at* http://blog.librarylaw.com/librarylaw/2007/10/digital-ill-and.html ("The rationale for this requirement was that activity in the [out-of-print] market for a particular title might encourage a publisher to reprint that work.").

Finally, in **Sections 108(d) and (e)**, libraries may respond to requests from users by providing copies of either all or part of specific copyrighted works that are held in their collections. The exemption applies only where "the user makes his or her request" for a particular work found in the library's collection. 17 U.S.C §§ 108(d) & (e). Moreover, where a copy of an "entire work" is requested by a user, a library is permitted to make a reproduction only after the library "has first determined, on the basis of a reasonable investigation, that a copy [] of the

22

copyrighted work cannot be obtained at a fair price[.]" *Id.* User-requested copies also must become "the property of the user," meaning libraries may not rely on Section 108(d) or (e) to add copies to their collections.[8]

**(d)    The Fair Use Savings Clause**

Congress also included in Section 108 a "fair use savings clause," providing that "[n]othing in this section . . . in any way affects the right of fair use as provided by section 107[.]" 17 U.S.C. § 108(f)(4). Congress's primary intent in including this provision was to address the isolated creation of copies made by or at the request of individual library patrons under circumstances that are not specifically addressed in Section 108. *See* H.R. REP. NO. 94-1476, at 78 (1976) ("Nothing in section 108 impairs the applicability of fair use to a wide variety of situations involving photocopying or other reproduction by a library of copyrighted material in its collection, *where the user requests the reproduction for legitimate scholarly or research purposes.*") (emphasis added). The House Judiciary Report's example of fair use "beyond" Section 108 is illustrative: "In the case of music, for example, it would be fair use for a scholar doing musicological research to have a library supply a copy of a portion of a score or to reproduce portions of a phonorecord of a work." *Id.* In a comprehensive report issued in 1983 at the direction of Congress, the Copyright Office adopted the same limited view of Section 108(f)(4):

---

[8] A global "backstop" in Section 108(g) allows only "isolated and unrelated" copies to be made "on separate occasions," and expressly forbids libraries from "engaging in the related or concerted reproduction or distribution of multiple copies [] of the same material" or "the systematic reproduction or distribution of single or multiple copies[.]" 17 U.S.C. §§ 108(g)(1) & 108(g)(2).

The Copyright Office does not believe that Congress intended that there should <u>never</u> be fair use photocopying "beyond" § 108. *On certain infrequent occasions, such copying may be permitted. But fair use privileges are not available on a broad and recurring basis once the copying permitted by § 108 has occurred.* Section 108 was enacted to make lawful some types of copying which would otherwise be infringements of copyright, fair use notwithstanding. This means that much of "108" photocopying would be infringing but for the existence of that section, thus *leaving section 107 often clearly unavailable as a basis for photocopying not authorized by section 108.*

REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS, LIBRARY REPRODUCTION OF COPYRIGHTED WORKS (17 U.S.C. 108) 96 (1983) (the "1983 REPORT") (underline in original; italics added for emphasis).

### (e)    Congress Balances the Incredible Promise and Inherent Risk Brought  by the Digital Revolution

The digital age prompted the 1998 passage of the Digital Millennium Copyright Act ("DMCA"), which included amendments to Section 108 that are highly relevant to this dispute. *First*, Congress removed the prohibition against libraries making copies of books in "machine-readable" format, for the first time allowing copies of certain works to be made in digital format; *providing*, *however*, that such digital copies may not be "made available to the public in that format outside the premises of the library[.]"  17 U.S.C. § 108(c)(2). *Second*, Congress increased the number of exempt copies from one to three, so that "[i]f the library has one copy on a server and one copy on a backup tape, then only one patron at a time would be able to generate a third copy by copying the server copy to a local machine."  PETER B. HIRTLE ET AL., COPYRIGHT & CULTURAL INSTITUTIONS 115 (2009), at http://ssrn.com/abstract=1495365.

Congress placed these restrictions on digital copying "in recognition of the risk that uncontrolled public access to the copies [] in digital formats could substantially harm the interests of the copyright owner by facilitating immediate, flawless and widespread reproduction and distribution of additional copies [] of the work." S. REP. NO. 105-190, at 61-62 (1998). Unlike Section 107, which was not amended to account for the unique risks posed by digital technology, in amending Section 108 Congress sought to "strike[] the appropriate balance, permitting the use of digital technology by libraries and archives while guarding against the potential harm to the copyright owner's market from patrons obtaining unlimited access to digital copies from any location." *Id.*

### 2.    The Mass Digitization Program Exceeds the Express Limitations of Section 108

The Libraries are vastly exceeding the special exemptions granted to them under Section 108.

### (a)    The Libraries are Using Books for a Commercial Purpose in Violation of Section 108(a)

While the Authors do not dispute the District Court's suggestion that the MDP has scholarship and research purposes, at least two elements of the program reveal its commercial character. *See Texaco*, 60 F.3d at 922 (systematic photocopying and archiving of journal articles to facilitate "research in the sciences . . . might well serve a broader public purpose" but does not constitute fair use). *First*, the participation by the Libraries in the Google Library Project provided enormous commercial and competitive benefits to Google, which uses the digital works to increase traffic to the Google website, improve the experience of Google

users, and generate additional revenue through advertising sold on Google's search result pages.  *See supra* pp. 7-8.

