# 12-4547-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

AUTHORS GUILD, INC., AUSTRALIAN SOCIETY OF AUTHORS LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS, PAT CUMMINS, ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON, AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK FAGLITTERAER FORFATTER0OG OVERSETTERFORENING, WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK GRUNDSTROM, HELGE RONNING, JACK R. SALAMANCA, JAMES SHAPIRO, DANIELLE SIMPSON,

*Plaintiffs-Appellants,*

—against—

HATHITRUST, REGENTS OF THE UNIVERSITY OF MICHIGAN, REGENTS of the UNIVERSITY of CALIFORNIA, BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM, TRUSTEES OF INDIANA UNIVERSITY, CORNELL UNIVERSITY,

(*caption continued on inside cover*)

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICUS CURIAE* THE ASSOCIATED PRESS IN SUPPORT OF NEITHER PARTY

ELIZABETH A. MCNAMARA
ALISON B. SCHARY
   (admission pending)
COLLIN J. PENG-SUE
DAVIS WRIGHT TREMAINE LLP
1633 Broadway, 27th Floor
New York, New York 10019
(212) 489-8230

*Attorneys for Amicus Curiae
   The Associated Press*

JULIA DONOVAN DARLOW, LAURENCE B. DEITCH, DENISE ILITCH, OLIVIA P. MAYNARD, ANDREA FISCHER NEWMAN, ANDREW C. RICHNER, S. MARTIN TAYLOR, in his official capacity as the Regents of the University of Michigan, KATHERINE E. WHITE, in her official capacity as the Regents of the University of Michigan, RICHARD C. BLUM, DAVID CRANE, WILLIAM DE LA PENA, RUSSELL GOULD, EDDIE ISLAND, ODESSA JOHNSON, GEORGE KIEFFER, SHERRY L. LANSING, MONICA LOZANO, HADI MAKARECHIAN, GEORGE M. MARCUS, ALFREDO MIRELES, JR., NORMAN J. PATTIZ, BONNIE REISS, FRED RUIZ, LESLIE TANG SCHILLING, BRUCE D. VARNER, PAUL WACHTER, in his official capacity as the Regents of the University of California, CHARLENE ZETTEL, in his official capacity as the Regents of the University of California, JEFFREY BARTELL, MARK J. BRADLEY, JUDITH V. CRAIN, JOHN DREW, TONY EVERS, MICHAEL J. FALBO, EDMUND MANYDEEDS, KATHERINE POINTER, CHARLES PRUITT, TROY SHERVEN, BRENT SMITH, MICHAEL J. SPECTOR, S. MARK TYLER, JOSE F. VAZQUEZ, in his official capacity as the Regents of the University of Wisconsin System, DAVID G. WALSH, in his official capacity as the Regents of the University of Wisconsin System, WILLIAM R. CAST, PATRICK A. SHOULDERS, MARYELLEN KILEY BISHOP, BRUCE COLE, PHILIP N. ESKEW, JR., CORA J. GRIFFIN, THOMAS E. REILLY, JR., DERICA W. RICE, in his official capacity as the Trustee of Indiana University, WILLIAM H. STRONG, in his official capacity as the Trustee of Indiana University, NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE, BLAIR SEIDLITZ, COURTNEY WHEELER,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE, BLAIR SEIDLITZ, COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure, *amicus curiae* The Associated Press states that it has no parent corporation and that no publicly held company owns more than 10% of its stock.

DWT 21240534v5 0025295-000064

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF AMICUS ...................................................................1

SUMMARY OF ARGUMENT ..............................................................6

ARGUMENT ...................................................................................8

    I.    THE COURT SHOULD CAREFULLY CONFINE ITS ANALYSIS TO CASES WHERE THE END PRODUCT DISPLAYS NO COPYRIGHTABLE MATERIAL ............................8

    II.    A TRANSFORMATIVE USE MUST NOT SUPERCEDE THE OBJECTS OF THE ORIGINAL WORK ...........................................11

        A.    The Core of the Transformative Use Doctrine Focuses on New Expressive Uses of the Original Work ............................12

        B.    Even Those Cases Recognizing A Functional Use As A Transformative Use Have Required That The New Work Not Be Capable of Serving the Same Purpose As The Original ...................................................................22

CERTIFICATE OF COMPLIANCE....................................................29

DWT 21240534v5 0025295-000064

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.V. ex rel Vanderhye v. iParadigms, LLC* ,
    562 F.3d 630 (4th Cir. 2009) ...........................................................10, 18, 23, 24

*Associated Press v. All Headline News Corp.*,
    608 F. Supp. 2d 454 (S.D.N.Y. 2009) ..................................................................3

*Associated Press v. Meltwater*,
    No. 12-1087 (S.D.N.Y. filed Feb. 14, 2012) .....................................................10

*Associated Press v. Moreover Technologies, Inc.*,
    No. 07 Civ. 8699 (S.D.N.Y. filed Oct. 9, 2007) ..................................................3

*Authors Guild, Inc. v. HathiTrust*,
    No. 11 CV 6531 (HB), 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012)..............1, 9

*Bill Graham Archives v. Dorling Kindersley, Ltd.*,
    448 F.3d 605 (2d Cir. 2006) .................................................................16, 20, 21

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006) .................................................................13, 17, 20

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994).......................................................................................*passim*

*Infinity Broad. Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998). ................................................................18, 19, 27

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ......................................................................*passim*

*Lennon v. Premise Media Corp.*,
    556 F. Supp. 2d 310 (S.D.N.Y. 2008) ................................................................17

