# 12-4547-cv

IN THE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT



AUTHORS GUILD, INC., AUSTRALIAN SOCIETY OF AUTHORS LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS, PAT CUMMINS, ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON, AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK FAGLITTERAER FORF ATTERO OG OVER-SETTERFORENING, WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK GRUNDSTROM, HELGE RONNING, JACK R. SALAMANCA, JAMES SHAPIRO, DANIELLE SIMPSON,

*Plaintiffs-Appellants,*

*v.*

HATHITRUST, REGENTS OF THE UNIVERSITY OF MICHIGAN, REGENTS OF THE UNIVERSITY OF CALIFORNIA, BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM,

*(Additional Caption On the Reverse)*

*On Appeal from the United States District Court*
*for the Southern District of New York (New York City)*

## BRIEF FOR AMICUS CURIAE AMERICAN SOCIETY OF JOURNALISTS AND AUTHORS, INC. IN SUPPORT OF PLAINTIFFS-APPELLANTS

David Leichtman
Hillel I. Parness
Shane D. St. Hill
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
*Counsel for Amicus Curiae American*
  *Society of Journalists and Authors, Inc.*
601 Lexington Avenue, Suite 3400
New York, New York 10022
212-980-7400
dleichtman@rkmc.com
hiparness@rkmc.com
sshill@rkmc.com

TRUSTEES OF INDIANA UNIVERSITY, CORNELL UNIVERSITY, JULIA DONOVAN DARLOW, LAURENCE B. DEITCH, DENISE ILITCH, OLIVIA P. MAYNARD, ANDREA FISCHER NEWMAN, ANDREW C. RICHNER, S. MARTIN TAYLOR, in his official capacity as THE REGENTS OF THE UNIVERSITY OF MICHIGAN, KATHERINE E. WHITE, in her official capacity as THE REGENTS OF THE UNIVERSITY OF MICHIGAN, RICHARD C. BLUM, DAVID CRANE, WILLIAM DE LA PENA, RUSSELL GOULD, EDDIE ISLAND, ODESSA JOHNSON, GEORGE KIEFFER, SHERRY L. LANSING, MONICA LOZANO, HADI MAKARECHIAN, GEORGE M. MARCUS, ALFREDO MIRELES, JR., NORMAN J. PATTIZ, BONNIE REISS, FRED RUIZ, LESLIE TANG SCHILLING, BRUCE D. VARNER, PAUL WACHTER, in his official capacity as THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, CHARLENE ZETTEL, in his official capacity as THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, JEFFREY BARTELL, MARK J. BRADLEY, JUDITH V. CRAIN, JOHN DREW, TONY EVERS, MICHAEL J. FALBO, EDMUND MANYDEEDS, KATHERINE POINTER, CHARLES PRUITT, TROY SHERVEN, BRENT SMITH, MICHAEL J. SPECTOR, S. MARK TYLER, JOSE F. VAZQUEZ, in his official capacity as THE REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM, DAVID G. WALSH, in his official capacity as THE REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM, WILLIAM R. CAST, PATRICK A. SHOULDERS, MARYELLEN KILEY BISHOP, BRUCE COLE, PHILIP N. ESKEW, JR., CORA J. GRIFFIN, THOMAS E. REILLY, JR., DERICA W. RICE, in his official capacity as THE TRUSTEE OF INDIANA UNIVERSITY, WILLIAM H. STRONG, in his official capacity as THE TRUSTEE OF INDIANA UNIVERSITY, NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE, BLAIR SEIDLITZ, COURTNEY WHEELER,

*Defendants-Appellees,*

*and*

NATIONAL FEDERATION OF THE BLIND,
GEORGINA KLEEGE, BLAIR SEIDLITZ, COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

Amicus Curiae American Society of Journalists and Authors, Inc. ("ASJA") is a non-governmental, 501(c)(6) not for profit organization incorporated in the State of New York with a membership of approximately 1,400 outstanding freelance writers of magazine articles, trade books, and many other forms of nonfiction writing. ASJA has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. ii

I.   INTEREST OF AMICUS CURIAE ............................................... 1

II.  STATEMENT OF ARGUMENT .................................................. 3

III. ARGUMENT ............................................................................. 6

   A. The District Court's finding that the MDP and HDL are
      "transformative" as that word is used in copyright fair use
      analysis is wrong. ................................................................. 6

     1.   The District Court's analysis and findings of fact were
         clearly erroneous ......................................................... 7

     2.   The District Court misapplied what the word
         "transformative" means in copyright law's fair use
         inquiry ....................................................................... 10

     3.   The District Court's decision on "transformation" writes
         derivative works right out of the Copyright Act. ................ 14

     4.   The District Court's finding of "transformation" is already
         being misused by Google in other contexts, and should
         therefore be reversed. ..................................................... 19

   B. The District Court's analysis of the remaining fair use factors
      was overly influenced by its incorrect determination of
      "transformation," and should thus be reversed. .......................... 22

   C. Sections 108 and 121 of the Copyright Act do not apply to the
      acts at issue here ..................................................................... 24

   D. So-called "orphaned works" should not be treated differently
      under current copyright law. ...................................................... 25

   E. Associational plaintiffs have standing ......................................... 27

IV. CONCLUSION ......................................................................... 29

i

# TABLE OF AUTHORITIES

Page

## Cases

*Am. Geophysical Union v. Texaco, Inc.*,
   60 F.3d 913, 923 (2d Cir. 1994) .......................................................11

*Authors Guild v. Google, Inc.*,
   282 F.R.D. 384 (S.D.N.Y. 2012).......................................................27

