# No. 12-4547

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

AUTHORS GUILD, INC., AUSTRALIAN SOCIETY OF AUTHORS LIMITED,
UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS, ANGELO
LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES SHAPIRO,
DANIELE SIMPSON, T.J. STILES, FAY WELDON, AUTHORS LEAGUE
FUND, INC., AUTHORS' LICENSING AND COLLECTING SOCIETY,
SVERIGES FORFATTARFORBUND, NORSK FAGLITTERAER
FORFATTERO OG OVERSETTERFORENING, WRITERS' UNION OF
CANADA, PAT CUMMINGS, ERIK GRUNDSTROM, HELGE RONNING,
JACK R. SALAMANCA,

Plaintiffs-Appellants,

*(For Continuation of Caption See Inside Cover)*
_____

On Appeal from the United States District Court
for the Southern District of New York
_____

**BRIEF OF *AMICUS CURIAE* MOTION PICTURE ASSOCIATION OF
AMERICA, INC. IN SUPPORT OF PLAINTIFFS-APPELLANTS**
_____

Steven B. Fabrizio
Kenneth L. Doroshow
Steven R. Englund
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
(202) 639-6000
sfabrizio@jenner.com

March 4, 2013

v.

HATHITRUST, CORNELL UNIVERSITY, MARY SUE COLEMAN, President,
University of Michigan, MARK G. YUDOF, President, University of California,
KEVIN REILLY, President, University of Wisconsin System, MICHAEL
MCROBBIE, President, Indiana University,

> Defendants-Appellees.

NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE, BLAIR
SEIDLITZ, COURTNEY WHEELER,

> Intervenor Defendants - Appellees.

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, the Motion Picture Association of America, Inc. has no parent corporation, and no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................. iii

IDENTITY AND INTERESTS OF AMICUS CURIAE...........................................1

SUMMARY OF ARGUMENT ...............................................................2

ARGUMENT ...............................................................................6

I.    THE FAIR USE ANALYSIS THAT THE DISTRICT COURT
      EMPLOYED IS TOO BLUNT AN INSTRUMENT TO
      ACCOMMODATE THE BROAD INTERESTS AT STAKE
      IN MASS DIGITIZATION .............................................................6

      A.    The District Court's Decision Effectively Preempts Ongoing
            Discussions Concerning Mass Digitization ........................................6

      B.    Broad Stakeholder Input Better Balances Competing Interests..........10

      C.    The District Court's Fair Use Analysis Effectively Preempts
            The Possibility Of Addressing Stakeholder Concerns Through
            Market Based Solutions ..................................................12

II.   THE DISTRICT COURT MISAPPLIED THE STATUTORY
      FAIR USE STANDARD ..............................................................15

CONCLUSION.............................................................................23

# TABLE OF AUTHORITIES

## CASES

*American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994) .. 13-14,16

*Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666 (S.D.N.Y. 2011)..........2, 19, 20

*Bill Graham Archives v. Dorling Kindersley Ltd*, 448 F.3d 605 (2d Cir. 2006) ............................................................................................20, 21

*Castle Rock Entertainment, Inc. v. Carol Publishing Group*, 150 F.3d 132 (2d Cir. 1998)............................................................................................21

*Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841)............................................6

*Tasini v. New York Times Co., Inc.,* 206 F.3d 161 (2d Cir. 2000), *aff'd*, 533 U.S. 483 (2001)............................................................................17, 23

## STATUTES

17 U.S.C. § 107(1) ............................................................................................18

17 U.S.C. § 108........................................................................................11, 15

17 U.S.C. §§ 108-122 ....................................................................................10, 18

17 U.S.C. § 109(b)(1).......................................................................................22

17 U.S.C. § 109(b)(2).......................................................................................22

17 U.S.C. § 110(1)...........................................................................................22

17 U.S.C. § 110(2)...........................................................................................22

17 U.S.C. § 110(6)...........................................................................................22

17 U.S.C. § 110(8)...........................................................................................22

17 U.S.C. § 110(9)...........................................................................................22

17 U.S.C. § 110(10).........................................................................................22

17 U.S.C. § 112(b)...........................................................................................22

17 U.S.C. § 112(c) ..........................................................................22

17 U.S.C. § 112(d) ..........................................................................22

17 U.S.C. § 112(f) ...........................................................................22

17 U.S.C. § 114(b) ..........................................................................22

17 U.S.C. § 118 ...............................................................................22

17 U.S.C. § 121 ...............................................................................12

Copyright Act of 1976, Pub. L. No. 94-553, § 710, 90 Stat. 2541 (1976) .............12

