# 12-4547-cv

## United States Court of Appeals
### for the
### Second Circuit

———————◆———————

THE AUTHORS GUILD, INC., THE AUSTRALIAN SOCIETY OF AUTHORS
LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS,
ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES
SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON,
THE AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND
COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK
FAGLITTERAER FORFATTERO OG OVERSETTERFORENING,
THE WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK
GRUNDSTROM, HELGE RONNING, JACK R. SALAMANCA,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*
————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

==================================================

## PAGE PROOF REDACTED BRIEF FOR INTERVENOR DEFENDANTS-APPELLEES

==================================================

DANIEL F. GOLDSTEIN
JESSICA P. WEBER
BROWN, GOLDSTEIN & LEVY, LLP
120 E. BALTIMORE STREET, SUITE 1700
BALTIMORE, MARYLAND 21202
TELEPHONE: (410) 962-1030
FACSIMILE: (410) 385-0869

ROBERT J. BERNSTEIN
THE LAW OFFICE OF ROBERT J. BERNSTEIN
380 LEXINGTON AVENUE, 17TH FLOOR
NEW YORK, NY 10168
TELEPHONE: 212-551-1068
FACSIMILE: 212-551-1001

PETER JASZI
5402 SURREY STREET
CHEVY CHASE, MARYLAND 20815
TELEPHONE: 301-656-1753
FACSIMILE: 301-656-7483

*Attorneys for Intervenor Defendants-Appellees*

---

v.

HATHITRUST, CORNELL UNIVERSITY, MARY SUE COLEMAN, President,
University of Michigan, MARK G. YUDOF, President, The University of California,
KEVIN REILLY, President, The University of Wisconsin System, MICHAEL MCROBBIE,
President, Indiana University,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE,
BLAIR SEIDLITZ & COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

# <u>CORPORATE DISCLOSURE STATEMENT</u>

The undersigned, counsel for Intervenor Defendants-Appellees, certifies that none of the Intervenor Defendants-Appellees have any parent corporation and no publicly-held corporation owns 10% or more of any of the Intervenor Defendants-Appellees' stock.

By:_____/s/_____
Daniel F. Goldstein
Jessica P. Weber
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Telephone:  410-962-1030
Facsimile:  410-385-0869
dfg@browngold.com
jweber@browngold.com

Robert J. Bernstein
THE LAW OFFICE OF ROBERT J. BERNSTEIN
380 Lexington Avenue, 17th Floor
New York, NY 10168
Telephone: 212-551-1068
Facsimile:  212-551-1001
rjb@robert-bernsteinlaw.com

Peter Jaszi
5402 Surrey Street
Chevy Chase, Maryland 20815
Telephone: 301-656-1753
Facsimile:  301-656-7483
pjaszi@wcl.american.edu

*Counsel for Intervenor Defendants-Appellees*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF ISSUES ................................................................. 6

STATEMENT OF THE CASE ............................................................. 7

STATEMENT OF FACTS ................................................................. 10

SUMMARY OF ARGUMENT .......................................................... 16

ARGUMENT ................................................................................... 19

    I.    The district court correctly analyzed the application of the
          ADA to the issues presented. ................................................ 19

    II.   The district court correctly concluded that the Chafee
         Amendment enables the University of Michigan to
         reproduce and distribute works in the HDL to the blind. ..................... 25

        A. The district court correctly concluded that accessible
           texts from the HDL are in "specialized formats,"
           consistent with the Chafee Amendment. ...................................... 26

        B. The district court correctly concluded that the
           University of Michigan is an entity authorized by the
           Chafee Amendment to distribute the HDL's content to
           blind and other print-disabled persons. ...................................... 30

    III.  The district court correctly held that enabling blind
         scholars to have equal access to university library
         collections through the HDL is a fair use under §107 of the
         Copyright Act. ............................................................................. 34

        A. The purpose and character of use for the blind
           strongly favor fair use. ............................................................. 40

           1. The use is highly transformative. ........................................ 40

2. The purpose and character of the blind's
use of the HDL strongly favor fair use
even if it were not viewed as
"transformative."...............................................................47

B. The nature of the copyrighted works favors fair
use. ...................................................................................50

C. The amount and substantiality of the works
copied are consistent with the purpose of the
use. ....................................................................................51

D. Use by the blind causes no harm to any actual
or potential market. .................................................52

E. The overall balance favors a finding of fair use. ......................54

CONCLUSION ..................................................................................55

CERTIFICATE OF COMPLIANCE .......................................................57

ADDENDUM ................................................................................ A-1

17 U.S.C. §107................................................................. A-1

17 U.S.C. §121 ............................................................... A-2

# TABLE OF AUTHORITIES

## Cases

*A.V.* ex rel. *Vanderhye v. iParadigms, LLC,*
    562 F.3d 630 (4th Cir. 2009)................................................................ 45, 46, 51

*A.V. v. iParadigms, LLC,*
    544 F. Supp. 2d 473 (E.D. Va. 2008), *aff'd in relevant part*, 562
    F.3d 630 (4th Cir. 2009)..................................................................................45

*Am. Geophysical Union v. Texaco, Inc.,*
    60 F.3d 913 (2d Cir. 1994)........................................................................ 47, 53

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
    448 F.3d 605 (2d Cir. 2006)................................................................... passim

*Blanch v. Koons,*
    467 F.3d 244 (2d Cir. 2006)...................................................... 47, 49, 51, 52

*Boys Mkts., Inc. v. Retail Clerks Union, Local 770,*
    398 U.S. 235 (1970) ........................................................................................23

*Campbell v. Acuff Rose Music, Inc.,*
    510 U.S. 569 (1994) ............................................................................... passim

*Field v. Google, Inc.,*
    412 F. Supp. 2d 1106 (D. Nev. 2006) .................................................... 46, 51

*Fortnightly Corp. v. United Artists Television, Inc.,*
    392 U.S. 390 (1968) ..........................................................................................5

*Golan v. Holder,*
    132 S. Ct. 873 (2012) .....................................................................................34

*Infinity Broad. Corp. v. Kirkwood,*
    150 F.3d 104 (2d Cir. 1998)...........................................................................47

*Kelly v. Arriba Soft Corp.,*
    336 F.3d 811 (9th Cir. 2002)...................................................... 42, 43, 46, 51

iii

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    133 S. Ct. 1351 (2013) .....................................................................................35

*Lore v. City of Syracuse*,
    670 F.3d 127 (2d Cir. 2012)...................................................................... 20, 42

*Mary Jo. C. v. N.Y. State & Local Ret. Sys.*,
    707 F.3d 144 (2d Cir. 2013)...................................................................... 20, 23

*Murphy v. Millennium Radio Grp. LLC*,
    650 F.3d 295 (3d Cir. 2011)...........................................................................52

*Nunez v. Caribbean Int'l News Corp.*,
    235 F.3d 18 (1st Cir. 2000) ............................................................................51

*NXIVM Corp. v. The Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004)...........................................................................48

*Peralta-Taveras v. Attorney Gen.*,
    488 F.3d 580 (2d Cir. 2007)...........................................................................26

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007)............................................................. 43, 46, 51

*Sega Enterprises, Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1993)........................................................ 43, 44, 46, 51

*Sony Computer Entertainment v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000)............................................................. 44, 46, 51

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) .............................................................................. passim

*Southeastern Comm. Coll. v. Davis*,
    442 U.S. 397 (1979) .........................................................................................5

## Constitutional Provisions

U.S. Const., Art. I, §8.................................................................................. 3, 25, 35

iv

**Federal Statutes**

17 U.S.C. §107 ................................................................................................ passim

17 U.S.C. §108 .......................................................................................... 38, 39, 40

17 U.S.C. §109 ........................................................................................................35

17 U.S.C. §121 ................................................................................................ passim

29 U.S.C. § 794 .............................................................................................. passim

42 U.S.C. §12101 ............................................................................................ passim

42 U.S.C. §12132 ....................................................................................................21

42 U.S.C. §12182 ....................................................................................................21

**State Statutes**

15 Ill. Comp. Stat. Ann. 323/10 ............................................................................34

16-3 Miss. Code R. §160:1 .....................................................................................34

236 Neb. Admin. Code §005 ..................................................................................34

24 Pa. Cons. Stat. §9338 .........................................................................................33

Ala. Code §21-1-15 .................................................................................................33

Ariz. Rev. Stat. Ann. §41-151.07 ...........................................................................33

Ark. Code Ann. §13-2-207 ......................................................................................33

Cal. Educ. Code §19320 .........................................................................................33

Colo. Rev. Stat. Ann. §24-90-105 ..........................................................................33

Conn. Gen. Stat. Ann. §11-1a .................................................................................33

Del. Code Ann. tit. 29, §8731 ...................................................................33

Fla. Stat. Ann. §257.04 ...........................................................................33

Ga. Code Ann. §20-2-305 ........................................................................34

Haw. Code R. §8-206.1-6 .........................................................................34

Ind. Code Ann. §4-23-7 ............................................................................34

Iowa Code Ann. §216B.3 ..........................................................................34

Kan. Admin. Regs. §54-3-1 .......................................................................34

Ky. Rev. Stat. Ann. §171.145 ...................................................................34

La. Rev. Stat. Ann. §25:16 ........................................................................34

Mass. Gen. Laws Ann. ch. 78, §19 ............................................................34

Md. Code Ann., Educ. §23-105 ..................................................................34

Me. Rev. Stat. tit. 27, §40 .........................................................................34

Mich. Comp. Laws Ann. §397.491 .............................................................34

Minn. Stat. Ann. §134.31 ..........................................................................34

Mo. Ann. Stat. §181.065 ...........................................................................34

Mont. Code Ann. §22-1-103 ......................................................................34

N.C. Gen. Stat. Ann. §125-2 .....................................................................34

N.H. Rev. Stat. Ann. §201-A:2 ..................................................................34

N.J. Stat. Ann. §18A:73-38.1 ....................................................................34

N.Y. Edu. Law §273 ..................................................................................33

Okla. Admin. Code §612:15-1-3 ...................................................................34

Or. Rev. Stat. Ann. §357.005 ....................................................................34

R.I. Gen. Laws Ann. §29-3.1-7 .................................................................34

S.C. Code Ann. §60-1-120 ........................................................................34

S.D. Codified Laws §14-1-50 ....................................................................34

Tenn. Code Ann. §10-1-103 ......................................................................34

Tex. Hum. Res. Code Ann. §91.081 ..........................................................34

Utah Code Ann. §63B-5-201 .....................................................................34

Va. Code Ann. §51.5-74 ............................................................................34

Vt. Stat. Ann. tit. 22, §605 .......................................................................34

Wash. Rev. Code Ann. §27.04.045 ............................................................34

Wis. Stat. §43.03(6) ..................................................................................33

## Legislative History

142 Cong. Rec. S9066 (daily ed. July 29, 1996) .............................. 28, 29

142 Cong. Rec. S9763 (daily ed. Sept. 3, 1996) ......................................33

*Copyright Law Revision*, H. R. Rep. No. 94-1476 (1976)........................... 5, 36, 48

