# 12-4547-cv

## United States Court of Appeals
### *for the*
## Second Circuit

THE AUTHORS GUILD, INC., THE AUSTRALIAN SOCIETY OF AUTHORS
LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS,
ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES
SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON,
THE AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND
COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK
FAGLITTERAER FORFATTERO OG OVERSETTERFORENING,
THE WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK
GRUNDSTROM, HELGE RØNNING, JACK R. SALAMANCA,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**REDACTED PAGE PROOF BRIEF FOR DEFENDANTS-APPELLEES**

KILPATRICK TOWNSEND &
STOCKTON LLP
The Grace Building
1114 Avenue of the Americas
New York, New York 10036
212-775-8700

*and*

KILPATRICK TOWNSEND &
STOCKTON LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, Georgia 30309
404-815-6500

*Attorneys for Defendants-Appellees*

---

v.

HATHITRUST, CORNELL UNIVERSITY, MARY SUE COLEMAN, President,
University of Michigan, MARK G. YUDOF, President, The University of
California, KEVIN REILLY, President, The University of Wisconsin System,
MICHAEL MCROBBIE, President, Indiana University,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE, BLAIR
SEIDLITZ, COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure,

Defendants-Appellees, by and through their undersigned counsel, each certify that

they have no parent corporation and have not issued any stock.

KILPATRICK TOWNSEND & STOCKTON LLP

Joseph Petersen
Robert Potter
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
Email: jpetersen@kilpatricktownsend.com

Joseph Beck
Andrew Pequignot
Allison Scott Roach
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: jbeck@kilpatricktownsend.com

*Attorneys for Defendants-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iv

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF ISSUES PRESENTED .............................................3

STATEMENT OF THE CASE................................................................4

STATEMENT OF FACTS .....................................................................5

     A.    The HDL....................................................................5

     B.    Problems with Printed Materials........................................6

     C.    The Libraries' Early Digitization Efforts............................9

     D.    The Benefits of the HDL's Full-Text Search
          Functionality...........................................................10

     E.    The Groundbreaking Benefits of the HDL for Individuals
          with Print Disabilities..............................................14

     F.    The Security of the HDL................................................15

     G.    The Orphan Works Project.............................................16

STANDARD OF REVIEW ....................................................................18

SUMMARY OF ARGUMENT ..............................................................19

ARGUMENT .......................................................................................20

I.    THE DISTRICT COURT PROPERLY HELD THAT THE
    LIBRARIES' USES FOR SEARCH, ACCESS TO THE
    PRINT DISABLED, AND PRESERVATION ARE FAIR...........................20

     A.    The Purpose and Character of the Uses Made of the
          Works Within the HDL Overwhelmingly Support Fair
          Use..........................................................................22

i

1.      Search Is "Transformative." ...................................... 22

2.      Providing Access to the Print Disabled Is Transformative. ............................................... 27

3.      Preservation by Academic Research Libraries Is Transformative. ............................................... 28

B.    Factor One Favors the Libraries, Even if Their Uses Are Not Deemed Transformative. .............................. 30

C.    The Nature of the Copyrighted Works Favors Fair Use. ................. 33

D.    The Amount and Substantiality of the Use Favors Fair Use. ........................................................ 35

E.    The Markets for Appellants' Works Are Not Harmed. .................... 37

1.      There is No Harm to Any Existing Market. ............................ 38

2.      There is No Harm to Any Potential Market. ............................ 39

F.    Balancing the Fair Use Factors, the Libraries' Uses Fall Safely Within the Protection of Fair Use. .......................... 43

II.    CONGRESS DID NOT INTEND FOR SECTION 108 TO CURTAIL FAIR USE. ................................................. 44

A.    The Plain Language of Section 108 Leaves Application of Section 107 Unaffected. ................................. 45

B.    The Legislative History of Section 108 Reinforces Its Plain Meaning. ............................................... 45

C.    Section 108 Complements Section 107; It Does Not Undermine It. ................................................ 46

III.   THE LIBRARIES' USES FOR THE PRINT DISABLED ARE PERMITTED UNDER SECTION 121. ................................... 48

ii

IV.    THE U.S. ASSOCIATIONS LACK STANDING TO
       CHALLENGE ANY ALLEGED ACTS OF INFRINGEMENT. ................50

V.     APPELLANTS' OWP CLAIMS ARE NOT JUSTICIABLE
       BECAUSE NO WORKS WERE MADE AVAILABLE
       THROUGH THE PROJECT AND THERE ARE NO
       CURRENT PLANS TO REINITIATE IT. ...................................55

       A.    Appellants' Abstract and Premature OWP Claims Are
             Not Ripe. ...................................................................55

       B.    Appellants Suffer No Hardship from Awaiting
             Development of Necessary Facts. .........................................58

       C.    Appellants Also Lack Standing to Assert the OWP
             Claims. .......................................................................59

CONCLUSION ...........................................................................61

RULE 32(a)(7)(C) CERTIFICATE OF COMPLIANCE ........................62

STATUTORY ADDENDUM
PURSUANT TO
FED R. APP. P. 28(f) ..................................................................63

iii

# TABLE OF AUTHORITIES

## Cases

*A.V. v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009)..............................24, 26, 35

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)...........................................................56

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971 (2d Cir. 1991).................................................................................................................50

*Am. Geophysical Union v. Texaco Inc.,* 802 F. Supp. 1 (S.D.N.Y. 1992), *aff'd*, 60 F.3d 913 (2d Cir. 1995)....................................................28, 29, 39

*Associated Press v. Meltwater U.S. Holdings, Inc.*, No. 12 Civ. 1087, 2013 WL 1153979 (S.D.N.Y. Mar. 21, 2013) .......................................................27

*Authors Guild, Inc. v. Google Inc.*, No. 05-cv-8136 (S.D.N.Y. Oct. 28, 2008)..................................................................................................................6, 34

*Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445 (S.D.N.Y. 2012).....................................................................................................................5

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006)................................................................. 23, 26, 28, 33, 36, 38, 43, 44

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006).....................................................19, 33

*Bogle-Assegai v. Connecticut,* 470 F.3d 498, 504 (2d Cir. 2006)...........................52

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994)............. 21, 22, 33, 35, 38

*Cariou v. Prince*, No. 11-1197-cv, 2013 WL 1760521 (2d Cir. Apr. 25, 2013).................................................................................................18, 19

*CBS Broad. Inc. v. EchoStar Commc'ns Corp.*, 450 F.3d 505 (11th Cir. 2006)...............................................................................................................54

*CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, No. 98-2651-CIV
(S.D. Fla. Mar. 31, 2003) ..................................................................54

*CBS, Inc. v. PrimeTime 24 Joint Venture*, 76 F. Supp. 2d 1333 (S.D.
Fla. 1998)..........................................................................................52

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013)...........................60

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992) ...............................45

*Duffy v. Penguin Books USA Inc.*, 4 F. Supp. 2d 268 (S.D.N.Y. 1998).................40

*Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27 (2d Cir.
1982)..........................................................................................50, 54

*Eldred v. Ashcroft*, 537 U.S. 186 (2002) ...............................................47

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ...........................20

*Field v. Google, Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006) ..................28

*Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821
(9th Cir. 2001) ..................................................................................24

*Hayes v. Carlin Am., Inc.* 168 F. Supp. 2d 154 (S.D.N.Y. 2001) ....................55, 56

*Isaacs v. Bowen*, 865 F.2d 468 (2d Cir. 1989) .......................................57

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003).............. 23, 24, 25, 34, 36

*Krim v. PCOrder.com, Inc.*, 402 F.3d 489 (5th Cir. 2005) ....................53

*LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471 (2d Cir.
2009)..................................................................................................18

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................60

*Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469 (2d Cir.
1999)..................................................................................................56

v

*Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144 (2d Cir. 2013), *petition for cert. filed,* No. 12-9996 (U.S. Apr. 26, 2013)........................48

*Maxtone-Graham v. Burtchaell*, 803 F.2d 1253 (2d Cir. 1986)..................22, 33, 35

*Miller v. Silbermann,* 951 F. Supp. 485 (S.D.N.Y. 1997) ........................................60

*Mullen v. Soc'y of Stage Dirs. & Choreographers*, No. 06 C 6818, 2007 WL 2892654 (N.D. Ill. Sept. 30, 2007) ........................................................51

*N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122 (2d Cir. 2008) .......55, 57, 60

*NXIVM Corp. v. Ross Inst.*, 364 F.3d 471 (2d Cir. 2004) ..................................22, 37

*Ocasek v. Hegglund*, 116 F.R.D. 154 (D. Wyo. 1987)..............................................51

*Olan Mills, Inc. v. Linn Photo Co.*, 795 F. Supp. 1423 (N.D. Iowa 1991), *rev'd on other grounds,* 23 F.3d 1345 (8th Cir. 1994) .............................54

*Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365 (1978)................................53

*Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123 (2d Cir. 2001).................................................................................................................18

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007).........24, 25, 35

*Righthaven LLC v. Hoehn*, Nos. 11-16751, 11-16776, 2013 WL 1908876 (9th Cir. May 9, 2013)..............................................................................51

*S. Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois*, 326 F.3d 919 (7th Cir. 2003) ..................................................................54

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1993).......................47

*Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881 (9th Cir. 2005) ......................51

*Simmonds v. INS,* 326 F.3d 351 (2d Cir. 2003) .....................................55, 56, 57, 59

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ....................................................................................... 21, 30, 31, 35, 38

vi

*Steel Co. v. Citizens for Better Env't*, 523 U.S. 83 (1998) ......................................52

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg LP*, 861 F. Supp. 2d 336
  (S.D.N.Y. 2012) ...................................................................................30

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975)..............................20

*United Food & Commercial Workers Union Local 751 v. Brown
  Group, Inc.*, 517 U.S. 544 (1996)........................................................52

*United States v. Cambio Exacto, S.A.*, 166 F.3d 522 (2d Cir. 1999)......................53

*United States v. LaBonte*, 520 U.S. 751 (1997).........................................50

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) ............................................47

*Woods v. Bourne Co.*, 60 F.3d 978 (2d Cir. 1995) .....................................27

**Statutes**

17 U.S.C. § 106......................................................................25

17 U.S.C. § 107.............................................................21, 22, 47

17 U.S.C. § 108..................................................................1, 6

17 U.S.C. § 108(e)...................................................................57

17 U.S.C. § 108(f)(4)................................................................45

17 U.S.C. § 108(h)...................................................................57

17 U.S.C. § 121..................................................................2, 6

17 U.S.C. § 121(a)...................................................................48

17 U.S.C. § 121(d)(1)................................................................49

17 U.S.C. § 501(b)...............................................................50, 60

17 U.S.C. § 501(e)...................................................................52

**Other Authorities**

H.R. Rep. No. 2222, 60th Cong., 2d Sess. (1909)....................................21

H.R. Rep. No. 89-2237 (1966)....................................................................46

H.R. Rep. No. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 ......31, 32, 46

S. Rep. No. 91-1219 (1970)........................................................................46

S. Rep. No. 94-473 (1975), *reprinted in* 1975 WL 370213 (Nov. 20, 1975)..............................................................................................................33

Staff of S. Comm. on the Judiciary (Barbara Ringer), 86th Cong., Renewal of Copyright 31 (Comm. Print 1960)....................................34

U.S. Const. art. I, § 8, cl. 8...................................................................2, 20

**Rules**

13A Charles Alan Wright et al., *Federal Practice and Procedure* § 3531.9.5 (3d ed. 2011)...........................................................................53

4 William F. Patry, *Patry on Copyright* § 11:3 (2011)...........................46

6 William F. Patry, *Patry on Copyright* § 21:28 (2011).........................51

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ...............................................................................................................22

Stewart E. Sterk, *Intellectualizing Property: The Tenuous Connections Between Land and Copyright*, 83 Wash. U.L.Q. 417 (2005) ...............................................................................................................21

## PRELIMINARY STATEMENT

This case involves the fair use of copyrighted books by university libraries that are digitizing those materials for limited purposes: helping scholars identify (but not read) potentially relevant works; providing the print disabled with access to books that until now have been largely unavailable to them; and preserving the libraries' irreplaceable collections for future generations of scholars.

The HathiTrust Digital Library ("HDL") is a secure repository of digital files drawn from the collections of leading university libraries. It enables groundbreaking research capabilities that are simply impossible with conventional printed texts, such as full-text searches and "text mining"—the search for word combinations and other textual patterns. The HDL makes works available to blind and other print-disabled individuals on a scale never before achievable. It preserves works in digital form to ensure that, if the original text deteriorates or is lost and copies are no longer available for purchase, a new copy can be created.

*But of all the facts of record concerning the HDL, perhaps the single most important fact for purposes of this appeal is this—the HDL is not a vehicle for reading books online.* It does not provide access to the *text* of copyrighted books, except for uses authorized by a copyright holder, uses authorized under 17 U.S.C. §108 (such as replacing out-of-print or stolen books), and to users with certified

print disabilities. The HDL thus respects copyright holders' rights while promoting fair use rights codified by Congress.

The HDL's services are limited, but its benefits are immense. Through the HDL, out-of-print, rarely checked-out books in offsite storage facilities can be searched and discovered online (and then read offline). Men and women who cannot see or turn physical pages may access knowledge. Deteriorating books that would have been lost are preserved.

In this case, Appellants, which are associations and individual authors, brought suit, claiming the HDL infringed their copyrights. After discovery and briefing, the District Court rejected those claims. The court concluded, among other things, that the HDL's functions constitute fair use of copyrighted works. It further held that the HDL's uses for blind and print-disabled individuals are authorized by the Chafee Amendment, 17 U.S.C. § 121.

This Court should affirm. The limited uses permitted by the HDL serve the Constitutional requirement that copyright law "promote the Progress of Science," (U.S. Const. art. I, § 8, cl. 8), and they do no harm to authors. They are fair uses and lawful reproductions for people who have disabilities. Accordingly, the District Court was correct in concluding that these uses are rightfully made without the authorization of Appellants, because they have the authorization of Congress.

## STATEMENT OF ISSUES PRESENTED

1.     Whether it is fair use for nonprofit university libraries, for purposes of scholarship and research, to digitize books in their collections to make those books text-searchable, *when Appellants have identified no meaningful likelihood of harm arising from such use*.

2.     Whether it is fair use for nonprofit university libraries, for purposes of scholarship and research, to digitize books in their collections to provide access to those collections, in specialized formats, for patrons with print disabilities, *when Appellants have identified no meaningful likelihood of harm arising from such use*.

3.     Whether it is fair use for nonprofit university libraries, for purposes of scholarship and research, to digitize books in their collections for the limited purposes of preserving books within their collections so that a replacement copy can be made in case of deterioration, theft, or natural disaster, *when Appellants have identified no meaningful likelihood of harm arising from such use*.

4.     Whether an academic institution can be an "authorized entity" that can rely upon Section 121 of the Copyright Act to provide access to works in specialized formats for the blind and other people with print disabilities, *when the undisputed evidence establishes that the academic institution has a primary goal of improving access for print-disabled individuals*.

3

5.      Whether the U.S. appellant associations who are neither the legal nor beneficial holder of a copyright lack statutory standing because Section 501(b) of the Copyright Act provides that only the "legal or beneficial owner of an exclusive right under a copyright" is entitled to institute an action for infringement.

6.      Whether a claim is not ripe where it seeks a declaration that certain uses of unidentified copyrighted works, *if* they took place, would constitute infringement, when those uses have not yet been made and there are no current plans to proceed with them.

## STATEMENT OF THE CASE

Appellants are individuals who hold copyrights in various published works and U.S. and foreign associations of copyright holders. Appellees (the "Libraries") are individuals and institutions associated with several public and private university libraries. Also named in the action is the "HathiTrust," a service offered by the University of Michigan ("Michigan") for the benefit of the HathiTrust member organizations as well as users of the HathiTrust website located at www.hathitrust.org.

The Libraries have been digitizing books in their collections and storing digital copies in a secure repository that has come to be called the HathiTrust Digital Library or "HDL." In 2011, seven years *after* Appellants first had notice

4

that Google would help digitize books found in the Libraries' collections,

Appellants sued the Libraries for copyright infringement.

In an omnibus ruling on October 10, 2012 ("Op."), the District Court

resolved various cross motions for summary judgment and judgment on the

pleadings. *See Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445 (S.D.N.Y.

2012). The District Court ruled that the U.S. associations of copyright holders

lacked statutory standing under the Copyright Act (Op. at 8-9), and that

infringement claims against the Orphan Works Project ("OWP") were unripe (Op.

at 11-12). On the merits, the court ruled that the Libraries' digitization efforts were

not infringing because they were a fair use of the copyrighted materials and

permissible under the statutory provision allowing reproduction and distribution

"exclusively for use by the blind or other persons with disabilities." (Op. at 21-23.)

## STATEMENT OF FACTS

### A.    The HDL.

The HDL represents a collaboration of more than 60 colleges, universities,

and other nonprofit institutions (including the Libraries) that have pooled their

collections of digitized books.[1] (Dkt#110 ¶¶55-56.)

The permitted uses of copyrighted works in the HDL are extremely limited:

---

[1] The number currently stands at eighty.

- **Full-Text Search.** Users may search for one or more terms or phrases across all works within the HDL. The search results indicate only the page numbers on which a term is found within a particular book and the number of times it appears on each page. *Search results do not show any text, and patrons do not have electronic access to any copyrighted content* (unless they are users with a certified print disability).

- **Access for persons with print disabilities.** As an authorized entity under 17 U.S.C. § 121, as well as consistent with fair use, Michigan has enabled uses for the blind and others with certified print disabilities.

- **Preservation.** The HDL is a safeguard against the sudden or ongoing loss of print books and enables the Libraries to make future non-infringing uses, such as replacing a work under 17 U.S.C. § 108.

(*Id.* ¶68.)

The HDL now totals more than ten million works published over many centuries, in a multitude of languages, covering almost every subject imaginable. (*Id.* ¶¶57-61.)

## B.    Problems with Printed Materials.

Libraries are entrusted with preserving books for generations of future scholars, including those researching some of the most arcane subjects known to humanity. (*Id.* ¶41) The vast majority of these books are out of print, meaning that replacements cannot be acquired easily, if at all. (*Id.* ¶66.) *See also* Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Settlement Approval at 27, *Authors Guild, Inc. v. Google Inc.*, No. 05-cv-8136 (S.D.N.Y. Oct. 28, 2008).

There are numerous threats to books. Millions of volumes in libraries were destroyed during the World Wars, and the collection of the National Library in Sarajevo lost over one million volumes due from shelling in the 1990s.[2] (Dkt#110 ¶32.) Hurricane Katrina devastated Tulane University's Howard-Tilton Memorial Library in 2005, with flooding destroying 90% of the 500,000 volumes in one of the library's collections. (*Id.* ¶31.) Just last year, the University of Wisconsin suffered significant losses to its collection due to severe flooding. (Dkt#107 ¶¶6-13.) Many of these works may be lost forever. (*Id.* ¶¶16-19.) Images of the Wisconsin destruction appear below.

 

Nor is sudden loss the only threat. For instance, many books in the Libraries' collections—books printed between 1850 and 1990—were printed on high-acid paper that is particularly prone to deterioration through a chemical reaction caused by moisture in the air. (Dkt#110 ¶¶22-25.)  Even materials printed on non-acidic

---

[2] Perhaps the most famous example of a loss of a library, of course, is the destruction of the Library of Alexandria. (Dkt#110 ¶32.)

paper often do not survive their years of library circulation unscathed: torn pages, worn covers, and broken spines are common. Because most books in the Libraries' collections are now out of print, the physical books have become irreplaceable. (*Id.* ¶ 66.) As of 2004, Michigan estimated that *approximately 3.5 million of its books* were particularly vulnerable to deterioration and, ultimately, loss. (*Id.* ¶25.) Michigan's experience is typical of other libraries.

In addition to being prone to damage, deterioration, loss, and theft, books in printed form present two further limitations. First, a book's contents are not readily searchable. Scholars researching specific references, terms, or phrases invariably must review many irrelevant books to find pertinent ones. (*See* Dkt#102 ¶¶5-7.) The printed form also makes many types of textual or statistical analyses of printed materials painstaking, if not impossible. (*See* Dkt#104 ¶¶7, 21.)

Second, a book's printed contents are largely inaccessible to individuals with visual and other print disabilities (such as cerebral palsy, quadriplegia, or missing arms). (Dkt#79 ¶6.) Without accessible digital books, print-disabled individuals depend on the limited existing audio, braille, or large-font versions of books, or must rely on lengthy and cumbersome processes to have a book read and recorded or converted into braille or another accessible format. (*Id.* ¶¶7, 10, 18-20, 32, 34-36; Dkt #77-4 (Kleege Decl.) ¶¶4-5; Dkt#77-5 (Seidlitz Decl.) ¶¶5-6; Dkt#110 ¶102.)

8

### C.    The Libraries' Early Digitization Efforts.

To protect their collections against the types of losses summarized above, more than twenty years ago Michigan and other libraries began digitizing deteriorating books in their collections. (Dkt#110 ¶41.) Their efforts could not begin to keep up with the rate of book losses (*id.* ¶¶25-29, 42); it would have taken Michigan more than 1,000 years to digitize its entire collection, then consisting of more than 7 million volumes (*id.* ¶44).

In 2004, Michigan entered into an agreement with Google to convert its hardcopy books into a digital format. (*Id.* ¶46.) The agreement required Google to give Michigan a digital copy. (*Id.* ¶47.) With Google's involvement, what would have taken Michigan a millennium to accomplish took less than a decade. (*Id.* ¶¶44-45.) The HDL comprises more than 10 million books and is growing every day. (*Id.* ¶57.)

While Michigan was the first academic library to work with Google to digitize Michigan's library collection, Google ultimately partnered with a number of other universities and research libraries (including the other Library defendants in this action and Harvard, Stanford, Oxford, Columbia, Princeton, and the Universities of Virginia and Texas at Austin, among others). (*Id.* ¶52.)

