# 12-4547-cv

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

---

THE AUTHORS GUILD, INC., THE AUSTRALIAN SOCIETY OF AUTHORS
LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS,
ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES
SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON,
THE AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND
COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK
FAGLITTERAER FORFATTERO OG OVERSETTERFORENING,
THE WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK
GRUNDSTROM, HELGE RONNING, JACK R. SALAMANCA,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

---

On Appeal from the United States District Court for the Southern District of New York

---

**BRIEF AMICI CURIAE OF AMERICAN LIBRARY ASSOCIATION, ASSOCIATION
OF COLLEGE AND RESEACH LIBRARIES, AND ASSOCIATION OF RESEARCH
LIBRARIES IN SUPPORT OF APPELLEES AND AFFIRMANCE**

---

Jonathan Band
Jonathan Band PLLC
21 Dupont Circle NW, 8th Floor
Washington, D.C., 20036
202-296-5675
jband@policybandwidth.com

Counsel for Amici

June 3, 2013

---

v.

HATHITRUST, CORNELL UNIVERSITY, MARY SUE COLEMAN, President, University of Michigan, MARK G. YUDOF, President, The University of California, KEVIN REILLY, President, The University of Wisconsin System, MICHAEL MCROBBIE, President, Indiana University,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE, BLAIR SEIDLITZ & COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

---

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae the American Library Association, the Association of College and Research Libraries, and the Association of Research Libraries state that none of these entities has a parent corporation and no publicly held corporation has an ownership stake of 10% or more in any entity.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ...................................................... i

INTEREST OF AMICI AND INTRODUCTION ..................................................... 1

ARGUMENT ..................................................................................... 3

    I.      APPELLANTS' READING OF SECTION 108 WOULD
           OUTLAW WELL-ESTABLISHED LIBRARY PRACTICES ........... 3

         A.      Appellants' Understanding of Section 108 Would Prevent
                 Libraries from Providing Internet Access to Users................... 4

         B.      Plaintiffs' Reading of Section 108 Precludes Many Other
                 Important Library Activities ....................................... 5

    II.     ACTIVITIES OUTSIDE SECTIONS 108 OR 121 CAN STILL
           QUALIFY FOR A FAIR USE FINDING .......................................... 7

         A.      The Copyright Act's Specific Exceptions Do Not Limit the
                 Applicability of Fair Use ......................................... 7

         B.      Section 108(f)(4) Unambiguously Provides that Section 108
                 Does Not Limit the Applicability of Fair Use to Libraries...... 10

         C.      Section 121 Does Not Limit the Applicability of Fair Use ..... 14

         D.      Appellants' Understanding of the Impact of Specific
                 Exceptions on Fair Use Is Inconsistent with the Privileged
                 Status Congress Has Accorded Libraries in Title 17 ............... 15

    III.    THE DISTRICT COURT CORRECTLY FOUND THAT HDL IS
           A FAIR USE ..................................................................... 17

         A.      HDL Embodies Widespread Best Practices for Fair Use ........ 17

         B.      Preservation Is Fair Use ......................................... 19

C.    A Fair Use Finding Does Not Usurp Congressional
Authority .................................................................................. 20

D.    Fair Use Permits Digitization of Numerous Works ................. 24

E.    Appellants' Litigation Choices Tilt the Equities In Favor of
HathiTrust .................................................................................. 25

IV.    THE DISTRICT COURT CORRECTLY FOUND THAT HDL
FALLS WITHIN SECTION 121 ...................................................... 28

CONCLUSION ................................................................................................. 29

# TABLE OF AUTHORITIES

## Federal Cases

*Authors Guild, Inc. v. Google, Inc.*,
  No. 05-cv-8136-DC (S.D.N.Y. Nov. 13, 2009) ........................................ 26

*Encyclopedia Britannica Educ. Corp. v. Crooks*,
  447 F. Supp. 243 (W.D.N.Y. 1978) ................................................................ 9

*Golan v. Holder*,
  132 S. Ct. 873 (2012) ........................................................................ 2, 16

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  133 S. Ct. 1351 (2013) ............................................................................ 4

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .............................................................. 5, 25

*Sega Enters., Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) ................................................................ 8, 9

*Sony Corp. of America v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ........................................................................... 20, 21

*Stewart v. Abend*,
  495 U.S. 207 (1990) ................................................................................ 7

## Federal Statutes

17 U.S.C. § 106 ....................................................................................... 9

17 U.S.C. § 107 ................................................................................. *passim*

17 U.S.C. § 108 ................................................................................. *passim*

17 U.S.C. § 109 ............................................................................... 4, 9, 15

17 U.S.C. § 110 ....................................................................................... 9

17 U.S.C. § 111 ....................................................................................... 9

17 U.S.C. § 112 ................................................................................... 9

17 U.S.C. § 113 ................................................................................... 9

17 U.S.C. § 114 ................................................................................... 9

17 U.S.C. § 115 ................................................................................... 9

17 U.S.C. § 116 ............................................................................... 8, 9

17 U.S.C. § 117 ...................................................................... 4, 8, 9, 28

17 U.S.C. § 118 ................................................................................... 9

17 U.S.C. § 119 ................................................................................... 9

17 U.S.C. § 120 ................................................................................... 9

17 U.S.C. § 121 ........................................................................... *passim*

17 U.S.C. § 504 ................................................................................. 16

17 U.S.C. § 602 ................................................................................. 16

17 U.S.C. § 1201 ............................................................................... 16

17 U.S.C. § 1203 ............................................................................... 16

17 U.S.C. § 1204 ............................................................................... 16

**State Statutes**

N.Y. Educ. Law § 273 (Consol. 2013) ............................................... 28

**Legislative Materials**

H.R. Rep. No. 107-685 (2002) ............................................................ 8

