# 12-4547

United States Court of Appeals for the Second Circuit

Authors Guild, Inc., Australian Society Of Authors Limited,
Union Des Ecrivaines Et Des Ecrivains Quebecois, Angelo
Loukakis, Roxana Robinson, Andre Roy, James Shapiro,

*(caption continued inside cover)*

Appeal from the United States District Court for the
Southern District of New York (New York City)

**Brief of *Amici Curiae* American Association of People with Disabilities,
American Council of the Blind, American Foundation for the Blind,
Association of Late-Deafened Adults, Judge David L. Bazelon Center for
Mental Health Law, Dr. Peter Blanck, Disability Rights Education &
Defense Fund (DREDF), Disability Rights Legal Center,
Gallaudet University, Hearing Loss Association of America, National
Association of the Deaf (NAD), National Disability Rights Network,
Telecommunications for the Deaf and Hard of Hearing, Inc. (TDI),
United Cerebral Palsy, and Dr. Gregg Vanderheiden**

**in Support of Intervenor Defendants–Appellees
National Federation of the Blind, et al.**

Blake E. Reid
Brian Wolfman

Institute for Public Representation
Georgetown Law

600 New Jersey Avenue NW
Washington, DC 20003

202.661.6582
wolfmanb@law.georgetown.edu

*(caption continued)*

Daniele Simpson, T.J. Stiles, Fay Weldon, Authors League Fund, Inc., Authors' Licensing and Collecting Society, Sveriges Forfattarforbund, Norsk Faglitteraer Forfattero OG Oversetterforening, Writers' Union of Canada, Pat Cummings, Erik Grundstrom, Helge Ronning, Jack R. Salamanca,

Plaintiffs–Appellants,

v.

Hathitrust, Cornell University, Mary Sue Coleman, President, University of Michigan, Mark G. Yudof, President, University of California, Kevin Reilly, President, University of Wisconsin System, Michael McRobbie, President, Indiana University,

Defendants–Appellees,

National Federation of the Blind, Georgina Kleege, Blair Seidlitz, Courtney Wheeler,

Intervenor Defendants–Appellees.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amici* certify that they have no parent corporations and that no corporations own 10% or more of any stock in *amici*.

Respectfully submitted,

/s/Brian Wolfman

June 4, 2013

# TABLE OF CONTENTS

Table of Authorities ........................................................................ iii

Interest of *Amici Curiae* ................................................................ 1

Summary of Argument .................................................................... 2

Argument ........................................................................................ 4

   I.   People with disabilities have long worked toward equal
       access to copyrighted works as a means of societal
       participation. ...................................................................... 4

  II.   The federal government routinely requires the transformation
       of copyrighted works to vindicate the rights of people with
       disabilities. ......................................................................... 7

       A.   The Pratt-Smoot Act and the Department of Health,
           Education, and Welfare ........................................... 7

       B.   Rehabilitation Act of 1973 ....................................... 9

       C.   Individuals with Disabilities Education Act ....................... 12

       D.   Americans with Disabilities Act ............................. 12

       E.   Video programming statutes .................................. 14

 III.   Making a copyrighted work accessible is a non-infringing fair
       use. ..................................................................................... 16

       A.   Making a copyrighted work accessible has an
           undeniably transformative purpose. ..................... 19

       B.   People with disabilities comprise a market historically
           underserved by copyright holders. ....................... 20

       C.   Copyright holders routinely disclaim any cognizable
           interest in making their works accessible. .......................... 25

List of *Amici Curiae* ..................................................................... 29

Certificate of Compliance ............................................................... 32

Certificate of Service ...................................................................... 33

# TABLE OF AUTHORITIES

**Cases**

*Campbell v. Acuff-Rose Music*, 510 U.S. 569 (1994) ............................................. 19

*Greater LA Agency on Deafness v. CNN*, 862 F. Supp. 2d 1021 (N.D. Cal. 2012) ................................................................................................................. 27

*MCA, Inc. v. Wilson*, 677 F.2d 180 (2d Cir. 1981) ............................................. 20

*Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) ............................ 20

*Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ............. 17, 18, 19

*Stewart v. Abend*, 495 U.S. 207 (1990) ................................................................ 18

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8 ............................................................................... 2, 28

**Statutes and Legislative Materials**

17 U.S.C. § 107 ............................................................................................... 17, 18

17 U.S.C. § 121 .................................................................................................... 17

2 U.S.C. § 135a-1 .................................................................................................. 8

20 U.S.C. § 1474(c) ............................................................................................. 12

Air Carrier Access Amendments Act, S. 556, 113th Cong. (2013) ................. 14

Americans with Disabilities Act, Pub. L. No. 101-336, 104 Stat. 327 (1990) (codified as amended at 42 U.S.C. §§ 12101 *et seq.* and scattered sections of the Communications Act of 1934, 47 U.S.C.) ................................................ 13

Captioning and Image Narration to Enhance Movie Accessibility Act ("CINEMA Act"), S. 555, 113th Cong. (2013) ................................................... 14

Education for All Handicapped Children Act, Pub. L. No. 94-142, 89 Stat. 773 (1975) (codified as amended at 20 U.S.C. §§ 1400 *et seq.* as the Individuals with Disabilities Education Act) ................................................. 12

H.R. Rep. 94-1476 (1976) ............................................................................. 17, 18

Pratt-Smoot Act, Pub. L. No. 71-787, ch. 400, 46 Stat. 1487 (1931) (codified as amended at 2 U.S.C. §§ 135a, 135a-1) ............................................................ 8

Pub. L. No. 76-118, ch. 191, 53 Stat. 812 (1939) ............................................... 8

Pub. L. No. 85-905, 72 Stat. 1742 (1958) ........................................................... 9

Rehabilitation Act Amendments of 1986, Pub. L. No. 99-506 § 603(a), 100 Stat. 1807 (codified as amended at Section 508 of the Rehabilitation Act of 1973, 29 U.S.C. § 794d) ...................................................................................... 11

Rehabilitation Act of 1973, Pub. L. No. 93-112 § 504, 87 Stat. 355 (codified as amended at 29 U.S.C. § 794) .......................................................................... 9

Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95-602 § 119, 92 Stat. 2955 (1978) ............ 9

Telecommunications Act of 1996, Pub. L. No. 104-104 § 305, 110 Stat. 56 (codified as amended at Section 713 of the Communications Act of 1934, 47 U.S.C. § 613) ....................................................................................................... 15

