# 12-4547-cv

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

———————————

THE AUTHORS GUILD, INC., THE AUSTRALIAN SOCIETY OF AUTHORS
LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS,
ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES
SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON, THE
AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND
COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK
FAGLITTERAER FORFATTERO OG OVERSETTERFORENING, THE
WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK GRUNDSTROM,
HELGE RONNING, JACK R. SALAMANCA,

*Plaintiffs-Appellants,*

(*For Continuation of Caption See Inside Cover*)

———————————

On Appeal from the United States District Court
for the Southern District of New York

———————————

**BRIEF OF *AMICUS CURIAE* THE LELAND STANFORD JUNIOR
UNIVERSITY IN SUPPORT OF AFFIRMANCE**

———————————

FREDERICK A. BRODIE
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 BROADWAY
NEW YORK, NY 10036
(212) 858-1000
fab@pillsburylaw.com

*Counsel for Amicus Curiae The Leland
Stanford Junior University*

June 4, 2013

v.

HATHITRUST, CORNELL UNIVERSITY, MARY SUE COLEMAN, President, University of Michigan, MARK G. YUDOF, President, The University of California, KEVIN REILLY, President, The University of Wisconsin System, MICHAEL MCROBBIE, President, Indiana University,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE, BLAIR SEIDLITZ, COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

The Board of Trustees of the Leland Stanford Junior University is a non-profit trust with corporate powers created by an amendment to the California Constitution.  It does not have any parent corporation, and there is no public company that has a ten percent or greater ownership interest in it.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ I

IDENTITY AND INTEREST OF *AMICUS CURIAE* .............................................1

SUMMARY OF ARGUMENT ................................................................3

ARGUMENT ....................................................................................5

SECTION 108 OF THE COPYRIGHT ACT DOES NOT
    OVERCOME THE CRITICAL INTEREST OF A UNIVERSITY
    LIBRARY IN PRESERVING ITS COLLECTION, AN
    ACTIVITY PROTECTED UNDER SECTION 107 ........................................5

    A. Section 108 Does Not Force Libraries to "Wait for the Flood".....................8

    B. Preservation of Collections Promotes the Public Interest and is a
       Transformative Fair Use under Section 107....................................12

       1.  Collections Preservation is Transformative .............................14

       2.  The Absence of Effect on the Market Favors Fair Use...........................16

       3.  Good Faith Weighs In Favor Of Fair Use In These Circumstances ........17

CONCLUSION ...............................................................................20

## TABLE OF AUTHORITIES

### Cases

*American Geophysical Union v. Texaco Inc.,*
    60 F.3d 913 (2d Cir., 1994).................................................................... 12, 15

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
    448 F.3d 605 (2d Cir. 2006)..................................................................... 15, 18

*Bill Graham Archives, LLC v. Dorling Kindersley Ltd.,*
    386 F.Supp.2d 324 (S.D.N.Y. 2005)....................................................18

*Blanch v. Koons,*
    467 F.3d 244 (2d Cir., 1996)..................................................................... 12, 14

*Field v. Google,*
    412 F.Supp.2d 1106 (D. Nevada 2006) ..............................................18

*Fisher v. Dees,*
    794 F.2d at 436 (9th Cir. 1986)............................................................18

*Kane v. Comedy Partners,*
    2003 U.S. Dist. LEXIS 18513 (S.D.N.Y. Oct. 15, 2003) ...................18

*Kelly v. Arriba Soft Corp.,*
    336 F.3d 811 (9th Cir. 2003)................................................................18

*MCA, Inc. v. Wilson,*
    677 F.2d 180 (2d Cir. N.Y. 1981)........................................................18

*Perfect 10 v. Amazon.com, Inc.,*
    508 F.3d 1146 (9th Cir. 2007).............................................................15

### Constitution

United States Constitution Article I, Section 8........................................3

iii

## Statutes and Codes

United States Code
    Title 17, Section 107 ................................................................ passim
    Title 17, Section 107(2)(3) ..............................................................17
    Title 17, Section 108 ................................................................ passim
    Title 17, Section 108(c) ....................................................................11
    Title 17, Section 108(c) (1) ..............................................................11
    Title 17, Section 108(f)(4) ..................................................................6
    Title 17, Section 121 ..........................................................................4

