# 12-4547-cv

## IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

AUTHORS GUILD, INC., AUSTRALIAN SOCIETY OF AUTHORS LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS, ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON, AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK FAGLITTERAER FORFATTERO OG OVERSETTERFORENING, WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK GRUNDSTROM, HELGE RONNING, JACK R. SALAMANCA,

*Plaintiffs – Appellants*,

v.

HATHITRUST, CORNELL UNIVERSITY, MARY SUE COLEMAN, PRESIDENT, UNIVERSITY OF MICHIGAN, MARK G. YUDOF, PRESIDENT, UNIVERSITY OF CALIFORNIA, KEVIN REILLY, PRESIDENT, UNIVERSITY OF WISCONSIN SYSTEM, MICHAEL MCROBBIE, PRESIDENT, INDIANA UNIVERSITY,

*Defendants – Appellees*,

NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE, BLAIR SEIDLITZ, COURTNEY WHEELER,

*Intervenor Defendants – Appellees*.

On Appeal from the United States District Court for the Southern District of New York

**BRIEF AMICI CURIAE OF BENEFICENT TECHNOLOGY, INC. AND LEARNING ALLY, INC. IN SUPPORT OF AFFIRMANCE**

Brandon Butler
21 Dupont Cir NW
Suite 800
Washington, DC 20036
Bbutler6@me.com
202-296-2296
Counsel for Amici
June 4, 2013

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae

Beneficent Technology, Inc., and Learning Ally, Inc., state that neither of these

entities has a parent corporation and no publicly held corporation has an ownership

stake of 10% or more in either entity.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

INTEREST OF AMICI AND SUMMARY OF ARGUMENT .......................... 1

ARGUMENT .................................................................................. 6

I.  Digital Books Like Those At Issue Here Are In "Specialized Formats" for
Purposes of the Chafee Amendment ................................................ 6

    A.  The Chafee Amendment's Purpose Is to Allow Creation and Distribution
of Copies In Accessible Formats for Use by the Print Disabled ...................... 8

    B.  Because HDL Digital Texts Are Accessible to the Print Disabled, They
Serve the Purpose of the Chafee Amendment. .................................... 9

    C.  "Exclusively For" Refers to Intended Beneficiaries of Copies Made or
Distributed Under Section 121, Not Theoretically Possible Users ................. 12

II.  The Guild's Interpretation of "Specialized Formats" Is Inconsistent With
Widespread, Industry Standard Tools and Practices ................................. 19

CONCLUSION ............................................................................... 21

CERTIFICATE OF COMPLIANCE ..................................................... 22

CERTIFICATE OF SERVICE ............................................................ 23

# <u>TABLE OF AUTHORITIES</u>

**Statutes**

17 U.S.C. § 121 ................................................................................... passim

Pratt-Smoot Act, ch. 400, 46 Stat. 1487 (1931) ....................................... 5

 **Legislative History**

142 Cong. Rec. S9066 (daily ed. July 29, 1996) ............................... 3, 8, 14

142 Cong. Rec. S9764 (daily ed. Sept. 3, 1996) ................................... 3, 8

**Other Authorities**

Brailleworks, History of Braille,
    http://www.brailleworks.com/Resources/HistoryofBraille.aspx ......................... 14

DAISY Consortium, Software and Hardware: DAISY Players,
    http://www.daisy.org/software-players ................................................... 19

DIAGRAM Center, http://www.diagramcenter.org ................................. 20

John P. Wilkin, *Bibliographic Indeterminacy and the Scale of Problems and
    Opportunities of "Rights" in Digital Collection Building*, Ruminations, Feb.
    2011, http://www.clir.org/pubs/ruminations/01wilkin/wilkin.html/wilkin.pdf. . 12

Learning Ally, ReadHear Frequently Asked Questions,
    https://www.learningally.org/support-topic/readhear/#using ............................ 20

New York Times Bestsellers – Bookshare,
    https://www.bookshare.org/browse/collection/28/ .............................. 11

