# 12-4547-cv

## United States Court Of Appeals
### *for the*
## Second Circuit

THE AUTHORS GUILD, INC., *et al.*,

*Plaintiffs-Appellants,*

v.

HATHITRUST, *et al.*,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, *et al.*,

*Intervenor Defendants-Appellees.*

(*Full Caption and List of Amici Joining this Brief Provided on Inside Cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF *AMICI CURIAE* HIGHER EDUCATION ASSOCIATIONS IN
SUPPORT OF APPELLEES HATHITRUST, *ET AL.*, AND AFFIRMANCE**

Ada Meloy
General Counsel
American Council
on Education
One DuPont Circle, NW
Washington, DC 20036
(202) 939-9300

June 4, 2013

Bruce G. Joseph
Karyn K. Ablin
WILEY REIN LLP
1776 K St. NW
Washington, DC 20006
(202) 719-7000

*Counsel for Amici Curiae*

THE AUTHORS GUILD, INC., THE AUSTRALIAN SOCIETY OF AUTHORS LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS, ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON, THE AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK FAGLITTERAER FORFATTERO OG OVERSETTERFORENING, THE WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK GRUNDSTROM, HELGE RONNING, JACK R. SALAMANCA,

*Plaintiffs-Appellants,*

v.

HATHITRUST, CORNELL UNIVERSITY, MARY SUE COLEMAN, President, University of Michigan, MARK G. YUDOF, President, The University of California, KEVIN REILLY, President, The University of Wisconsin System, MICHAEL MCROBBIE, President, Indiana University,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE, BLAIR SEIDLITZ, COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

---

**BRIEF OF *AMICI CURIAE* AMERICAN COUNCIL ON EDUCATION, ASSOCIATION OF AMERICAN UNIVERSITIES, ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES, AMERICAN ASSOCIATION OF STATE COLLEGES AND UNIVERSITIES, AMERICAN ASSOCIATION OF COMMUNITY COLLEGES, THE NATIONAL ASSOCIATION OF INDEPENDENT COLLEGES AND UNIVERSITIES, AND EDUCAUSE IN SUPPORT OF APPELLEES HATHITRUST, *ET AL.*, AND AFFIRMANCE**

---

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rules 26.1 and 29(c) of the Federal Rules of Appellate Procedure, *amici* American Council on Education, Association of American Universities, Association of Public and Land-Grant Universities, American Association of State Colleges and Universities, American Association of Community Colleges, the National Association of Independent Colleges and Universities, and EDUCAUSE each states that it is a non-profit association, with no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................................. iv

INTEREST OF *AMICI* .......................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................. 2

ARGUMENT ......................................................................................................... 5

I.    FAIR USE IS INTEGRAL TO COPYRIGHT'S PUBLIC INTEREST
       GOAL OF PROMOTING THE PROGRESS OF SCIENCE –
       UNDERSTOOD TO MEAN LEARNING AND KNOWLEDGE –
       AND THE FAIR USE FACTORS MUST BE ANALYZED IN
       LIGHT OF THIS PURPOSE .......................................................................... 5

       A.    The Constitution Authorizes Congress To Enact Copyright
               Laws for the Public Purpose of Promoting Learning, Not for the
               Private Benefit of Authors ................................................................... 6

       B.    Congress Implemented the Public Purpose of Copyright by
               Creating Significantly Circumscribed Rights. .................................... 8

       C.    Fair Use Is an Integral Part of Copyright Law, Essential To
               Fulfilling the Constitution's Purpose of Promoting Learning. ............ 9

       D.    Fair Use Should Be Construed To Advance Copyright's Public
               Purposes............................................................................................... 10

II.   THE PURPOSE OF THE CHALLENGED USES HEAVILY
       FAVORS FAIR USE – EDUCATION, SCHOLARSHIP, AND
       RESEARCH ARE CORE PUBLIC INTERESTS THAT ARE
       SYNONYMOUS WITH THE PROMOTION OF KNOWLEDGE
       AND LEARNING. ...................................................................................... 11

       A.    The Copyright Act Expressly Favors the Challenged Uses................ 12

       B.    The Public Has a Strong Interest in Fostering Higher Education,
               and the Educational Uses Challenged in this Case Confer

Fundamental Public Benefits Central to the Purpose of the
Copyright Clause and the First Amendment. ................................... 13

1.    The Public's Vital Interest in Higher Education Is an
      American Article of Faith. ...................................... 13

2.    The Right To Acquire Knowledge and Learning Is an
      Essential Right Protected by the First Amendment and,
      Therefore, by Fair Use. ........................................ 19

3.    The Challenged Uses Are Instrumental in Fulfilling
      These Core Public Values and Are Too Important To
      Subject to Narrow, Limited Private Interests. ...................... 21

      a.    The HDL Dramatically Expands Opportunities for
            Education, Research, and Scholarship by Enabling
            Scholars To Conduct Full-Text Searches and Text
            Analysis. ...................................... 21

      b.    The HDL Dramatically and Uniquely Expands
            Educational Opportunities for the Print Disabled,
            Promoting the Goals of the Copyright Clause and
            the Public Policy of the United States. ....................... 23

      c.    The HDL's Preservation Function Ensures that its
            Member Institutions Will Continue To Provide the
            Benefits Described Above and Safeguards the
            Future Progress of Science Against the
            Deterioration or Destruction of Books. ...................... 26

C.    Plaintiffs' Arguments Against Fair Use Are Misguided. ................... 28

CONCLUSION ..................................................... 31

CERTIFICATE OF COMPLIANCE ........................................ 32

CERTIFICATE OF SERVICE .............................................. 33

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**CASES**

*A.V. ex rel. Vanderhye v. iParadigms LLC*,
   562 F.3d 630 (4th Cir. 2009) ............................................................30

*American Geophysical Union v. Texaco, Inc.*,
   802 F. Supp. 1 (S.D.N.Y. 1992), *aff'd*, 60 F.3d 913 (2d Cir. 1994) .................29

*American Geophysical Union v. Texaco Inc.*,
   60 F.3d 913 (2d Cir. 1994) ........................................................11, 29

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006) ...........................................................10

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006) ............................................................5

*Board of Education v. Pico*,
   457 U.S. 853 (1982)................................................................15, 20

*Brown v. Board of Education*,
   347 U.S. 483 (1954)...................................................................15

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994)......................................................5, 9, 13, 29

