# 12-4547-CV

## United States Court of Appeals

*for the*

## Second Circuit

THE AUTHORS GUILD, INC., THE AUSTRALIAN SOCIETY OF
AUTHORS LIMITED, UNION DES ECRIVAINES ET DES
ECRIVAINS QUEBECOIS, ANGELO LOUKAKIS, ROXANA
ROBINSON, ANDRE ROY, JAMES SHAPIRO, DANIELE
SIMPSON, T.J. STILES, FAY WELDON,

*(For Continuation of Caption See Following Page)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR AMICI CURIAE UNIVERSITIES:  THE BOARD OF
TRUSTEES OF THE UNIVERSITY OF ILLINOIS, THE BOARD OF
TRUSTEES OF MICHIGAN STATE UNIVERSITY,  THE REGENTS OF
THE UNIVERSITY OF MINNESOTA, THE BOARD OF REGENTS OF
THE UNIVERSITY OF NEBRASKA, NORTHWESTERN UNIVERSITY,
THE PENNSYLVANIA STATE UNIVERSITY AND THE TRUSTEES OF
PURDUE UNIVERSITY**

Susan M. Kornfield
BODMAN PLC
201 South Division, Suite 400
Ann Arbor, MI 48104

THE AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING
AND COLLECTING SOCIETY, SVERIGES
FORFATTARFORBUND, NORSK FAGLITTERAER
FORFATTERO OG OVERSETTERFORENING, THE WRITERS'
UNION OF CANADA, PAT CUMMINGS, ERIK GRUNDSTROM,
HELGE RØNNING, JACK R. SALAMANCA,

*Plaintiffs-Appellants,*

v.

HATHITRUST, CORNELL UNIVERSITY, MARY SUE
COLEMAN, President, University of Michigan, MARK G. YUDOF,
President, The University of California, KEVIN REILLY, President,
The University of Wisconsin System, MICHAEL MCROBBIE,
President, Indiana University,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, GEORGINA
KLEEGE, BLAIR SEIDLITZ, COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

# CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure, *Amici curiae* The Board of Trustees of the University of Illinois, The Board of Trustees of Michigan State University, The Regents of the University of Minnesota, The Board of Regents of The University of Nebraska, Northwestern University, The Pennsylvania State University, and The Trustees of Purdue University, by and through their undersigned counsel, each certify that they have no parent corporation and have not issued any stock.

BODMAN PLC

*/s/  Susan M. Kornfield*

Susan M. Kornfield
201 South Division, Suite 400
Ann Arbor, MI  48104
Telephone: (734) 930-2488
Facsimile: (734) 930-2494
Email: skornfield@bodmanlaw.com

*Attorneys for Amici Universities: The Board of Trustees of the University of Illinois, The Board of Trustees of Michigan State University, The Regents of the University of Minnesota, The Board of Regents of the University of Nebraska, Northwestern University, The Pennsylvania State University, and The Trustees of Purdue University*

i

# TABLE OF CONTENTS

I.  INTERESTS OF *AMICI* AND SUMMARY OF ARGUMENT .........................1

II.  DIGITAL CONTENT AND THE ADVANCEMENT OF KNOWLEDGE.......4

III.  FAIR USE AND ACADEMIC INSTITUTIONS .............................................6

   *A. Universities Understand Rights and the Limitations on those Rights.* ...........7

   *B. Assessing the Evidence.* ....................................................................8

   *C. Copying Works in Their Entireties Can Be a Fair Use and a Transformative Use.* ......................................................................................10

   *D. The Guild Misstates the Legal Framework for Infringement.*........................13

IV.  THE GUILD HAS FAILED TO MEET ITS BURDEN ...................................14

   *A. Congress Did Not Grant Copyright Holders The Exclusive Right To Copy Their Works.*.......................................................................................16

   *B. Congress Did Not Make Fair Use an "Affirmative Defense."* .....................19

   *C. Proponent of Fair Use Has the Burden of Raising the Defense and of Producing Evidence – Never the Burden of Proving Non-Infringement.*.............21

V.  CONCLUSION ...............................................................................24

## Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Circ. 2009) ..........12

*Accord, Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1230 n.3 (11th Cir. 2002) ....22

*Authors Guild, Inc. v. HathiTrust,* 902 F. Supp. 2d 445, 452-53 (S.D.N.Y. 2012)..4, 8, 9, 14

*Belmore v. City Pages, Inc.*, 880 F.Supp. 673 (D.Minn. 1995)...............................11

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006)....11

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2008) ........................................................11

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586-87 (1994) .......................10

*Embrex, Inc. v. Service Eng'g Corp.*, 216 F.3d 1343, 1349 (Fed. Cir. 2000).........19

*Feist Publ's, Inc., v. Rural Telephone Serv. Co.*, 499 U.S. 340, 350 (1991) ..........17

*Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006)...................................11

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517-18 (1994).....................................................3