*Second*, in exchange for allowing Google to keep copies of the digitized books for its own commercial purposes, the Libraries received their own "free" digital copies, avoiding the need to buy digital copies of the books from the Authors and millions of other copyright holders.  *See supra* p. 8.  *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001) ("Commercial use is demonstrated by a showing that repeated and exploitative unauthorized copies of copyrighted works were made to save the expense of purchasing authorized copies."); *Encyclopaedia Britannica Educational Corp. v. Crooks*, 542 F. Supp. 1156, 1169 (W.D.N.Y. 1982) ("It is totally unreasonable to expect educational institutions to pay for licensing agreements or videotape copies marketed by the plaintiffs when these same works can be obtained and copied with the proper equipment for nothing.").

The District Court essentially ignored the relationship between the Libraries and Google, stating without explanation that Google's commercial use of the material is relevant only to the parallel Google Books case pending before Judge Chin.  Op. at 19 n.27.  However, *this lawsuit* challenges the propriety of the Libraries delivering millions of copyright-protected books to Google, and therefore these commercial purposes must be considered in weighing the commercial purpose of the Mass Digitization Program.

> **(b)     The Libraries are Not Exempt Under Sections 108(b) or (c) for Digitizing Virtually Every Book in Their Collection Without Regard to Any Book's Physical Condition or Commercial Availability**

Given that all of the Authors' works are published books and neither the Libraries nor Google could identify any digitized works that are unpublished [Dkt_125-6(45:3-46:8)], the Libraries' unauthorized reproduction and storage does not fall within the narrow exception allowing copying for preservation purposes. 17 U.S.C. § 108(b). There also is no question that the Libraries have exceeded the express limitations for replacement copying set forth in Section 108(c). The Libraries did not limit the MDP to books that were lost, stolen, damaged or deteriorating, nor did they check whether a new copy of a book could be obtained at a fair price before digitizing it. Dkt_116(#29-43). Accordingly, the MDP does not comply with Section 108's requirement that works be copied only for "replacement" purposes, and not until "the library or archives has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price." 17 U.S.C. § 108(c)(1).

> **(c)    The Libraries' Creation, Storage and Wide Dissemination of at Least Five Digital Copies Exposes the Authors' Books to Security Risks**

The digitization process results in the creation of *at least five digital copies of each work*,[9] including (1) a copy kept by Google for its own commercial purposes, (2) a copy hosted on HDL's primary server in Michigan, (3) a copy hosted on HDL's secondary server in Indiana, (4) a tape backup copy stored on

---

[9] As the Libraries admit that each digital copy includes "a set of image and OCR files," it is more accurate to state that the Libraries have created at least *ten copies* of each work, comprising five sets of image files (i.e., photographic reproductions of the printed pages) and five sets of text files containing the text of the book. Dkt_23(¶52).

27

UM's campus, and (5) a second tape backup copy stored on UM's campus. Dkt_125-6(64:17-65:9); Dkt_114-75(#3).  Accordingly, the Libraries have made more than the three copies they are entitled to make under Section 108(c).

The Libraries also are storing and disseminating copies of the digitized books far beyond the physical library walls, in violation of Section 108's prohibition against making digital copies "available to the public in that format outside the premises of the library or archives in lawful possession of such copy." 17 U.S.C. § 108(c)(2).  Each copy is connected to a "campus network," and the primary and mirror HathiTrust sites include World Wide Web servers, compounding the risks of exposure.  Dkt_114-75(#3).  *See* Laura N. Gasaway, *America's Cultural Record*, 40 Hous. L. Rev. 643, 656 (2003) (Congress intended that any digital copies "could be used only within the library premises and not on a campus network or the World Wide Web").  Furthermore, HathiTrust grants remote access to the complete image and text files to nearly one hundred HathiTrust administrators and researchers located throughout the country. Dkt_114-75(#3); Dkt_125-5(pp.190-194).  As opined by Professor Benjamin Edelman, who submitted a report on the digital security risks inherent in the MDP, these and other facts raise a significant risk of breach and unauthorized access. Dkt_124.[10]

_____

[10] The District Court brushed aside Professor Edelman's detailed expert report, citing to Professor Edelman's statement that he does not "know about *all* of the security systems that [the Libraries] have."  Op. at 19-20 (emphasis added).  However, Professor Edelman's expert report was not submitted to establish the Libraries' lack of particular security controls, but to describe the inherent insecurity of storing files in digital format, especially on a system connected to an online campus network.

     **(d)**    **The MDP is Not Permitted By Sections 108(d) or (e) Because the Digital Copies Are Made Without a User Request**

The Libraries and Google selected books for digitization pursuant to a Cooperative Agreement calling for millions of books, including in-print books that are commercially-available, to be scanned *en masse*. The Libraries do not and could not contend that the works were requested by any particular library "user," as required for Sections 108(d) or (e) to apply. Moreover, once a digital copy is created, it is reproduced, disseminated to and retained by multiple parties, including Google and HathiTrust. The copies certainly do not become "the property of the user," but are generated to grow the size of the HDL and the Google Books database. Thus, the MDP is not permitted under Sections 108(d) or (e).