*Maxtone-Graham v. Burtchaell*,
    803 F.2d 1253 (2d Cir. 1986) ............................................................................17

*Monge v. Maya Magazines, Inc.*,
    688 F.3d 1164 (9th Cir. 2012) .......................................................................7, 21

DWT 21240534v5 0025295-000064

*New Era Publ'ns Int'l, ApS v. Carol Publ'g Group*,
    904 F.2d 152 (2d Cir. 1990) .................................................................17

*Nihon Keizai Shimbun v. Comline Business Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999) ...................................................................17

*Pacific and Southern Co. v. Duncan*,
    744 F.2d 1490 (11th Cir. 1984) ...........................................................19

*Perfect 10, Inc. v. Amazon.com*,
    508 F.3d 1146 (9th Cir. 2007) ........................................10, 18, 24, 26

*Princeton University Press v. Michigan Document Serv.*,
    99 F.3d 1381 (6th Cir. 1981) ...............................................................22

*Ringgold v. Black Entertainment Television, Inc.*,
    126 F.3d 70 (2d Cir. 1997) ...................................................................17

*Rogers v. Koons*,
    960 F.2d 301 (2d Cir. 1992) .................................................................17

*Twin Peaks Prods. v. Publ. Int'l Ltd.*,
    996 F.2d 1366 (2d Cir. 1993) .........................................................17, 21

*U.S. v. ASCAP*,
    599 F. Supp. 2d 415 (S.D.N.Y. 2009) ........................................10, 19, 27

*Video Pipeline, Inc. v. Buena Vista Home Entm't*,
    342 F.3d 191 (3d Cir. 2003) .........................................................10, 19

*Wainwright Sec. Inc. v. Wall Street Transcript Corp.*,
    558 F.2d 91 (2d Cir. 1977) .............................................................17, 18

OTHER AUTHORITIES

89th Cong. 1st Sess, ser.8, pt.3 (1966).....................................................18

Fed. R. App. P. 29(c)(5)..............................................................................1

Keiyana Fordham, *Can Newspapers Be Saved? How Copyright Law Can
    Save Newspapers from the Challenges of New Media*, 20 Fordham Intell.
    Prop. Media & Ent. L.J. 939 (2010) ....................................................5

iv

Kimberly Isbell, *The Rise of the News Aggregator: Legal Implications and Best Practices* (Berkman Ctr. for Internet & Soc'y, Res. Publ'n Working Paper No. 2010) ..................................................................................5

Pierre N. Leval, *Commentaries: Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ...............................................................13, 14, 15

v

## BRIEF OF *AMICUS CURIAE*
## THE ASSOCIATED PRESS

This brief is respectfully submitted by the Associated Press ("AP") pursuant to Federal Rule of Appellate Procedure ("FRAP") 29.[1]

## INTEREST OF AMICUS

One of the district court's several conclusions in this case was that "[t]he use to which the works in the [HathiTrust Digital Library] are put" – namely, an index containing only page numbers from relevant books – "is transformative because the copies serve an entirely different purpose than the original works: the purpose is superior search capabilities rather than actual access to copyrighted material." *Authors Guild, Inc. v. HathiTrust*, No. 11 CV 6531 (HB), 2012 WL 4808939, at *11 (S.D.N.Y. Oct. 10, 2012).  This brief is addressed solely to that holding and, more generally, the district court's suggestion that superior search capabilities can constitute a transformative use under the fair use doctrine.  As detailed below, it is critical that this Court's opinion be carefully confined to the narrow facts of this unusual case – namely a non-commercial use that provides no access to copyrighted material – since any broad-sweeping conclusion that search

---

[1] Pursuant to FRAP 29(c)(5), AP states that no counsel for a party authored this brief in whole or in part, and no person or entity other than AP and its counsel made a monetary contribution to the preparation or submission of this brief.  All parties in this matter have consented to the filing of this brief.

1

capabilities generally lead to transformative uses would have far reaching implications for AP and the media industry as a whole.

AP is a not-for-profit news cooperative owned by its approximately 1,400 U.S. newspaper members. AP's content – including articles, photographs, and videos – is licensed to its member publishers, as well as to other licensees including news agencies, research databases, government agencies, online news aggregators, clipping services, search engines, and online publishers – many of whom utilize "search capabilities." AP has approximately 8,000 licensees who pay fees to gain access to and legitimately use AP material in their products and platforms. AP derives most of its revenues from membership and license fees, which are critical to support its extensive newsgathering infrastructure worldwide.

As a publisher and licensor of content, AP has a broad interest in the development of copyright law and the fair use doctrine – both in relation to its own use of third-party materials in news coverage and in protecting its own content. AP generates over a thousand articles each day, and in its news reporting it routinely relies on key copyright principles, including the fact/expression dichotomy and fair use, which serves an important function in allowing it to quote from and comment upon everything from serious political books to pop lyrics. On the other hand, copyright protection for AP's content is critical to the company when others seek to profit from AP's enormous investments in newsgathering

2

through services that substitute for AP's products. Accordingly, AP has been a keen protector of its content when it believes it is being infringed in a systematic and ongoing manner.[2]

AP has no particular interest in the outcome of this case on the merits. Instead, AP submits this brief because it is concerned that an overly broad ruling – one that does not take into account the peculiar fact pattern of this case discussed in more detail below – could constitute a fundamental shift in Second Circuit fair-use jurisprudence that would have a profound impact on the ability of content providers to protect their content and to continue earning licensing fees for their content from digital businesses. Although the district court's opinion refers to "search capabilities" in its finding of transformative use, it is important to note that "search" is not a monolithic term. In today's world, use of search technology is not the identifying feature of any one type of online business. Online services