*Authors Guild v. Google, Inc.*,
   770 F. Supp. 2d 666 (S.D.N.Y. 2012)................................................25

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006) ..............................................................13

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569, 579 (1994) ...................................................................10

*Cariou v. Prince*,
   784 F. Supp. 2d 337, 348 (S.D.N.Y. 2011) ................................. 15, 21

*Castle Rock Entm't v. Carol Publ'g Group*,
   150 F.3d 132, 143 (2d Cir. 1998) ......................................................15

*Circuit City Stores v. Adams*,
   532 U.S. 105, 117-18 (2001) .............................................................24

*Infinity Broadcast Corp. v. Kirkwood*,
   150 F.3d 104 (2d Cir. 1998) ..............................................................12

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
   166 F.3d 65, 72 (2d Cir. 1999) ..........................................................18

*On Davis v. The Gap, Inc.*,
   246 F.3d 152, 174 (2d Cir. 2001) ......................................................11

*Ringgold v. Black Entertainment Television, Inc.*,
   126 F.3d 70, 78 (2d Cir. 1997) ..........................................................11

*Rogers v. Koons*,
   960 F.2d 301, 310 (2d Cir. 1992), *cert. denied*, 506 U.S. 934 (1992) ................16

*U.S. v. Am. Soc'y of Composers* (*in re: AT&T*),
   599 F. Supp. 2d 415, 427 (S.D.N.Y. 2009) .................................................... 13, 25

*UMG Recordings, Inc. v. MP3.com, Inc.*,
   91 F. Supp. 2d 349 (S.D.N.Y. 2000) ....................................................................18

**Statutes**

17 U.S.C. § 101 ......................................................................................................15

17 U.S.C. § 106(2) ..................................................................................................15

17 U.S.C. § 107 .................................................................................................. 2, 14

17 U.S.C. § 108 ........................................................................................................4

**Other Authorities**

2 Paul Goldstein, <u>Goldstein on Copyright</u> § 12.2.2.1(c), 12:39–40
   (3d ed. Supp. 2010) ...........................................................................................17

**Rules**

Fed. R. App. P. 29(a) ...............................................................................................1

Fed. R. App. P. 29(c)(5) ...........................................................................................1

Rule 29.1 ...................................................................................................................1

## I.    INTEREST OF *AMICUS CURIAE*

*Amicus curiae* American Society of Journalists and Authors, Inc. ("ASJA"), founded in 1948, is a non-governmental, 501(c)(6) not for profit organization with headquarters in New York City and with active regional chapters in Arizona, Chicago, Illinois, New York City (local chapter separate from headquarters), Northern California, Southern California, San Diego, California, the Rocky Mountains region (Denver area), the Southeast (Atlanta area), the Upper Midwest (Minneapolis area), upstate New York (Rochester area), Boston, and Washington, DC.[1] ASJA has a membership of approximately 1,400 outstanding freelance writers of magazine articles, trade books, and many other forms of nonfiction writing, each of whom has met ASJA's exacting standards of professional achievement.

The requirements for membership in the organization are stringent: an author is required to demonstrate a substantial professional resume before being admitted to membership. Nonfiction book authors qualify with two or more traditionally published nonfiction books, or one book with a second under contract. Article

---

[1] Pursuant to Fed. R. App. P. 29(c)(5) and Rule 29.1 of the Local Rules of the United States Court of Appeals for the Second Circuit, ASJA hereby states that (1) no party or their counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money intended to fund preparing or submitting this brief; and (3) no person — other than ASJA, its members, and its counsel — contributed money intended to fund preparing or submitting this brief. Pursuant to Fed. R. App. P. 29(a), ASJA also states that all parties have consented to the filing of this brief.

authors must provide a minimum of six substantial bylined articles written on a freelance basis in national publications that pay for content. A reader browsing any U.S. news stand would find many articles by ASJA members. *See* generally, *http://www.asja.org/our-members/member-news/*.

ASJA offers extensive benefits and services focusing on professional development, including confidential market information, meetings with editors and others in the field, an exclusive referral service, seminars and workshops, discount services and, above all, the opportunity for members to explore professional issues and concerns with their peers. Additionally, ASJA is the publisher and author of several works. Therefore, ASJA and its members are directly affected by Defendants-Appellees' agreement with Google, Inc. ("Google") to scan the collections of the libraries of the defendants creating digital copies of works, and making those digital copies available to the public in various ways.

ASJA supports Plaintiffs-Appellants' appeal of the Order of the District Court for the reasons stated below. Specifically, ASJA urges this Court to reverse the District Court's ruling with respect to its finding of "transformative use," and thus its determination that the uses the Defendants-Appellees put to the copyrighted works at issue were "fair" pursuant to 17 U.S.C. § 107 . In addition, other issues raised by the District Court's opinion that are of particular concern to ASJA and its members are addressed.

## II.   STATEMENT OF ARGUMENT

This case concerns allegations of copyright infringement arising from a joint venture between Defendants-Appellees and Google, Inc. ("Google"), whereby Google scanned – and continues to scan – the library collections of the University Defendants-Appellees and then built – and continues to build – an immense database containing the full text of all of the scanned works, referred to in the underlying opinion as the Mass Digitization Project ("MDP"). In partnership with Defendants-Appellees, Google put the MDP to multiple uses. The main use to which the MDP has been put is Google Books, a commercial service available to all over the Internet, and the subject of a parallel lawsuit pending before Judge Chin and currently on appeal with respect to class certification.