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 94-1476 (1976)), *reprinted in* 1976 U.S.C.C.A.N. 5659 ................19

S. Rep. No. 105-190 (1998) ...........................................................9

**OTHER AUTHORITIES**

Copyright Clearance Center, *The Annual Copyright License: A Single, Multi-Use Copyright License for Academic Institutions* (2011) *available at* http://www.copyright.com/content/dam/cc3/marketing/documents/pdfs/AACLProductSheet.pdf ...............................................................14

Pierre N. Leval, *Nimmer Lecture:  Fair Use Rescued,* 44 U.C.L.A. L. Rev. 1449 (1997) .......................................................................6

Pierre N. Leval, Commentary, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ...............................................................21

Claire Cain Miller, *Google Deal Gives Publishers a Choice: Digitize or Not*, NY Times, Oct. 4, 2012, *available at* http://www.nytimes.com/2012/10/05/technology/google-and-publishers-settle-over-digital-books.html?_r=0 ...............................................................13

Orphan Works and Mass Digitization, 77 Fed. Reg. 64,555 (Oct. 22, 2012) ...........7

Orphan Works, U.S. Copyright Office, http://www.copyright.gov/orphan (last visited Mar. 2, 2013) ...............................................................7

Maria A. Pallante, U.S. Copyright Office, *Priorities and Special Projects of the United States Copyright Office October 2011 – October 2013* (Oct. 25, 2011), *available at* http://www.copyright.gov/docs/priorities.pdf.................7

Mary Rasenberger & Chris Weston, *Overview of the Libraries and Archives Exception in the Copyright Act* (2005) ..............................................11

Report of the Register of Copyrights, *Library Reproduction of Copyrighted Works (17 U.S.C. 108)* (1983), *available at* http://www.copyright.gov/ reports/library-reproduction-1983.pdf........................................16, 17

Revising Section 108: Copyright Exceptions for Libraries and Archives, U.S. Copyright Office, http://www.copyright.gov/docs/section108/ (last visited Mar. 2, 2013)..........................................................11

Supplementary Register's Report on the General Revision of the U.S. Copyright Law (House Comm. Print 1965), *reprinted in* 9 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, App. 15 (2010)............10, 13

U.S. Copyright Office, *Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document* (Oct. 2011), *available at* http://www.copyright.gov/docs/massdigitization/USCOMassDigitization _October2011.pdf .............................................6, 7, 8, 9, 14, 15, 17

## IDENTITY AND INTERESTS OF AMICUS CURIAE[1]

The Motion Picture Association of America, Inc. ("MPAA") is a not-for-profit trade association, founded in 1922 to address issues of concern to the motion picture industry. Its members include Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Twentieth Century Fox Film Corporation, Universal City Studios LLC, Walt Disney Studios Motion Pictures and Warner Bros. Entertainment Inc.

The MPAA's members are the leading producers and distributors of filmed entertainment in the domestic theatrical, television, and home entertainment markets, and they are among the leading distributors of motion pictures internationally. The MPAA's members also distribute their works in electronic form, including through internet and mobile downloads and streaming, thus making their works more available to consumers and businesses than ever before.

The MPAA's members depend upon effective copyright protection in order to protect the motion picture and television content that they invest in, create and distribute. As a result, the MPAA's members have a significant interest in the important questions that this case presents concerning the interpretation of the

---

[1] No party's counsel authored this brief in whole or in part. No party or a party's counsel made a monetary contribution intended to fund the preparation or submission of this brief, and no person other than Amicus or its counsel made such a monetary contribution. All parties have consented to the filing of this brief.

Copyright Act, 17 U.S.C. §§ 101 et seq., and in particular the application of the

"fair use" doctrine to the mass digitization of copyrighted works.

## SUMMARY OF ARGUMENT

Mass digitization, such as the project at issue in this litigation, has the

potential to benefit copyright owners and users alike.[2]  However, it also raises a

host of complex concerns that are the subject of substantial controversy and

ongoing study worldwide.  In view of these complexities, the decision by the

district court in this case is problematic.

The defendants here have partnered with Google to make digital copies of

the entire collections of several major university libraries, without regard to

whether the works are under copyright, in need of preservation or commercially

available.  Without the input of the many global stakeholders who could be

affected by the district court's decision and jurisprudential approach, the district

---

[2] As Judge Chin observed in the parallel litigation against Google
concerning the same mass digitization project at issue here:

> Books will become more accessible.  Libraries, schools, researchers,
> and disadvantaged populations will gain access to far more books.
> Digitization will facilitate the conversion of books to Braille and
> audio formats, increasing access for individuals with disabilities.
> Authors and publishers will benefit as well, as new audiences will be
> generated and new sources of income created.  Older books –
> particularly out-of-print books, many of which are falling apart buried
> in library stacks – will be preserved and given new life.

*Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 670 (S.D.N.Y. 2011).

court authorized this mass digitization on the basis of fair use, a doctrine that is expressly intended only for case-by-case consideration. The dangers of the court's approach are evident in at least two respects.

*First*, by concluding that the defendants' unauthorized copying of the millions of titles in their collections was fair use, the district court made a preemptive, categorical determination that could have effects well beyond the parties and interests here. Policymakers and stakeholders in the United States and abroad are actively considering the implications of mass digitization projects and how best to balance the potential benefits of mass digitization and the appropriate rewards for authors and other rights owners under the copyright system. The district court's decision effectively preempted that process and purports to establish a precedent based on an incomplete view of the issues at stake.

As discussed below, consideration of copyright limitations and exceptions is typically a participative process in which all stakeholder views can be considered under conditions to protect the various affected interests. The ordinary operation of the copyright marketplace also serves to enable desirable uses while permitting the relevant parties to negotiate protections for their respective interests. The fair use analysis in the context of the streamlined procedural posture of this one case does not lend itself to this degree of nuance or thorough consideration of the issues at stake. When, as here, a fair use defense is proposed to excuse mass copying of

3

copyrighted works, there is great potential for upsetting the careful balance of interests reflected in the Copyright Act, and courts should exercise extreme caution – which the district court below failed to do.

*Second*, the district court misapplied the fair use test and overlooked key facts that weigh heavily against a finding of fair use in this case. In particular, the district court employed a broad interpretation of fair use that effectively reads out of the Copyright Act specific limitations and exceptions that Congress carefully crafted to grant permission for specific uses of copyrighted works by specific groups of users. Indeed, the court all but ignored two provisions that speak directly to the types of uses at issue here – Section 108 (which deals with reproduction by libraries and archives) and Section 121 (which deals with reproduction for blind or other people with disabilities) – and which authorize a far narrower scope of copying than the district court found to be permissible. By concluding that the limits set forth in these specific provisions were irrelevant to its determination of fair use, the district court effectively rendered these provisions mere surplusage. Because the Copyright Act contains numerous such limitations and exceptions dealing with uses of copyrighted works in a host of other contexts, the district court's broad interpretation of fair use, if followed by other courts, threatens to render superfluous these many carefully-crafted limitations and

4

exceptions, thereby upsetting the careful balance of interests that Congress sought to achieve in the statute.

Moreover, in reaching its conclusion as to fair use, the court did not address Google's role in the copying at issue here, which involves a *quid pro quo* between Google (which is building this digital library for its own commercial purposes) and the defendants by which defendants obtain digital copies of the books in their collections in exchange for authorization to Google to make and keep copies of those works – an authorization that was not the defendants' to give.  Contrary to the court's findings, the uses of copyrighted works in question here have an undeniable commercial purpose (for both Google and the defendants) that weighs heavily against a finding of fair use.

# ARGUMENT

## I.   THE FAIR USE ANALYSIS THAT THE DISTRICT COURT EMPLOYED IS TOO BLUNT AN INSTRUMENT TO ACCOMMODATE THE BROAD INTERESTS AT STAKE IN MASS DIGITIZATION

The fair use doctrine evolved from judicial consideration in the context of specific disputes involving specific uses of specific works by specific parties.  *E.g., Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (identifying predecessors of current statutory fair use factors); Pierre N. Leval, *Nimmer Lecture:  Fair Use Rescued,* 44 U.C.L.A. L. Rev. 1449, 1451-54 (1997) (summarizing origins of fair use doctrine).  This highly fact-dependent analysis is, however, poorly suited to determinations of broad reach such as those implicated by this mass digitization project.

### A.   The District Court's Decision Effectively Preempts Ongoing Discussions Concerning Mass Digitization

Mass digitization presents numerous important issues that are the focus of study and debate around the world.  The United States Copyright Office has issued a detailed report on the topic, outlining several of these ongoing global efforts.  *See* U.S. Copyright Office, *Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document* (Oct. 2011) [hereinafter "Mass Digitization Report"], *available at* http://www.copyright.gov/docs/massdigitization/USCOMassDigitization_October2

6

011.pdf.  Future research and discussions of the topic remain on the Copyright

Office's list of priorities.  *See* Maria A. Pallante, U.S. Copyright Office, *Priorities*

*and Special Projects of the United States Copyright Office October 2011 –*

*October 2013*, at 5 (Oct. 25, 2011), *available at*

http://www.copyright.gov/docs/priorities.pdf.  Indeed, the Copyright Office is

currently taking public comments concerning mass digitization in the context of

orphan works.  Orphan Works and Mass Digitization, 77 Fed. Reg. 64,555, 64,558-

59 (Oct. 22, 2012); Orphan Works, U.S. Copyright Office,

http://www.copyright.gov/orphan (last visited Mar. 2, 2013).