H. R. Rep. 101-485(II), (1990), *reprinted in* 1990 U.S.C.C.A.N. 303......................5

*Statement of the Assoc. of Am. Publishers on the NII Copyright Prot.*
   *Act of 1995 before the House Subcomm. on Courts and*
   *Intellectual Prop.*, Feb. 8, 1996, *available at*
   http://judiciary.house.gov/legacy/441.htm........................................29

*The House Report on the Berne Convention Implementation Act of
    1988*, H.R. Rep. No. 100-609 (1988) .............................................................25

**Other Authorities**

Wayne C. Booth et al.,
    *The Craft of Research* (3d ed. 2008) ...............................................................12

M. Suzanne Brown & LeiLani Freund, Assn. of Research Libraries,
    *SPEC Kit 321: Services for Users with Disabilities* (Dec. 2010),
    *available at* http://www.arl.org/bm~doc/spec-321-web.pdf ...........................31

*Download Books*, Bookshare,
    https://www.bookshare.org/_/gettingStarted/downloadBooks (last
    visited May 16, 2013) ........................................................................................28

Bryan A. Garner, *Grammar and Usage*, *in The Chicago Manual of
    Style* (16th ed. 2010) ..........................................................................................28

Benjamin Kaplan, *An Unhurried View of Copyright* (1967) ...................................25

George Kerscher, *Mastering WordPerfect 5.0* (1988) .............................................10

L. Ray Patterson & Stanley W. Lindberg,
    *The Nature of Copyright* (1991) ........................................................................25

The Largest Selection of Large Print Books Available Anywhere!,
    http://www.largeprintbooks.com (last visited May 16, 2013) ........................29

## PRELIMINARY STATEMENT

Courtney Wheeler refrains from taking courses requiring library research. Blair Seidlitz does not read recommended supplementary texts to complete his physics classes. The prospect of limited library access convinced Georgina Kleege not to pursue a graduate degree in English Literature after she received her baccalaureate from Yale. Because they are blind—and for no other reason—they have had little or no access to the contents of libraries that are so freely available to their sighted peers.[1]

Limited library access and, consequently, limited achievement were facts of life for blind scholars until the creation of the HathiTrust Digital Library ("HDL").[2] But now, blind and print-disabled students and faculty at the University of Michigan have equal access to the university's library collections: what nondisabled students can read in the print collection, blind and print-disabled students can read in the parallel digital collection.[3] This development, unless

---

[1] *See* Dkt_77-4 to 77-6.

[2] The universities that received digital scans of their library collections from Google refer to themselves collectively as the HathiTrust. For administrative convenience, those universities agreed that the University of Michigan would serve as the repository and administrator of those digital collections, collectively known as the HDL. Dkt_110(¶55).

[3] The term "print disabled" is used in this brief to refer to those who cannot effectively read print because of a visual, physical, perceptual, developmental, cognitive or learning disability. Thus, for example, someone who because of a palsy could not hold her head or hands steady enough to focus on print and someone who because of a spinal cord injury could not turn a page are included in

disapproved by this Court, fundamentally and dramatically changes what it means to be blind; after all, full participation in modern society is possible only with equal access to information. Library collections are a substantial, significant, and often unique source of information available to those of us without print disabilities as we pursue our individual educational, vocational, and recreational activities.

The Americans with Disabilities Act and Section 504 of the Rehabilitation Act[4] express a national commitment to ensure that persons with disabilities can pursue on an equal basis "those opportunities for which our free society is justifiably famous."[5] Even so, at no point in this litigation have appellants (the "Guild") addressed the ADA's application to the facts at hand; instead, they have treated this purely as a copyright case, insisting that copyright law forbids university libraries from affording the blind full access to their digital libraries.

The Guild is wrong to ignore the civil rights of the blind and wrong in its reading of copyright law. The idea that animates the ADA, equal opportunity for persons with disabilities, and that which animates the copyright law, promoting the

---

the term "print disabled." *See* Dkt_79(¶6). For the sake of brevity, this brief will principally refer to one group of print-disabled persons, the blind, although these references apply with equal force to those with other print disabilities.

[4] With respect to the issues in this case, there are no pertinent differences between the ADA and the Rehabilitation Act's requirements; accordingly, this brief will refer to the two statutes collectively as the "ADA."

[5] 42 U.S.C. §12101(a)(8).

"Progress of Science and useful Arts,"[6] are complementary. Each promotes the creation of and access to knowledge in different, but mutually sustaining ways. The ADA expands the circle of persons entitled to access the collective wisdom contained in libraries, while copyright law, through the right of fair use, enables the use of that wisdom to promote learning.

A library is the heart of a university in the sense that, through it, the knowledge that humanity has created and collected over thousands of years circulates to all parts of the academy. It is the use of that collection that promotes progress: by that means, students can identify, locate, evaluate, correlate, and effectively synthesize information to illuminate any topic. So long as they can access libraries, students and other scholars can advance our understanding of our past, our present, and our future. Heretofore, the opportunity to make such contributions required both an affiliation with a library and the ability to see. Now, if this judgment is affirmed, blindness need no longer bar the doors to our collective storehouses of knowledge. At stake is not only the unprecedented access the HDL affords the blind to individual books in exponentially greater numbers than ever before, but also the potential—for the first time—to participate fully in the enterprise of research itself.

---

[6] U.S. Const., Art. I, §8, cl. 8.

The Guild correctly urged the district court that "it is the *purpose* for which the Defendant *libraries* digitized and used the [library print collections] that is at issue here."[7]  Even before the first book in this enterprise was scanned, the University of Michigan was committed to making the resulting digital corpus available to the blind.  And the Guild concedes that the University of Michigan's "uses for the blind admittedly serve a purpose that benefits society. . . ."[8]  Indeed, in its opening brief, the Guild states that it "do[es] not object to the use of the HDL by the blind."[9]  Nevertheless, it argues that the creation and use of the HDL is forbidden by copyright law and could be made available to the blind only with the permission of every copyright holder represented in the collection.

The Guild has unhitched the limited rights granted copyright holders from the objective of copyright itself, insisting that the blind must be denied meaningful access to university libraries, even though doing so would not encourage authors to create.  Both historically and today, authors and publishers have found no profit in releasing their works in formats intended to be accessible to the blind, much less in enabling the creation of entire academic libraries that could be accessed by the blind.  Moreover, they have no plans for such exploitation.

---

[7] Dkt_115(p.19) (first emphasis added).
[8] Dkt_135(p.24).
[9] Guild Br. at 12.

The HDL and its promise for the blind spring from remarkable recent advances in technology.  Technology now makes it possible for the blind to engage in library research to the same extent and with the same facility as sighted readers—an opportunity that might have been thought chimerical only a decade ago.  Both civil rights and copyright jurisprudence require courts to interpret their doctrines in the light of technological progress.  As the Supreme Court has said, "[t]echnological advances can be expected to enhance opportunities to rehabilitate the handicapped."[10]  In enacting the ADA, Congress noted that "the types of accommodations and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times."[11]  So, too, when Congress enacted §107 of the Copyright Act, it stated that "there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change."[12]  As with the ADA, the Supreme Court has insisted that copyright law be interpreted in light of new technological circumstances and opportunities.[13]

From the advent of libraries until the digitization of the HDL, the blind could draw on only a paltry number of books contained in special libraries for the

---

[10] *Southeastern Comm. Coll. v. Davis*, 442 U.S. 397, 412 (1979).

[11] H. R. Rep. 101-485(II), at 108, (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 391.

[12] *Copyright Law Revision*, H. R. Rep. No. 94-1476 at 66 (1976) (hereinafter "House Report").

[13] *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 396 (1968).

blind, together with the occasional print book that had been digitized on demand. The blind scholar's share was the beggar's portion and not the feast available to the sighted, merely for the taking. But the Guild desires to preserve the status quo, consigning the blind to permanent second-class citizenship and denying the blind, and all of society, the benefits that would flow from allowing the blind through the library door. The Guild persists even though, as the record makes unarguably clear, it would suffer no harm if the blind have equal access to academic library collections. In this instance, the district court's decision, well supported by the record and the law, vindicates the ideals of both the ADA and copyright law and therefore should be affirmed.

## STATEMENT OF ISSUES

1. Whether the district court correctly applied the ADA to the issues presented.

2. Whether the district court correctly concluded that the Chafee Amendment, 17 U.S.C. §121, which empowers authorized entities to create and distribute books in specialized formats exclusively for print-disabled persons, enables the University of Michigan to reproduce and distribute works in the HDL to the blind.

3.      Whether the district court correctly held that enabling blind scholars to have equal access to university library collections through the HDL is a fair use under §107 of the Copyright Act.[14]

## STATEMENT OF THE CASE

The National Federation of the Blind (the "Federation"), Blair Seidlitz, Courtney Wheeler, and Georgina Kleege (collectively, "NFB") adopt the Guild's Statement of the Case and add the following:

In its complaint, the Guild sought to impound the HDL and enjoin the University Appellees ("Universities") from continuing to build or allow access to the HDL.[15] Because the Guild's requested relief would completely deny the blind access to the HDL, NFB moved to intervene in the lawsuit.[16]  The Federation is the oldest and largest membership organization of blind people in the United States, with more than 50,000 members.[17]  Mr. Seidlitz and Ms. Wheeler are blind students at the University of Wisconsin and Ms. Kleege is a blind faculty member at the University of California, Berkeley.[18]  With the consent of all parties, the district court granted NFB's motion to intervene.

---

[14] NFB adopts the Guild's proposed standards of review.
[15] Dkt_4(pp.27-28).
[16] Dkt_25(p.6).
[17] Dkt_27-1(¶6).
[18] Dkt_25(pp.4-6).

Although styled as a motion for summary judgment, the Guild's motion addressed only liability and not the factors that determine the appropriateness of equitable remedies.

In its ruling on the parties' motions for summary judgment, the lower court held that the HDL's creation and use as a resource for blind readers is permissible pursuant to the ADA and §121 of the Copyright Act ("the Chafee Amendment") and is a protected fair use under §107 of the Copyright Act.[19]

The court ruled that on the facts of this case "[t]he provision of equal access to copyrighted information for print-disabled individuals is mandated by the ADA . . . ."[20]  It also found that University of Michigan was an "authorized entity" under the Chafee Amendment, explaining that the "ADA requires that libraries of educational institutions have a primary mission to reproduce and distribute their collections to print-disabled individuals," and that the record clearly demonstrated that the University of Michigan had embraced this goal as a primary mission.[21]

With respect to fair use, the district court determined that the first, third, and fourth nonexclusive fair use factors favored the Universities and NFB, and that the second factor was neutral.  On these points, the lower court's reasoning may be summarized as follows:

---

[19] Dkt_156(pp.14-23).
[20] *Id*.(p.22).
[21] *Id*.(pp.22-23).