9

**D.    The Benefits of the HDL's Full-Text Search Functionality.**

Full-text searching is the most significant advance in library search technology in the last five decades. (*Id.* ¶75.) Rather than combing through paper, card, or electronic catalog records and attempting to discern from author, title, and subject heading whether works may be relevant, scholars can go to the HathiTrust website and search—*but not read or copy*—the actual text of copyrighted books and journals. (*Id.* ¶¶76-81.) The search results display bibliographic information—including title, author, publisher, and publication date—for in-copyright books containing the search term. (*Id.* ¶77-79.) The search results also display the page numbers on which the term is found within the book and the number of times it appears on each page, thereby providing some clues as to how useful the book might be. (*Id.* ¶¶77, 80.) The text itself, however, is not made digitally available (readable or downloadable) unless it is determined that it is in the public domain or the rights holder has given permission to provide access to the work's content. (*Id.* ¶81; *see also id.* ¶16.)

Scholars and former scholars of a certain age can remember the process of endlessly thumbing through well-worn card catalogues in search of *potentially* relevant books. (Dkt#102 ¶¶5-7.) Now, through the HDL, library search can be performed anywhere with an Internet connection yielding, in milliseconds, results like this:

10



Hathi Trust Digital Library - Holdings: Allergy and tissue metabolism

HATHI TRUST Digital Library

Help Feedback

Home About Collections My Collections

Catalog Search

Catalog Search [ ] All Fields ☐ Full view only Advanced Catalog Search *Search Tips*

Cite this Export to Endnote

### Similar Items

Life and letters of Thomas Kilby Smith brevet major-general United States volunteers 1820-1887
By: Smith, Walter George, 1854-1924
Published: (1898)

Allergy and anaphylaxis as metabolic error
By: Godlowski, Zbigniew Z.
Published: (1962)

The Metabolism of oral tissues
Published: (1960)

Clinical immunology and allergy
By: Criep, Leo Hermann, 1896-
Published: (1969)

Ascorbic acid metabolism in adrenal gland and reproductive tissues of the guinea pig
By: Devine, Marjorie Mealey.
Published: (1967)

Metabolic bone disease cellular and tissue mechanisms /
Published: (1989)

Adipose tissue regulation and metabolic functions /
Published: (1970)

Energy metabolism tissue determinants and cellular corollaries /
Published: (1992)

Lipid metabolism in tissue culture cells /
Published: (1967)

Lipid metabolism in tissue culture cells
Published: (1967)

## Allergy and tissue metabolism [by] W. G. Smith.

| | |
|---|---|
| Main Author | Smith, Walter George. |
| Language(s) | English |
| Published | Springfield, Ill., C. C. Thomas [1964] |
| Subjects | Allergy<br>Tissue metabolism |
| Physical Description: | 110 p. illus. 22 cm. |
| Original Format: | Book |
| Original Classification Number | QR 185 .A4 S662 |
| Locate a Print Version: | Find in a library |

### Viewability:

Limited (search-only) *(original from University of Michigan)*

About Help Feedback | Take-Down Policy

http://catalog.hathitrust.org/Record/002077547[6/13/2012 12:47:47 PM]

HathiTrust Digital Library Search Inside -- Allergy and tissue metabolism [by] W. G. Smith. ... .

HATHI TRUST Digital Library

Login Help Feedback

Home About Collections My Collections

« Back to page

Search in this text [anaphylactic shock]

**About this Book**

Allergy and tissue metabolism [by] W. G. Smith. ... . Smith, Walter George.

View full catalog record

**Copyright:** Protected by copyright law.

**Get this Book**

Find in a library

**Add to Collection**

Login to make your personal collections permanent

Select Collection

Add

**Share**

Permanent link to this book

http://hdl.handle.net/2027/mdp.39015006705670

Version: 2012-05-07 09:10 UTC

◀ Go to the beginning of the book

Full view is not available for this item
due to copyright © restrictions.

Limited (search-only)

**anaphylactic AND shock** matched **41** pages in this item.

Broaden your search to pages having just one or more of your terms.

Viewing results for: 1 to 10 of 41 pages
1 | 11 | 31 | 32 | next▶

p.17 - *12 matching terms*
p.26 - *13 matching terms*
p.30 - *11 matching terms*
p.27 - *12 matching terms*
p.15 - *11 matching terms*
p.88 - *9 matching terms*
p.9 - *8 matching terms*
p.28 - *8 matching terms*
p.18 - *8 matching terms*
p.21 - *8 matching terms*

Viewing results for: 1 to 10 of 41 pages
1 | 11 | 31 | 32 | next▶

Login About Help Feedback Mobile Take-Down Policy Privacy Contact

http://babel.hathitrust.org/cgi/pt/search?id=mdp.39015006705670;view=image;seq=7;q1=anaphylactic%20shock;start=1;size=10;page=search;orient=0[6/13/2012 1:07:19 PM]

(Dkt#110 ¶¶76-81.)

Absent full-text search, the information within the Libraries' collections may be all but invisible to scholars. As explained by Dr. Stanley Katz, the renowned American historian at Princeton, "[s]ophisticated digital searching over the text of large numbers of books has permitted me to search for specific words or names (or words or names in relation to each other) *that simply was not possible* using a library card catalog, the electronic [Online Public Access Catalogs], or other bibliographic sources." (Dkt#102 ¶9 (emphasis added).) Author Margaret Leary similarly used HathiTrust search to discover books otherwise unknown to her for her own scholarship, noting: "In seven years of research, I did not find [the] information anywhere else." (Dkt#103 ¶¶10-13.) Both researchers, after identifying relevant books, located physical copies of the books and read the relevant portions *in those copies, not online*. (Dkt#102 ¶¶14-16; Dkt#103 ¶10.)

The HDL also empowers researchers to engage in a form of scholarship or research known as "text mining." Text mining is the use of technology to extract meaningful information from text, for example identifying patterns and trends or performing statistical analyses. (Dkt#104 ¶¶3-7.) The text files produced by the digitization can also be aggregated into datasets and fed into specialized statistical and analytical software tools to extract valuable information. (*Id.* ¶¶7, 14-21, 25-29.)

As University of Illinois at Chicago Professor Neil Smalheiser explained, text mining has been used to identify "influential experts…in a particular subject, predict[] civil unrest in third world countries, or track[] the emergence of infectious disease outbreaks or terrorist cells." (*Id.* ¶4.) One researcher used text mining to infer that fish oil supplementation would ameliorate "Raynaud Syndrome," a blood disorder potentially causing necrosis and gangrene. (*Id.* ¶13.) Likewise, the same researcher used this technique to propose that magnesium supplementation would ameliorate migraine headaches. (*Id.*) Another researcher used text mining to identify a molecule likely to be involved in Huntington's Disease, a neurodegenerative genetic disorder. (*Id.* ¶¶15-17.) All three hypotheses developed through text mining were validated through clinical testing. (*Id.* ¶¶13,17.)

In both search and text mining, the end user never sees the underlying work's *text*. (*See* Dkt#110 ¶¶16, 77-81; Dkt#104 ¶¶3, 7, 14-21, 27.) The user obtains only bibliographical information about the book that contains her search terms along with a listing of pages where the terms appear. (Dkt#110 ¶¶77-81.) If the user wishes to view a book, she must obtain it from the library by reviewing a copy on the premises or checking out a physical copy. (*See id.; see also* Dkt#102 ¶¶15-16; Dkt#103 ¶10.)

13

**E.    The Groundbreaking Benefits of the HDL for Individuals with Print Disabilities.**

For centuries, students and scholars with a broad range of disabilities have been denied equal access to library collections. (Dkt#110 ¶101; *see also* Dkt#77-4 (Kleege Decl.) ¶¶5-7; Dkt#77-5 (Seidlitz Decl.) ¶¶5-8; Dkt#77-6 (Wheeler Decl.) ¶¶6-8; Dkt#79 ¶¶7, 10, 32-36.) A visually impaired student or scholar must wait weeks or months for requested works to be converted into accessible formats without knowing beforehand whether the works will be of any value to her research. (Dkt#110 ¶102; *see also* Dkt#79 ¶¶18-20, 32, 34-36.)

In response to the roadblocks faced by print-disabled scholars, Michigan developed an accessibility program that affords scholars with print disabilities full access to its libraries' works within the HDL. (Dkt#110 ¶¶103-06.) Other HathiTrust member libraries intend to provide similar specialized services through the HDL to print-disabled scholars on their campuses. (Dkt#125-5 (Ex.9) (Wilkin Tr. 217:8-218:7); Dkt#145 ¶3, Ex.B at 1.)

Access for individuals with visual or print disabilities is subject to rigorous safeguards. To use the HDL, a person with a print disability must obtain certification of that disability from a qualified expert. (Dkt#110 ¶105.) Such certified users obtain secure access using their unique digital access passwords and are trained on the system and warned about possible copyright infringement. (*Id.*;

14

Dkt#125-5 (Ex.9) (Wilkin Tr. 213:17-214:10).) With digital access, a print-disabled patron can perceive the works within the HDL using adaptive technologies such as software that converts the text into spoken words. (Dkt#110 ¶105; Dkt#144 ¶¶7-8.) In addition, images can be used with magnification displays to show an enlarged copy of a work to a print-disabled individual, including those non-textual parts of the book—pictures, charts, diagrams, and the like—that are difficult to convert to text or spoken form. (Dkt#144 ¶¶7-8; *see also* Dkt#148 ¶¶16-17.)

###    F.    The Security of the HDL.

The works within the HDL are stored on secure servers at Michigan and Indiana University's Indianapolis campus.[3] (Dkt#110 ¶88.) The facilities at both institutions implement a number of physical and electronic security measures to thwart unauthorized access. (*Id.* ¶¶93-99; *see also* Dkt#137 ¶14.) The Center for Research Libraries, through its rigorous assessment program, has certified the HDL as a trustworthy digital repository. (Dkt#110 ¶91; *see also* Dkt#137 ¶9.)

Extensive physical controls restrict access to the HDL. The HDL servers, storage, and networking equipment at Michigan and Indiana are mounted in locked

---

[3] Maintenance of copies at two different locations mitigates the risk of destruction or loss of the digital files, ensuring that physical damage to one site, for example from a fire or earthquake, would not completely destroy the digital files. (Dkt#110 ¶¶87-89.) Encrypted tape backups of the HDL are also maintained and stored securely offline. (*Id.* ¶90.)

racks, and only six individuals at Michigan and three at Indiana have keys to those racks. (Dkt#110 ¶94.) The data centers housing that equipment are monitored by video surveillance, and entry requires use of a keycard and recognition by a biometric sensor. (*Id.*)

Web access to the HDL corpus is also highly restricted. (*Id.* ¶96.) Access by users of the HDL service is governed by the HDL rights database, and also by a user's authentication to the system (e.g., as an individual certified to have a print disability by Michigan's Office of Services for Students with Disabilities). (*Id.*)

The Libraries began the digitization project at issue in this lawsuit more than seven years ago and, as testified by the individual in charge of the HDL's security, "in all that time there is absolutely no reason to believe that anyone has managed to pierce Michigan's or the HDL's security protections and obtain unauthorized access to the text of a single in-copyright work."[4] (Dkt#137 ¶9.)

### G.    The Orphan Works Project.

In 2011, Michigan announced a project called the "Orphan Works Project" (or "OWP" for short). (Dkt#110 ¶109.) Orphan works are still in copyright but

---

[4] Appellants' security expert admitted: "I don't know about all of the security systems that [the Libraries] have." (Dkt#137 ¶8, Ex.A (Edelman Tr. 248:11-12).) He acknowledged that "I don't think I would be the best person to evaluate [an entity's] security systems, but I think I would be able to assist them in selecting an appropriate person." (*Id.* (Edelman Tr. 288:15-18).)

16

prospective users cannot readily identify or locate the copyright holders (Dkt#133 ¶76; *see also* Dkt#110 ¶108). The (unrealized) goal of the OWP had two stages:

1)    identify out-of-print works, try to find their copyright holders, and, if no copyright holder could be found, publish a list of orphan works candidates before moving to the second stage (Dkt#110 ¶¶109-10, 112-13; Dkt#114-75 at 20-21 (response to Interrogatory 5));

2)    enable limited, non-infringing uses of the works by Michigan Library patrons (Dkt#110 ¶¶109-10).[5]

Before any works were made accessible, Michigan—the only library that has actively engaged in the work of the OWP (Dkt#110 ¶115)—sought to identify and locate contact information for potential copyright holders through a number of different avenues. (Dkt#114-75 at 20-21 (response to Interrogatory 5).) Michigan posted a list of potential orphan works that it had identified through this process. (Dkt#110 ¶112.) If the public listing led to the identification of a copyright holder for a work, that work would have been removed as a candidate from the program. (*Id.* ¶113; *see also* Dkt#114-75 at 21-22 (response to Interrogatory 5).) Michigan

---

[5] Had Michigan implemented the OWP, the number of users permitted to view a given orphan work at any one time would have been limited to the number of hardcopies owned by the library. (Dkt#110 ¶111.)

discovered that a number of the works initially identified as potential orphan works

had ascertainable copyright holders. (Dkt#110 ¶113.)

Concluding that its initial screening mechanism might have been

insufficient, Michigan did not implement the OWP. (*Id.* ¶114.) The director of the

OWP testified that he does not know "whether or how the OWP will continue."

(*Id.* ¶116.)

Not a single patron has been given access to a work through the OWP, and

no additional works have been publicly identified as potential orphan works under

the project. (*Id.* ¶¶114, 116; Dkt#133 ¶¶84, 86.)

## STANDARD OF REVIEW

This Court reviews the district court's entry of summary judgment *de novo*.

*Cariou v. Prince*, No. 11-1197-cv, 2013 WL 1760521, at *4 (2d Cir. Apr. 25,

2013). A Rule 12(c) entry of judgment on the pleadings is reviewed similarly. *See*

*Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001)

(specifying de novo review); *see also LaFaro v. N.Y. Cardiothoracic Grp., PLLC*,

570 F.3d 471, 475-76 (2d Cir. 2009) (in reviewing judgment on pleadings, courts

must accept as true factual allegations of complaint, and draw all inferences in

favor of pleader). "[T]his court has on numerous occasions resolved fair use

determinations at the summary judgment stage where there are no genuine issues

of material fact." *Cariou*, 2013 WL 1760521, at \*4 (quoting *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006)) (ellipsis omitted).

## SUMMARY OF ARGUMENT

The Libraries' nonprofit educational uses of digitized works for search, access to the print disabled, and preservation are fair uses, as demonstrated by the relevant factors. The Libraries' uses are favored purposes under Section 107 of the Copyright Act, are transformative, and do not harm the market for the copyrighted works (Section 107 Preamble and Factors 1 and 4). The books in the HDL are predominantly factual, published, and out of print (Factor 2); and complete digitizations are necessary for the Libraries' educational and transformative purposes (Factor 3).

The Libraries' fair use rights are not preempted or limited by Section 108 of the Copyright Act, and Michigan, as an "authorized entity" under Section 121 of the Copyright Act, is entitled to provide access to works in specialized formats to the blind and other people with print disabilities.

Finally, certain of Appellants' claims are not justiciable. The Appellant associations based in the United States lack statutory standing under Section 501(b) of the Copyright Act because they are neither the legal nor beneficial holder of the copyrights in their members works. The *Hunt* test for associational standing

19

governs only constitutional and prudential standing; it does not address statutory standing.

Appellants' infringement claims based on prospective uses of unidentified works through the OWP are not ripe because they present abstract hypothetical disputes and lack facts crucial to deciding whether such uses, were they to occur, would be non-infringing uses under Sections 107 or 108. Appellants likely would not even be the relevant rights holders in a potential future dispute, and therefore also lack standing for their OWP claims.

## ARGUMENT

### I.    THE DISTRICT COURT PROPERLY HELD THAT THE LIBRARIES' USES FOR SEARCH, ACCESS TO THE PRINT DISABLED, AND PRESERVATION ARE FAIR.

The primary objective of copyright "is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.' " *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991) (alteration in original) (quoting U.S. Const. art. I, § 8, cl. 8). A copyright is a statutorily limited right and "reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature…." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). Copyright "is not based upon any natural right" of authors but rather reflects a weighing of the benefits to the public arising

from "stimulating the producer" of copyrighted works against "the evils of the temporary monopoly." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 n.10 (1984) (quoting H.R. Rep. No. 2222, 60th Cong., 2d Sess. 7 (1909)).[6]

Inherent in the Act's objective to promote the "Progress of Science" is the right of the public to make fair use of copyrighted works. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) ("From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill [this] very purpose…."). Thus, as Congress has instructed, "notwithstanding the provisions of section 106…fair use of a copyrighted work…is not an infringement of copyright." 17 U.S.C. § 107.

Section 107 enumerates four factors courts consider in evaluating fair use: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use upon the potential market for or value of the copyrighted work. Courts have "the

_____

[6] Appellants' references to eminent domain and takings without compensation (Appellants' Br. at 1, 40) are misplaced. Copyright law is not derived from, nor is it the equivalent of, common law protections for real property. *See generally* Stewart E. Sterk, *Intellectualizing Property: The Tenuous Connections Between Land and Copyright*, 83 Wash. U.L.Q. 417, 417 (2005). Further, there has been no "taking" of Appellants' works. Appellants who are the legal or beneficial holders of a copyright can continue making such uses of their works as they see fit.

21

freedom to adapt [fair use] to particular situations on a case-by-case basis, in light of changing technology." *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1260 (2d Cir. 1986).

### A.    The Purpose and Character of the Uses Made of the Works Within the HDL Overwhelmingly Support Fair Use.

The Libraries' "nonprofit educational" uses—for "teaching," "scholarship," and "research"—perfectly match the examples Congress intended as fair uses under Factor One. *See* 17 U.S.C. § 107. Indeed, as this Court has held, Factor One strongly favors fair use where the use falls within the categories listed in Section 107. *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004).

Factor One heavily favors the Libraries. If there is any doubt (and there should be none), the transformative purpose of the HDL removes it.

### 1.    Search Is "Transformative."

Factor One evaluates whether new uses "supersede the objects" of the works used or instead "add[] something new, with a further purpose or different character, altering the first with new expression, meaning, or message…[,]" *Campbell*, 510 U.S. at 579 (citing Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)). In courts' lexicon, Factor One asks whether the new uses are "transformative."

Enabling the contents of millions of books to be fully searchable and

analyzable for scholarship and research purposes—but not read online—is a highly

transformative use.[7] Original works provide scholarly or artistic value in book

format by allowing users to peruse and enjoy their contents. By contrast, search

and text mining of the digital format allows individual words or phrases in the

works to be located and analyzed algorithmically. (*See* Dkt#110 ¶¶16, 77-81;

Dkt#104 ¶3, 7, 14-21, 27.) Such uses are quintessentially transformative.

The District Court's finding of a transformative use is grounded in Circuit-

level authority. In *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003)

(cited favorably in *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605,

609 (2d Cir. 2006)), the Ninth Circuit concluded that copying for purposes of

search is a transformative use and thus fair. Although the defendant in *Arriba Soft*

made and displayed "exact replications" of millions of works, the use was

transformative because the copied images appearing in search engine results served

---

[7] The HDL's search results do not reveal any portion of the text of the underlying work. (Dkt #110 ¶¶77-81.) However, even search results that revealed a portion or snippet of the content would have a strong claim of transformative purpose. But that is not an issue before this Court. (*See* Dkt#133 ¶¶50-51.)

a different purpose, "improving access to information on the internet versus artistic expression."[8] *Id.* at 819.

In *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), the Ninth Circuit drew the same conclusion when it examined Google's copying of Internet content: "Although an image may have been created originally to serve an entertainment, aesthetic, or informative function, a search engine *transforms* the image into a pointer directing a user to a source of information."[9] *Id.* at 1165 (emphasis added); *see also A.V. v. iParadigms, LLC*, 562 F.3d 630, 640 (4th Cir. 2009) (finding defendant's copying and archiving of student papers to detect plagiarism a protected fair use as it "was completely unrelated to expressive content").

---

[8] Through the HDL, library patrons do not see even a low-resolution or reduced-size copy of books; rather they see only book titles and the page numbers where their search terms appear, neither of which is protected by copyright. (Dkt#110 ¶¶16, 77-81.)

[9] Appellants seek to distinguish *Arriba Soft* and *Perfect 10* on the ground that "such owners have provided an implied license to search engines to copy and index their contents." (Appellants' Br. at 33.) But an implied license is a separate defense to copyright infringement; if an implied license is found, there is no need to engage in the fair use analysis. *See, e.g., Foad Consulting Grp., Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 832 n.19 (9th Cir. 2001) (finding it unnecessary to address fair use where there was an implied license). Moreover, as amicus Associated Press recognizes, "[n]either decision makes any distinction between publication on the Internet versus another medium, and neither decision ever mentions an implied license argument." (The Associated Press ("AP") AP Br. at 24 n.11.)

The search functionality enabled by the digitization here is legally indistinguishable from the transformative search engines found to be fair uses in *Perfect 10* and *Arriba Soft*. Search and text mining allows HDL users to identify works based on criteria of interest and to analyze—but not read—text through means impossible in their original form. (*See* Dkt#102 ¶9; Dkt#104 ¶¶7, 21.) Whereas the original works derive value from their contents, search and text mining reveal their value from extracting information *about* the text or from aggregating information from multiple sources. Such uses serve "an entirely different function," *Arriba Soft*, 336 F.3d at 818, than the original expressive purpose of the books and are unquestionably transformative.

Appellants argue that "even if ingesting a copyrighted work into a search engine is transformative, it does not follow that the permanent storage of the original content is also transformative." (Appellants' Br. at 33.) But the mere storage of a lawfully made, non-infringing copy does not implicate any rights protected by copyright. *See* 17 U.S.C. § 106. Moreover, as the District Court recognized, permanent storage of the content fulfills the purposes of preservation and is the only way to provide immediate, meaningful access for those with print disabilities.[10] (Op. at 19 n.26.)

---

[10] Appellants point out that the full-size copies created by *Arriba Soft* were not retained (even though the thumbnails that were created and displayed clearly

Appellants' amici claim that a transformative use must add something to the original work and result in a new expressive work. (*See* The Associated Press ("AP") Br. at 12-21; American Society of Journalists and Authors, Inc. Br. at 10-11.) Amici confuse the distinct concepts of derivative works (which require new copyrightable expression) and transformative uses under Section 107 (which do not). *See Bill Graham Archives*, 448 F.3d at 609 (holding that the unauthorized *use* of entire, unaltered concert posters to illustrate points in a book was for an "entirely different purpose" and thus was transformative); *iParadigms*, 562 F.3d at 639 (holding that a use "can be transformative in function or purpose *without altering or actually adding to the original work*.") (emphasis added).