H.R. Rep. No. 90-83 (1967) ................................................................ 8

H.R. Rep. No. 94-1476 (1976) .......................................................... 11

Orphan Works Act, H.R. 5439, 109th Cong. (2006) ............................................. 22

Orphan Works Act, H.R. 5889, 110th Cong. (2008) ............................................. 22

Orphan Works and Mass Digitization, 77 Fed. Reg. 64555 (Oct. 22, 2012) ......... 22

S. Rep. No. 91-1219 (1970) ................................................................................. 11

Shawn Bentley Orphan Works Act, S. 2913, 110th Cong. (2008) ........................ 22

## Other Authorities

ARL, *Code of Best Practices in Fair Use for Academic and Research Libraries* (2012) .......................................................... 6, 17, 18, 19

Patricia Aufderheide and Peter Jaszi, *Reclaiming Fair Use* (2011) ...................... 17

Jonathan Band, *Google and Fair Use*, 3 J. Bus. & Tech. Law (2008) ................... 17

Jonathan Band, *The Impact of Substantial Compliance with Copyright Exceptions on Fair Use*, 59 J. Copyright Soc'y (2012) ................................ 9

Samantha Becker, *et al.*, *Opportunity for All: How the American Public Benefits from Internet Access at U.S. Libraries* (2010) .............................................. 5

Library of Congress, *Copyright and Other Restrictions*, Prosperity and Thrift, http://memory.loc.gov/ammem/coolhtml/ccres.html .................................... 6

Randolph D. Moss, Office of Legal Counsel, *Whether And Under What Circumstances Government Reproduction Of Copyrighted Materials Is A Noninfringing "Fair Use" Under Section 107 Of The Copyright Act Of 1976* (1999) ....................................................................................... 13

Melville Nimmer & David Nimmer, *Nimmer on Copyright* (2011) ..................... 12

William Patry, *Patry on Copyright* (2011) ........................................................... 12

Press Release, Bob Goodlatte, Chairman of the House Judiciary Comm., Chairman Goodlatte Announces Comprehensive Review of Copyright Law (Apr. 24, 2013) ...................................................................................... 23

Mary Rasenberger and Chris Weston*, Overview of the Libraries and Archives Exception in the Copyright Act* (2005) ........................................................ 10

*The Register's Call for Updates to U.S. Copyright Law: Hearing Before the Subcomm. on Courts, Intellectual Prop. and the Internet*, 113th Cong. (2013) .................................................................................................. 23

*The Section 108 Study Group Report* (2008) ......................................................... 12

Smithsonian Institution Libraries, *Proceedings of the National Academy of Sciences of the United States*, Electronic Resources from the Smithsonian Libraries, http://www.sil.si.edu/eresources/silpurl.cfm?purl=10916490 ....... 6

U.S. Copyright Office, *Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document* (2011) ............................................... 24

U.S. Copyright Office, *Report on Copyright and Digital Distance Education* (1999) ........................................................................................... 8

Siva Vaidhyanathan, *A Risky Gamble with Google*, Chron. Higher Educ., Dec. 2, 2005 ................................................................................................ 27

## INTEREST OF AMICI AND INTRODUCTION[1]

The American Library Association ("ALA") is a nonprofit professional organization of more than 60,000 librarians dedicated to providing and improving library services and promoting the public interest in a free and open information society.

The Association of College and Research Libraries, the largest division of the ALA, is a professional association of academic and research librarians.

The Association of Research Libraries ("ARL") is a nonprofit organization of 125 research libraries in North America, including university, public, government and national libraries.

Collectively, these three associations represent over 100,000 libraries in the United States employing over 350,000 librarians and other personnel.

This is an unusual case. By virtue of the conduct of the Appellees, a party not named in this litigation (Google), and the Appellants themselves, a resource of world historic significance has been created. The HathiTrust Digital Library ("HDL") consists of more than 10 million digitized volumes gathered from the collections of many of the nation's leading research libraries. The libraries on their

---

[1] No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than amici, its members, or its counsel contributed money intended to fund preparation or submission of this brief. Several ARL member libraries are partners in HathiTrust. All parties have consented to the filing of this brief.

1

own would never have been able to create a digital library of this scale in such a short time. HDL assures the preservation of this great storehouse of human knowledge, gives scholars powerful new tools for research, and promises print disabled persons equitable access to printed books for the first time.

Perhaps in recognition of HDL's value, Appellants do not seek the typical copyright remedy of destruction. But Appellants' proposed relief—indefinite suspension pending legislation—is no more reasonable.

Fortunately for the public, copyright law has a built-in accommodation for the First Amendment values embodied by this extraordinary repository of knowledge—the fair use right. *See Golan v. Holder*, 132 S. Ct. 873, 890 (2012). Fair use provides the Court with the equitable means to allow the public to benefit from this resource in a manner that respects the law and the interests of authors.

Appellants, however, seek to deprive HDL and libraries generally of the fair use right. They contend that the library exception in 17 U.S.C. § 108 "should guide the fair use analysis"—with a heavy hand: if library activities fall outside Section 108, that fact "should weigh heavily against a finding of fair use." Appellants Br. at 30.

Appellants take this view notwithstanding the plain language of Section 108(f)(4) that nothing in Section 108 "in any way affects the right of fair use as provided by section 17 …." Appellants' interpretation of Section 108

conflicts with the legislative history and the structure of the Copyright Act. Congress included the savings clause in Section 108(f)(4) to preclude Section 108 being applied in precisely the manner that Appellants propose.

Appellants' interpretation of Section 108 would have repercussions far beyond pulling the plug on HDL and its benefits to research and accessibility. It would prevent libraries from performing some of their most basic functions, from film preservation to Internet access. The law does not require this absurd result.