Television Decoder Circuitry Act, Pub. L. No. 101-431, 104 Stat. 960 (codified as amended at scattered sections of the Communications Act of 1934, 47 U.S.C.) ........................................................................................................ 15

*The ADA and Entertainment Technologies: Hearing Before the Committee on Health, Education, Labor, and Pensions*, 113th Cong. (2013) ............................ 22

Twenty-First Century Communications and Video Accessibility Act of 2010, Pub. L. No. 111-260 § 202(a)-(b), 124 Stat. 2751 (codified at Section 713 of the Communications Act of 1934, 47 U.S.C. § 613) ............................. 16

## Administrative and Executive Materials

22 C.F.R. § 142.4(e) .................................................................................................. 11
22 C.F.R. § 144.103 .................................................................................................. 11
22 C.F.R. § 144.160(a)(1) .......................................................................................... 11
28 C.F.R. § 35.104(1)-(2) .......................................................................................... 13
28 C.F.R. § 36.303(a)-(b) .......................................................................................... 13
28 C.F.R. § 39.103 .................................................................................................... 11
28 C.F.R. § 39.160(a)(1) ............................................................................................ 11
28 C.F.R. § 42.503(f) ................................................................................................ 11
28 C.F.R. pt. 39 ........................................................................................................ 10
28 C.F.R. pt. 41 ........................................................................................................ 10
29 C.F.R. § 32.4(b)(7)(i)-(ii) ...................................................................................... 11
29 C.F.R. § 33.11(a)(1) .............................................................................................. 11
29 C.F.R. § 33.3 ........................................................................................................ 11
34 C.F.R. § 104.44(d)(1)-(2) ...................................................................................... 10
34 C.F.R. § 300.321 .................................................................................................. 12
34 C.F.R. § 300.324(a)(2)(iii) .................................................................................... 12
36 C.F.R. § 1194.21(d) .............................................................................................. 11
36 C.F.R. § 1194.22(b) .............................................................................................. 11
36 C.F.R. § 1194.24(c) .............................................................................................. 11

iv

36 C.F.R. §§ 1194.21-1194.26 ................................................ 11

45 C.F.R. § 84.52(d) ........................................................... 11

45 C.F.R. § 85.3 ................................................................ 11

45 C.F.R. § 85.51(a)(1) ....................................................... 11

47 C.F.R. § 79.1 ................................................................ 16

47 C.F.R. § 79.3 ................................................................ 16

47 C.F.R. § 79.4 ................................................................ 16

*Amendment of Subpart E, Part 73, of the Commission's Rules and Regulations to Reserve Line 21 of the Vertical Blanking Interval of the Television Broadcast Signal for Captioning for the Deaf*, FCC Docket No. 20693, 63 F.C.C.2d 378 (1976) ............................................................................ 15

*Closed Captioning of Internet Protocol-Delivered Video Programming*, Notice of Proposed Rulemaking, FCC Docket No. 11-154, 26 FCC Rcd. 13,734 (2011) .. 24

*Comments of the Motion Picture Association of America, Closed Captioning and Video Description*, FCC Docket No. 95-176 (Mar. 15, 1996) ..................... 25

*Comments of the Motion Picture Association of America, Closed Captioning and Video Description*, FCC Docket No. 95-176, (Feb. 28, 1997) ..................... 26

*Comments of the Motion Picture Association of America, Closed Captioning of Internet Protocol-Delivered Video Programming*, FCC Docket No. 11-154 (Oct. 18, 2011) ................................................................. 26

*Comments of the National Association of Broadcasters, Video Description*, FCC Docket No. 11-43 (Apr. 28, 2011) ...................................... 27

Department of Justice, *Information and Technical Assistance on the Americans with Disabilities Act, Proposed Regulations* ....................... 14

Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980) ........... 10

*Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 75 Fed. Reg. 43,825, 43,838-39 (July 27, 2010) ............................................................................. 23

*Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 77 Fed. Reg. 65,260, 65,262-63 (Oct. 26, 2012) (codified at 37 C.F.R. § 201.40(b)(1)) .......................... 23

*Implementation of Section 504*, 42 Fed. Reg. 22,676 (May 4, 1977) ........ 10

*Implementation of Video Description of Video Programming*, 15 FCC Rcd. 15,230 (2000) ............................................................. 24

*Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations*, 75 Fed. Reg. 43,460 (July 26, 2010) ....................... 13

*Nondiscrimination on the Basis of Disability; Movie Captioning and Video Description*, 75 Fed. Reg. 43,467 (July 26, 2010) ................................................ 14

*Petition of the Entertainment Software Association, Advanced Communication Provisions of the CVAA*, FCC Docket. No. 10-213 (Mar. 22, 2012) ................. 27

*The Use of Telecasts to Inform and Alert Viewers with Impaired Hearing*, 26 F.C.C.2d 917 (1970) ................................................................................... 14

## Other Materials

American Council of the Blind, *The Audio Description Project: DVDs and Blu-ray Discs.* ..................................................................................................... 24

American Foundation for the Blind, *Helen Keller Biography* ........................... 4

Frances A. Koestler, *The Unseen Minority: A Social History of Blindness in the United States* (2004) ................................................................................. 6

Harry G. Lang & Bonnie Meath-Lang, *Deaf Persons in the Arts and Sciences: A Biographical Dictionary* (1995) ................................................. 6

Helen Keller & Annie Sullivan, *The Story of My Life* (1924 ed.) ..................... 4

Helen Keller, Speech Honoring Louis Braille at the Sorbonne, Paris (June 21, 1952). ..................................................................................................... 5

Joanne Karger, *Timeline and Overview of "An Act to provide books for the adult blind" (or "Pratt-Smoot Act")* (June 12, 2012) ............................................ 8

Karen Peltz Strauss, *A New Civil Right: Telecommunications Equality for Deaf and Hard of Hearing Americans* (2006) .................................................... 7, 23

Robert McG. Thomas Jr., *Gregory T. Frazier, 58; Helped Blind See Movies with Their Ears*, NY Times, July 17, 1996 ......................................................... 7

The AbleGamers Foundation and 7-128 Software, *Gaming on a Collision Course: Averting Significant Revenue Loss By Making Games Accessible to Older Americans* (2010) ................................................................................ 24

United States Library of Congress, *NLS: That All May Read* ........................... 8

United States Library of Congress, *The History of the Edison Cylinder Phonograph.* ............................................................................................... 5

Wendy Chisholm & Matt May, *Universal Design for Web Applications* (2009) ............................................................................................................ 24

World Blind Union, *WIPO Negotations: Treaty for Blind People* (Apr. 20, 2013) ........................................................................................................... 22

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are organizations and individuals concerned with equal access to knowledge and information for the more than fifty million Americans with sensory, print, and intellectual disabilities. *Amici* seek to vindicate the civil rights of people with disabilities to access on equal terms the cultural, educational, and economic opportunities afforded by modern copyrighted works, including books, movies, television programming, software, educational materials, video games, and web content. *Amici* advocate for strong disability rights protections that require places of public accommodation, governmental institutions, and other entities that create and distribute copyrighted works to make them accessible, particularly where copyright holders do not do so. These policies promote

a) The transformation of textual works to accessible formats, such as Braille, large-print, and audio versions of books;

b) The addition of transformative accessible features such as closed captions and audio descriptions to audiovisual works; and

c) Other transformations of works that facilitate access by people with sensory, print, or intellectual disabilities.