## Rules and Regulations

Rules of Appellate Procedure
    Rule 29 ..............................................................................................1

## Other Authorities

Andrew Prescott, *'Their Present Miserable State of Cremation': the
    Restoration of the Cotton Library*, in Sir Robert Cotton as Collector:
    Essays on an Early Stuart Courtier and His Legacy, (C. J. Wright,
    London: British Library Publ'ns, 1997)..............................................14

Gina Kolata, "In Archimedes' Puzzle, a New Eureka Moment" *The New
    York Times*, Dec. 12, 2003 ..................................................................13

Keith V. Erickson, *"The Lost Rhetorics of Aristotle"*, Communication
    Monographs, Volume 43, August 1976 ..............................................13

Lisa Trei, Stanford Report, April 15, 1998, " Update on flood damage to
    books:  4/5/98 Warm and Dry:  Damaged books trickling back."....................8, 9

Michael A. Keller, "The February Flood of 1998:  Causes, Revoery &
    Recurrence Prevention", Stanford University Libraries,
    http://www-sul.stanford.edu/staff/flood/flood.html................................9

Nigel Lewis, <u>Paperchase:  Mozart, Beethoven, Bach:  The search for their
    lost music</u> (1981)................................................................................13

<u>Our Dramatic Heritage:  The Golden Age</u>, edited by Philip George Hill, (1985). ....................................................................................................13

Stuart Kelly, <u>The Book of Lost Books:  An Incomplete History of All the Great Books You Will Never Read</u>, (2005). .......................................................13

<u>The Cambridge Companion to Ernest Hemingway</u>, edited by Scott Donaldson, (1996)......................................................................13

The National Digital Information Infrastructure and Preservation Program of 2010 Report ..........................................................................................14

<u>William Shakespeare:  The Complete Works</u> edited by Stanley Wells, Gary Taylor, (2005). ..................................................................................13

Yang Huanyin, "Confucius (K'ung Tzu), UNESCO:  International Bureau of Education, 1999..........................................................................................13

Pursuant to Rule 29 of the Rules of Appellate Procedure, The Leland

Stanford Junior University respectfully submits this brief as *amicus curiae* in

support of affirmance.[1]

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

The Leland Stanford Junior University ("Stanford") is a leading academic

research institution.  Stanford University Libraries ("SUL"), the main library for

Stanford, is comprised of 16 branch libraries, the largest of which is Green Library,

the central campus library.  Stanford also has five auxiliary libraries, including the

Lane Medical Library, the Robert Crown Law Library and the Hoover Institution

Library and Archive.  Stanford libraries have amassed collections of books,

journals, scores and printed reference works numbering more than 8.5 million

physical volumes.  The libraries also hold 1.5 million e-books, nearly 1.5 million

audiovisual materials, more than 75,000 serials, thousands of other digital

resources and nearly 6 million microform holdings.

---

[1]  Stanford has obtained consent to file this brief from counsel for both the
Plaintiffs and the Defendants.  No counsel for a party authored this brief in whole
or in part, and no such counsel or party made a monetary contribution intended to
fund the preparation or submission of this brief.  Only Stanford has made a
monetary contribution to the preparation and submission of this brief.

SUL's holdings contain much more than books. The following types of materials are all interwoven into SUL's holdings: printed and electronic books, newspapers and journals; microfiche; government papers; personal papers; musical scores; photographs; ephemera; film, television and video recordings; sound recordings such as musical compositions and radio broadcasts; software; multimedia materials; websites; email; and information preserved in nearly obsolete data formats.

SUL is a non-contributing participant of HathiTrust Digital Library ("HDL"), meaning that Stanford has access to use the HDL in ways permitted under HDL's guidelines. At this time, Stanford does not contribute works to be included in HDL. Independent from HDL, Stanford has an agreement with Google to digitize SUL's holdings.

Stanford has an interest in ensuring the preservation of books and materials in its care, in the advancement of research, and in providing access to materials for all members of its community, including print-disabled individuals. The curation, collection and preservation of works are crucial to the research and teaching mission of a major research university. Scholars are rarely drawn to study at an institution based on the availability of a single work; rather, scholars are drawn to institutions based on the strength and depth of the collective library holdings in the

scholar's field of expertise. The mission of SUL's librarians is not to collect individual works *per se*, but to build a robust whole made up of many individual works. This collected whole is an individual unit; it is a "Collection," which academic librarians understand to mean a curated set of individual works that collectively make up a library's holdings.