*On the "NII Copyright Protection Act of 1996" H.R. 2441: Hearing Before the
    Subcomm. on Courts and Intell. Prop. of the H. Comm. on the Judiciary,* 104th
    Cong. (1996) (statement of Dr. Tuck Tinsley, Am. Printing House for the Blind,
    Inc.) .................................................................................................... 8, 17

*On the "NII Copyright Protection Act of 1996" H.R. 2441: Hearing Before the
    Subcomm. on Courts and Intell. Prop. of the H. Comm. on the Judiciary,* 104th
    Cong. (1996) (statement of the AAP) ................................................. 17

Read2Go | Screenshots, http://read2go.org/?page_id=7 ......................... 20

Ronald L. Mace, A Perspective on Universal Design, Presentation at Hofstra University's Designing for the 21st Century: An International Conference on Universal Design (June 19, 1998) .................................................................... 16

Roy Blount, Jr., *The Kindle Swindle?*, N.Y. TIMES, Feb. 25, 2009, at A27 ........... 10

Support Center & FAQs – Bookshare, http://www.bookshare.org/portal .............. 13

## <u>INTEREST OF AMICI AND SUMMARY OF ARGUMENT[1]</u>

Beneficent Technology, Inc., is an international, nonprofit organization that develops technology for social good. The organization does business as Benetech and works in the fields of accessibility for people with disabilities, human rights, the environment, and volunteerism. Originally founded in 1989 as Arkenstone, Inc., the organization created affordable reading machines and systems for people who are legally blind or have learning disabilities such as dyslexia. Arkenstone sold the assets of the reading machine enterprise in 2000, changed its legal name to Beneficent Technology, Inc., and used the majority of the resulting proceeds to build and launch Bookshare, the online digital library for people who are blind or dyslexic.

The Bookshare project is now Benetech's largest program; it represents more than half of Benetech's activities. Bookshare currently serves more than 250,000 Americans with qualifying print-related disabilities, who download more than 1,000,000 accessible books and articles each year, selected from more than 190,000 accessible e-book titles and 150 daily newspapers. Benetech is also the largest single user of the National Instructional Materials Accessibility Center, the

---

[1] No counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than amici, its members, or its counsel contributed money intended to fund preparation or submission of this brief. All parties have consented to the filing of this brief.

main K–12 repository for textbooks established under the 2004 Individuals with Disabilities Education Act reauthorization, with more than thirty states designating Benetech as one of each state's five authorized users of the Center.

The Bookshare project is funded primarily by the United States Department of Education Office of Special Education Programs, which provides $6.5 million annually to support Bookshare's provision of accessible books free of charge to U.S. students with qualifying disabilities. This grant is conditioned on Bookshare's activities receiving protection under 17 U.S.C. § 121, known as the Chafee Amendment.

As an organization with "a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities," Benetech is an "authorized entity" under the Chafee Amendment, and it creates and distributes accessible ebooks pursuant to the requirements of that provision. While Bookshare is proud of its partnerships with publishers, it relies on the Chafee Amendment to scan hundreds of books in response to requests from users with disabilities each month without publisher authorization. Indeed, one of the ways Bookshare grows its library is by partnering with colleges and universities to incorporate into its databases the digitized books they provide. Without the rights granted by Section 121 to Bookshare and its

partners, Bookshare's work would be substantially curtailed and the materials made accessible to the print-disabled public would be significantly restricted.

Learning Ally, Inc. is a national, nonprofit organization that has provided individuals with visual impairments and other qualifying disabilities with accessible audio textbooks since its founding in 1948 as the National Committee for Recording for the Blind. Learning Ally provides accessible textbooks to an estimated 300,000 students in elementary through post-graduate studies through individual subscriptions, institutional service contracts with over 10,000 schools, and statewide access programs with seven state education agencies.