*Cariou v. Prince*,
   __ F.3d __, No. 11–1197–cv, 2013 WL 1760521 (2d Cir. Apr. 25,
   2013) ...............................................................................9, 10

*Eldred v. Ashcroft*,
   537 U.S. 186 (2002)......................................................6, 12, 20, 21

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
   499 U.S. 340 (1991)....................................................................7

*Fogerty v. Fantasy, Inc.*,
   510 U.S. 517 (1994)....................................................................7

*Golan v. Holder*,
    132 S. Ct. 873 (2012) .................................................................6, 8, 20

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) .................................................................14, 16

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ...............................................30

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ...............................................................20

*Martin v. City of Struthers, Ohio*,
    319 U.S. 141 (1943) ...............................................................19

*Meyer v. Nebraska*,
    262 U.S. 390 (1923) ......................................................3, 14, 19

*Mueller v. Allen*,
    463 U.S. 388 (1983) ...............................................................15

*NXIVM Corp. v. The Ross Institute*,
    364 F.3d 471 (2d Cir. 2004) ..........................................5, 13

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .............................................30

*Plyler v. Doe*,
    457 U.S. 202 (1982) .......................................................14, 15, 17

*Sarl Louis Feraud International v. Viewfinder, Inc.*,
    489 F.3d 474 (2d Cir. 2007) ..............................................20-21

*Sega Enterprises Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1993) .............................................11

*Sony Corp. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ........................................................7, 8, 30

*Stanley v. Georgia*,
    394 U.S. 557 (1969) ...............................................................20

*Sundeman v. Seejay Society, Inc.*,
  142 F.3d 194 (4th Cir. 1998) ........................................................................11

*Suntrust Bank v. Houghton Mifflin Co.*,
  268 F.3d 1257 (11th Cir. 2001) ...................................................................5, 6

*Sweezy v. New Hampshire*,
  354 U.S. 234 (1957)........................................................................................20

*Twentieth Century Music Corp. v. Aiken*,
  422 U.S. 151 (1975)........................................................................................7, 8

*United States v. Paramount Pictures, Inc.*,
  334 U.S. 131 (1948)........................................................................................2, 7

*Wheaton v. Peters*,
  33 U.S. (8 Pet.) 591 (1834) ............................................................................8

*Wright v. Warner Books, Inc.*,
  953 F.2d 731 (2d Cir. 1991) ..........................................................................12, 13

**CONSTITUTIONS**

U.S. Const. art. 1, § 8, cl. 8 ................................................................................2, 5, 6

**STATUTES**

17 U.S.C. §§ 102, 107-122 ...................................................................................8

17 U.S.C. § 107 .....................................................................................................9, 12, 13

17 U.S.C. § 108 .....................................................................................................28

17 U.S.C. § 121 .....................................................................................................25

42 U.S.C. § 12101 .................................................................................................25

Act of May 31, 1790, ch. 15, § 1, 1 Stat. 124 ....................................................6

**LEGISLATIVE MATERIALS**

142 Cong. Rec. S 9061(daily ed. July 29, 1996) ...............................................26

## OTHER AUTHORITIES

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2012)................12

Benjamin Franklin, *Proposals Relating to the Education of Youth in Pennsylvania* (1749), *available at* http://www.archives.upenn.edu/primdocs/1749proposals.html .........................16

*Cultural incineration:  80 years since Nazi book burnings*, *available at* http://www.dw.de/cultural-incineration-80-years-since-nazi-book-burnings/a-16798958 ...........................................................................27

Jing Liao, *A Historical Perspective: The Root Cause for the Underdevelopment of User Services in Chinese Academic Libraries*, 30 J. Acad. Librianship 109 (Mar. 2004) ....................................................27

Orrin Hatch & Thomas Lee, *"To Promote the Progress of Science"; The Copyright Clause and Congress's Power To Extend Copyrights*, 16 Harv. J.L. & Tech. 1 (2002)............................................................................6

Oxford Online Dictionary, *available at* http://oxforddictionaries.com/us/definition/ american_english/scholarship?q=scholarship ....................................................11

Pierre Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) .........10

President Barack Obama, State of the Union Address (Feb. 12, 2013), *available at* http://www.whitehouse.gov/the-press-office/2013/02/12/remarks-president-state-union-address ................................18

President George H.W. Bush, State of the Union Address (Jan. 28, 1992), *available at* http://www.presidency.ucsb.edu/ws/index.php?pid=20544...........18

President George W. Bush, The Third Bush-Kerry Presidential Debate (Oct. 13, 2004), *available at* http://www.debates.org/index.php?page=october-13-2004-debate-transcript...................................................................18

Remarks by the President on College Affordability, Ann Arbor, Michigan, University of Michigan (Jan. 27, 2012), *available at* http://www.whitehouse.gov/the-press-office/2012/01/27/remarks-president-college-affordability-ann-arbor-michigan ....................................17, 18

Remarks by the President on Higher Education and the Economy at the
    University of Texas at Austin (Aug. 9, 2010), *available at*
    http://www.whitehouse.gov/the-press-office/2010/08/09/remarks-
    president-higher-education-and-economy-university-texas-austin ....................14

Remarks of U.S. Secretary of Education Arne Duncan at the TIME Higher
    Education Summit (Oct. 18, 2012), *available at*
    http://www.ed.gov/news/speeches/remarks-us-secretary-education-arne-
    duncan-time-higher-education-summit ...............................................................15

Sandy Baum & Jennifer Ma, *Education Pays: The Benefits of Higher
    Education for Individuals and Society* (2007), *available at*
    http://www.collegeboard.com/prod_downloads/about/news_info/trends/e
    d_pays_2007.pdf .........................................................................................16, 17

*The Library of Alexandria: Center of Learning in the Ancient World* xi (Roy
    McLeod ed. 2004).............................................................................................27

*The Writings of James Madison* (Gaillard Hunt ed. 1900), *available at*
    http://www.justice.gov/oip/foiapost/2008foiapost12.htm ..................................15

Walter McMahon, *Higher Learning, Greater Good: The Private Social
    Benefits of Higher Education* 217-23 (2009) ............................................. 16-17

Webster's Third New International Dictionary (1981) ...........................................11

## INTEREST OF *AMICI*

The American Council on Education, Association of American Universities, Association of Public and Land-Grant Universities, American Association of Community Colleges, American Association of State Colleges and Universities, National Association of Independent Colleges and Universities, and EDUCAUSE submit this brief as *amici curiae* in support of appellees.[1]  *Amici* are seven non-profit associations whose members include the great majority of U.S.-based public and private colleges and universities.  The associations represent all sectors of higher education – public and private, large and small.  They regularly submit amicus briefs in cases raising legal issues important to higher education and seek to foster high standards in higher education, believing that a strong higher education system is the cornerstone of a democratic society.[2]

The  copyright fair use issues presented here profoundly affect the public-interest mission of *amici* and their members, a mission that the Supreme Court has described as one of "supreme importance."  The effort of the Authors Guild and its amici to distort the copyright fair use right into a narrow exception that does not encompass the hugely beneficial non-profit educational activities of HathiTrust and

---

[1] No party's counsel authored this brief in whole or in part.  No party or its counsel or anyone other than *amici*, their members, and their counsel contributed money intended to fund preparation or submission of this brief.