*Keeler Brass Co. v Continental Brass Company,* 862 F.2d 1063, 1066 (4th Cir. 1988) .......................................................................................................................22

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003).......................................11

*Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1358 (2013) ....................18

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 124 (2004)........................................................................................................................20

*Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003) .................11

*Nuñez v. Caribbean Int'l News, Corp.*, 235 F.3d 18 (1st Cir. 2000)......................11

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007)....................11

*Quality King Distribs., Inc. v. L'Anza Research Int'l, Inc.*, 523 U.S. 135, 150 (1998)........................................................................................................................18

*See Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir.1995)...........................21

*See Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) ...................16

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1993)......................11

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). 11, 12, 17

*Sony Entm't v. Connectix Corp.* 203 F.3d 596 (2000)............................................11

*Sundeman v. Seajay Society, Inc.*, 142 F.3d 194 (4th Cir. 1998) ...........................11

*Suntrust v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001) .......................13

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010) .20

*Whittemore v. Cutter,* 29 F. Cas. 1120, 1121 (C.C.D. Mass. 1813) (No. 17,600) ..19

**Statutes**

17 U.S.C. § 101 ............................................................................. *passim*

## Rules

Fed. R. Civ. P. 8 ...............................................................................21
Fed. R. Evid. 301 .............................................................................21
Federal Rule of Appellate Procedure 32(a)(6)....................................1
Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); .............................1
Second Circuit Rule 29.1(b) ............................................................1


## Article

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Har L. Rev. 105, 1111 (1990)10

The Board of Trustees of the University of Illinois, The Board of Trustees of Michigan State University, The Regents of the University of Minnesota, The Board of Regents of the University of Nebraska, Northwestern University, The Pennsylvania State University, and The Trustees of Purdue University submit this *amicus* brief in support of Defendants-Appellees and request that the decision of the District Court be affirmed.  All parties have consented to the submission of this brief.[1]

## I.  INTERESTS OF *AMICI* AND SUMMARY OF ARGUMENT

Nothing is more fundamental to the mission of universities than the advancement of knowledge through teaching, research, and scholarship.  These activities could not take place without university libraries.  The litigation against the HathiTrust and the other Defendants-Appellees (collectively, "the Libraries") is a threat to the libraries, and thus the universities, putting at risk their ability to use effectively the materials they have purchased at a cost of hundreds of millions of dollars.

*Amici* are nonprofit universities in the United States with hundreds of thousands of educators, research faculty, scholars, enrolled students, and staff.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5) and Second Circuit Rule 29.1(b), *amici* state that no counsel for a party has written this brief in whole or in part; and that no person or entity, other than the *amici* or counsel for *amici* has made a monetary contribution that was intended to fund the preparation or submission of this brief.

They are members of the HathiTrust but are not defendants in the instant litigation. *Amici* have a deep interest in the outcome of the case because they rely upon the HathiTrust Digital Library (HDL) for research, scholarship, education, and preservation of library collections; they have digitization programs apart from the HDL; and they engage in fair use every day.  They expect that a court will ensure that any copyright holder seeking to interfere with such teaching, research, and scholarship will have to prove that the university's conduct is not fair use. Congress did not codify fair use as a defense, it identified it as a "right" that exists "notwithstanding" the rights of copyright holders, which are in turn "subject to" fair use.  The federal rules of pleading and evidence also support the conclusion that once a defendant has raised the issue of its fair use and proffered evidence in support, it is plaintiff that must prove that defendant's conduct is not authorized by §107 of the Copyright Act. *Amici* support the district court's holding that the HathiTrust clearly made a fair use of the works of Plaintiffs-Appellants (collectively, "the Guild").

For more than a decade, universities have been digitizing their print collections to preserve them and improve access to and use of their materials. It is expensive, laborious, and slow – but necessary to support their mission.  The HathiTrust secure digital repository is a tremendous advancement in the use and stewardship of library collections.  It enables access to materials previously not

2

accessible, new kinds of scholarship, development of new research methodologies, and preservation. With the HDL, *Amici* are better able to meet the demands and expectations of 21st century institutions of higher education.

*Amici* are also copyright holders in an incalculable number of works. They fund and otherwise support the creation of millions of copyrighted works and make decisions regarding the use and protection of their copyrights. They desire that their works be digitized and used in the manner developed by the HathiTrust.

The arguments advanced by the Guild, if accepted by the courts, would impair the ability of *Amici* to make rational decisions about the acquisition of library materials and the implementation of fair use throughout their universities. "Because copyright law ultimately serves the purpose of enriching the general public through access to creative works, it is peculiarly important that the law's boundaries be demarcated as clearly as possible." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517-18 (1994). This Court's demarcation in favor of fair use will advance copyright's goal of public knowledge and ensure the "breathing space" that lies in the "heart of fair use." *Id.* at 579. Its ruling on standing will ensure that the only parties who can sue for copyright infringement are those who meet the requirements of the U.S. Copyright Act.[2]

---

[2] "The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it."