**B.**    **The Mass Digitization Program Does Not Constitute Fair Use Under Section 107 of the Copyright Act**

    **1.**    **The Libraries' Violations of Section 108 Should Weigh Heavily Against a Finding of Fair Use**

Although Section 107 of the Copyright Act sets forth four factors that courts traditionally apply to analyze whether a challenged activity constitutes fair use, the Supreme Court has made clear that the Section 107 factors "are not meant to be exclusive." *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 560 (1985); *see Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) ("[T]he four listed statutory factors in § 107 guide but do not control our fair use analysis and 'are to be explored, and the results weighed together, in light of the purposes of copyright.'") (quoting *Campbell*, 510 U.S. at 577). This

case presents the unusual circumstance in which the conduct at issue – library copying – is specifically addressed by another statute, Section 108, which therefore should guide the fair use analysis.  As demonstrated above, the Libraries exceeded many of the express limitations of Section 108, and these violations should weigh heavily against a finding of fair use.

The District Court, however, interpreted the savings clause in Section 108(f)(4) so broadly as to render Section 108 meaningless.  *See* Op. at 22 n.32 ("I need not decide if the MDP fits within the parameters of 17 U.S.C. § 108 because it unquestionably fits within the definition of fair use.") (citing 17 U.S.C. § 108(f)(4)).  This was an improper interpretation of Section 108(f)(4).  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 385 (1992) (holding that "[a] general 'remedies' saving clause cannot be allowed to supersede the specific substantive pre-emption provision").  As the Copyright Office observed, "permitting 'post-108' reliance on fair use as if no § 108 copying had occurred" comes "dangerously close to reading § 108 out of the statute."  1983 REPORT at 98.  Given that Congress deemed Section 108 "necessary to exempt much library photocopying from copyright liability, and since Congress did not likely intend to construct complex mechanisms in most of the section only to render them moot via subsection (f)(4), that result is implausible."  *Id.*

## 2. The Four Factors Enumerated in Section 107 Weigh Against Fair Use

### (a) Purpose and Character of the Use

The most important step in weighing the first factor – an examination of the purpose and character of the use – is determining "whether the new work merely

30

'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with *new expression, meaning, or message*; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (citations omitted; emphasis added). For the reasons set forth below, the Libraries' use of the Authors' copyrighted works is not transformative. Moreover, to the extent that there is any transformative or other legitimate purpose to the Libraries' actions, the making of multiple copies of the works and then storing the full text and image files online where they are susceptible to theft and widespread distribution goes far beyond what is needed to satisfy such purpose.[11]

### (i)    The Libraries' Preservation Purpose is Not Transformative

The Libraries attempt to justify their retention of multiple copies as necessary for "preservation," but the District Court correctly recognized that the Libraries' "argument that preservation on its own is a transformative use is not strong." Op. at 15 n.19. As this Court held in *Texaco*, a research library does not transform a journal article when it makes an "archival" photocopy of it for the purpose of "future retrieval and reference." 60 F.3d at 919. The mechanical conversion of printed books into digital form is not transformative because it does not add any "new information, new aesthetics, [or] new insights and understandings," to the books. Pierre Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990). Rather, "photocopying merely transforms *the*

---

[11] The question of whether the MDP "is of a commercial nature," 17 U.S.C. § 107(1), is addressed at Point II.A.2.(a), *supra.*

*material object* embodying the intangible article that is the copyrighted original work." *Texaco*, 60 F.3d at 924 (emphasis added); *see Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (retransmission of radio broadcast, which merely repackages the original, is not transformative because it adds "neither new expression, new meaning nor new message") (quotation omitted). Given that one of the core functions of academic libraries is to "preserve" books "not just for current students and faculty, but also for future generations" [Dkt_110(¶¶11,17)], a library does not "transform" a print book that was acquired for preservation purposes by digitizing it for the exact same purpose. Here, "the predominant archival purpose of the copying tips the first factor against the copier, despite the benefit of a more usable format." *Texaco*, 60 F.3d at 924.

> **(ii)    Even if Copying Millions of Books to Facilitate Search is Transformative, There is No Justification for Storing Multiple Copies of the Image and Text Files Online**

In light of the weakness of the Libraries' preservation argument, the District Court focused its finding that the Libraries' conduct was fair use almost exclusively on the search engine feature of HathiTrust. Op. at 15-17. The Authors maintain, as they did below, that the Libraries have no right to copy and use millions of books without authorization or payment. If the Libraries want to scan print books in order to create indices or to facilitate text mining or other research tools, they should be required to ask for and obtain permission for their copying.

But more importantly for purposes of this appeal, to the extent that any of the Libraries' goals fit within the rubric of fair use, the Libraries should be permitted to do no more than is necessary to accomplish that particular purpose.

*See Campbell,* 510 U.S. at 589.  As discussed below at Point II.B.2.(c), the District Court erred by failing to recognize that the Libraries are able to facilitate text searching and to provide access to the print-disabled without creating and storing so many digital copies online.

The Ninth Circuit cases cited by the District Court that address the legality of copying web pages for the purpose of creating a search index, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) and *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003), are distinguishable because copyright owners who publish material on the Internet do so because they want their content to be found and viewed.  For all intents and purposes, such owners have provided an implied license to search engines to copy and index their contents.  Moreover, unlike HathiTrust's perpetual storage of high resolution image files and text files of every book, the Web pages copied by a search engine are incidental to the search function.  As noted by one court, after copying full size images onto its server for the purpose of creating "thumbnails," the search engine deleted the original copy from its server.  *See Kelly*, 336 F.3d at 815.  Thus, even if ingesting a copyrighted work into a search engine is transformative, it does not follow that the permanent storage of the original content is also transformative.