---

[2] For example, AP successfully brought an action against All-Headline News, which offered a service that contained slightly re-written AP stories. *Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d 454 (S.D.N.Y. 2009). AP also sued Moreover Technologies, Inc., a media monitoring service which scraped AP content from member websites and sold aggregated excerpts of that content to its subscribers. *Associated Press v. Moreover Technologies, Inc.*, No. 07 Civ. 8699 (S.D.N.Y. filed Oct. 9, 2007). The action against Moreover was settled for a confidential amount. In 2012, AP brought suit against a commercial, subscription-based online clipping service, Meltwater News, for copyright infringement and hot-news misappropriation. The case, Docket No. 12-1087, is currently pending before the Hon. Denise L. Cote of the United States District Court for the Southern District of New York. AP is represented by the same counsel in both the Meltwater action and in its submission of this amicus brief.

employing search technology span a wide spectrum, including such varied platforms as traditional free public search engines such as Google and Yahoo, desktop services such as LexisNexis and Factiva, online aggregators of news content such as the Huffington Post, and clipping services such as Burrelles Luce. All of the companies mentioned – and thousands of other digital businesses – license content from AP for use in their services.

Fair use is a fact-specific inquiry, and the determination of whether any particular service's use qualifies as fair use should therefore be limited to the particular facts of that use – and not turn broadly on whether search technology is involved. As the cases establish, the question of whether a particular defendant's services qualify as transformative requires a nuanced, sophisticated analysis, informed by a fact-specific examination that looks at whether the use is a one-time use or a systematic, exploitative use, the nature and amount of the expression copied, the presence or absence – and extent – of surrounding commentary and whether it requires the taking of the amount used, the purpose of the use, and whether the use can act as a substitute for the original work, among other grounds. These are not issues subject to broad or glib pronouncements. Unfortunately, discourse on this topic has often generated too many unfounded sweeping pronouncements – such as notions that if material is available for free on the Internet, it is free for re-use (including for commercial purposes), or that any use

4

should be fair if it is good for consumers, or that search engines are automatically transformative uses.

But these sweeping generalities have little to do with what drives the fair use doctrine under the long-standing caselaw reviewed in this brief. And they fly in the face of the very purpose of copyright, to create an incentive to create. AP and its fellow news organizations invest time, money and lives to create the news they disseminate, and their role is critical in a democracy. The news media has been highly concerned with the impact on their business of unlicensed news aggregators – whose services all rest on "search capabilities."[3] Unlicensed news aggregators have a built-in advantage over the news media; news aggregation websites are able to build their business models without incurring any of the necessary expenses associated with being a news purveyor, including the costs to investigate, research, gather, write and edit news, and need only bear the minimal costs of distribution in the digital age.

---

[3] Keiyana Fordham, *Can Newspapers Be Saved? How Copyright Law Can Save Newspapers from the Challenges of New Media*, 20 Fordham Intell. Prop. Media & Ent. L.J. 939, 941-42, 983 (2010) ("studies indicate that online readers may use this feature [automatic news aggregation] as a news source instead of a reference tool, which . . . create[s] a news reporting purpose."); *see also* Kimberly Isbell, *The Rise of the News Aggregator: Legal Implications and Best Practices*, at 11 (Berkman Ctr. for Internet & Soc'y, Res. Publ'n Working Paper No. 2010) (noting that "feed" news aggregators "serve[] a similar function to a newspaper's website – to collect and organize news stories so that they can be read by the public")

5

An overly broad decision carries the risk of placing a permanent thumb on the scale of the fair-use analysis – to the detriment of publishers and other content creators – effectively creating a presumption that a broad array of uses of content by digital services are transformative and fair. It would also deal a sharp blow to content providers such as AP, which relies on licensing fees from digital businesses to support its news mission. AP therefore urges this Court to limit any holding to the unique fact pattern before it in this case.

## SUMMARY OF ARGUMENT

The fair use doctrine, and in particular what qualifies as a transformative use, are centrally important in a broad array of cases affecting content creators and technology industries today. This is the first time the Second Circuit has addressed a claim that search technology can create a transformative use. Such an argument is based on the premise that a transformative use can be based on the use of the original works for a new functional purpose, rather than a new expressive purpose.

The district court below found that the mass digitization of millions of books qualified as fair use largely based on its conclusion that the subsequent use of those digital files to create a page-number index and copies accessible to the blind constituted transformative use. However, the facts of this case are very unusual because the principal end use examined by the court – namely, the search index – does not display the copyrighted works themselves and thus does not constitute an

infringement in and of itself. [4]  It is therefore critical that any holding be narrowly focused so that it does not have unintended consequences in a wide variety of circumstances that are not before this Court.

This amicus will address three points:

First, it is crucial to tailor any holding to the facts at issue in this case: whether the reproduction of books for non-commercial purposes is a copyright violation where the resulting end product – here, a search index – does not display results that infringe those works at all.

Second, the Court should reiterate that the core of the transformative use doctrine is the protection of a new work that incorporates an earlier work in order to make a new *expressive* use.  "*Campbell* makes clear that the 'heart' of a claim for transformative use is 'the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works.'" *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1175 (9th Cir. 2012), quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994).  To date, the Second Circuit has never held that a new functional, non-expressive purpose qualifies as a transformative use of another's copyrighted content.

---

[4] This brief will not address the issues regarding the blind, which raise separate issues.