In addition to the creation of Google Books, Google and Defendants-Appellees agreed that Google would provide digital copies of the scanned books to the Defendants-Appellees, and that the scanned works would also become part of the HathiTrust Digital Library ("HDL"), through which the Defendants-Appellees would make the books available to their patrons in various forms. They also undertook to create a database of "orphan works," referred to in the underlying opinion as the Orphan Works Project ("OWP"). All of the foregoing was undertaken by Defendants-Appellees and Google without obtaining the prior consent of the authors or copyright owners of the scanned books, and Plaintiffs-

Appellants sued the Defendants-Appellees for copyright infringement. The primary defense asserted by the Defendants-Appellees was fair use, under Section 107 of the Copyright Act.

On October 10, 2012, the District Court sided with Defendants-Appellees, finding that their acts of infringement were excused under the fair use doctrine. The District Court also held that Section 108 of the Copyright Act (relating to excepted uses by libraries) did not bar a finding under Section 107 of fair use, and that Defendants-Appellees were excused from copyright infringement under Section 121 (relating to excepted uses by the blind).[2] The District Court also ruled that the questions surrounding the OWP were not yet ripe, and that the associational plaintiffs lacked standing under the Copyright Act. Plaintiffs-Appellants appealed. ASJA submits this Brief of *Amicus Curiae* in support of Plaintiffs-Appellants to the extent set forth below, and to focus on certain errors of the District Court that are of particular concern to ASJA's members.

First, in concluding that Defendants-Appellees' are eligible to invoke the fair

---

[2] While the District court wrote that it "need not decide if the MDP fits within the parameters of 17 U.S.C. § 108 because it unquestionably fits within the definition of fair use" (Opinion & Order ("Op.") at 22 n.32, *The Authors Guild v. Hathitrust*, No. 11 CV 6351 (HB), Dkt. 156 (S.D.N.Y. Oct. 10, 2012), it also expressly agreed with Defendants-Appellees' interpretation of Section 108, namely that "'systemic' means reproducing a single work repeatedly, rather than reproducing all the works in their libraries." *Id.* at 12 n.15.  The District Court thus <u>did</u> decide that the limitations of Section 108 do not prohibit Defendants-Appellees' activity, and Plaintiffs-Appellants appeal that holding.

use defense to their copyright infringement, the District Court erroneously found that Defendants-Appellees' actions were and are "transformative" as to the books that they and Google scanned without the consent of the authors and copyright owners. As discussed in greater detail below, scanning and digitizing books is not transformative under copyright law. ASJA is particularly concerned that the finding of "transformation" not be used in the effort already underway in other proceedings to expand the District Court's "transformative" conclusion and apply it to inapposite fact patterns, including the parallel case that is proceeding against Google with respect to its commercial undertakings.

Second, ASJA joins Plaintiffs-Appellants' arguments that the District Court erroneously applied Sections 108 and 121 of the Copyright Act because statutory exceptions to the Copyright Act must be interpreted narrowly and applied strictly. Any effort to live up to the "spirit" of such sections without requiring conformance with the letter of these narrow statutory exceptions to copyright exclusivity undermines the legislative scheme implemented by Congress and unfairly further narrows the rights of copyright owners.

ASJA also joins Plaintiffs-Appellants' argument concerning the OWP and ripeness on the ground that, if the creation of the OWP is ripe for adjudication, the Court should conclude that the OWP represents unexcused copyright infringement by the Defendants-Appellees and is a further reason to reject the fair use defense

5

for the overall scanning and distribution of the works.

Finally, it is important for the Court to recognize that associational plaintiffs like the ASJA do have standing to represent their individual members under the Copyright Act. The ASJA represents over 1,400 authors and journalists who, without ASJA, would not have the resources to enforce their rights in copyright suits, especially against large and well-funded entities such as Defendants-Appellees and Google. This reality, along with judicially encouraged principles of efficiency and economy, are the exact reason why associational plaintiff standing is recognized in cases comparable to this lawsuit.

## III. ARGUMENT

### A. The District Court's finding that the MDP and HDL are "transformative" as that word is used in copyright fair use analysis is wrong.

The MDP and HDL are not "transformative" uses under copyright law. Thus, regardless of the Court's ultimate conclusion on the question of fair use, it should reverse the District Court's finding of transformative use for at least four reasons. First, the District Court's findings rest on contested issues of fact that should not have been resolved on summary judgment. Second, even putting the District Court's factual findings aside, the copyrighted works of authors have not been transformed under applicable case law defining what it means to transform excusably a copyrighted work. Third, if the District Court's decision were

6

permitted to stand, it would effectively write out the derivative works right from

the Copyright Act. Fourth, if permitted to stand, there is a significant risk that the

District Court's "transformation" analysis may be applied to commercial

enterprises erroneously; indeed, Google itself has already begun to cite the District

Court's opinion below as if it applies to Google's purely commercial venture.

### 1.    The District Court's analysis and findings of fact were clearly erroneous.

The District Court's conclusion that Defendants-Appellees should prevail on

their fair use defense was built largely on an initial erroneous factual finding which

then led the court to conclude wrongly that the actions of Defendants-Appellees

were "transformative."

After reciting the basic principles of fair use, the District Court began its

analysis of the first fair use factor – purpose and character of the use – with a

number of factual assertions, including:

> "The MDP was undertaken with several goals in mind. The MDP allows scholars to identify relevant works far more efficiently."  Op. at 15 (citing The Libraries' Statement of Material Facts ("Libraries' 56.1") at ¶¶ 18-23, *The Authors Guild v. Hathitrust*, No. 11 CV 6351 (HB), Dkt. 113 (S.D.N.Y. Jun. 29, 2012)).