In the Mass Digitization Report, the Copyright Office found that "the large

scale scanning and dissemination of entire books is difficult to square with fair

use."  Mass Digitization Report, at 23.  Thus, for example, the report describes

how the American Memory project pursued by the Library of Congress since 1994

has been carefully limited to public domain works.  *Id.* at 12.  The report then

identifies some of the questions implicated by mass digitization of copyrighted

works.  These include questions like whether such mass digitization should be an

activity for national libraries (as seems to be the general direction in Europe), or

whether there are circumstances in which it might be appropriate to allow pursuit

of such mass digitization by potentially countless nonprofit organizations or even

for-profit entities.  *See id.* at 15-16.  The Copyright Office specifically identified,

as a question for consideration, the use of digitized content resulting from commercial partnerships such as the defendants' relationship with Google. *Id.* at 16. These questions are of concern to stakeholders well beyond the parties to this case. As "stakeholders may be in the best position to find points of consensus and create strategies for the U.S. book and library sectors," *id.* at ii, the Copyright Office has called for "further discussion among all stakeholders." *Id.* at 40. However, by finding the mass copying here to be fair use, the district court effectively preempted that discussion.

For example, the district court dismissed plaintiffs' claims concerning the security of the digital copies that are made and maintained in the process of this mass digitization, finding that "Plaintiffs' unsupported argument [about the risk of mass piracy] fails to demonstrate a meaningful likelihood of future harm" to the market for plaintiffs' works. Opinion & Order at 19-20, ECF No. 156 ("Order"). Had this analysis been conducted in a context that was attentive to the mass digitization process and not merely the defendants' current end uses, it could have been informed by the input of stakeholders with broad perspective and expertise on security and piracy matters, well beyond the limited record presented in this litigation. The MPAA's members, in particular, have deep experience and a long history of successful work with the technology sector in this area (including the development of the DVD, Blu-ray discs and the recent cloud-based UltraViolet

8

system), and regularly contribute substantially to policymakers' and courts' understanding of these issues.[3] A fair use analysis in this litigation, however, cannot benefit from such broad input, nor does it present the opportunity for collaboration among interested stakeholders in crafting appropriate conditions of security that must be in place before mass digitization of copyrighted works should be permitted.

Similarly, the district court's opinion blesses the defendants' asserted current uses of their massive databases of copyrighted works without regard to the outer limits of permissible use of those databases. There is "increasing pressure" on libraries and archives "to disseminate works once they have been digitized." Mass Digitization Report at 15. The district court did not address the potential res judicata and related effects of its ruling if the defendants later choose to use the copies they have made for purposes beyond those considered in its decision, including those that would have caused the district court here to reject fair use. In a broader setting than this litigation, stakeholders would not address mass digitization in the piecemeal fashion driven by the particular end uses here, but could instead address the propriety of mass digitization more generally. Such an approach could better ensure that any exemption for copying by libraries is tied

---

[3] *See, e.g.,* S. Rep. No. 105-190, at 52 (1998) (describing development of copy control technology for DVDs).

strictly to specific, permitted uses and that copyright owners are not at risk of being precluded from challenging the initial copying as unlawful in the event that the users' purposes change, even if the propriety of copies for certain uses had already been decided or the statute of limitations for challenging the copying would otherwise arguably have run.

### B.    Broad Stakeholder Input Better Balances Competing Interests

Categorical exemptions from copyright liability are typically granted by Congress, not district courts engaged in case-by-case fair use analysis.  Congress has granted many such exemptions in the form of Sections 108-122 of the Copyright Act.  *See* 17 U.S.C. §§ 108-122.  Because they affect broad swaths of copyright owners and users, statutory exemptions are carefully crafted and have clear boundaries.  They generally apply to specific, defined categories of users.  They often apply to narrowly-drawn categories of works.  They impose conditions.  Perhaps most important, the metes and bounds of these exemptions are the product of an open and participative process in which all stakeholders' views can be considered, and conditions crafted to protect the affected interests, exempting no more activity than judged necessary.  *See* Supplementary Register's Report on the General Revision of the U.S. Copyright Law, at 14 (House Comm. Print 1965), *reprinted in* 9 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, App. 15-37 (2010) [hereinafter "1965 Register's Report"] ("we believe that the author's

10

rights should be stated in the statute in broad terms, and that the specific limitations on them should not go any further than is shown to be necessary in the public interest").