1. (a) The "purpose of the use is for scholarship and research," which constitutes an "invaluable contribution to the progress of science and the cultivation of the arts that at the same time effectuates the ideals espoused by the ADA," and such uses are "explicitly mentioned in the preamble to Section 107," thereby tilting the first factor toward a finding of fair use;

   (b) Providing blind individuals with "access to the wealth of information within library collections" is a transformative use; and

   (c) Making copies of works in formats accessible to blind persons is expressly identified in the legislative history of the 1976 Copyright Act as an example of a fair use;

2. Given the transformative purpose of the HDL, the nature of the copyrighted works is a consideration of limited usefulness;

3. Digitization of the works in their entirety is necessary to ensure equal access for the blind; and

4. The uses are noncommercial and the Guild has failed to show any meaningful likelihood of market harm; the transformative nature of the contested uses weighs against any inference of market substitution because:

   (a) "A copyright holder cannot preempt a transformative market";

   (b) The Universities and NFB provided "substantial evidence that it would be prohibitively expensive to develop a market to license the use of works for search purposes, access for print-disabled individuals, or preservation purposes"; and

   (c) The blind constitute such "a tiny minority" that the development of a market to provide them with equal access to library collections is "almost impossible to fathom."[22]

---

[22] *Id.*(pp.14-22).

The court then concluded that the totality of the factors favor fair use because the "copyright law's 'goal of promoting the Progress of Science . . . would be better served by allowing the use than by preventing it.'"[23]

## STATEMENT OF FACTS

Digital books were invented to benefit blind readers. In 1988, George Kerscher, a blind graduate student in computer science, issued the first publicly available digital book, "Mastering WordPerfect 5.0," through his company, Computerized Books for the Blind and Print Disabled. Unlike a print book, a digital book can be accessible to a blind person who may read it using screen-access software with a text-to-speech program or a refreshable Braille display. To encourage the development of digital books as a specialized format for the blind, Kerscher refrained from seeking patents on any of the technology he developed.[24] Unfortunately for him, every book he needed for his graduate degree studies was inaccessible, and he was forced to drop out.[25] Had the HDL existed and been available, he could have pursued his education.

Apart from the HDL, a blind scholar's lot has not greatly improved since Kerscher's graduate school days. Despite Kerscher's decision not to patent his technology, only a few books, such as iBooks or audio books, may be purchased in

---

[23] *Id.*(p.21) (quoting *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006)).
[24] Dkt_79(¶¶8, 9).
[25] *Id.*(¶¶7,10).

10

formats accessible to the blind.[26]  Accessible books that may be borrowed through a library are still fewer in number (about 200,000)[27] and the number added annually is a small fraction of the number of print books published each year.[28] For the most part, accessible books available for borrowing are best sellers or primary-school textbooks.[29]  Moreover, library books that are accessible as narrated recordings are unsuitable for academic use because of their limited navigability and the slowness with which they must be read.[30]  By contrast, the HDL includes more than 10 million digitized texts spanning over five-hundred years and more than forty different languages, including titles in nearly every discipline imaginable.[31]

Universities have not been able to do much to address the needs of blind students.  Making a truly usable and accessible e-book from a print copy of a typical university library book is a painstaking process.[32]  As a result, universities can rarely manage to make assigned texts accessible and, even these are rarely available on the timely basis that an academic schedule requires.[33]

---

[26] Dkt_78(¶39).

[27] *Id.*(¶¶9-10); Dkt_79(¶38).

[28] Dkt_78(¶10).

[29] Dkt_79(¶¶37-38); Dkt_80(¶16).

[30] Dkt_79(¶20).

[31] Dkt_110(¶¶57,59-61).

[32] Dkt_80(¶¶17,24-27).

[33] Dkt_79(¶¶32-35).

Research, however, requires more than just the access to individual books (with a significant time lag between each request for access and its fulfillment) currently available to blind students.  Research involves, among other things, searching among an array of books, consulting their tables of contents and indices, and skimming through selected passages—all necessary just to identify which books may offer insight into the issue in question.[34]  From the time of the library in Alexandria until the development of the HDL, the printed nature of books prevented blind scholars from engaging in library research like their sighted peers.

A student at the University of Michigan who is free from impairments has access to some eleven million print volumes.[35]  The nearly four million patron visits to the Michigan library in fiscal year 2011 dramatically demonstrate the library's utility.[36]  Now the HDL offers blind users the revolutionary opportunity to join in research endeavors: to use a comprehensive library to locate accumulated knowledge on specific points, to trace the development of ideas from age to age and from scholar to scholar, and to synthesize seemingly unrelated data into startling new results.[37]  The HDL transports blind students and scholars from a

---

[34] *See, e.g.*, Wayne C. Booth et al., *The Craft of Research* 74-76 (3d ed. 2008) (explaining research strategies such as physically scanning the library stacks and skimming books' indices and chapters to determine relevancy).
[35] Dkt_110(¶9).
[36] *Id.*(¶10).
[37] Dkt_78(¶11); Dkt_110(¶33).

world of delayed access to individual titles on a limited, ad hoc basis to a world where they have immediate and equal access to a new universe of knowledge.[38]

Blind and sighted members of the University of Michigan community can search the entire HDL to locate books of possible interest.[39]  Uniquely, only print-disabled readers can then enter the HDL through a secure, password-protected portal that allows full-text access to those whose disabilities have been certified by a qualified expert.[40]  This access enables blind HDL users to read and evaluate items in the collection independently.[41]  They can sample and investigate the contents of different volumes just as sighted individuals search physical library stacks and flip through titles to gauge their relevance.[42]  Only those with proven print disabilities have access to the HDL's digital content.[43]  Those without print disabilities who wish to see the content of the library's collection must use the same resources that have always been available to them.

Not every digital text is accessible, but those in the HDL are.[44]  This was not an incidental consequence of the scanning process, but an intended result.  The University of Michigan, the lead institution in the HathiTrust, consciously

---

[38] Dkt_79(¶¶18,40).
[39] Dkt_110(¶68).
[40] *Id.*(¶105).
[41] Dkt_79(¶21).
[42] *Id.*(¶¶31,34).
[43] Dkt_110(¶¶16,105).
[44] Dkt_79(¶¶16,22).

prioritized accessibility in the design and execution of the project.[45]  It did so "to ensure that students and faculty with print disabilities had access to works within the HDL on par with their non-disabled peers," in furtherance of one of the University of Michigan's "primary missions of providing specialized services to the blind or other persons with disabilities."[46] As early as 2005, the Federation and George Kerscher met with various HathiTrust universities and other stakeholders to ensure that the end product of the digitization process would be accessible.[47]  As a result of these collective efforts, the software selected to create the HDL maximized accessibility for blind users.[48]

In creating a digital library that is both comprehensive and fully accessible, the University of Michigan and other HathiTrust universities had a purpose altogether different from the authors and publishers who have written off the blind as an audience for their books.[49]    **REDACTED**

---

[45] *Id.*(¶30); Dkt_78(¶¶13-14); Dkt_110(¶103).

[46] Dkt_110(¶47); *see* Dkt_114-6(86:17-87:13) (Paul Courant, University Librarian and Dean of Libraries at the University of Michigan, confirming that one of the reasons the University of Michigan asked Google for a digital copy of its library collection was "to provide accessibility to people with print disabilities").

[47] Dkt_79(¶30);Dkt_78(¶¶12-13).

[48] Dkt_79(¶31).

[49] *See* Dkt_114-1(pp.56:15-57:3) (Appellant Pat Cummings answering "no" when asked if she believed "the print disabled should have access to those [the HDL] works" and refusing to agree that it is "beneficial to individuals with disabilities to have access to the works that have been digitized as part of the HathiTrust project"); Dkt_114-2(p.80:22-25) (Appellant Helge Rønning testifying, in response

14

**REDACTED**.[50]

Similarly, the Association of American Publishers has determined that there is no market for accessible books.[51]  On the whole, publishers, authors, and e-book platform developers have not only failed to promote e-book accessibility, but have actively worked to frustrate it.[52]  For this reason, the HDL stands alone in its ability to provide blind students and scholars an equal opportunity to pursue knowledge.[53]

The Guild's interrogatory answers further acknowledge the absence of any economic harm to authors as a result of making texts accessible to the blind.  Thus, the Guild admitted that "Plaintiffs . . . have not identified any specific, quantifiable past harm, or any documents relating to any such past harm, suffered as a result of the actions of Defendants in making books in fully accessible formats available for

---

to the question of whether he understood how "a US student with a print disability would obtain access to your works," "No. Why should I?").
[50] **REDACTED**.
[51] Dkt_79(¶ 42).
[52] *Id.*(¶43); Dkt_78(¶¶20-39).
[53] Dkt_79(¶ 17).

library lending to persons who cannot access print versions of such books."[54]  Nor has the Guild in any way contradicted (or even responded to) the substantial record evidence establishing unequivocally that there has never been, nor is ever likely to be, a market-based solution to the book scarcity that confronts blind students and scholars.[55]

The HDL represents the first—and the only foreseeable—opportunity for blind individuals to achieve truly equal access to university library collections and thus to equal opportunity in higher education, research, and professional employment.  Access to the HDL makes it possible for the blind to realize their true potential to contribute to the academic, cultural, and scientific advancement of society.

## SUMMARY OF ARGUMENT

Overarching this case is an unprecedented and historic opportunity for the blind to get at the accumulated knowledge and wisdom that our culture has developed and stored in libraries.  The district court correctly identified three independent legal bases for embracing this opportunity.  In response, the Guild offers only strained and dogmatic arguments that ignore that this is a use that does society much good and the Guild no harm.

---

[54] Dkt_77-3(p.7) (Pls. Resp. to NFB Interrogatory No. 5); *see id.*(p.5) (Pls.' Resp. to NFB Interrogatory No. 1).
[55] *See* Dkt_79(¶¶41-50); Dkt_78(¶¶ 9, 20-23, 25-29, 31-38); Dkt_80(¶ 29).

First, the district court correctly held that: (a) the ADA requires universities that have already digitized their print collections to make their digital libraries available to the blind; (b) the ADA's mandate imposes on universities a primary mission of providing equal access to the blind and thus permits the University of Michigan to create and distribute books to the blind under the aegis of the Chafee Amendment; and (c) the ADA supports the creation and use of the HDL for the blind as a fair use. The Guild does not dispute the applicability of the ADA to the facts at hand; it simply assumes that the ADA and copyright law are in conflict and that the ADA must give way. The use of the HDL for the blind, however, furthers the goals of both copyright law and the ADA: promoting learning by expanding access to knowledge.

Second, the district court correctly concluded that the conduct of the University of Michigan was within the scope of the Chafee Amendment. Based on the ADA mandate and the historic practices of the University of Michigan, the district court correctly concluded that the university has a primary mission of facilitating the education, adaptive reading, and information access needs of persons with disabilities, rendering it an authorized Chafee entity. Furthermore, because the University of Michigan, just as long-established Chafee entities do, distributes digital texts exclusively for use by the print disabled these digital copies constitute "specialized formats" within the meaning of this statutory provision.