The ultimate question is whether a new use "supersedes" the original purpose of the copyrighted work. Non-expressive uses such as search are *less likely* to be superseding, not more. Appellants' amicus agrees: the Associated Press recognizes that "[i]n this unusual case, in which an educational, non-commercial institution has created an index that does not display any actual text from the

---

were). (Appellants' Br. at 33.) But the Ninth Circuit's decision does not suggest anywhere that this was relevant to the holding. Nor should it be, since the focus in fair use is logically and naturally on the "use" and not the copying that enabled it.

26

allegedly infringed works, the index…likely does not supercede [sic] the objects of the copyrighted books."[11] (AP Br. at 12.)

### 2.    Providing Access to the Print Disabled Is Transformative.

The District Court found that the "use of digital copies to facilitate access for print-disabled persons is also transformative" (Op. at 18), noting that providing access to print-disabled persons was not an intended use of the printed book. That finding is supported by an undisputed factual record. The Secretary of Appellant The Authors Guild, Inc. testified that she did not believe the print disabled should have access to her works. (Dkt#111 ¶22, Ex.U (Cummings Tr. 56:23-57:3).)

Appellants miss the mark in asserting that accommodating the print disabled is not a transformative use, comparing it to a translation that violates a copyright holder's control over derivative works. The hallmark of a derivative work, under Section 101, is the addition of copyrightable expression to existing works. *See Woods v. Bourne Co.*, 60 F.3d 978, 990 (2d Cir. 1995) ("[F]or a work to qualify as a derivative work it must be independently copyrightable."). That is a distinct issue

---

[11] Amicus the Associated Press appears to be primarily motivated by the impact that this Court's decision will have on its pending case against Meltwater News. (*See* AP Br. at 3 n.2.) That case has no real application here because the district court found that the uses at issue in that case superseded the need to read the original articles. *Associated Press v. Meltwater U.S. Holdings, Inc*., No. 12 Civ. 1087, 2013 WL 1153979, at *12-14 (S.D.N.Y. Mar. 21, 2013). Here, in contrast, the Libraries' limited uses are not superseding.

from whether the use is transformative under Section 107, a Factor One inquiry that focuses on the purpose underlying the use and not the work itself.

### 3.  Preservation by Academic Research Libraries Is Transformative.

Preserving books for future lawful uses is "transformatively different from the original expressive purpose" of the books. *See Bill Graham Archives*, 448 F.3d at 609; *cf. Am. Geophysical Union v. Texaco Inc.,* 802 F. Supp. 1, 14 (S.D.N.Y. 1992) (noting that copying an article "onto durable archival paper to prevent deterioration, or onto microfilm to conserve space,…might be a persuasive transformative use"), *aff'd*, 60 F.3d 913 (2d Cir. 1995); *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1118-19 (D. Nev. 2006) (finding Google's "caching" of websites transformative because the archival copy allowed users to access otherwise inaccessible information, and thus served a different purpose than the artistic function of the copyrighted works).

If an out-of-print, but in-copyright book deteriorates or is stolen, the Libraries may invoke Section 108(c) to replace the book—a right they could not exercise if the book had not been preserved digitally. Preservation also ensures that books will exist when they enter the public domain, which may be long after the books have gone out of print.

Appellants argue that, "[g]iven that one of the core functions of academic libraries is to 'preserve' books 'not just for current students and faculty, but also for future generations,' a library does not 'transform' a print book that was acquired for preservation purposes by digitizing it for the exact same purpose." (Appellants' Br. at 32 (citation omitted).) Appellants confuse the "purpose" that is relevant. Authors do not write books to be preserved; they write books to be read. Digitization for the purpose of preservation does not interfere with this purpose.

Appellants' reliance on *Texaco*, 60 F.3d 913, is misplaced. (Appellants' Br. at 31-32.) Texaco circulated monthly journal issues and encouraged its employees to photocopy and "archive" the articles, or even entire issues, *for later reading*. Texaco defended making the reproduced articles available for reading under fair use as a form of "preservation," but the real purpose of Texaco's copying was to avoid buying additional copies of the works. *Texaco*, 60 F.3d at 919. Here, in contrast, the Libraries' preservation efforts are not a pretext for providing users with access to the text of works; when the Libraries want additional copies to be read, they buy them. (*See* Dkt#110 ¶¶69-74.) Therefore, unlike Texaco's use, preservation does not supersede any existing use of the books.

29

**B.      Factor One Favors the Libraries, Even if Their Uses Are Not Deemed Transformative.**

Uses can be fair uses even without being transformative when they benefit the public. In *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), the Supreme Court held that copying television broadcasts to view at a later time (*i.e.*, "time shifting") benefited society and, thus, was a protected fair use even though the copyrighted works were being used for the identical purpose. *Id.* at 449, 454. Similarly, in *Swatch Group Management Services Ltd. v. Bloomberg LP*, 861 F. Supp. 2d 336 (S.D.N.Y. 2012), the court held that posting full versions of earnings calls, while not transformative, was nonetheless a fair use because it advanced the public interest in disseminating financial news. *Id.* at 340-41.

As Appellants admit, the HDL presents enormous public benefits.[12] First, full-text searching can yield breakthrough research by allowing scholars to identify works that they would not otherwise have discovered. (*See* Dkt#102 ¶¶9, 11, 14-17; Dkt#103 ¶¶10-13.) It also enables new methods of scholarship that can help scholars better understand the connections between texts and the evolution of literary language. (*See* Dkt#104 ¶¶3-7, 25-29.)

---

[12] In response to the Libraries' Statement of Undisputed Facts that "[t]he HDL offers immense public benefit" (Dkt#133 ¶60), Appellants admitted that the statement was "uncontroverted" (*id.*).

30

Second, the HDL affords print-disabled scholars the freedom to perform the types of research that non-disabled scholars have long taken for granted. Before the HDL, print-disabled scholars often had no choice but to wait for books of *possible* interest to be converted to accessible formats. (*See* Dkt#110 ¶¶101-02; Dkt#77-4 (Kleege Decl.) ¶¶5, 7; Dkt#77-5 (Seidlitz Decl.) ¶¶5-6; Dkt#79 ¶¶7, 10, 32-36.) Now, as a result of the HDL, sources are readily and quickly available to those scholars to an extent that at least approximates the ready access long enjoyed by non-disabled scholars. (*See* Dkt#110 ¶¶105-6; *see also* Dkt#79 ¶¶16, 18, 26, 31, 33-34, 38, 40, 51.) Providing access to the blind offers a public benefit so substantial that both Congress and the Supreme Court have endorsed a finding of fair use for copying to provide access to the blind. *See* H.R. Rep. No. 94-1476, at 73 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5686 ("Another special instance illustrating the application of the fair use doctrine pertains to the making of copies or phonorecords of works in the special forms needed for the use of blind persons."); *see also Sony*, 464 U.S. at 455 n.40 ("Making a copy of a copyrighted work for the convenience of a blind person is expressly identified by the House Committee Report as an example of fair use, with no suggestion that anything more than a purpose to entertain or to inform need motivate the copying.").

Appellants downplay this legislative history as somehow limited to instances where a print-disabled patron makes an individual request. (Appellants' Br. at 51.)

31

But Congress imposed no such limitation. Nor would such a limitation make any sense, if the goal is to provide blind students with meaningful access. For example, Michigan cannot predict whether a blind student will need a specific book on literary theory or medieval history for a term paper due in one week—insufficient time to convert it into an accessible format. (Dkt#110 ¶102.) Offering works to the print disabled in a comprehensive and timely fashion is a groundbreaking facet of the HDL, one that clearly advances the "Progress of Science." For a scholar or student with a print disability, immediate access to one book is a small step; immediate access to a library is a giant leap.

Third, preservation is a public value expressly endorsed by Congress. *See* H.R. Rep. No. 94-1476, at 73, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5687 ("The efforts of the Library of Congress, the American Film Institute, and other organizations to rescue and preserve this irreplaceable contribution to our cultural life are to be applauded, and the making of duplicate copies for purposes of archival preservation certainly falls within the scope of 'fair use.' ") The Libraries' efforts to preserve millions of imperiled books are an invaluable public benefit.

Finally, even beyond the public benefits of the HDL, the Libraries are nonprofit organizations (Dkt#133 ¶5), making non-commercial uses for the purpose of teaching, research, and scholarship (Dkt#110 ¶55; Dkt#110-3 (Ex.B) at

32

1). The Libraries' uses are favored under Factor One and overwhelmingly support a finding of fair use.

### C.     The Nature of the Copyrighted Works Favors Fair Use.

As to Factor Two, the District Court correctly held that, "[b]ecause the use is transformative, intended to facilitate key-word searches or access for print-disabled individuals, the second factor is not dispositive." (Op. 18 (citing *Bill Graham Archives*, 448 F.3d at 612 ("[T]he second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose.")).) *See also Campbell*, 510 U.S. at 586 (noting that this factor is unlikely to "separat[e] the fair use sheep from the infringing goats . . ." where the use is transformative). In any event, the nature of the works in the HDL favors fair use.

Factor Two recognizes that some works are more susceptible to fair use than others. Copying nonfiction works is more likely to be fair use than copying fictional works. *Blanch*, 467 F.3d at 256. Appellants have not disputed that the large majority of works in the HDL are nonfiction. (*See* Dkt#110 ¶67; Dkt#133 ¶45.) Copying published works is more likely to be fair than copying unpublished ones, *Blanch*, 467 F.3d at 256, and copying out-of-print works is more likely to be fair use than copying in-print works, *Maxtone-Graham*, 803 F.2d at 1264 n.8.[13]

---

[13] *See also* S. Rep. No. 94-473, at 64 (1975), *reprinted in* 1975 WL 370213 (Nov. 20, 1975) ("A key, though not necessarily determinative, factor in fair use is

Appellants have not disputed that the large majority of works in the HDL are published and out of print. (*See* Dkt#110 ¶66; Dkt#133 ¶44.) More broadly, Appellants concede that "[a]pproximately 75% of the Books in United States libraries are out of print and have ceased earning any income at all for their Rightsholders." Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Settlement Approval at 27, *Authors Guild, Inc. v. Google Inc.*, No. 05-cv-8136 (S.D.N.Y. Oct. 28, 2008).

Many out-of-print works are no longer subject to copyright protection. (*See* Dkt#110 ¶¶63-66.) Works published between 1923 and 1963 entered the public domain unless they were renewed (*id.* ¶63); the vast majority were not renewed.[14]

Appellants contend that this factor cannot favor fair use because the Libraries "indiscriminately scanned millions of books…." (Appellants' Br. at 35.) Yet if an entity relying on fair use needed to parse each collection to determine whether it was nonfiction, out of print, or in the public domain before using it, numerous other beneficial services, including search engines (*Arriba Soft* and

---

whether or not the work is available to the potential user. If the work is 'out of print' and unavailable for purchase through normal channels, the user may have more justification for reproducing it than in the ordinary case….").

[14] A 1960 Copyright Office study found that only 7% of books were renewed. *See* Staff of S. Comm. on the Judiciary (Barbara Ringer), 86th Cong., Renewal of Copyright 31, at 220 (Comm. Print 1960).

34

*Perfect 10*) and plagiarism-detection services (*iParadigms*), would need be shuttered as well.

But the heart of the fair use inquiry is not numbers. Copying by nonprofit libraries of mostly out-of-print, nonfiction, published books to enable search, preservation, and access to the print disabled is fairer and more in keeping with copyright law's ultimate objective than making *one copy* of only *one book* for the purpose of selling that copy. It is the difference between fair use and infringement.

### D.    The Amount and Substantiality of the Use Favors Fair Use.

Factor Three asks whether the amount copied was reasonable in relation to its purpose. *See Sony*, 464 U.S. at 449-50. The District Court rightly concluded that "entire copies were necessary to fulfill [the Libraries'] purposes of facilitation of searches and access for print-disabled individuals."[15] (Op. at 19.)

As this Court has noted, "[t]here are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use." *Maxtone-Graham*, 803 F.2d at 1263. "[T]he extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87. The crux of the inquiry is whether "*no more was taken than necessary.*" *Id.* at 587 (emphasis

---

[15] Appellants do not dispute that if the Libraries digitized only portions of their collections they could not provide a comprehensive search tool, provide equal access to students with print disabilities, or preserve imperiled works. (Dkt#133 ¶33.)

35

added). In some cases, it is "necessary" to copy and display entire works. *See Bill Graham Archives*, 448 F.3d at 613; *Arriba Soft*, 336 F.3d at 821.

The Libraries have copied no more than is necessary for their fair uses. Entire books must be digitized for preservation and to allow meaningful access for the print disabled. Without digitizing entire books, HDL researchers could miss vital pieces of information. *See Arriba Soft*, 336 F.3d at 821 ("If Arriba only copied part of the image, it would be more difficult to identify it, thereby reducing the usefulness of the visual search engine.").

Appellants argue that the Libraries' preservation efforts have gone too far by "storing millions of books (including best-selling, commercially-available books) that have no legitimate need to be 'preserved.' " (Appellants' Br. at 36.) Appellants ignore that preservation is but one permissible objective among three.[16] If preservation alone does not justify the digitization of all the books in the HDL, the Libraries' efforts to make books discoverable by scholars and accessible to the print disabled certainly do.

Similarly flawed is Appellants' argument that the Libraries' search-related uses "unnecessarily retain[] complete image and text files comprising every page

---

[16] Even widely available books have different editions with slightly different content. Such differences may be of particular significance to scholars and should be preserved.

36

of every book." (*Id.*) While the HDL's search functionality does not require image files, the Libraries' preservation uses do. For example, many books include pictures and illustrations, diagrams, charts, graphs, tables, and other visual material and such material would be lost without an image file to complement the text file. (*See* Dkt#144 ¶¶3, 5-6.)

Further, the Libraries' efforts to make their collections accessible to the print disabled also require the retention of image files. Text-to-speech software is one way to facilitate access by the print disabled, but for many such scholars the image files enable a vastly superior form of access. This is because some legally blind students can review image files if they can increase the size or alter the contrast of the image. (Dkt#144 ¶¶7-8; *see also* Dkt#148 ¶¶16-17.) And disabled students who have physical impairments may be incapable of turning pages or holding books. For such students, access to the image files in the HDL is essential.

In sum, Appellants continue to miss what was clear to the District Court. The Libraries' uses have been in support of *three* purposes: search, access for the print disabled, and preservation. These purposes complement and reinforce one another and justify the full extent of the uses here.

### E.    The Markets for Appellants' Works Are Not Harmed.

Factor Four asks "whether the secondary use usurps the market of the original work." *NXIVM Corp.*, 364 F.3d at 482. The "markets" at issue are "only

those that creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 592; *Bill Graham Archives*, 448 F.3d at 614 (noting that only "traditional, reasonable, or likely to be developed markets" are relevant under the fourth factor). "[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." *Sony*, 464 U.S. at 450.

### 1.    There is No Harm to Any Existing Market.

The HDL's search results do not reveal any contents of a searched-for work. (Dkt#110 ¶¶16, 77-81; Dkt#133 ¶¶50-51.) Accordingly, the HDL cannot substitute for access to the work and does not harm copyright holders' ability to sell or license original works.

Appellants admitted below they were unable to identify "any specific, quantifiable past harm, or any documents relating to any such past harm" resulting from the Libraries' uses of their works. (*See* Dkt#111 ¶¶2-21, Exs.A-T (responses to Interrogatory 5).)[17] Appellants more likely have it backwards:  the text-search functionality made possible in the HDL by digitization now allows students and scholars to *find* Appellants' copyrighted works, many of which have not been

---

[17] Only afterwards did Appellants rely upon a colloquial statement of one author that each digital copy equates to a lost sale. (*See* Dkt#116 ¶¶129, 136; Dkt#133 ¶40.) The District Court rightly observed that "purchase of an additional copy would not have allowed either full-text searches or access for the print-disabled individuals, two transformative uses that are central to the [HDL]." (Op. at 19.)

checked out of the library in decades.[18] (*See, e.g.*, Dkt#102 ¶¶9, 11, 14-17;

Dkt#103 ¶¶10-13; Dkt#110 ¶73.)

Appellants' continued reliance on *Texaco* (involving a commercial, non-

transformative, photocopying use by a for-profit entity) is again misplaced. In

*Texaco*, the court found harm to the plaintiffs' licensing opportunities where the

Copyright Clearance Center ("CCC"), a licensing agent, offered licenses for the

exact use made by Texaco. This Court found such evidence highly relevant

because "a particular unauthorized use should be considered 'more fair' when there

is no ready market or means to pay for the use" and, conversely, "'less fair' when

there is a ready market or means to pay for the use." *Texaco*, 60 F.3d at 931. Here,

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████.

(Dkt#138 ¶9, Ex.H (Haber Tr. 13:23-24:23).)

### 2. There is No Harm to Any Potential Market.

Appellants conjure "likely to be developed 'workable markets' for the

Libraries to obtain licenses to digitize, store and make various uses of the

copyrighted books in their collections." (Appellants' Br. at 41.) Yet their

---

[18] Indeed, two Appellants deposed in this action—including the Secretary of the
The Authors Guild, Inc.—confessed to not even being aware of the Libraries' uses
of works within the HDL, a fact that evidences they have not been commercially
harmed by the operation of the HDL. (*See* Dkt#111 ¶22, Ex.U (Cummings Tr.
19:3-9); *id.* ¶23, Ex.V (Rønning Tr. 52:8-14).)

arguments are based on self-serving speculation. Appellants did not produce in discovery:

(1)    any business plans for licensing the digitization of books;

(2)    any plans for the use of books for preservation and research purposes;

(3)    any analysis of their costs for licensing such markets or anticipated revenues;

(4)    any communications with entities that might collectively license these rights; or

(5)    any analysis of the substantial limitations that such an entity would face in terms of the number of works it could foreseeably license.

They did not produce this evidence because it does not exist. Instead, they offer only "conjecture." [19] (Op. at 20.)

Appellants argue that even if the CCC does not currently offer a license specifically covering preservation, search, and access to the blind—████████—it could eventually develop such licenses. However, ████████

████████████████████████████████████████

██████. (Dkt#138 ¶9, Ex.H (Haber Tr. 13:23-24:23).)

Indeed, given prohibitively expensive costs, no collective licensing entity could possibly aggregate the rights to the millions of volumes within the HDL that

---

[19] That the majority of works digitized by the Libraries are out of print (Dkt#110 ¶66) also supports the absence of any adverse effect on Appellants' markets. *See Duffy v. Penguin Books USA Inc.*, 4 F. Supp. 2d 268, 275 (S.D.N.Y. 1998) (noting that, because the plaintiff's book was out of print at the time of the alleged infringement, there was no market harm).

are potentially still in copyright. Dr. Joel Waldfogel, the Frederick R. Kappel

Professor of Applied Economics at the University of Minnesota, conservatively

estimated that it would cost $569 million merely to identify all copyright holders

and seek a license from each to the works within the HDL.[20] (Dkt#108 ¶24.)

Appellants argue that the Libraries' reliance on Dr. Waldfogel's report is

akin to the notion "that it is permissible to steal the goods if it is too expensive to

buy them." (Appellants' Br. at 43.) But when the Libraries make fair uses under

Section 107, those uses are, by definition, "not an infringement." Factor Four turns

on whether a market is likely to form; and, because the uncontested evidence

demonstrates that there are enormous start-up costs precluding the formation of a

market for digitization for the Libraries' purposes (*see* Dkt#108 ¶¶24, 44), it is

entirely appropriate for the Libraries to rely on Dr. Waldfogel's report to show no

harm to "likely to develop" markets.

Appellants invoke European licensing models for support but fail to mention

a key distinction: in those nations that have legislation addressing digitization of

library collections, the legislation was enacted for the purpose of *authorizing

access to the text itself*, not just for research, preservation and access by the print

---

[20] Of course, this assumes that the rights holders can be found. Many of the books
in the HDL are out of print or orphan works for which a rights holder might never
be found. (*See* Dkt#110 ¶66.)

disabled. (Dkt#136 ¶¶25-28.) The uncontroverted testimony of Bernt Hugenholtz,

Professor of Intellectual Property Law and Director of the Institute for Information

Law at the University of Amsterdam, was that the European licensing models

"well exceed the types of very limited uses made by the HDL of in-copyright

works (i.e., preservation, search-only and access to the visually impaired)." (*Id.*)

Finally, Appellants claim that the proposed settlement agreement in the

Google Books case would have represented "a ready market or means to pay for

the use" made by the Libraries. (Appellants' Br. at 43.) However, a proposed,

unperformed release and settlement agreement between litigating parties that was

rejected by the court evinces wishful thinking, not a relevant market.

At bottom, Appellants speculate that Congress will eventually step in and

form a market, for example, by creating a compulsory licensing system. (*See*

Dkt#4 ¶6.) But as the Supreme Court noted in *Sony*, addressing the "new"

technology of videocassette recorders, "it is not [the court's] job to apply laws that

have not yet been written." *Sony*, 464 U.S. at 456. Any need for payment to rights

holders, through a compulsory license or otherwise, only becomes an issue if the

Libraries' activities are not a fair use, because fair uses require neither payment nor

permission.[21]

---

[21] Even if Appellants' contentions regarding future markets were based on
something more than conjecture (they are not), it would still not be enough to tilt

42

F.   **Balancing the Fair Use Factors, the Libraries' Uses Fall Safely Within the Protection of Fair Use.**

Appellants waited nearly seven years after the Libraries began this well-publicized project, and after the Libraries made enormous investments in the HDL, before voicing a single objection to the Libraries' conduct. They then abruptly asked the District Court to shut down and impound the HDL. But the District Court concluded that it "cannot imagine a definition of fair use that would not encompass the transformative uses made by Defendants' [Mass Digitization Project] and would require that [it] terminate this invaluable contribution to the progress of science and cultivation of the arts that at the same time effectuates the ideals espoused by the ADA [Americans with Disabilities Act]." (Op. at 22.)

As the District Court recognized, "[t]he totality of the fair-use factors suggest that copyright law's 'goal of promoting the Progress of Science…would be better served by allowing the use than by preventing it." (Op. at 21 (ellipsis in original) (quoting *Bill Graham Archives*, 448 F.3d at 608).) It correctly held that the "Progress of Science" was better served by allowing "enhanced search capabilities that reveal no in-copyright material, the protection of Defendants'

---

Factor Four in Appellants' favor. The Libraries' uses are transformative and thus any harm arises, if at all, in a "transformative market" which copyright holders should not be permitted to preempt. *See Bill Graham Archives*, 448 F.3d at 614 ("Copyright owners may not prevent exploitation of transformative markets.") (internal quotation marks and citation omitted).