The District Court correctly applied the fair use doctrine to the facts of this case. HDL is consistent with research libraries' best practices. Preservation is a quintessential fair use. The District Court's fair use finding does not usurp Congressional authority, and legislation addressing mass digitization is not imminent. Supreme Court precedent allows fair use to be applied to far larger amounts of copying than is at issue in this case. Additionally, Appellants' litigation choices tilt the equities in favor of fair use.

Finally, the District Court's alternative ruling that 17 U.S.C. § 121 permits HDL should also be affirmed.

## ARGUMENT

## I.  APPELLANTS' READING OF SECTION 108 WOULD OUTLAW WELL-ESTABLISHED LIBRARY PRACTICES.

In the District Court, Appellants argued that the Section 108 library exceptions represented the totality of the exceptions to the reproduction and

3

distribution rights available to libraries. Under Appellants' original position, libraries could not employ the first sale doctrine to circulate books, *see Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1364 (2013); nor Section 117(a) to copy software into their computers' memory; nor Section 109(c) to display book covers and posters in exhibitions; nor Section 110(1) to perform films in classrooms; nor Section 110(2) to perform and display works in distance education; nor Section 121 to make and distribute copies in accessible formats. Further, Appellants argued that Section 108 precluded libraries from asserting the fair use right. The District Court correctly rejected these assertions.

Now Appellants more narrowly argue that HathiTrust "exceeded many of the express limitations of Section 108, and these violations should weigh heavily against a finding of fair use." Appellants Br. at 30.[2] Libraries rely on fair use to engage in a wide range of activities not covered by Section 108. If Appellants' baseless position were correct, libraries across the country would likely infringe copyright millions of times every day.

A.    **Appellants' Understanding of Section 108 Would Prevent Libraries From Providing Internet Access to Users.**

A major library function threatened by Appellants' interpretation of Section 108 is providing Internet access for underserved communities. In 2009,

---

[2] Appellants persist in referring to "violations" of Section 108 or 121. One cannot "violate" an exception.

over 77 million people accessed the Internet from public libraries in the United States. Samantha Becker, *et al*., *Opportunity for All: How the American Public Benefits from Internet Access at U.S. Libraries* 2 (2010). Forty-four percent of people below the poverty line used library computers for Internet access and other services. Among young adults below the poverty line, the level of usage increased to 61%. Forty-two percent of the people who accessed the Internet from public libraries did so for educational purposes, 40% for employment matters, 37% for healthcare, and 34% for government and legal matters. *Id.* at 5-8.

Whenever a user views a website, the browser caches a copy of the website in the computer's memory. Courts have treated this cache copy as a fair use. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169-70 (9th Cir. 2007). Librarians and library users make hundreds of thousands, if not millions, of such copies every day. Because the cache copying by libraries in the course of Internet browsing wildly exceeds that authorized by Section 108, "these violations should weigh heavily against a finding of fair use." Appellants Br. at 30. Appellants' reading similarly would weigh against a librarian or user printing out a page from a website, an obvious fair use for which Section 108 makes no provision.

## B.    Plaintiffs' Reading of Section 108 Precludes Many Other Important Library Activities.

Libraries regularly rely upon fair use to perform a wide range of completely non-controversial practices. Libraries make preservation copies of musical,

pictorial, graphic or sculptural works, and motion pictures—all categories of works not covered by Section 108. *See* 17 U.S.C. § 108(i); ARL, *Code of Best Practices in Fair Use for Academic and Research Libraries* 17-18 (2012) ("*Code*"). Libraries archive websites of significant cultural or historical interest. *Code* at 26. They reproduce selections from collection materials to publicize their activities or to create physical and virtual exhibitions. *Id.* at 15. Academic libraries copy material into institutional digital repositories and make deposited works publicly available. *Id.* at 23. School libraries make multiple copies of appropriate portions of works for classroom use.

The Library of Congress, where the Copyright Office resides, relies heavily on fair use. For numerous collections, the Library of Congress states that it is providing online access to items "under an assertion of fair use" if "despite extensive research, the Library has been unable to identify" the rightsholder. *E.g.*, Library of Congress, *Copyright and Other Restrictions*, Prosperity and Thrift, http://memory.loc.gov/ammem/coolhtml/ccres.html. Similar language appears on the copyright pages of more than a dozen other collections. Under Appellants' interpretation of Section 108, the Library of Congress is a serial copyright infringer.[3]

---

[3] Other federal libraries also rely on fair use. *E.g.*, Smithsonian Institution Libraries, *Proceedings of the National Academy of Sciences of the United States*, Electronic Resources from the Smithsonian Libraries,

## II.   ACTIVITIES OUTSIDE SECTIONS 108 OR 121 CAN STILL QUALIFY FOR A FAIR USE FINDING.

Congress did not intend for the specific limitations in the Copyright Act to constrain the availability of the fair use right. This legislative intent is especially clear with respect to Section 108, where Congress included a specific savings clause. Appellants' interpretation of Section 108 asks this Court to ignore the plain meaning of Section 108, legislative intent, and common sense.

### A.   The Copyright Act's Specific Exceptions Do Not Limit the Applicability of Fair Use.

The Copyright Act's specific exceptions narrowly define which uses of which works may be made by which actors under which circumstances. In contrast, Section 107 lists four general, nonexclusive factors a court must weigh in evaluating whether a particular use is fair. While the specific exceptions provide courts with little discretion, fair use is "an 'equitable rule of reason' which 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (internal citations omitted).