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part. No party, counsel to any party, or any person other than *amici curiae* contributed money to fund preparation or submission of this brief. A full list and brief descriptions of the *amici* are included in the addendum. Counsel thank Georgetown Law student Ashley Nash for her help in preparing this brief.

## SUMMARY OF ARGUMENT

*Amici* urge this Court to affirm the district court's order granting the motions for summary judgment by defendant–appellees Hathitrust, *et al.* (the "HathiTrust Digital Library" or "HDL") and intervenor defendant–appellees National Federation of the Blind, *et al.* ("NFB") and denying the motions for summary judgment by plaintiff–appellants The Authors Guild, Inc., *et al.* (the "Guild"). In particular, we urge the Court to affirm the district court's conclusion that the HDL's digitization of library books to facilitate equal access for people with print disabilities is consistent with federal disability rights protections and constitutes a non-infringing fair use. *See* Op. & Order at 14-23.

For more than a century, Americans with disabilities have sought to break down societal barriers and eliminate discrimination by achieving equal access to copyrighted works. Congress has long supported the efforts of the disability community by enacting legislation to require places of public accommodation, governmental entities, and even copyright holders and their licensees to transform copyrighted works so that they are accessible to people with disabilities. Good-faith efforts to make copyrighted works accessible to people with disabilities are consistent with the letter and the spirit of federal accessibility law and further the goal of affording *all* Americans access to the fruits of the progress of science expressed in the Progress Clause of the Constitution. *See* U.S. Const. art. I, § 8, cl. 8.

Accordingly, this Court should conclude that making a copyrighted work accessible constitutes a non-infringing fair use—a proposition supported by a straightforward application of statutory fair use factors. In particular, making a copyrighted work accessible involves modifying or adding to the work so that a person with a disability who could not otherwise perceive the work can do so—a literally transformative use with an undeniable public benefit.

Moreover, federal accessibility initiatives are undertaken almost exclusively in response to the decision of copyright holders not to make their works accessible on a voluntary basis. The government's repeated recognition of this market failure is often confirmed by copyright holders themselves, who publicly disclaim an interest in adding accessibility features to their works on the ground that doing so is too expensive or too time consuming.

The transformative use of copyrighted works to serve a historically neglected market in which copyright holders have no interest is at the core of fair use. Upholding the district court's determination that HDL's digitization constitutes non-infringing fair use will ensure that accessibility efforts can proceed in harmony with federal disability rights statutes, copyright law, and the goals of the Progress Clause.

## ARGUMENT

I.  **People with disabilities have long worked toward equal access to copyrighted works as a means of societal participation.**

American history is replete with examples of efforts by people with disabilities to achieve equal access to the economic, social, and cultural benefits of copyrighted works—including luminaries of the disability community, themselves content creators, copyright holders, and inventors. For example, more than a century ago, the noted deaf-blind author, activist, and lecturer Helen Keller wrote about the profound importance of access to books to people who are blind or visually impaired:

> In a word, literature is my Utopia. Here I am not disenfranchised. No barrier of the senses shuts me out from the sweet, gracious discourse of my book-friends. They talk to me without embarrassment or awkwardness.

Helen Keller & Annie Sullivan, *The Story of My Life* 117-18 (1924 ed.).[2]

The advocacy of Keller and others led to the widespread adoption of Braille, which transforms written text into raised dots readable by people who are blind or visually impaired.[3] In 1952, Keller spoke of the critical role that access to Braille versions of books and other written works had played

---

[2] The Story of My Life is freely available online, courtesy of the libraries of the University of Michigan, at http://books.google.com/ books?id=qDAmAAAAMAAJ (last visited June 3, 2013).

[3] *See generally* American Foundation for the Blind, *Helen Keller Biography*, http://www.afb.org/section.aspx?FolderID=1&SectionID=1&TopicID=129 &DocumentID=1351 (last visited June 3, 2013).

in affording people with disabilities access to the societal benefits of the
copyright system:

> [T]hese raised letters are, under our fingers, precious
> seeds from which has grown our intellectual harvest.
> Without the [B]raille dot system, how incomplete and
> chaotic our education would be! The dismal doors of
> frustration would shut us out from the untold treasures
> of literature, philosophy and science. But, like a magic
> wand, the six dots of Louis Braille have resulted in
> schools where embossed books, like vessels, can
> transport us to ports of education, libraries and all the
> means of expression that assure our independence.

Helen Keller, Speech Honoring Louis Braille at the Sorbonne, Paris (June
21, 1952).[4]

Efforts to adopt Braille ran in parallel with the development of other
transformative accessibility technologies for books. For example, Thomas
Edison suggested in 1878 that the newly developed phonograph player
would lead to the use of "[p]honographic books, which will speak to blind
people." United States Library of Congress, *The History of the Edison
Cylinder Phonograph*.[5] Blind inventor Robert Irwin helped adapt the
phonograph to operate at slower speeds and offer longer play times.
Frances A. Koestler, *The Unseen Minority: A Social History of Blindness in the*

---

[4] *Available at* http://www.afb.org/section.aspx?SectionID=86&
DocumentID=4620 (last visited June 3, 2013).

[5] *Available at* http://memory.loc.gov/ammem/edhtml/edcyldr.html (last
visited June 3, 2013)

*United States* (2004).[6] The efforts of Irwin and others led to the adoption of accessible "Talking Book" recordings of printed books and magazines in the 1930s and later gave rise to the long-play record. *Id.* The Talking Book also foreshadowed the rise of the audiobook and modern text-to-speech and screen reader technologies, which now facilitate access to textual works for people with visual, print, and intellectual disabilities.