Digital technology enables the faithful reproduction and preservation of the Collection to ensure that works are protected against catastrophe and decay over time, so that they are made available to future generations of scholars. Section 107 of the Copyright Act, 17 U.S.C. § 107, supports the transformative use of technology to ensure the preservation of the Collection in order "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8.

## SUMMARY OF ARGUMENT

In Stanford's view, the crux of this case is about the preservation of information for future generations and Stanford argues here that Section 107 of the Copyright Act permits the faithful digitization of a library's Collection.

Stanford agrees with the District Court's Opinion & Order ("Op.") and Defendants-Appellees that the activities of the HDL in collecting digitized books from leading university libraries for the limited purposes presented here -- making works text-searchable, making works available to individuals with print disabilities

3

under Section 121 of the Copyright Act, and preserving library Collections -- constitute fair use under Section 107 of the Copyright Act.

Independently, however, a library must also be permitted to create a digital archive of its Collection for solely preservation purposes: a "dark archive" – a repository of information that is not available to a library's current users, but is held in trust for future generations. Stanford wishes to underscore the consequences of being unable to preserve works digitally and offer its own relevant experiences for the Court's consideration.

Therefore, while Stanford agrees that all of the HDL's activities constitute fair use, in this brief Stanford will highlight two points: (1) Section 108 of the Copyright Act does not preclude reliance on Section 107 for library digitization; and (2) Collection preservation is a fair use.

Section 108 of the Copyright Act permits libraries to reproduce and allow patron uses of copies of works in certain specified circumstances. When certain library conduct is not covered within the provisions of Section 108, however, fair use under Section 107 of the Copyright Act must be considered. Section 108 does not bar a fair use analysis; rather, the two provisions are complementary.

Nor should Section 108 be read to require libraries to wait until after disaster strikes, or materials are damaged or lost, before such materials can be copied for

4

preservation. The various types of materials contained in a library Collection are fragile and are easily put at risk. Once a work has been severely damaged or destroyed, it is too late for a preservation copy to be made. Such a reading of Section 108 would thus be contrary to the important social policy of protecting copyrighted works that is embodied in that section.

The preservation of library Collections is a fair use under Section 107. Libraries uniquely serve the public interest in preserving knowledge for future generations. Preservation of a Collection is also a transformative use because preservation serves a completely different purpose than that which applied when the original works were created. Creating archival copies of works for preservation purposes does not negatively affect the market for or the value of such works. Finally, the Court should consider the good faith inherent in the libraries' actions and uphold the preservation and the other activities of the HDL as fair use.

## ARGUMENT

### SECTION 108 OF THE COPYRIGHT ACT DOES NOT OVERCOME THE CRITICAL INTEREST OF A UNIVERSITY LIBRARY IN PRESERVING ITS COLLECTION, AN ACTIVITY PROTECTED UNDER SECTION 107

This case has significant implications for the use of digital technology for the long-term preservation of library Collections. Plaintiffs have argued that Section 108 is a bar to Collection preservation under section 107 and that fair use

5

is thus not available to libraries.  Opening Brief of Plaintiffs-Appellants ("Appellants' Br.")  at 18-28.  Plaintiffs proffer the incorrect proposition that the libraries have "violated" Section 108 and, therefore, are precluded from making fair uses under Section 107. Appellants' Br. at 25.  Section 108 prohibits nothing; through Section 108, Congress has authorized specific rights and uses especially for libraries.  Section 108 does not limit libraries in any way; rather, Section 108 is explicitly codified to limit copyright holders.  As if anticipating Plaintiffs' proposition, Congress included Section 108(f)(4), which specifically establishes that Section 108 does not affect the rights in Section 107 in any way.  17 U.S.C. § 108(f)(4).  Sections 107 and 108 of the Copyright Act are designed to work together and to complement each other, not to be mutually exclusive.  As Defendants-Appellees point out, this is apparent from the clear language of Section 108(f)(4) as well as from the relevant legislative history. Appellees' Br. at 44-48.  Nor is there any authority to the contrary with respect to these two provisions.