Learning Ally, then Recording for the Blind and Dyslexic, was a leading advocate for the adoption of the Chafee Amendment. The primary sponsor of the amendment, Sen. John Chafee, noted Learning Ally's role in advocating for reform. *See* 142 Cong. Rec. S9066 (daily ed. July 29, 1996). Learning Ally serves one of the core purposes of the amendment: providing the print-disabled with access to vital instructional materials, thereby combatting what Senator Chafee called the "unintended censorship" of students with print disabilities. 142 Cong. Rec. S9764 (daily ed. Sept. 3, 1996). Learning Ally estimates that over 90% of the reformatted books it creates and distributes are made in reliance on Section 121.

Learning Ally is a leading organization in the development of the evolving formats of accessible audio textbooks, including digital formats that can be used

with special software. Its employees have pioneered some of the most advanced accessibility technologies available. Learning Ally has also adopted cutting edge technologies and strategies to ensure its services only reach the intended beneficiaries. Through a combined system of software controls and a certifying application process, Learning Ally screens its beneficiaries and ensures that only intended users benefit from its programs.

As the leading providers of accessible books to people with print disabilities in the U.S., Benetech and Learning Ally (Accessibility Amici) are deeply concerned that their work and the work of their peers in support of this shared national goal could be undermined by appellants' (the "Guild") arguments in this case. Accessibility Amici rely heavily on copyright exceptions such as Sections 107 and 121 of the Copyright Act. The Guild's arguments regarding the definition of "specialized formats" would nullify Section 121 and remove the legal authorization for the important services that amici provide, relegating the print disabled to second class status.

Accessibility Amici, together with the National Library Service for the Blind and Physically Handicapped (NLS) and the disability support services (DSS) offices on university campuses, exist to correct a market failure: publishers do not publish accessible versions of their books because they do not believe accessibility is profitable. The U.S. government has worked to counteract this failure through a

4

long history of legislative intervention. Beginning with the Pratt-Smoot Act, ch. 400, 46 Stat. 1487 (1931) (creating the NLS), the basic strategy of these interventions has been the same: to empower third parties to provide access where market actors will not. In a better world, consumer formats and reading technologies would be universally accessible: all formats and all reading tools would serve all users. Until we live in that world, the tireless work of groups like Learning Ally, Bookshare, and the HathiTrust Digital Library (HDL) will remain an essential part of an inclusive, democratic society.

Given this clear policy imperative, Accessibility Amici were surprised to see the Guild's argument that the "specialized formats" supplied to print-disabled persons, authorized by 17 U.S.C. § 121 (the Chafee Amendment), must be in a format useful *only* to print-disabled persons. Guild Br. at 50. If this were true, then the digital books provided by Learning Ally and Bookshare would not qualify for Chafee Amendment protection, as they are perceptible to the general population (when accessed by appropriate, widely available technology). As Senator Chafee named amicus Learning Ally expressly as an intended beneficiary of the Amendment, this would be an extraordinary outcome.

The Guild's interpretation of the Chafee Amendment is incorrect. The digital text formats used by HDL satisfy the statute, as do the formats used by Bookshare and Learning Ally: they are provided under Section 121 exclusively for the use of

5

patrons with qualifying disabilities. In fact, the formats used by Learning Ally were clearly in mind when Congress adopted the Chafee Amendment, as Learning Ally was deeply involved in ensuring that the Amendment became law. A contrary reading, one which requires "specialized formats" to be perceptible *only* to the print disabled, would nullify the Chafee Amendment and frustrate longstanding U.S. policy to encourage equitable access to knowledge and fair opportunity for all.

While the balance of this brief will focus on Section 121's language regarding "specialized formats," Accessibility Amici welcome and support the entirety of Judge Baer's decision, which makes clear what they have long believed: that universities are key partners in providing accessible works to print disabled students, faculty, and staff. Even with strong federal support, robust non-profit funding, and some private subscription revenue, Benetech and Learning Ally do not have sufficient funding to respond to the flood of requests they receive each year for accessible books. The HathiTrust Digital Library (HDL) represents a great leap forward in accessibility.

## **ARGUMENT**

### I.   **Digital Books Like Those At Issue Here Are In "Specialized Formats" for Purposes of the Chafee Amendment**

The Chafee Amendment provides that:

> it is not an infringement of copyright for an authorized entity to reproduce or to distribute copies or phonorecords of a previously published, nondramatic literary work if such copies or phonorecords are reproduced or distributed in specialized formats exclusively for use by blind or other persons with disabilities.