[2] EDUCAUSE is a nonprofit association and the foremost community of information technology leaders and professionals committed to advancing higher education.

the university defendants would greatly impede teaching, learning, research, and scholarship – the very "Progress of Science" that the Constitution commands copyright law to promote. *Amici* have a fundamental interest in protecting the higher education system against this result.

*Amici* offer this brief to present fair use in its proper context, as an integral tool for achieving the Constitution's goal in granting Congress the power to enact copyright laws, and to amplify the defendants' showing that the challenged uses are fair uses. All parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

The Constitution grants Congress the power to enact copyright laws for a specific purpose – "to promote the Progress of Science." U.S. Const. art 1, § 8, cl. 8. The term "the Progress of Science" is understood to refer broadly to the creation and spread of knowledge and learning.

It is well-settled that the rights granted by Congress to accomplish this purpose are granted to serve the public interest, not the copyright owner's private gain. "The copyright law, like the patent statutes, makes reward to the owner a secondary consideration." *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 158 (1948). Thus, copyright rights are carefully limited, and those limitations are a structural part of the statutory balance necessary to accomplish copyright's constitutional purpose. Fair use is one of the most important limitations on

- 2 -

copyright rights, long recognized as an essential means of: (i) ensuring that copyright law does not stifle the very learning that it is designed to promote; (ii) promoting the public interest; and (iii) securing important First Amendment goals.

Given its importance, fair use is not properly viewed as a narrow exception to exclusive property rights; rather, it is an integral part of copyright law and one means by which that law accomplishes its goals of serving the public interest and promoting the spread of learning. Fair use must be construed in light of those goals.

Educational uses, particularly non-profit educational, scholarship, and research uses expressly referenced in section 107 of the Copyright Act, are strongly favored in fair use analysis. Indeed, the public interest in higher education is undeniable – "[t]he American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted." *See*, *e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923). Education is the foundation of citizenship and democracy and the source of enormous benefits for society, the economy, and the individual. Moreover, the right to obtain knowledge and information is an essential First Amendment right, and fair use is a primary means by which copyright law protects First Amendment interests.

The HathiTrust Digital Library ("HDL") facilitates education in numerous ways. First, it fosters traditional modes of education, research, and scholarship by enabling researchers quickly to identify relevant works. More fundamentally, it transforms scholarship, research, and education by enabling scholars to seek, identify, and analyze broad trends in art, literature, and science across time, continents, and disciplines.

The HDL also enormously expands educational opportunities for the print disabled, eliminating for the first time the severe disadvantage that they have historically faced in research, scholarship, and learning. Finally, the HDL preserves humanity's accumulated learning for future generations of scholars. The HDL offers these enormous public benefits entirely because of the contribution of the university defendants and their technology partners, without adversely affecting any traditional or reasonably exploitable market for the works that are digitized.

In the words of Judge Baer, "I cannot imagine a definition of fair use that would not encompass the transformative uses made by Defendants' MDP [Mass Digitization Project] and would require that I terminate this invaluable contribution to the progress of science and cultivation of the arts that at the same time effectuates the ideals espoused by the ADA." Op. and Order, ECF No. 156, at 22

(S.D.N.Y. Oct. 10, 2012) ("Op."). Judge Baer was right. This Court should affirm his judgment.

## ARGUMENT

I.  **FAIR USE IS INTEGRAL TO COPYRIGHT'S PUBLIC INTEREST GOAL OF PROMOTING THE PROGRESS OF SCIENCE – UNDERSTOOD TO MEAN LEARNING AND KNOWLEDGE – AND THE FAIR USE FACTORS MUST BE ANALYZED IN LIGHT OF THIS PURPOSE.**

As the Supreme Court and this Court have repeatedly recognized, fair use must be analyzed "in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994); *see*, *e.g.*, *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006); *NXIVM Corp. v. The Ross Institute*, 364 F.3d 471, 482 (2d Cir. 2004); *accord Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1260 (11th Cir. 2001) (courts must apply fair use factors in light of the history and purpose of the Constitution's Copyright Clause).

Copyright's core purpose is defined by the Constitution, which empowers Congress to grant copyright rights to foster the creation and spread of knowledge and learning. *See* U.S. Const. art. 1, § 8, cl. 8. Copyright exists to promote the public interest, not the private interests of authors. Judged in the context of those purposes, each of the uses challenged in this case is fair use.

**A.    The Constitution Authorizes Congress To Enact Copyright Laws for the Public Purpose of Promoting Learning, Not for the Private Benefit of Authors.**

Article I, section 8, clause 8 of the Constitution grants Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." *Id.* (emphasis added).  Thus, the power to enact copyright laws exists for a specific purpose – "to promote the Progress of Science."[3]

The "'Progress of Science' ... refers broadly to 'the creation and spread of knowledge and learning.'" *Golan*, 132 S. Ct. 873, 888 (2012); *accord Eldred v. Ashcroft*, 537 U.S. 186, 245 (2002) (Breyer, J., dissenting) (describing "the basic Clause objective" as "'promot[ing] the Progress of Science,' *i.e.*, knowledge and learning"); Orrin Hatch & Thomas Lee, *"To Promote the Progress of Science"; The Copyright Clause and Congress's Power To Extend Copyrights*, 16 Harv. J.L. & Tech. 1, 7 (2002) ("Everyone agrees that the notion of 'science' in the founding era referred generally to all forms of knowledge and learning.").[4]

---

[3] "Perhaps counterintuitively for the contemporary reader, Congress' copyright authority is tied to the progress of science; its patent authority, to the progress of the useful arts." *Golan v. Holder*, 132 S. Ct. 873, 888 (2012).  This is clear from the clause's parallel structure.