## II. DIGITAL CONTENT AND THE ADVANCEMENT OF KNOWLEDGE

In a university library, content comes in many forms and formats. Sometimes the format enables a particular learning experience. One can read an article about the Gutenberg bible, see a photograph of it, visit the New York Public Library and view one of the remaining original Gutenberg bibles in a display case, and (if digitized) search across its text. If that digitized bible is part of a corpus of millions of other digital materials, one can develop a completely different understanding of the content of that bible and of its influence on culture in the past 500 years. It becomes much more than "just" the first major book printed in the West with movable type. Whether a work is in the public domain or under copyright, the form of the work affects the very nature of the learning that can take place.

This is not just the promise of the HDL, it is the reality. *Amici* use the HDL in myriad ways, including to:

- Locate (instantaneously) rare and obscure materials from centuries ago. Without the HDL, access might be literally or practically impossible and require the expenditure of thousands of dollars and extensive time in travel and investigation.

- Locate materials with extremely small print runs. In some cases, the HDL could be the only repository where the material can be found.

---

17 U.S.C. § 501(b). Some of the named plaintiffs do not hold legal or beneficial rights in the copyrights at issue. *Authors Guild, Inc. v. HathiTrust,* 902 F. Supp. 2d 445, 452-53 (S.D.N.Y. 2012).

4

- Locate information that was never indexed and can only be found by text searching.

- Create new scholarship and author new works with greater depth, insight, authority, correctness, and completeness that could not otherwise be written.  The HDL facilitates this process because reading every book ever written is not possible, and information does not always turn up where one might expect.

- Develop, test, and design machine learning algorithms.  This is useful in the design of technology and data architecture and human-machine interfaces.

- Design research that cannot otherwise be conducted. For example, the HDL allows the gathering and presentation of data in a visual manner, including geospatially and temporally significant patterns of representation, which enables different kinds of understanding of information, concepts, and events.

- Enable professors to design courses to improve student research skills in a manner which could not otherwise be accomplished if research was limited to print books and existing online materials.

- Develop computer-based methods and analytic tools based on natural language processing, social network analysis, graph theory, and statistics.  The methods may, in time, enable the development of technology that can conduct genre analysis on gigabytes of data, obviating the need for human analysts.

- Mitigate or prevent local data corruption, loss, or disaster.  The stability of the HDL allows focus on activities that are not duplicative of the activities of the HDL.  Because the HDL is a certified Trusted Repository, the digital materials are safe.

- Enable those with print disabilities to have access to knowledge available to those who do not have print disabilities.

5

The HDL enables online reading and downloading of content in the public domain.  Other than for library users with print disabilities and other § 108 uses, it does not enable online reading or downloading of content under copyright.  If a user of the HDL runs a search and locates content of interest, the user can arrange for purchase of the materials, request an inter-library loan, locate other copies, or, in some cases, explore the option of electronic access.  The point is that the HDL facilitates the location and use of materials (some of which are used for the first time in decades).  The HDL is not a substitute for acquiring copies of the materials.

HathiTrust is committed to maintaining and growing its repository in perpetuity.  It is difficult to describe the impact on *Amici* if the HathiTrust were enjoined from providing its nonprofit services.  Although one can put a cost on duplicating technology infrastructure and digitization, there is no way to estimate the costs – economic, intellectual, and social – of research and scholarship not undertaken, technology not developed, materials lost to decay, and diminished intellectual and economic competitiveness.  It is not an overstatement to say that the loss of the HDL, and what HathiTrust represents, is an incomparable loss for the world with no countervailing benefits to authors or copyright holders.

## III.  FAIR USE AND ACADEMIC INSTITUTIONS

A.  *Universities Understand Rights and the Limitations on those Rights.*

Universities rely upon fair use every day.  The list of ways is almost endless – assigned and suggested readings for courses, class lecture materials, published research, student papers, content published by university presses, materials posted to websites, news reporting, and copies of materials made for education, research, and scholarship.  Universities devote resources to the development and implementation of copyright policies designed to reflect applicable law and university values. As copyright holders and copyright users, universities are uniquely positioned to appreciate the rights granted by law and the limitations on those rights also granted by law.