### (iii)    Making Digital Copies of Copyrighted Works Available for Print-Disabled Users is Not Transformative

The District Court's holding that "[t]he use of digital copies to facilitate access for print-disabled persons is also transformative" demonstrates a fundamental misapplication of the term "transformative" as it has been used by this

33

Court in the context of fair use.  The Copyright Act grants copyright owners
exclusive control over any "derivative work," which is defined as

> a work based upon one or more preexisting works, such as a
> translation, musical arrangement, dramatization, fictionalization,
> motion picture version, sound recording, art reproduction, abridgment,
> condensation, or any other form in which a work may be recast,
> *transformed,* or adapted.

17 U.S.C. §§ 101 (emphasis added), 106(2).  The Second Circuit distinguishes
between a transformation that is merely derivative and one that falls within the
rubric of fair use as follows: "Although derivative works that are subject to the
author's copyright transform an original work into a new mode of presentation,
such works – unlike works of fair use – take expression for purposes that are not
'transformative.'"  *Castle Rock*, 150 F.3d at 143.  Providing the digital text of a
book so that it can be translated to speech for consumption by a print-disabled
person transforms only the "mode of presentation," not the expression itself.  *Id.*

The District Court held that the use of the Authors' works is transformative
on the ground that "[p]rint-disabled individuals are not considered to be a
significant market or potential market to publishers and authors."  Op. at 18.  "As a
result," reasoned the District Court, "the provision of access for them was not the
intended use of the original work (enjoyment and use by sighted persons) and this
use is transformative."  *Id.*  Although the Authors concede that it is common
practice in the publishing industry for authors to forgo royalties that are generated
through the sale of books manufactured in specialized formats for the blind, the
Authors strongly object to the District Court's suggestion that they write only for
the "enjoyment and use [of their works] by sighted persons."  *Id.*  Authors write

books to be read (or listened to), regardless of the "mode of consumption." *Castle Rock*, 150 F.3d at 133. Moreover, to the extent that sales to the print-disabled are relevant to the fair use analysis, it should be considered in connection with the market harm factor, not whether adapting a book for the visually-disabled changes the book's expression. Finally, for the same reasons set forth above, to the extent that making copyrighted works available to the print-disabled is transformative, the Libraries do not need to leave multiple copies of the entirety of their digital library online in order to meet any legitimate purpose.

### (b)    Nature of the Copyrighted Works

The second statutory factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. Here, the works digitized as part of the MDP include every conceivable type of book – fiction and non-fiction, obscure academic works and bestsellers; yet no consideration was given to the nature of the books copied. *See supra* p. 9. Rather, the vast majority of the books were "selected" because they happened to be on a shelf in a library. Dkt_114-7(#2). Under the unusual circumstances of this case, where the Libraries indiscriminately scanned millions of books in assembly-line fashion, they cannot meet their burden of showing that the nature of the copyrighted work favors a finding of fair use.

### (c)    Amount and Substantiality of the Use

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," or whether "the quantity and value

of the materials used are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (internal quotation marks and citations omitted). This factor "recognizes that the more of a copyrighted work that is taken, the less likely the use is to be fair, and that even a less substantial taking may be unfair if it captures the essence of the copyrighted work." *Infinity*, 150 F.3d at 109. "Though not an absolute rule, 'generally, it may not constitute a fair use if the entire work is reproduced.'" *Id.* (quoting 4 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT, § 13.05[A][3] at 13-178 (1997)).

Here, the third fair use factor takes on particular significance because truckloads of books were digitized in their entirety. The District Court held that "entire copies were necessary to fulfill the Libraries' purposes of facilitation of searches and access for print-disabled individuals." Op. at 19. There are three fundamental problems with this finding.

*First*, the court did not address the Libraries' archival storage of books for "preservation" purposes. Even if the Libraries' preservation activities were transformative (which they are not), the Libraries digitized and are storing millions of books (including best-selling, commercially-available books) that have no legitimate need to be "preserved." Dkt_125-5(108:17-110:2).

*Second*, even if it is necessary to digitize an entire work in order to index the contents for facilitating search, the third factor weighs heavily against the Libraries because they are unnecessarily retaining complete image and text files comprising every page of every book. *See, e.g.*, *Campbell,* 510 U.S. at 589 (while defendants' use of lyrical excerpts from Roy Orbison's song "Oh Pretty Woman" was justified to achieve a parodic purpose, case was remanded to determine whether the

36

repetition of the original's iconic bass riff was excessive). Here, the record shows that once a book's text is recorded in the index, the image and text files are no longer necessary for the operation of the search engine. Dkt_125-5(228:15-236:12).[12] Although the Libraries may argue that fair use permits them to make an intermediate copy of a work for purposes of enabling full text search or so-called "non-consumptive research,"

> [t]o satisfy the criteria of fair use, any copies created for such research purposes should be destroyed upon completion of the research project for which they were created. Should the individual or institution carrying on this research desire to retain the copy for archival purposes or future use, it should be required to obtain permission to do so from the copyright proprietor.

Final CONTU Report (July 31, 1978), p. 39, *available at* http://digital-law-online.info/CONTU/PDF/index.html. *See also Kelly*, 336 F.3d at 815 (once the search engine created a thumbnail version of the indexed image, the full-sized originals were deleted).[13] The Libraries' permanent storage of multiple copies is the exact opposite of copies that are "intermediate" or retained for a "transitory duration." *Cf. Cartoon Network, LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 129-30 (2d Cir. 2008) (a bit of data that remains in computer buffer for no more than 1.2 seconds is not "fixed . . . for a period of more than transitory duration").