<u>Third</u>, to the extent the Court holds that a new functional purpose can qualify as a transformative use, it should confine that holding to non-commercial uses that are not capable of serving the same intrinsic purpose as the original.

## ARGUMENT

## I. THE COURT SHOULD CAREFULLY CONFINE ITS ANALYSIS TO CASES WHERE THE END PRODUCT DISPLAYS NO COPYRIGHTABLE MATERIAL

It is essential to note that this is an unusual case. Plaintiffs brought this case based on concerns about the mass digitization of millions of books, the long-term retention of those digital files, and the HathiTrust "orphan works" program. Because the district court decided that issues relating to the orphan works program were not ripe, the court's decision ended up being an adjudication of whether the digital copying of the books to create a) a page number index and b) resources for the blind constituted fair use – none of which were the focus of the original complaint.

Instead of focusing on the mass digitization and retention of millions of books for multiple purposes – including for preservation and other future unknown uses – as the relevant use, the district court improperly analyzed the case solely through the lens of whether the end products of a search index and a platform providing access for the blind constituted fair use. Critically, as the district court noted, *"no actual text from the book is revealed" in search results* – instead, "a

search for a particular term reveals the pages on which the term is found and the number of times the term is found on each page." *Authors Guild*, 2012 WL 4808939, at \*10.   Standing alone, therefore, the search index results do not constitute a *prima facie* infringement at all.   This fact is key to the district court's finding that the relevant purpose in this case is "superior search capabilities, rather than actual access to copyrighted material." *Id.* at \*11.

Thus, the only question in this case is whether the *prior* reproduction – namely, the mass digitization of paper books – which was antecedent to creating these index results – constitutes fair use.   In other words, the *only* alleged violation in connection with the index results is Section 106(1) (reproduction of copyrighted work in copies) – initial, antecedent mass digitization.   This case does not involve the preparation and distribution of derivative works based on a copyrighted work (§ 106(2)); distribution of copies of the copyrighted work to the public (§ 106(3)); public performance (§ 106(4)); or public display of the copyrighted work (§ 106(5)).

This presents a highly unusual fact pattern.   In most of the leading and pending cases considering transformative use, the "output" or "end product" at issue provided actual access to copyrighted material.   In other words, the output *itself* constituted *prima facie* copyright infringement by violating one of the exclusive rights of the copyright holder set forth in Sections 106(2), (3), (4) and

9

(5).  *See, e.g.*, *Associated Press v. Meltwater*, No. 12-1087 (S.D.N.Y. filed Feb. 14, 2012) (alleging *prima facie* infringement by unauthorized copying, distribution, and display of copyrighted news articles), *Video Pipeline, Inc. v. Buena Vista Home Entm't*, 342 F.3d 191 (3d Cir. 2003) (*prima facie* infringement of movie trailers in "clip previews"); *U.S. v. ASCAP*, 599 F. Supp. 2d 415 (S.D.N.Y. 2009) (*prima facie* infringement of musical works in ringtone previews) (hereinafter "*ASCAP*").  Similarly, in *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) and *Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146 (9th Cir. 2007), the two cases involving search engine results, the Ninth Circuit's analysis turned on whether the *thumbnail images displayed to end users* – which constituted a *prima facie* infringement – were a fair use, implicating the exclusive rights of public display and/or distribution.[5]

In sum, AP urges that the Court focus on the mass digitization and retention of copyrighted works – as the Authors Guild has argued in its appeal brief – and not just the end use of a page-number index that does not constitute independent infringement.  Furthermore, if and to the extent that Court finds fair use, the Court

---

[5] *A.V. ex rel Vanderhye v. iParadigms, LLC* (hereinafter "*iParadigms*"), 562 F.3d 630 (4th Cir. 2009), is one of the few cases that focuses on the antecedent act of digital copying rather than a user-facing end product that constitutes a *prima facie* infringement.  *See infra* at 23-24.  The Fourth Circuit's broadly-worded decision is a cautionary tale to this Court; despite the unique facts of that case, the decision is often cited (including by the district court below) to argue that *any* change in purpose is sufficient to find transformative use.

10

should be very clear that its holding is confined to the context where the reproduction is not made accessible to any member of public and the end product does not provide any access to copyrightable material at all.[6]

## II.     A TRANSFORMATIVE USE MUST NOT SUPERCEDE THE OBJECTS OF THE ORIGINAL WORK

The district court correctly focused on the fact that this case does not involve actual access to copyrighted material, and this Court should retain that focus. We strongly urge this Court to conclude that this is not the case to assess the abstract value of aggregators or to weigh the intrinsic value of search capabilities. This case does not raise any of those issues. Nor is this the platform to wade into generalities about these issues. Aggregators come in many stripes and search is an integral feature associated with myriad end products, including products sold and licensed by the AP. At bottom, aggregation and search engines do not lend themselves to per se rules; rather, any use of actual expressive content – absent here – is a fact specific analysis.

Moreover, as set forth below, the transformative use doctrine, at its core, is designed to protect new *expressive* uses of content. Here, HathiTrust's transformative use argument is essentially an argument that it serves a different *functional* purpose, namely to allow users to find books addressing their topics of

---

[6] Moreover, any such holding should emphasize the important fact that this is a case involving a non-profit educational institution, rather than a use with a commercial purpose.