"The program provides print-disabled individuals with 'access to the wealth of information within library collections.'" *Id*. (citing Libraries' 56.1 ¶¶ 61-66).[3]

Critically, the first statement above regarding the manner in which the MDP benefits scholars does <u>not</u> find support in the cited paragraphs of Defendants-Appellees' Rule 56.1 statement, which neither discuss the benefits of the MDP, nor its usefulness to scholars. Indeed, the one paragraph that suggests the benefits of digital search tools is expressly controverted by Plaintiff-Appellants. *See*, *e.g.*, Plaintiffs' Counter-Statement In Response to Defendants' Statement of Material Facts ("Pl. Resp. 56.1") at ¶ 18, *The Authors Guild, Inc. v. Hathitrust*, No. 11 cv 6351 (HB), Dkt. 133 (S.D.N.Y. Jul. 20, 2012) (referring to the benefits of academic libraries, not the MDP); *id.* at ¶ 23 (Plaintiffs-Appellants contesting Defendants-Appellees' assertions, writing "[t]here are many other ways in which a particular work might be discovered by a researcher.").

The District Court thus begins with two factual premises, at least one of which with regard to scholarship (a term the District Court did not define with any level of scrutiny), that is either not supported by the record at all or that, at best, fails to acknowledge facts that are disputed. Accordingly, its conclusion was clearly erroneous and should be reversed.

---

[3] The District Court also states that the MDP "helps Defendants preserve their collections…" *Id*. (citation omitted) but then acknowledges that preservation is not a strong basis to find transformative use. *Id*. at 15 n.19.

From that point forward in its opinion, the District Court then paints Defendants-Appellees' actions with the incorrectly broad brush of "scholarship and research," suggesting that the first fair use factor automatically "tilts in the defendants' favor" because of this contested purpose. Op. at 15. The court goes on to add – without citation – that the provision of full-text search capabilities to the Defendants-Appellees' library patrons satisfies the first prong of the fair use test. Op. at 16. The court's reasoning on this point is, however, completely unclear.

Even though a court could decide the question of whether or not a particular use is fair without finding the use to be "transformative," and here such a finding was not necessary to the adjudication of the issue, the District Court then goes further, finding that Defendants-Appellees' actions are "transformative." It reaches this conclusion, apparently, on the theory that the "superior search capabilities" of the MDP (to search for the works) are an "entirely different purpose than the original works," because the search capabilities have "given rise to new methods of academic inquiry." Op. at 16. The court also finds that "use of digital copies to facilitate access for print-disabled persons is also transformative," because "the provision of access for [disabled persons] was not the intended use of the original work (enjoyment and use by sighted persons)…." Op. at 18. But even if the Court's erroneous factual determination is upheld as proper on summary judgment,

providing the copyrighted works in a new format or affording greater access is not "transformative" as that word is intended in copyright law.

> ## 2.    The District Court misapplied what the word "transformative" means in copyright law's fair use inquiry.

The fair use doctrine in copyright law is a mix of statutory and judge-made law. "Transformative use" is not mentioned in the statutory factors, but it has been imported into the first statutory factor which directs the finder of fact to make an inquiry into the purpose and character of the accused infringing use. In *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994), where the Supreme Court first announced that an inquiry into whether the use is "transformative" should be part of the first factor, the High Court defined what it meant by "transformative": whether it "*adds something new*, with a further purpose or different character, *altering the first* with new expression, meaning, or message." *Id.* at 579 (emphasis added).

The accused infringing uses put to the copyrighted works at issue here fall outside of this definition. They do not "add" anything or "alter" the original use intended for the copyrighted works in any way. As this Court has made clear, an accused infringing work is not transformative if, "[r]ather than making some contribution of *new* intellectual value and thereby fostering the advancement of the arts and sciences, [it] is likely to be used simply *for the same intrinsic purpose* as

the original." *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 923 (2d Cir. 1994) (emphasis added). The literal copying done by Google for the MDP and HDL is not putting the copyrighted works to a different intrinsic purpose than the originals. Rather, the argument of the Defendants-Appellees (and their corporate sponsor Google), erroneously accepted by the District Court, is simply that more or different groups of people will gain *access* to those works and can enjoy them in a different contextual manner; but there is no argument, and there cannot be, that the works themselves have been transformed.

This Court's binding precedent makes it crystal clear that the work itself must be transformed and that a mere change of context is insufficient to make a pure literal copy into a "transformative" fair use. For example, in *On Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001), the use of a literal copy by the defendant was deemed not transformative because the work itself was not transformed: the display of copyrighted jewelry in a clothing advertisement "in the manner it was made to be worn" was not transformative. *Id.* at 174. Similarly, in *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70 (2d Cir. 1997), a visual image of plaintiff's copyrighted quilt was used without alteration but for a different purpose than originally intended, namely to create a mood in a televised scene. *Id.* at 78. Nevertheless, this Court held it not to be transformative as the infringing use did not alter the work itself: "the defendants have used Ringgold's work for precisely a

central purpose for which it was created – to be decorative." *Id.* at 79. Here, the copyrighted works at issue were created to be read, studied, etc. The MDP and HDL did not transform them by simply providing greater or different means of access.