As an example of how issues such as those implicated in this litigation can be addressed through an open and participative process that takes into account the concerns of all the stakeholders, one need look no further than Section 108 of the Copyright Act.  That section carefully delimits the conditions under which libraries (such as defendants here) are permitted to copy and distribute works without the author's permission.  17 U.S.C. § 108.  The detailed conditions set forth in Section 108 are the product of decades of debate and discussion among scholars, authors, librarians, publishers and other interested stakeholders, multiple hearings before Congress, and four separate amendments to the section since its original enactment.  *See generally* Mary Rasenberger & Chris Weston, *Overview of the Libraries and Archives Exception in the Copyright Act* (2005).  Maintaining Section 108 in the face of technological change remains a top policy priority of the U.S. Copyright Office today.  *See* Revising Section 108: Copyright Exceptions for Libraries and Archives, U.S. Copyright Office, http://www.copyright.gov/docs/section108/ (last visited Mar. 2, 2013).

Yet, the district court below did not consider Section 108, concluding that it was irrelevant to its determination of fair use.  *See* Order at 22 n.32 ("I need not

11

decide if the MDP fits within the parameters of 17 U.S.C. § 108 because it unquestionably fits within the definition of fair use.").  In so ruling, the district court lost the benefit of the decades of discussion and careful consideration of stakeholder interests that Section 108 reflects, and that remains ongoing.[4]  Instead, the court effectively immunized a large and vaguely-defined category of mass digitization without regard to the concerns that other stakeholders such as MPAA's members may have about the boundaries of mass digitization.  The fair use determination in this case simply cannot support the mass digitization that it authorizes.

C. **The District Court's Fair Use Analysis Effectively Preempts The Possibility Of Addressing Stakeholder Concerns Through Market Based Solutions**

In the absence of a specific statutory exemption, systematic uses of large numbers of copyrighted works are typically subject to marketplace processes that likewise serve to enable desirable uses while permitting the relevant parties to

---

[4] Another statutory exemption, Section 121, deals with reproduction of certain kinds of copyrighted works for blind or other people with disabilities.  17 U.S.C. § 121.  These issues also have a long history in copyright law.  *See* Copyright Act of 1976, Pub. L. No. 94-553, § 710, 90 Stat. 2541, 2594 (1976) (voluntary licensing for reproduction and distribution to the blind as predecessor to current Section 121).  The district court felt similarly unconstrained by this section – and the years of debate and stakeholder input that led to its enactment – in rendering its decision on fair use.  *See* Order at 23 n.33 ("Nothing in [Section 121] indicates an intent to preclude a fair-use defense as to copies made to facilitate access for the blind that do not fall within its ambit.").

negotiate protections for their respective interests.  *See* 1965 Register's Report, at 14 ("it is generally true, as the authors and other copyright owners argue, that if an exclusive right exists under the statute a reasonable bargain for its use will be reached").  A sweeping fair use analysis in the context of this litigation is a poor substitute for these market processes.

Mass digitization of books is a comparatively new activity and, before the project at issue here, there had never been such a large-scale effort to digitize copyrighted works.  Thus, it is not surprising that a market for licensing such use is only just emerging.[5]  Copyright owners are highly motivated to meet market demand for their works.  The companion case to this one illustrates the point: major publishers have granted licenses to Google covering a substantial part of its activities in the very project that is the subject of this case.  *See* Claire Cain Miller, *Google Deal Gives Publishers a Choice: Digitize or Not*, NY Times, Oct. 4, 2012, *available at* http://www.nytimes.com/2012/10/05/technology/google-and-publishers-settle-over-digital-books.html?_r=0.

Similarly, as this court is well aware, the Copyright Clearance Center ("CCC") has a long history of collective licensing of literary works.  *See Am.*

---

[5] The marketplace does to a significant extent serve the specific uses that the defendants made of their databases of digitized works.  We understand that many of the works at issue here were commercially available, including in electronic form, as replacement copies for libraries and use by the blind.  *See* Brief of Plaintiffs-Appellants at 38-39.

*Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929-31 (2d Cir. 1994).  More than a thousand colleges and universities have CCC licensees.  *See* Copyright Clearance Center, *The Annual Copyright License: A Single, Multi-Use Copyright License for Academic Institutions* (2011) *available at* http://www.copyright.com/content/dam/cc3/marketing/documents/pdfs/AACLProductSheet.pdf.  To the extent that such licenses do not already cover the specific activities here, it seems likely that ordinary market forces would cause them increasingly to do so.  The district court should not so easily have preempted development of a market to serve a large and important use of copyrighted works.