17

Third, the court below correctly determined that the creation and maintenance of the HDL to serve the blind constitute fair use. Even assuming *arguendo*, that these activities may not qualify as transformative (as the Guild incorrectly maintains), the HDL's availability to the blind serves the critical ends of education, scholarship, and research—purposes expressly referred to in §107 of the Copyright Act. As the lower court properly ruled, however, use of the HDL for the blind is transformative. It serves a new purpose (allowing the blind to perform library research), has a different character (as a means for equal educational opportunity for the blind), and gives the works in the HDL new meaning (because the print texts were previously devoid of meaning for the blind). Furthermore, use of the HDL as a source of accessible texts falls within a paradigmatic example of fair use—making copies for the blind—acknowledged by both Congress and the Supreme Court. Thus, the first factor in the fair use analysis, the purpose and character of the use, strongly supports the district court's finding of fair use.

The second factor—the nature of the works used—also supports this finding as most of the works in the HDL are factual in nature or used for scholarly purposes. That copying the entire corpus was necessary to effectuate the goal of equal access for the blind also inclines the third factor—the amount and substantiality of the portion used—in favor of fair use. Finally, the record establishes that there has never been, nor is there ever likely to be, a market for

18

creating a digital database of library collections accessible to the blind, thereby

causing the fourth factor—the effect of the use on the market—to favor fair use as

well.  Thus, the HDL's use by the blind creates no disincentives to the creation of

new works by authors who have never considered the blind to be a potential source

of economic reward.  The absence of an existing or potential market is significant

not merely as it relates to the Guild's economic well-being.  If this use of the HDL

is disallowed, there would be no market drivers giving rise to another method for

the blind to participate in academic work on an equal basis.

The ADA, the Chafee Amendment, and the fair use doctrine each provides

ample support for the district court's decision denying the Guild's effort to shut

down the only chance the blind may ever have to conduct library research and

engage in the exchange and creation of new ideas on an equal basis.  Accordingly,

this Court should affirm the decision below.

## **ARGUMENT**

### I.    **The district court correctly analyzed the application of the ADA to the issues presented.**

The district court properly made three distinct holdings with respect to the

ADA's significance to the facts at hand.  First, as to an existing digital library that

mirrors a university's print collection, the ADA's mandate of equal access to

programs and activities requires that university to make that digital collection

available to blind students.  Second, because the ADA makes equal access a

19

primary mission of universities, a university may be an authorized entity under the

Chafee Amendment.  Third, the ADA supports the conclusion that creation of an

accessible digital library from a print collection and its use by blind persons

constitute fair use.

On these facts, the district court held that the "provision of equal access to

copyrighted information for print-disabled individuals is mandated by the ADA

and the Rehabilitation Act . . . ."[56]  On appeal, the Guild ignores this holding.  This

unchallenged determination by the district court constitutes an independent basis

for affirmance without consideration of other unrelated arguments offered by the

Guild.[57]

The district court was correct that under the present facts the ADA mandates

the provision of equal access to copyrighted information.  As this Court reiterated

only a few months ago:

> "In the ADA, Congress provided a broad mandate" to "effectuate its
> sweeping purpose to . . . forbid discrimination against disabled
> individuals in major areas of public life, including . . . public services
> . . . ."  "As a remedial statute, the ADA must be broadly construed to
> effectuate its purpose of providing a clear and comprehensive national
> mandate for the elimination of discrimination against individuals with
> disabilities."[58]

---

[56] Dkt_156(p.22).

[57] *See Lore v. City of Syracuse*, 670 F.3d 127, 149 (2d Cir. 2012) (noting that "any
challenges by [the appellant] to adverse decisions that are undiscussed" in the
opening brief are deemed abandoned).

[58] *Mary Jo. C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 160 (2d Cir. 2013)
(quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) and *Noel v. N.Y. City*

In education, as with public services, the ADA forbids discrimination.[59] Thus, effectuating the ADA's purpose to eliminate discrimination in education requires public and private universities to provide equal access to their programs and activities, except to the extent that affording equal access may unduly burden the universities, fundamentally alter the nature of the universities' programs or, in limited circumstances, be unreasonable.[60] Where, as here, the HDL is already in digital form and ready for use, employing it imposes no burden on the participating universities nor fundamentally alters their programs.

The record establishes that outside of the University of Michigan the blind do not have equal access to research and library programs.[61] As one witness noted, blind students "compete under a severe handicap. That handicap is not lack of sight, but a lack of access to information in a world in which information is the key to success."[62]

---

*Taxi & Limousine Comm'n*, 67 F.3d 63, 68 (2d Cir. 2012)) (alteration marks omitted).

[59] 42 U.S.C. §12132 (prohibiting discrimination by public entities); 42 U.S.C. §12182 (prohibiting discrimination by private entities); *see* 42 U.S.C. §12101 (a)(3) (finding that "discrimination against individuals with disabilities persists in such critical areas as . . . education").

[60] *See* 42 U.S.C. §§12132, 12182.

[61] Dkt_79(¶32); Dkt_78(¶11); *see* Dkt_79(¶51) (George Kerscher describing the HDL as providing "an unparalleled opportunity to achieve true equality in higher education for blind and print-disabled students and scholars").

[62] Dkt_78(¶7).

21

The Guild does not contest the social utility of enabling the blind to engage in research across an entire library collection on an equal footing, acknowledging that "Defendants' uses for the blind admittedly serve a purpose that benefits society."[63]  Moreover, the Guild does not contest the inequality of access that has existed for blind students or that the University of Michigan, employing the HDL, currently affords equal access.  Nonetheless, the Guild claims that only with the consent of all copyright holders of every text and image in that collection could a blind student have equal access to the copyrighted material it contains—although the Guild admits that obtaining those consents "might be difficult."[64]

Because sighted library patrons do not need similar consents to study and conduct research, what the Guild proposes would constitute decidedly unequal access for the blind.  In the absence of seven million plus prior consents, the Guild insists, an accessible book can only be made in response to a specific request.[65]  Such a haphazard and belated provision of books—which is the sad state of affairs today for blind scholars without access to the HDL—does not enable blind scholars "to search the library or skim materials in the way that sighted researchers

---

[63] Dkt_135(p.24).
[64] Transcript of Motions Hearing ("Hrg. Tr.") at 11:13-17, 24-25 (Aug. 6, 2012).
[65] Dkt_110(¶62); Guild Br. at 51; Dkt_135(p.23).

can,"[66] nor does it provide them the timely access that their sighted peers expect and receive.[67]

Because the Guild focuses exclusively on copyright doctrine, with no discussion of the ADA, it appears that the Guild assumes that copyright law and the ADA are at cross purposes, and that copyright prevails.  Fortunately, civil rights and copyright are not on a collision course in this case.  The Chafee Amendment embraces the goal of access for the blind.  Likewise, the doctrine of fair use welcomes consideration of public benefits and goals such as those embodied in the ADA.[68]

Even assuming *arguendo*, that the ADA and Copyright Act were at odds, when faced with the interplay of different statutes, a court must consider "the total corpus of pertinent law and the policies that inspired ostensibly inconsistent positions."[69]  To adopt the Guild's view that copyright law must reign alone would render the ADA "effectively impotent, which would be contrary to the broad remedial purpose of the ADA—an act that has been described as a milestone on the path to a more decent, tolerant, progressive society."[70]

---

[66] Dkt_79(¶18).

[67] *Id.*(¶32).

[68] *See infra* Part III at 34-38.

[69] *Boys Mkts., Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 250 (1970).

[70] *Mary Jo C.,* 707 F.3d at 160 (quoting *Martin*, 532 U.S. at 675 and *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 375 (2001) (Kennedy, J., concurring)) (internal quotation marks omitted).

The trial court also concluded that, as a government entity with a primary mission of reproducing and distributing books for the blind, the University of Michigan met the Chafee Amendment's requirements to be an "authorized entity."[71]  Although disputing its implications for Chafee purposes, the Guild does not deny that the ADA imposes on universities "a primary mission to provide specialized services relating to . . . education . . . or information access needs of blind and other persons with disabilities."[72]

The Guild's only rebuttal to the district court's reasoning is that because libraries are subject to the ADA, any library could choose to also be a Chafee Amendment authorized entity.  It fails to explain, however, why having more institutions qualify to serve the needs of blind readers would be undesirable.  As noted in Section II.B, *infra*, many mainstream libraries have already chosen to be Chafee Amendment entities that distribute accessible books to their blind patrons.

With respect to fair use, the district court correctly recognized that providing "print-disabled individuals with 'access to the wealth of information within library collections'"[73] promotes "scholarship and research—uses explicitly mentioned in the preamble to Section 107."[74]  The first policy listed in the Copyright Clause, "to

---

[71] Dkt_156(pp.22-23) (citing 17 U.S.C. §121(d)(1)).

[72] Dkt_156(p.22) (quoting 17 U.S.C. §121).

[73] Dkt_156(p.15) (citations omitted).

[74] *Id.* (citing *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004)).

24

promote the Progress of Science and useful Arts,"[75] is intended to "facilitate the

flow of ideas in the interest of learning."[76]  Facilitating that flow to the blind

expands the universe of those who may learn and thereby add to our collective

knowledge.  Thus, the policy underlying the ADA here furthers the primary

purpose of the Copyright Clause.

The district court correctly recognized the impact of the ADA in its own

right and in connection with the Chafee Amendment and fair use.

## II.    The district court correctly concluded that the Chafee Amendment enables the University of Michigan to reproduce and distribute works in the HDL to the blind.

The Chafee Amendment, 17 U.S.C. §121 (a), provides that:

> [I]t is not an infringement of copyright for an authorized entity to
> reproduce or to distribute copies or phonorecords of a previously
> published, nondramatic literary work if such copies or phonorecords
> are reproduced or distributed in specialized formats exclusively for
> use by blind or other persons with disabilities.

In turn, an "authorized entity" is defined in §121 (d)(1) as

---

[75] U.S. Const., Art. I, §8, cl. 8.

[76] *The House Report on the Berne Convention Implementation Act of 1988*, H.R.
Rep. No. 100-609, at 22 (1988); *see also* Benjamin Kaplan, *An Unhurried View of
Copyright* 74 (1967) ("Copyright law wants to give any necessary support and
encouragement to the creation and dissemination of fresh signals or messages to
stir human intelligence and sensibilities: it recognizes the importance of these
excitations for the development of individuals and society."); L. Ray Patterson &
Stanley W. Lindberg, *The Nature of Copyright* 52 (1991) (describing copyright as
"a functional concept: its function was to encourage the author to distribute the
works he or she created; its purpose was to promote learning").

a nonprofit organization or a governmental agency that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities.