43

fragile books, and, perhaps most importantly, the unprecedented ability of print-

disabled individuals to have an equal opportunity to compete with their sighted

peers in the ways imagined by the ADA." (*Id.*)

## II.  CONGRESS DID NOT INTEND FOR SECTION 108 TO CURTAIL FAIR USE.

Appellants argue that whether the Libraries complied with the requirements

of Section 108 holds some undefined relevance to the Libraries' fair use rights with

respect to the HDL. (Appellants' Br. at 18.) Appellants' position before this Court

is also a marked departure from their representations before the District Court.

Appellants argued below that the Libraries could not rely upon fair use *at all*

because Section 108 *alone* governed the Libraries' uses. (Op. at 12.) Appellants

now contend that "violations"[22] of Section 108 "should weigh heavily against a

finding of fair use." (Appellants' Br. at 30.) Appellants' new argument, like their

first, remains contradicted by Section 108(f)(4) (which provides that "[n]othing in

this section … in any way affects the right of fair use as provided by section

107…."), legislative history, and the logical function of Sections 107 and 108.[23]

---

[22] Section 108 establishes rights for libraries that statutorily limit a copyright holder's Section 106 rights. A library cannot "violate" its Section 108 rights any more than a parodist could "violate" her right of fair use under Section 107 or a person with a disability could "violate" his right to a reasonable accommodation under the ADA.

[23] Section 108, adopted in 1976, provides a safe harbor to libraries and archives primarily for the then-relatively-new technology of photocopying. Although it was

### A.    The Plain Language of Section 108 Leaves Application of Section 107 Unaffected.

"[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). The only plausible interpretation of Section 108(f)(4) is that it means what it says, *viz.*, that "[n]othing in this section [108]…*in any way affects the right of fair use as provided by section 107…..*" 17 U.S.C. § 108(f)(4) (emphasis added). Because Section 108(f)(4) is unambiguous on its face, "judicial inquiry is complete." *Germain,* 503 U.S. at 254 (internal quotation marks and citation omitted).

### B.    The Legislative History of Section 108 Reinforces Its Plain Meaning.

Although the Court need not consider legislative history because the statutory text is unambiguous, the legislative history of the statute further evidences Congress's clear intent to leave fair use unaffected by Section 108. In an early draft of the legislation, the House Judiciary Committee stated:

> It is the committee's intention that the fair use principle provide a potential limitation on all of the copyright owner's exclusive rights, whether they are subject to other, specific limitations or not. Thus, while some of the exemptions in sections 108 through 116 may overlap the fair use doctrine, they are not intended to supersede it.

---

amended in 1998 in an attempt to address the shift from analog to digital formats, it remains addressed to copying by Libraries for consumptive purposes, that is, copying in contemplation of later review of the full text by library patrons.

H.R. Rep. No. 89-2237, at 65-66 (1966).

The 1969 Senate Report similarly confirmed that "[t]he rights given to the libraries and archives by this provision of the bill are *in addition to those granted under the fair-use doctrine.*" S. Rep. No. 91-1219, at 6 (1970) (emphasis added). The 1976 House Report again crystallized the meaning of Section 108(f)(4): "*No provision of section 108 is intended to take away any rights existing under the fair use doctrine.*" H.R. Rep. No. 94-1476, at 74 (1976) (emphasis added), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5687-88; *see also id.* at 78-79, 1976 U.S.C.C.A.N. at 5692 ("Nothing in section 108 impairs the applicability of the fair use doctrine to a wide variety of situations involving photocopying or other reproduction by a library of copyrighted material in its collections, where the user requests the reproduction for legitimate scholarly or research purposes.").[24]

### C.    Section 108 Complements Section 107; It Does Not Undermine It.

Appellants cite the "specific governs the general" canon to support their interpretation of Section 108(f)(4). But the purpose of that canon is to avoid "applying a general provision when doing so would *undermine* limitations created

---

[24] *See also* 4 William F. Patry, *Patry on Copyright* § 11:3 (2011) (noting that the legislative history "indicates that if for one reason or another, certain copying by a library does not qualify for the section 108 exemption…, the library's photocopying would be evaluated under the same criteria of section 107 as other asserted fair uses. This interpretation not only gives meaning to both sections but is fully in line with the earlier committee reports.").

by a more specific provision." *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996)

(emphasis added). Here, fair use, as codified in Section 107, does not undermine

Section 108; rather, the two sections are entirely complementary. *See Eldred v.*

*Ashcroft*, 537 U.S. 186, 220 (2002) (noting that Section 108(h) "*supplements* [the]

traditional First Amendment safeguards…[,]" including fair use as codified in 17

U.S.C. § 107) (emphasis added)).

As the Ninth Circuit explained in rejecting an argument that the Section 117

limitation for copying computer programs preempted fair use:

> [S]ections 107 and 117 serve entirely different functions. Section 117
> defines a narrow category of copying that is lawful *per se*. Section
> 107, by contrast, establishes a *defense* to an otherwise valid claim of
> copyright infringement…. The fact that Congress has not chosen to
> provide a *per se* exemption to section 106 for disassembly [of
> software code] does not mean that particular instances of disassembly
> may not constitute fair use.

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1521 (9th Cir. 1993) (citations

omitted) (holding that Section 117, which permits the owner of a computer

program to make certain copies, had no effect on the defendant's additional right to

make other copies under fair use, noting that plaintiff's argument to the contrary

"verges on the frivolous"). Here too, Section 108 and Section 107 serve entirely

different functions, complementing rather than restricting the other.

Appellants attempt to create ambiguity by selectively quoting from a 1983

Report from the Register of Copyrights. (Appellants' Br. at 30.)  But the Register's

comments were made in contemplation of further copying of books for

consumptive purposes above and beyond the copying that libraries had already

made under Section 108.[25] The Register in 1983 was not contemplating the types

of non-consumptive uses now made possible by digitization. In any case, Section

108(f)(4) unambiguously provides that "[n]othing in this section [108]… *in any*

*way* affects the right of fair use as provided by section 107…" (emphasis added),

and therefore trumps possibly contrary interpretations of Section 108, *Mary Jo C.*

*v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 171-72 (2d Cir. 2013), *petition for*

*cert. filed,* No. 12-9996 (U.S. Apr. 26, 2013).

## III.    THE LIBRARIES' USES FOR THE PRINT DISABLED ARE PERMITTED UNDER SECTION 121.

Section 121 of the Copyright Act, the Chafee Amendment, provides in

relevant part, "Notwithstanding the provisions of section 106, it is not an

infringement of copyright for an authorized entity to reproduce or to distribute

copies…of a previously published, nondramatic literary work if such copies…are

reproduced or distributed in specialized formats exclusively for use by blind or

other persons with disabilities[.]" 17 U.S.C. § 121(a). Section 121(d)(1) states that

for purposes of that section, " 'authorized entity' means a nonprofit organization or

a governmental agency that has a primary mission to provide specialized services

---

[25] The District Court did not determine whether the Libraries' uses were permitted under Section 108. (Op. at 22 n.32.)

48

relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities." 17 U.S.C. § 121(d)(1).

The District Court held that Michigan has a " 'primary mission' to provide access for print-disabled individuals, and it is consequently an authorized entity." (Op. at 23 ("The provision of access to previously published non-dramatic literary works within the HDL fits squarely within the Chafee Amendment, although Defendants may certainly rely on fair use, as explained above, to justify copies made outside of these categories or in the event that they are not authorized entities.").)

The Libraries adopt in full the arguments set out in the Intervenors' brief concerning Section 121. We emphasize that the District Court's finding that Michigan has "a primary mission" to provide access to print-disabled individuals and is an "authorized entity" under Section 121 was based on undisputed facts applied to clear statutory language.

Appellants admitted as much. In their Statement of Material Facts in Support of Their Motion for Summary Judgment, the Libraries—citing the June 28, 2012 Declaration of John Wilkin (Dkt#110 ¶¶68, 100, 105)—stated that "[o]ne of the primary goals of HathiTrust has always been to enable people who have print disabilities to access the wealth of information within library collections," (Dkt#113 ¶61) and that "[t]he HDL was designed specifically to enable libraries to

49

make their collections accessible in digital format to print-disabled readers," (*id.* ¶58). In their Counter-Statement in Response to the Libraries' Statement of Material Facts, the Appellants responded that these facts were "[u]ncontroverted…." (Dkt#133 ¶¶58, 61.)

## IV. THE U.S. ASSOCIATIONS LACK STANDING TO CHALLENGE ANY ALLEGED ACTS OF INFRINGEMENT.

Section 501(b) of the Copyright Act states that a "legal or beneficial owner of an exclusive right under a copyright is entitled…to institute an action for any infringement of that particular right…." 17 U.S.C. § 501(b). This language is clear and unambiguous; Congress expressly limited the category of plaintiffs who can "institute an action" *to legal and beneficial copyright holders*. This Court should "assume that in drafting this legislation, Congress said what it meant." *United States v. LaBonte*, 520 U.S. 751, 757 (1997). The U.S. associations are indisputably neither the legal nor beneficial holders of their members' copyrights and, as a result, they lack standing under the Copyright Act.

This Circuit's case law supports the Act's plain meaning. The Second Circuit repeatedly has made clear that "the Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991); *accord Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 n.3 (2d Cir. 1982).

Other circuit and district courts have drawn the same conclusion. *See Righthaven*

*LLC v. Hoehn*, Nos. 11-16751, 11-16776, 2013 WL 1908876, at *2-5 (9th Cir.

May 9, 2013) (concluding that the Plaintiff lacked standing to sue for infringement

because it did not hold any of the exclusive rights in the news articles at issue, even

where there was privity between the association and its member); *see also Silvers*

*v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc)

("Congress' explicit listing of who may sue for copyright infringement should be

understood as an *exclusion of others* from suing for infringement.") (emphasis

added); *Mullen v. Soc'y of Stage Directors & Choreographers*, No. 06 C 6818,

2007 WL 2892654, at *4 (N.D. Ill. Sept. 30, 2007) (noting that United Scenic

Artists, a professional association of designers and scenic artists, "would surely fail

for lack of standing because it is [not] an 'owner' nor is it a 'beneficial owner' (*e.g.*

a licensee) of any copyright at issue under the Copyright Act") (citation omitted);

*Ocasek v. Hegglund*, 116 F.R.D. 154, 157 (D. Wyo. 1987) ("ASCAP's Achilles'

heel, if it has one, is that it lacks standing to sue for infringement of its members'

copyrights."); 6 William F. Patry, *Patry on Copyright* § 21:28 (2011)

("[A]ssociational standing is not permitted under the Copyright Act, which

expressly limits standing to legal or beneficial owners of exclusive rights.")

    Had Congress wanted to expand the class of those entitled to sue for

copyright infringement to include associations, it has shown it knows how to do so.

51

In the Satellite Home Viewers Act, for example, Congress expanded the right of action created by § 501(b) to include television network stations with a license to transmit copyrighted works. *See* 17 U.S.C. § 501(e) (stating that network stations should be treated as legal or beneficial copyright holders); *see also CBS, Inc. v. PrimeTime 24 Joint Venture*, 76 F. Supp. 2d 1333, 1336 (S.D. Fla. 1998) (explaining this expansion). The U.S. associations, however, have not similarly been deemed legal or beneficial copyright holders under the Copyright Act.[26]

Appellants' reliance on the *Hunt* test is unpersuasive. (Appellants' Br. at 44-47.)  First, any argument that § 501(b) is satisfied by meeting the first element of *Hunt* is waived, as it was not raised below.[27]  *See Bogle-Assegai v. Connecticut,* 470 F.3d 498, 504 (2d Cir. 2006) ("[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.") (alteration in original). Second, the first prong of *Hunt* deals with constitutional standing, *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 554-55 (1996). The issue here is statutory standing, which is entirely different, *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 97 (1998)

---

[26] It was for this reason that the District Court could not rule on the foreign associations because some foreign laws potentially might treat certain associations as legal or beneficial copyright holders. (Op. at 9-10.)

[27] As the District Court rightly observed, the Appellants "repeatedly sidestepped or obfuscated" whether Section 501(b) precluded associational standing. (Op. at 5 n.7.)

(explaining that "statutory standing…has nothing to do with whether there is case or controversy under Article III."). "[C]laimants must have both standing under the statute or statutes governing their claims and standing under Article III of the Constitution as required for any action brought in federal court." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526 (2d Cir. 1999).

Congress undeniably has the power to limit federal jurisdiction to specific rights of action and to certain parties. *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978) ("The limits upon federal jurisdiction, whether imposed by the Constitution or by Congress, must be neither disregarded nor evaded."); *see also Krim v. PCOrder.com, Inc.*, 402 F.3d 489, 500 (5th Cir. 2005) ("While Article III sets the minimum requirements for standing, Congress is entitled to impose more exacting standing requirements for the vindication of federal statutory rights if it wishes."); 13A Charles Alan Wright et al., *Federal Practice and Procedure* § 3531.9.5 (3d ed. 2011) (noting that where a statute "bars an action by representation, an organization should not be able to borrow a member's standing"). Congress chose here to do just that, refusing to expand the statutory standing under § 501(b) to encompass associations that are not the legal or beneficial holders of the copyrights at issue.

The cases on which Appellants rely (Appellants' Br. at 46) are inapposite. In *CBS Broadcasting Inc. v. EchoStar Communications Corp.*, 450 F.3d 505, 518

53

n.25 (11th Cir. 2006), the Eleventh Circuit brushed aside the standing argument in

a footnote, agreeing with the district court that the associations "meet the

requirements for representational standing under *Hunt*." 450 F.3d at 518 n.25. The

issue of an association's statutory standing in that case does not appear to have

been argued. *See CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, No. 98-2651-

CIV, at 12 (S.D. Fla. Mar. 31, 2003) (order denying motions for summary

judgment) (ECF No. 739) (noting that defendants argued "that the Affiliate

Associations have failed to prove that their members have standing"—a

requirement directed to constitutional standing inquiry under *Hunt*, rather than

statutory standing under the Copyright Act).[28]

    Appellants' reliance on *Southern Illinois Carpenters Welfare Fund v.*

*Carpenters Welfare Fund of Illinois*, 326 F.3d 919 (7th Cir. 2003), is similarly

misplaced. That case involved ERISA, which features a very different enforcement

scheme and was enacted for very different purposes. Whatever Congress's intent in

ERISA, it clearly gave the right to sue for copyright infringement only to legal or

beneficial copyright holders.

---

[28] The district court decision in *Olan Mills, Inc. v. Linn Photo Co.*, 795 F. Supp.
1423 (N.D. Iowa 1991), *rev'd on other grounds,* 23 F.3d 1345 (8th Cir. 1994), also
cited by Appellants, while purporting to distinguish *Eden Toys*, similarly failed to
provide any substantive discussion or legal authority for its holding that the *Hunt*
test governed the copyright infringement claims. *Id.* at 1427-28.

**V.    APPELLANTS' OWP CLAIMS ARE NOT JUSTICIABLE BECAUSE NO WORKS WERE MADE AVAILABLE THROUGH THE PROJECT AND THERE ARE NO CURRENT PLANS TO REINITIATE IT.**

It is undisputed that not a single work has ever been made available through the OWP (Dkt#110 ¶¶114, 116; Dkt#133 ¶¶84, 86), and the individual in charge of the project testified that Michigan does not "know whether or how the OWP will continue," (Dkt#110 ¶116; *see also* Dkt#125-2 (Ex.6) (Courant Tr. 158:23-25, 161:9-18) (Q: "Do you have any specific timetable for [listing additional candidate orphan works]?" A: "No.")). Based on such *undisputed* evidence, the District Court properly found that Appellants' claims based on distribution and display of works through the OWP are not ripe for adjudication.

**A.    Appellants' Abstract and Premature OWP Claims Are Not Ripe.**

Ripeness has constitutional and prudential components. *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 130 (2d Cir. 2008); *Simmonds v. INS,* 326 F.3d 351, 356-59 (2d Cir. 2003). Appellants' speculative OWP claims fail under both.

"Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies 'of sufficient immediacy and reality,'…and not 'hypothetical or abstract disputes.' " *Hayes v. Carlin Am., Inc.* 168 F. Supp. 2d 154, 159 (S.D.N.Y. 2001) (citations omitted) (noting that "[t]his [jurisdictional] limitation applies equally to declaratory judgment actions"). In this action,

55

Appellants seek a declaration of infringement about unknown uses, of unspecified works, through an undefined process.

Appellants would have the court decide whether "any iteration" of the OWP that makes available *any* copyrighted works in *any* manner will violate the Copyright Act. (Appellants' Br. at 13-14.) But courts do not decide purely hypothetical legal questions unmoored from record facts. *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 478 (2d Cir. 1999) ("A hypothetical or abstract dispute does not present a case or controversy…."). It is uncertain whether there will *ever* be a concrete dispute related to distribution of a specific work through the OWP (Dkt#110 ¶116), and even if there is, it cannot be known when, who the rights holder(s) would be, what work(s) would be at issue, or the details of their selection or use. Any decision on such a hypothetical and abstract dispute without crucial facts would be "advisory only." *Hayes,* 168 F. Supp. 2d at 160.

Prudential ripeness, the other component, involves two factors: "(1) whether an issue is fit for judicial decision and (2) whether and to what extent the parties will endure hardship if decision is withheld." *Simmonds,* 326 F.3d at 359 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). Appellants' OWP claims fail this standard as well.

Appellants' OWP claims are unfit for judicial decision because no works were ever displayed to patrons (Dkt#110 ¶¶114, 116; Dkt#133 ¶¶84, 86), and the

details of any future implementation of the project are purely speculative and

hypothetical (*see* Dkt#110 ¶116). *See Simmonds,* 326 F.3d at 359 (observing that

the "fitness" analysis is "concerned with whether the issues sought to be

adjudicated are contingent on future events or may never occur"); *see also*

*Grandeau*, 528 F.3d at 133 (rejecting challenge as unfit for judicial review because

it was "in many ways contingent on future events" and any judicial disposition

would "certainly benefit from additional factual development"); *Isaacs v. Bowen*,

865 F.2d 468, 477 (2d Cir. 1989) (deeming challenge to proposed policy change

unripe because it was "directed at possibilities and proposals only, not at a concrete

plan which has been formally promulgated and brought into operation").

Appellants argue that their OWP claims present "pure legal" questions

(Appellants' Br. at 13-14), but a determination of whether any resumed OWP is

fair use or permitted by Section 108 would turn on specific facts. For example,

both Sections 108(e) and (h) require a "reasonable investigation" of whether a

copy of the work can be obtained "at a fair price," 17 U.S.C. § 108(e), or "at a

reasonable price," 17 U.S.C. § 108(h). The District Court cannot make this

determination when the process for identifying possible orphan works has not even

been established. (*See* Dkt#110 ¶¶114-16.) The court also lacks facts required to

resolve fair use issues. Certainly a project involving limited distribution of out-of-

print 1940s botany works would have a starkly different fair use analysis than more

57

wide-scale distribution of fictional works from the 1970s. But without facts concerning, among other things, the nature of the works and their current and potential market, fair use cannot possibly be evaluated.

### B.  Appellants Suffer No Hardship from Awaiting Development of Necessary Facts.

Delaying adjudication of these claims creates no cognizable hardship. None of the Appellants' copyrighted works has been made available through the OWP (Dkt#110 ¶¶114, 116; Dkt#133 ¶¶84, 86), and there is no imminent threat that they will be (*see* Dkt#110 ¶116; *see also* Dkt#125-2 (Ex.6) (Courant Tr. 158:23-25, 161:9-18)).

Appellants claim to be currently harmed by the OWP by arguing that "[g]iven the expense of litigation and the sovereign immunity of the Libraries, there is nothing to stop the Libraries from reinstituting the OWP and then, if owners of the listed works come forward, suspending it again." (Appellants' Br. at 16.) Appellants refer to this as a game of "Whac-A-Mole." (*Id.*)

But this is not an apt comparison. The Libraries have not engaged in a pattern of distributing purported orphan works only to cease distribution in response to lawsuits. *They have not distributed or displayed a single orphan work and have no plans to do so in the future.* (Dkt#110 ¶¶114, 116; Dkt#133 ¶¶84, 86; Dkt#125-2 (Ex.6) (Courant Tr. 158:23-25, 161:9-18).)

58

What Appellants are really saying is that the Libraries *may* in the future take some action that Appellants allege will cause "[a]uthors and other copyright owners" future harm. (Appellants' Br. at 16.) It is clear, however, that "[t]he *mere possibility of future injury*, unless it is the cause of some *present detriment*, does not constitute hardship" that would justify adjudication of an otherwise unfit claim. *Simmonds v. INS*, 326 F.3d at 360 (emphasis added).

Appellants' arguments against mootness (an issue which is not even addressed in the District Court's opinion) are even further afield. Appellants argue that cessation of illegal activity "does not necessarily make a case moot." (Appellants' Br. at 16.) Appellants ignore that to date, the OWP has consisted only of the indisputably lawful and non-infringing activities of research and investigation to identify potential orphan works. (*See* Dkt#110 ¶¶114, 116; Dkt#133 ¶¶84, 86.) Allegedly infringing activity has not "ceased" for the simple reason that it never began.

### C.    Appellants Also Lack Standing to Assert the OWP Claims.

As discussed above, because no works were made available through the OWP (Dkt#110 ¶¶114, 116; Dkt#133 ¶¶84, 86), no potential candidate works have been identified (and thus none of Appellants' works have been identified), and because it is uncertain whether the OWP will proceed at all (Dkt#110 ¶116), Appellants have not been injured by the OWP and there is no imminent threat that

59

they will be. Appellants therefore lack standing to assert their OWP claims,

providing another basis for affirming the District Court's dismissal. *See Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (stating that the constitutional

minimum of standing requires an "injury in fact" that is "actual or imminent, not

conjectural or hypothetical") (internal quotation marks and citation omitted); *see*

*also Grandeau*, 528 F.3d at 130 n.8 ("Standing and ripeness are closely related

doctrines that overlap most notably in the shared requirement that the plaintiff's

injury be imminent rather than conjectural or hypothetical.")