The legislative history of the Copyright Act stresses that a specific exception does not limit the availability of fair use for conduct that does not fall within its

---

http://www.sil.si.edu/eresources/silpurl.cfm?purl=10916490.   ("interlibrary loan requests 'are to be filled in compliance with the U.S. Copyright Act and fair use provisions of the federal Copyright Act.'").

scope. One congressional report noted that "[a] question that came up several times during the hearings was whether the specific exemptions for certain uses … should be in addition to or instead of fair use …. [W]hile some of the exemptions in sections 108 through 116 may overlap the fair use doctrine, they are not intended to supersede it." H.R. Rep. No. 90-83, at 36-37 (1967). The Register of Copyrights, in a report that led to the TEACH Act, stated: "[f]air use could apply as well to instructional transmissions not covered by the changes to section 110(2) recommended above. Thus, for example, the performance of more than a limited portion of a dramatic work in a distance education program might qualify as fair use in appropriate circumstances." U.S. Copyright Office, *Report on Copyright and Digital Distance Education* 162 (1999). The Conference Report that accompanied the enactment of the TEACH Act reiterated that the "continued availability of the fair use doctrine" was critical to the Office's recommendation that Congress pass the Act. H.R. Rep. No. 107-685, at 234 (2002) (Conf. Rep.).

Similarly, judicial opinions addressing the relationship between specific exceptions and fair use state that a defendant's failure to qualify for a specific exception does not prejudice its fair use rights. In *Sega Enters., Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520-21 (9th Cir. 1992), Sega argued that because Accolade's disassembly of Sega's computer program did not fall within the Section 117 exception relating to software, Accolade could not rely upon Section 107. Sega's

position was that Section 117 "constitutes a legislative determination that any copying of a computer program *other* than that authorized by section 117 cannot be considered a fair use of that program under section 107." *Id.* The Ninth Circuit responded that this "argument verges on the frivolous. Each of the exclusive rights created by section 106 of the Copyright Act is expressly made subject to all of the limitations contained in sections 107 through 120." *Id.* at 1521. The court went on to observe that

> sections 107 and 117 serve entirely different functions. Section 117 defines a narrow category of copying that is lawful *per se* .… The fact that Congress has not chosen to provide a *per se* exemption to section 106 for disassembly does not mean that particular instances of disassembly may not constitute fair use.

*Id.* Before the District Court, Appellants attempted to distinguish *Sega* on its facts, but the principle of specific exceptions not restricting fair use applies nonetheless. *See also Encyclopedia Britannica Educ. Corp. v. Crooks*, 447 F. Supp. 243, 249 n.7 (W.D.N.Y. 1978) ("The legislative history … makes clear that the statutory exemptions were intended to supplement rather than supersede the doctrine of fair use."). In short, a defendant's inability to meet the requirements of a specific exception cannot have a negative effect on its assertion of fair use.[4]

---

[4] To the contrary, when a defendant engages in the type of activity permitted by a specific exception, but does not qualify for a technical reason, the court should give weight to the defendant's substantial compliance with the exception when considering the first factor. Jonathan Band, *The Impact of Substantial Compliance with Copyright Exceptions on Fair Use*, 59 J. Copyright Soc'y 453 (2012).

**B.      Section 108(f)(4) Unambiguously Provides that Section 108 Does Not Limit The Applicability of Fair Use to Libraries.**

Section 108(f)(4) makes explicit what is implicit in the Copyright Act's other specific exceptions: that nothing in Section 108 "in any way affects the right of fair use as provided by section 107 …." The legislative history of this savings clause underscores that it means exactly what it says: libraries can rely on fair use to engage in activities whether or not they are explicitly permitted under Section 108. While Section 108 creates a safe harbor where libraries can make settled uses without engaging in a fair use analysis, nothing in Section 108 weighs against libraries making fair uses.

The 1909 Copyright Act did not contain any exceptions for libraries; instead, libraries relied entirely on the federal common law of fair use. When the possibility of a specific exception for libraries was raised during the process that resulted in the 1976 Copyright Act, library representatives expressed concern that the specific exception might limit the availability of fair use to libraries. Mary Rasenberger and Chris Weston, *Overview of the Libraries and Archives Exception in the Copyright Act* 13 (2005) ("Library representatives … asserted that there was 'great danger' in the statutory language, because it would freeze what was allowable at the very moment that technology is advancing.").

Accordingly, when the Senate Subcommittee on Patents, Trademarks, and Copyrights reported out the bill in December 1969 with the basic elements of what

is currently Section 108, it included the language now in Section 108(f)(4). The Subcommittee report's discussion of Section 108 stated: "[t]he rights given to the libraries and archives by this provision of the bill are in addition to those granted under the fair-use doctrine." S. Rep. No. 91-1219, at 6 (1970). Section 108(f)(4) was intended to ensure that Section 108 had no negative impact on fair use.

The House Judiciary Committee Report on the 1976 Act quoted the language of Section 108(f)(4) and then explained that "[n]o provision of section 108 is intended to take away any rights existing under the fair use doctrine." H.R. Rep. No. 94-1476, at 74 (1976). The House Report's discussion of other parts of Section 108 reinforces the point that Section 108(f)(4)'s purpose was to prevent any implication that Section 108 limited fair use. In the context of Section 108(h), the House Report observed:

> Although subsection (h) generally removes musical, graphic, and audiovisual works from the specific exemptions of section 108, it is important to recognize that the doctrine of fair use under section 107 remains fully applicable to the photocopying or other reproduction of such works.

H.R. Rep. No. 94-1476, at 78.

In 2005, the Library of Congress sponsored an independent review of Section 108 by a study group consisting of publishers and librarians. The Study Group observed, "[i]n addition to section 108, libraries and archives rely upon fair use to make copies of copyrighted works for preservation and other purposes." *The*

*Section 108 Study Group Report* 21 (2008). The Study Group stated that "section 108 was not intended to affect fair use. Certain preservation activities fall within the scope of fair use, regardless of whether they would be permitted by section 108." *Id.* at 22.