The need for access to copyrighted audiovisual works has also been a long-standing priority for people with disabilities. When "talkies" hit American theaters in the late 1920s, deaf and hard of hearing people who had previously enjoyed subtitled silent movies lost one of their primary sources of entertainment and information. Harry G. Lang & Bonnie Meath-Lang, *Deaf Persons in the Arts and Sciences: A Biographical Dictionary* 302-303 (1995). However, the arrival of the talkies led the deaf Hollywood actor Emerson Romero, cousin of Hollywood star Cesar Romero, to splice subtitles into the frames of feature films, documentaries, and short subjects for use by schools and clubs for deaf and hard of hearing people. *Id.*

The efforts of Romero and others gave rise to the modern captioning movement, which has resulted in the captioning or subtitling of a significant proportion of television and Internet-delivered video programming and motion pictures. *See generally* Karen Peltz Strauss, *A New*

---

[6] *Available at* http://www.afb.org/unseen/book.asp?ch=Koe-10 (last visited June 3, 2013).

*Civil Right: Telecommunications Equality for Deaf and Hard of Hearing Americans* 205-273 (2006). Romero's work foreshadowed the efforts of Gregory T. Frazier, a publisher and writer who conceived the idea of narrating visual elements of video programming during natural pauses in dialogue to facilitate access to movies for blind and visually impaired people, a process that became known as "audio description" or "video description." *See* Robert McG. Thomas Jr., *Gregory T. Frazier, 58; Helped Blind See Movies with Their Ears*, NY Times, July 17, 1996.[7]

## II.    The federal government routinely requires the transformation of copyrighted works to vindicate the rights of people with disabilities.

The federal government has undertaken increasingly comprehensive efforts over the past century to ensure that people with disabilities have equal access to society. Congress and federal agencies have repeatedly emphasized the right of people with disabilities to access knowledge and information—including copyrighted works—on equal terms and routinely require governmental and private entities to transform copyrighted works to accessible formats and include accessibility features.

### A.    The Pratt-Smoot Act and the Department of Health, Education, and Welfare

One of the federal government's early efforts toward accessibility took place in 1897, when Librarian of Congress John Russell Young established a

---

[7] *Available at* http://www.nytimes.com/1996/07/17/us/gregory-t-frazier-58-helped-blind-see-movies-with-their-ears.html (last visited May 28, 2013).

reading room for people who are blind or visually impaired, including 500 Braille books and music items. United States Library of Congress, *NLS: That All May Read*.[8] In 1931, Congress formalized and expanded Young's efforts by enacting the Pratt-Smoot Act, which ordered the Librarian to "provide books for the use of the adult blind residents of the United States" and arrange for "libraries . . . to serve as local or regional centers for the circulation of such books." Pub. L. No. 71-787, ch. 400, 46 Stat. 1487 (1931) (codified as amended at 2 U.S.C. §§ 135a, 135a-1).[9]

In 1958, Congress expanded its accessibility efforts to films by requiring the Department of Health, Education, and Welfare ("HEW") to "establish a loan service of captioned films" for people who are deaf or

---

[8] *Available at* http://www.loc.gov/nls/about_history.html (last visited June 3, 2013).

[9] *See generally* Joanne Karger, *Timeline and Overview of "An Act to provide books for the adult blind" (or "Pratt-Smoot Act")* (June 12, 2012), http://aim.cast.org/learn/policy/federal/pratt-smoot_timeline (providing a detailed account of the lengthy subsequent history of the Pratt-Smoot Act). Congress's 1939 amendment to the Pratt-Smoot Act, Pub. L. No. 76-118, ch. 191, 53 Stat. 812, instructed the Library of Congress to contract with non-profit entities to create accessible adaptations of works in an attempt to avoid assertions of copyright infringement by book publishers. *See Karger, supra*, at heading "CS 1939: Amendment Granting Preference to Nonprofit Organizations 'Primarily Concerned with the Blind' to Serve as Producers of Books in Raised Characters and Talking Books." Subsequent amendments also ordered the Librarian of Congress to maintain an accessible library of "musical scores, instructional texts, and other specialized materials." *See* 2 U.S.C. § 135a-1.

hard of hearing. Pub. L. No. 85-905, 72 Stat. 1742.[10] By making available captioned films, Congress sought "to bring to deaf persons understanding and appreciation of those films which play such an important part in the general and cultural advancement of hearing persons," "to provide . . . enriched educational and cultural experiences . . . ," and "to provide a wholesome and rewarding experience which deaf persons may share together." *Id.*[11]

### B.    Rehabilitation Act of 1973

Congress later required all governmental entities, educational institutions, and private organizations receiving federal funding to make their programs and activities accessible to people with disabilities under Section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112 § 504, 87 Stat. 355 (codified as amended at 29 U.S.C. § 794) ("Rehabilitation Act").[12] Various implementing regulations contemplate that entities receiving federal funding will make copyrighted works accessible through

---

[10] HEW's responsibilities are now divided between the Department of Education and the Department of Health and Human Services.

[11] Although the law contemplated that HEW could "[a]cquire films (or rights thereto) by purchase, lease, or gift," it also permitted HEW to "make use . . . of films" deposited with the Library of Congress pursuant to the registration requirements of the 1909 Copyright Act. Pub. L. No. 85-905 § 3(b)(1), (4).

[12] Section 504 was amended in 1978 to require executive agencies to make their own programs and activities accessible. Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95-602 § 119, 92 Stat. 2955.