The unambiguous language of Section 108(f)(4) clearly states that "[n]othing in this section [108]…in any way affects the right of fair use as provided by section 107."  17 U.S.C. § 108(f)(4).  This statement, in plain English, could not be more clear on its face.  The legislative history of Section 108 also supports this view. Appellees' Br. at 45-46.

6

Moreover, Section 108 speaks to the consumptive uses that may be made of individual works; Section 108 does not expressly address the digitization of Collections solely for preservation purposes in a dark archive.   If certain library activity is not covered under Section 108, then the question becomes whether such activity is nevertheless a fair use under Section 107.  In such circumstances, a fair use analysis is performed, just as it would be for any other copyrighted work.

A fair use analysis supports the conclusion that preserving a Collection against destruction, loss, theft, and decay is lawful. A Collection that exists only in physical media is threatened by even careful use and normal environmental factors. Even with only careful use, hard-copy books that are read are subject to routine harms from oils on hands of readers, being picked up or held incorrectly, and the residue of self-sticking memos.[2]  Even if never read, books are subject to degradation from environmental factors like light, heat, dampness, aridness, pests, and exposure to many kinds of plastics.[3]   To preserve a Collection against the destruction that comes to it when the individual items in it eventually degrade is a

---

[2]   "Caring for Your Treasures," Am. Inst. for Conservation of Historic and Artistic Works, available at http://www.conservation-us.org/_data/n_0001/resources/ live/books.pdf (last visited June 3, 2013).

[3]   *Id.*

transformative use of the individual works that benefits society through the

preservation of knowledge for future generations. If a library does not preserve its

Collection, society risks losing forever the work that is the Collection.

### A.    Section 108 Does Not Force Libraries to "Wait for the Flood"

> *Catherine Tierney smiles as she touches a few dozen*
> *books on a table in her Green Library Office. Survivors*
> *of the Flood of '98, the books are water-stained but not*
> *warped or moldy. "They're dry, it's wonderful," says*
> *Tierney, assistant university librarian for technical*
> *services. She leafs through pages of Euripides,*
> *Tragodien, volumes V and VI, and a book title Simeon*
> *Polotskii printed in Cyrillic. The books, from the*
> *literature and reference sections, are part of the*
> *university's general collection. Although not rare, many*
> *would be difficult to replace if lost."*[4]

In the overnight hours of February 2-3, 1998, in heavy rains brought during

an El Niño season, four of Stanford's libraries, covering an area of 12 acres,

flooded: Green Library, Meyer Library, Braun Music Library and Cubberley

Education Library.[5] The rains that damaged Stanford's Collection were not

cataclysmic in the way that most imagine the loss of library books: there was no

---

[4]    Lisa Trei, *Update on flood damage to books: 4/5/98 Warm and Dry: Damaged books trickling back*, Stanford Report (April 15, 1998), available at http://news. stanford.edu/news/1998/april15/books415.html (emphasis added).

[5]    *Id.*

8

Category 5 Hurricane as there was at Tulane University in 2005,[6] nor was there an

attacking army bent on destruction as was the case at the Catholic University of

Leuven, Belgium in 1914.[7]  Instead of a dramatic natural disaster, Stanford's

flooding was caused as a result of over-saturated grounds and storm-drains that

could not absorb the run-off of another rainy day during an unusually rainy

season.[8]

   In the middle of the night, after the flooding was discovered, hundreds of

students and staff volunteered to form "bucket brigades" to move wet books up

from the saturated basement areas to dry ground.[9]  In total, about 70,000 books

were damaged in the flood.[10]  Within 15 hours, these books were relocated to a

---

[6]   *See* Andy Corrigan, *Hurricane Katrina and the Library's Collections,* Tulane
Univ. Howard-Tilton Mem'l Library, http://library.tulane.edu/collections/katrina_\
recovery (last visited June 1, 2013).

[7]   Sarah Prescott, *Libraries Burning:  A Discussion to Be Shared*, 26 Progressive
Librarian 40, 43, Winter 2005/06) ("According to an eyewitness, the fire burned
for days, consuming over 230,000 books, among them priceless editions of some
of the west's earliest books and manuscripts").

[8]   Michael A. Keller, *The February Flood of 1998:  Causes, Recovery &
Recurrence Prevention*, Stanford Univ. Libraries,
http://www-sul.stanford.edu/staff/flood/flood.html (last visited June 3, 2013).