17 U.S.C. § 121(a). The statute goes on to define "specialized formats" as "braille, audio, or digital text which is exclusively for use by blind or other persons with disabilities." 17 U.S.C. § 121(d)(4)(A). The best interpretation of "is exclusively for use by" is "is distributed under this provision exclusively for use by." This interpretation recognizes the provision's limited community of intended beneficiaries and does not disqualify audio and digital text formats, which are explicitly authorized by the statute.

Formats provided to qualifying users by HDL and its partner libraries satisfy this definition because the digital texts, which are enhanced in ways that make them accessible in combination with appropriate software exactly as Senator Chafee intended, are reproduced and distributed under the Chafee Amendment exclusively to persons with qualifying disabilities. The fact that they could also be viewed by persons lacking such disabilities to whom the specialized formats are not provided under Section 121 is wholly irrelevant.

**A. The Chafee Amendment's Purpose Is to Allow Creation and Distribution of Copies In Accessible Formats for Use by the Print Disabled.**

Legislative history makes clear the problem the Chafee Amendment is meant to address: that works "readily available to sighted individuals in libraries, bookstores, newsstands, and countless other locations" are not routinely made simultaneously available through ordinary channels in formats accessible to the print disabled. 142 Cong. Rec. S9764. Senator Chafee described the challenges encountered by services like Learning Ally and Bookshare who prepare accessible versions of books, who "issue[] request after request only to wait months for a response from the publisher. These delays are not because the publishers have a desire to withhold permission; it is simply a low priority. They just set it aside." 142 Cong. Rec. S9066. Chafee described this market failure as "unintended censorship." 142 Cong. Rec. S9764. *See also On the "NII Copyright Protection Act of 1996" H.R. 2441: Hearing Before the Subcomm. on Courts and Intell. Prop. of the H. Comm. on the Judiciary,* 104th Cong. (1996) (statement of Dr. Tuck Tinsley, Am. Printing House for the Blind, Inc.), *available at* http://judiciary.house.gov/legacy/440.htm ("Tinsley Stmt.") (describing the "unwieldy" process of seeking permission to create accessible texts).

To vindicate the purpose of the Chafee Amendment, a key question in determining whether a format is "specialized" should be whether the format has

attributes that, in combination with appropriate reading technology, render it accessible, thus counteracting the market failure. Specialized formats are necessary because widely used commercial formats lack attributes that would make them fully accessible, or (as is the case with many e-books currently published) incorporate technological measures that disable accessibility.

### B. Because HDL Digital Texts Are Accessible to the Print Disabled, They Serve the Purpose of the Chafee Amendment.

George Kerscher, Senior Officer of Accessible Technology at Learning Ally and a renowned expert on accessible digital formats, has described at length some of the qualities that make a digital file accessible. *See* Dkt_79(¶¶ 21–29). Not all digital files are accessible; a basic PDF file, which is simply a picture of a printed page, can be read by a sighted person, but on its own is not an accessible format for the print disabled. *Id.* at ¶ 22. Rendering a digital scan of a paper book fully accessible requires processing the images with optical character recognition (OCR) and optical structural recognition (OSR) software. *Id.* at ¶ 23. OCR recognizes individual letters on a scanned page, while OSR recognizes structural elements like words, sentences, paragraphs, and chapters. *Id.* Together, OCR and OSR can transform an inaccessible image into a digital text that can be searched, browsed, and even skimmed by print-disabled readers using specialized software in ways that closely approximate the access to information available to a sighted user of a printed text. *Id.* at ¶ 21. Accessibility is further enhanced when a work's table of

contents and index are properly scanned and tagged. This must be done manually, and even colleges' disability student services (DSS) offices do not always take this step. *Id.* at ¶ 33.