[4] The English Statute of Anne, which "[t]he Framers of the U.S. Constitution relied on ... when drafting the Copyright Clause of our Constitution," was "introduced as '[a]n act for the encouragement of learning.'" *Suntrust*, 268 F.3d at 1260 & n.4.  The first U.S. Copyright Act was similarly entitled "[a]n Act for the encouragement of learning."  Act of May 31, 1790, ch. 15, § 1, 1 Stat. 124.

The Supreme Court consistently has emphasized that the ultimate goal of copyright is to serve the public interest, not the author's private interest:

> The monopoly privileges that Congress may authorize are neither unlimited nor primarily designed to provide a special private benefit. Rather, the limited grant is a means by which an important public purpose may be achieved.

*Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984); *accord Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526 (1994) ("[T]he monopoly privileges that Congress has authorized ... must ultimately serve the public good.").  Indeed, "[t]he copyright law, like the patent statutes, makes reward to the owner a secondary consideration."  *Paramount Pictures*, 334 U.S. at 158; *accord Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991) (observing that "[t]he primary objective of copyright is not to reward the labors of authors").

Copyright rights are granted to authors to induce them to create and to disseminate their creations.  *See*, *e.g.*, *Paramount Pictures*, 334 U.S. at 158 ("[R]eward to the author or artist serves to induce release to the public of the products of his creative genius."); *Fogerty*, 510 U.S. at 526 (copyright is "intended to motivate the creative activity of authors").  "But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good."  *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156 (1975).  Moreover, "[e]vidence from the founding ...  suggests that inducing <u>dissemination</u> – as opposed to creation

- 7 -

– was viewed as an appropriate means to promote science." *Golan*, 132 S. Ct. at 888.

**B.    Congress Implemented the Public Purpose of Copyright by Creating Significantly Circumscribed Rights.**

Congress has exercised its constitutional power to promote knowledge and learning by creating carefully circumscribed copyright rights.  Plaintiffs attempt to paint the HDL as a "taking [of] their property."  Br. for Pls.-Appellants, ECF No. 54, at 1 (Feb. 25, 2013) ("Appellants' Br.").  They are wrong.  Copyright rights are not absolute property rights but statutory creations subject to important limitations that further the constitutional goal.  *E.g.*, 17 U.S.C. §§ 102(b), 107-122.  "The limited scope of the copyright holder's statutory monopoly ... reflects a balance of competing claims upon the public interest:  Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature." *Aiken*, 422 U.S. at 156.

From the beginning, the Supreme Court consistently has held that copyright is not grounded in any theory of the author's natural right.  It is solely a creature of statute, and the scope of the right is strictly limited by the statutory grant.  *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 659-64, 667-68 (1834); *Sony Corp.*, 464 U.S. at 429 n.10 (observing that copyright law "is not based upon any natural right" of the author and describing the balance between the public benefit from "stimulat[ing] the producer" and the public detriment from "the evils of the temporary

- 8 -

monopoly." (quoting H.R. Rep. No. 2222, 60th Cong., 2d Sess. 7 (1909)).  This Court has agreed, observing that "copyright is not an inevitable, divine, or natural right that confers on authors absolute ownership of their creations.  It is designed rather to stimulate activity and progress in the arts for the intellectual enrichment of the public."  *Cariou v. Prince*, __ F.3d __, No. 11–1197–cv, 2013 WL 1760521 at *4 (2d Cir. Apr. 25, 2013) (quoting Pierre Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1107 (1990)).

In other words, the limitations in the Copyright Act do not contravene any natural order or property right.  Rather they are a structural part of the balanced means by which Congress fulfills its constitutional mandate to promote knowledge and learning.  They should be construed on equal footing with, and as broadly as, the underlying rights.

### C.    Fair Use Is an Integral Part of Copyright Law, Essential To Fulfilling the Constitution's Purpose of Promoting Learning.

One of the most important limitations in copyright law is the fair use right, on which this case turns.  17 U.S.C. § 107.  "From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose … ."  *Campbell*, 510 U.S. at 575. According to Judge Leval, "Fair use should be perceived not as a disorderly basket of exceptions to the rules of copyright, nor as a departure from the principles governing that body of law, but rather as a rational, integral part of copyright,

whose observance is necessary to achieve the objectives of that law."  Pierre Leval,

*Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1107 (1990).  In response to

the rhetorical question "why allow fair use," Judge Leval explains:

> First, all intellectual creative activity is in part derivative.  There is no
> such thing as a wholly original thought or invention.  Each advance
> stands on the building blocks fashioned by prior thinkers.  Second,
> important areas of intellectual activity are explicitly referential.
> Philosophy, criticism, history, and even the natural sciences require
> continuous reexamination of yesterday's theses.
>
> Monopoly protection of intellectual property that impeded referential
> analysis and the development of new ideas out of old would strangle
> the creative process.

*Id*. at 1109.

### D.    Fair Use Should Be Construed To Advance Copyright's Public Purposes.

It follows from the foregoing that fair use should be analyzed, and the four

statutory fair use factors applied, specifically to foster learning and the general

public interest.  "The ultimate test of fair use . . . is whether the copyright law's

goal of 'promoting the Progress of Science and useful Arts' would be better served

by allowing the use than by preventing it."  *Cariou*, 2013 WL 1760521 at *4

(quoting *Castle Rock Entm't , Inc. v. Carol Publ'g Group*, 150 F.3d 132, 141 (2d

Cir. 1998));  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608

(2d Cir. 2006).

More generally, courts recognize that the public interest in a challenged use

deserves strong consideration in fair use analysis. "[C]ourts are more willing to

- 10 -

find a secondary use fair when it produces a value that benefits the broader public interest." *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994); *accord Sundeman v. Seejay Soc'y, Inc.*, 142 F.3d 194, 203-04 (4th Cir. 1998) (considering public benefit from the challenged use in connection with "the development of art, science and industry"); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1993) (reasoning that "we are free to consider the public benefit resulting from a particular use" and that "[p]ublic benefit need not be direct or tangible, but may arise because the challenged use serves a public interest").

Simply put, the challenged uses should be evaluated under the fair use doctrine in light of their inherent public benefit and the constitutional goal of promoting learning. In that light, they are fair use.