There are some copyright infringement/fair use cases that are a "close call." This is not one of them.  On the record before the lower court, with the facts, the law, and the equities in favor of the HathiTrust, it is not surprising that the Libraries prevailed on their motion for summary judgment and that the Guild's motion was denied.  It is concerning, though, that the Guild asserts views of

copyright law that are deeply flawed and advocate for the private economic interests of copyright holders at the expense of all else.[3]

### B. Assessing the Evidence.

The record reveals: (1) the HathiTrust is a nonprofit service of a nonprofit university, comprised of nonprofit members who engage in nonprofit academic use of the HathiTrust technology and corpus of materials; (2) the uses all relate to the academic missions of the HathiTrust members, namely education, research, scholarship, preservation, and access by those with print disabilities; (3)  the works forming the corpus of the HDL were purchased or otherwise lawfully acquired by the members of the HathiTrust; (4) there are no allegations about the publishing of unpublished copyrighted works; (5) the efforts and existence of the HDL result in knowledge being found and being created; (6) the HDL preserves works vulnerable to (and indeed, already in a state of) decay; (7) the works in the HDL, in digital form, function differently than the works in physical form, including that they enable computer-based searches; (8) HDL enables easier access to copies of works out of copyright; (9) the availability of rare materials in digital format available 24/7/365 from virtually any location frees scholars from travel across the world to locate rare materials; (10) there is value in enabling those with print disabilities to

---

[3] It is also concerning that some Guild plaintiffs confessed that they do not know the uses made of the works in the HDL.  Brief of Defendants-Appellees at 39, *Authors Guild, Inc. v. HathiTrust*, No 12-4547-cv (2d Cir. May 28, 2013).

access content on an equal footing with sighted persons; (11) the HathiTrust does not sell subscriptions to the HDL to the public; (12) the Guild does not provide the HathiTrust digital platform or its related services; and (13) the Guild has no evidence of lost sales.  Brief for Defendants-Appellees at 5-16, 18, *Authors Guild, Inc. v. HathiTrust*, No. 12-4547-cv (2d Cir. May 28, 2013).

Despite facts that overwhelmingly support a finding of fair use, the Guild argues that copying for purposes of education, research, scholarship, preservation, and enabling those with print disabilities to access a work is not "transformative;" that libraries cannot make a claim to fair use under § 107 because Congress gave them certain rights under § 108; and that the Guild is willing to charge for educational uses.  The lower court properly rejected those arguments.

This Court's review of the Guild's contentions will not only dispose of this appeal, it will confirm the proper framework for fair use cases.  This will be significant to *Amici* who, from time to time, deal with putative copyright plaintiffs who equate copying a work with infringing the copyright.  It is also critical to ensure that the requirements of standing be enforced and only persons who actually hold copyright can assert them against universities.  Authors know the origin of the content of their works, whether some of that content is in the public domain or authorized for use by a third party, whether some of the content is co-authored or

9

supported by funding that may enable third party uses – myriad of other facts not known to entities that purport to assert the copyrights of others.

C. *Copying Works in Their Entireties Can Be a Fair Use and a Transformative Use.*

The Guild contends that the copying of an entire work is not transformative[4] and is therefore not a fair use. This is incorrect. The plain language of §107 states that a fair use can involve the exercise of any of the rights under § 106, including verbatim copying: ". . . the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section . . . is not an infringement of copyright."

Other than *de minimis* copying*,* a defendant must offer a rationale to explain the quantum of copying. For years plaintiffs contended that the use of the "heart of the work" was, *per se¸* not fair use, until the Supreme Court ruled that a fair use can involve using "the heart of the work" so long as the user offers evidence justifying the amount used. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586-87 (1994) ("the extent of permissible copying varies with the purpose and

---

[4] The "transformative use" inquiry was articulated by this court's Judge Leval in an article suggesting that a use that was "transformative" was less likely to "supersede the objects" of plaintiff's work and, by giving us something new, was more likely to be a fair use. *See* Pierre N. Leval, *Toward a Fair Use Standard*, 103 Har L. Rev. 105, 1111 (1990). The suggestion is a useful analytical tool and adopted in many cases.

character of the use").  Numerous courts have determined that copying an entire

work is consistent with fair use and can be transformative, for example:

- *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) (copying entire television programs for later viewing).

- *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1993) and *Sony Entm't v. Connectix Corp.* 203 F.3d 596 (2000) (copying software to gather technical information to create a competitive product).

- *Belmore v. City Pages, Inc.*, 880 F.Supp. 673 (D. Minn. 1995) ("creative fable" copied for purposes of news reporting).

- *Sundeman v. Seajay Society, Inc.*, 142 F.3d 194 (4th Cir. 1998) (manuscript copied for purposes of preservation, research and scholarship).

- *Nuñez v. Caribbean Int'l News, Corp.*, 235 F.3d 18 (1st Cir. 2000) (photograph reproduced as part of news reporting; copying less than the whole would have rendered useless the purpose for the copying).

- *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) (image search engines may display thumbnail copies of images within their search results).

- *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003) (photographs of plaintiff's sculptural work).

- *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) (artwork copied and presented with additional cultural and historical content).

- *Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2008) (photograph copied and embodied in artwork).

- *Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006) and *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) (hundreds

of millions of works may be copied every day as part of Google's crawl of the Web so as to be able to deliver search results to users).