---

[12] Significantly, HathiTrust has contracted to provide copies of its search index to four private companies. Dkt_114-72(#2). As HathiTrust does not provide these companies with the image or text files, there is no question that the search feature can operate without HathiTrust retaining copies of the actual books. Dkt_125-5(228:15-236:12).

[13] Contrary to the suggestion of the District Court, [Op. 19 n.26], the Authors do not seek to have the digitized books in the HDL destroyed, but rather to have them taken offline and stored under lock and key.

*Third*, the Authors do not object to the print-disabled obtaining access to the full digital copies created as part of the MDP, provided they are retained and disseminated in accordance with the Chafee Amendment – by an "authorized entity" and in a "specialized format." *See infra* Point IV. However, even if this Court were to hold that HathiTrust in its current configuration satisfies these criteria, the Libraries still have not demonstrated their need to retain the digital *image* files in order to facilitate access to the print-disabled, as the assistive technology uses *text* files to convert the text from the book into speech. Dkt_79(¶¶19-40).

Thus, the third factor also weighs heavily against the Libraries.

### (d)    The Effect of the Use Upon the Market for or Value of the Work

Under the fourth factor, "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4), the copyright holder need not show either "actual present harm" or "with certainty that future harm will result," but rather must show "by a preponderance of the evidence that *some* meaningful likelihood of future harm exists." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984) (emphasis in original). The District Court erred in failing to recognize the actual and potential harm to the Authors caused by the Libraries' unlicensed mass digitization.

### (i)    Each Unlicensed Digital Copy Represents a Lost Sale

The Libraries' digitization and archiving of the Authors' works caused actual harm to the Authors' own market and potential market for book sales. The majority of their books are in-print and commercially available for purchase.

38

Dkt_116(#174).  Many are available for sale in digital format.  *Id.*  Each digital copy of a book that the Libraries created – for preservation, archiving or any other purpose – rather than purchasing it through lawful channels, represents a lost sale to the book's rights-holders.  Dkt_116(#128); Dkt_83(¶¶11-12, Exs. 6&9) (exemplifying revenue lost due to the Libraries' unlicensed copying); Dkt_114-3(163:1-10).

The District Court refused to account for the Authors' lost sales, suggesting that the argument "ignores the fact that purchase of an additional copy would not have allowed either full-text searches or access for the print-disabled individuals, two transformative uses that are central to the MDP."  Op. at 19.  However, as shown above, the Libraries did not need to retain full copies of the digitized books to facilitate searches.  To the extent the Libraries elected to retain copies for non-transformative archival purposes, a use the District Court again overlooked in the context of market harm, the Libraries could and should have purchased additional copies.

The Authors do not object to giving print-disabled users access to digitized books, but challenge the Libraries' provision of those copies because (a) the Libraries are not providing access in accordance with the Chafee Amendment [*see infra* Point IV]; and (b) HathiTrust provides not only text files, but also *image files*, to persons with print disabilities for the purpose of rendering large-print versions of the books – a use that does "directly compete with and impair important growth businesses of publishers for [] large-type books[.]"  *AAP Statement*, Feb. 8, 1996, *at* http://judiciary.house.gov/legacy/441.htm.

39

### (ii)    The Works are Exposed to Unlimited Piracy

With neither a legislative mandate nor an agreement from rights-holders, the Libraries expose the Authors' property to immense security risks by digitizing, copying, transferring, storing and allowing various levels of online access to millions of copyright-protected books.  *See supra* Points II.A.1.(e) (discussing Congressional recognition of digital security risks) and II.A.2.(c) (security risks caused by MDP).  A breach has the potential to cannibalize the book market through the same type of widespread Internet piracy that decimated the music industry.  *See* Edelman Report, Dkt_124.  The Authors have no right to audit the Libraries' security systems and, in the event of a breach, the Authors may not seek indemnification from the Libraries due to their sovereign immune status.  Although a breach has yet to occur, the Libraries are playing with fire.[14]

And even if these Libraries exercise care, the Court must consider "whether unrestricted and wide-spread conduct of the sort engaged in by defendant . . . would result in a substantially adverse impact on the potential market."  *Campbell*, 410 U.S. at 590.  Under the District Court's ruling, far less sophisticated providers now may attempt to engage in their own mass digitization programs, subjecting the Authors' property to whatever security measures such providers do or do not employ.  Dkt_124(¶25).

### (iii)    The Authors Will Lose Licensing Revenues

---

[14] For confidential facts concerning HathiTrust's security, *see* Dkt_125-5(198:13-200:19) and Dkt_125-13-15. *See also* Nicole Perlroth, *Some Victims of Online Hacking Edge Into the Light*, N.Y. TIMES, February 20, 2013, at A1.

40

It is well established that the "impact on potential licensing opportunities for traditional, reasonable or likely to be developed markets should be legally cognizable when evaluating a secondary user's 'effect upon the potential market for or value of the copyrighted work.'" *Texaco*, 60 F.3d at 930. The undisputed evidence establishes that the Libraries' activities will harm the Authors by undermining existing and emerging licensing opportunities.