DWT 21240534v5 0025295-000064

interest.  The Second Circuit has never before held that a new *functional* use can constitute a transformative use, and correctly has expressed significant concerns about such arguments.  As a contested new use moves farther away from the core of the transformative use doctrine, it is all the more important to focus on whether the new use "supercede[s] the objects of the original creation."  *Campbell*, 501 U.S. at 579.  In this unusual case, in which an educational, non-commercial institution has created an index that does not display any actual text from the allegedly infringed works, the index – viewed in isolation without reference to the mass digitization that preceded it – likely does not supercede the objects of the copyrighted books.  But in many other contexts, users – including commercial aggregators – whose "purpose is superior search capabilities" *do* create secondary works containing substantial excerpts or depictions of the original that can supplant demand for the copyrighted work and can seriously damage the underlying purpose of the Copyright Act:  to create the monetary incentives to stimulate progress of science and the arts.

## A. The Core of the Transformative Use Doctrine Focuses on New Expressive Uses of the Original Work

The most critical inquiry under the first factor of the fair use analysis, and modern fair use jurisprudence generally, is whether the new work is transformative.  As the U.S. Supreme Court has instructed, "The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely

'supercede[s]' the objects' of the original creation, *Folsom v. Marsh* [citation omitted], *accord, Harper & Row*, [citation omitted] ("supplanting the original"), or instead adds something new, with a further purpose or different character, *altering the first with new expression, meaning or message*; it asks, in other words, whether and to what extent the new work is transformative." *Campbell*, 510 U.S. at 579 (emphasis added). As this Court has clarified:

> If "the secondary use adds value to the original – if [copyrightable expression in the original work] is used as *raw material*, transformed in the creation of new information, new aesthetics, new insights and understandings – this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society."

*Blanch v. Koons*, 467 F.3d 244, 251-52 (2d Cir. 2006) (emphasis added), quoting *Castle Rock Entm't Grp. v. Carol Publ'g*, 150 F.3d 132, 142 (2d Cir. 1998) (brackets in original).

The transformative use doctrine, as adopted by the Supreme Court in *Campbell*, has its origins in an article written by Judge Pierre N. Leval titled "Commentaries: Toward a Fair Use Standard." 103 Harv. L. Rev. 1105 (1990). The article makes eminently plain that the core aim of the doctrine is to advance expressive uses of a prior author or creator's works. Leval begins by establishing that the goal of copyright is "to stimulate activity and progress in the arts for the intellectual enrichment of the public," and that "[t]his utilitarian goal is achieved by permitting authors to reap the rewards of their creative efforts." *Id*. at 1107. He

13

then explains: "Notwithstanding the need for monopoly protection of intellectual creators to stimulate creativity and authorship, excessively broad protection would stifle, rather than advance, the objective." *Id*. at 1109. Leval's reasoning underscores the types of subsequent expressive uses that he is seeking to protect. As he states, the fair use doctrine is necessary for two reasons: "First, all intellectual creative activity is in part derivative. . . . Each advance stands on building blocks fashioned by prior thinkers. Second, important areas of intellectual activity are explicitly referential. Philosophy, criticism, history, and even the natural sciences require the continuous reexamination of yesterday's theses." *Id.*

With these limited goals in mind, Leval proposes the transformative use analysis subsequently adopted by the Supreme Court in *Campbell* – again in a fashion that confirms that he is contemplating subsequent uses of an earlier work that serve a new expressive purpose. As Leval writes, "A quotation of copyrighted material that merely repackages or republishes the original is unlikely to pass the test; in Justice Story's words, it would merely 'supercede the objects' of the original." 103 Harv. L. Rev. at 1111. His examples are telling: "Transformative uses may include criticizing a quoted work, exposing the character of the original author, proving a fact, or summarizing an idea argued in the original in order to defend or rebut it. They also may include parody, symbolism, aesthetic declaration, and innumerable other uses." *Id.* Critically, Leval also emphasizes

14

that the extent of the taking must be justified by the transformative purpose to constitute a transformative use. Even in a biography, the taking of "dazzling passages" because they constitute "good reading, not because such quotation was vital to demonstrate an objective of the biographers" is "without sufficient transformative justification." *Id*. at 1112.

The Supreme Court's decision in *Campbell* is likewise very focused on the fair use doctrine as a means of permitting the use of an earlier published work in order to advance a new expressive purpose, and sounds many of the same themes as Judge Leval's article. The context of the case is a song parody – a new expressive use – and the Court's analysis is deeply moored to that context. Likewise, the case clearly addresses a one-time use, not a commercial business built on the systematic exploitation of copyrighted works created by others. *Campbell* emphasizes that the fair use doctrine is "necessary to fulfill copyright's very purpose" and that "[e]very book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before." 510 U.S. at 575, *quoting Emerson v. Davies*, 8 F.Cas. 615, 619 (CCD Mass 1845). The Court bases its articulation of the transformative use analysis on Leval's article and the early opinions of Justice Story referenced by Leval, and likewise emphasizes that the inquiry "may be guided by "the examples given in the preamble to §107, looking to whether the uses is for criticism, or comment, or

news reporting." *Id*. at 578-79.  It reasons that parody "has an obvious claim to transformative value" because, "[l]ike less ostensibly humorous forms of criticism, it can provide social benefit by shedding light on an earlier work, and, in the process, creating a new one." *Id*. at 579.  Further, *Campbell* emphasizes that the parodist loses its claim of transformation if "the commentary has no critical bearing on the substance or style of the original creation" and is used "merely to get attention or to avoid the drudgery in working up something fresh." *Id*. at 580. Finally, the Supreme Court makes clear that new uses that largely re-package the original are not transformative, observing that a work "composed primarily of an original, particularly its heart, with little added or changed" "reveal[s] a dearth of transformative character or purpose under the first factor" and "is more likely to be a merely superseding use, fulfilling demand for the original." *Id*. at 587-88.