The District Court's finding on "transformation" represents a sharp break from existing case law that should be corrected. The situation here merits a close comparison to *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998), where this Court rejected a similar argument that recontextualizing an exact copy of a copyrighted work is an excused "transformation" for purposes of fair use. *Infinity Broadcast* involved the operator of a service that retransmitted the plaintiff's radio broadcasts over the telephone. *Id.* at 106. No alterations were made to the radio transmissions and defendant claimed they were only used "for purposes such as audition[ing] on-air talent, verifying the broadcast of commercials, and listening to a station's programing format and feel." The defendant argued that its use thus constituted fair use because the broadcasts were used for *informative* rather than entertainment purposes. *Id.* at 108. This Court disagreed and ruled that defendant's retransmissions were not transformative because, although the informational purpose was different than the original entertainment purpose, that "differen[ce] in purpose is not quite the same thing as transformation, and . . . transformativeness is the critical inquiry . . . ." *Id*. Because

12

the "character of the original broadcasts [remained] unchanged," there was "neither new expression, new meaning nor new message . . . ." *Id*. As is the case here, no transformation had taken place. *See also U.S. v. Am. Soc'y of Composers* (*in re: AT&T*), 599 F. Supp. 2d 415, 427 (S.D.N.Y. 2009) (previews of copyrighted songs were not transformative under fair use analysis because "any difference in applicant's informational purpose in streaming previews of ASCAP music from the original entertainment purpose of the music is insufficient, by itself, to render applicant's use transformative.").

In support of its understanding of transformative use, the District Court cited one case from this Circuit: *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006), describing the holding as "the use of entire copyrighted concert posters in a book 'to document and represent the actual occurrence' of the concerts was different from the 'dual purposes of artistic expression and promotion of the original use.'" Op. at 16. In *Bill Graham*, however, the images were found to be used fairly because of the biographical nature of the use, which is clearly within the statutory fair use exceptions that are specifically enumerated in the preamble of "criticism, comment, news reporting, teaching [for classroom use], scholarship or research." 17 U.S.C. § 107. Thus, any finding of "transformation" was unnecessary to the holding. Furthermore, the use of copyrighted posters in the biography at issue in that case were truly for an "entirely different" purpose than the original,

13

whereas here the uses being put to the infringing works by the MDP and HDL are actually identical to the purpose of the original use as discussed above. Other than *Bill Graham*, the District Court essentially ignored the extensive case law in this Circuit, focusing instead on inapposite cases from the Ninth Circuit in claimed support of its interpretation. *See* Op. at 16-17.

Accordingly, this Court should reverse the District Court's finding that the MDP and HDL have "transformed" the copyrighted works at issue, irrespective of how it may weigh the other fair use factors.

### 3. The District Court's decision on "transformation" writes derivative works right out of the Copyright Act.

Following on its theme of "access," the District Court also found Defendants-Appellees' use to be transformative because it "provides print-disabled individuals with access to the wealth of information within library collections." *See, e.g.*, Op. at 15 (internal quotations omitted); *id.* at 18 ("The use of digital copies to facilitate access for print-disabled persons is also transformative.").

However, as a matter of law, this purpose, however beneficial it may be, cannot be considered "transformative" because providing print-disabled individuals with the access to understand copyrighted works is the legal equivalent of translating or reformatting these works. Section 106 of the Copyright Act provides authors with the exclusive right to prepare, reproduce, distribute, display

14

and perform not only their original works but derivative works made therefrom. *See* 17 U.S.C. § 106(2). Section 101 of the Copyright Act defines a derivative work as: "a work based upon one or more preexisting works, such as a translation. . . abridgment, condensation, or any other form in which a work may be recast, *transformed*, or adapted." 17 U.S.C. § 101 (emphasis added). *See also Castle Rock Entm't v. Carol Publ'g Group*, 150 F.3d 132, 143 (2d Cir. 1998) (rejecting fair use defense, noting that "[a] derivative work, over which a copyright owner has exclusive control, is defined as a work based upon one or more preexisting works, such as a translation . . . .").

The new format for copyrighted works created by Defendants-Appellees and Google by literally copying millions of copyrighted works and digitizing them is merely the creation of a mass of unauthorized derivative works that are still subject to copyright protection. The MDP and HDL do not change the ultimate purpose of the copyright protected works, which is to read, understand and consume the contents of books (even if that reading is done via Braille, audio translation, or large-type editions). As a recent District Court opinion in this Circuit and one of the major treatises on copyright law also point out, the transformative use doctrine for fair use analysis cannot trump the author's exclusive right to make derivative works, and would conflict with that right if misapplied. *See*, *e.g.*, *Cariou v. Prince*, 784 F. Supp. 2d 337, 348 (S.D.N.Y. 2011)  (thoughtful discussion distinguishing

15

an infringing derivative work that recasts or "transforms" the original work as defined in Section 101 from a work that is excusably "transformative" in the sense of the first fair use factor; specifically holding that there is no precedent to support a finding that an infringing "use is fair absent transformative comment on the original."); *see also* 2 Paul Goldstein, Goldstein on Copyright § 12.2.2.1(c), 12:39–40 (3d ed. Supp. 2010) (criticizing "transformative" use doctrine as inconsistent with derivative works right).

While *amici* laud the efforts to bring access to a greater portion of the population, the use by the MDP and HDL does not comment on the original works in any way, and calling the purpose of providing access "transformative" would write the derivative works doctrine out of the Copyright Act. "If an infringement of copyrightable expression could be justified as fair use solely on the basis of the infringer's claim to a higher or different artistic use . . . there would be no practicable boundary to the fair use defense." *Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir.), *cert. denied*, 506 U.S. 934 (1992).

An unrestricted ruling that the MDP and HDL are "transformative" because of the purported benefits to scholars and the sight-impaired would open the door for other commercial digitization and indexing projects of writings, music and even film, on the theory that doing so allows scholars with new ways to study and access those works. Under such a regime, someone who managed to capture all of

16

the content available through Netflix's commercial online streaming service could argue that he was motivated by the "scholarship" of television and film. Once one begins branding search engines with the label "scholarship," and deeming them transformative, there is no rational or logical place to draw the line on who is or who is not legitimately a scholar, who is or is not engaged in "scholarship," and who is or is not the "intended" consumer of such a service. The very definition of "scholar" is bound to loosen over time, further muddying who would or would not be entitled to a scholarship-based fair use exception. Much more scrutiny of these questions ought to be required than that employed by the District Court before a blanket finding of fair use can be made for a mass digitized use such as that at issue here.