Leaving mass digitization to the marketplace may or may not provide a solution to the complex issues that mass digitization presents.  But the Copyright Office – which has a broad and nuanced view of these issues – views it as an option worthy of consideration.  *See* Mass Digitization Report, at ii, 15-16.  If the district court's decision is left to stand, then that option will effectively be off the table.

In short, given its inherent limits, a fair use analysis of the circumstances presented in this litigation – and, in particular, the manner in which the district court below employed such an analysis – is a poor means of accommodating the many broad and complex public policy issues at stake here.  Courts confronted with claims of fair use in this context must therefore be especially sensitive to the

14

limits of the fair use doctrine and should exercise great caution and restraint in their analysis.  The district court failed to do so here.

## II.    THE DISTRICT COURT MISAPPLIED THE STATUTORY FAIR USE STANDARD

As noted, the Copyright Office has observed that "large scale scanning and dissemination of entire books is difficult to square with fair use."  Mass Digitization Report, at 23.  Yet, the district court here concluded that the mass digitization project "unquestionably fits within the definition of fair use."  Order at 22 n.32.  As discussed above, because the blunt instrument of fair use is so poorly suited to determining the propriety of the unprecedented scope of copying in this case, it is not surprising that the district court went astray in its attempt to do so.

*First,* as an overarching consideration in applying the fair use standard, the district court should have taken into account the specific provisions of the Copyright Act that speak directly to the types of uses at issue here, and should not have interpreted fair use so broadly as to subsume those specific provisions. Section 108 is an especially pertinent example of such a provision, dealing specifically with reproductions and distributions made by libraries and archives, such as defendants here.  17 U.S.C. § 108.  The district court did not mention the many conditions and limitations set forth in Section 108 and, instead, relied on the fair use "savings clause" of Section 108(f)(4) to exclude them entirely from its

15

analysis.  As this court has already suggested, however, such an approach is
misguided:

> Section 108 of the Copyright Act narrowly circumscribes the
> conditions under which libraries are permitted to make copies of
> copyrighted works.  Though this section states that it does not in any
> way affect the right of fair use, . . . the very fact that Congress
> restricted the rights of libraries to make copies implicitly suggests that
> Congress views [copyright owners] as possessing the right to restrict
> photocopying, or at least the right to demand a licensing royalty from
> nonpublic institutions that engage in photocopying.

*Am. Geophysical Union*, 60 F.3d at 931 (internal citations omitted).[6]

The Copyright Office has also made clear that consideration of Section 108
is an essential part of any fair use analysis concerning copying by libraries such as
defendants here.  *See* Report of the Register of Copyrights, *Library Reproduction
of Copyrighted Works (17 U.S.C. 108)*, at 97 (1983) [hereinafter "1983 Register's
Report on Library Copying"] ("[A] fair use examination of a photocopying
transaction 'beyond' §108 *must* be made with due consideration for the fact that
'108' copying privileges have already been exhausted."(emphasis in original)),
*available at* http://www.copyright.gov/reports/library-reproduction-1983.pdf ; *see*

---

[6] The district court similarly felt no obligation to evaluate the extent to which the
copying at issue here exceeded the permissions granted in Section 121, which
authorize reproduction and distribution of certain works for blind or other people
with disabilities under specific circumstances and subject to certain well-defined
conditions.  Notably, unlike Section 108, Section 121 does not contain a fair use
savings clause.  Still, the district court concluded that "[n]othing in [Section 121]
indicates an intent to preclude a fair-use defense as to copies made to facilitate
access for the blind that do not fall within its ambit."  Order at 23 n.33.

16

*also* Order at 13 (acknowledging Copyright Office guidance that courts "should take 'into account the 108 copying that has already occurred'" when evaluating a fair use defense for libraries (citation omitted)); Mass Digitization Report, at 20 ("Any review of mass book digitization would need to consider, if not compare, the activities that currently are, or should be, permissible for libraries under Section 108.").