Although these provisions are unambiguous,[77] the Guild disputes their plain meaning, arguing (1) that accessible digital books, such as those in the HDL, are not in a "specialized format" because sighted people can also read digital books;[78] and (2) that the University of Michigan is not an "authorized entity" under the Chafee Amendment.[79]  As discussed below, these strained interpretations run counter to both the letter and the spirit of the Chafee Amendment.

### A.    The district court correctly concluded that accessible texts from the HDL are in "specialized formats," consistent with the Chafee Amendment.

In the context of the Chafee Amendment, a specialized format is one that someone who is blind or has another print disability can use to access the content of a book.  The Guild, however, insists that the HDL collection is not in a specialized format because "people without disabilities" can use the same format.[80]

---

[77] *See Peralta-Taveras v. Attorney Gen.*, 488 F.3d 580, 584 (2d Cir. 2007) (noting that "where the statutory language provides a clear answer, [the inquiry] ends there") (internal quotation marks omitted).

[78] Guild Br. at 50.

[79] Guild Br. at 49.  The Guild incorrectly characterizes the decision below, which held that the University of Michigan, not the HathiTrust, is the Chafee-authorized entity. Dkt_156(p.23).

[80] Guild Br. at 50.

In other words, the Guild apparently believes that a "specialized format exclusively for use by [the] blind" is a format that nondisabled people cannot use.

A disability is an impairment. Being blind means that a person cannot see, not that he or she has some additional sense unavailable to the sighted. The Guild presupposes a format that cannot and does not exist. It certainly does not describe what that format might be.

The Chafee Amendment recognizes phonorecords as a "specialized format." But any person with hearing can access a format that uses sound to convey meaning. And any person with a sense of touch who learns Braille can access a format that uses tactile characters to convey meaning. Plainly, "specialized" describes a format that makes content accessible to those who cannot access print by virtue of a disability.

A digital format, when produced correctly, as is the case with the HDL, is accessible with assistive technology to those who cannot access print, but who retain a sense of hearing or touch.[81] Given the undisputed evidence that commercial digital books were first developed specifically for use by the blind, the Guild's assertion that a digital format is not a specialized format seems particularly absurd.[82] Indeed, Senator Chafee anticipated the development of "new digital

---

[81] Dkt_79(¶21); Dkt_110(¶105).
[82] Dkt_79 (¶¶8,9).

27

formats that can be used for special software"[83] as "specialized formats" that would be covered by his amendment. Today, long-established Chafee entities like Bookshare and the Library of Congress National Library Service, regularly distribute books to qualifying individuals in digital formats that they can read with "special software" (assistive technology).[84]

A grammatical reading of the relevant restrictive language in §121 also contradicts the Guild's gloss on "specialized formats." The adverb "exclusively" can properly modify a verb, adjective, or phrase, but not a noun.[85] "Exclusively specialized" makes no sense and "exclusively" cannot modify "format." Thus, "exclusively" must modify the phrase "for use by blind and other persons with disabilities." A grammatical interpretation of this sentence fulfills the promise of the section while putting the interpretative emphasis where it belongs: not on the

---

[83] 142 Cong. Rec. S9066 (daily ed. July 29, 1996) (statement of Sen. John H. Chafee) ("Chafee Statement").

[84] *See, e.g.*, *Download Books*, Bookshare, https://www.bookshare.org/_/gettingStarted/downloadBooks (last visited May 16, 2013) ("Once you have found the book you want, on the book information page, choose the format that best suits your needs:

- **DAISY** (Digital Accessible Information System)
  This format is used for many devices and software applications, such as Victor Reader Soft Bookshare Edition and READ:OutLoud Bookshare Edition.
- **BRF** (Braille Refreshable Format)
  This format is used with Braille reading devices or Braille printers.").

[85] *See* Bryan A. Garner, *Grammar and Usage*, *in The Chicago Manual of Style* 243-244 (16th ed. 2010) (stating that an adverb may qualify a verb, adjective, another adverb, preposition, conjunction, or clause, but not a noun or pronoun).

28

noun and its modifier ("specialized formats") that precede the word "exclusively," but on the prepositional phrase that follows.  It is undisputed that the University of Michigan reserves full expressive access to the HDL's digital texts exclusively for persons with demonstrated print disabilities.[86]  This exclusive use by the print disabled, therefore, falls well within the requirements of §121.[87]

Finally, the Guild argues that because §121 does not extend generally to the reproduction and distribution of "large print" formats[88] the HDL exceeds its safe harbor by allowing print-disabled persons with limited or impaired vision to employ software that produces enhanced screen displays.  Here the Guild indulges in category confusion:  "Large print" books are a particular kind of physical information commodity[89] that the publishing industry, in the negotiations around the enactment of §121, succeeded in reserving as its own special province.[90]  This

---

[86] Dkt_110(¶105).

[87] In introducing his amendment, Senator Chafee made a similar point about the generally accessible format of audio recording, noting that would qualify as a specialized format because the National Library Service restricts the distribution of those audio records to eligible individuals.  *See* Chafee Statement at S9066.

[88] *See* 17 U.S.C. §121(d)(4)(B).

[89] *See, e.g.*, the listings at http://www.largeprintbooks.com (last visited May 16, 2013) (advertising "The Largest Selection of Large Print Books Available Anywhere!").

[90] *See Statement of the Assoc. of Am. Publishers on the NII Copyright Prot. Act of 1995 before the House Subcomm. on Courts and Intellectual Prop.*, Feb. 8, 1996, *available at* http://judiciary.house.gov/legacy/441.htm (discussing the carve-out for "large-type *books*") (emphasis added).

reservation does not, of course, give copyright holders an effective monopoly over all processes for enlarging print, whether by optical or technological means.

### B. The district court correctly concluded that the University of Michigan is an entity authorized by the Chafee Amendment to distribute the HDL's content to blind and other print-disabled persons.

The district court held that the University of Michigan, as the HDL's administrator, is an entity authorized under the Chafee Amendment to reproduce and distribute the HDL's content to the blind and other persons with disabilities. The statute sets forth in straightforward language the two requirements to be an authorized entity, both of which the University of Michigan meets.

First, an authorized entity must be a governmental or nonprofit entity, which the University of Michigan is. Second, an authorized entity must have as "a primary mission the provision of specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities."[91] This language describes the University of Michigan: to meet its obligations under the ADA, it daily provides specialized services relating to the education, adaptive reading, and information access needs of persons with disabilities.[92] And even apart from the ADA, universities and their libraries have

---

[91] Section 121 refers to "*a* primary mission" of a qualifying institution, using the indefinite article in preference to the definite one. Thus, the statutory phrase necessarily contemplates the possible existence of a plural class of such missions.
[92] Dkt_110(¶¶100-106).

30

long understood assisting blind and print-disabled members of their communities in achieving equality of access to print materials to be among their fundamental functions.[93]

The record supports the University of Michigan's assertion that one of its primary missions is "providing specialized services to the blind or other persons with disabilities."[94] That mission has been front and center from the beginning of the HDL. Even during preliminary negotiations, the University of Michigan addressed the requirement that the digitized books be accessible to the blind.[95] The University insisted on the right to keep a digital copy of the works to "ensure that students and faculty with print disabilities had access to works within the HDL on par with their non-disabled peers."[96]

The Guild's argument that "[i]t simply cannot be that every library in the country"[97] is a potential Chafee authorized entity is not grounded in the language of the statute. The Guild has accurately stated that §121 was the product of negotiation among stakeholders, including authors and publishers as well as the blind. Under those circumstances, if further restrictions were called for to define

---

[93] *See generally* M. Suzanne Brown & LeiLani Freund, Assn. of Research Libraries, *SPEC Kit 321: Services for Users with Disabilities* (Dec. 2010), *available at* http://www.arl.org/bm~doc/spec-321-web.pdf.

[94] Dkt_110(¶47).

[95] Dkt_114-9(35:18-36:9, 43:13-25, 136:14-20); Dkt_78(¶14).

[96] Dkt_110(¶47).

[97] Guild Br. at 49.

who might be authorized, those restrictions would have been explicitly stated in the statute. At the end of the day, the statute states the restrictions that the industry called for and that were consistent with Senator Chafee's purpose to expand access for those with print disabilities to the wealth of information that informs, guides, educates, and enriches the lives of those who can see.

The Guild's concern that recognizing some academic libraries as authorized entities for purposes of §121 would somehow lead to an unruly proliferation of such designations, in and out of higher education, is misplaced. The Guild apparently believes that recognizing Michigan's basis for choosing to be a Chafee authorized entity would somehow require every entity "with 15 or more employees" to make their books accessible.[98] This is far from the truth. What the district court recognized is that serving as a Chafee authorized entity is one way that a governmental or non-profit entity with a library program can choose to meet its ADA obligations.[99] There are many reasons why a library might choose not to be an authorized entity and the University of Michigan's willingness to take on that role may reduce the necessity for others to do so. In practice, few universities (let

---

[98] Hrg. Tr. at 13:17-22.
[99] Similarly, the assertion by the Association of American Publishers ("AAP") that the ruling below opens the door to "all 'public accommodations' under the ADA [qualifying as] 'authorized entities,'" ignores that most places of public accommodation are neither governmental nor non-profit entities that could qualify under §121 and that few public accommodations other than public libraries and universities have library programs to which equal access must be granted. *See* AAP Br. at 22.

alone public libraries or other non-profits) can match the level of commitment to accessibility that the University of Michigan has manifested.  However, institutions that are able to prioritize accessibility should have the option to function as authorized entities under the Chafee Amendment if they so choose.  Denying qualifying institutions that status would be at odds with the Chafee Amendment's purpose—to "end the unintended censorship of blind individuals' access to current information" that is "readily available to sighted individuals in libraries."[100]

Indeed, it is commonplace for a mainstream library to have as an additional primary mission the distribution of books in specialized formats for the blind.  The New York Public Library, for example, is apportioned aid by the State of New York for doing precisely that.[101]  In Wisconsin, the State Superintendent enters into an annual contract with a library in "a 1st class city" to provide library services for the blind.[102]  In Pennsylvania, a district library center can receive additional money for providing services to patrons with disabilities.[103]  There has not been and should not now be a quota on how many of these libraries may provide additional services for the blind.[104]

---

[100] 142 Cong. Rec. S9763, S9764 (daily ed. Sept. 3, 1996).

[101] N.Y. Edu. Law §273.

[102] Wis. Stat. §43.03(6).

[103] 24 Pa. Cons. Stat. §9338(c)(2)(iii).

[104] *See* Ala. Code §21-1-15; Ariz. Rev. Stat. Ann. §41-151.07; Ark. Code Ann. §13-2-207; Cal. Educ. Code §19320; Colo. Rev. Stat. Ann. §24-90-105; Conn. Gen. Stat. Ann. §11-1a; Del. Code Ann. tit. 29, §8731; Fla. Stat. Ann. §257.04; Ga.

In ruling that the University of Michigan qualifies as an authorized entity under §121, the district court wisely rejected the Guild's unwarranted narrow reading of the statute.  This Court should do the same.