Appellants claim an "imminent injury" to authors and copyright holders

generally and assert that this is sufficient to establish Appellants' standing. (*See*

Appellants' Br. at 16-17, n.4.) However, the Copyright Act requires that the

"imminent" injury be *to the holder of an exclusive right under copyright. See* 17

U.S.C. § 501(b).[29] If the OWP were restarted at some point, it is pure speculation

that it would involve any works in which Appellants hold copyright. A speculative

injury will not support a finding of standing; the injury must be "sufficiently real

and immediate…." *Miller v. Silbermann,* 951 F. Supp. 485, 489 (S.D.N.Y. 1997)

(citation omitted); *see also Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147

---

[29] At best, two Appellants allege copyright in two works that were previously
identified as candidates for the OWP but never were, and never will be, made
available through the project.

(2013) ("[W]e have repeatedly reiterated that 'threatened injury must be *certainly*

*impending* to constitute injury in fact,' and that '[a]llegations of *possible* future

injury' are not sufficient.") (citations omitted). Appellants thus fail to meet both

the constitutional and statutory standing requirements for their OWP claims.

## CONCLUSION

For the foregoing reasons, the Libraries respectfully request that the District

Court's Judgment be affirmed.

KILPATRICK TOWNSEND & STOCKTON LLP

Joseph Petersen
Robert Potter
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
Email: jpetersen@kilpatricktownsend.com

Joseph Beck
Andrew Pequignot
Allison Scott Roach
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: jbeck@kilpatricktownsend.com

*Attorneys for Defendants-Appellees*

## RULE 32(a)(7)(C) CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because based on the word count of the word-processing system used to prepare the brief (Microsoft Word), this brief contains 13,904 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:  May 28, 2013

Joseph Petersen

# STATUTORY ADDENDUM PURSUANT TO FED R. APP. P. 28(f)

# TITLE 17—COPYRIGHTS

*This title was enacted by act July 30, 1947, ch. 391, 61 Stat. 652, and was revised in its entirety by Pub. L. 94–553, title I, § 101, Oct. 19, 1976, 90 Stat. 2541*

| Chap. | | Sec. |
|---|---|---|
| 1. | **Subject Matter and Scope of Copyright** .............................................. | **101** |
| 2. | **Copyright Ownership and Transfer** | **201** |
| 3. | **Duration of Copyright** ...................... | **301** |
| 4. | **Copyright Notice, Deposit, and Registration** ................................... | **401** |
| 5. | **Copyright Infringement and Remedies** ...................................................... | **501** |
| 6. | **Importation and Exportation** .......... | **601** |
| 7. | **Copyright Office** ................................ | **701** |
| 8. | **Proceedings by Copyright Royalty Judges** ................................................ | **801** |
| 9. | **Protection of Semiconductor Chip Products** ............................................. | **901** |
| 10. | **Digital Audio Recording Devices and Media** ........................................ | **1001** |
| 11. | **Sound Recordings and Music Videos** ...................................................... | **1101** |
| 12. | **Copyright Protection and Management Systems** .................................. | **1201** |
| 13. | **Protection of Original Designs** ........ | **1301** |

AMENDMENTS

2010—Pub. L. 111–295, § 4(b)(1)(B), Dec. 9, 2010, 124 Stat. 3180, substituted ''Importation and Exportation'' for ''Manufacturing Requirements, Importation, and Exportation'' in item relating to chapter 6.

2008—Pub. L. 110–403, title I, § 105(c)(3), Oct. 13, 2008, 122 Stat. 4260, substituted ''Manufacturing Requirements, Importation, and Exportation'' for ''Manufacturing Requirements and Importation'' in item relating to chapter 6.

2004—Pub. L. 108–419, § 3(b), Nov. 30, 2004, 118 Stat. 2361, substituted ''Proceedings by Copyright Royalty Judges'' for ''Copyright Arbitration Royalty Panels'' in item relating to chapter 8.

1998—Pub. L. 105–304, title I, § 103(b), title V, § 503(a), Oct. 28, 1998, 112 Stat. 2876, 2916, added items relating to chapters 12 and 13.

1997—Pub. L. 105–80, § 12(a)(1), Nov. 13, 1997, 111 Stat. 1534, substituted ''Requirements'' for ''Requirement'' in item relating to chapter 6, ''Arbitration Royalty Panels'' for ''Royalty Tribunal'' in item relating to chapter 8, and ''Semiconductor Chip Products'' for ''semiconductor chip products'' in item relating to chapter 9, and added item relating to chapter 10.

1994—Pub. L. 103–465, title V, § 512(b), Dec. 8, 1994, 108 Stat. 4974, added item relating to chapter 11.

1984—Pub. L. 98–620, title III, § 303, Nov. 8, 1984, 98 Stat. 3356, added item relating to chapter 9.

TABLE I

This Table lists the sections of former Title 17, Copyrights, and indicates the sections of Title 17, as enacted in 1947, which covered similar and related subject matter.

| Title 17 Former Sections | Title 17 1947 Revision Sections |
|---|---|
| 1 ............................................. | 1 |

TABLE I—CONTINUED

| Title 17 Former Sections | Title 17 1947 Revision Sections |
|---|---|
| 2 ............................................. | 2 |
| 3 ............................................. | 3 |
| 4 ............................................. | 4 |
| 5 ............................................. | 5 |
| 6 ............................................. | 6 |
| 7 ............................................. | 7 |
| 8 ............................................. | 8 |
| 9 ............................................. | 9 |
|  | 10 |
| 10 ............................................. | 11 |
| 11 ............................................. | 12 |
| 12 ............................................. | 13 |
| 13 ............................................. | 14 |
| 14 ............................................. | 15 |
| 15 ............................................. | 16 |
| 16 ............................................. | 17 |
| 17 ............................................. | 18 |
| 18 ............................................. | 19 |
| 19 ............................................. | 20 |
| 20 ............................................. | 21 |
| 21 ............................................. | 22 |
| 22 ............................................. | 23 |
| 23 ............................................. | 24 |
| 24 ............................................. | Rep. |
| 25 ............................................. | 101 |
| 26 ............................................. | 102 |
| 27 ............................................. | 103 |
| 28 ............................................. | 104 |
| 29 ............................................. | 105 |
| 30 ............................................. | 106 |
| 31 ............................................. | 107 |
| 32 ............................................. | 108 |
| 33 ............................................. | 109 |
| 34 ............................................. | 110 |
| 35 ............................................. | 111 |
| 36 ............................................. | 112 |
| 37 ............................................. | 113 |
| 38 ............................................. | 114 |
| 39 ............................................. | 115 |
| 40 ............................................. | 116 |
| 41 ............................................. | 27 |
| 42 ............................................. | 28 |
| 43 ............................................. | 29 |
| 44 ............................................. | 30 |
| 45 ............................................. | 31 |
| 46 ............................................. | 32 |
| 47 ............................................. | 201 |
| 48 ............................................. | 202 |
| 49 ............................................. | 203 |
| 50 ............................................. | 204 |
| 51 ............................................. | 205 |
| 52 ............................................. | 206 |
| 53 ............................................. | 207 |
| 54 ............................................. | 208 |
| 55 ............................................. | 209 |
| 56 ............................................. | 210 |
| 57 ............................................. | 211 |
| 58 ............................................. | 212 |
| 59 ............................................. | 213 |
| 60 ............................................. | 214 |
| 61 ............................................. | 26 |
| 62 ............................................. | 6 |
| 63 ............................................. | 6 |
| 64 ............................................. | 6 |
| 65 ............................................. | 25 |

TABLE II

This Table lists the sections of former Title 17, Copyrights, and indicates the sections of Title 17, as revised in 1976, which cover similar and related subject matter.

| Title 17 1947 Revision Sections | Title 17 New Sections |
|---|---|
| 1 ............................................. | 106, 116 |
| 2 | 301 |

TABLE II—CONTINUED

| Title 17<br>1947 Revision Sections | Title 17<br>New Sections |
|---|---|
| 3 .................................... | 102, 103 |
| 4 .................................... | 102 |
| 5 .................................... | 102 |
| 6 .................................... | 102 |
| 7 .................................... | 103 |
| 8 .................................... | 104, 105, 303 |
| 9 .................................... | 104 |
| 10 ................................... | 401 |
| 11 ................................... | 410 |
| 12 ................................... | 408 |
| 13 ................................... | 407, 411 |
| 14 ................................... | 407 |
| 15 ................................... | 407 |
| 16 ................................... | 601 |
| 17 ................................... | 407 |
| 18 ................................... | 407, 506 |
| 19 ................................... | 401 |
| 20 ................................... | 401, 402 |
| 21 ................................... | 405 |
| 22 ................................... | 601 |
| 23 ................................... | 601 |
| 24 ................................... | 203, 301 et seq. |
| 25 ................................... | 301 et seq. |
| 26 ................................... | 101 |
| 27 ................................... | 109, 202 |
| 28 ................................... | 201, 204 |
| 29 ................................... | 204 |
| 30 ................................... | 205 |
| 31 ................................... | 205 |
| 32 ................................... | 201 |
| 101 .................................. | 412, 501–504 |
| 102 .................................. | Rep. See T. 28 §1338 |
| 103 .................................. | Rep. See F.R. Civ. Proc. |
| 104 .................................. | 110, 506 |
| 105 .................................. | 506 |
| 106 .................................. | 602 |
| 107 .................................. | 602 |
| 108 .................................. | 603 |
| 109 .................................. | 603 |
| 110 .................................. | Rep. See T. 28 §1338 |
| 111 .................................. | Rep. See T. 28 §1400 |
| 112 .................................. | 502 |
| 113 .................................. | 502 |
| 114 .................................. | 502 |
| 115 .................................. | 507 |
| 116 .................................. | 505 |
| 201 .................................. | 701(a) |
| 202 .................................. | 701(a) |
| 203 .................................. | 708(c) |
| 204 .................................. | Rep. |
| 205 .................................. | 701(c) |
| 206 .................................. | 701(b) |
| 207 .................................. | 702 |
| 208 .................................. | 705 |
| 209 .................................. | 407, 410 |
| 210 .................................. | 707 |
| 211 .................................. | 707 |
| 212 .................................. | 705 |
| 213 .................................. | 704 |
| 214 .................................. | 704 |
| 215 .................................. | 708(a), (b) |
| 216 .................................. | 703 |

PRIOR PROVISIONS

Title 17, as enacted by act July 30, 1947, ch. 391, 61 Stat. 652, consisting of sections 1 to 32, 101 to 116, and 201 to 216, as amended through 1976, and section 203, as amended by Pub. L. 95–94, title IV, §406(a), Aug. 5, 1977, 91 Stat. 682, terminated Jan. 1, 1978.

EFFECTIVE DATE

Section 102 of Pub. L. 94–553, Oct. 19, 1976, 90 Stat. 2598, provided that: ''This Act [enacting this title and section 170 of Title 2, The Congress, amending section 131 of Title 2, section 290e of Title 15, Commerce and Trade, section 2318 of Title 18, Crimes and Criminal Procedure, section 543 of Title 26, Internal Revenue Code, section 1498 of Title 28, Judiciary and Judicial Procedure, sections 3203 and 3206 of Title 39, Postal Service, and sections 505 and 2117 of Title 44, Public Printing and Documents, and enacting provisions set out as notes below and under sections 104, 115, 304, 401, 407, 410, and 501 of this title] becomes effective on January 1, 1978, except as otherwise expressly provided by this Act, including provisions of the first section of this Act. The provisions of sections 118, 304(b), and chapter 8 of title 17, as amended by the first section of this Act, take effect upon enactment of this Act [Oct. 19, 1976].''

SEPARABILITY

Section 115 of Pub. L. 94–553, Oct. 19, 1976, 90 Stat. 2602, provided that: ''If any provision of title 17 [this title], as amended by the first section of this Act, is declared unconstitutional, the validity of the remainder of this title is not affected.''

AUTHORIZATION OF APPROPRIATIONS

Section 114 of Pub. L. 94–553, Oct. 19, 1976, 90 Stat. 2602, provided that: ''There are hereby authorized to be appropriated such funds as may be necessary to carry out the purposes of this Act [this title].''

LOST AND EXPIRED COPYRIGHTS; RECORDING RIGHTS

Section 103 of Pub. L. 94–553, Oct. 19, 1976, 90 Stat. 2599, provided that: ''This Act [enacting this title] does not provide copyright protection for any work that goes into the public domain before January 1, 1978. The exclusive rights, as provided by section 106 of title 17 as amended by the first section of this Act, to reproduce a work in phonorecords and to distribute phonorecords of the work, do not extend to any nondramatic musical work copyrighted before July 1, 1909.''

# CHAPTER 1—SUBJECT MATTER AND SCOPE OF COPYRIGHT

Sec.
101. Definitions.
102. Subject matter of copyright: In general.
103. Subject matter of copyright: Compilations and derivative works.
104. Subject matter of copyright: National origin.
104A. Copyright in restored works.
105. Subject matter of copyright: United States Government works.
106. Exclusive rights in copyrighted works.
106A. Rights of certain authors to attribution and integrity.
107. Limitations on exclusive rights: Fair use.
108. Limitations on exclusive rights: Reproduction by libraries and archives.
109. Limitations on exclusive rights: Effect of transfer of particular copy or phonorecord.
110. Limitations on exclusive rights: Exemption of certain performances and displays.
111. Limitations on exclusive rights: Secondary transmissions of broadcast programming by cable.
112. Limitations on exclusive rights: Ephemeral recordings.
113. Scope of exclusive rights in pictorial, graphic, and sculptural works.
114. Scope of exclusive rights in sound recordings.
115. Scope of exclusive rights in nondramatic musical works: Compulsory license for making and distributing phonorecords.
116. Negotiated licenses for public performances by means of coin-operated phonorecord players.
[116A. Renumbered.]
117. Limitations on exclusive rights: Computer programs.
118. Scope of exclusive rights: Use of certain works in connection with noncommercial broadcasting.
119. Limitations on exclusive rights: Secondary transmissions of distant television programming by satellite.
120. Scope of exclusive rights in architectural works.
121. Limitations on exclusive rights: Reproduction for blind or other people with disabilities.
122. Limitations on exclusive rights: Secondary transmissions of local television programming by satellite.

AMENDMENTS

2010—Pub. L. 111–175, title I, §§102(a)(2), 103(a)(2), 104(a)(2), May 27, 2010, 124 Stat. 1219, 1227, 1231, added items 111, 119, and 122 and struck out former items 111

its obligation to secure permission in order to publish a copyrighted work; and (2) publication or other use by the Government of a private work would not affect its copyright protection in any way. The question of use of copyrighted material in documents published by the Congress and its Committees is discussed below in connection with section 107.

**Works of the United States Postal Service.** The intent of section 105 [this section] is to restrict the prohibition against Government copyright to works written by employees of the United States Government within the scope of their official duties. In accordance with the objectives of the Postal Reorganization Act of 1970 [Pub. L. 91–375, which enacted title 39, Postal Service], this section does not apply to works created by employees of the United States Postal Service. In addition to enforcing the criminal statutes proscribing the forgery or counterfeiting of postage stamps, the Postal Service could, if it chooses, use the copyright law to prevent the reproduction of postage stamp designs for private or commercial non-postal services (for example, in philatelic publications and catalogs, in general advertising, in art reproductions, in textile designs, and so forth). However, any copyright claimed by the Postal Service in its works, including postage stamp designs, would be subject to the same conditions, formalities, and time limits as other copyrightable works.

## § 106. Exclusive rights in copyrighted works

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

(Pub. L. 94–553, title I, § 101, Oct. 19, 1976, 90 Stat. 2546; Pub. L. 101–318, § 3(d), July 3, 1990, 104 Stat. 288; Pub. L. 101–650, title VII, § 704(b)(2), Dec. 1, 1990, 104 Stat. 5134; Pub. L. 104–39, § 2, Nov. 1, 1995, 109 Stat. 336; Pub. L. 106–44, § 1(g)(2), Aug. 5, 1999, 113 Stat. 222; Pub. L. 107–273, div. C, title III, § 13210(4)(A), Nov. 2, 2002, 116 Stat. 1909.)

HISTORICAL AND REVISION NOTES

HOUSE REPORT NO. 94–1476

**General Scope of Copyright.** The five fundamental rights that the bill gives to copyright owners—the exclusive rights of reproduction, adaptation, publication, performance, and display—are stated generally in section 106. These exclusive rights, which comprise the so-called "bundle of rights" that is a copyright, are cumulative and may overlap in some cases. Each of the five enumerated rights may be subdivided indefinitely and, as discussed below in connection with section 201, each subdivision of an exclusive right may be owned and enforced separately.

The approach of the bill is to set forth the copyright owner's exclusive rights in broad terms in section 106, and then to provide various limitations, qualifications, or exemptions in the 12 sections that follow. Thus, everything in section 106 is made "subject to sections 107 through 118", and must be read in conjunction with those provisions.

The exclusive rights accorded to a copyright owner under section 106 are "to do and to authorize" any of the activities specified in the five numbered clauses. Use of the phrase "to authorize" is intended to avoid any questions as to the liability of contributory infringers. For example, a person who lawfully acquires an authorized copy of a motion picture would be an infringer if he or she engages in the business of renting it to others for purposes of unauthorized public performance.

**Rights of Reproduction, Adaptation, and Publication.** The first three clauses of section 106, which cover all rights under a copyright except those of performance and display, extend to every kind of copyrighted work. The exclusive rights encompassed by these clauses, though closely related, are independent; they can generally be characterized as rights of copying, recording, adaptation, and publishing. A single act of infringement may violate all of these rights at once, as where a publisher reproduces, adapts, and sells copies of a person's copyrighted work as part of a publishing venture. Infringement takes place when any one of the rights is violated: where, for example, a printer reproduces copies without selling them or a retailer sells copies without having anything to do with their reproduction. The references to "copies or phonorecords," although in the plural, are intended here and throughout the bill to include the singular (1 U.S.C. § 1).

*Reproduction.*—Read together with the relevant definitions in section 101, the right "to reproduce the copyrighted work in copies or phonorecords" means the right to produce a material object in which the work is duplicated, transcribed, imitated, or simulated in a fixed form from which it can be "perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." As under the present law, a copyrighted work would be infringed by reproducing it in whole or in any substantial part, and by duplicating it exactly or by imitation or simulation. Wide departures or variations from the copyrighted work would still be an infringement as long as the author's "expression" rather than merely the author's "ideas" are taken. An exception to this general principle, applicable to the reproduction of copyrighted sound recordings, is specified in section 114.

"Reproduction" under clause (1) of section 106 is to be distinguished from "display" under clause (5). For a work to be "reproduced," its fixation in tangible form must be "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." Thus, the showing of images on a screen or tube would not be a violation of clause (1), although it might come within the scope of clause (5).

*Preparation of Derivative Works.*—The exclusive right to prepare derivative works, specified separately in clause (2) of section 106, overlaps the exclusive right of reproduction to some extent. It is broader than that right, however, in the sense that reproduction requires fixation in copies or phonorecords, whereas the preparation of a derivative work, such as a ballet, pantomime, or improvised performance, may be an infringement even though nothing is ever fixed in tangible form.

To be an infringement the "derivative work" must be "based upon the copyrighted work," and the definition in section 101 refers to "a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." Thus, to constitute a violation of section 106(2), the infringing work must incorporate a portion of the copyrighted work in

some form; for example, a detailed commentary on a work or a programmatic musical composition inspired by a novel would not normally constitute infringements under this clause.

*Use in Information Storage and Retrieval Systems.*—As section 117 declares explicitly, the bill is not intended to alter the present law with respect to the use of copyrighted works in computer systems.

*Public Distribution.*—Clause (3) of section 106 establishes the exclusive right of publication: The right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." Under this provision the copyright owner would have the right to control the first public distribution of an authorized copy or phonorecord of his work, whether by sale, gift, loan, or some rental or lease arrangement. Likewise, any unauthorized public distribution of copies or phonorecords that were unlawfully made would be an infringement. As section 109 makes clear, however, the copyright owner's rights under section 106(3) cease with respect to a particular copy or phonorecord once he has parted with ownership of it.

**Rights of Public Performance and Display.** *Performing Rights and the "For Profit" Limitation.*—The right of public performance under section 106(4) extends to "literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works and sound recordings" and, unlike the equivalent provisions now in effect, is not limited by any "for profit" requirement. The approach of the bill, as in many foreign laws, is first to state the public performance right in broad terms, and then to provide specific exemptions for educational and other nonprofit uses.

This approach is more reasonable than the outright exemption of the 1909 statute. The line between commercial and "nonprofit" organizations is increasingly difficult to draw. Many "non-profit" organizations are highly subsidized and capable of paying royalties, and the widespread public exploitation of copyrighted works by public broadcasters and other noncommercial organizations is likely to grow. In addition to these trends, it is worth noting that performances and displays are continuing to supplant markets for printed copies and that in the future a broad "not for profit" exemption could not only hurt authors but could dry up their incentive to write.

The exclusive right of public performance is expanded to include not only motion pictures, including works recorded on film, video tape, and video disks, but also audiovisual works such as filmstrips and sets of slides. This provision of section 106(4), which is consistent with the assimilation of motion pictures to audiovisual works throughout the bill, is also related to amendments of the definitions of "display" and "perform" discussed below. The important issue of performing rights in sound recordings is discussed in connection with section 114.

*Right of Public Display.*—Clause (5) of section 106 represents the first explicit statutory recognition in American copyright law of an exclusive right to show a copyrighted work, or an image of it, to the public. The existence or extent of this right under the present statute is uncertain and subject to challenge. The bill would give the owners of copyright in "literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works", including the individual images of a motion picture or other audiovisual work, the exclusive right "to display the copyrighted work publicly."

**Definitions.** Under the definitions of "perform," "display," "publicly," and "transmit" in section 101, the concepts of public performance and public display cover not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public. Thus, for example: a singer is performing when he or she sings a song; a broadcasting network is performing when it transmits his or her performance (whether simultaneously or from records); a local broadcaster is performing when it transmits the network broadcast; a cable television system is performing when it retransmits the broadcast to its subscribers; and any individual is performing whenever he or she plays a phonorecord embodying the performance or communicates the performance by turning on a receiving set. Although any act by which the initial performance or display is transmitted, repeated, or made to recur would itself be a "performance" or "display" under the bill, it would not be actionable as an infringement unless it were done "publicly," as defined in section 101. Certain other performances and displays, in addition to those that are "private," are exempted or given qualified copyright control under sections 107 through 118.