Copyright scholars agree that Section 108 does not limit the availability of Section 107 to libraries. 4 William Patry, *Patry on Copyright* § 11:3 (2011) ("[I]f for one reason or another, certain copying by a library does not qualify for the section 108 exemption …, the library's photocopying would be evaluated under the same criteria of section 107 as other asserted fair uses. This interpretation not only gives meaning to both sections but is fully in line with the earlier committee reports."); 4-13 Melville Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05 (2011) ("[I]f a given library or archive does not qualify for the Section 108 exemption, or if a qualifying library or archive engages in photocopying practices that exceed the scope of the Section 108 exemption, the defense of fair use may still be available.").

Appellants argue that a plain reading of Section 108(f)(4) reads Section 108 out of the Copyright Act. Appellants Br. at 30. However, it is Appellants who seek to read Section 108(f)(4) out of the statute. They do not offer an alternative interpretation; they simply contend that it does not mean what it clearly says.

12

Contrary to Appellants' assertions, the plain language of Section 108(f)(4) does not read Section 108 out of the statute. Section 108 sets forth certain situations where a library can always make reproductions and distributions without the right holder's authorization. Some of these actions might be fair uses, but Section 108 provides legal certainty that encourages the library to proceed without conducting the more complex fair use analysis.[5] Other actions under Section 108 might be beyond what fair use would allow, yet Congress in its balancing of competing interests decided to permit them. Section 108(f)(4) clarifies that libraries can rely on Section 108 when they meet its detailed criteria and on Section 107 in other circumstances, when they satisfy its more general criteria.

Appellants mischaracterize the Copyright Office's 1983 report on Section 108 as supporting their interpretation. The report actually recognizes that fair use is available to libraries in situations not authorized by Section 108.[6] Read in context,

---

[5] *See also* Randolph D. Moss, Office of Legal Counsel, *Whether And Under What Circumstances Government Reproduction Of Copyrighted Materials Is A Noninfringing "Fair Use" Under Section 107 Of The Copyright Act Of 1976* 14 n.12 (1999). ("[S]ection 108 of the 1976 Act does not narrow the protection for fair use provided by the common law doctrine codified in section 107 …. Section 108 thus fairly can be viewed as a very valuable—and not superfluous—safe harbor: If a certain library practice is noninfringing under the specific and detailed provisions of section 108(a) … a library need not be concerned about how that particular photocopying practice would fare under section 107's more complex and indeterminate fair use standards.")

[6] U.S. Copyright Office, *Library Reproduction of Copyrighted Works (17 U.S.C. 108)* 98 (1983) ("[Section 108(f)(4)] means that the 'tests' implicit in § 107 may be applied to photocopying 'beyond' § 108 …").

13

what the 1983 report suggests is not that the exhaustion of Section 108 rights should weigh against fair use, but rather that the copying done under Section 108 should be considered in the equitable balancing that constitutes a fair use evaluation.[7] This is a far cry from Appellants' proposed rule.

### C.    Section 121 Does Not Limit the Applicability of Fair Use.

Section 121 of the Copyright Act permits 'authorized entities' to make accessible format copies of literary works for people with print disabilities. As discussed below in greater detail, amici library associations agree with the District Court's finding that Section 121 permits HathiTrust's activities on behalf of the print disabled. We also support the District Court's alternative holding that these activities are fair use. While Appellants do not argue that copying in excess of Section 121 weighs against a fair use finding, its amici do. *See* Motion Picture Association of America ("MPAA") Br. at 12 n.4. However, the authorities cited in section II.A., *supra*, make clear that Congress did not intend for the existence of a specific exception to restrict in any way the availability of fair use for an action that falls outside the scope of the specific exception. These authorities apply with equal force to Section 121 as they do Section 108.

---

[7] For example, in assessing the fourth fair use factor, the market effect of a library's use of a particular work, a court should not ignore uses of that work the library already made pursuant to Section 108.

The absence in Section 121 of a savings clause similar to Section 108(f)(4) in no way implies Section 121 has a limiting effect on Section 107. As discussed above, Congress included Section 108(f)(4) to address concerns that were raised by the library community with respect to the Section 108; thus, Section 108(f)(4) does not create a negative implication with respect to any other section. Moreover, Section 108(f)(4) refers not only to the impact of Section 108 on fair use; it also provides that "nothing in this section … in any way affects … any contractual obligation assumed at any time by the library …." If the absence of provisions like Section 108(f)(4) in other exceptions such as Section 121 implies that these exceptions could have a negative impact on fair use, then the absence of similar savings clauses in other exceptions also implies that those exceptions could have an adverse impact on contractual obligations assumed by libraries. Under this logic, courts could interpret the absence of a contractual savings clause in Section 107 as reflecting Congressional intent that Section 107 preempts license terms restricting fair use—a result Appellants and their amici no doubt would oppose.

### D. Appellants' Understanding of the Impact of Specific Exceptions on Fair Use Is Inconsistent With the Privileged Status Congress Has Accorded Libraries In Title 17.

Recognizing the importance of libraries, Congress has accorded them privileged status in Title 17. In addition to Section 108, Congress has provided libraries with other specific shelters against Title 17 liability. Section 109(b)(2)

excludes libraries from the prohibition on software rental. Section 504(c)(2) shields libraries from statutory damages liability where they reasonably (but incorrectly) believed their actions constituted fair use.[8] Section 602(a)(3)(C) provides organizations operated for scholarly, educational, or religious purposes with an exception to the importation right for "library lending or archival purposes." Section 1201(d) of the Digital Millennium Copyright Act ("DMCA") gives libraries the right to circumvent technological protection measures for purposes of determining whether to acquire a copy of the work. Section 1203(c)(5)(B) allows a court to remit statutory damages to libraries in cases of innocent violations of the DMCA. Section 1204(b) excludes libraries from criminal liability for DMCA violations.