9

transformative means.[13] For example, the Department of Education's regulations require federally funded post-secondary educational institutions to provide "taped texts, interpreters or other effective methods of making orally delivered materials available to students with hearing impairments, [and] readers in libraries for students with visual impairments." 34 C.F.R. § 104.44(d)(1)-(2). The Department of Health and Human Services ("HHS"), the Department of Labor ("DOL"), the Department of State ("DOS"), the Department of Justice ("DOJ"), and other agencies also require federally funded entities and the agencies' own programs and services to

    a) Facilitate access to visual material for people who are blind or visually impaired by providing "auxiliary aids" such as Braille and audio versions of material and readers; and

---

[13] The first Section 504 regulations were promulgated by HEW. *See Implementation of Section 504*, 42 Fed. Reg. 22,676 (May 4, 1977). Oversight responsibility now rests with the Department of Justice ("DOJ"). *See* Exec. Order No. 12,250, 45 Fed. Reg. 72,995, at 1-201(c) (Nov. 2, 1980). All executive agencies must promulgate Section 504 regulations for their own grantees ("federally assisted" regulations) and their own operations ("federally conducted" regulations), which must be consistent with DOJ's coordinating regulations—28 C.F.R. pt. 41 and 28 C.F.R. pt. 39, respectively.

b) Facilitate access to audio recordings and aural material for people who are deaf or hard of hearing by providing aids such as written versions of material, interpreters, and note takers.[14]

In Section 508 of the Rehabilitation Act, Congress required that all federally procured, maintained, or used electronic and information technology be accessible. Rehabilitation Act Amendments of 1986, Pub. L. No. 99-506 § 603(a), 100 Stat. 1807 (codified as amended at Section 508 of the Rehabilitation Act of 1973, 29 U.S.C. § 794d). The United States Access Board's regulations under Section 508 now require the federal government to ensure that the copyrighted software applications, operating systems, web-based intranet and Internet information and applications, and video and multimedia products it uses are accessible. *See generally* 29 U.S.C. § 794d(a)(2); 36 C.F.R. §§ 1194.21-1194.26. For example, the regulations require the provision of text equivalents for non-text elements of applications, 36 C.F.R. § 1194.21(d), the creation of synchronized alternatives to multimedia presentations, 36 C.F.R. § 1194.22(b), and captioning and audio description for training and informational videos, 36 C.F.R. § 1194.24(c).

---

[14] *See, e.g.*, 45 C.F.R. §§ 84.52(d), 85.3, 85.51(a)(1) (HHS); 29 C.F.R. §§ 32.4(b)(7)(i)-(ii), 33.3, 33.11(a)(1) (DOL); 22 C.F.R. §§ 142.4(e), 144.103, 144.160(a)(1) (DOS); 28 C.F.R. §§ 39.103, 39.160(a)(1), 42.503(f) (DOJ).

**C.    Individuals with Disabilities Education Act**

In 1975, Congress passed requirements for access to copyrighted educational materials in what later became known as the Individuals with Disabilities Education Act ("IDEA"), enacted to ensure that children with disabilities are afforded a free, individualized public education. *See generally* Education for All Handicapped Children Act, Pub. L. No. 94-142, 89 Stat. 773 (codified as amended at 20 U.S.C. §§ 1400 *et seq.*) IDEA requires the Secretary of Education to support the provision and distribution of captions and audio description of television programs, videos, and "other materials, including programs and materials associated with new and emerging technologies, such as CDs, DVDs, video streaming, and other forms of multimedia" where the producers and distributors of the materials do not already provide captions or description. 20 U.S.C. § 1474(c). Department of Education regulations under IDEA also require parents, teachers, and school representatives responsible for implementing the education program for a child who is blind or visually impaired to provide for Braille instruction, including Braille versions of reading and writing media. *See* 34 C.F.R. §§ 300.321, 300.324(a)(2)(iii).

**D.    Americans with Disabilities Act**

In 1990, Congress enacted the landmark Americans with Disabilities Act, broadly prohibiting discrimination against people with disabilities including by mandating access to a wide variety of materials distributed by governmental and private entities. Pub. L. No. 101-336, 104 Stat. 327

12

(codified as amended at 42 U.S.C. §§ 12101 *et seq.* and scattered sections of the Communications Act of 1934, 47 U.S.C.) ("ADA"). DOJ's implementing regulations contemplate the accessible transformation of copyrighted works through "auxiliary aids and services," which include interpreters and readers, note takers, written versions of materials, taped, audible, large print, and Braille versions of materials, captioning, and "other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing" and "visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. §§ 35.104(1)-(2), 36.303(a)-(b).

DOJ and Congress have continued to build on the ADA's foundation by proposing additional regulations and legislation to facilitate equal access to copyrighted works for people with disabilities. In 2010, DOJ proposed ADA regulations that would require captions and audio description for copyrighted motion pictures shown in movie theaters and accessible transformations of copyrighted web information and services. *Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations*, 75 Fed. Reg. 43,460 (July 26, 2010); *Nondiscrimination on the Basis of Disability; Movie Captioning and Video Description*, 75 Fed. Reg. 43,467 (July

26, 2010).[15] In 2013, Senator Tom Harkin followed suit by introducing complementary bills that would require captions and audio description for copyrighted motion pictures shown in theaters and captioning for in-flight entertainment, including copyrighted motion pictures and television programming shown on airplanes. Captioning and Image Narration to Enhance Movie Accessibility Act ("CINEMA Act"), S. 555, 113th Cong. (2013); Air Carrier Access Amendments Act, S. 556, 113th Cong. (2013).

### E.    Video programming statutes

Finally, the federal government has undertaken substantial efforts to ensure that copyrighted broadcast, satellite, cable, and Internet-delivered video programming is accessible to people with disabilities through the provision of closed captions and audio description. In 1970, the Federal Communications Commission ("FCC") encouraged broadcasters to begin including visual material along with news, information, and entertainment telecasts to facilitate access for deaf and hard of hearing viewers. *See generally The Use of Telecasts to Inform and Alert Viewers with Impaired Hearing*, 26 F.C.C.2d 917. In 1976, the FCC amended its rules to permit television broadcasters to begin distributing closed captions with programming. *Amendment of Subpart E, Part 73, of the Commission's Rules*

---

[15] DOJ solicited and received comments, and the regulations remain pending. *See also* Department of Justice, *Information and Technical Assistance on the Americans with Disabilities Act, Proposed Regulations*, http://www.ada.gov/newproposed_regs.htm (last visited June 3, 2013).

*and Regulations to Reserve Line 21 of the Vertical Blanking Interval of the
Television Broadcast Signal for Captioning for the Deaf*, FCC Docket No. 20693,
63 F.C.C.2d 378, 389, ¶ 28.

In 1990, Congress enacted the Television Decoder Circuitry Act, Pub.
L. No. 101-431, 104 Stat. 960 (codified as amended at scattered sections of
the Communications Act of 1934, 47 U.S.C.) ("TDCA"), requiring television
manufacturers to include built-in decoder circuitry to display closed
captions distributed with broadcast and cable programming. In the TDCA,
Congress declared that "to the fullest extent made possible by technology,
deaf and hearing-impaired people should have equal access to the
television medium," that "closed-captioned television transmissions have
made it possible for thousands of deaf and hearing-impaired people to gain
access to the television medium, thus significantly improving the quality of
their lives," and that "closed-captioned television will provide access to
information, entertainment, and a greater understanding of our Nation and
the world to . . . people in the United States who are deaf or hearing-
impaired." TDCA § 2(1)-(3).