[9]   Trei, *supra* note 3

[10]   *Id.*

cold storage facility to arrest the damage and to prevent mildew from setting in.[11]

From cold storage, the books were transferred in batches to undergo a drying and

restoration process.[12]  Some books came through the process nearly unscathed.

Others needed minor repair such as page repair, page cleaning, and un-sticking of

pages.[13]  The most damaged books needed to be re-bound.[14]  In all, Stanford was

lucky.  Of the 70,000 affected works only about 3,500 were a total loss.[15]  Had the

flooding not been discovered during the night or the large number of volunteers not

been available, the losses would have been much greater.

　　The loss of any work at all within a Collection can fundamentally alter it.

For over 75 years, the field of library science has examined how to select and

deselect works for a Collection, evaluating the Collection apart from the

independent value of the sum of its individual works.[16]  The 1998 flood caused

Stanford to re-evaluate its preservation practices and put SUL on a path toward the

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *See, e.g.,* Charles B. Osburn, *Collection Management in the Library Quarterly*, 76 Library Quarterly, Quarterly 36 (Jan 2006).

use of digital technology to safeguard against the destruction or alteration of its Collection.  In addition to the invaluable research and scholarship that becomes available through full-text searching and the extraordinary unparalleled access it provides to individuals with print disabilities, digitization meets Stanford's need to protect its Collection.

Section 108 should not be construed to require a library to "wait for the flood" before it can take steps to preserve its Collection.  Indeed, Section 108(c) cannot be effectuated when no preservation copy exists to access.  Section 108(c) provides that a library, after establishing that an "unused replacement cannot be obtained at a fair price," may replace a work that is "damaged, deteriorating, lost or stolen, or if the existing format in which the work is stored becomes obsolete" 17 U.S.C § 108(c).  When a work has been destroyed and an unused replacement cannot be obtained at a fair price, the work might never be replaced, access to the work will be lost, and the library Collection becomes altered forever.

Digital technology allows our library Collections to avoid the fate of the Library of Alexandria; it would be devastating to the future of scholarship if laws prevent our society from preserving its cultural and intellectual output.

11

**B.** **Preservation of Collections Promotes the Public Interest and is a Transformative Fair Use under Section 107**

> *Much is at stake if we do not act now. The nation's educational system, economic security, energy infrastructure, and the continuing creativity and innovation that assure the people's well-being all depend on a secure knowledge base. What is at stake is no less than the ability to show our children and grandchildren where we have come from, to help them understand how our democracy grows, and to empower them with the knowledge and wisdom to make the difficult choices that the Founders well understood would confront us as a free people.*

Nat'l Digital Info. Infrastructure and Pres. Program Report of 2010, The Library of Congress, Preserving Our Digital Heritage 7 (Jan. 2011).

The public interest in preserving Collections weighs strongly in favor of finding that preservation efforts are a fair use. "Courts are more willing" to find a fair use when the purpose "produces a value that benefits the broader public interest." *See, e.g., Blanch v. Koons,* 467 F.3d 244, 253 (2d Cir. 2006) ("courts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest") (quoting *Am. Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 922 (2d Cir. 1994)).

Historically, countless great works of literature and intellectual output have been lost to the ages.  Works by Archimedes;[17] Aristotle;[18] Confucius;[19] Shakespeare;[20] Moliere;[21] Bach, Mozart and Beethoven;[22] Hemingway;[23] and Plath;[24] to name but a tiny few,[25] have been lost or destroyed.   The only copy of *Beowulf*, one of the earliest existing poems in Old English dating from the 11th

---

[17]   *See* Gina Kolata, "In Archimedes' Puzzle, a New Eureka Moment" *The New York Times*, Dec. 12, 2003 (discussing the lost treatise the Stomachian).

[18]   *See* Keith V. Erickson, *"The Lost Rhetorics of Aristotle"*, Communication Monographs, Volume 43, August 1976.

[19]   Yang Huanyin, "Confucius (K'ung Tzu), UNESCO:  International Bureau of Education, 1999 originally published in Prospects:  the quarter review of comparative education January 1993 (noting that Confucius' *The Book of Music* has been lost).

[20]   William Shakespeare:  The Complete Works edited by Stanley Wells, Gary Taylor, (2005), p. 337 (discussing evidence that Shakespeare wrote *Love Labour's Won* prior to 1598).