The HDL scans are formatted with all of these core accessibility features. Kerscher describes the scans as "high resolution images that have been digitized using the most sophisticated OCR/OSR software I have ever encountered." *Id.* at ¶ 31. In addition to sophisticated software scanning and tagging of the main text, most HDL files include manually tagged tables of contents. *Id.* at ¶ 34. Again, this is a feature that even DSS offices cannot always afford to create in the files they prepare for disabled students on an ad hoc basis. The HDL files also contain a high-resolution image of the scanned page, which can be magnified by appropriate software.

Compared to commercially available audio or digital formats, the HDL scans offer significant improvements in accessibility. For example, Kerscher recounts the sad and unnecessary history of inaccessibility on the Amazon Kindle. Dkt_79 (¶ 46). Amazon encountered fierce opposition from Appellant Authors Guild when it tried to allow text-to-speech for all Kindle books on its Kindle 2 device. Amazon eventually capitulated, allowing publishers to deliberately render the e-book inaccessible by turning off the text-to-speech feature. *Id. See also* Roy Blount, Jr., Op-Ed., *The Kindle Swindle?*, N.Y. Times, Feb. 25, 2009, at A27,

10

*available at* http://www.nytimes.com/2009/02/25/opinion/25blount.html?_r=0

("Kindle 2 can read books aloud. And Kindle 2 is not paying anyone for audio rights."). Even if the text of Kindle books were made accessible, the menus and navigation of the Kindle itself are not accessible. The Digital Rights Management (DRM) software on Kindle e-books prevents them from being read on an accessible non-Kindle device, such as an iPad running specialized text-to-speech software.[2]

Standard consumer "audiobooks" also lack specialized functionality that would make them adequate substitutes for printed text. *See* Dkt_79 (¶26). Accessible text-to-speech software allows reading at high speeds, and specialized digital book readers allow for virtual bookmarking, notetaking, and navigation, all at a level of sophistication that standard audiobooks cannot match. *Id.*

Of course, the overwhelming majority of titles in the HDL was never released in audio or digital formats of any kind, and likely never will be, due to their obscure, academic nature.[3] These books were issued in small print runs,

---

[2] It is telling that the Guild has not objected to Bookshare's provision of *New York Times* bestselling books to the print disabled in formats that, in combination with appropriate software, provide essentially the same listening experience as the Kindle 2. *See* New York Times Bestsellers – Bookshare, https://www.bookshare.org/browse/collection/28/ (last visited May 29, 2013). Perhaps this is because access to these works is strictly limited to users with qualifying disabilities, as required by the Chafee Amendment.

[3] *See generally* John P. Wilkin, *Bibliographic Indeterminacy and the Scale of Problems and Opportunities of "Rights" in Digital Collection Building*,

purchased primarily by libraries, and promptly went out of print. But even for the tiny fraction of works represented in the HDL that are commercially available in digital and audio formats, these formats simply cannot match the specialized functionality enabled by digital texts created by Bookshare, Learning Ally, and HDL. These formats cannot, therefore, provide equitable access to the knowledge and information stored in books. This is precisely why the Chafee Amendment empowers authorized entities like Bookshare, Learning Ally, and HDL to provide accessible formats despite the indifference (and, in this case, the outright hostility) of some rightsholders.

### C. "Exclusively For" Refers to Intended Beneficiaries of Copies Made or Distributed Under Section 121, Not Theoretically Possible Users

The Chafee Amendment requires that authorized entities provide accessible copies in "specialized formats," which is defined as "braille, audio, or digital text which is exclusively for use by blind or other persons with disabilities." 17 U.S.C. 121(d)(4)(A). "Exclusively" is an adverb that modifies the verb "is," but the phrase "is exclusively for use by" is, on its face, susceptible to multiple interpretations.

The best interpretation of this phrase is "is distributed under this provision exclusively for use by." This interpretation allows use of formats that meet the objective of the statute without allowing distribution beyond the intended

---

Ruminations, Feb. 2011,
http://www.clir.org/pubs/ruminations/01wilkin/wilkin.html/wilkin.pdf.

beneficiaries. Providers satisfy this requirement by ensuring that only persons with qualifying disabilities obtain access under the Chafee Amendment to the formats they create. For Learning Ally, this means that, in order to create a valid Learning Ally account and receive validation credentials, an individual must submit an application that includes documentation from a qualified certifying professional and specifies the qualifying disability. Bookshare takes similar steps, requiring registration and proof of disability for access to its copyrighted books.[4] *See* Dkt_129(¶ 5). HDL, too, provides access to these formats only to qualified users. Dkt_110(¶ 105).