## II. THE PURPOSE OF THE CHALLENGED USES HEAVILY FAVORS FAIR USE – EDUCATION, SCHOLARSHIP, AND RESEARCH ARE CORE PUBLIC INTERESTS THAT ARE SYNONYMOUS WITH THE PROMOTION OF KNOWLEDGE AND LEARNING.

Education, scholarship, and research are, of course, primary means by which society promotes learning and knowledge. *See*, *e.g.*, Webster's Third New International Dictionary 723 (1981) (defining "educate" as, *inter alia*, "to develop ... by fostering to varying degrees the growth or expansion of knowledge"); Oxford Online Dictionary, *available at* http://oxforddictionaries.com/us/definition/ american_english/scholarship?q=scholarship (defining "scholarship" as "academic study or achievement; learning of a high level"). Thus, the link between education,

scholarship, and research and the 'Progress of Science" cannot be denied.  Nor can the overarching public benefit of education.

Given this context, it is unsurprising that education, scholarship, and research are primary objectives of the fair use doctrine, which "affords considerable 'latitude for scholarship and comment.'"  *Eldred*, 537 U.S. at 220; *see also Wright v. Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir. 1991) (holding that scholarly biography's use of letters was fair where it "fits comfortably within several of the statutory categories of uses that Congress has indicated may be fair – criticism, scholarship, and research" (quotation marks and citation omitted)).

## A.    The Copyright Act Expressly Favors the Challenged Uses.

Section 107 itself establishes the importance of educational uses in the fair use calculus.  The section's preamble identifies three educational activities as prototypical favored uses – "teaching (including multiple copies for classroom use), scholarship, [and] research." 17 U.S.C. § 107; *see* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][1], at 13-160 (2012) (acknowledging that "'nonprofit educational'" uses "will tend to render a given use 'fair'" and that "the preamble to Section 107 does enumerate certain purposes that are most appropriate for a finding of fair use: 'criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship or research'").

- 12 -

Moreover, in the first of the four factors that courts must consider in assessing whether a use of a copyrighted work is fair – "the purpose and character of the use" – the only use that Congress mandated that courts consider favorably is "whether such use is ... for nonprofit educational purposes."  17 U.S.C. § 107(1).

Congress' explicit inclusion of multiple educational uses in the preamble and in factor one is a strong indication that factor one favors the challenged uses. *See Campbell*, 510 U.S. at 579 ("The [factor one] enquiry here may be guided by the examples given in the preamble to § 107.").  Moreover, "'there is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in section 107.'"  *NXIVM*, 364 F.3d at 477 (quoting *Wright*, 953 F.2d at 736).  "[I]f a book falls into one of these categories [i.e., criticism, scholarship or research], assessment of the first fair use factor should be at an end … ."  *Wright*, 953 F.2d at 736 (alterations in original; citation omitted)).

> **B.**   **The Public Has a Strong Interest in Fostering Higher Education, and the Educational Uses Challenged in this Case Confer Fundamental Public Benefits Central to the Purpose of the Copyright Clause and the First Amendment.**
>
> > **1.**   **The Public's Vital Interest in Higher Education Is an American Article of Faith.**

The importance of education to society and to the individual is so self-evident as to be a truism.  As the Supreme Court observed, "[t]he American people

have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted." *See*, *e.g.*, *Meyer*, 262 U.S. at 400; *accord Plyler v. Doe*, 457 U.S. 202, 221 (1982).

The importance of higher education in particular is similarly well-established. The Supreme Court has "long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Higher education is so important that the Supreme Court has found that it should be universally available. *See id.* at 331 (observing that "the diffusion of knowledge and opportunity through public institutions of higher education must be accessible to all individuals").

The President agrees, stressing the duty of society to ensure that a good education is accessible to all: "[t]he single most important thing we can do is to make sure we've got a world-class education system for everybody… . It is an obligation that we have for the next generation." Remarks by the President on Higher Education and the Economy (Aug. 9, 2010), *available at* http://www.whitehouse.gov/the-press-office/2010/08/09/remarks-president-higher-education-and-economy-university-texas-austin. Indeed, "[p]olls show that three out of four Americans believe 'in order to get ahead in life these days, it is

- 14 -

necessary to get a college education.'"  Remarks of U.S. Secretary of Education

Arne Duncan (Oct. 18, 2012), *available at*

http://www.ed.gov/news/speeches/remarks-us-secretary-education-arne-duncan-

time-higher-education-summit.

An educated public provides innumerable societal benefits.  Perhaps most

fundamentally, an educated citizenry is the predicate of a thriving democracy.

*Mueller v. Allen*, 463 U.S. 388, 395 (1983) (observing that "[a]n educated populace

is essential to the political and economic health of any community").  "Indeed, the

Constitution presupposes the existence of an informed citizenry prepared to

participate in governmental affairs ... ."  *Bd. of Educ. v. Pico*, 457 U.S. 853, 876

(1982) (Blackmun, J., concurring).  As James Madison observed, "[k]nowledge

will forever govern ignorance:  And a people who mean to be their own Governors

must arm themselves with the power which knowledge gives."  Letter from James

Madison to W.T. Barry (Aug. 4, 1822), in *The Writings of James Madison*

(Gaillard Hunt ed. 1900), *available at*

http://www.justice.gov/oip/foiapost/2008foiapost12.htm.

Education "is the very foundation of good citizenship."  *Brown v. Bd. of

Educ.*, 347 U.S. 483, 493 (1954); *accord Plyler*, 457 U.S. at 223.  "'[E]ducation

prepares individuals to be self-reliant and self-sufficient participants in society.'"

*Id.* at 222.  Inculcating not only "an ability" but also "an inclination" "to serve

mankind, one's country, friends and family" is "the great Aim and End of all learning."  Benjamin Franklin, *Proposals Relating to the Education of Youth in Pennsylvania* (1749), *available at* http://www.archives.upenn.edu/primdocs/1749proposals.html.  The Supreme Court has:

> repeatedly acknowledged the overriding importance of preparing students for work and citizenship, describing education as pivotal to "sustaining our political and cultural heritage" with a fundamental role in maintaining the fabric of society.

*Grutter*, 539 U.S. at 331 (quoting *Plyler*, 457 U.S. at 221).