- *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Circ. 2009) (millions of student papers can be digitized and stored in repository to enable better detection of plagiarism).[5]

Further, the Supreme Court ruled that a transformative use is not required for a use to be fair. *Campbell*, 510 U.S. at 579 (verbatim coping for classroom use was an example of copying that could be fair and holding that the copying of television programs for later viewing is fair). *See also Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 455 (1984). The Guild seems to confuse "transformative use" and "derivative work." A derivative work[6] is the creation of a second work (prepared, in a copyright infringement case, by the *defendant*) and which can be a fair use. *See, e.g.*, *Suntrust v. Houghton Mifflin Co.*, 268 F.3d 1257

---

[5] *See also* U.S. Patent Office, Office of the Gen. Counsel, *USPTO Position of Fair Use of Copies of NPL [Non-Patent Literature] Made in Patent Examination*, (January 9, 2012), http://www.uspto.gov/about/offices/ogc/USPTOPositiononFairUse_of_CopiesofNPLMadeinPatentExamination.pdf (copying copyrighted, non-patent literature to submit to U.S. Patent and Trademark Office in the course of patent prosecution is fair use).

[6] "A 'derivative work' is a work based upon one or more pre-existing works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications, which, as a whole, represent an original work of authorship, is a 'derivative work." 17 U.S.C. § 101.

12

(11th Cir. 2001) (defendant's novel drew upon "Gone With The Wind" to criticize the depiction of plantation era slavery and was a fair use). A transformative *use*, on the other hand, focuses on the use of *plaintiff's* work and may involve verbatim copying but for a different purpose than that provided by plaintiff's work. *See Bill Graham Archives* (copying entire poster was fair use when reduced to thumbnail size and juxtaposed with historical and cultural content) and other cases discussed *infra* pp. 11-12.

In the instant case, the explanation for copying the entire work is obvious – scholars conducting searches across millions of volumes cannot locate a word or phrase unless that word or phrase appears in the text that is searched. Librarians cannot preserve a "work" if they preserve anything less than the entire work. A student with print disabilities cannot access a work if the work is not available in an accessible format. It is difficult to imagine uses more transformative.

### D. The Guild Misstates the Legal Framework for Infringement.

The Guild offers a view of copyright infringement that is not supported by the Act or case law. The Guild contends that fair use is not available to the Libraries because libraries have special rights under § 108 of the Act. However, § 108(f)(4) states "Nothing in this section — . . . in any way affects the right of fair use as provided by section 107 . . . ." That statement could not be more clear. Not only is § 107 available to the Libraries, fair use is a *right*.

13

The Guild also contends that the Libraries have "violated" §§107 and 108. Brief for Plaintiffs-Appellants at 18, *Authors Guild, Inc. v. HathiTrust,* No. 12-4547-cv (2d Cir. Feb. 25, 2013). But § 107 and § 108 identify conduct outside the control of the copyright holder.  It is not possible for a defendant to "violate" uses that are outside a plaintiff's rights.  Copyright infringement is only a violation of § 106 and § 106A.  17 U.S.C. § 501.  It is not legally possible for a defendant to "violate" a limitation on the rights of the copyright holder.

In order to prevail upon the fourth fair use factor (the market for or value of the copyrighted work), the Guild asserts that it is willing to charge for the uses made by the HDL.  However, the Act does not give it this power.  This Court, relying on Supreme Court authority, noted in *Bill Graham Archives*, 448 F.3d at 615, "[a] publisher's willingness to pay license fees for reproduction of images does not establish that the publisher may not, in the alternative, make fair use of those images" (citing *Campbell*, 510 U.S. at 585 n.18).  The Guild cannot carry the burden on the fourth factor by asserting merely a willingness to charge for the use about which it is complaining. Otherwise every plaintiff would prevail on the fourth factor.

## IV. THE GUILD HAS FAILED TO MEET ITS BURDEN

Universities rely upon the plain language of the Copyright Act, controlling case law, and the Rules of Civil Procedure and of Evidence when evaluating

14

whether the use of a copyrighted work in a particular instance is an infringement. A university uses this framework to create defensible copyright policies, to evaluate risk (as a potential plaintiff or defendant), to assess the strength of a claim asserted against it, to engage in collaborations involving third party content (such as the HathiTrust) and myriad other reasons. The view of copyright advanced by the Guild is legally unsupportable and, simply, a power grab. It seeks to convince the courts that it has been granted virtually absolute property rights and it is the burden of the Libraries to prove otherwise.

In a copyright infringement case plaintiffs have the burden of proving infringement. The Libraries do not have the burden of proving non-infringement. Because fair use is "not an infringement of copyright," 17 U.S.C. § 107, once the Libraries proffer evidence in support of fair use, the Guild has the burden of proving that the Libraries' conduct is not fair use and is thus an infringement of their copyright. Because the Guild filed a motion for summary judgment below (which was denied), it conceded that there were no material facts in dispute. It failed to come forward with evidence rebutting the overwhelming facts supporting fair use proffered by the Libraries. It argues essentially that the Libraries made copies of copyrighted works without permission from the Guild. In light of the applicable legal framework (including the burdens of production and persuasion)

and this Court's *de novo* standard of review, not only has the Guild failed to meet its burden, but the Libraries would prevail under any standard.