In *Texaco*, the Second Circuit considered whether a corporate library's systematic photocopying of scientific journal articles for research and archival purposes was fair use. 60 F.3d at 915. In analyzing whether it was appropriate for the district court to have considered the increase in publishers' revenue that would result if Texaco's unauthorized copying was not permitted as fair use, the Second Circuit observed that "the publishers still have not established a conventional market for the direct sale and distribution of individual articles[.]" *Id.* at 930. Nevertheless, the court found that "they have created, primarily through [the Copyright Clearance Center ("CCC")], a workable market for institutional users to obtain licenses for the right to produce their own copies of individual articles via photocopying." *Id.*

Here, too, there are several existing and likely to be developed "workable market[s]" for the Libraries to obtain licenses to digitize, store and make various uses of the copyrighted books in their collections. *See* Gervais Report, Dkt_109(¶9) (stating that "collective management systems provide a market-based mechanism by which libraries could compensate authors and rightsholders in exchange for a license to mass digitize and make various uses of copyrighted books in their collections"). In the United States, organizations like the CCC

41

"presently license the same general type of copyrighted content as the material copied through the Google Library Project." *Id.* The CCC has existing licenses with academic institutions like the Libraries that allow for the rights of thousands of works to be collectively negotiated. Dkt_109(¶34).[15]

Collective licensing systems in other countries, including the resident nations of several Authors and their representative associations, provide additional mechanisms by which the Libraries could have obtained licenses to digitize and use thousands of books of foreign authors. For example, Associational Plaintiffs from the U.K., Quebec, Sweden and Norway submitted testimony showing that they could have negotiated the digitization rights either directly or by acting as an intermediary for their members. Dkt_85(¶9); Dkt_88(¶7); Dkt_90(¶7); Dkt_91(¶7). Authors and their representatives in Norway and Sweden, including Associational Plaintiffs in this litigation, have entered into or are finalizing license agreements to permit their national libraries to digitize entire collections of books in exchange for royalty payments. Dkt_90(¶¶7&10, Ex. A); Dkt_91(¶¶7&10, Ex. A). In France, Google announced last year that "it had an industrywide book-scanning agreement in place to cover works that are out of print but still under copyright – a category that covers most of the world's books," and that Google was

---

[15] The District Court incorrectly found that "the CCC has no plans to provide for or develop" a "license for the uses to which The Libraries put the works[.]" Op. at 21. In fact, the representative from the CCC testified that "[w]hen we authorize a digitization and reproduction, which is one of the rights that we can authorize under various of our licenses, what is then done with the end result, whether it's read, it's used for nonconsumptive research or any other purpose, we would not know." Dkt_77-1(19:7-13).

"interested in exporting these deals elsewhere."  Eric Pfanner, *Google Has Deal in France For Book-Scanning Project*, N.Y. TIMES, June 12, 2012, at B5.

Similar licensing schemes for mass digitization are likely to develop in the United States.  *See* Dkt_109(¶ 33).  For example, although Judge Chin ultimately rejected the settlement agreement entered into by The Authors Guild and others in the Google Books case, the proposed resolution provides more compelling evidence that "there is a ready market or means to pay for the use" that the Libraries are making.  *Texaco*, 60 F.3d at 931.  Dkt_82(¶¶14-17).  The ASA exemplifies how a mass digitization licensing system could operate; it permitted Google and the Libraries to digitize and make various display and non-display uses of books while providing a mechanism to compensate the millions of affected authors and ensure that their intellectual property rights were secure.  *Id.*

Finally, the District Court should not have been persuaded by the report submitted by Dr. Waldfogel, who opined that it would be prohibitively expensive to develop a market for mass digitization uses.  *First*, the report is predicated on the remarkable notion that it is permissible to steal goods if it is too expensive to buy them.  However, "[b]ecause obedience to the law might be inconvenient or expensive is not a valid excuse for flouting a statute."  *Lawton v. Bd. of Med. Examiners*, 143 Cal. App. 2d 256, 262-63 (1956).  *Second*, Dr. Waldfogel's "sticker shock" inducing estimate that it would cost $569 million to obtain the necessary licenses is grossly exaggerated because it wrongly assumes that the Libraries would have to obtain a separate license for each and every work, when in fact, as shown above, there are existing mechanisms that would allow the Libraries to obtain licenses for thousands of works at once.  *Third*, given that the Libraries

43

have large acquisition budgets and spend significant sums to build their collections [Dkt_125-2(25:3-25)], the fact that obtaining licenses to digitize and use millions of copyrighted books will require a significant financial outlay should not weigh in favor of fair use. *Finally*, contrary to the District Court's suggestion that the report considered a market for licenses of each of the Libraries' uses, in fact Dr. Waldfogel analyzed only whether "specifically the ability to *search* digitized books [] could be undertaken as a viable and licensed commercial enterprise." Dkt_108(¶4) (emphasis added).

The fourth factor, like all of the factors in this fair use analysis, weighs against the Libraries. Accordingly, the fair use defense must fail in its entirety.

## III

## THE DISTRICT COURT ERRED IN FINDING THAT THE ASSOCIATIONAL PLAINTIFFS LACK STATUTORY STANDING

The District Court properly found that the Associational Plaintiffs satisfy each of the following elements necessary to establish associational standing under the 3-part test set forth by the Supreme Court in *Hunt v. Wash. State. Apple Adver. Comm'n*.: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. 333, 343 (1977). *See* Op. at 6; *see also The Authors Guild v. Google, Inc.*, 282 F.R.D. 384, 389 (S.D.N.Y. 2012) (Chin, J.) (holding that The Authors Guild and other associational plaintiffs have standing to bring copyright claims on behalf of their members against Google for claims arising from the MDP).