All of the Second Circuit cases upholding a finding of fair use have involved a new work that uses the original work to serve a new *expressive* purpose.  Moreover, individual one-off uses of another's copyrighted content have fared much better than commercial businesses built on the systematic taking and exploiting of other people's works. *See, e.g.*, *Bill Graham Archives v. Dorling Kindersley, Ltd.*, 448 F.3d 605, 610-11 (2d Cir. 2006) (finding transformative use where small images of concert posters in cultural history of the Grateful Dead had the "separate and distinct" expressive purpose of "enhancing the biographical information" in the book);

16

*Blanch*, 467 F.3d 244 (use of portions of ad photographs in artist's work to comment on ad constituted transformative commentary); *New Era Publ'ns Int'l, ApS v. Carol Publ'g Group*, 904 F.2d 152 (2d Cir. 1990) (use of quotations from L. Ron Hubbard's works in biography criticizing Hubbard were transformative); *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253 (2d Cir. 1986) (use of excerpts from published interviews transformative where they were incorporated into essay about abortion for purposes of critique); *see also Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310 (S.D.N.Y. 2008) (transformative use where defendant used two topical lines from song in film to comment on the role of religion in society).[7]  As the Second Circuit said in *Wainwright*, "a classic illustration of fair use is quoting from another's work in order to criticize it . . . . Put more graphically, the doctrine

---

[7] C*ompare with*: *Nihon Keizai Shimbun v. Comline Business Data, Inc.*, 166 F.3d 65 (2d Cir. 1999) (competitor distributing abstracts from numerous news articles not fair use); *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 78-79 (2d Cir. 1997) (decorative use of artwork was not transformative, in contrast to use for comment or criticism); *Twin Peaks Prods. v. Publ. Int'l Ltd.*, 996 F.2d 1366, 1374-76 (2d Cir. 1993) (detailed plot summaries serve no transformative function); *Rogers v. Koons*, 960 F.2d 301, 309-10 (2d Cir. 1992) (sculpture was not a fair use of photograph where it did not comment on the photograph itself); *Wainwright Sec. Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 96-97 (2d Cir. 1977) (routine publication of abstracts of plaintiff's financial reports not a fair use).

distinguishes between 'a true scholar and a chiseler who infringes a work for personal profit.'" [8]

Other circuits, namely the Ninth and Fourth Circuit, have found that a new functional purpose can qualify as a transformative use in cases such as *Kelly*, 336 F.3d 811, *Perfect 10, Inc.*, 508 F.3d 1146 and *iParadigms*, 562 F.3d 630. But even these cases are carefully circumscribed, as set forth in Section II(B) below, to situations in which the new use is not capable of serving the same intrinsic purposes as the original copyrighted work and thus could not supplant the original. Moreover, the Second Circuit has twice expressed concern with such "different functional use" arguments.

This Court recognized the critical distinction between an expressive use and a different functional use in *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998). There, the defendant Media Dial-Up operated a radio monitoring service that re-transmitted free radio broadcasts to subscribers through the use of special phone lines. Dial-Up was marketed to radio stations, advertisers, talent scouts and performance rights organizations for purposes such as verifying the broadcast of commercials, auditioning on-air talent, and enforcing copyrights. *Id.* at 106. In some instances, Dial-Up customers listened only to "mere snippets of Infinity's broadcasts." *Id.* at 109. Dial-Up argued that, as a monitoring service, it

---

[8] 558 F.2d at 94, quoting Hearings on Bills for the General Revision of the Copyright Law Before the House Committee on the Judiciary, 89th Cong. 1st Sess, ser.8, pt.3, at 1706 (1966).

DWT 21240534v5 0025295-000064

was using the plaintiff's radio broadcasts for a different functional purpose –
namely, for information about the broadcasts rather than entertainment. Although
this Court noted that the beneficial aspects of the service could be taken into
account in assessing fair use, it concluded that "difference in purpose is not quite
the same thing as transformation and *Campbell* instructs that transformativeness is
the critical inquiry under this factor." *Id*. at 108. As it stated:

> Here, as the district judge observed, "Kirkwood's
> retransmissions *leave the character of the original broadcasts
> unchanged.* There is neither new expression, new meaning nor
> new message." 965 F. Supp. at 557. In short, there is no
> transformation. As then-District Judge Leval noted in his
> frequently-cited article on fair use, a use of copyrighted
> material that "merely repackages or republishes the original" is
> unlikely to be deemed a fair use. Leval, Toward a Fair Use
> Standard, 103 Harv. L. Rev. 1105, 1111 (1990).

*Id* (emphasis added).[9] Ultimately, the *Infinity* decision concluded that a different
purpose or function alone did not carry the contested use into the zone of fair use
and that a use which could serve the same purpose as the original for even a small
segment of users was not a transformative one.

---

[9] *See also Video Pipeline*, 342 F.2d at 198-99 & n.5 (rejecting the argument that a
defendant's movie clip previews were transformative because they allegedly served
an "informational and promotional" purpose rather than the movies' "aesthetic and
entertainment" purpose, since the previews were "part of – not information about"
plaintiff's copyrighted works); *ASCAP*, 599 F. Supp. 2d at 424-27 (rejecting
AT&T's argument that ringtone previews were transformative because they
allegedly served the purpose of informing customers about the ringtones, as
opposed to the original entertainment purpose of the original music); *Pacific and
Southern Co. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir. 1984) (TV news clipping
service was "neither productive nor creative in any way").