The District Court's attempt to squeeze the provision of copies of books to the disabled into the "transformative" mold demonstrates the complete lack of fit with that doctrine. To do so, the court – without citation to any authority – invented the idea that the purpose of books is for sighted people to enjoy them, to the exclusion of non-sighted persons, and thus the conversion of books so that blind people can enjoy them represents a *de facto* transformative event. This cannot possibly be the law, or else it would mean that people who translate books from English to French enjoy a fair use defense, having transformed the use of the book from its original purpose – to be read by English speakers – into a totally new use – to be read by

17

French speakers. *See Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 72 (2d Cir. 1999) (finding copyright infringement "not in the least transformative . . . [because] the abstracts are for the most part direct translations . . . ; defendants added almost nothing new in their works. This factor weighs strongly against fair use."). Indeed, there would be no reason to exclude copies of large print books from fair use immunity, either.

The District Court employed similarly flawed reasoning in its attempt to distinguish the present case from *UMG Recordings, Inc. v. MP3.com, Inc.*, 91 F. Supp. 2d 349 (S.D.N.Y. 2000), (*see* Op. at 17). In *UMG*, the court rejected the defendant's argument that reproduction of tens of thousands of plaintiffs' music CDs to stream music over the Internet to customers who had already purchased the same CDs was transformative. Defendant's theory was that by enabling customers to "space shift" their music, defendant had brought about a transformative use. The court rejected this argument correctly, writing that defendant's argument was "simply another way of saying that the unauthorized copies are being retransmitted in another medium – an insufficient basis for any legitimate claim of transformation." *Id*. at 351. Likewise, translating books for a different audience is simply not "transformative" and should not be deemed to be such.

In some regards, the District Court appears to have been motivated by the overall "fairness" of expanding the access of books to the disabled, and also to

18

scholars, although the term is lamentably undefined and unscrutinized. *Amicus* does not wish to diminish the obvious benefits of making books more widely available to the disabled. However, the perceived worthiness of a goal does not, of itself, mean that every way of achieving it is fair. In this instance, it also cannot be used to expand or rewrite the proper definition of "transformative" use.

**4.    The District Court's finding of "transformation" is already being misused by Google in other contexts, and should therefore be reversed.**

It is important that the Court understand how Google and others who support Google are already misusing the District Court's finding of fair use, and in particular its determination of "transformation." As discussed above, the MDP and HDL are merely elements, or perhaps mere by-products, of Google's massive efforts to digitize an enormous number of copyrighted works for purely commercial purposes in the Google Books project.

The Court is no doubt aware of the co-pending appeal from class certification in the litigation referred to as the "Google Books" litigation. *See The Authors Guild, Inc. v. Google*, No. 12-3200-cv (2d Cir. 2013). In the briefing in that case, Google cited the District Court's opinion in this case for the proposition that because the commercial Google Books project purportedly "creates new information—a comprehensive searchable catalog of the world's books—and does not replace books, the first fair use factor (the purpose and character of the use)

19

*decidedly* tilts the analysis in Google's favor *across-the-board*." Brief for

Appellant at 28-29, *The Authors Guild, Inc. v. Google, Inc.*, No. 12-3200-cv (2d

Cir. Nov. 9, 2012) (emphasis added) (citing *Authors Guild, Inc. v. Hathitrust*, No.

11 cv 6351 (HB), 2012 U.S. Dist. LEXIS 146169, at *45 (S.D.N.Y. Oct. 10,

2012)). While the District Court below clearly did not intend to hand Google a

victory over the commercial uses of all the millions of books it digitized,

nevertheless Google apparently felt free to pronounce to this Court in its appeal

brief in the Google Books case that such a victory had occurred - *as if the decision*

*below had provided it with complete carte blanche* to infringe. Alas, Google

appears to interpret the decision below as providing it with the complete freedom

to do whatever it desires with millions of copyrighted works without the

permission of their owners.[4]

---

[4] In the Google Books case the *amici* supporting Google also felt free to cynically quote the decision below without providing the context of the special circumstance at issue here and the non-commercial aspect of the use of the HDL and MDP. *See* Brief of Amici Curiae Academic Authors In Support of Defendant-Appellant And Reversal at 14-15, *The Authors Guild, Inc. v. Google, Inc.*, No. 12-3200 (2d Cir. Nov. 16 2012) (matter-of-factly stating that the decision below stands for the overly broad proposition that, "making digital copies of works to index their contents and to make small portions more accessible is a transformative use that supports a finding of fair use."); *see also id*. at 17 ("A virtually identical brief helped to persuade a District Court in the *Authors Guild v. HathiTrust* lawsuit to uphold the fair use defense of Google's library partners because of the nonexpressive uses the latter were making of copyrighted works in the digital corpus that the libraries got from Google.").