The district court's decision to ignore Section 108 in its fair use analysis – and then to adopt an interpretation of fair use well beyond what is authorized by Section 108– effectively rendered the provision surplusage.  Doing so violates the "cardinal rule . . . that significance and effect shall, if possible, be accorded to every word. . . . [A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *Tasini v. N.Y. Times Co.*, 206 F.3d 161, 167 (2d Cir. 2000) (quotation marks omitted); *aff'd*, 533 U.S. 483 (2001).  As the Copyright Office has observed, it is simply "implausible" that Congress intended fair use, when applied to copying by libraries, to excuse activity so far beyond the scope of Section 108 as to render irrelevant all of the distinctions made in Section 108's carefully crafted provisions.  *See* 1983 Register's Report on Library Copying, at 97-98.

17

The implications of affirming the district court's approach in this respect extend well beyond Section 108.  Limitations and exceptions that perform a role within the structure of the Act comparable to Section 108 make up a large part of the Copyright Act.  *See* 17 U.S.C. §§ 108-122.  If fair use can be found without regard to what Congress has said about the precise lines it wished to draw in each of these circumstances, then many of these limitations and exceptions are in danger of being swallowed by fair use.

*Second*, the court treated the use here as strictly noncommercial, ignoring entirely the commercial relationship between the defendants and Google that made the use possible.  The first factor to be considered in a fair use analysis is the "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  The district court found that the defendants could not have had the commercial purpose of "sav[ing] the expense of purchasing authorized copies" of the books (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001)) because "the purchase of additional paper copies, or even electronic copies, would not have allowed Defendants to create a searchable inventory of their works or provide access to print-disabled individuals on an equal footing with sighted individuals."  Order at 17.  But the court's finding misses a larger point about the commercial nature of the arrangement between the defendants and Google.

18

The mass copying at issue here is the result of a *quid pro quo* arrangement between Google (which is building a digital library for its own commercial purposes) and the defendants, by which the defendants obtain digital copies of the books in their collections in exchange for their authorization to Google to make and keep copies of those works for its own use.  Google thus functions as a digital conversion services vendor for the defendants – on an unprecedentedly massive scale.  Congress has made clear that this very sort of arrangement is inherently commercial and, at least in the context of Section 108, impermissible: "[I]t would not be possible for a non-profit institution, by means of contractual arrangements with a commercial copying enterprise, to authorize the enterprise to carry out copying and distribution functions that would be exempt if conducted by the non-profit institution itself."  H.R. Rep. No. 94-1476, at 74 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5688.

Whatever can be said about the saved cost of purchasing replacement copies, there can be no doubt that this *quid pro quo* arrangement saved defendants the many millions of dollars that the digital conversion services provided by Google would no doubt cost in a fair market.  The defendants were able to procure Google's services for free, simply by authorizing Google to make and keep copies of their collections for its own use – an authorization that was not defendants' to give.  *Cf. Authors Guild v. Google*, 770 F. Supp. 2d 666, 679 (S.D.N.Y. 2011)

19

("While its competitors went through the 'painstaking' and 'costly' process of obtaining permissions before scanning copyrighted books, 'Google by comparison took a shortcut by copying anything and everything regardless of copyright status.'" (quoting Microsoft representative)). By using the authors' works (without permission) as the currency for this exchange, defendants obtained a significant commercial benefit – and served Google's significant commercial goals[7] – to a degree that weighs heavily against a finding of fair use here.

*Third*, the district court attached deciding weight to what it deemed the "transformative" nature of the defendants' various activities, when none of those activities was transformative in a sense previously recognized by this court. The district court purported to base its decision on this court's decision in *Bill Graham Archives v. Dorling Kindersley Ltd*, 448 F.3d 605 (2d Cir. 2006). But neither *Bill Graham Archives* nor any other decision of this court holds that simple copying is transformative simply *because* it involves a purpose not pursued by the copyright owner or addresses what is "not to be considered to be a significant market or

---

[7] Given the immense scale of the copying at issue here, and the commensurate barriers to entry, Google's ability to build its own digital library without having to seek permission from or pay license fees to copyright owners would provide it with extraordinary market power. *Cf. Authors Guild*, 770 F. Supp. 2d at 682 (noting antitrust concerns with proposed settlement that "would give Google a right, which no one else in the world would have, . . . to digitize works with impunity, without any risk of statutory liability, for something like 150 years" and which would thus "arguably give Google control over the search market." (internal quotation marks omitted) (ellipsis in original)).

potential market to publishers and authors." Order at 18.[8]  The law of this Circuit

is very much to the contrary.[9]

    *Fourth,* the district court made short shrift of the second and third statutory

fair use factors.  The district court simply dismissed the second as "not

dispositive," Order at 18, even though a substantial proportion of the works at issue

were "of the creative or instructive type that the copyright laws value and seek to

foster."  Pierre N. Leval, Commentary, *Toward a Fair Use Standard*, 103 Harv. L.