**III.  The district court correctly held that enabling blind scholars to have equal access to university library collections through the HDL is a fair use under §107 of the Copyright Act.**

Enabling the blind to engage in the same ordinary academic uses of university collections as their sighted counterparts serves the primary goal of copyright, "the creation and spread of knowledge and learning."[105]  As the Supreme Court explained in *Campbell v. Acuff Rose Music, Inc.*, "[f]rom the infancy of copyright protection, some opportunity for fair use of copyrighted

---

Code Ann. §20-2-305; Haw. Code R. §8-206.1-6; 15 Ill. Comp. Stat. Ann. 323/10; Ind. Code Ann. §4-23-7; Iowa Code Ann. §216B.3; Kan. Admin. Regs. §54-3-1; Ky. Rev. Stat. Ann. §171.145; La. Rev. Stat. Ann. §25:16; Me. Rev. Stat. tit. 27, §40; Md. Code Ann., Educ. §23-105; Mass. Gen. Laws Ann. ch. 78, §19; Mich. Comp. Laws Ann. §397.491; Minn. Stat. Ann. §134.31; 16-3 Miss. Code R. §160:1; Mo. Ann. Stat. §181.065; Mont. Code Ann. §22-1-103; 236 Neb. Admin. Code §005; N.H. Rev. Stat. Ann. §201-A:2; N.J. Stat. Ann. §18A:73-38.1; N.C. Gen. Stat. Ann. §125-2; Okla. Admin. Code §612:15-1-3; Or. Rev. Stat. Ann. §357.005; R.I. Gen. Laws Ann. §29-3.1-7; S.C. Code Ann. §60-1-120; S.D. Codified Laws §14-1-50; Tenn. Code Ann. §10-1-103; Tex. Hum. Res. Code Ann. §91.081; Utah Code Ann. §63B-5-201; Vt. Stat. Ann. tit. 22, §605; Va. Code Ann. §51.5-74; Wash. Rev. Code Ann. §27.04.045.

[105] *Golan v. Holder*, 132 S. Ct. 873, 888 (2012) (citation and internal quotation marks omitted).

materials has been thought necessary to fulfill *copyright's very purpose*, '[t]o promote the Progress of Science and useful Arts' . . . ."[106]

It is because of "copyright's very purpose" that Congress insisted that the courts, when evaluating fair use, give special consideration to uses that are "for purposes such as . . . teaching (including multiple copies for classroom use), scholarship, or research . . . ."[107]  Use of the HDL for and by the blind is precisely for the purposes of teaching, scholarship, and research and, in turn, enables the blind to engage in a range of culturally productive activities, including criticism and comment (also singled out explicitly in §107).[108]

The Supreme Court's most recent copyright pronouncement again reminds us that promoting access to knowledge is the preeminent goal of copyright policy.[109]  In ruling that the first sale doctrine set forth in §109(b) of the Copyright Act applies to goods lawfully manufactured abroad, the Court emphasized the importance of library collections as repositories of knowledge available to the public.[110]  Likewise, this Court should recognize that if the contents of library collections cannot be digitized and made available to the blind, the blind will be unable to engage in the productive cultural and intellectual activities that library

---

[106] 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I, §8, cl. 8) (alterations in original) (emphasis added).
[107] 17 U.S.C. §107.
[108] *Id.*
[109] *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1354 (2013).
[110] *Id.*

35

collections support, and will lose the opportunity to contribute as fully to the advancement of knowledge as those who can readily access printed information.

Affording the blind access to the wealth of knowledge and information contained in library collections is such an obvious vindication of fundamental copyright policy that in 1976 the House Judiciary Committee singled out "the making of copies or phonorecords of works in the special forms needed for the use of blind persons" as an example of fair use.[111]  Thirty-six years later, thanks to the HDL, the Universities now have the capability to fulfill blind students' and scholars' requests for particular books in accessible formats quickly and completely–the very goal that the Committee's report contemplates.

The Guild badly misreads the House Judiciary Committee's statement, taking it not as a clear-cut example of fair use in action, but as the source of an implied limitation on fair use for the blind—to the creation of single copies on demand for individual blind users.[112]  Even were this interpretation correct, Michigan has not exceeded this notional limitation: it offers each blind student only a single copy of any title for her own use.  More fundamentally, the Guild's gloss cannot be reconciled with the policies driving fair use.  Instead, the passage must be understood as having been written before the prospect of making an entire

---

[111] House Report at 73.  *See also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n.40 (1984) (citing this section of House Report with approval).
[112] Guild Br. at 51 (pointing to language in the House Report requiring permission of the copyright holder for the making of multiple copies for general circulation).

university library accessible to the blind by digitizing its print collection was a feasible concept.

The error in the Guild's thinking is traceable to its failure to accept that the copyright holder's limited monopoly is not "designed to provide a special private benefit."[113]  Rather, it is intended to extend authors' economic interest only far enough to "give the public appropriate access to their work product,"[114] and not so far as to hinder that access.  The four non-exclusive factors associated with a fair use analysis, together with applicable equitable and public policy considerations, are the calculus by which the border between these competing considerations is located in any given circumstance.

Thus, *Campbell* instructs that in determining whether a use is fair, the four statutory factors "are to be explored, and the results weighed together, in light of the purposes of copyright."[115]  Such analysis strongly favors fair use here in view of:

1.  the transformative nature[116] of use for the blind and its nonprofit educational purpose;

2.  the predominance of informational content in the HDL database;

---

[113] *Sony*, 464 U.S. at 429.

[114] *Id.* (emphasis added).

[115] 510 U.S. at 578.

[116] *See infra* Part III.A.2 (discussing why factor 1 strongly favors fair use here whether or not the use is characterized as transformative).

37

3.  the necessity for comprehensive digitization to provide equal access to library collections; and

4.  the absence of any harm to the Guild's actual or potential market.

Where, as here, a use confers great public benefits by providing equal educational and research opportunities for the blind *and* does not harm copyright holders, the equities strongly favor fair use.  The public benefits generated by using the HDL for accessibility are not counterbalanced by harm to authors and publishers, who have never considered the blind to be a significant market or **REDACTED**.[117]  Allowing the blind equal access to library collections does not affect the economic incentives for authors and publishers to create and disseminate new works.[118]  Thus, the district court correctly held that the HDL's creation, maintenance, and use for accessibility fully serve the constitutional purpose of copyright.

Before turning to the fair use factors, it should be noted that neither §121 nor §108 of the Copyright Act affects the application of fair use to the facts of this case.  Thus, for example, certain works in a library, such as unpublished and nondramatic literary works, are excluded from the scope of the Chafee Amendment, but should be considered under the fair use doctrine so that they can

---

[117] **REDACTED**; Dkt_79(¶¶42-43); Dkt_78(¶¶20-39); Dkt_114-1(pp.56-57); Dkt_114-2(p.80).
[118] *See infra* Part III.D.

be as equally available to a blind college student as to a sighted one.  Without

supporting authority, the Guild argues that if the doctrine of fair use permitted the

blind to access the HDL, the Chafee Amendment would have been unnecessary.[119]

The Guild, however, concedes that the doctrine of fair use applies to providing an

accessible copy of a book on request to a blind reader, even when the provider is

not a Chafee entity.[120]  In light of the Guild's concession that fair use has some

application to the provision of accessible texts to the blind, it follows that its

application in the present case must be assessed in exactly the same way as any

other invocation of fair use.  As demonstrated below, that analysis leads to the

conclusion that use of the HDL for the blind is fair use.

For the first time on appeal, the Guild also suggests that §108 should inform

the analysis of libraries' right to fair use.  Below, the Guild argued that libraries

had no fair use rights beyond those outlined in §108 and therefore could not rely on

§107 to serve the blind—a position antithetical to the plain language of §108 (f)(4):

"Nothing in this section . . . in any way affects the right of fair use as provided by

section 107."  The Guild's new argument should fare no better.  Because §108

does not address what non-infringing actions are open to libraries to address the

needs of blind patrons, it has no bearing on the fair use analysis.

---

[119] Guild Br. at 51.

[120] *Id.*

39

Both §121 and §108 are congressional enactments that define a safe harbor for certain permitted non-infringing institutional practices without in any way limiting rights under §107.  Accordingly, as demonstrated below, application of the traditional fair use factors establishes the correctness of the district court's decision.

### A.    The purpose and character of use for the blind strongly favor fair use.

In *Campbell*, the Court explained that a fair use may, but need not be, transformative in nature, so long as it furthers the goal of copyright to promote science and the arts.[121]  The educational purpose of this use—to enable the blind to engage in study and research—tilts the first factor in favor of fair use.  In addition, the district court correctly found that the "use of digital copies to facilitate access for print-disabled persons is . . . transformative."[122]

### 1.    The use is highly transformative.

Pursuant to *Campbell*, a transformative use adds something new or has a further purpose, a different character, or new meaning,[123] in contradistinction to a

---

[121] *Campbell*, 510 U.S. at 579.

[122] Dkt_156(p.18).

[123] 510 U.S. at 579 (citing Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)).

use that merely "supersede[s] the objects" of the original creation.[124]  For several of the reasons set forth by the Court, the HDL's creation to serve the blind qualifies as transformative: (i) that use has a "further purpose"—to enable the entire corpus of university libraries to be searched and studied by blind teachers, students, and scholars (whereas, in printed form, the HDL's texts were neither written, published, nor marketed to be accessible to the blind); (ii) it has a "different character"—to serve as the foundation of equal educational opportunity for the blind and fulfillment of the moral values, societal norms, and legal imperatives that call for the abolition of discrimination against individuals with disabilities; and (iii) it "alter[s] the first [work] with new . . . meaning . . ." by making the library collections accessible to the blind, and thus imbuing them with vast new significance for those whose print disabilities previously rendered those collections devoid of meaning.  The district court correctly found that, in contrast, the purpose of works presented in print format is for the edification and enjoyment of people who can see.[125]

In holding that the use by the blind is transformative, the district court explicitly relied on this Court's holding in *Bill Graham Archives v. Dorling*

---

[124] *Id.* (citing *Folsom v. Marsh*, 9 F. Cas. 342, 348 (No. 4,901) (CCD Mass. 1841); and *Harper & Row Publishers, Inc. v. National Enter.*, 471 U.S. 539, 562 (1985) ("supplanting" the original)).

[125] Dkt_156(p.18).

*Kindersley Limited.*[126] that an unauthorized use of unaltered images from Grateful

Dead concert posters and tickets was transformative because it used the images for

a wholly different purpose.  Citing *Bill Graham Archives*, the district court

correctly reasoned that "a transformative use can also be one that serves an entirely

different purpose" even when there is no change to the original work.[127]  Notably,

the Guild is silent as to the district court's view of the significance of *Bill Graham*

*Archives*.[128]

    The use here is also analogous to the use found transformative in *Kelly v.*

*Arriba Soft Corp.*[129] (explicitly relied on by this Court in *Bill Graham Archives*[130]),

which involved the wholesale, unmodified copying of entire works to create an

enormous database of photographs.[131]  Because the defendant's purpose in

displaying thumbnail versions of the photographs on its website was to enable

users to research available photographs and to locate the websites from which they

could be obtained, the Ninth Circuit reasoned that the use was "significantly

transformative."[132]  Just as the court found that "Arriba's use of the images serves

a different function than Kelly's use—improving access to information on the

---

[126] 448 F.3d at 611 (2d Cir. 2006).