To "perform" a work, under the definition in section 101, includes reading a literary work aloud, singing or playing music, dancing a ballet or other choreographic work, and acting out a dramatic work or pantomime. A performance may be accomplished "either directly or by means of any device or process," including all kinds of equipment for reproducing or amplifying sounds or visual images, any sort of transmitting apparatus, any type of electronic retrieval system, and any other techniques and systems not yet in use or even invented.

The definition of "perform" in relation to "a motion picture or other audiovisual work" is "to show its images in any sequence or to make the sounds accompanying it audible." The showing of portions of a motion picture, filmstrip, or slide set must therefore be sequential to constitute a "performance" rather than a "display", but no particular order need be maintained. The purely aural performance of a motion picture sound track, or of the sound portions of an audiovisual work, would constitute a performance of the "motion picture or other audiovisual work"; but, where some of the sounds have been reproduced separately on phonorecords, a performance from the phonorecord would not constitute performance of the motion picture or audiovisual work.

The corresponding definition of "display" covers any showing of a "copy" of the work, "either directly or by means of a film, slide, television image, or any other device or process." Since "copies" are defined as including the material object "in which the work is first fixed," the right of public display applies to original works of art as well as to reproductions of them. With respect to motion pictures and other audiovisual works, it is a "display" (rather than a "performance") to show their "individual images nonsequentially." In addition to the direct showings of a copy of a work, "display" would include the projection of an image on a screen or other surface by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage and retrieval system.

Under clause (1) of the definition of "publicly" in section 101, a performance or display is "public" if it takes place "at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." One of the principal purposes of the definition was to make clear that, contrary to the decision in *Metro-Goldwyn-Mayer Distributing Corp. v. Wyatt*, 21 C.O.Bull. 203 (D.Md.1932), performances in "semipublic" places such as clubs, lodges, factories, summer camps, and schools are "public performances" subject to copyright control. The term "a family" in this context would include an individual living alone, so that a gathering confined to the individual's social acquaintances would normally be regarded as private. Routine meetings of businesses and governmental personnel would be excluded because they do not represent the gathering of a "substantial number of persons."

Clause (2) of the definition of "publicly" in section 101 makes clear that the concepts of public performance and public display include not only performances and displays that occur initially in a public place, but also acts that transmit or otherwise communicate a

performance or display of the work to the public by means of any device or process. The definition of ''transmit''—to communicate a performance or display ''by any device or process whereby images or sound are received beyond the place from which they are sent''—is broad enough to include all conceivable forms and combinations of wired or wireless communications media, including but by no means limited to radio and television broadcasting as we know them. Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a ''transmission,'' and if the transmission reaches the public in my [any] form, the case comes within the scope of clauses (4) or (5) of section 106.

Under the bill, as under the present law, a performance made available by transmission to the public at large is ''public'' even though the recipients are not gathered in a single place, and even if there is no proof that any of the potential recipients was operating his receiving apparatus at the time of the transmission. The same principles apply whenever the potential recipients of the transmission represent a limited segment of the public, such as the occupants of hotel rooms or the subscribers of a cable television service. Clause (2) of the definition of ''publicly'' is applicable ''whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.''

AMENDMENTS

2002—Pub. L. 107–273 substituted ''122'' for ''121'' in introductory provisions.

1999—Pub. L. 106–44 substituted ''121'' for ''120'' in introductory provisions.

1995—Par. (6). Pub. L. 104–39 added par. (6).

1990—Pub. L. 101–650 substituted ''120'' for ''119'' in introductory provisions.

Pub. L. 101–318 substituted ''119'' for ''118'' in introductory provisions.

EFFECTIVE DATE OF 1995 AMENDMENT

Amendment by Pub. L. 104–39 effective 3 months after Nov. 1, 1995, see section 6 of Pub. L. 104–39, set out as a note under section 101 of this title.

EFFECTIVE DATE OF 1990 AMENDMENTS

Amendment by Pub. L. 101–650 applicable to any architectural work created on or after Dec. 1, 1990, and any architectural work, that, on Dec. 1, 1990, is unconstructed and embodied in unpublished plans or drawings, except that protection for such architectural work under this title terminates on Dec. 31, 2002, unless the work is constructed by that date, see section 706 of Pub. L. 101–650, set out as a note under section 101 of this title.

Section 3(e)(3) of Pub. L. 101–318 provided that: ''The amendment made by subsection (d) [amending this section] shall be effective as of November 16, 1988.''

## § 106A. Rights of certain authors to attribution and integrity

(a) RIGHTS OF ATTRIBUTION AND INTEGRITY.— Subject to section 107 and independent of the exclusive rights provided in section 106, the author of a work of visual art—

(1) shall have the right—

(A) to claim authorship of that work, and

(B) to prevent the use of his or her name as the author of any work of visual art which he or she did not create;

(2) shall have the right to prevent the use of his or her name as the author of the work of visual art in the event of a distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation; and

(3) subject to the limitations set forth in section 113(d), shall have the right—

(A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and

(B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

(b) SCOPE AND EXERCISE OF RIGHTS.—Only the author of a work of visual art has the rights conferred by subsection (a) in that work, whether or not the author is the copyright owner. The authors of a joint work of visual art are coowners of the rights conferred by subsection (a) in that work.

(c) EXCEPTIONS.—(1) The modification of a work of visual art which is a result of the passage of time or the inherent nature of the materials is not a distortion, mutilation, or other modification described in subsection (a)(3)(A).

(2) The modification of a work of visual art which is the result of conservation, or of the public presentation, including lighting and placement, of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the modification is caused by gross negligence.

(3) The rights described in paragraphs (1) and (2) of subsection (a) shall not apply to any reproduction, depiction, portrayal, or other use of a work in, upon, or in any connection with any item described in subparagraph (A) or (B) of the definition of ''work of visual art'' in section 101, and any such reproduction, depiction, portrayal, or other use of a work is not a destruction, distortion, mutilation, or other modification described in paragraph (3) of subsection (a).

(d) DURATION OF RIGHTS.—(1) With respect to works of visual art created on or after the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990, the rights conferred by subsection (a) shall endure for a term consisting of the life of the author.

(2) With respect to works of visual art created before the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990, but title to which has not, as of such effective date, been transferred from the author, the rights conferred by subsection (a) shall be coextensive with, and shall expire at the same time as, the rights conferred by section 106.

(3) In the case of a joint work prepared by two or more authors, the rights conferred by subsection (a) shall endure for a term consisting of the life of the last surviving author.

(4) All terms of the rights conferred by subsection (a) run to the end of the calendar year in which they would otherwise expire.

(e) TRANSFER AND WAIVER.—(1) The rights conferred by subsection (a) may not be transferred, but those rights may be waived if the author expressly agrees to such waiver in a written instrument signed by the author. Such instrument shall specifically identify the work, and uses of that work, to which the waiver applies, and the waiver shall apply only to the work and uses so identified. In the case of a joint work prepared

by two or more authors, a waiver of rights under this paragraph made by one such author waives such rights for all such authors.

(2) Ownership of the rights conferred by subsection (a) with respect to a work of visual art is distinct from ownership of any copy of that work, or of a copyright or any exclusive right under a copyright in that work. Transfer of ownership of any copy of a work of visual art, or of a copyright or any exclusive right under a copyright, shall not constitute a waiver of the rights conferred by subsection (a). Except as may otherwise be agreed by the author in a written instrument signed by the author, a waiver of the rights conferred by subsection (a) with respect to a work of visual art shall not constitute a transfer of ownership of any copy of that work, or of ownership of a copyright or of any exclusive right under a copyright in that work.

(Added Pub. L. 101–650, title VI, §603(a), Dec. 1, 1990, 104 Stat. 5128.)

REFERENCES IN TEXT

Section 610(a) of the Visual Artists Rights Act of 1990 [Pub. L. 101–650], referred to in subsec. (d), is set out as an Effective Date note below.

EFFECTIVE DATE

Section 610 of title VI of Pub. L. 101–650 provided that:

"(a) IN GENERAL.—Subject to subsection (b) and except as provided in subsection (c), this title [enacting this section, amending sections 101, 107, 113, 301, 411, 412, 501, and 506 of this title, and enacting provisions set out as notes under this section and section 101 of this title] and the amendments made by this title take effect 6 months after the date of the enactment of this Act [Dec. 1, 1990].

"(b) APPLICABILITY.—The rights created by section 106A of title 17, United States Code, shall apply to—

"(1) works created before the effective date set forth in subsection (a) but title to which has not, as of such effective date, been transferred from the author, and

"(2) works created on or after such effective date, but shall not apply to any destruction, distortion, mutilation, or other modification (as described in section 106A(a)(3) of such title) of any work which occurred before such effective date.

"(c) SECTION 608.—Section 608 [set out below] takes effect on the date of the enactment of this Act."

STUDIES BY COPYRIGHT OFFICE

Section 608 of Pub. L. 101–650 provided that:

"(a) STUDY ON WAIVER OF RIGHTS PROVISION.—

"(1) STUDY.—The Register of Copyrights shall conduct a study on the extent to which rights conferred by subsection (a) of section 106A of title 17, United States Code, have been waived under subsection (e)(1) of such section.

"(2) REPORT TO CONGRESS.—Not later than 2 years after the date of the enactment of this Act [Dec. 1, 1990], the Register of Copyrights shall submit to the Congress a report on the progress of the study conducted under paragraph (1). Not later than 5 years after such date of enactment, the Register of Copyrights shall submit to the Congress a final report on the results of the study conducted under paragraph (1), and any recommendations that the Register may have as a result of the study.

"(b) STUDY ON RESALE ROYALTIES.—

"(1) NATURE OF STUDY.—The Register of Copyrights, in consultation with the Chair of the National Endowment for the Arts, shall conduct a study on the feasibility of implementing—

"(A) a requirement that, after the first sale of a work of art, a royalty on any resale of the work,

consisting of a percentage of the price, be paid to the author of the work; and

"(B) other possible requirements that would achieve the objective of allowing an author of a work of art to share monetarily in the enhanced value of that work.

"(2) GROUPS TO BE CONSULTED.—The study under paragraph (1) shall be conducted in consultation with other appropriate departments and agencies of the United States, foreign governments, and groups involved in the creation, exhibition, dissemination, and preservation of works of art, including artists, art dealers, collectors of fine art, and curators of art museums.

"(3) REPORT TO CONGRESS.—Not later than 18 months after the date of the enactment of this Act [Dec. 1, 1990], the Register of Copyrights shall submit to the Congress a report containing the results of the study conducted under this subsection."

## § 107. Limitations on exclusive rights: Fair use

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

(Pub. L. 94–553, title I, §101, Oct. 19, 1976, 90 Stat. 2546; Pub. L. 101–650, title VI, §607, Dec. 1, 1990, 104 Stat. 5132; Pub. L. 102–492, Oct. 24, 1992, 106 Stat. 3145.)

HISTORICAL AND REVISION NOTES

HOUSE REPORT NO. 94–1476

**General Background of the Problem.** The judicial doctrine of fair use, one of the most important and well-established limitations on the exclusive right of copyright owners, would be given express statutory recognition for the first time in section 107. The claim that a defendant's acts constituted a fair use rather than an infringement has been raised as a defense in innumerable copyright actions over the years, and there is ample case law recognizing the existence of the doctrine and applying it. The examples enumerated at page 24 of the Register's 1961 Report, while by no means exhaustive, give some idea of the sort of activities the courts might regard as fair use under the circumstances: "quotation of excerpts in a review or criticism for purposes of illustration or comment; quotation of short passages in a scholarly or technical work, for illustration or clarification of the author's observations; use in a parody of some of the content of the work parodied; summary of an address or article, with brief quotations, in a news report; reproduction by a library of a portion of a work to replace part of a damaged

copy; reproduction by a teacher or student of a small part of a work to illustrate a lesson; reproduction of a work in legislative or judicial proceedings or reports; incidental and fortuitous reproduction, in a newsreel or broadcast, of a work located in the scene of an event being reported.''

Although the courts have considered and ruled upon the fair use doctrine over and over again, no real definition of the concept has ever emerged. Indeed, since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts. On the other hand, the courts have evolved a set of criteria which, though in no case definitive or determinative, provide some gauge for balancing the equities. These criteria have been stated in various ways, but essentially they can all be reduced to the four standards which have been adopted in section 107: ''(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.''

These criteria are relevant in determining whether the basic doctrine of fair use, as stated in the first sentence of section 107, applies in a particular case: ''Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.''

The specific wording of section 107 as it now stands is the result of a process of accretion, resulting from the long controversy over the related problems of fair use and the reproduction (mostly by photocopying) of copyrighted material for educational and scholarly purposes. For example, the reference to fair use ''by reproduction in copies or phonorecords or by any other means'' is mainly intended to make clear that the doctrine has as much application to photocopying and taping as to older forms of use; it is not intended to give these kinds of reproduction any special status under the fair use provision or to sanction any reproduction beyond the normal and reasonable limits of fair use. Similarly, the newly-added reference to ''multiple copies for classroom use'' is a recognition that, under the proper circumstances of fairness, the doctrine can be applied to reproductions of multiple copies for the members of a class.

The Committee has amended the first of the criteria to be considered—''the purpose and character of the use''—to state explicitly that this factor includes a consideration of ''whether such use is of a commercial nature or is for non-profit educational purposes.'' This amendment is not intended to be interpreted as any sort of not-for-profit limitation on educational uses of copyrighted works. It is an express recognition that, as under the present law, the commercial or non-profit character of an activity, while not conclusive with respect to fair use, can and should be weighed along with other factors in fair use decisions.

**General Intention Behind the Provision.** The statement of the fair use doctrine in section 107 offers some guidance to users in determining when the principles of the doctrine apply. However, the endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in the statute. The bill endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change. Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis. Section 107 is intended to restate the present judicial

doctrine of fair use, not to change, narrow, or enlarge it in any way.

**Intention as to Classroom Reproduction.** Although the works and uses to which the doctrine of fair use is applicable are as broad as the copyright law itself, most of the discussion of section 107 has centered around questions of classroom reproduction, particularly photocopying. The arguments on the question are summarized at pp. 30–31 of this Committee's 1967 report (H.R. Rep. No. 83, 90th Cong., 1st Sess.), and have not changed materially in the intervening years.

The Committee also adheres to its earlier conclusion, that ''a specific exemption freeing certain reproductions of copyrighted works for educational and scholarly purposes from copyright control is not justified.'' At the same time the Committee recognizes, as it did in 1967, that there is a ''need for greater certainty and protection for teachers.'' In an effort to meet this need the Committee has not only adopted further amendments to section 107, but has also amended section 504(c) to provide innocent teachers and other non-profit users of copyrighted material with broad insulation against unwarranted liability for infringement. The latter amendments are discussed below in connection with Chapter 5 of the bill [§501 et seq. of this title].

In 1967 the Committee also sought to approach this problem by including, in its report, a very thorough discussion of ''the considerations lying behind the four criteria listed in the amended section 107, in the context of typical classroom situations arising today.'' This discussion appeared on pp. 32–35 of the 1967 report, and with some changes has been retained in the Senate report on S. 22 (S. Rep. No. 94–473, pp. 63–65). The Committee has reviewed this discussion, and considers that it still has value as an analysis of various aspects of the problem.

At the Judiciary Subcommittee hearings in June 1975, Chairman Kastenmeier and other members urged the parties to meet together independently in an effort to achieve a meeting of the minds as to permissible educational uses of copyrighted material. The response to these suggestions was positive, and a number of meetings of three groups, dealing respectively with classroom reproduction of printed material, music, and audio-visual material, were held beginning in September 1975.

In a joint letter to Chairman Kastenmeier, dated March 19, 1976, the representatives of the Ad Hoc Committee of Educational Institutions and Organizations on Copyright Law Revision, and of the Authors League of America, Inc., and the Association of American Publishers, Inc., stated:

You may remember that in our letter of March 8, 1976 we told you that the negotiating teams representing authors and publishers and the Ad Hoc Group had reached tentative agreement on guidelines to insert in the Committee Report covering educational copying from books and periodicals under Section 107 of H.R. 2223 and S. 22 [this section], and that as part of that tentative agreement each side would accept the amendments to Sections 107 and 504 [this section and section 504 of this title] which were adopted by your Subcommittee on March 3, 1976.

We are now happy to tell you that the agreement has been approved by the principals and we enclose a copy herewith. We had originally intended to translate the agreement into language suitable for inclusion in the legislative report dealing with Section 107 [this section], but we have since been advised by committee staff that this will not be necessary.

As stated above, the agreement refers only to copying from books and periodicals, and it is not intended to apply to musical or audiovisual works.

The full text of the agreement is as follows:

AGREEMENT ON GUIDELINES FOR CLASSROOM COPYING IN NOT-FOR-PROFIT EDUCATIONAL INSTITUTIONS

WITH RESPECT TO BOOKS AND PERIODICALS

The purpose of the following guidelines is to state the minimum and not the maximum standards of

educational fair use under Section 107 of H.R. 2223 [this section]. The parties agree that the conditions determining the extent of permissible copying for educational purposes may change in the future; that certain types of copying permitted under these guidelines may not be permissible in the future; and conversely that in the future other types of copying not permitted under these guidelines may be permissible under revised guidelines.

Moreover, the following statement of guidelines is not intended to limit the types of copying permitted under the standards of fair use under judicial decision and which are stated in Section 107 of the Copyright Revision Bill [this section]. There may be instances in which copying which does not fall within the guidelines stated below may nonetheless be permitted under the criteria of fair use.

GUIDELINES

I. *Single Copying for Teachers*

A single copy may be made of any of the following by or for a teacher at his or her individual request for his or her scholarly research or use in teaching or preparation to teach a class:

A. A chapter from a book;

B. An article from a periodical or newspaper;

C. A short story, short essay or short poem, whether or not from a collective work;

D. A chart, graph, diagram, drawing, cartoon or picture from a book, periodical, or newspaper;

II. *Multiple Copies for Classroom Use*

Multiple copies (not to exceed in any event more than one copy per pupil in a course) may be made by or for the teacher giving the course for classroom use or discussion; *provided that:*

A. The copying meets the tests of brevity and spontaneity as defined below; *and,*

B. Meets the cumulative effect test as defined below; *and*

C. Each copy includes a notice of copyright.

*Definitions*

*Brevity*

*(i)* Poetry: (a) A complete poem if less than 250 words and if printed on not more than two pages or, (b) from a longer poem, an excerpt of not more than 250 words.

*(ii)* Prose: (a) Either a complete article, story or essay of less than 2,500 words, or (b) an excerpt from any prose work of not more than 1,000 words or 10% of the work, whichever is less, but in any event a minimum of 500 words.

[Each of the numerical limits stated in "i" and "ii" above may be expanded to permit the completion of an unfinished line of a poem or of an unfinished prose paragraph.]

*(iii)* Illustration: One chart, graph, diagram, drawing, cartoon or picture per book or per periodical issue.

*(iv)* "Special" works: Certain works in poetry, prose or in "poetic prose" which often combine language with illustrations and which are intended sometimes for children and at other times for a more general audience fall short of 2,500 words in their entirety. Paragraph "ii" above notwithstanding such "special works" may not be reproduced in their entirety; however, an excerpt comprising not more than two of the published pages of such special work and containing not more than 10% of the words found in the text thereof, may be reproduced.

*Spontaneity*

*(i)* The copying is at the instance and inspiration of the individual teacher, and

*(ii)* The inspiration and decision to use the work and the moment of its use for maximum teaching effectiveness are so close in time that it would be unreasonable to expect a timely reply to a request for permission.

*Cumulative Effect*

*(i)* The copying of the material is for only one course in the school in which the copies are made.

*(ii)* Not more than one short poem, article, story, essay or two excerpts may be copied from the same author, nor more than three from the same collective work or periodical volume during one class term.

*(iii)* There shall not be more than nine instances of such multiple copying for one course during one class term.

[The limitations stated in "ii" and "iii" above shall not apply to current news periodicals and newspapers and current news sections of other periodicals.]

III. *Prohibitions as to I and II Above*

Notwithstanding any of the above, the following shall be prohibited:

(A) Copying shall not be used to create or to replace or substitute for anthologies, compilations or collective works. Such replacement or substitution may occur whether copies of various works or excerpts therefrom are accumulated or reproduced and used separately.

(B) There shall be no copying of or from works intended to be "consumable" in the course of study or of teaching. These include workbooks, exercises, standardized tests and test booklets and answer sheets and like consumable material.

(C) Copying shall not:

(a) substitute for the purchase of books, publishers' reprints or periodicals;

(b) be directed by higher authority;

(c) be repeated with respect to the same item by the same teacher from term to term.

(D) No charge shall be made to the student beyond the actual cost of the photocopying.

Agreed March 19, 1976.

Ad Hoc Committee on Copyright Law Revision:

By SHELDON ELLIOTT STEINBACH.

Author-Publisher Group:

Authors League of America:

By IRWIN KARP, *Counsel.*

Association of American Publishers, Inc.:

By ALEXANDER C. HOFFMAN.
*Chairman, Copyright Committee.*

In a joint letter dated April 30, 1976, representatives of the Music Publishers' Association of the United States, Inc., the National Music Publishers' Association, Inc., the Music Teachers National Association, the Music Educators National Conference, the National Association of Schools of Music, and the Ad Hoc Committee on Copyright Law Revision, wrote to Chairman Kastenmeier as follows:

During the hearings on H.R. 2223 in June 1975, you and several of your subcommittee members suggested that concerned groups should work together in developing guidelines which would be helpful to clarify Section 107 of the bill [this section].

Representatives of music educators and music publishers delayed their meetings until guidelines had been developed relative to books and periodicals. Shortly after that work was completed and those guidelines were forwarded to your subcommittee, representatives of the undersigned music organizations met together with representatives of the Ad Hoc Committee on Copyright Law Revision to draft guidelines relative to music.

We are very pleased to inform you that the discussions thus have been fruitful on the guidelines which have been developed. Since private music teachers are an important factor in music education, due consideration has been given to the concerns of that group.

We trust that this will be helpful in the report on the bill to clarify Fair Use as it applies to music.