Nonetheless, Appellants would as a practical matter deny libraries the benefit of the most significant privilege of all: fair use. The Supreme Court recently described fair use as part of "the traditional contours of copyright protection" and one of copyright law's "built-in First Amendment accommodations." *Golan*, 132 S. Ct. at 890. It is inconceivable that Congress intended to withhold the protection of this crucial right from non-profit libraries

---

[8] The existence of this provision cuts against Appellants' interpretation of the effect of Section 108. If exceeding Section 108 weighed against fair use, a library could rarely have reasonable grounds for believing its use was fair.

16

while allowing it to be employed regularly by highly profitable commercial entities. *See* Jonathan Band, *Google and Fair Use*, 3 J. Bus. & Tech. Law 1 (2008).

## III. THE DISTRICT COURT CORRECTLY FOUND THAT HDL IS A FAIR USE

Appellees in their briefs respond comprehensively to Appellants' arguments concerning fair use. Here we address only a few points pertinent to libraries.

### A.    HDL Embodies Widespread Best Practices for Fair Use

Appellants assert that HathiTrust's activities fall far beyond the bounds of fair use. In fact, HDL's design reflects a widespread fair use consensus among libraries, as embodied in the ARL's *Code of Best Practices in Fair Use for Academic and Research Libraries*.

The development of the Code was prompted by Professor Michael Madison's insight (following a review of numerous fair use decisions) that the courts were

> implicitly or explicitly, asking about habit, custom, and social context of the use, using what Madison termed a 'pattern-oriented' approach to fair use reasoning. If the use was normal in a community, and you could understand how it was different from the original market use, then judges typically decided for fair use.

Patricia Aufderheide and Peter Jaszi, *Reclaiming Fair Use* 71 (2011). Based on this insight, with the goal of making fair use analysis more predictable for librarians, ARL undertook an effort to "document[] the considered views of the library community about best practices in fair use, drawn from the actual practices

17

and experience of the library community itself." *Code* at 3. The resulting code of best practices identified "the library community's current consensus about acceptable practices for the fair use of copyrighted materials…in certain recurrent situations." *Id.*

Many of the activities that are the subject of this litigation are consistent with the Code. For example, the Code affirms that "[i]t is fair use for libraries to develop and facilitate the development of digital databases of collection items to enable nonconsumptive analysis across the collection for both scholarly and reference purposes." *Id.* at 25. The Code explains:

> librarians have always played an important role in conducting and supporting scholarship in disciplines that examine trends and changes across broad swaths of information, *e.g.*, information science, linguistics, bibliography, and history of science.

*Id.* at 24. And that:

> Nonconsumptive uses are highly transformative. Digitizing and indexing works for purposes such as statistical meta-analysis and search creates a powerful new scholarly resource that is not at all a mere substitute for the original work. The analyses facilitated by scanning for nonconsumptive use do not use the works for their original intended purposes; no person ever "reads" the underlying work or works. Instead, this kind of analysis focuses on the underlying facts about a collection of works … rather than the protected expression of any single work.

*Id.* at 25. These are precisely the types of uses HDL enables.

The Code also addresses providing access to materials to students and faculty with disabilities. The Code explains: "[p]rint-disabled academic and

research library patrons require access to readable text in order to function as full members of an academic community …." *Id.* at 21. HDL, of course, does just that.

Finally, the Code addresses preservation, stating that "[i]t is fair use to make digital copies of collection items that are likely to deteriorate, or that exist only in difficult-to-access formats, for purposes of preservation, and to make those copies available as surrogates for fragile or otherwise inaccessible materials." *Id.* at 18. Again, HDL serves that very purpose.

### B.    Preservation Is Fair Use.

With respect to HathiTrust's preservation activities, Appellants state that HathiTrust is digitizing and storing millions of books "that have no legitimate need to be 'preserved.'" Appellants Br. at 36. This statement reveals profound ignorance about the function of libraries and the nature of preservation. One of the primary missions of libraries is to preserve our cultural and intellectual heritage for future generations. Libraries think in terms of centuries, not quarterly royalty statements. Libraries need to ensure that the materials presently in our collections are accessible to current users, that these materials will be available to researchers in the future, and that the libraries can accommodate the growth of their collections so that new material can also be preserved. Balancing these competing interests involves a complex and costly process of deaccession, off-site storage, photocopying, and format shifting employing state of the art technologies. The

19

safest, most effective way to preserve an item is to reproduce it before it has begun to deteriorate.[9] Many HathiTrust members were already digitally preserving the works in their collections before they began working with Google to digitize their collections more rapidly, thereby greatly enhancing their ability to fulfill their preservation mission. Because the overwhelming majority of the works in HDL are out-of-print, and the few that are in-print are not digitally available, there was no alternative avenue for digital preservation.

### C. A Fair Use Finding Does Not Usurp Congressional Authority.

Appellants and their amici repeatedly assert that the copyright issues relating to the mass digitization of books are better left to Congress, and that the District Court usurped Congressional authority by creating a "blanket exception" for mass digitization. *See* Appellants Br. at 3; Association of American Publishers ("AAP") Br. at 4-5. The District Court did nothing of the sort. Judge Baer was presented with a specific case, and he ruled that a discrete set of actions by a particular group of defendants fell within the scope of the fair use right. AAP states that the Supreme Court in *Sony Corp. of America v. Universal City Studios, Inc*., 464 U.S. 417, 431 (1984), noted that it was Congress' responsibility to adapt the copyright laws in response to changes in technology. However, AAP fails to acknowledge

---

[9] At pages 7-8 of their brief, Appellees HathiTrust, *et al*., describe the numerous threats to books in library collections: natural disasters, wars, high acid paper, and heavy use.