Following the TDCA, Congress required closed captioning of
copyrighted video programming in the Telecommunications Act of 1996,
Pub. L. No. 104-104 § 305, 110 Stat. 56 (codified as amended at Section 713
of the Communications Act of 1934, 47 U.S.C. § 613). The FCC's
implementing regulations require video programming distributors, such as

15

broadcasters and cable and satellite companies, to provide the programming they deliver with closed captions. 47 C.F.R. § 79.1.

Most recently, Congress enacted the Twenty-First Century Communications and Video Accessibility Act of 2010, Pub. L. No. 111-260 § 202(a)-(b), 124 Stat. 2751 (codified at Section 713 of the Communications Act of 1934, 47 U.S.C. § 613) ("CVAA"), which required the FCC to expand the accessibility of copyrighted video programming beyond the requirements of its existing regulations. The FCC's implementing regulations now require copyright holders and video distributors to provide certain Internet Protocol ("IP")-delivered programming with closed captions, 47 C.F.R. § 79.4, and video distributors to add audio descriptions to some broadcast and cable programming, 47 C.F.R. § 79.3.

## III.  Making a copyrighted work accessible is a non-infringing fair use.

In championing equal access for people with disabilities for more than a century, Congress has repeatedly required various entities, including government agencies, to transform copyrighted works so that they are accessible. *See* discussion *supra*, Part II. Against this backdrop, it would be unreasonable to conclude, as the Guild suggests, that Congress intended to meet the transformative efforts required to comply with federal accessibility law with punishment under copyright law. *See* Guild Br. at 50-51; *see also* Br. of Association of American Publishers at 20-21 ("AAP Br.") (same).  Fortunately, Congress has harmonized copyright and accessibility

16

law by recognizing that making copyrighted works accessible for people with disabilities is a non-infringing fair use. *See* 17 U.S.C. § 107.[16]

The Supreme Court explained in *Sony Corp. v. Universal City Studios, Inc.* that "[m]aking a copy of a copyrighted work for the convenience of a blind person is expressly identified by the House Committee Report [on the Copyright Act] as an example of fair use." 464 U.S. 417, 455 n.40 (1984). Indeed, the House Committee Report noted that a "special instance illustrating the application of the fair use doctrine pertains to the making of copies or phonorecords of works in the special forms needed for the use of blind persons." H.R. Rep. 94-1476, at 73 (1976). *Amici* agree with HDL and NFB that the House Committee Report—and its recognition by the Supreme Court in *Sony*—indicates that the efforts undertaken by HDL to make books accessible to people with disabilities are non-infringing. HDL Br. at 31; NFB Br. at 36. Moreover, the principles underpinning the House Committee Report are equally applicable to other efforts to make a copyrighted work accessible, consistent with the goals of federal disability rights law. *See* discussion *supra*, Part II.

---

[16] As the HDL and NFB explain, Congress also enacted Section 121 of the Copyright Act, 17 U.S.C. § 121, to clarify that efforts to make books accessible to patrons with disabilities are non-infringing. HDL Br. at 48-50; NFB Br. at 25-34; *see also* Br. of Disability Law Professors at Part II (explaining the courts' obligation to harmonize accessibility laws with laws of general applicability, including copyright law).

*Sony* and the House Committee Report articulated two key principles that reinforce the general fairness of accessibility efforts. First, *Sony* indicated that transforming a copyrighted work for the "convenience" of a person with a disability requires nothing more than a "purpose to entertain or to inform" to render the transformation fair. *See* 464 U.S. at 455 n.40. Second, the House Committee Report indicated that accessible transformations are fair because accessible versions of works, "such as copies in Braille and phonorecords of oral readings (talking books), are not usually made by . . . publishers for commercial distribution." H.R. Rep. 94-1476, at 73.[17]

The principles articulated in *Sony* and the House Committee Report map cleanly onto the Copyright Act's fair-use provision, Section 107, under which the fairness of a use hinges primarily on two factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; . . . [and]

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*See* 17 U.S.C. § 107.[18]

---

[17] *See also* discussion *infra*, Part III.B (discussing the failure of the market to serve people with disabilities).

[18] The second fair-use factor—the nature of the copyrighted work—generally depends on whether a copyrighted work is factual or creative. *Stewart v. Abend*, 495 U.S. 207, 237 (1990). We agree with NFB that the second factor weighs in favor of fair use in this case because the majority of works in university libraries are more factual than creative. NFB Br. at 50-*(continued . . .)*

As *Sony* and the House Committee Report make clear, efforts to make copyrighted works accessible generally weigh both factors in favor of fair use.

### A.   Making a copyrighted work accessible has an undeniably transformative purpose.

*Sony* indicates that the first factor—the purpose and character of the use—weighs in favor of fair use where a copyrighted work is being transformed for the purpose of facilitating access for a person with a disability. *See* 464 U.S. at 455 n.40. Indeed, the first factor will weigh in favor of fair use where a use "adds something new, with a further purpose or different character," and is therefore "transformative." *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994) (citations omitted). It is difficult to imagine a use more "transformative" than adapting a copyrighted work, partially or fully imperceptible in its original form to a person as a result of a sensory, print, or intellectual disability, to a form that permits the person to perceive and enjoy the creativity and expression embodied in the work.

---

51. In general, however, accessibility efforts may transform both factual and creative works without regard to their nature, meaning that the second factor is unlikely to prove dispositive.

Moreover, although adapting a book to an accessible format requires the use of the entire book, an accessible adaptation of an audiovisual work generally requires only the use of one component of the work, such as the use of a video's audible elements for the creation of closed captions or the use of a video's visual elements for the creation of audio description, often weighing the third factor—the amount and substantiality of the portion used in relation to the copyrighted work as a whole—in favor of fairness.

Moreover, courts should "consider the public benefit resulting from a particular use" when determining whether the use is transformative. *Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992); *see also MCA, Inc. v. Wilson*, 677 F.2d 180, 182-83 (2d Cir. 1981). The extent of the public benefit that accrues from ensuring that people with disabilities can access the vast array of copyrighted works on equal terms is so substantial that Congress has explicitly and consistently recognized it in scores of sweeping legislative initiatives for more than a century. *See* discussion, *supra*, Part II. In fact, the public benefit of ensuring the accessibility of copyrighted works is so obvious that even the Guild concedes in this case that it "do[es] not object to the use of the [HDL] by the blind." Guild Br. at 12.