[21]   Our Dramatic Heritage:  The Golden Age, edited by Philip George Hill, p. 564 (1985) (noting that some of Moliere's earlier plays, "written while Moliere's company was touring the provinces, are now lost.")

[22]   *See generally,* Nigel Lewis, Paperchase:  Mozart, Beethoven, Bach:  The search for their lost music (1981).

[23]   The Cambridge Companion to Ernest Hemingway, edited by Scott Donaldson, pp. 39 -41 (1996) (discussing the lost or stolen valise containing a draft of *Juvenilia*).

[24]   Stuart Kelly, The Book of Lost Books:  An Incomplete History of All the Great Books You Will Never Read pp. 330-31 (2005).

[25]   *See generally id.*

Century, nearly burned in a fire in 1731.[26]  Although saved, the manuscript was left

to deteriorate for another 100 years and some text was lost to decay before

restoration efforts were undertaken in 1845.[27]  Although preservation technology

has improved vastly since 1845, we still face the loss of massive amounts of

information.  The National Digital Information Infrastructure and Preservation

Program of 2010 Report ("NDIIP Report") noted that of over 1,600 federally-

funded social science research projects that took place in 2008, by 2010 "at least

25% of the data had been lost and was not available to researchers." [28]

The crisis of information loss is not behind us; it continues today and looms

over the future.  It remains even more incumbent upon libraries to preserve our

intellectual and cultural output for current and future generations.

### 1.    Collections Preservation is Transformative

"Courts are more willing" to find a fair use when the purpose "produces a

value that benefits the broader public interest."  *Blanch,* 467 F.3d at 253.

---

[26]  Andrew Prescott, *'Their Present Miserable State of Cremation': the Restoration of the Cotton Library*, in Sir Robert Cotton as Collector: Essays on an Early Stuart Courtier and His Legacy, 391-454 (C. J. Wright, London: British Library Publ'ns, 1997).

[27]  *Id.*

[28]  Preserving Our Digital Heritage", supra, at 5.

14

The preservation of a Collection is a transformative use, which supports a finding of fair use. *See Perfect 10 v. Amazon.com, Inc.,* 508 F.3d 1146, 1166-67 (9th Cir. 2007 (finding that transformative use weighs in favor of finding a fair use under the first prong of the test). Stanford therefore respectfully disagrees with the District Court's statement that "[t]he argument that preservation on its own is a transformative use is not strong." Op. at 15 n. 19 (*citing Texaco,* 60 F.3d at 924). Authors may send individual works into the marketplace to be read (consumed) immediately. Libraries, in contrast, curate, collect, and preserve massive numbers of works into a single Collection; this Collection is then preserved as a whole against destruction for future generations of scholars to access. A preserved work is not available to be read (or viewed or heard or otherwise consumed) until a future event occurs making it proper to do so. Preservation (denying consumptive access, but protecting a work from destruction) is a highly transformative use of a work that was otherwise placed into the marketplace for immediate consumption. *See Perfect 10,* 508 F.3d at 1165 ("making an exact copy of a work may be transformative so long as the copy serves a different function than the original work."); *see also Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 609 (2d Cir. 2006) (finding a transformative use in the use of thumbnail concert

15

posters where the transformative use was to document the occurrence of the concerts, rather than the original purposes of "artistic expression and promotion.").

Achieving preservation through other means, such as purchasing multiple copies of a work, is not a viable solution. Each copy of a work is susceptible to the same problems: decay over time and sudden destruction from catastrophe. Even if it were feasible to build a physical plant to store back-up physical media copies, those copies would still be subject to the same risks, such as floods, hurricanes, earthquakes, or tornadoes. Additionally, library Collections are made up of much more than just commercially available printed works; libraries need to have the functionality to preserve materials created in all varieties of media in multiple formats to ensure that the information is safe.

## 2.    The Absence of Effect on the Market Favors Fair Use

Retaining a preservation copy for non-consumptive purposes does not affect the market. As the District Court noted, there is no marketplace for the preservation of works. Op. at 19-20. Moreover, no industry other than libraries has an incentive to create and preserve collections combining works from a multitude of authors, publishers, and subject matters. While a single publisher may make efforts to preserve works issued by that publisher, broader collection practices are necessary to best ensure the preservation of knowledge.