The Guild argues that the phrase "exclusively for use by blind or other persons with disabilities" in the Chafee Amendment is meant to exclude any format that is also useful or made available (outside of the Chafee Amendment) to persons without a disability, e.g., a digital text or scan that could also be read, or an audio file that could be heard, by a sighted person. Guild Br. at 50 (arguing HDL scans are not in a 'specialized format' "because people without [sic] print disabilities are using the same format as the general population [of HDL users]").

---

[4] Bookshare also provides detailed guidance to educators administering Bookshare accounts on behalf of print-disabled students, with the aim of ensuring that access is appropriately limited. *See, e.g.*, Support Center & FAQs – Bookshare, http://www.bookshare.org/portal (follow "Downloading and Reading Books" hyperlink; then follow "If one student in the class has a qualifying disability, is it acceptable to use the Bookshare book with a class that includes that student, for example displaying it on an electronic write board?" hyperlink) (last visited May 30, 2013).

They go on to argue that no format which makes text available in large print can satisfy the "specialized format" requirement of the Chafee Amendment. *Id.* (comparing HDL's policy of providing scanned text images for enlargement via software with 17 U.S.C. 121(d)(4)(B), which limits which materials may be converted into "large print book" format). Neither of these arguments is consistent with the logic, text, history, or purpose of the Chafee Amendment.

The argument that "specialized formats" must not be accessible or useful to non-disabled persons has absurd consequences. Most notably, it would exclude all known formats now in use by the disabled and the groups that serve them. *See* Part II, *infra*. Indeed, as Appellees National Federation for the Blind (NFB) point out, it is hard to imagine a format that would satisfy this criterion. Appellees NFB Br. at 27. By definition, any text perceptible to the print-disabled is perceptible to the non-disabled, as the former group does not have access to any special power of perception not available to the latter. *Id.* Even braille books—a format specifically identified as specialized by the statute—are perceptible to non-disabled persons who have taken the time to learn the braille alphabet.[5]

---

[5] In fact, Braille is based on a secret code used by the French military. Called "night writing," the code was designed for sighted soldiers to read in the dark using touch. Louis Braille simplified the system so that each letter could be felt all at once with a single fingertip. *See History of Braille*, Brailleworks, http://www.brailleworks.com/Resources/HistoryofBraille.aspx (last visited May 29, 2013). The cross-pollination between sighted and print-disabled modes of communication is common.

The Guild's reading of Section 121 is also inconsistent with the plain text of the statute and its legislative history. Section 121 refers to "audio" and "digital text" as types of "specialized formats," and both of these formats are, of course, useful and perceptible to the non-disabled. Senator Chafee referred to "new digital formats that can be used with special software," 142 Cong. Rec. S9066, a description that corresponds perfectly to the digital books produced by Bookshare, Learning Ally, and HDL, which incorporate accessibility features described in Part I.B., *supra*, and which are used with special reading software to render them into full-featured audio or braille, as well as large text. Senator Chafee did not say that these formats *must be* used with special software; only that they *can be*, i.e., that they are fit for use with such software (unlike the inaccessible formats available on the mass market). The heart of any "digital text" is the text of the original work, so any digital format will necessarily include everything a sighted reader needs to access the work. The Guild's interpretation would read "digital text" right out of the statute.