Government statistics confirm the positive influence of an education on a person's sense of civic duty.  "Higher levels of education are correlated with higher levels of civic participations, including volunteer work, voting, and blood donation, as well as with greater levels of openness to the opinions of others." Sandy Baum & Jennifer Ma, *Education Pays: The Benefits of Higher Education for Individuals and Society*, 2, 25-28 (2007) (based on data from the Bureau of Labor Statistics, National Center for Health Statistics, the U.S. Census Bureau, and the National Opinion Research Center), *available at* http://www.collegeboard.com/prod_downloads/about/news_info/trends/ed_pays_2 007.pdf.  Education also contributes to lower crime rates, air and water pollution rates, and health and prison costs.  *See* Walter McMahon, *Higher Learning,*

- 16 -

*Greater Good: The Private Social Benefits of Higher Education* 217-23, 232-35, 238-39 (2009).

In addition to the obvious civic benefits fostered by an education, higher education contributes to tangible economic benefits in the form of higher earnings, lower unemployment, and higher tax revenues to the public fisc:

> Higher levels of education correspond to lower unemployment and poverty rates. So, in addition to contributing more to tax revenues than others do, adults with higher levels of education are less likely to depend on social safety-net programs, generating decreased demand on public budgets.

Baum & Ma, *supra* at 2, 18-19 (based on U.S. Census Bureau data); *see also id.* ("There is a positive correlation between higher levels of education and higher earnings for all racial/ethnic groups and for both men and women."). In short, "education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all." *Plyler*, 457 U.S. at 221.

President Obama has repeatedly recognized the economic benefits of an educated populace, emphasizing that "in this economy, there is no greater predictor of individual success than a good education." Remarks by the President on College Affordability, Ann Arbor, Michigan, University of Michigan (Jan. 27, 2012), *available at* http://www.whitehouse.gov/the-press-office/2012/01/27/remarks-president-college-affordability-ann-arbor-michigan. He observed that:

- 17 -

> Today, the unemployment rate for Americans with a college degree or more is about half the national average. Their incomes are twice as high as those who don't have a high school diploma. College is the single most important investment you can make in your future.

*Id.* He further asserted in his most recent State of the Union address that "[i]t's a simple fact the more education you've got, the more likely you are to have a good job and work your way into the middle class." President Barack Obama, State of the Union Address (Feb. 12, 2013), *available at* http://www.whitehouse.gov/the-press-office/2013/02/12/remarks-president-state-union-address.

Other Presidents similarly have recognized the strong public interest in education. *See*, *e.g.*, President George H.W. Bush, State of the Union Address (Jan. 28, 1992), *available at* http://www.presidency.ucsb.edu/ws/index.php?pid=20544 ("The workplace of the future will demand more highly skilled workers than ever, more people who are computer-literate, highly educated. We must be the world's leader in education."); President George W. Bush, The Third Bush-Kerry Presidential Debate (Oct. 13, 2004), *available at* http://www.debates.org/index.php?page=october-13-2004-debate-transcript ("But perhaps the best way to keep jobs here in America and to keep this economy growing is to make sure our education system works. ... Education is how to make sure we've got a workforce that's productive and competitive.").

### 2. The Right To Acquire Knowledge and Learning Is an Essential Right Protected by the First Amendment and, Therefore, by Fair Use.

The benefits of a vigorous educational system are not merely abstract goals to be pursued when convenient; the right to acquire knowledge and learning is an essential constitutional right protected by the First Amendment. It therefore deserves special consideration as fair use.

In a long line of cases dating back nearly a century, the Supreme Court has recognized the constitutional right of every citizen to have access to knowledge and learning. In 1923, for example, the Court found that the Constitution protects "the right of the individual ... to acquire useful knowledge." *Meyer*, 262 U.S. at 399. Twenty years later, the Court reiterated the importance of the right to disseminate and receive knowledge, observing that "[t]he right of freedom of speech and the press has broad scope" and that "[t]his freedom embraces the right to distribute literature and necessarily protects the right to receive it." *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943) (citation omitted). It emphasized that "[f]reedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved." *Id*. at 146-47. By 1969, the Supreme Court recognized that "[i]t is now well established that the Constitution protects the right to receive

- 19 -

information and ideas," observing that this right "is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

This right to receive such knowledge "follows ineluctably from the sender's First Amendment right" and "is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Pico*, 457 U.S. at 867. For that reason, it is settled law that "'the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge.'" *Id*. at 866 (citation omitted).

The Supreme Court has emphasized that "this right [to receive knowledge and ideas] is 'nowhere more vital' than in our schools and universities." *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

Fair use is the means by which First Amendment rights are protected against overreaching claims of copyright infringement. As the Supreme Court has stated, fair use serves as a "built-in First Amendment accommodation[]" and "affords considerable latitude for scholarship and comment." *Golan*, 132 S. Ct. at 890; *accord Eldred*, 537 U.S. at 219-20; *see also Sarl Louis Feraud Int'l v. Viewfinder,*

*Inc.*, 489 F.3d 474, 482 (2d Cir. 2007) ("[T]he fair use doctrine balances the competing interests of the copyright laws and the First Amendment ... .").  Thus, fair use should be applied in a manner that safeguards this essential right.  *See Eldred*, 537 U.S. at 221 n.24 ("[I]t is appropriate to construe copyright's internal safeguards to accommodate First Amendment concerns.").

> ### 3.    The Challenged Uses Are Instrumental in Fulfilling These Core Public Values and Are Too Important To Subject to Narrow, Limited Private Interests.

Each of the three challenged uses – providing library access to the print disabled, enabling full-text searches, and preservation – promotes the public interest in higher education, learning, research, and scholarship that is central to the Copyright Clause's purpose.  Indeed, Plaintiffs concede "that the MDP has scholarship and research purposes."  Appellants' Br. 25.  The challenged uses are quintessentially fair use.

> ### a.    The HDL Dramatically Expands Opportunities for Education, Research, and Scholarship by Enabling Scholars To Conduct Full-Text Searches and Text Analysis.

The HDL's full-text search capability transforms the ability to conduct academic research and opens the door to entirely new modes of scholarly thought and analysis.  The search function thus powerfully furthers the Copyright Clause's goal of promoting knowledge and learning, and it does so without ever disclosing any of the expressive content of any copyrighted works.  As the university

defendants in this case observe, "[f]ull-text searching is the most significant advance in library search technology in the last five decades."  Br. for Defs.-Appellees, ECF No. 107, at 10 (May 28, 2013) ("Library Appellees' Br.").