A. *Congress Did Not Grant Copyright Holders The Exclusive Right To Copy Their Works.*

Congress did not grant to copyright holders the exclusive right to copy their work. All copyrights are subject to 16 statutory limitations. These limitations identify conduct that is outside the legal power of the copyright holder to control in any manner. It is irrelevant that plaintiffs object to the lawful uses of their copyright or that they wish to charge for it. Fair use is a part of the law, not an exception to the law.

At various points in the instant litigation, the Guild has referred to the burden of the Libraries without distinguishing among the "burden of persuasion," "burden of production," and "burden of proof." In a copyright infringement case, the plaintiff must show: (i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work. *See Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003). The plaintiff has no affirmative duty in its complaint to assert facts on all potential defenses. The defendant has the burden to assert its reliance on fair use (or other reasons why its copying is not improper or unlawful) and to proffer evidence in support of it or risk a finding of infringement. The burden of proof (persuasion) remains with plaintiff at all time.

Under the Copyright Act, the rights of copyright holders are granted "[s]ubject to sections 107 through 122." 17 U.S.C. § 106. Some of those sections identify specific uses of the copyright that the copyright holder may not control and expressly state that those uses are not an infringement of copyright.[7] These limitations are not "exceptions" to the law, they *are* the law and they inhere in the very rights the Guild claims to own. This is not "an unforeseen byproduct of a statutory scheme," *Feist Publ's, Inc., v. Rural Telephone Serv. Co.*, 499 U.S. 340, 350 (1991) – ***it is the statutory scheme.***

Thirty years ago, the Supreme Court confirmed that the law "has never accorded the copyright owner complete control over all possible uses of his work." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984) (copying entire television programs for later viewing was fair use). Relying on the relationship between §106 and § 107 (and noting that plaintiffs in copyright and patent cases have a tendency to overstate their rights)[8] the Court confirmed that

---

[7] *See e.g. id.* § 107 ("the fair use of a copyrighted work [including the exercise of rights set forth in § 106] . . . is not an infringement of copyright"); *id.* § 108(a) (it is not an infringement of copyright for a library or archives [to exercise rights set forth in § 106]"); *id.* § 110 ("the following [dozen examples of public performances] are not infringements of copyright . . ."); *id.* § 117 ("it is not an infringement for the owner of a copy of a computer program to make . . . another copy or adaptation of that computer program . . ."); *id.* § 121 ("it is not an infringement of copyright . . . [to make copies of certain materials for the blind under certain conditions]").

[8] *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. at 432 n.13,

17

"[a]ny individual may reproduce a copyrighted work for a "fair use;" the copyright owner does not possess the exclusive right to such a use." *Id.*; *accord*, *Quality King Distribs., Inc. v. L'Anza Research Int'l, Inc.*, 523 U.S. 135, 150 (1998) (all of the rights in §106 are subject to all the statutory limitations and holding fair use was a sphere of use upon which copyright holders could not encroach); *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1358 (2013) (rejecting the offer of copyright holders to read into the U.S. Copyright Act a geographical limitation in the first sale doctrine).

There is no copyright infringement unless there is an invasion of one of the rights of § 106.[9]  Because all of the rights of § 106 are limited by §§ 107 - 122, there can be no infringement if the conduct of a defendant is encompassed by §§ 107 - 122.  Thus, as discussed further below, when a defendant has asserted that its conduct is authorized under § 107 and proffers evidence in support, the burden remains with the plaintiff to prove its case of infringement.

---

(citing *United States v. Paramount Pictures,* 334 U.S. 131, 156-158 (1948) (copyright owners claiming right to tie license of one film to license of another under copyright law)); *Fox Film Corp. v. Doyal*, 286 U.S. 123, 126 (1932) (copyright owner claiming copyright renders it immune from state taxation of copyright royalties); *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 349-351 (1908) (copyright owner claiming that a right to fix resale price of his works within the scope of his copyright).

[9] "Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 or of the author as provided in section 106A(a) . . .  is an infringer of the copyright . . . ." 17 U.S.C. § 501(b).

B. *Congress Did Not Make Fair Use an "Affirmative Defense."*

Congress knows how to legislate defenses and how to allocate the burden of proof for defenses.[10]    It did not establish copyright fair use as an affirmative defense for which defendants have the burden of proof.    Rather, it established boundaries of the copyright holder's § 106 rights by making them "subject to" authorized rights and uses in §§ 107 - 122 and codifying that those authorized rights and uses exist "notwithstanding" the copyright holder's rights.    This relationship is unique among statutory grants of rights under federal intellectual property law.