44

The District Court erred, however, in proceeding to hold that, despite having found that the Associational Plaintiffs satisfied the Article III and prudential requirements to bring a claim on behalf of their members, the Associational Plaintiffs from the U.S., Canada and Australia lack "statutory standing" under Section 501(b) of the Copyright Act. That section provides that "the legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). The District Court interpreted this provision as imposing an "explicit limit" on who may maintain a claim for copyright infringement, thus precluding associations from bringing copyright lawsuits on behalf of their members because the associations are not the "legal or beneficial owner[s]" of the copyrights at issue.

The flaw in the District Court's analysis is that statutory standing under the Copyright Act is satisfied through the first prong of the 3-part *Hunt* test for associational standing. The Associational Plaintiffs are suing only on behalf of their members who "would otherwise have standing to sue in their own right" because they are the "legal or beneficial owner[s]" of copyrights in works that have been infringed by the Libraries. Thus, the real parties-in-interest are the members with copyright ownership who have standing under the Copyright Act; their associations have standing to bring claims on their behalves as long as the *Hunt* test is satisfied.

Although the District Court correctly observes that "Courts in the Second Circuit have not explicitly addressed the issue of whether associational standing is permissible under the Copyright Act" [Op. at 8], the Eleventh Circuit considered

45

this very question and held that an association that satisfies the *Hunt* test may assert copyright claims on behalf of its members who have standing to sue in their own right under the Copyright Act. *See CBS Broad., Inc. v. EchoStar Comms. Corp.*, 450 F.3d 505, 518 n.25 (11th Cir. 2006) (association of television network affiliates with *Hunt* standing may bring copyright claims on behalf of their members who satisfy the standing requirements under 17 U.S.C. § 501(e)); *see also Olan Mills, Inc. v. Linn Photo Co.*, 795 F. Supp. 1423, 1428 (N.D. Iowa 1991), *rev'd on other grounds*, 23 F.3d 1345 (8th Cir. 1994) (association has standing under *Hunt* to bring copyright claim on behalf of its member photographers who are the legal or beneficial owners of their copyrights).[16]

A decision by Judge Posner in the Seventh Circuit is also highly instructive in demonstrating the District Court's error. In *Southern Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois*, 326 F.3d 919 (7th Cir. 2003), the Seventh Circuit held that a union had associational and "statutory" standing under ERISA to bring a claim on behalf of its members against a welfare fund. Like the "legal or beneficial owner" limitation in the Copyright Act, ERISA restricts the right to sue to "plan participants and beneficiaries." 29 U.S.C. § 1132(a)(1). Notwithstanding this limitation, the court held that the union could

---

[16] In *Olan Mills*, 795 F. Supp. at 1428, the court held that cases like *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 (2d Cir. 1982), upon which the District Court relied, are inapposite because they do not address the issue presented here: whether an association with standing under *Hunt* may bring a copyright claim on behalf of its members who meet the Copyright Act's statutory standing requirements and therefore would have standing to sue in their own right. *Eden* and its progeny addressed the standing of licensees and managers to sue in their own right.

bring the ERISA claim on behalf of its members, reasoning that "we do not think that by confining the right to sue under section 1132(a)(1) to plan participants and beneficiaries Congress intended to prevent unions from suing on behalf of participants. The union in such a case is not seeking anything for itself; the real plaintiffs in interest are plan participants." *Id.* at 922. Here, "the real plaintiffs in interest" are the copyright owners/members of the Associational Plaintiffs. Those groups should be permitted to assert claims on behalf of their members, recognizing that any injunction will extend only to those members who can prove their legal or beneficial copyright ownership. *See generally Reed Elsevier, Inc v. Muchnick*, 559 U.S. 154 (2010) (holding that court has subject matter jurisdiction over case even though some of the plaintiffs had not satisfied requirement that they register their works).

## IV

## HATHITRUST IS NOT AN "AUTHORIZED ENTITY" AND THE BOOKS ARE NOT IN A "SPECIALIZED FORMAT" UNDER SECTION 121

The Authors recognize the considerable societal value of providing individuals with print-disabilities ready access to library books, including the works digitized as part of the Mass Digitization Program. The Authors did not file this lawsuit against any users of the HDL, and the Authors have no wish to prevent people with print-disabilities from gaining privileged access to the digitized copies of the Authors' books. However, the way in which the Libraries are presently reproducing and making available digitized texts to the print-disabled neither qualifies as fair use nor falls within the special exemption accorded to "authorized entities" in the so-called Chafee Amendment.

47

**A.     The Legislative History of the Chafee Amendment Supports a Narrow Definition of "Authorized Entity" and "Specialized Formats"**

In 1996, Senator John Chafee sponsored an amendment to the Copyright Act that exempts a narrowly-defined group of "authorized entities" from claims of copyright infringement for reproducing and distributing copyrighted works in "specialized formats exclusively for use by blind or other persons with disabilities."  17 U.S.C. § 121.  As Senator Chafee explained on the Senate floor, the amendment provides that "groups that produce specialized formats for the blind," which includes a "handful" of non-profit organizations like the National Library Service for the Blind, "no longer are required to gain permission from the copyright holder before beginning production.  142 CONG. REC. S. 9763, 9764, Sept. 3, 1996 ("It includes a *very narrow definition* of those who are eligible to undertake such production.") (emphasis added).