In *Blanch*, 467 F.3d 244, this Court again expressed hesitation with an analysis focused solely on purpose, including the different purposes of an advertisement and a painting, stating that, "We have declined to find a transformative use when the defendant has done no more than find a new way to exploit the creative virtues of the original work." *Id*. at 252. It likewise took issue with a Seventh Circuit decision holding that the exploitation of "new, complementary markets" qualified as fair use and with a treatise stating that the fair use defense may be invoked if the defendant's work "performs a different function than that of plaintiffs" because these statements were "in tension with the Copyright Act's express grant to copyright holders of rights over derivative works." *Id*. at 252 n.4.10

---

[10] Thus, a different purpose is not a "catch-all" equating with transformative use. The Second Circuit's decision in *Bill Graham Archives* is instructive. While it discussed the different purpose of the use, the context was a classic example of fair use and a paradigmatic expressive use: reproduction of copyrighted material to illustrate and give texture to a biographical work. The Second Circuit emphasized that *Illustrated Trip* was "a biographical work documenting the 30-year history of the Grateful Dead." 448 F.3d at 609. The Court explained that although "there are no categories of presumptively fair use . . . courts have frequently afforded fair use protection to the use of copyrighted material in biographies, recognizing such works as forms of historic scholarship, criticism, and comment that require incorporation of original source material for optimum treatment of their subjects." *Id.* (internal citations omitted). With that backdrop, the Court stressed that the images in the biographical work served as "historical artifacts," *id.* at 610, a distinct purpose from the original artistic and promotional purpose of the images.

20

In sum, at its core, the transformative use doctrine has historically been confined to a work that uses another's copyrighted material to advance a new expressive purpose.  As even the Ninth Circuit has recognized, "*Campbell* makes clear that the 'heart' of a claim for transformative use is 'the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works.'"  *Monge*, 688 F.3d at 1175, quoting *Campbell*, 510 U.S. at 580.  Fair use analysis is not an "all or nothing matter" but rather focuses on whether the challenged work serves the purposes of the Copyright Act "to an insignificant or substantial extent."  *Twin Peaks Prods*, 996 F.2d at 1374.  New expressive works that comment upon the originals or use them as historical artifacts are most likely to substantially advance the goals of the Copyright Act.  But when it comes to the unauthorized copying and reproduction of copyrighted works with only a new functional purpose as the justification – such as "superior search capabilities" – it is critical that the courts recognize that such uses are far from the heart of the transformative use doctrine and its historical roots, and that they condone such uses as transformative uses, *if at all,* with the utmost of care and in the narrowest of circumstances.  As the Sixth Circuit stated in one of the university coursepack cases, "This kind of mechanical 'transformation' bears little resemblance to the creative metamorphosis accomplished by the parodists in the

21

Campbell case." *Princeton University Press v. Michigan Document Serv.*, 99 F.3d 1381, 1389 (6th Cir. 1981).

Here, the district court found that "superior search capabilities" of the HathiTrust index could be transformative because they did not provide "actual access to copyrighted material." That is often not the case with services making use of search technology, including commercial aggregators. Thus, it is centrally important that if this Court does make a finding of a transformative use based on "superior search capabilities," it should clearly confine its holding and reasoning to situations in which an educational institution or other non-commercial entity has created an index or other new work that does not provide any access to the original works. In instances in which a defendant has instead re-packaged excerpts or previews of the original work while leaving the character of the original unchanged, *Campbell* and its progeny in this circuit make clear that a new functional purpose such as "superior search capacities" cannot suffice to constitute transformative use where the new work is capable of serving the same purpose as the original and supplanting the demand for it.

### B.    Even Those Cases Recognizing A Functional Use As A Transformative Use Have Required That The New Work Not Be Capable of Serving the Same Purpose As The Original

The district court relied on three circuit cases from the Fourth and Ninth Circuits for its holding that superior search capabilities can constitute a

transformative use in connection with an index that provides no access to any copyrighted text. While the Second Circuit has never endorsed the holdings of those cases, even those cases did not render blanket holdings that all search capabilities are transformative but rather all looked closely at the uses at issue.

*iParadigms*, 562 F.3d 630, is closest to this case on its facts. There the defendant operated plagiarism detection software. When schools subscribed to the service, they required their students to submit papers through the service, which archived copies of the student papers in order to allow for comparison of subsequently submitted student papers to those earlier works. The result of such comparison was an "Originality Report" indicating what percentage of the work appeared to be unoriginal. In *iParadigms*, as here, the plaintiffs were focused solely on the copying and archiving of their works by the defendants, and *not* on any subsequent reproduction or display of their works in new materials. Although the Fourth Circuit could have been clearer in its reasoning, it upheld the archiving of the student papers as a transformative use because the copying and archiving "was completely unrelated to expressive content and instead aimed at detecting and discouraging plagiarism." 562 F.3d at 640. Here, too, the HathiTrust index – which displays only page numbers and no text – is "completely unrelated to expressive conduct." In most cases, however, aggregators and other defendants offering search capabilities make use of content creators' works in ways to do

relate to and display the expressive work composed by the copyright holder.  Thus, it is critical that the Court cabin its reasoning to the narrow circumstances of this case.