Similarly, because of its ramifications in the Google Books case, Google filed an amicus brief in another co-pending appeal in the *Cariou v. Prince* matter discussed above. In that brief, under the heading "A use need not comment on the original in order to be transformative," Google argued incorrectly that "the productive recontextualization of existing works, with or without commentary on those works, is one common type of transformative use." Brief of Amicus Curiae Google Inc. In Support of Neither Party at 7, *Cariou v. Prince*, No. 11-1197 (2d Cir. Nov. 2, 2011). Google is wrong about the law. "Recontextualizing" uses of copyrighted works may be "common," and increasingly so in the digital age, but it is not "transformative" in the sense of the copyright fair use doctrine. As discussed above, literal copying of massive numbers of copyrighted works without permission and creating infringing derivative works from them cannot be excused by labeling the copying "transformative."[5]

The finding below that the uses are "transformative" should be reversed. This case should not be used as a vehicle for Google to further its position that mass copying is excusably "transformative" with respect to its liability in the Google Books litigation or any other commercial mass digitization project. Even if this

---

[5] In its brief in *Cariou v. Prince*, Google follows the aforementioned section with a nine-page section entitled "The court should be particularly cognizant of the impact of its decision on digital uses of many works at once, which rarely comment but are frequently held to be transformative," in which it cites a litany of completely distinguishable cases, not one of which hails from the Second Circuit. *See id.* at 9-17.

Court is inclined to approve the uses at issue in this case as fair because of their more narrow audience and potential non-commercial purpose, a finding of "transformation" would not be necessary to reaching such a conclusion. But if the District Court's decision on "transformation" is permitted to stand, the kind of bootstrapping efforts that Google is trying to make to apply the decision below to purely commercial activities are unfortunately inevitable.

The District Court's erroneous conclusions regarding transformative use must be corrected. Leaving the District Court's decision untouched could motivate others to build decidedly commercial services, but make sure that such services have an element that resembles the services provided by the HDL in the hope that the entire enterprise will be immunized from copyright liability.

**B.    The District Court's analysis of the remaining fair use factors was overly influenced by its incorrect determination of "transformation," and should thus be reversed.**

The District Court's flawed finding that Defendants' use is "transformative" appears to have influenced improperly its analysis of the other fair use factors. When addressing the second factor – nature of the copyrighted works – although the District Court acknowledged that a meaningful portion of the HDL (9%) and a substantial majority of the identified works (76%) were fiction, prose or drama, the court held it was "not dispositive" because "the use is transformative, intended to facilitate key-word searches or access for print-disabled individuals." Op. at 18. If

22

the MDP and HDL are not, in fact, transformative, the District Court expresses no reason why this factor should not weigh heavily in Plaintiffs-Appellants' favor.

With regard to the third factor – amount of the work copied – the District Court concluded that "entire copies were necessary to fulfill Defendants' purposes of facilitation of searches and access for print-disabled individuals." *Id*. at 19. Not only is this reasoning plainly circular and lacking in support, at least in <u>this</u> Circuit, but without the erroneous finding that search functionality and access to the blind are inherently transformative, the argument on this prong fails as well. Likewise in connection with the fourth factor – impact on the market – the District Court concluded that because "at least two of the uses are transformative – that is, the provision of search capabilities and access for print-disabled individuals," the harm would also be to a "transformative market," and thus irrelevant. *Id*. at 20. Like the court's analysis of the other factors, this argument employs circular reasoning and collapses without the erroneous "transformative" finding.

Further, while that whereas the District Court initially hews closely to concepts of "scholarship and research" and "academic inquiry" to justify its finding of transformative fair use (*see* Op. at 15, 16), the terminology in the opinion then shifts, so that by the time the court considers the remaining fair use factors, it is using much more general language, such as "provision of search capabilities." *Id*. at 20. This is yet another reflection of the manifest flaws in the

23

District Court's analysis, and that uncorrected it represents a temptation for those who would try to manipulate it further.

Because the District Court's remaining fair use analysis appears to have been overly influenced by its incorrect determination that the MDP and HDL are transformative, divorced of that incorrect conclusion, the District Court's remaining findings on the other fair use factors do not survive scrutiny. It should be reversed, or at best remanded for further findings in a light not overcast with the dark shadow of an erroneous finding of "transformation."

### C.    Sections 108 and 121 of the Copyright Act do not apply to the acts at issue here.

ASJA joins in the arguments of Plaintiffs-Appellants on the inapplicability of Sections 108 and 121 of the Copyright Act to the MDP and HDL. Each of these statutory exceptions reflects a deliberate decision by Congress, the elements of which must be met if they are to be applied, and the elements simply are not met. *See* Plaintiffs-Appellants' Br. at 18-29, 47-51. This is an unassailable principle of statutory construction. *See Circuit City Stores v. Adams*, 532 U.S. 105, 117-18 (2001) (plain meaning of words in a statute evidenced a narrower Congressional intent than a more open-ended formulation). Once again, it seems possible that the District Court was motivated by a determination to help the visually impaired and legitimate scholars gain full or greater access to the written word, but regardless of

24

the merits of such goals those motivations cannot be allowed to override the plain

language of the Copyright Act. *Cf. U.S. v. Am. Soc'y of Composers*, 599 F. Supp.

2d 415, 433 (S.D.N.Y. 2009) (finding § 110(7) exemption "was intended only for

previews of music in physical record stores. Congress may have had many reasons

for limiting the provision in this way and we will not endeavor to divine the

Congressional intent behind it. We see no reason to override Congress's

intentionally restrictive wording."). [6]

### D.    So-called "orphaned works" should not be treated differently under current copyright law.

The District Court determined that the OWP was not ripe for adjudication,

leaving for another day determination of its legality. If this Court does determine

that the dispute as to the planned OWP is currently ripe for adjudication

Defendants-Appellees' proposed approach to copy first without permission and

apologize later should not be approved by this Court. As Judge Chin stated in the

related case *The Authors Guild, Inc. v. Google, Inc.*, 770 F. Supp. 2d 666

(S.D.N.Y. 2012), the issue of how to handle orphaned works should be left to

---

[6] The District Court ended its fair use analysis by calling the MDP an "invaluable contribution to the progress of science and cultivation of the arts that at the same time effectuates *the ideals espoused by the ADA*." Op. at 22 (emphasis added). But it is impermissible to rely on "ideals" when the statutory exceptions in Sections 108 and 121 already reflect a careful balance considered by Congress.  Where the letter of the exceptions is not met, the exceptions cannot be expanded in the manner that the District Court did so.