Rev. 1105, 1117 (1990).  The district court's very brief discussion of the third

factor simply observes that because the defendant's purpose was making and

distributing copies of whole works, copying of entire works was necessary.

---

[8] At issue in *Bill Graham Archives* was the inclusion of copyrighted images of
Grateful Dead posters in a 480-page cultural history of the band.  This court found
the use of the posters to be transformative, noting that the defendant's purpose of
enhancing the biographical information in the book was "separate and distinct from
the original artistic and promotional purpose for which the images were created."
448 F.3d at 610.  However, that statement must be understood in light of the facts
of the case, where the images were embedded in a major new copyrightable work
and were found to contribute to the informational message of the new material.  *Id.*

[9] In this Circuit, when considering whether a use is transformative, the "critical . . .
factor . . . is whether the allegedly infringing work 'merely supersedes' the original
work 'or instead adds something new, with a further purpose or different character,
altering the first with new . . . meaning [] or message.'"  *Castle Rock Entm't, Inc.
v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 142 (2d Cir. 1998) (quoting *Campbell v.
Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (first two ellipses added)).  That
is, a use is transformative when "'the secondary use adds value to the original — if
[copyrightable expression in the original work] is used as raw material,
transformed in the creation of new information, new aesthetics, new insights and
understandings . . . .'"  *Id.* (quoting Pierre N. Leval, Commentary, *Toward a Fair
Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990) (alteration in original)).

Defendants who copy whole works will almost always be able to argue that doing so was necessary to their purpose.  Surely in a case involving the most massive, systematic copying of copyrighted works in history, the district court should have addressed whether the amount and substantiality of the copying was really justified.

   *Finally*, in applying the fourth fair use factor, the district court placed undue emphasis on what it perceived to be the absence of a market for licensing the uses at issue here.  *See* Order at 20-21 (finding "Plaintiffs' argument about a potential market [to be] conjecture" and the possible development of a market to provide access to the "tiny minority" of print-disabled individuals to be "almost impossible to fathom").  Like Section 108, many of the other limitations and exceptions in the Copyright Act apply to activities of nonprofit organizations.[10]  Two (outside Section 108) are even targeted to libraries.[11]  Two others (outside Section 121) are directed at service to the blind.[12]  Most are very specialized and so do not represent

---

[10] *E.g.,* 17 U.S.C. § 110(1)-(2), (6), (10) (exempting various public performances by nonprofits); *id.* § 112(b)-(d), (f) (exempting various reproductions of transmitted material by nonprofits); *id.* § 114(b) (exempting certain reproduction and distribution of sound recordings as part of copies of public broadcasting programs); *id.* § 118 (statutory license for certain uses of works in noncommercial broadcasting).

[11] 17 U.S.C. § 109(b)(1)-(2) (sound recording and software rental rights exceptions for libraries).

[12] 17 U.S.C. § 110(8)-(9) (exemptions for certain performances to the blind).

"a significant market or potential market" for copyright owners.  Order at 18.

Indeed, they might also be said to affect only a "tiny minority" of potential

customers.  There is by definition no established licensing market for the uses

subject to statutory exemptions.  Yet those considerations substantially drove the

district court's fair use analysis here.  As noted above, an analysis of fair use that

disregards what Congress has said about the precise lines it wished to draw with

respect to particular categories of activity effectively – and impermissibly –

renders these carefully-considered limitations and exceptions "superfluous, void,

or insignificant." *Tasini*, 206 F.3d at 167 (quotation marks omitted).

### CONCLUSION

For the foregoing reasons, the district court's decision should be reversed.

Respectfully submitted,


 /s/  Steven B. Fabrizio
Steven B. Fabrizio
Kenneth L. Doroshow
Steven R. Englund
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
(202) 639-6000
sfabrizio@jenner.com

Dated:  March 4, 2013

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 5,488 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).   This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6), respectively, because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2007 in Times New Roman 14-point font.

 /s/  Steven B. Fabrizio
Steven B. Fabrizio

# CERTIFICATE OF SERVICE

I certify that on March 4, 2013, I caused the foregoing Brief of *Amicus Curiae* Motion Picture Association of America with the Clerk of Court to be electronically filed via the Court's CM/ECF System; all of the parties listed on the attorney service preference report have been served via the Court's CM/ECF system.

I further certify that on March 4, 2013, I caused six (6) copies of the foregoing Brief of *Amicus Curiae* Motion Picture Association of America to be delivered via overnight mail to the Clerk of the United States Court of Appeals for the Second Circuit.

<u> /s/  Steven B. Fabrizio        </u>
Steven B. Fabrizio