[127] Dkt_156(p.16).

[128] *Cf. Lore*, 670 F.3d at 149 (challenges to the district court's ruling should not be raised for the first time in reply).

[129] 336 F.3d 811, 818-20 (9th Cir. 2002).

[130] 448 F.3d at 611.

[131] 336 F.3d at 815.

[132] *Id* at 817-20.

internet . . . ,"[133] so, too, the digitization of library collections improves access to information for the blind. Digitization makes it possible for the blind to locate and study books in academic libraries. This use differs completely from the authors' original purpose in creating works accessible only to those who could read the print in which they were fixed.[134]

Similarly, in *Sega Enterprises, Ltd. v. Accolade, Inc.*, where Accolade's purpose to develop new, compatible video games required copying Sega's security software, in part because its original object code was visually inaccessible, the Ninth Circuit held that the copying was transformative.[135] Likewise, the print texts from which the HDL was created are not in a format that can be read by the blind, but when digitized to make them accessible, serve the societal goal of equal educational opportunity for the blind.[136] In both *Arriba Soft* and *Sega*, as in this case, (1) the resulting public benefit represented a new purpose relevant to the determination of fair use, (2) the digital copying was necessary to access (literally, to see) the works, and (3) that which was copied was not altered.

---

[133] *Id.* at 819. *See also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1166 (9th Cir. 2007) (amended decision) (holding that Google search engine's gathering and displaying thumbnail versions of plaintiff's photographs was "significantly transformative," and noting the "importance of analyzing fair use flexibly in light of new circumstances") (citing *Sony*, 464 U.S. at 431–32)).

[134] Dkt_114-1(pp.56-57); Dkt_114-2(p.80).

[135] 977 F.2d 1510, 1525 (9th Cir. 1993) (amended decision) ("[T]he record clearly establishes that humans cannot *read* object code") (emphasis in original).

[136] Dkt_79(¶18).

43

The *Sega* court emphasized the importance of a strong public interest as a consideration favoring fair use, stating:

> [W]e are free to consider the public benefit resulting from a particular use . . . .  Public benefit need not be direct or tangible, but may arise because the challenged use serves a public interest . . . .  It is precisely this growth in creative expression, based on the dissemination of other creative works, and the unprotected ideas contained in those works, that the Copyright Act was intended to promote. [137]

The same observation applies to benefits flowing from making library collections accessible to the blind: increased educational and research opportunities for the blind will, in turn, generate substantial new creative expression to the benefit of society.

In *Sony Computer Entertainment v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) the Ninth Circuit held that intermediate copying of the Sony Playstation basic input-output operating system (BIOS), in order to reverse engineer the BIOS software and create new platforms on which Playstation videogames could be played, was a transformative fair use.[138]  The court reasoned that prohibiting the copying inherent to reverse engineering "would erect an artificial hurdle in the way of the public's access to the ideas contained within copyrighted software programs . . . [and] decline[d] to erect such a barrier . . . ."[139]  Likewise, the barrier of printed

---

[137] 977 F.2d at 1523 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991)).

[138] 203 F.3d 596, 605 (9th Cir. 2000).

[139] *Id.*

text is an artificial hurdle for the blind to the ideas in that text and this Court should similarly decline to bless the unnecessary maintenance of such a barrier.  Indeed, the public clearly has a greater interest in equal educational opportunity for the blind, an interest for which Congress has provided "a clear and comprehensive national mandate"[140] than in the creation of new interoperable videogames and game platforms.

In *A.V.* ex rel. *Vanderhye v. iParadigms, LLC*, the Fourth Circuit considered whether the creation of a huge database of student papers for the purpose of detecting plagiarism was a transformative fair use.[141]  The database was generated in part by copying millions of past student papers, against which current student work could be electronically compared for telltale signs of plagiarism.[142]  Plaintiffs were students who protested the involuntary digital ingestion of their papers as an infringement of their copyrights.  The court held this use to be highly transformative because the purpose and character of the defendant's use were different from those of the student-author plaintiffs, and because it provided a substantial public benefit.[143] The same analysis applies here: the different purpose (accessibility) and the important public benefit (equality in educational

---

[140] 42 U.S.C. §12101 (b)(1).

[141] 562 F.3d 630 (4th Cir. 2009).

[142] *A.V. v. iParadigms, LLC,* 544 F. Supp. 2d 473, 478 (E.D. Va. 2008), *aff'd in relevant part*, 562 F.3d 630 (4th Cir. 2009).

[143] *iParadigms,* 562 F.3d at 638-640.

opportunity) justify both creating the HDL and employing it to promote accessibility for the blind.[144]  The Guild's brief does not address *iParadigms*, even though the district court relied on it as one of several cases in which a court "upheld wholesale copying of works where the use and purpose for the copies was clearly distinguishable from those of the original."[145]

*Kelly*, *Perfect 10*, *Sega*, *Connectix*, and *iParadigms* demonstrate that uses can be transformative in circumstances where the original work is neither altered nor significantly re-contextualized.  Otherwise, *Campbell*'s most basic tenet—that fair use must be decided in a flexible manner in light of all circumstances, including the public interest and the purpose of copyright—would be gone with the wind.  In all these cases, the transformative nature of the uses in question arose from their new and publicly beneficial purposes in furtherance of the goals of copyright.  Similarly, here, the transformative nature of the use by the blind derives from its significant and socially beneficial new purpose.

In contrast, the cases relied upon by the Guild, holding that certain uses were neither fair nor transformative, concerned copying by a multinational oil company

---

[144] *See also Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1119 (D. Nev. 2006) (holding that "[b]ecause Google serves different and socially important purposes in offering access to copyrighted works through "[c]ached" links and does not merely supersede the objectives of the original creations, the Court concludes that Google's alleged copying and distribution of Field's Web pages containing copyrighted works was transformative").

[145] Dkt_156(p.16).

46

seeking to cut costs and maximize profits, and for-profit, telephonic retransmission of radio broadcasts by a company that charged fees to subscribers for listening to distant radio stations.[146]  Neither offers a useful analogy to the non-commercial digitization of library books to allow access to a group of previously excluded students and scholars.

The HDL does not merely allow blind individuals to read; it grants them unprecedented entry into a universe of information, insight, and understanding that has long been available to the rest of us.  The HDL transforms blind students from sidelined bystanders to full participants in the development, exchange, and dissemination of ideas.  In light of the highly transformative nature of use of the HDL as a tool to promote accessibility, and of its educational purposes, the first factor weighs heavily in favor of fair use.

### 2. The purpose and character of the blind's use of the HDL strongly favor fair use even if it were not viewed as "transformative."

As stated above, the Guild is wrong in arguing that the use is not transformative.  Even if, *arguendo*, the use were not transformative, it would still be fair.[147]  In 1976, long before *Campbell* introduced the concept of transformative use into the judicial copyright lexicon, Congress set forth its understanding that

---

[146] *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998).

[147] *See Campbell*, 510 U.S. at 578; *Sony,* 464 U.S. at 455 n.40; *Blanch v. Koons*, 467 F.3d 244, 252, n.3 (2d Cir. 2006).

providing blind persons with accessible copies of books was a paradigmatic example of fair use.[148]

In 1984, the Supreme Court reiterated that use by the blind is an example of fair use in *Sony Corporation of America v. Universal City Studios, Inc*.[149] In *Sony*, consumers using home video recorders had made copies of television programs for later personal viewing at times that suited their own needs. Accordingly, the Court reasoned that such copying was a fair use. Here, the copying enables access to learning to print-disabled readers. This important public purpose of promoting equal access to education is even more in keeping with the letter of fair use, to say nothing of its spirit—advancing the development of knowledge—than the facilitation of postponed home television viewing.

This Court has recognized that uses mentioned specifically in the text of §107 tip the first fair use factor in favor of fair use.[150] *Campbell* likewise instructs that the first factor enquiry "may be guided by the examples in the preamble to §107 . . . ."[151] Educational use appears both among the illustrations provided in the section's preamble and in the text relating to the first factor itself (contrasting use "of a commercial nature" with use for "nonprofit educational purposes"). A

---

[148] *See* House Report at 73.

[149] 464 U.S. at 464-65.

[150] *NXIVM Corp. v. The Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004) ("there is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in §107") (internal citation omitted).

[151] *Campbell*, 510 U.S. at 578-79.

purpose that not only is educational, but implements other important public policies such as equal access for the blind, should weigh even more heavily in favor of fair use.

Where, as here, the copying provides equal educational opportunity for blind scholars, thereby dramatically increasing dissemination of knowledge to the blind and enabling them to make new intellectual contributions, the purpose and character of the use weigh overwhelmingly in favor of fair use, regardless of whether it is characterized as transformative. In dismissing the significance of non-transformative fair use, without actually addressing the point,[152] the Guild ignores *Campbell*'s directive to engage in "an open-ended and context-sensitive inquiry," [153] and instead embraces a disfavored "bright-line" approach[154] to unjustifiably exclude the blind.

Now that digitization enables a vastly larger number of books to be accessible to the blind, the role of fair use in promoting accessibility, recognized by Congress and in *Sony*, is more significant than ever. Thus, the fair use purpose of making accessible copies for the blind, as identified in the 1976 House Judiciary Committee Report, applies with full force now that digital technology has made comprehensive access to university library collections possible. Based on the

---

[152] Guild Br. at 32-33.
[153] *Blanch*, 467 F. 3d at 251.
[154] *Campbell*, 510 U.S. at 578 (citations omitted).

revolutionary context of the HDL's use by the blind, and its furtherance of

scholarship, equality of opportunity, and the advancement of the arts and sciences,

the first factor weighs heavily in favor of a finding of fair use.

### B.    The nature of the copyrighted works favors fair use.

Factor two—"the nature of the copyrighted work"—concerns whether the

work is at the core of copyright's protective purpose (fiction, painting, poetry,

theatrical film, songs) or instead is more in the nature of a factual or informational

work (historical or scientific works, statistical compilations, maps, political

commentaries, sociological studies).   The use of works of a more factual nature is

more likely to qualify as fair.[155]   Although, the second factor may have "limited

usefulness" in light of the transformative nature of the use,[156] it nevertheless favors

a finding of fair use.