The text of the guidelines accompanying this letter is as follows:

GUIDELINES FOR EDUCATIONAL USES OF MUSIC

The purpose of the following guidelines is to state the minimum and not the maximum standards of

educational fair use under Section 107 of H.R. 2223 [this section]. The parties agree that the conditions determining the extent of permissible copying for educational purposes may change in the future; that certain types of copying permitted under these guidelines may not be permissible in the future, and conversely that in the future other types of copying not permitted under these guidelines may be permissible under revised guidelines.

Moreover, the following statement of guidelines is not intended to limit the types of copying permitted under the standards of fair use under judicial decision and which are stated in Section 107 of the Copyright Revision Bill [this section]. There may be instances in which copying which does not fall within the guidelines stated below may nonetheless be permitted under the criteria of fair use.

*A. Permissible Uses*

1. Emergency copying to replace purchased copies which for any reason are not available for an imminent performance provided purchased replacement copies shall be substituted in due course.

2. (a) For academic purposes other than performance, multiple copies of excerpts of works may be made, provided that the excerpts do not comprise a part of the whole which would constitute a performable unit such as a section, movement or aria, but in no case more than 10% of the whole work. The number of copies shall not exceed one copy per pupil.

(b) For academic purposes other than performance, a single copy of an entire performable unit (section, movement, aria, etc.) that is, (1) confirmed by the copyright proprietor to be out of print or (2) unavailable except in a larger work, may be made by or for a teacher solely for the purpose of his or her scholarly research or in preparation to teach a class.

3. Printed copies which have been purchased may be edited or simplified provided that the fundamental character of the work is not distorted or the lyrics, if any, altered or lyrics added if none exist.

4. A single copy of recordings of performances by students may be made for evaluation or rehearsal purposes and may be retained by the educational institution or individual teacher.

5. A single copy of a sound recording (such as a tape, disc or cassette) of copyrighted music may be made from sound recordings owned by an educational institution or an individual teacher for the purpose of constructing aural exercises or examinations and may be retained by the educational institution or individual teacher. (This pertains only to the copyright of the music itself and not to any copyright which may exist in the sound recording.)

*B. Prohibitions*

1. Copying to create or replace or substitute for anthologies, compilations or collective works.

2. Copying of or from works intended to be ''consumable'' in the course of study or of teaching such as workbooks, exercises, standardized tests and answer sheets and like material.

3. Copying for the purpose of performance, except as in A(1) above.

4. Copying for the purpose of substituting for the purchase of music, except as in A(1) and A(2) above.

5. Copying without inclusion of the copyright notice which appears on the printed copy.

The problem of off-the-air taping for nonprofit classroom use of copyrighted audiovisual works incorporated in radio and television broadcasts has proved to be difficult to resolve. The Committee believes that the fair use doctrine has some limited application in this area, but it appears that the development of detailed guidelines will require a more thorough exploration than has so far been possible of the needs and problems of a number of different interests affected, and of the various legal problems presented. Nothing in section 107 or elsewhere in the bill is intended to change or prejudge the law on the point. On the other hand, the Committee is sensitive to the importance of the problem, and urges the representatives of the various interests, if possible under the leadership of the Register of Copyrights, to continue their discussions actively and in a constructive spirit. If it would be helpful to a solution, the Committee is receptive to undertaking further consideration of the problem in a future Congress.

The Committee appreciates and commends the efforts and the cooperative and reasonable spirit of the parties who achieved the agreed guidelines on books and periodicals and on music. Representatives of the American Association of University Professors and of the Association of American Law Schools have written to the Committee strongly criticizing the guidelines, particularly with respect to multiple copying, as being too restrictive with respect to classroom situations at the university and graduate level. However, the Committee notes that the Ad Hoc group did include representatives of higher education, that the stated ''purpose of the * * * guidelines is to state the minimum and not the maximum standards of educational fair use'' and that the agreement acknowledges ''there may be instances in which copying which does not fall within the guidelines * * * may nonetheless be permitted under the criteria of fair use.''

The Committee believes the guidelines are a reasonable interpretation of the minimum standards of fair use. Teachers will know that copying within the guidelines is fair use. Thus, the guidelines serve the purpose of fulfilling the need for greater certainty and protection for teachers. The Committee expresses the hope that if there are areas where standards other than these guidelines may be appropriate, the parties will continue their efforts to provide additional specific guidelines in the same spirit of good will and give and take that has marked the discussion of this subject in recent months.

**Reproduction and Uses for Other Purposes.** The concentrated attention given the fair use provision in the context of classroom teaching activities should not obscure its application in other areas. It must be emphasized again that the same general standards of fair use are applicable to all kinds of uses of copyrighted material, although the relative weight to be given them will differ from case to case.

The fair use doctrine would be relevant to the use of excerpts from copyrighted works in educational broadcasting activities not exempted under section 110(2) or 112, and not covered by the licensing provisions of section 118. In these cases the factors to be weighed in applying the criteria of this section would include whether the performers, producers, directors, and others responsible for the broadcast were paid, the size and nature of the audience, the size and number of excerpts taken and, in the case of recordings made for broadcast, the number of copies reproduced and the extent of their reuse or exchange. The availability of the fair use doctrine to educational broadcasters would be narrowly circumscribed in the case of motion pictures and other audiovisual works, but under appropriate circumstances it could apply to the nonsequential showing of an individual still or slide, or to the performance of a short excerpt from a motion picture for criticism or comment.

Another special instance illustrating the application of the fair use doctrine pertains to the making of copies or phonorecords of works in the special forms needed for the use of blind persons. These special forms, such as copies in Braille and phonorecords of oral readings (talking books), are not usually made by the publishers for commercial distribution. For the most part, such copies and phonorecords are made by the Library of Congress' Division for the Blind and Physically Handicapped with permission obtained from the copyright owners, and are circulated to blind persons through regional libraries covering the nation. In addition, such copies and phonorecords are made locally by individual volunteers for the use of blind persons in their communities, and the Library of Congress conducts a program

for training such volunteers. While the making of multiple copies or phonorecords of a work for general circulation requires the permission of the copyright owner, a problem addressed in section 710 of the bill, the making of a single copy or phonorecord by an individual as a free service for blind persons would properly be considered a fair use under section 107.

A problem of particular urgency is that of preserving for posterity prints of motion pictures made before 1942. Aside from the deplorable fact that in a great many cases the only existing copy of a film has been deliberately destroyed, those that remain are in immediate danger of disintegration; they were printed on film stock with a nitrate base that will inevitably decompose in time. The efforts of the Library of Congress, the American Film Institute, and other organizations to rescue and preserve this irreplaceable contribution to our cultural life are to be applauded, and the making of duplicate copies for purposes of archival preservation certainly falls within the scope of "fair use."

When a copyrighted work contains unfair, inaccurate, or derogatory information concerning an individual or institution, the individual or institution may copy and reproduce such parts of the work as are necessary to permit understandable comment on the statements made in the work.

The Committee has considered the question of publication, in Congressional hearings and documents, of copyrighted material. Where the length of the work or excerpt published and the number of copies authorized are reasonable under the circumstances, and the work itself is directly relevant to a matter of legitimate legislative concern, the Committee believes that the publication would constitute fair use.

During the consideration of the revision bill in the 94th Congress it was proposed that independent newsletters, as distinguished from house organs and publicity or advertising publications, be given separate treatment. It is argued that newsletters are particularly vulnerable to mass photocopying, and that most newsletters have fairly modest circulations. Whether the copying of portions of a newsletter is an act of infringement or a fair use will necessarily turn on the facts of the individual case. However, as a general principle, it seems clear that the scope of the fair use doctrine should be considerably narrower in the case of newsletters than in that of either mass-circulation periodicals or scientific journals. The commercial nature of the user is a significant factor in such cases: Copying by a profit-making user of even a small portion of a newsletter may have a significant impact on the commercial market for the work.

The Committee has examined the use of excerpts from copyrighted works in the art work of calligraphers. The committee believes that a single copy reproduction of an excerpt from a copyrighted work by a calligrapher for a single client does not represent an infringement of copyright. Likewise, a single reproduction of excerpts from a copyrighted work by a student calligrapher or teacher in a learning situation would be a fair use of the copyrighted work.

The Register of Copyrights has recommended that the committee report describe the relationship between this section and the provisions of section 108 relating to reproduction by libraries and archives. The doctrine of fair use applies to library photocopying, and nothing contained in section 108 "in any way affects the right of fair use." No provision of section 108 is intended to take away any rights existing under the fair use doctrine. To the contrary, section 108 authorizes certain photocopying practices which may not qualify as a fair use.

The criteria of fair use are necessarily set forth in general terms. In the application of the criteria of fair use to specific photocopying practices of libraries, it is the intent of this legislation to provide an appropriate balancing of the rights of creators, and the needs of users.

AMENDMENTS

1992—Pub. L. 102–492 inserted at end "The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors."

1990—Pub. L. 101–650 substituted "sections 106 and 106A" for "section 106" in introductory provisions.

EFFECTIVE DATE OF 1990 AMENDMENT

Amendment by Pub. L. 101–650 effective 6 months after Dec. 1, 1990, see section 610 of Pub. L. 101–650, set out as an Effective Date note under section 106A of this title.

## § 108. Limitations on exclusive rights: Reproduction by libraries and archives

(a) Except as otherwise provided in this title and notwithstanding the provisions of section 106, it is not an infringement of copyright for a library or archives, or any of its employees acting within the scope of their employment, to reproduce no more than one copy or phonorecord of a work, except as provided in subsections (b) and (c), or to distribute such copy or phonorecord, under the conditions specified by this section, if—

(1) the reproduction or distribution is made without any purpose of direct or indirect commercial advantage;

(2) the collections of the library or archives are (i) open to the public, or (ii) available not only to researchers affiliated with the library or archives or with the institution of which it is a part, but also to other persons doing research in a specialized field; and

(3) the reproduction or distribution of the work includes a notice of copyright that appears on the copy or phonorecord that is reproduced under the provisions of this section, or includes a legend stating that the work may be protected by copyright if no such notice can be found on the copy or phonorecord that is reproduced under the provisions of this section.

(b) The rights of reproduction and distribution under this section apply to three copies or phonorecords of an unpublished work duplicated solely for purposes of preservation and security or for deposit for research use in another library or archives of the type described by clause (2) of subsection (a), if—

(1) the copy or phonorecord reproduced is currently in the collections of the library or archives; and

(2) any such copy or phonorecord that is reproduced in digital format is not otherwise distributed in that format and is not made available to the public in that format outside the premises of the library or archives.

(c) The right of reproduction under this section applies to three copies or phonorecords of a published work duplicated solely for the purpose of replacement of a copy or phonorecord that is damaged, deteriorating, lost, or stolen, or if the existing format in which the work is stored has become obsolete, if—

(1) the library or archives has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price; and

(2) any such copy or phonorecord that is reproduced in digital format is not made avail-

able to the public in that format outside the premises of the library or archives in lawful possession of such copy.

For purposes of this subsection, a format shall be considered obsolete if the machine or device necessary to render perceptible a work stored in that format is no longer manufactured or is no longer reasonably available in the commercial marketplace.

(d) The rights of reproduction and distribution under this section apply to a copy, made from the collection of a library or archives where the user makes his or her request or from that of another library or archives, of no more than one article or other contribution to a copyrighted collection or periodical issue, or to a copy or phonorecord of a small part of any other copyrighted work, if—

(1) the copy or phonorecord becomes the property of the user, and the library or archives has had no notice that the copy or phonorecord would be used for any purpose other than private study, scholarship, or research; and

(2) the library or archives displays prominently, at the place where orders are accepted, and includes on its order form, a warning of copyright in accordance with requirements that the Register of Copyrights shall prescribe by regulation.

(e) The rights of reproduction and distribution under this section apply to the entire work, or to a substantial part of it, made from the collection of a library or archives where the user makes his or her request or from that of another library or archives, if the library or archives has first determined, on the basis of a reasonable investigation, that a copy or phonorecord of the copyrighted work cannot be obtained at a fair price, if—

(1) the copy or phonorecord becomes the property of the user, and the library or archives has had no notice that the copy or phonorecord would be used for any purpose other than private study, scholarship, or research; and

(2) the library or archives displays prominently, at the place where orders are accepted, and includes on its order form, a warning of copyright in accordance with requirements that the Register of Copyrights shall prescribe by regulation.

(f) Nothing in this section—

(1) shall be construed to impose liability for copyright infringement upon a library or archives or its employees for the unsupervised use of reproducing equipment located on its premises: *Provided,* That such equipment displays a notice that the making of a copy may be subject to the copyright law;

(2) excuses a person who uses such reproducing equipment or who requests a copy or phonorecord under subsection (d) from liability for copyright infringement for any such act, or for any later use of such copy or phonorecord, if it exceeds fair use as provided by section 107;

(3) shall be construed to limit the reproduction and distribution by lending of a limited number of copies and excerpts by a library or

archives of an audiovisual news program, subject to clauses (1), (2), and (3) of subsection (a); or

(4) in any way affects the right of fair use as provided by section 107, or any contractual obligations assumed at any time by the library or archives when it obtained a copy or phonorecord of a work in its collections.

(g) The rights of reproduction and distribution under this section extend to the isolated and unrelated reproduction or distribution of a single copy or phonorecord of the same material on separate occasions, but do not extend to cases where the library or archives, or its employee—

(1) is aware or has substantial reason to believe that it is engaging in the related or concerted reproduction or distribution of multiple copies or phonorecords of the same material, whether made on one occasion or over a period of time, and whether intended for aggregate use by one or more individuals or for separate use by the individual members of a group; or

(2) engages in the systematic reproduction or distribution of single or multiple copies or phonorecords of material described in subsection (d): *Provided,* That nothing in this clause prevents a library or archives from participating in interlibrary arrangements that do not have, as their purpose or effect, that the library or archives receiving such copies or phonorecords for distribution does so in such aggregate quantities as to substitute for a subscription to or purchase of such work.

(h)(1) For purposes of this section, during the last 20 years of any term of copyright of a published work, a library or archives, including a nonprofit educational institution that functions as such, may reproduce, distribute, display, or perform in facsimile or digital form a copy or phonorecord of such work, or portions thereof, for purposes of preservation, scholarship, or research, if such library or archives has first determined, on the basis of a reasonable investigation, that none of the conditions set forth in subparagraphs (A), (B), and (C) of paragraph (2) apply.

(2) No reproduction, distribution, display, or performance is authorized under this subsection if—

(A) the work is subject to normal commercial exploitation;

(B) a copy or phonorecord of the work can be obtained at a reasonable price; or

(C) the copyright owner or its agent provides notice pursuant to regulations promulgated by the Register of Copyrights that either of the conditions set forth in subparagraphs (A) and (B) applies.

(3) The exemption provided in this subsection does not apply to any subsequent uses by users other than such library or archives.

(i) The rights of reproduction and distribution under this section do not apply to a musical work, a pictorial, graphic or sculptural work, or a motion picture or other audiovisual work other than an audiovisual work dealing with news, except that no such limitation shall apply with respect to rights granted by subsections (b), (c), and (h), or with respect to pictorial or graphic works published as illustrations, dia-

grams, or similar adjuncts to works of which copies are reproduced or distributed in accordance with subsections (d) and (e).

(Pub. L. 94–553, title I, §101, Oct. 19, 1976, 90 Stat. 2546; Pub. L. 102–307, title III, §301, June 26, 1992, 106 Stat. 272; Pub. L. 105–80, §12(a)(4), Nov. 13, 1997, 111 Stat. 1534; Pub. L. 105–298, title I, §104, Oct. 27, 1998, 112 Stat. 2829; Pub. L. 105–304, title IV, §404, Oct. 28, 1998, 112 Stat. 2889; Pub. L. 109–9, title IV, §402, Apr. 27, 2005, 119 Stat. 227.)

HISTORICAL AND REVISION NOTES

HOUSE REPORT NO. 94–1476

Notwithstanding the exclusive rights of the owners of copyright, section 108 provides that under certain conditions it is not an infringement of copyright for a library or archives, or any of its employees acting within the scope of their employment, to reproduce or distribute not more than one copy or phonorecord of a work, provided (1) the reproduction or distribution is made without any purpose of direct or indirect commercial advantage and (2) the collections of the library or archives are open to the public or available not only to researchers affiliated with the library or archives, but also to other persons doing research in a specialized field, and (3) the reproduction or distribution of the work includes a notice of copyright.

Under this provision, a purely commercial enterprise could not establish a collection of copyrighted works, call itself a library or archive, and engage in for-profit reproduction and distribution of photocopies. Similarly, it would not be possible for a non-profit institution, by means of contractual arrangements with a commercial copying enterprise, to authorize the enterprise to carry out copying and distribution functions that would be exempt if conducted by the non-profit institution itself.

The reference to "indirect commercial advantage" has raised questions as to the status of photocopying done by or for libraries or archival collections within industrial, profit-making, or proprietary institutions (such as the research and development departments of chemical, pharmaceutical, automobile, and oil corporations, the library of a proprietary hospital, the collections owned by a law or medical partnership, etc.).

There is a direct interrelationship between this problem and the prohibitions against "multiple" and "systematic" photocopying in section 108(g)(1) and (2). Under section 108, a library in a profitmaking organization would not be authorized to:

(a) use a single subscription or copy to supply its employees with multiple copies of material relevant to their work; or

(b) use a single subscription or copy to supply its employees, on request, with single copies of material relevant to their work, where the arrangement is "systematic" in the sense of deliberately substituting photocopying for subscription or purchase; or

(c) use "interlibrary loan" arrangements for obtaining photocopies in such aggregate quantities as to substitute for subscriptions or purchase of material needed by employees in their work.

Moreover, a library in a profit-making organization could not evade these obligations by installing reproducing equipment on its premises for unsupervised use by the organization's staff.

Isolated, spontaneous making of single photocopies by a library in a for-profit organization, without any systematic effort to substitute photocopying for subscriptions or purchases, would be covered by section 108, even though the copies are furnished to the employees of the organization for use in their work. Similarly, for-profit libraries could participate in interlibrary arrangements for exchange of photocopies, as long as the reproduction or distribution was not "systematic." These activities, by themselves, would ordinarily not be considered "for direct or indirect commercial advantage," since the "advantage" referred to in this clause must attach to the immediate commercial motivation behind the reproduction or distribution itself, rather than to the ultimate profit-making motivation behind the enterprise in which the library is located. On the other hand, section 108 would not excuse reproduction or distribution if there were a commercial motive behind the actual making or distributing of the copies, if multiple copies were made or distributed, or if the photocopying activities were "systematic" in the sense that their aim was to substitute for subscriptions or purchases.

The rights of reproduction and distribution under section 108 apply in the following circumstances:

**Archival Reproduction.** Subsection (b) authorizes the reproduction and distribution of a copy or phonorecord of an unpublished work duplicated in facsimile form solely for purposes of preservation and security, or for deposit for research use in another library or archives, if the copy or phonorecord reproduced is currently in the collections of the first library or archives. Only unpublished works could be reproduced under this exemption, but the right would extend to any type of work, including photographs, motion pictures and sound recordings. Under this exemption, for example, a repository could make photocopies of manuscripts by microfilm or electrostatic process, but could not reproduce the work in "machine-readable" language for storage in an information system.

**Replacement of Damaged Copy.** Subsection (c) authorizes the reproduction of a published work duplicated in facsimile form solely for the purpose of replacement of a copy or phonorecord that is damaged, deteriorating, lost or stolen, if the library or archives has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price. The scope and nature of a reasonable investigation to determine that an unused replacement cannot be obtained will vary according to the circumstances of a particular situation. It will always require recourse to commonly-known trade sources in the United States, and in the normal situation also to the publisher or other copyright owner (if such owner can be located at the address listed in the copyright registration), or an authorized reproducing service.

**Articles and Small Excerpts.** Subsection (d) authorizes the reproduction and distribution of a copy of not more than one article or other contribution to a copyrighted collection or periodical issue, or of a copy or phonorecord of a small part of any other copyrighted work. The copy or phonorecord may be made by the library where the user makes his request or by another library pursuant to an interlibrary loan. It is further required that the copy become the property of the user, that the library or archives have no notice that the copy would be used for any purposes other than private study, scholarship or research, and that the library or archives display prominently at the place where reproduction requests are accepted, and includes in its order form, a warning of copyright in accordance with requirements that the Register of Copyrights shall prescribe by regulation.

**Out-of-Print Works.** Subsection (e) authorizes the reproduction and distribution of a copy or phonorecord of an entire work under certain circumstances, if it has been established that a copy cannot be obtained at a fair price. The copy may be made by the library where the user makes his request or by another library pursuant to an interlibrary loan. The scope and nature of a reasonable investigation to determine that an unused copy cannot be obtained will vary according to the circumstances of a particular situation. It will always require recourse to commonly-known trade sources in the United States, and in the normal situation also to the publisher or other copyright owner (if the owner can be located at the address listed in the copyright registration), or an authorized reproducing service. It is further required that the copy become the property of the user, that the library or archives have no notice that the copy would be used for any purpose other than private

study, scholarship, or research, and that the library or archives display prominently at the place where reproduction requests are accepted, and include on its order form, a warning of copyright in accordance with requirements that the Register of Copyrights shall prescribe by regulation.

**General Exemptions.** Clause (1) of subsection (f) specifically exempts a library or archives or its employees from liability for the unsupervised use of reproducing equipment located on its premises, provided that the reproducing equipment displays a notice that the making of a copy may be subject to the copyright law. Clause (2) of subsection (f) makes clear that this exemption of the library or archives does not extend to the person using such equipment or requesting such copy if the use exceeds fair use. Insofar as such person is concerned the copy or phonorecord made is not considered "lawfully" made for purposes of sections 109, 110 or other provisions of the title.

Clause (3) provides that nothing in section 108 is intended to limit the reproduction and distribution by lending of a limited number of copies and excerpts of an audiovisual news program. This exemption is intended to apply to the daily newscasts of the national television networks, which report the major events of the day. It does not apply to documentary (except documentary programs involving news reporting as that term is used in section 107), magazine-format or other public affairs broadcasts dealing with subjects of general interest to the viewing public.