20

what the Court stated in the final paragraph of the opinion: "[i]t may well be that Congress will take a fresh look at this new technology," but it was the Court's job to apply the copyright statute "as it now reads." *Sony*, 464 U.S. at 456. That is precisely what the District Court did.

In support of the contention that the District Court overreached, MPAA states that the District Court preempted ongoing discussions concerning mass digitization, MPAA Br. at 3, and AAP asserts that "the legislative process is already well underway for revised exceptions and limitations to copyright that would address the uses at issue in this case." AAP Br. at 6. Contrary to AAP's suggestion, the legislative process for addressing mass digitization, Section 108 reform, and orphan works is not well underway. To be sure, the Copyright Office in October 2011 did "publish an analysis addressing the 'issues raised by the intersection between copyright law and the mass digitization of books,' including the issues raised by the Google Books case and this case," AAP Br. at 8, but it offered no legislative proposals.

Similarly, after three contentious years of deliberations, the Section 108 Study Group convened by the Library of Congress issued a report in 2008 containing several high level recommendations for legislative change, none of which are applicable to the facts of this case. In the five years since, the Copyright

Office has not proposed statutory language nor has any member of Congress introduced a bill implementing the Study Group's recommendations.

The history of orphan works legislation is no more encouraging. In 2006, after stakeholder roundtables, the Copyright Office issued a report on orphan works that included draft legislation. Legislation was introduced in the 109th Congress in 2006 and in the 110th Congress in 2008. Shawn Bentley Orphan Works Act, S. 2913, 110th Cong. (2008); Orphan Works Act, H.R. 5889, 110th Cong. (2008); Orphan Works Act, H.R. 5439, 109th Cong. (2006). The legislation passed the Senate in 2009, but died in the House in the face of furious opposition from visual artists and Appellants' amicus MPAA. Legislation has not been reintroduced in the subsequent three Congresses. In October 2012, the Copyright Office published a notice of inquiry concerning orphan works. Orphan Works and Mass Digitization, 77 Fed. Reg. 64555 (Oct. 22, 2012). In reply comments filed by amici library associations, we observed that the initial comments were "literally all over the map. There is less agreement now than six years ago both on the existence of a problem and the best approach to solve it." Reply Comments of LCA to the Copyright Office 4 (Mar. 5, 2013). Indeed, Appellant Authors Guild stated that the orphan works problem was "vastly overstated," signaling that it would oppose orphan works legislation. Comments of the Authors Guild to the Copyright Office 2 (Feb. 4, 2013).

This March, in a hearing before the House Subcommittee on Courts, Intellectual Property, and the Internet, the Register of Copyrights called for Congress to begin considering "the next great copyright act." *The Register's Call for Updates to U.S. Copyright Law: Hearing Before the Subcomm. on Courts, Intellectual Prop. and the Internet*, 113th Cong. (2013) (statement of Maria Pallante, Register of Copyrights, U.S. Copyright Office). She explained that Congress should approach a long list of issues, including library exceptions, orphan works, and mass digitization, "comprehensively over the next few years." She noted that the Copyright Act of 1976 required over two decades to negotiate, clearly implying that Congress should start its comprehensive review soon because the next revision may also require decades of deliberations. This April, House Judiciary Committee Chairman Bob Goodlatte announced that the Committee would hold a "comprehensive series of hearings on U.S. copyright law" with the goal of determining "whether the laws are still working in the digital age." Press Release, Bob Goodlatte, Chairman of the House Judiciary Comm., Chairman Goodlatte Announces Comprehensive Review of Copyright Law (Apr. 24, 2013).

In short, the legislative process for potentially addressing the issues underlying this litigation is not "well underway." It has barely begun. And given the vociferous opposition to orphan works legislation and the Google Books Settlement, there is no reason to assume that a thorough overhaul of the copyright

laws will conclude successfully, or that it will speak directly to the issues raised by this case.[10]

Fortunately, a "legislative solution" already exists: the fair use right, codified at 17 U.S.C. § 107. The District Court properly used the equitable power granted it by Congress in Section 107 to allow HDL to offer socially valuable services that cause Appellants no economic harm,[11] such as search, non-consumptive research, preservation, and access to full text by the print disabled.

### D.    Fair Use Permits Digitization of Numerous Works

AAP argues that "Appellees' unprecedented uses far exceed anything contemplated by Congress as falling within … fair use and beyond what any single sitting judge can properly authorize." AAP Br. at 15. AAP adds that "Congress never contemplated that … Section 107 … would be used to copy works en masse." *Id.* at 15 n.16. AAP evidently overlooks the Supreme Court's decision in *Sony*, where the Court found viewers' time-shifting of over-the-air broadcasts to be a fair use. Consistent with that decision, every week tens of millions of American households record hundreds of millions of hours of television broadcasts with their

---

[10] Accordingly, the remedy Appellants seek, the impounding of the HDL "pending an appropriate act of Congress," Complaint at 23, is completely implausible.

[11] Appellees discuss the absence of market harm in detail. Here we just note that the Copyright Office's mass digitization report emphasizes the infeasibility of individual licensing arrangements and the ineffectiveness of voluntary collective licensing for a project like HDL. U.S. Copyright Office, *Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document* 30-34 (2011).

24

DVRs. Likewise, under *Perfect 10 v. Amazon*, commercial search engines such as Google and Bing cache billions of web pages on an ongoing basis. Relative to these examples of copying, HDL is a modest undertaking.