## B.   People with disabilities comprise a market historically underserved by copyright holders.

As the district court correctly explained, "[a] copyright holder cannot preempt a transformative market." Op. & Order at 20 (citing *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2009)). Because affording people with disabilities equal access to a copyrighted work is transformative, in-depth consideration of the fourth fair-use factor—the effect of the use on the potential market for or value of the copyrighted work—is unnecessary. *See id*; NFB Br. at 52-53. Nevertheless, consideration of the impact of accessibility efforts on the market for copyrighted works reinforces the fairness of those efforts.

Historically, copyright holders have expressed little more than hypothetical interest in fully serving the market of people with disabilities, and equal access to collections of copyrighted works for people with disabilities has rarely materialized absent specific government action to compel or enable it. Here, *amici* agree with NFB that the market for a digital database of library collections accessible to blind students neither currently exists nor is likely to exist in the future. NFB Br. at 53-54.

More broadly, the failure of the market to generate accessible versions of library collections of copyrighted books is just one representative example of a systemic pattern of market failures that have denied people with disabilities equal access to copyrighted works. In particular, this pattern shows that the market often fails to provide either accessible substitutes for copyrighted works, such as Braille books, or supplemental accessibility features such as closed captions and audio descriptions. Despite the well-known goal of millions of Americans with disabilities to access copyrighted works on equal terms, copyright holders have often chosen not to serve the market for accessible formats or accessible features, leaving the federal government with no choice but to facilitate accessibility through legislation. A senior FCC official recently explained this pattern before the U.S. Senate:

> Although the number of people with disabilities in the United States is said to hover around 50 million, each individual disability group—*i.e.*, individuals who are deaf, blind, mobility disabled, etc.—typically has not

been large or strong enough to exert the market
pressures needed to incentivize industry to include
accessibility features in their products and services. . . .
Often, when market forces have failed in the past, the
government has stepped in with regulatory measures to
ensure that people with disabilities have the access that
they need.

*The ADA and Entertainment Technologies: Hearing Before the Committee on*

*Health, Education, Labor, and Pensions*, 113th Cong. (2013) (statement of

Karen Peltz Strauss, Deputy Bureau Chief, FCC).[19]

The failure of the market to facilitate equal access for people with

disabilities has long proved to be the rule rather than the exception. For

example:

- Only 7% of published books are ever made available in accessible

  formats in the world's wealthiest countries (with fewer than 1%

  made accessible in the poorest countries), leading to a worldwide

  "book famine" for people with visual and print disabilities. World

  Blind Union, *WIPO Negotiations: Treaty for Blind People* (Apr. 20,

  2013).[20]

- As the Librarian of Congress has recognized, most ebooks are

  encumbered with technological protection measures ("TPMs") that

  prevent people with visual and print disabilities from using read-

---

[19] *Available at* http://www.help.senate.gov/imo/media/doc/Strauss.pdf
(last visited June 3, 2013).
[20] *Available at* http://www.worldblindunion.org/English/news/Pages/
Press-Release-WIPO-Negotiations-Treaty-for-Blind-people.aspx (last
visited May 28, 2013).

aloud or screen reader functionality to access them. *Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 77 Fed. Reg. 65,260, 65,262-63 (Oct. 26, 2012) (codified at 37 C.F.R. § 201.40(b)(1)) (exempting the circumvention of ebook TPMs for certain accessibility purposes from the anti-circumvention measures of the Digital Millennium Copyright Act, 17 U.S.C. § 1201 ("DMCA"), following the recommendation of the Register of Copyrights and the Assistant Secretary for Communications and Information of the Department of Commerce).[21]

- Before the FCC's enactment of television closed captioning regulations, only a small proportion of broadcast and cable programming was provided with captions. Strauss, *A New Civil Right*, *supra*, at 226.

- Before the FCC's enactment of IP captioning rules, "much IP-delivered programming remain[ed] inaccessible to individuals who were hard of hearing." *Closed Captioning of Internet Protocol-Delivered*

---

[21] In exempting circumvention of ebook TPMs during the previous review of the DMCA's anti-circumvention measures, the Librarian noted the "broad benefits to society in making works accessible to the visually impaired." *Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 75 Fed. Reg. 43,825, 43,838-39 (July 27, 2010).

*Video Programming*, *Notice of Proposed Rulemaking*, FCC Docket No.
11-154, 26 FCC Rcd. 13,734, 13,739, ¶ 8 (2011).

- Before the FCC's enactment of audio description rules, only a "very
  small fraction" of television programming was described.
  *Implementation of Video Description of Video Programming*, 15 FCC
  Rcd. 15,230, 15,231, ¶ 2 (2000), *overturned on unrelated grounds*,
  *MPAA v. FCC*, 309 F.3d 796 (D.C. Cir. 2002) (other subsequent
  history omitted).

- Out of the hundreds of thousands of movies available on DVD and
  Blu-ray discs, only about 280 have ever been released with audio
  description. American Council of the Blind, *The Audio Description
  Project: DVDs and Blu-ray Discs*.[22]

- As of 2009, only about 7% of web images include alternate text tags
  to facilitate access by people who are blind or visually impaired.
  Wendy Chisholm & Matt May, *Universal Design for Web Applications*
  24 (2009) (citing BBC, *'Most websites' failing disabled* (Dec. 5, 2006)).

- Most mainstream video games are wholly or partially inaccessible to
  people with disabilities. *See* The AbleGamers Foundation and 7-128
  Software, *Gaming on a Collision Course: Averting Significant Revenue
  Loss By Making Games Accessible to Older Americans*, at 10 (2010).[23]

---

[22] http://www.acb.org/adp/dvds.html (last visited June 3, 2013).
[23] *Available at* http://www.ablegamers.org/publications/
Gaming_on_a_Collision_Course-AGF-7128.pdf (last visited May 28, 2013).

**C.    Copyright holders routinely disclaim any cognizable interest in making their works accessible.**

Strong empirical evidence that people with disabilities are systemically unserved or underserved by copyright holders is sufficient to confirm that there is rarely, if ever, any market for substitute accessible versions or accessibility features for copyrighted works that third-party accessibility efforts such as HDL's could possibly undermine. Moreover, some copyright holders acknowledge that they do not want to serve these markets by opposing government initiatives that would require them to do so. In particular, some copyright holders insist that adding accessibility features to their works will prove too expensive or too difficult—or even violate the First Amendment.