16

To demonstrate marketplace harm, Appellants speculate broadly about the security risks allegedly inherent in the HDL.  They conjecture that if the security for the HDL is not sound, then unlawful access to the works might cause Appellants to suffer financial harm.  The District Court correctly concluded that "Plaintiffs' unsupported argument fails to demonstrate a meaningful likelihood of future harm."  Op. at 20.  That result is correct; only when a plaintiff can establish that an actual breach has occurred or is likely to occur would this final factor favor a copyright owner's interests.  No such showing was made here; accordingly, the record affords no basis for a finding of marketplace harm.  There simply is no market for what HDL is doing, although the need is uncontroverted.

3.    Good Faith Weighs In Favor Of Fair Use In These Circumstances

The four factors specifically listed in Section 107 are not exclusive; rather, those factors "shall [be] include[d]" in consideration, but courts may also consider other factors.[29]

---

[29]    For the purposes of brevity and to avoid repeating the points ably put forward by Defendants-Appellants, Stanford does not focus on the second (nature of the copyrighted work) and third (amount of work used) factors of a fair use analysis.  17 U.S.C. § 107(2)(3).  Under the nature of the copyrighted work factor, case law instructs that "copying factual works is more likely fair use than copyright

One additional factor that may be considered as part of a fair use analysis is whether an alleged copyright infringer acted in good faith. *See, e.g., MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir. 1981); *Bill Graham Archives, LLC v. Dorling Kindersley Ltd.*, 386 F.Supp.2d 324, 333 (S.D.N.Y. 2005) (good faith is a positive factor in fair use analysis); *Kane v. Comedy Partners*, 2003 WL 22383387, *7 (S.D.N.Y. Oct. 15, 2003); *Field v. Google Inc.*, 412 F.Supp.2d 1106, 1122 (D. Nev. 2006) (citing *Fisher v. Dees*, 794 F.2d 432, 436-37 (9th Cir. 1986)).

In this case, the libraries seek to preserve their Collections, to help scholars identify potentially relevant works, and to provide access to people with print disabilities. The SUL and other libraries have no commercial or improper reasons for participating in the HathiTrust Digital Library. The libraries have acted in

---

creative works." Op. at 18 citing *Blanch*, 467 F.3d at 256. Collection preservation captures both creative and factual works. Where the use is highly transformative, however, courts have held that the second factor is of "limited usefulness." *Bill Graham Archives*, 448 F.3d at 612. With regard to the third factor focusing on the amount of work used, a work cannot be faithfully preserved digitally without copying the whole. Accordingly, preservation requires the use of an entire work. Courts have recognized that it is permissible to copy the whole work when that is the amount necessary to accomplish the underlying lawful purpose. *See, e.g., Bill Graham Archives*, 448 F.3d at 613; *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2003).

good faith, and this factor provides additional support for the District Court's fair use determination.

## CONCLUSION

For the foregoing reasons, Stanford as *amicus curiae* respectfully submits

that the District Court's judgment should be affirmed.

Dated:  New York, New York
      June 4, 2013

Respectfully submitted,

/s/ Frederick A. Brodie
FREDERICK A. BRODIE
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 BROADWAY
NEW YORK, NY 10036
(212) 858-1000
fab@pillsburylaw.com

Of Counsel:

CYDNEY A. TUNE (*application pending*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
FOUR EMBARCADERO CENTER
SAN FRANCISCO, CA 94111
(415) 983-6443

LAUREN SCHOENTHALER (*application pending*)
CHRISTINE BOEHM (*application pending*)
OFFICE OF THE GENERAL COUNSEL
STANFORD UNIVERSITY
STANFORD, CA  94035
(650) 723-9611
(650) 723-9611

*Counsel for Amicus Curiae The Leland Stanford Junior University*

20

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7), the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 29(d) and Fed. R. App. P. 32(a)(7)(B).

1.     Exclusive of the exempted portions in Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 4,023 words.

2.     This brief has been prepared in proportionally spaced 14-point font typeface using Microsoft Office Word 2010 in Times New Roman typeface.

_____/s/ Frederick A. Brodie_____
Frederick A. Brodie

June 4, 2013

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 4th day of June, 2013, the Brief of *Amicus Curiae* the Leland Stanford Junior University in Support of Affirmance was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

/s/ Frederick A. Brodie
<br>
Frederick A. Brodie