The Guild complains that HDL uses the same formats to serve both the print-disabled and the "general population" of HDL users. Guild Br. at 50. The Guild is objecting to a widely acknowledged best practice for accessibility: universal design. Beginning with architecture, designers have recognized the advantages of keeping accessibility in mind from the beginning, rather than

adapting and retrofitting inaccessible buildings, technologies, and objects. *See,*
*e.g.*, Ronald L. Mace, A Perspective on Universal Design, Presentation at Hofstra
University's Designing for the 21st Century: An International Conference on
Universal Design (June 19, 1998) *available at*
http://www.ncsu.edu/ncsu/design/cud/about_us/usronmacespeech.htm
("[U]niversal design is design for the built environment and consumer products for
a very broad definition of user that encourages attractive, marketable products that
are more usable by everyone."). Research libraries also recognize the value of this
principle. *See, e.g.*, Association of Research Libraries, *Report of the Task Force on*
*Services to Patrons with Print Disabilities* 8 (2012),
http://www.arl.org/storage/documents/publications/print-disabilities-
tfreport02nov12.pdf ("Universal accessibility should be embedded in future
licensed and acquired products and services so special conversion to a usable
format will only be required for retrospective works."). The latest iteration of the
EPUB standard for e-books incorporates DAISY accessibility requirements, and all
works published in this format following these requirements are accessible by
default. Dkt_79(¶29). Unfortunately, publishers continue to deliberately exclude
the blind by converting these accessible formats into inaccessible ones. Dkt_79(¶¶
43–50).

Of course, HDL does not rely on the Chafee Amendment when it provides scans of, e.g., public domain works to non-disabled users. That a format is appropriate for creation and distribution under the Chafee Amendment does not preempt it from being suitable for distribution to others in appropriate contexts. That the blind can be served by the same formats as the "general population" of HDL users is a good thing, and nothing in Section 121 forbids it.

The Guild cites concerns of the Association of American Publishers (AAP) regarding potential harm to the market for audiobooks and large print books, which were expressed in response to legislative language that would later become Section 121. *On the "NII Copyright Protection Act of 1996" H.R. 2441: Hearing Before the Subcomm. on Courts and Intell. Prop. of the H. Comm. on the Judiciary,* 104th Cong. (1996) (statement of the AAP), *available at* http://judiciary.house.gov/legacy/441.htm. Congress already took those concerns into account in enacting Section 121, balancing them with the concerns of the print disabled community about publishers' reticence in granting permission to create accessible formats. This reticence was precisely the problem the amendment was designed to overcome, by removing the need to seek publishers' permission before creating accessible texts. *See* Tinsley Stmt. ("Large type and sound recording rights are often denied if the publisher hopes to publish in those formats in the future, regardless of any immediate student need."). Congress specifically

17

addressed publishers' concerns through the limitation of access to persons with qualified disabilities and the omission of printed formats other than Braille.[6] To go further and require that all accessible formats be somehow *inaccessible* to sighted people would renegotiate the original compromise to give rightsholders much more than they bargained for, and the print disabled much, much less.

The Guild objects particularly to HDL's making high-resolution optical scans available to disabled users, who can then use magnification technology to aid in their overall access to the work. *See* Guild Br. at 50 (arguing HDL and its partners "unquestionably violate Section 121" by providing formats that include high resolution images). The Guild cites the language regarding printed instructional materials, 17 U.S.C. 121(d)(4)(B), though that provision does not address the creation of digital formats. While the digitization and processing of texts using OCR and OSR are important for the reasons described in Part I.B, *supra*, experiencing text across multiple sensory modalities (where possible) offers the potential for increased learning and comprehension. *See* Learning Ally, How Audiobooks Help Struggling Readers, https://www.learningally.org/parents-students/why-audiobooks-work/ (last visited May 30, 2013). Viewing magnified

---

[6] When Congress later added large print formats for instructional materials to Section 121 as part of the Individuals with Disabilities Education Improvement Act of 2004, it made explicit what was implicit in the original provision—that "exclusively" means "distributed exclusively for use by blind or other persons with disabilities." *See* 17 U.S.C. 121(d)(4)(B).

image scans in concert with text-to-speech of the digitized work provides print-disabled readers who retain some sight with a greater opportunity to comprehend otherwise inaccessible works, fulfilling the purpose of the Chafee Amendment. Nothing in the Amendment's definition of "specialized formats" forbids the use of formats that bundle text and image information into a single digital text to create an accessible package.