Before the HDL offered its text-searchable database of millions of digitized books, scholars were forced to search card catalogs and physical copies of books to identify potentially relevant material.  They were then forced to review those works page by page, aided at most by a table of contents and an index, in search of relevant content.  With the HDL, however, scholars now can perform in seconds what used to take days, months, or even years – if it was possible at all – namely, searching millions of works for relevance to a particular research endeavor based on the presence and frequency of user-specified words or phrases.

Moreover, the HDL permits textual analysis of an entire library.  Such analysis has resulted in striking new research findings, including:

- Fish oil supplementation ameliorates "Raynaud Syndrome," and magnesium supplementation alleviates migraines (Library Appellees' Br. 13);

- Identification of a molecule associated with Huntington's Disease (*id.*);

- The characteristics of "Harriet Beecher Stowe's fiction are closer "to the work of male authors of her generation than to the female-authored works" with which her works traditionally have been categorized (Br. of Digital Humanities & Law Scholars as *Amici Curiae*, No. 1:11-cv-6351, ECF No. 123, at 8 (S.D.N.Y. July 7, 2012);

- Nineteenth-century Irish works referred to American slavery far more frequently than contemporaneous British works, perhaps reflecting greater concern about the institution (*id.* at 9); and

- The noun "United States" was used mostly with plural verbs until the late nineteenth century, suggesting a collection of states rather than a single nation (*id.* at 7).

The above examples barely scratch the surface of the numerous, powerful research avenues that now may be explored with the HDL to fulfill the Copyright Clause's purpose of advancing knowledge and learning. It is no overstatement that the HDL rivals in importance such milestones as Gutenberg's invention of the printing press, the Rosetta Stone's discovery, Martin Luther's translation of the Bible into German, the creation of the Library of Congress, and the development of the American public library system in promoting the spread of knowledge. This core educational purpose of the HDL and its revolutionary effect on the ability to conduct scholarly research that contributes to the public corpus of knowledge and learning strongly supports a finding that it constitutes fair use.

> **b.    The HDL Dramatically and Uniquely Expands Educational Opportunities for the Print Disabled, Promoting the Goals of the Copyright Clause and the Public Policy of the United States.**

The HDL opens educational opportunities for the print disabled in a way never before possible and thus directly advances the Copyright Clause's goal of promoting knowledge and learning. *See* Br. for Intervenor Defs.-Appellees 10-12 (May 28, 2013) ("NFB Br."); *see also* Library Appellees' Br. 14-15.

- 23 -

Before the HDL, print-disabled scholars were severely disadvantaged vis-à-vis sighted ones in their ability to access the full body of written knowledge and efficiently conduct research using that knowledge.  Although a student without print disabilities at the University of Michigan "has access to some eleven million print volumes,"  only a tiny fraction of that number, about 200,000 books, were available in accessible formats to the print disabled before the HDL.  NFB Br. 11-12.  Moreover, many of those formats were difficult to navigate and use for research and study.  *Id*. at 11.

The HDL, however, radically transformed and accelerated the way in which print-disabled scholars may receive an education and contribute to the body of knowledge through their own research and writing.  Because of the HDL, the print disabled now are able:

> to join in research endeavors: to use a comprehensive library to locate accumulated knowledge on specific points, to trace the development of ideas from age to age and from scholar to scholar, and to synthesize seemingly unrelated data into startling new results.  The HDL transports blind students and scholars from a world of delayed access to individual titles on a limited, ad hoc basis to a world where they have immediate and equal access to a new universe of knowledge.

*Id.* at 12-13.  In the words of the NFB, "the HDL stands alone in its ability to provide blind students and scholars an equal opportunity to pursue knowledge."

*Id.* at 15.   By making its collection of books available to the print disabled in

digital form for education, research, and scholarship, the HDL fulfills the core purpose of copyright and promotes the Progress of Science.

The HDL promotes the public interest in other ways as well. Congress has repeatedly declared that the public policy of the United States is to ensure that the disabled, including the print disabled, fully participate in the benefits of modern society. In the 1990 Americans with Disabilities Act ("ADA"), Congress found that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(5), (7). To this end, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Id.* § 12101(b)(1).

Congress amplified this public policy in 17 U.S.C. § 121, which confirms that copyright rights should not be allowed to interfere with providing the print disabled full access to materials available to individuals without print disabilities. That section grants an infringement safe harbor to defined entities that make copies of published nondramatic works for distribution to the blind in specialized formats. In testimony regarding this provision, then-Register of Copyrights, Marybeth Peters, stated that "[b]lind and physically handicapped readers have a legitimate need for prompt and timely access as soon as possible after works become

- 25 -

available to the general reading public."  142 Cong. Rec S 9061, 9066 (daily ed. July 29, 1996).

In short, the HDL directly advances these strong public interests and the Copyright Clause's goal of promoting knowledge by greatly expanding the educational opportunities available to the print disabled.

> **c.    The HDL's Preservation Function Ensures that its Member Institutions Will Continue To Provide the Benefits Described Above and Safeguards the Future Progress of Science Against the Deterioration or Destruction of Books.**

The HDL's making and retention of copies to ensure that its digital works are preserved for the future directly promotes the Progress of Science.  First, such preservation ensures that the core fair uses described above will continue to be provided.

Second, preservation of the HDL ensures that the available body of knowledge is not reduced through the intentional or inadvertent destruction of physical copies of books.   Not only can physical books be lost through natural disasters and deterioration (Library Appellees' Br. 6-8), but history is filled with tragic examples of the large-scale destruction of accumulated knowledge by fire, invasion, and zealotry.  Perhaps the most notorious such example is the destruction of the wisdom of antiquity accumulated "by generations of resident scholars and philosophers" in the great library of Alexandria.  The destruction began "[w]hen

- 26 -

Julius Caesar captured Alexandria in 47 BC" and continued episodically, until some 500 years later "[m]ore destruction ... removed from scholarship a priceless inheritance of Greek, Hebrew, and probably Mesopotamian literature, and much of what was then known of ancient Egypt."  *See The Library of Alexandria: Center of Learning in the Ancient World* xi (Roy McLeod ed. 2004).