Under the U.S. Patent Act, only the patent owner may use the patented invention, and one who uses a patented invention without authorization from the patent holder is liable for patent infringement. 35 U.S.C. § 271(a).    The law was seen as so inflexible that a judge-made "experimental use" exception was created. *Whittemore v. Cutter,* 29 F. Cas. 1120, 1121 (C.C.D. Mass. 1813) (No. 17,600). Congress has declined to codify this defense, and the Federal Circuit has held that this experimental use exception is *de minimis* and extremely narrow.  *Embrex, Inc. v. Service Eng'g Corp*., 216 F.3d 1343, 1349 (Fed. Cir. 2000).

---

[10] *See, e.g.*, 8 U.S.C. § 1324(a)(3) (hiring of illegal aliens); 15 U.S.C. § 78dd-1(c) (influencing foreign officials); 15 U.S.C. § 714p (release of innocent purchasers of converted goods); 15 U.S.C. § 1681g(e)(10) (credit reporting agencies); 19 U.S.C. § 1308(c)(6) (special provisions in the Tariff Act); 39 U.S.C. § 3017(e) (Postal Service nonmailable matter); 47 U.S.C. § 227(c)(5) (restrictions on use of telephone equipment).

Under the U.S. Trademark Act, fair use is identified as a "defense." 15 U.S.C. § 1115(b)(4) ("Such conclusive evidence of the right to use the registered mark . . . shall be subject to the following defenses . . ."). Although trademark fair use is an affirmative defense, the burden of proving infringement (*i.e.,* the burden of persuasion) remains with the plaintiff. In *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 124 (2004), a unanimous Court held it was reversible error for the Ninth Circuit to have required the defendant raising the defense of fair use to negate the likelihood of confusion. That was an impermissible shift of the burden of proof from the plaintiff to the defendant. *See id.* Since that ruling, federal courts of appeals have confirmed the obligation of the plaintiff to prove its case. As the Ninth Circuit recently concluded, since trademark fair use "is, by definition, not infringement," the burden of disproving fair use remains with the plaintiff. The defendant does not have the burden of proof – it has only the duty to raise the grounds on which its lawful use is based. *See Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010).

The Copyright Act, however, is different from the statutes governing patent or trademark defenses. Not only did Congress decline to codify copyright fair use as a defense to infringement, it identified it as "right" and "not an infringement of copyright." Congress codified fair use alongside and "notwithstanding" the rights

of the copyright holder, and expressly placed the rights of the copyright holder "subject to" fair use.  Section 501 of the Act authorizes infringement claims only within the scope of the limited rights granted to copyright holders.

### C. Proponent of Fair Use Has the Burden of Raising the Defense and of Producing Evidence – Never the Burden of Proving Non-Infringement.

In a copyright infringement case, the plaintiff has the burden of proving that defendant's conduct is not authorized.  *See Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir.1995).    Because the copyright holder's rights are limited by so many statutory provisions, and because under any particular set of facts a plaintiff's claim could be limited by other defenses (*see, for example,* Fed. R. Civ. P. 8), in the course of litigation the defendant will proffer evidence relevant to the statutory limitations and other defenses on which it relies, just as the plaintiff proffers evidence supporting its contention that defendant's conduct is not lawful.

The duty to proffer evidence, however, does not create the burden of disproving the plaintiff's case. Fed. R. Evid. 301.  For example, although the existence of a license is identified as an "affirmative defense" in Rule 8(c) of the Federal Rules of Civil Procedure,[11] this Court held that defendant's burden was to

---

[11] Fed. R. Civ. P. 8(c) provides:

> In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: accord and satisfaction; arbitration and award; assumption of risk; contributory negligence; duress; estoppel; failure

proffer evidence that the license *existed* but it was the plaintiff's burden to prove defendant's conduct was *outside the scope of the* license. *See Bourne*, 68 F.3d at 631 ("the copyright owner bears the burden of proving that the defendant's copying was unauthorized").

Similarly, in *Keeler Brass Co. v Continental Brass Company,* 862 F.2d 1063, 1066 (4th Cir. 1988), the court confirmed that the burden of proving copyright infringement remained with the plaintiff throughout the litigation. A defendant proffers evidence supporting its denial of liability. "[T]he function of the fact finder then is to weigh all the evidence, keeping in mind that the plaintiff has the ultimate burden of persuading it that the defendant copied the material." *Id.* at 1066. Again, this is a clear distinction among (1) the plaintiff's obligation to plead a *prima facie* case, (2) the defendant's obligation to identify the basis on which it is not liable and to offer evidence in support of its defense (or risk a finding of infringement), and (3) the plaintiff's obligation to prove infringement. *Accord*, *Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1230 n.3 (11th Cir. 2002).