The Chafee Amendment was supported by interest groups representing both the blind and rightsholders, including Intervenor NFB and the Association of American Publishers ("AAP").  The AAP worked with groups representing the blind to ensure that the amendment would not "create an infrastructure that would directly compete with and impair important growth businesses of publishers for (1) large-type books and (2) books on tape of CD."  *Statement of the AAP*, Feb. 8, 1996, *available at* http://judiciary.house.gov/legacy/441.htm.  The AAP's goal was achieved by "tighten[ing] the definitions" [*id.*] contained in a previous proposal, which would have permitted any "non-profit organization" to make copies for the blind in both large type and audio formats.  *See Intellectual Property and the*

48

*National Information Infrastructure*, Sept. 1995, at 228, *available at*

http://www.uspto.gov/web/offices/com/doc/ipnii/rec.pdf.

**B.     HathiTrust's Provision of Access to the Print-Disabled Does Not Comply With the Chafee Amendment or Fair Use**

The District Court held that "[t]he provision of access to previously-published non-dramatic literary works within the HDL fits squarely within the Chafee Amendment, although Defendants certainly may rely on fair use . . . to justify copies made outside of these categories or in the event that they are not authorized entities."  Op. at 23.  This holding was in error for three reasons.

**1.     HathiTrust is Not an Authorized Entity**

Works that qualify for Section 121 status may be reproduced and distributed only by an "authorized entity," defined as "a nonprofit organization or a governmental agency that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities."  17 U.S.C. § 121(d)(1).  The District Court found that because the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") imposes certain equal access obligations on "public entities" and places of "public accommodation," every library is potentially an "authorized entity" under the Chafee Amendment.  Op. at 22.  However, this broad application of the ADA swallows the "very narrow definition" of "authorized entity" in Section 121. *See Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 489 (2d Cir. 2002) (rejecting blind student's interpretation of futility exception that would swallow the exhaustion requirement in Individuals with Disabilities Education Act).  It simply cannot be that every library in the country is one of the

49

"handful of nonprofit organizations" that Congress intended to exempt from copyright infringement.

## 2.    The Digitized Texts and Images are Not in Specialized Formats

Authorized entities may reproduce and distribute works only in "specialized formats," defined as "braille, audio, or digital text which is *exclusively for use by blind or other persons with disabilities*."  17 U.S.C. § 121(d)(1) (emphasis added). The record is clear that the HDL goes far beyond this limitation, granting "privileged access" to the complete images and text of the scanned books. Dkt_114-71(#3(l)); Dkt_125-5(pp.190-194).  This fact alone negates the possibility that the HDL provides a "specialized format exclusively for use by blind" because people without print disabilities are using the same format as the general population.  Moreover, even if the text files in the HDL did constitute a "specialized format," which they do not, Defendants unquestionably violate Section 121 by storing and permitting persons with print disabilities to view the high resolution images of every scanned page of every book in the HDL.  *Compare* 17 U.S.C. § 121(d)(4)(B) (permitting only "print instructional materials" to be reproduced into "large print book" format), *with* Dkt_125-5(214:12-21) (testifying that HathiTrust provides the print-disabled with access to the image files "to have them, for example, enlarged").

## 3.    The HDL's Uses For the Blind Are Not Protected Fair Use

There is no support for the District Court's suggestion that, even without the special privileges granted in the Chafee Amendment, Congress intended fair use to permit the preemptive digitization, replication and storage of millions of

copyrighted books in a digital format that includes universally-readable image and text files, even when no particular book has been requested by a print-disabled individual.  Indeed, the very reason that groups representing the blind pushed for the Chafee Amendment was to eliminate the need to obtain advance permission from publishers.  Plainly this provision would not have been necessary if fair use permitted these acts without permission.

As discussed above, the District Court erred in finding that HathiTrust's provision of access to the blind is a transformative use of the copyrighted books. *See supra* pp. 33-35.  Moreover, the District Court improperly relied on the legislative history of Section 107 in finding that Defendants' uses for the print-disabled constitute fair use.  The House and Senate Reports discussed by the Supreme Court in *Sony* and cited by the District Court do not support the proposition that the MDP, which digitized millions of books into universally-accessible formats without any request from a blind person, is fair use.  *See* H.R. REP. NO. 94-1476, at 73 (1976) ("While *the making of multiple copies* or phonorecords of a work for general circulation *requires the permission of the copyright owner*, a problem addressed in [a previous proposed section addressing copies for the blind], the making of a *single copy* or phonorecord by *an individual* as a free service for a blind persons would properly be considered a fair use under section 107.") (emphasis added).

The Authors do not seek a remedy that would foreclose the print-disabled from gaining access to the digital library, but one that would require any access to be facilitated in accordance with the statutory scheme established by Congress.

## **CONCLUSION**

For the above-stated reasons, Plaintiffs-Appellants respectfully request that this Court vacate the Judgment of the District Court.

Dated:  New York, New York
        February 25, 2013

FRANKFURT KURNIT KLEIN & SELZ, P.C.


By: _____s/ Edward H. Rosenthal_____
        Edward H. Rosenthal
        Jeremy S. Goldman
        Anna Kadyshevich

488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

*Attorneys for Plaintiffs-Appellants*

## **CERTIFICATE OF COMPLIANCE**

As counsel of record to the Plaintiffs-Appellants, I hereby certify that this brief complies with the type – volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. I am relying upon the word count of the word-processing system (Microsoft Word) used to prepare the brief, which indicates that 13,918 words appear in the brief.

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By:_____s/ Edward H. Rosenthal_____
     Edward H. Rosenthal
     Jeremy S. Goldman
     Anna Kadyshevich

488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

*Attorneys for Plaintiffs-Appellants*