Turning to the two Ninth Circuit decisions, both *Kelly*, 336 F.3d 811, and *Perfect 10*, 508 F.3d 1146, involved search engines that returned thumbnail images of plaintiffs' photographs in their search results. [11]  In short, both are *images* cases; to date, no circuit court case has addressed whether and in what circumstances a search engine or commercial aggregator using search technology may reproduce and distribute the *text* of a copyrighted work consistent with the Copyright Act. Moreover, the Ninth Circuit's holding of a transformative use in *Kelly* turned on its finding that the thumbnail images at issue were "much smaller, lower-resolution

---

[11] In their appellate brief, the Authors Guild attempts to distinguish *Kelly* and *Perfect 10* from its own case by claiming that "copyright owners who publish material on the Internet do so because they want their content to be found and viewed.  For all intents and purposes, such owners have provided an implied license to search engines to copy and index their contents."  Brief of Plaintiffs-Appellants at 33.  AP strenuously disputes any implication that publishing a work on the Internet automatically grants the world an implied license to use it for any purpose whatsoever.  In both *Kelly* and *Perfect 10*, the Ninth Circuit considered the fact that the works were previously published on the Internet solely to note that they were not entitled to the higher protection afforded to *unpublished* works. Neither decision makes any distinction between publication on the Internet versus another medium, and neither decision ever mentions an implied license argument. In fact, many copyright owners – including AP – publish their copyrighted work on the Internet subject to specific terms and conditions of use, which often prohibit, for example, copying and distributing the work for commercial purposes.

images" that made them "inappropriate as display material" and noted that, "in the unique context of photographic images, the quality of reproduction may matter more than other fields of endeavor."  336 F.3d at 818, 821 n.37.  It was for this reason – because people could not use the images "for the same [aesthetic] purpose" as the original works – that the court found the images "served an entirely different function than Kelly's original images" and hence could qualify as transformative.  *Id.* at 818.

The Ninth Circuit in *Kelly* took pains to try to harmonize its ruling with the Second Circuit's decision in *Infinity.*  In order to do so, it emphasized that in *Infinity*, even though the radio broadcasts were transmitted "for the purpose of allowing advertisers and radio stations to check on the broadcast of commercials or on-air talent, *there was nothing preventing listeners from subscribing to the service for entertainment purposes*."  336 F.3d at 819 (emphasis added).  As the Ninth Circuit underscored, "Even though the intended purpose of the retransmission may have been different from the purpose of the original transmission, *the result was that people could use both types of transmission for the same purpose*."  *Id.* (emphasis added).  In short, *Kelly* turned on the fact that users could not use the thumbnails for the same purpose as the original photographic works.  *Perfect 10* also involved low resolution thumbnail images, and thus followed *Kelly*, which was a close precedent.  Further, the Ninth Circuit repeatedly emphasized that a key

25

fact weighing in favor of transformative use was that the free public search engine at issue "serves the interest of the public."  508 F.3d at 1164-1166.

In the event that this Court determines that "superior search capabilities" can *ever* form the basis of a transformative use argument, it should confine that holding to non-commercial uses that are not capable of serving the same intrinsic purpose (broadly defined) as the original.  In other words, it should make clear that a transformative use argument fails where "the result was that people could use both types of [works] for the same purpose."  *Kelly*, 336 F.3d at 819.  As the Ninth Circuit stated in *Kelly*, this requirement should control even if the plaintiff's intent was that the original copyrighted work and the new work be used for different purposes.  Such limitations are required by *Campbell*, which holds that "[t]he central purpose of this investigation is to see, in Justice Story's words, whether the new work merely 'supercede[s] the objects' of the original creation."  *Id.* at 579.  Such limitations are also consistent with *Infinity*, which rejected the plaintiff's argument of transformativeness because some limited number of listeners to the radio monitoring service would be listening to the broadcasts for their entertainment value.  150 F.3d at 108 ("Talent scouts, who admittedly would not be listening in

26

order to be entertained themselves, would nevertheless be listening for the entertainment value of the broadcasts rather than their factual content.").[12]

Finally, a leading decision in the Southern District of New York has adopted a similar standard. In *ASCAP*, 599 F. Supp. 2d at 427, AT&T argued that its customers, who were deciding whether to purchase ringtones for their cell phones, listened to ringtone previews (i.e., clips) merely to decide whether to buy them and not for their original entertainment value. The court rejected that argument, stating that AT&T Wireless did not demonstrate that "its customers use previews *solely* for informational purposes, and not also to assess the musical quality and entertainment value of the ringtones" and thus there was no transformation. *Id.* (emphasis added).

In conclusion, in the event that the Second Circuit concludes that "superior search capabilities" can ever qualify as a transformative use, the legal standard articulated above is necessary to ensure that content creators, including the news media, are able to continue to robustly serve their valuable role in today's world, where digital aggregators' costs of reproduction and distribution are minimal, and they can so easily free-ride on the enormous investment required of content creators, including the news media, to produce their content.

---

[12] Further, as this quote reveals, this Court examined the purpose at a high level of abstraction.

Dated:  March 4, 2013

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP


By:   s/ Elizabeth A. McNamara
Elizabeth A. McNamara
Alison B. Schary (admission pending)
Collin J. Peng-Sue
1633 Broadway
New York, NY  10019
Tel:  212-489-8230
Fax:  212-489-8340

Attorneys for *Amicus Curiae*
The Associated Press

28

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume limitation of Rules 29(d) 32(a)(7)(B) and contains 6,978 words, inclusive of headings, footnotes, and quotations.

Dated:  March 4, 2013

By:  __s/ Elizabeth A. McNamara____
Elizabeth A. McNamara

*Attorney for* Amicus Curiae
*The Associated Press*