Congress. *See id*. at 677 ("First, the establishment of a mechanism for exploiting unclaimed books is a matter more suited for Congress than this Court."). The fact that Congress and the Copyright Office have not yet found a legislative solution they find satisfactory does not give Google the right to privatize the solution unilaterally.

The manner in which Google and the Defendants-Appellees created the MDP and HDL offer great incentives to declare a book or other work "orphaned" or "out of print" with no investigation into whether it is either. Google and Defendants-Appellees do not merit the necessary trust in handling and digitizing orphaned works. "The questions of who should be entrusted with guardianship over orphan books, under what terms, and with what safeguards are matters more appropriately decided by Congress than through an agreement among private, self-interested parties. Indeed, the Supreme Court has held that it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives." *Id.* at 677 (internal quotations omitted).

Google and the Defendants-Appellees did not ask any author to opt-in – they simply made unauthorized copies and determined to deal with the consequences later. The Court should not provide a rubber stamp for wholesale copying that Congress did not authorize as an exception to the copyright laws.

### E.    Associational plaintiffs have standing.

In *The Authors Guild v. Google, Inc.*, 282 F.R.D. 384 (S.D.N.Y. 2012), Judge Chin made it clear that associational standing in copyright actions confers many benefits valued by our judicial system. "The Supreme Court has acknowledged that associational standing confers certain advantages on individual members and the judicial system as a whole. Specifically, an association can draw upon a pre-existing reservoir of expertise and capital that its individual members lack." *Id*. at 391. In particular, Defendants-Appellees' copying here was done *en masse*; no attempt was made to contact individual copyright holders for permission. Given the breadth of Defendants-Appellees' conduct, it would be unfair to now ask individual copyright holders to bring suits against Defendants-Appellees to enforce their copyright. As Judge Chin stated:

> "Furthermore, given the sweeping and undiscriminating nature of Google's unauthorized copying, it would be unjust to require that each affected association member litigate his claim individually. When Google copied works, it did not conduct an inquiry into the copyright ownership of each work; nor did it conduct an individualized evaluation as to whether posting 'snippets' of a particular work would constitute 'fair use.' It copied and made search results available en masse. Google cannot now turn the tables and ask the Court to require each copyright holder to come forward individually and assert rights in a separate action."

*See id*.

The need for associational plaintiff standing is even more critical in cases involving Internet and new media technologies, where many of the traditional

elements of cases have become magnified. Entities employing new technologies are able to engage in acts of infringement more rapidly, on a greater scale, and with substantially-reduced costs (if costs are not eliminated altogether). Once the initial infringements have taken place, these entities can instantly disseminate the resulting copies on a vast scale with, once again, negligible costs.

For the injured parties, however, the effects are reversed. It becomes increasingly difficult, costly and time-consuming for copyright owners to keep up with the rising tide of infringing activity and seek meaningful resolution of their claims. While large scale copyright owners like record labels and music publishers have their own problems playing "Whack-A-Mole," the problems of enforcement in today's digital environment are especially magnified for authors and owners of single, or limited numbers of, works. Those authors have neither the resources nor the financial ability to mount any effort to enforce their rights unless they can do so collectively. And unlike other laborers whose work conditions are protected by unions, most authors are not protected by collective bargaining for fear that efforts to do so will be attacked (whether meritorious or not) under the antitrust laws. So associations like the named associational plaintiffs, ASJA and others are all that authors have to serve as watchdogs for their rights. And while this case is not styled as a class action, only group action can be effective when those rights need to be vindicated in court.

28

What is most relevant here is that Defendants-Appellees' decision to proceed in the way that they did, on the scale that they did, with full knowledge of its impact on authors, makes it a quintessential example of why associational plaintiff standing exists, and why it is a perfect fit for cases such as this, especially in this digital age.

## IV. CONCLUSION

For the foregoing reasons, ASJA respectfully requests that the order of the District Court be reversed.

Dated: March 4, 2013                   Respectfully submitted,

*/s/ David Leichtman*
David Leichtman
Hillel I. Parness
Shane D. St. Hill
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone: (212) 980–7400
Facsimile: (212) 980–7499
dleichtman@rkmc.com
hiparness@rkmc.com
ssthill@rkmc.com

*Counsel for Amicus Curiae The American Society of Journalists and Authors*

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)

I.  This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) and 29(d) because this brief contains 6,973 words, excluding the

parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

II.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)

and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief

has been prepared in a proportionally spaced typeface using Microsoft Word in

Times New Roman, 14 point font.


Dated: March 4, 2013                    Respectfully submitted,

                                        */s/ David Leichtman*
                                        David Leichtman
                                        Hillel I. Parness
                                        Shane D. St. Hill
                                        ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
                                        601 Lexington Avenue, Suite 3400
                                        New York, NY 10022
                                        Telephone: (212) 980–7400
                                        Facsimile: (212) 980–7499
                                        dleichtman@rkmc.com
                                        hiparness@rkmc.com
                                        ssthill@rkmc.com

                                        *Counsel for Amicus Curiae The American Society
                                        of Journalists and Authors*

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on this 4th day of March, 2013, I caused a PDF version

of the foregoing brief to be filed electronically using the CM/ECF system.


*/s/ David Leichtman*
David Leichtman

31