University libraries do not abound in best sellers, but instead focus on

collecting works of interest to scholars and on creating a comprehensive record of

our cultural history.[157]   In the case of most university libraries, such as the

University of Michigan's, a majority of the works will be closer to the

factual/informational end of the spectrum rather than the creative end.[158]   Blind

---

[155] *See, e.g.*, *Campbell*, 510 U.S. at 585; *see also*, *Bill Graham Archives*, 448 F.3d
at 612.
[156] *Bill Graham Archives*, 448 F.3d at 612 (citing *Campbell*, 510 U.S. at 586).
[157] Dkt_110(¶¶11,86).
[158] *Id.*(¶59).

scholars will generally retrieve even works of fiction, drama and poetry from the

HDL as objects of study, rather than as sources of entertainment.[159]  Factor two

therefore favors fair use.

### C.    The amount and substantiality of the works copied are consistent with the purpose of the use.

The third factor—"the amount and substantiality of the portion used in

relation to the copyrighted work as a whole"—concerns whether the amount

copied is reasonable in light of the purpose of the use.[160]  Where, as here, the entire

work must be copied to accomplish the purpose of the use, this factor is fully

consistent with a finding of fair use.[161]  Equality of access for the blind cannot be

obtained unless the blind can use the same collections that are available to sighted

students and scholars in the same ways—that is, with the capacity to browse and

search the collection to identify relevant research materials, as well as to study the

---

[159] *See Bill Graham Archives,* 448 F.3d at 612-13 (even where all works used were "creative," "the second factor has limited weight in our analysis because the purpose of DK's use was to emphasize the images' historical rather than creative value").

[160] *Campbell*, 510 U.S. at 586.

[161] Courts have repeatedly found fair use even though the entire work or works were copied. *See iParadigms*, 562 F.3d 630*, Perfect 10*, 508 F.3d 1146; *Bill Graham Archives*, 448 F.3d 605; *Arriba Soft*, 336 F.3d 811; *Sega,* 977 F.2d 1510, *Connectix*, 203 F.3d 596; *Field*, 412 F. Supp. 2d 1106; *see also Blanch*, 467 F.3d at 257-58 (Where copying is "reasonable when measured in light of [its] purpose . . . [the third factor] weighs distinctly in [defendant's] favor."); *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000) ("[T]o copy any less than [the entire image] would have made the picture useless to the story") (citing *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc*., 150 F.3d 132, 144 (2d Cir. 1998)).

material located as a result. That highly important purpose requires comprehensive digitization of library collections so that they can be made available in an accessible form.

### D. Use by the blind causes no harm to any actual or potential market.

The fourth factor—"the effect of the use upon the potential market for or value of the copyrighted work"—weighs strongly in favor of fair use for both legal and factual reasons. *Campbell* and its progeny instruct that where, as here, a use is transformative, factor four generally favors fair use. The different purpose and character of a transformative use makes it unlikely to affect, much less usurp, the market for the original work.[162] Moreover, as this Court has noted, a copyright holder is not entitled to monopolize transformative uses. If it were, a primary purpose of the Copyright Clause and fair use—promoting progress—would be obstructed.[163] This rationale applies with full force to the Guild's efforts to

---

[162] *Campbell*, 510 U.S. at 591 ("[W]hen . . . the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred."); *see Bill Graham Archives,* 228 F.3d at 615 ("Since DK's use of BGA's images falls within a transformative market, BGA does not suffer market harm due to the loss of license fees."); *Blanch*, 467 F.3d at 258 ("The fourth fair-use factor greatly favors Koons" because his transformative uses did not "usurp[] the market for the original work."); *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 308 (3d Cir. 2011) ("[A] copyright owner cannot claim market harm simply because he would have liked to charge for the use in question. If that were the case, then it would be difficult indeed for any fair use defense to succeed.").

[163] *Bill Graham Archives,* 448 F.3d at 615 (A "copyright holder cannot prevent others from entering fair use markets merely by developing or licensing a market

frustrate the availability of the HDL to blind students and scholars—without pointing to any meaningful practical alternative.

In addition, the record below establishes that, as a purely factual matter, there is no harm to any of the Guild's actual or potential markets. As evidenced by the declarations of George Kerscher, James Fruchterman, and Dr. Marc Maurer, **REDACTED**, there has never been, nor is there ever likely to be, a market for creating a digital database of library collections accessible to blind students.[164] Neither the Guild nor its members' publishers have ever attempted to develop such a "market" because they believe there is no profit to be made in it. The Association of American Publishers, after study, determined that there was no market for books for the blind.[165] The market is so devoid of commercial value "that it is common practice in the publishing industry for authors to forgo royalties that are generated through the sale of books manufactured in specialized formats for the blind."[166]

The absence of a market that could be harmed is a critical distinction between this case and *Texaco*, on which the Guild relies so heavily.[167] There, an

---

for . . . transformative uses of its own creative work.") (internal citation and quotation marks omitted).

[164] Dkt_78(¶¶20-40); Dkt_79(¶¶41-50); Dkt_80(¶¶9-10); **REDACTED**.

[165] Dkt_79(¶42).

[166] Guild Br. at 34.

[167] *Texaco*, 60 F.3d 913.

active licensing market was in place and each unlicensed copy represented a sale lost.  Here,                    **REDACTED**                    and no evidence suggests that copyright holders believe that licensing works in library collections for accessibility purposes would represent a worthwhile business model; indeed, the evidence is to the contrary.[168]

The enormous cost of creating the HDL, and the lack of a profitable market for the provision of accessible books in general, demonstrate why no specialized market offering the blind comprehensive access to library collections is likely to develop, even in the absence of the HDL.[169]  As no actual or potential market is impaired by this use, factor four weighs decidedly in favor of fair use.

### E.    The overall balance favors a finding of fair use.

The foregoing requires these conclusions: (1) the creation and use of the HDL to facilitate access to library collections by the blind is a fair use, and without it the goal of universal accessibility will not be achieved; (2) the ADA's mandate of equal access in all spheres of life, including education, gives even greater weight to the public interest in this use; and (3) this use dovetails with the constitutional mandate that copyright serve the goal of advancing learning and knowledge.  Thus,

---

[168] **REDACTED**; Dkt_77-3(pp.5,7).
[169] Dkt_79(¶17); Dkt_77-2(56:2-9) (Google testifying that "the cost just of the scanning of the book, not of the development of the technology, would be $10, estimate").

in the words of this Court in *Bill Graham Archive,* "copyright law's goal of promoting the Progress of Science . . . would be better served by allowing the use than by preventing it."[170] The record unequivocally establishes that the district court correctly determined that the activities at issue, insofar as they concern access by the blind to library collections, constitute a fair and non-infringing use.

## **CONCLUSION**

For the reasons set forth above, the judgment of the district court should be affirmed.

Dated: May 28, 2013

Respectfully submitted,

By:_____/s/_____
Daniel F. Goldstein
Jessica P. Weber
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Telephone:  410-962-1030
Facsimile:  410-385-0869
dfg@browngold.com
jweber@browngold.com

Robert J. Bernstein
THE LAW OFFICE OF ROBERT J. BERNSTEIN
380 Lexington Avenue, 17th Floor
New York, NY 10168
Telephone: 212-551-1068
Facsimile:  212-551-1001
rjb@robert-bernsteinlaw.com

---

[170] 448 F.3d at 608 (internal quotation marks omitted).

55

Peter Jaszi
5402 Surrey Street
Chevy Chase, Maryland 20815
Telephone: 301-656-1753
Facsimile:  301-656-7483
pjaszi@wcl.american.edu

*Counsel for Intervenors Defendant-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

As counsel of record to the Intervenor Defendants-Appellees, I hereby

certify that this brief complies with the type-volume limitations set forth in Rule

32(a)(7)(B) of the Federal Rules of Appellate Procedure.  I am relying upon the

word count of the word-processing system (Microsoft Word) used to prepare the

brief, which indicates that 13,198 words appear in the brief, except for the portions

excluded from the word count pursuant to Federal Rule of Appellate Procedure

32(a)(17)(B)(iii).


By:_____/s/_____

Daniel F. Goldstein
Jessica P. Weber
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Telephone:  410-962-1030
Facsimile:  410-385-0869
dfg@browngold.com
jweber@browngold.com

Robert J. Bernstein
THE LAW OFFICE OF ROBERT J. BERNSTEIN
380 Lexington Avenue, 17th Floor
New York, NY 10168
Telephone: 212-551-1068
Facsimile:  212-551-1001
rjb@robert-bernsteinlaw.com

Peter Jaszi
5402 Surrey Street
Chevy Chase, Maryland 20815
Telephone: 301-656-1753
Facsimile:  301-656-7483
pjaszi@wcl.american.edu

*Counsel for Intervenors Defendant-Appellees*

# **ADDENDUM**

## 17 U.S.C. §107

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1)    the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)    the nature of the copyrighted work;

(3)    the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)    the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. §121

(a)   Notwithstanding the provisions of section 106, it is not an infringement of copyright for an authorized entity to reproduce or to distribute copies or phonorecords of a previously published, nondramatic literary work if such copies or phonorecords are reproduced or distributed in specialized formats exclusively for use by blind or other persons with disabilities.

(b)

   (1)   Copies or phonorecords to which this section applies shall—

      (A)   not be reproduced or distributed in a format other than a specialized format exclusively for use by blind or other persons with disabilities;

      (B)   bear a notice that any further reproduction or distribution in a format other than a specialized format is an infringement; and

      (C)   include a copyright notice identifying the copyright owner and the date of the original publication.

   (2)   The provisions of this subsection shall not apply to standardized, secure, or norm-referenced tests and related testing material, or to computer programs, except the portions thereof that are in conventional human language (including descriptions of pictorial works) and displayed to users in the ordinary course of using the computer programs.

(c)   Notwithstanding the provisions of section 106, it is not an infringement of copyright for a publisher of print instructional materials for use in elementary or secondary schools to create and distribute to the National Instructional Materials Access Center copies of the electronic files described in sections 612(a)(23)(C), 613(a)(6), and section 674(e) of the Individuals with Disabilities Education Act that contain the contents of print instructional materials using the National Instructional Material Accessibility Standard (as defined in section 674(e)(3) of that Act), if—

   (1)   the inclusion of the contents of such print instructional materials is required by any State educational agency or local educational agency;

A-2

(2)     the publisher had the right to publish such print instructional materials in print formats; and

(3)     such copies are used solely for reproduction or distribution of the contents of such print instructional materials in specialized formats.

(d)     For purposes of this section, the term—

(1)     "authorized entity" means a nonprofit organization or a governmental agency that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities;

(2)     "blind or other persons with disabilities" means individuals who are eligible or who may qualify in accordance with the Act entitled "An Act to provide books for the adult blind", approved March 3, 1931 (2 U.S.C. 135a; 46 Stat. 1487) to receive books and other publications produced in specialized formats;

(3)     "print instructional materials" has the meaning given under section 674(e)(3)(C) of the Individuals with Disabilities Education Act; and

(4)     "specialized formats" means—

(A)     braille, audio, or digital text which is exclusively for use by blind or other persons with disabilities; and

(B)     with respect to print instructional materials, includes large print formats when such materials are distributed exclusively for use by blind or other persons with disabilities.

A-3