The clause was first added to the revision bill in 1974 by the adoption of an amendment proposed by Senator Baker. It is intended to permit libraries and archives, subject to the general conditions of this section, to make off-the-air videotape recordings of daily network news casts for limited distribution to scholars and researchers for use in research purposes. As such, it is an adjunct to the American Television and Radio Archive established in Section 113 of the Act [2 U.S.C. 170] which will be the principal repository for television broadcast material, including news broadcasts, the inclusion of language indicating that such material may only be distributed by lending by the library or archive is intended to preclude performance, copying, or sale, whether or not for profit, by the recipient of a copy of a television broadcast taped off-the-air pursuant to this clause.

Clause (4), in addition to asserting that nothing contained in section 108 "affects the right of fair use as provided by section 107", also provides that the right of reproduction granted by this section does not override any contractual arrangements assumed by a library or archives when it obtained a work for its collections: For example, if there is an express contractual prohibition against reproduction for any purpose, this legislation shall not be construed as justifying a violation of the contract. This clause is intended to encompass the situation where an individual makes papers, manuscripts or other works available to a library with the understanding that they will not be reproduced.

It is the intent of this legislation that a subsequent unlawful use by a user of a copy or phonorecord of a work lawfully made by a library, shall not make the library liable for such improper use.

**Multiple Copies and Systematic Reproduction.** Subsection (g) provides that the rights granted by this section extend only to the "isolated and unrelated reproduction of a single copy or phonorecord of the same material on separate occasions." However, this section does not authorize the related or concerted reproduction of multiple copies or phonorecords of the same material, whether made on one occasion or over a period of time, and whether intended for aggregate use by one individual or for separate use by the individual members of a group.

With respect to material described in subsection (d)— articles or other contributions to periodicals or collections, and small parts of other copyrighted works—subsection (g)(2) provides that the exemptions of section 108 do not apply if the library or archive engages in "systematic reproduction or distribution of single or multiple copies or phonorecords." This provision in S. 22 provoked a storm of controversy, centering around the extent to which the restrictions on "systematic" activities would prevent the continuation and development of interlibrary networks and other arrangements involving the exchange of photocopies. After thorough consideration, the Committee amended section 108(g)(2) to add the following proviso:

*Provided*, that nothing in this clause prevents a library or archives from participating in interlibrary arrangements that do not have, as their purpose or effect, that the library or archives receiving such copies or phonorecords for distribution does so in such aggregate quantities as to substitute for a subscription to or purchase of such work.

In addition, the Committee added a new subsection (i) to section 108 [this section], requiring the Register of Copyrights, five years from the effective date of the new Act and at five-year intervals thereafter, to report to Congress upon "the extent to which this section has achieved the intended statutory balancing of the rights of creators, and the needs of users," and to make appropriate legislative or other recommendations. As noted in connection with section 107, the Committee also amended section 504(c) in a way that would insulate librarians from unwarranted liability for copyright infringement; this amendment is discussed below.

The key phrases in the Committee's amendment of section 108(g)(2) are "aggregate quantities" and "substitute for a subscription to or purchase of" a work. To be implemented effectively in practice, these provisions will require the development and implementation of more-or-less specific guidelines establishing criteria to govern various situations.

The National Commission on New Technological Uses of Copyrighted Works (CONTU) offered to provide good offices in helping to develop these guidelines. This offer was accepted and, although the final text of guidelines has not yet been achieved, the Committee has reason to hope that, within the next month, some agreement can be reached on an initial set of guidelines covering practices under section 108(g)(2).

**Works Excluded.** Subsection (h) provides that the rights of reproduction and distribution under this section do not apply to a musical work, a pictorial, graphic or sculptural work, or a motion picture or other audiovisual work other than "an audiovisual work dealing with news." The latter term is intended as the equivalent in meaning of the phrase "audiovisual news program" in section 108(f)(3). The exclusions under subsection (h) do not apply to archival reproduction under subsection (b), to replacement of damaged or lost copies or phonorecords under subsection (c), or to "pictorial or graphic works published as illustrations, diagrams, or similar adjuncts to works of which copies are reproduced or distributed in accordance with subsections (d) and (e)."

Although subsection (h) generally removes musical, graphic, and audiovisual works from the specific exemptions of section 108, it is important to recognize that the doctrine of fair use under section 107 remains fully applicable to the photocopying or other reproduction of such works. In the case of music, for example, it would be fair use for a scholar doing musicological research to have a library supply a copy of a portion of a score or to reproduce portions of a phonorecord of a work. Nothing in section 108 impairs the applicability of the fair use doctrine to a wide variety of situations involving photocopying or other reproduction by a library of copyrighted material in its collections, where the user requests the reproduction for legitimate scholarly or research purposes.

## AMENDMENTS

2005—Subsec. (i). Pub. L. 109–9 substituted "(b), (c), and (h)" for "(b) and (c)".

1998—Subsec. (a). Pub. L. 105–304, §404(1)(A), (B), in introductory provisions, substituted "Except as other-

wise provided in this title and notwithstanding'' for ''Notwithstanding'' and inserted '', except as provided in subsections (b) and (c)'' after ''of a work''.

Subsec. (a)(3). Pub. L. 105–304, §404(1)(C), inserted before period at end ''that appears on the copy or phonorecord that is reproduced under the provisions of this section, or includes a legend stating that the work may be protected by copyright if no such notice can be found on the copy or phonorecord that is reproduced under the provisions of this section''.

Subsec. (b). Pub. L. 105–304, §404(2), substituted ''three copies or phonorecords'' for ''a copy or phonorecord'', struck out ''in facsimile form'' after ''duplicated'', and substituted ''if—

''(1) the copy or phonorecord reproduced is currently in the collections of the library or archives; and

''(2) any such copy or phonorecord that is reproduced in digital format is not otherwise distributed in that format and is not made available to the public in that format outside the premises of the library or archives.''

for ''if the copy or phonorecord reproduced is currently in the collections of the library or archives.''

Subsec. (c). Pub. L. 105–304, §404(3), substituted ''three copies or phonorecords'' for ''a copy or phonorecord'', struck out ''in facsimile form'' after ''duplicated'', inserted ''or if the existing format in which the work is stored has become obsolete,'' after ''stolen,'', substituted ''if—

''(1) the library or archives has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price; and

''(2) any such copy or phonorecord that is reproduced in digital format is not made available to the public in that format outside the premises of the library or archives in lawful possession of such copy.''

for ''if the library or archives has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price.'', and inserted concluding provisions.

Subsecs. (h), (i). Pub. L. 105–298 added subsec. (h) and redesignated former subsec. (h) as (i).

1997—Subsec. (e). Pub. L. 105–80 substituted ''fair price'' for ''pair price'' in introductory provisions.

1992—Subsec. (i). Pub. L. 102–307 struck out subsec. (i), which read as follows: ''Five years from the effective date of this Act, and at five-year intervals thereafter, the Register of Copyrights, after consulting with representatives of authors, book and periodical publishers, and other owners of copyrighted materials, and with representatives of library users and librarians, shall submit to the Congress a report setting forth the extent to which this section has achieved the intended statutory balancing of the rights of creators, and the needs of users. The report should also describe any problems that may have arisen, and present legislative or other recommendations, if warranted.''

EFFECTIVE DATE OF 1998 AMENDMENTS

Pub. L. 105–304, title IV, §407, Oct. 28, 1998, 112 Stat. 2905, provided that: ''Except as otherwise provided in this title [enacting section 4001 of Title 28, Judiciary and Judicial Procedure, amending this section, sections 112, 114, 701, and 801 to 803 of this title, section 5314 of Title 5, Government Organization and Employees, and section 3 of Title 35, Patents, and enacting provisions set out as notes under sections 112 and 114 of this title], this title and the amendments made by this title shall take effect on the date of the enactment of this Act [Oct. 28, 1998].''

Pub. L. 105–298, title I, §106, Oct. 27, 1998, 112 Stat. 2829, provided that: ''This title [amending this section and sections 203 and 301 to 304 of this title, enacting provisions set out as a note under section 101 of this title, and amending provisions set out as notes under sections 101 and 304 of this title] and the amendments made by this title shall take effect on the date of the enactment of this Act [Oct. 27, 1998].''

## § 109. Limitations on exclusive rights: Effect of transfer of particular copy or phonorecord

(a) Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord. Notwithstanding the preceding sentence, copies or phonorecords of works subject to restored copyright under section 104A that are manufactured before the date of restoration of copyright or, with respect to reliance parties, before publication or service of notice under section 104A(e), may be sold or otherwise disposed of without the authorization of the owner of the restored copyright for purposes of direct or indirect commercial advantage only during the 12-month period beginning on—

(1) the date of the publication in the Federal Register of the notice of intent filed with the Copyright Office under section 104A(d)(2)(A), or

(2) the date of the receipt of actual notice served under section 104A(d)(2)(B),

whichever occurs first.

(b)(1)(A) Notwithstanding the provisions of subsection (a), unless authorized by the owners of copyright in the sound recording or the owner of copyright in a computer program (including any tape, disk, or other medium embodying such program), and in the case of a sound recording in the musical works embodied therein, neither the owner of a particular phonorecord nor any person in possession of a particular copy of a computer program (including any tape, disk, or other medium embodying such program), may, for the purposes of direct or indirect commercial advantage, dispose of, or authorize the disposal of, the possession of that phonorecord or computer program (including any tape, disk, or other medium embodying such program) by rental, lease, or lending, or by any other act or practice in the nature of rental, lease, or lending. Nothing in the preceding sentence shall apply to the rental, lease, or lending of a phonorecord for nonprofit purposes by a nonprofit library or nonprofit educational institution. The transfer of possession of a lawfully made copy of a computer program by a nonprofit educational institution to another nonprofit educational institution or to faculty, staff, and students does not constitute rental, lease, or lending for direct or indirect commercial purposes under this subsection.

(B) This subsection does not apply to—

(i) a computer program which is embodied in a machine or product and which cannot be copied during the ordinary operation or use of the machine or product; or

(ii) a computer program embodied in or used in conjunction with a limited purpose computer that is designed for playing video games and may be designed for other purposes.

(C) Nothing in this subsection affects any provision of chapter 9 of this title.

(2)(A) Nothing in this subsection shall apply to the lending of a computer program for nonprofit purposes by a nonprofit library, if each copy of

''(a) IN GENERAL.—Except as provided in subsections (b) and (c), the amendments made by this Act [amending this section, sections 101, 104A, 108 to 110, 114 to 116, 303, 304, 405, 407, 411, 504, 509, 601, 708, 801 to 803, 909, 910, 1006, and 1007 of this title, and section 2319 of Title 18, Crimes and Criminal Procedure, and amending provisions set out as a note under section 914 of this title] shall take effect on the date of the enactment of this Act [Nov. 13, 1997].

''(b) SATELLITE HOME VIEWER ACT.—The amendments made by section 1 [amending this section] shall be effective as if enacted as part of the Satellite Home Viewer Act of 1994 (Public Law 103–369).

''(c) TECHNICAL AMENDMENT.—The amendment made by section 12(b)(1) [amending provisions set out as a note under section 914 of this title] shall be effective as if enacted on November 9, 1987.''

EFFECTIVE DATE OF 1995 AMENDMENT

Amendment by Pub. L. 104–39 effective 3 months after Nov. 1, 1995, see section 6 of Pub. L. 104–39, set out as a note under section 101 of this title.

EFFECTIVE AND TERMINATION DATES OF 1994 AMENDMENT

Pub. L. 103–369, §6, Oct. 18, 1994, 108 Stat. 3481, provided that:

''(a) IN GENERAL.—Except as provided in subsections (b) and (d), this Act [amending this section and section 111 of this title, enacting provisions set out as notes under this section and section 101 of this title, and repealing provisions set out as a note under this section] and the amendments made by this Act take effect on the date of the enactment of this Act [Oct. 18, 1994].

''(b) BURDEN OF PROOF PROVISIONS.—The provisions of section 119(a)(5)(D) [now section 119(a)(6)(D)] of title 17, United States Code (as added by section 2(2) of this Act) relating to the burden of proof of satellite carriers, shall take effect on January 1, 1997, with respect to civil actions relating to the eligibility of subscribers who subscribed to service as an unserved household before the date of the enactment of this Act.

''(c) TRANSITIONAL SIGNAL INTENSITY MEASUREMENT PROCEDURES.—The provisions of [former] section 119(a)(8) of title 17, United States Code (as added by section 2(5) of this Act), relating to transitional signal intensity measurements, shall cease to be effective on December 31, 1996.

''(d) LOCAL SERVICE AREA OF A PRIMARY TRANSMITTER.—The amendment made by section 3(b) [amending section 111 of this title], relating to the definition of the local service area of a primary transmitter, shall take effect on July 1, 1994.''

EFFECTIVE DATE

Section 206 of title II of Pub. L. 100–667 provided that: ''This title and the amendments made by this title [enacting this section and sections 612 and 613 of Title 47, Telegraphs, Telephones, and Radiotelegraphs, amending sections 111, 501, 801, and 804 of this title and section 605 of Title 47, and enacting provisions set out as notes under this section and section 101 of this title] take effect on January 1, 1989, except that the authority of the Register of Copyrights to issue regulations pursuant to section 119(b)(1) of title 17, United States Code, as added by section 202 of this Act, takes effect on the date of the enactment of this Act [Nov. 16, 1988].''

Section 207 of title II of Pub. L. 100–667 provided that this title and the amendments made by this title (other than the amendments made by section 205 [amending section 605 of Title 47]) cease to be effective on Dec. 31, 1994, prior to repeal by Pub. L. 103–369, §4(b), Oct. 18, 1994, 108 Stat. 3481.

TERMINATION OF SECTION

Pub. L. 111–175, title I, §107(a), May 27, 2010, 124 Stat. 1245, provided that: ''Section 119 of title 17, United States Code, as amended by this Act, shall cease to be effective on December 31, 2014.''

Pub. L. 111–118, div. B, §1003(a)(2)(A), Dec. 19, 2009, 123 Stat. 3469, as amended by Pub. L. 111–144, §10(a)(2), Mar. 2, 2010, 124 Stat. 47; Pub. L. 111–151, §2(a)(2), Mar. 26, 2010, 124 Stat. 1027; Pub. L. 111–157, §9(a)(2), Apr. 15, 2010, 124 Stat. 1119, which provided that this section would cease to be effective on May 31, 2010, was repealed by Pub. L. 111–175, title I, §107(b), May 27, 2010, 124 Stat. 1245.

Pub. L. 103–369, §4(a), Oct. 18, 1994, 108 Stat. 3481, as amended by Pub. L. 106–113, div. B, §1000(a)(9) [title I, §1003], Nov. 29, 1999, 113 Stat. 1536, 1501A–527; Pub. L. 108–447, div. J, title IX [title I, §101(a)], Dec. 8, 2004, 118 Stat. 3394, which provided that this section would cease to be effective on Dec. 31, 2009, was repealed by Pub. L. 111–118, div. B, §1003(a)(2)(B), Dec. 19, 2009, 123 Stat. 3469.

REMOVAL OF INCONSISTENT PROVISIONS

Pub. L. 109–303, §4(g), Oct. 6, 2006, 120 Stat. 1483, provided that: ''The amendments contained in subsection (h) of section 5 of the Copyright Royalty and Distribution Reform Act of 2004 [Pub. L. 108–419, amending this section] shall be deemed never to have been enacted.''

EFFECT ON CERTAIN PROCEEDINGS

Pub. L. 108–447, div. J, title IX [title I, §106], Dec. 8, 2004, 118 Stat. 3406, provided that: ''Nothing in this title [see Short Title of 2004 Amendment note set out under section 101 of this title] shall modify any remedy imposed on a party that is required by the judgment of a court in any action that was brought before May 1, 2004, against that party for a violation of section 119 of title 17, United States Code.''

APPLICABILITY OF 1994 AMENDMENT

Section 5 of Pub. L. 103–369 provided that: ''The amendments made by this section apply only to section 119 of title 17, United States Code.''

§ 120. Scope of exclusive rights in architectural works

(a) PICTORIAL REPRESENTATIONS PERMITTED.—The copyright in an architectural work that has been constructed does not include the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embodied is located in or ordinarily visible from a public place.

(b) ALTERATIONS TO AND DESTRUCTION OF BUILDINGS.—Notwithstanding the provisions of section 106(2), the owners of a building embodying an architectural work may, without the consent of the author or copyright owner of the architectural work, make or authorize the making of alterations to such building, and destroy or authorize the destruction of such building.

(Added Pub. L. 101–650, title VII, §704(a), Dec. 1, 1990, 104 Stat. 5133.)

EFFECTIVE DATE

Section applicable to any architectural work created on or after Dec. 1, 1990, and any architectural work, that, on Dec. 1, 1990, is unconstructed and embodied in unpublished plans or drawings, except that protection for such architectural work under this title terminates on Dec. 31, 2002, unless the work is constructed by that date, see section 706 of Pub. L. 101–650, set out as an Effective Date of 1990 Amendment note under section 101 of this title.

§ 121. Limitations on exclusive rights: Reproduction for blind or other people with disabilities

(a) Notwithstanding the provisions of section 106, it is not an infringement of copyright for an

authorized entity to reproduce or to distribute copies or phonorecords of a previously published, nondramatic literary work if such copies or phonorecords are reproduced or distributed in specialized formats exclusively for use by blind or other persons with disabilities.

(b)(1) Copies or phonorecords to which this section applies shall—

(A) not be reproduced or distributed in a format other than a specialized format exclusively for use by blind or other persons with disabilities;

(B) bear a notice that any further reproduction or distribution in a format other than a specialized format is an infringement; and

(C) include a copyright notice identifying the copyright owner and the date of the original publication.

(2) The provisions of this subsection shall not apply to standardized, secure, or norm-referenced tests and related testing material, or to computer programs, except the portions thereof that are in conventional human language (including descriptions of pictorial works) and displayed to users in the ordinary course of using the computer programs.

(c) Notwithstanding the provisions of section 106, it is not an infringement of copyright for a publisher of print instructional materials for use in elementary or secondary schools to create and distribute to the National Instructional Materials Access Center copies of the electronic files described in sections 612(a)(23)(C), 613(a)(6), and section 674(e) of the Individuals with Disabilities Education Act that contain the contents of print instructional materials using the National Instructional Material Accessibility Standard (as defined in section 674(e)(3) of that Act), if—

(1) the inclusion of the contents of such print instructional materials is required by any State educational agency or local educational agency;

(2) the publisher had the right to publish such print instructional materials in print formats; and

(3) such copies are used solely for reproduction or distribution of the contents of such print instructional materials in specialized formats.

(d) For purposes of this section, the term—

(1) "authorized entity" means a nonprofit organization or a governmental agency that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities;

(2) "blind or other persons with disabilities" means individuals who are eligible or who may qualify in accordance with the Act entitled "An Act to provide books for the adult blind", approved March 3, 1931 (2 U.S.C. 135a; 46 Stat. 1487) to receive books and other publications produced in specialized formats;

(3) "print instructional materials" has the meaning given under section 674(e)(3)(C) of the Individuals with Disabilities Education Act; and

(4) "specialized formats" means—

(A) braille, audio, or digital text which is exclusively for use by blind or other persons with disabilities; and

(B) with respect to print instructional materials, includes large print formats when such materials are distributed exclusively for use by blind or other persons with disabilities.

(Added Pub. L. 104–197, title III, §316(a), Sept. 16, 1996, 110 Stat. 2416; amended Pub. L. 106–379, §3(b), Oct. 27, 2000, 114 Stat. 1445; Pub. L. 107–273, div. C, title III, §13210(3)(A), Nov. 2, 2002, 116 Stat. 1909; Pub. L. 108–446, title III, §306, Dec. 3, 2004, 118 Stat. 2807.)

REFERENCES IN TEXT

Sections 612, 613, and 674 of the Individuals with Disabilities Education Act, referred to in subsecs. (c) and (d)(3), are classified to sections 1412, 1413, and 1474, respectively, of Title 20, Education.

The Act approved March 3, 1931, referred to in subsec. (d)(2), is act Mar. 3, 1931, ch. 400, 46 Stat. 1487, as amended, which is classified generally to sections 135a and 135b of Title 2, The Congress. For complete classification of this Act to the Code, see Tables.

AMENDMENTS

2004—Subsec. (c). Pub. L. 108–446, §306(2), added subsec. (c). Former subsec. (c) redesignated (d).

Subsec. (d). Pub. L. 108–446, §306(1), redesignated subsec. (c) as (d).

Subsec. (d)(3), (4). Pub. L. 108–446, §306(3), added pars. (3) and (4) and struck out former par. (3) which read as follows: "'specialized formats' means braille, audio, or digital text which is exclusively for use by blind or other persons with disabilities."

2002—Pub. L. 107–273 substituted "Reproduction" for "reproduction" in section catchline.

2000—Subsec. (a). Pub. L. 106–379 substituted "section 106" for "sections 106 and 710".

§ 122. Limitations on exclusive rights: Secondary transmissions of local television programming by satellite

(a) SECONDARY TRANSMISSIONS INTO LOCAL MARKETS.—

(1) SECONDARY TRANSMISSIONS OF TELEVISION BROADCAST STATIONS WITHIN A LOCAL MARKET.—A secondary transmission of a performance or display of a work embodied in a primary transmission of a television broadcast station into the station's local market shall be subject to statutory licensing under this section if—

(A) the secondary transmission is made by a satellite carrier to the public;

(B) with regard to secondary transmissions, the satellite carrier is in compliance with the rules, regulations, or authorizations of the Federal Communications Commission governing the carriage of television broadcast station signals; and

(C) the satellite carrier makes a direct or indirect charge for the secondary transmission to—

(i) each subscriber receiving the secondary transmission; or

(ii) a distributor that has contracted with the satellite carrier for direct or indirect delivery of the secondary transmission to the public.

(2) SIGNIFICANTLY VIEWED STATIONS.—

(A) IN GENERAL.—A secondary transmission of a performance or display of a work embodied in a primary transmission of

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 28th day of May, 2013, a true and correct copy of the foregoing Redacted Page Proof Brief For Defendants-Appellees was served by electronic means via ECF transmission upon the following counsel of record:

> Jeremy Seth Goldman
> jgoldman@fkks.com
> Edward Rosenthal
> erosenthal@fkks.com
> *Attorneys for Plaintiffs-Appellants*
>
> Mr. Robert J. Bernstein
> Daniel Frank Goldstein
> dfg@browngold.com
> Ms. Jessica Paulie Weber
> jweber@browngold.com
> *Attorneys for Defendants-Intervenors*

This 28th day of May, 2013

_____
Alberto Garcia