### E.    Appellants' Litigation Choices Tilt the Equities In Favor Of HathiTrust

As this Court reviews the District Court's equitable analysis that is at the heart of the fair use calculus, it should be aware that the current situation—where the Court must consider the legality of an existing digital library of over 10 million books—is in large measure the result of litigation choices made by Appellants. This case is born of the Google Books Project, which has been the subject of litigation since 2005. When Appellants sued Google in 2005, they chose not to seek preliminary relief or sue the libraries. When Appellants entered into settlement discussions with Google, they chose not to demand that Google cease scanning books and providing copies of the scans to libraries. During the course of the three years of settlement negotiations with Google, they chose not to insist that Google discontinue scanning. When the Appellants agreed to a settlement with Google in 2008, they once again chose not to insist that Google cease scanning pending approval of the settlement. In short, Appellants' litigation decisions over the past eight years have allowed Google to scan millions of books and to provide copies of those scans to partner libraries.

Moreover, the structure of HDL is the result of the settlement that Appellants agreed to and attempted to convince class members and the presiding judge to accept. Under the original agreements between Google and its partner libraries, Google promised to provide each library with a scan of the books that that library made available to Google for scanning. The settlement, by contrast, allowed for the creation of the much larger Research Corpus ("Corpus"), a set of all the scans made by Google in connection to the Library Project. Amended Settlement Agreement, at 1.132, 7.2(d), *Authors Guild, Inc. v. Google, Inc.*, No. 05-cv-8136-DC (S.D.N.Y. Nov. 13, 2009) ("ASA"). The Corpus could be housed at two host sites selected by the libraries participating in the Library Project. ASA at 7.2(d)(ii). HDL consists primarily of the Corpus contemplated by the settlement. Accordingly, it is completely disingenuous for Appellants to express shock at the "extraordinary and unprecedented" mass digitization project represented by HDL, when it is a product of the settlement they helped design.[12]

Under the settlement, qualified researchers could use the Corpus for "non-consumptive research," computational analysis of the books that does not require the reading of the books' intellectual content. ASA at 1.93. This is precisely one of the major uses of HDL today. But the Corpus played another, more profound role

---

[12] Similarly, Appellants' concerns about the "immense security risks" posed by HDL, Appellants Br. at 40, ring hollow given that HDL implements the same security measures imposed by the settlement on the Corpus. ASA at 8.2.

in the architecture of the settlement. During the extensive public debate over the Library Project, some authors expressed concern that a single corporation would have exclusive control over a vast digital library of all published books. *See, e.g.*, Siva Vaidhyanathan, *A Risky Gamble with Google*, Chron. Higher Educ., Dec. 2, 2005, at B7-10. Essentially, they worried about the privatization of knowledge. The settlement addressed that problem by creating the Corpus as an alternative digital library under the control of the nation's most respected libraries – the very entities that had served as the custodians of the books contained in the digital library. The Corpus represented a fail-safe that would protect the interests of the plaintiffs to the Google litigation – including the Appellants here – and the public at large in the event that Google went out of business or became "evil" by restricting access to or otherwise misusing the contents of the digital library.

Judge Chin rejected the settlement. But that does not mean that this valuable resource that resulted, in significant part, from Appellants' own litigation decisions should be destroyed or "mothballed" until Congress takes action. The District Court correctly exercised its equitable power to find that the existence and use of HDL is a fair use. The public interest and core fair use principles counsel firmly in favor of affirmance.

## IV.    THE DISTRICT COURT CORRECTLY FOUND THAT HDL FALLS WITHIN SECTION 121

Appellants argue that the District Court erred by holding that the University of Michigan was an authorized entity within the meaning of Section 121. As with Section 108(f)(4), Appellants ask this Court to ignore the plain language of the statute. Under Section 121(d)(1), an "'authorized entity' means a nonprofit organization or a governmental agency that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind … persons …." Appellants provide no statutory basis for excluding the University of Michigan or HDL from this definition. Instead, they argue that "it simply cannot be that every library in the country" could fall within the definition of authorized entity. Appellants Br. at 49. But why not? If a particular library serves people with print disabilities, then one of that library's primary missions is to serve that community.[13] That this exception could theoretically be used by thousands of libraries does not argue for a narrower application of the definition. More than ten thousand libraries qualify for Section 108. Every person that owns software can use Section 117. The 300 million Americans that own a lawfully made copy of a copyright protected work can rely on the first sale doctrine.

---

[13] Every state code requires the funding of libraries to provide services to the blind. *See, e.g.*, N.Y. Educ. Law § 273(1)(i) (Consol. 2013).

28

Appellants claim that they "do not seek a remedy that would foreclose the print disabled from gaining access to the digital library," Appellants Br. at 51, but they would foreclose that access under Section 121 and fair use. So how exactly do they propose to provide access?

AAP likewise would deny blind students the benefit of Section 121 or fair use. AAP correctly claims that some publishers have begun to provide textbooks with accessible features. In contrast, HDL enables blind students and faculty to perform research on millions of works of scholarship and literature, the vast majority of which are out-of-print and will never be made available by their publishers in accessible formats. A viable market for accessible versions of the books in HDL is implausible.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court.

Dated:  June 3, 2013                    Respectfully submitted,

/s/ Jonathan Band
Jonathan Band
Jonathan Band PLLC
21 Dupont Circle NW, 8th Floor
Washington, D.C., 20036
202-296-5675
jband@policybandwidth.com

*Counsel for Amici*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 6,953 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the types style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated:  June 3, 2013                    /s/ Jonathan Band
                                        Jonathan Band

## CERTIFICATE OF SERVICE

I hereby certify, that on June 3, 2013, a true and correct copy of the foregoing Brief of Amici Curiae American Library Association, Association of College and Research Libraries, and Association of Research Libraries was timely filed in accordance with FRAP 25(a)(2)(D) and served on all counsel of record via CM/ECF.

I further certify that on June 4, 2013, I will cause six (6) copies of the foregoing Brief of Amici Curiae American Library Association, Association of College and Research Libraries, and Association of Research Libraries to be delivered overnight to the Clerk of the United States Court of Appeals for the Second Circuit.

Dated:  June 3, 2013                    /s/ Jonathan Band
                                        Jonathan Band