For example, when Congress ordered the FCC to promulgate video accessibility regulations in light of the limited availability of accessible copyrighted video programming, *amicus* the Motion Picture Association of America ("MPAA") urged the FCC not to adopt comprehensive audio description or closed captioning requirements. *See Comments of MPAA, Closed Captioning and Video Description*, FCC Docket No. 95-176, at iii (Mar. 15, 1996).[24] When the FCC proposed television closed captioning requirements, MPAA urged compliance windows of a decade or more and complained that it would be untenable to require video programmers to caption even a majority of their "library" programming, citing the "sheer

---

[24] *Available at* http://apps.fcc.gov/ecfs/document/view?id=1564860001.

volume" of video and the "practical, technical and economic impediments to captioning" faced by copyright holders. *Comments of MPAA*, *Closed Captioning and Video Description*, FCC Docket No. 95-176, at iii (Feb. 28, 1997).[25] When the FCC adopted IP captioning rules, MPAA even indicated that requiring copyright holders to caption their video programming would violate the First Amendment. *Comments of MPAA*, *Closed Captioning of Internet Protocol-Delivered Video Programming*, FCC Docket No. 11-154, at 3, 12, 13 (Oct. 18, 2011).[26]

MPAA is not alone among copyright holders in objecting to requirements that would require action to make their works accessible. Though a complete survey of these objections is beyond the scope of this brief, several recent examples illustrate this phenomenon:

- The National Association of Broadcasters ("NAB"), which represents television stations and broadcast networks that produce copyrighted content, urged the FCC to adopt five categorical exemptions to audio description requirements for television programming and to consider case-by-case exemptions on the basis of "economi[c] burden," complaining of the "substantial costs" and logistical difficulties involved in creating audio descriptions. *See*

---

[25] *Available at* http://apps.fcc.gov/ecfs/comment/view?id=178735.
[26] *Available at* http://apps.fcc.gov/ecfs/document/view?id=7021715152.

*Comments of NAB*, *Video Description*, FCC Docket No. 11-43, at ii
(Apr. 28, 2011).[27]

- The Entertainment Software Association ("ESA"), which represents
  video game copyright holders, petitioned the FCC to exempt
  copyrighted video game software from federal accessibility
  requirements for advanced communications services on the grounds
  that requiring accessibility would "discourag[e] . . . innovation." *See
  Petition of ESA, Advanced Communication Provisions of the CVAA*, FCC
  Docket. No. 10-213, at 2 (Mar. 22, 2012).[28]

- Cable News Network, Inc. ("CNN") argued in a pending federal
  lawsuit that its decision not to caption its copyrighted IP-delivered
  video programming was not only deliberate, but was in furtherance
  of its editorial discretion and free-speech rights and therefore was
  protected by the First Amendment. *Greater LA Agency on Deafness v.
  CNN*, 862 F. Supp. 2d 1021, 1025-26 (N.D. Cal. 2012).

These examples illustrate that copyright holders commonly see
accessibility features as a cost that they would prefer to minimize or avoid
rather than a potential market they want to serve. Viewed in light of the
historic lack of equal access to copyrighted works for people with
disabilities, copyright holders' objections to accessibility mandates

---

[27] *Available at* http://apps.fcc.gov/ecfs/document/view?id=7021341439.
[28] *Available at* http://apps.fcc.gov/ecfs/comment/view?id=6017026251.

effectively disclaim any market interest in accessibility features that conceivably could be undermined by the good-faith efforts of third parties to make copyrighted works accessible.

*     *     *

Because making copyrighted works accessible to people with disabilities is transformative and does not impact any meaningful market interest of copyright holders, this Court should follow the guidance of *Sony* and the House Committee Report and confirm that accessibility efforts constitute a non-infringing fair use. Doing so will honor the century-long efforts of people with disabilities to seek equal access to copyrighted works and sensibly harmonize well-established federal accessibility policy with copyright law and the Constitution's requirement that copyright "promote the Progress of Science and useful Arts." *See* U.S. Const. art I., § 8, cl. 8. Accordingly, we urge the Court to affirm.

Respectfully submitted,

/s/ Brian Wolfman

Brian Wolfman
Blake E. Reid
Institute for Public Representation
Georgetown Law
June 4, 2013

## LIST OF *AMICI CURIAE*

- The American Association of People with Disabilities, the nation's largest non-profit disability rights organization

- The American Council of the Blind, a non-profit organization pursuing independence and equal opportunities for all blind and visually-impaired people

- The American Foundation for the Blind, a non-profit organization expanding possibilities for the more than twenty-five million Americans living with vision loss

- The Association of Late-Deafened Adults, a non-profit organization providing resources for people who lose their hearing after childhood

- The Judge David L. Bazelon Center for Mental Health Law, a non-profit legal advocacy organization advancing the rights of adults and children with mental disabilities

- Dr. Peter Blanck, professor, attorney, disability law scholar and disability rights advocate

- The Disability Rights Education & Defense Fund (DREDF), a nonprofit law and policy center dedicated to protecting and advancing the civil rights of people with disabilities, nationally recognized for its disability rights law expertise

- Disability Rights Legal Center, a non-profit organization committed to championing the rights of people with disabilities through education, advocacy, and litigation

- Gallaudet University, the world's only university with programs and services specifically designed for deaf and hard of hearing students

- Hearing Loss Association of America, the nation's leading non-profit organization representing people with hearing loss

- The National Association of the Deaf (NAD), the nation's premier non-profit civil rights organization of, by, and for Americans who are deaf and hard of hearing

- National Disability Rights Network, a non-profit organization, representing the interests of the P&A/CAP network, the United States' largest provider of advocacy services to people with disabilities

- Telecommunications for the Deaf and Hard of Hearing, Inc. (TDI), a non-profit organization focusing on equal, barrier-free access to telecommunications, media, and information technology for people who are deaf or hard of hearing

- United Cerebral Palsy, an affiliation of nonprofit organizations providing services and supports to more than 176,000 children and adults with a spectrum of disabilities

- Dr. Gregg Vanderheiden, a researcher in the field of augmentive communication and accessibility technology

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because it contains 6564 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, 14-point Book Antiqua, using Microsoft Word 2008.

Respectfully submitted,

/s/Brian Wolfman

June 4, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2013, a copy of the foregoing was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

/s/ Brian Wolfman

June 4, 2013