## II.   The Guild's Interpretation of "Specialized Formats" Is Inconsistent With Widespread, Industry Standard Tools and Practices

The format limitation that the Guild proposes would turn the Chafee Amendment on its head. By conditioning the provision of accessible copies on an impossible test—that the formats be inaccessible to sighted users—the Guild would simply nullify the statutory provision and its important social purpose. The consequences for print disabled readers would be disastrous.

Bookshare and Learning Ally both use the industry standard DAISY format for most of the digital books they provide to qualified users. Developed by the International DAISY Consortium, the DAISY standard ensures that a digital format is fully accessible to the print disabled. Dkt_79(¶27). Just like the HDL scans, DAISY books can easily be made perceptible to sighted people using widely available software. *See* DAISY Consortium, Software and Hardware: DAISY Players, http://www.daisy.org/software-players (last visited May 30, 2013). Bookshare's own iOS app, Read2Go, renders DAISY books as magnified text on

19

the screen of an iPhone, iPod Touch, or iPad, with simultaneous highlighting of text to allow visual and audio processing of the underlying work. *See* Read2Go | Screenshots, http://read2go.org/?page_id=7 (last visited May 30, 2013). Learning Ally provides its members with a free license to use ReadHear, software for Mac and PC that displays large print text with highlighting functionality along with audio when presented with appropriate digital book files. *See* Learning Ally, ReadHear Frequently Asked Questions, https://www.learningally.org/support-topic/readhear/#using (last visited May 30, 2013). The Guild's interpretation of "specialized formats" would outlaw the use of industry standard DAISY digital texts and software because they allow (indeed, they actively facilitate) the display and audio performance of text in a format that is also necessarily perceptible to non-disabled persons.

The Guild's reading of the Chafee Amendment would also preempt the development of new specialized formats that promise to further the goals of accessibility. For example, the DIAGRAM Center is a project of Benetech and the U.S. Department of Education Office of Special Education Programs with the goal of developing freely available standards, platforms, and software tools for using description and tagging to make images accessible to students who are blind or otherwise disabled. *See* DIAGRAM Center, http://www.diagramcenter.org (last visited May 30, 2013). The output of this technology will be a representation of

20

images by means of spoken words, tags, or other accessible media. While the shift in sensory modality will be transformative and (hopefully) quite helpful to the disabled, the resulting representation will, of course, be perceptible to non-disabled persons, either as text, audio, or a combination of the two. And, like many accessibility technologies, the descriptions created by the DIAGRAM Center will likely be useful to the general population in myriad ways. Thus, while the outputs of this technology would be a "specialized format" if ever there was one, the Guild's misreading of the Chafee Amendment would not allow its creation absent rightsholder consent.

## **CONCLUSION**

For the foregoing reasons, this Court should affirm the holding of the District Court.

Respectfully submitted,

/s/ Brandon Butler
Brandon Butler
21 Dupont Cir NW, Ste. 800
Washington, DC 20036
Bbutler6@me.com
Counsel for Amici
June 4, 2013

21

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 4,718 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the types style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

/s/ Brandon Butler
Brandon Butler
21 Dupont Cir NW, Ste. 800
Washington, DC 20036
Bbutler6@me.com
Counsel for Amici
June 4, 2013

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify, that on this 4th day of June 2013, a true and correct copy of the

foregoing Brief of Amici Curiae Beneficent Technology, Inc. and Learning Ally,

Inc. was timely filed in accordance with FRAP 25(a)(2)(D) and served on all

counsel of record via CM/ECF.

I further certify that on June 4, 2013 I caused six (6) copies of the foregoing Brief

of Amici Curiae Beneficent Technology, Inc. and Learning Ally, Inc. to be

delivered overnight to the Clerk of the United States Court of Appeals for the

Second Circuit.


<u>/s/ Brandon Butler</u>
Brandon Butler
21 Dupont Cir NW, Ste. 800
Washington, DC 20036
Bbutler6@me.com
Counsel for Amici
June 4, 2013