Chinese history includes numerous instances of massive book destructions, including the 213 BC "'Incidence of Burning Books and Executing Intellectuals' ordered by Qin Shihuang," during which "countless precious books were burned." *See* Jing Liao, *A Historical Perspective: The Root Cause for the Underdevelopment of User Services in Chinese Academic Libraries*, 30 J. Acad. Librarianship 109, 112 (Mar. 2004).  More recently, "libraries in China lost 1 billion items" during World War II.  *Id.*

And, of course, the Nazis recognized the power of destroying knowledge. During the "holocaust of books," on May 10, 1933, "some of Germany's most valuable creative works went up in flames." *Cultural incineration:  80 years since Nazi book burnings*, *available at* http://www.dw.de/cultural-incineration-80-years-since-nazi-book-burnings/a-16798958.

The creation of multiple, geographically separated digital copies of works is a powerful safeguard against the destruction of humanity's collective knowledge.

If physical copies are destroyed, digital copies can ensure that knowledge is not irretrievably lost.

### C.     Plaintiffs' Arguments Against Fair Use Are Misguided.

Plaintiffs' primary argument that the challenged uses are not fair is that library uses are subject to an "express limitation" set forth in section 108, the "violation" of which weighs against fair use.  Appellants' Br. 29-30.  But this argument directly contradicts the unambiguous statutory text.  Section 108 could not be more explicit: "Nothing in this section . . . in any way affects the right of fair use as provided by section 107."  17 U.S.C. § 108(f)(4).  This explicit statutory mandate controls.[5]

When Plaintiffs do attempt to apply this Court's fair use jurisprudence, they incorrectly limit their analysis of the first factor to whether the challenged use is "transformative."  Appellants' Br. 30-35.  First, as the Library Appellees demonstrate, the challenged uses are transformative.  Library Appellees' Br. 22-29, *see* Op. at 16, 18 (district court holding digital search and access for the print-disabled to be transformative).

---

[5] Nor does the district court's application of fair use "render Section 108 meaningless."  Appellants' Br. 30.  Section 108 provides safe harbors that relate to reproduction and the general making available to the public of copies.  The digital copies made by HDL are not made available generally to the public.  Moreover, safe harbors, such as section 108, have a significantly different function in copyright law than the case-specific fair use doctrine.  They provide a floor under fair use, not a ceiling above it.  Here, the court analyzed the fair use factors and properly found that the HDL's uses comfortably fit.

- 28 -

Moreover, Plaintiffs' suggestion that <u>only</u> transformative uses can be fair is simply wrong. Where, as here, noncommercial educational uses are at issue, the use need not be transformative to be fair, as the Supreme Court made clear in the very case in which it first discussed the relevance of the transformative use inquiry: "The obvious statutory exception to this focus on transformative uses is the straight reproduction of multiple copies for classroom distribution." *Campbell*, 510 U.S. at 579 n.11. Similarly, Judge Leval has observed that "[s]econdary users have succeeded in winning the first factor by reason of <u>either</u> (1) transformative (or productive) nonsuperseding use of the original, <u>or</u> (2) noncommercial use, generally for a socially beneficial or widely accepted purpose." *Am. Geophysical Union v. Texaco, Inc.*, 802 F. Supp. 1, 12 (S.D.N.Y. 1992) (emphasis added), *aff'd*, 60 F.3d 913 (2d Cir. 1994).[6] The challenged uses undeniably are socially beneficial.

Finally, Plaintiffs' argument that the number of books digitized for HDL weighs against fair use is misguided. Appellants' Br. 36; *see also* Br. of Ass'n of Am. Publ'rs as *Amicus Curiae* 4 (Mar. 4, 2013) (incorrectly decrying the district court's careful application of fair use as creation of a "blanket exception" and

---

[6] This Court deemed Judge Leval's discussion "insightful." *Texaco*, 60 F.3d at 921.

"judicial legislation").[7] There is no statutory limit to the number of works that may

fairly be used. Indeed, courts have regularly approved as fair use the copying of

enormous quantities of works when the purposes of the use justify the copying.

*See*, *e.g.*, *Sony*, 464 U.S. at 422, 447-56 (holding that copying by "millions of

Betamax video tape recorders" was fair use); *Kelly v. Arriba Soft Corp.*, 336 F.3d

811, 815, 817-22 (9th Cir. 2003) (holding that copying by a search engine that

crawled the World Wide Web looking for images to copy and index was fair use);

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163-68 (9th Cir. 2007)

(holding that Google's indexing and copying "millions of ... images" from the

Internet was fair use); *A.V.  ex rel. Vanderhye v. iParadigms LLC*, 562 F.3d 630,

637-45 (4th Cir. 2009) (holding a plagiarism detection database that today contains

more than 24 billion web pages, 300 million student papers, and millions of articles

to be fair use).[8] The relevant issue is not the number of works, but the hugely

beneficial educational and transformative purposes that the HDL undeniably

serves.

---

[7] The MPAA's plea to "[l]eave mass digitization to the marketplace," Br. of Motion Picture Ass'n of Am., Inc. as *Amicus Curiae* 14 (Mar. 8, 2013), is effectively a plea to subject the enormous public benefits of the HDL to the economic self-interest of commercial enterprises, precisely what the fair use doctrine is designed to avoid.

[8] Database size from http://turnitin.com/en_us/products/originalitycheck, May 30, 2013.

## **<u>CONCLUSION</u>**

The district court's judgment should be affirmed.


Respectfully submitted,


<u>/s/ Bruce Joseph</u>

| | |
|---|---|
| Ada Meloy | Bruce Joseph |
| American Council | Karyn Ablin |
| on Education | WILEY REIN LLP |
| One Dupont Circle, NW | 1776 K St. NW |
| Washington, DC 20036 | Washington, DC 20006 |
| 202-939-9300 | 202-719-7000 |
| ameloy@acenet.edu | bjoseph@wileyrein.com |
| | kablin@wileyrein.com |

*Counsel for Amici Curiae*


June 4, 2013

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7), the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 29(d) and Fed. R. App. P. 32(a)(7)(B).

1.     Exclusive of the exempted portions in Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 6,949 words.

2.     This brief has been prepared in proportionally spaced 14-point font typeface using Microsoft Office Word 2010 in Times New Roman typeface.

/s/  Bruce G. Joseph

June 4, 2013

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 4th day of June, 2013, the Brief of *Amici Curiae* American Council on Education, Association of American Universities, Association of Public and Land-Grant Universities, American Association of State Colleges and Universities, American Association of Community Colleges, the National Association of Independent Colleges and Universities, and EDUCAUSE in Support of Appellees HathiTrust, *et al.*, and Affirmance was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

/s/  Bruce G. Joseph