The Supreme Court has never held that defendants must prove fair use. Its reference to fair use as an affirmative defense was by way of explaining the decision by Congress not to give a presumption of fair use to those engaging in

---

of consideration; fraud; illegality; injury by fellow servant; laches; license; payment; release; res judicata; statute of frauds; statute of limitations; and waiver.

news reporting, comment, criticism, teaching, scholarship and research (even though such uses were "the sorts of copying that courts and Congress most commonly had found to be fair uses") but to decide the disputes on a case-by-case basis. *Campbell,* 510 US at 577.

 The *Campbell* Court corrected certain fundamental misunderstandings about fair use and clarified the proper legal framework.  For example, (1) a commercial use can be a fair use; (2) there is no presumption[12] that a commercial use is unfair and a user can make a commercial use and still prevail on the first factor of § 107; (3) a fair use can involve using "the heart of the work" and a user can copy the "heart of the work" and still prevail upon the third factor of § 107; (3) the inquiry into the third factor (the amount used) is analyzed with reference to the justification for the copying; (4) there is no "transformative use" inquiry for certain kinds of verbatim copying; (5) no fee is required to be paid when a use is fair; and (6) copyright is designed to enrich the public and foster creativity.  In remanding the case, the Court noted that a party seeking summary judgment would need to provide evidence on the factors relevant to a fair use analysis and thus a silent record was not sufficient.  *Id.* at 594.

---

[12] The Court ruled held that there is no presumption against commercial use and no presumption that the fourth fair use factor weighed against a finding of fair use. (Neither of those presumptions appears in the Copyright Act.)  Such presumptions were inconsistent with the purpose of copyright law and harmful to many activities that courts find to be fair uses.  *Id.* at 594.

Supreme Court jurisprudence has underscored how critical it is for courts to apply the proper analytical framework in copyright infringement cases. In *Feist*, 499 U.S. at 352, the Court rejected attempts by lower courts to supplant the Constitutional requirement of "authorship" with one that allowed copyright protection for "sweat of the brow" effort that lacked creative expression. In *Fogerty*, 510 U.S. at 534, the Supreme Court ruled that courts should not favor prevailing plaintiffs over prevailing defendants when deciding whether to award attorneys' fees to the "prevailing party." It noted that the goal of the Act was not to reward authors but instead "to stimulate artistic creativity for the general public good" through the "broad public availability of literature, music, and the other arts."[13] *Id.* at 526-27.

The *Campbell* court, like the *Sony* court, provides clear support for the proposition that the copying of an entire work can advance the goals of copyright law and be a fair use under proper circumstances.

---

[13] Copyright law advances public knowledge in many ways, including by ensuring ideas, facts, and other knowledge are not protected by copyright, *see* 17 U.S.C. § 102(b); *Feist*, 499 U.S. at 350; by ensuring that works of the U.S. government are uncopyrightable, 17 U.S.C. § 105; and by expressly permitting certain uses of third party content for purposes such as comment, criticism, news reporting, teaching, scholarship, and research, *id.* § 107.

## V.  CONCLUSION

In this litigation, the Guild's vision of its copyright power extends to the belief that, unless universities have secured permission, the Guild can require library books to degrade, prevent blind students from accessing materials made freely available to sighted students, and prevent scholars and research scientists from running computer searches across large volumes of text.  This is wishful thinking.[14]  Where the universities and their nonprofit academic collaborations engage in activities designed to advance public knowledge and where they offer powerful evidence that those activities are authorized, the Guild must prove infringement by a preponderance of the evidence.  The Guild must prove that the Libraries' use is not a fair use.  It has failed to meet its burden under applicable law.  The decision of the district court should be affirmed.

Respectfully submitted,

Dated:        June 4, 2013                /s/  Susan M. Kornfield

BODMAN PLC
Susan M. Kornfield (P41071)
201 South Division Street, Ste. 400
Ann Arbor, MI 48104
Tel:   (734) 930-2488
Fax:   (734) 930-2494
skornfield@bodmanlaw.com

---

[14] Or, as the Supreme Court might describe it, "mutant copyright." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003) (attempt to limit uses of content in the public domain).

*Attorneys for Amici Universities: The Board of Trustees of the University of Illinois, The Board of Trustees of Michigan State University, The Regents of the University of Minnesota, The Board of Regents of the University of Nebraska, Northwestern University, The Pennsylvania State University and The Trustees of Purdue University*

## CERTIFICATE OF COMPLIANCE

I hereby certify that on this 4th day of June, 2013:

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 6,447 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ Susan M. Kornfield
Susan M. Kornfield

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2013, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

Dated:  June 4, 2013

/s/  Susan M. Kornfield
Susan M. Kornfield (P41071)
201 South Division Street, Suite 400
Ann Arbor, MI  48104
Tel:  (734) 930-2488
Fax:  (734) 9302494
skornfield@bodmanlaw.com

*Attorneys for Amici Universities:  The Board of Trustees of the University of Illinois, The Regents of the University of Minnesota, The Board of Regents of the University of Nebraska, Northwestern University, The Pennsylvania State University and The Board of Trustees of Purdue Univer*sity