# 12-4547-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

THE AUTHORS GUILD, INC., THE AUSTRALIAN SOCIETY OF AUTHORS LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS, ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON, THE AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK FAGLITTERAER FORFATTERO OG OVERSETTERFORENING, THE WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK GRUNDSTROM, HELGE RONNING, JACK R. SALAMANCA,

*Plaintiffs-Appellants,*

—against—

(*caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE ELECTRONIC FRONTIER FOUNDATION, PUBLIC KNOWLEDGE, AND THE CENTER FOR DEMOCRACY & TECHNOLOGY AS AMICI CURIAE SUPPORTING APPELLEES

CORYNNE MCSHERRY
DANIEL NAZER
ELECTRONIC FRONTIER
    FOUNDATION
815 Eddy Street
San Francisco, California 94110
(415) 436-9333

*Of Counsel to the Electronic
    Frontier Foundation*

RODERICK M. THOMPSON
STEPHANIE P. SKAFF
DEEPAK GUPTA
ROCHELLE L. WOODS
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

*Counsel for Amici Curiae*

(*Counsel continued on inside cover*)

HATHITRUST, CORNELL UNIVERSITY, MARY SUE COLEMAN, President, University of Michigan, MARK G. YUDOF, President, The University of California, KEVIN REILLY, President, The University of Wisconsin System, MICHAEL MCROBBIE, President, Indiana University,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE, BLAIR SEIDLITZ, COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

————————————

JOHN BERGMAYER
PUBLIC KNOWLEDGE
1818 N. Street NW, Suite 410
Washington DC 20036
(202) 861-0020

*Of Counsel to Public Knowledge*

DAVID SOHN
CENTER FOR DEMOCRACY
  & TECHNOLOGY
1634 I Street NW, #1100
Washington, DC 20006
(202) 637-9800

*Of Counsel to the Center for
  Democracy & Technology*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure:

Amici the Electronic Frontier Foundation, Public Knowledge, and the Center for Democracy & Technology certify that they are privately held 501(c)(3) non-profit corporations, that they have no parent or subsidiary corporations, and that no publicly held company owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE.......................................................... 1

ARGUMENT ................................................................................. 2

I.    TECHNOLOGIES LIKE THE HDL ADVANCE THE CORE
      VALUES OF COPYRIGHT LAW ........................................... 4

      A.    The Purpose of Copyright Law is to Spur the Creation
            and Dissemination of Knowledge to the Benefit of the
            Public.............................................................................. 4

      B.    The HDL Furthers The Purpose of Copyright and Serves
            the Public Interest........................................................... 5

II.   A FLEXIBLE FAIR USE DOCTRINE EXISTS TO PREVENT
      THE STIFLING OF INNOVATION AND TO FOSTER THE
      DEVELOPMENT OF POSITIVE NEW TECHNOLOGIES
      LIKE THE HDL .................................................................. 6

      A.    Fair Use Is A Robust and Flexible Doctrine That Was
            Designed to Adapt to New Technologies ........................ 7

      B.    Searching and Indexing is a Transformative Use ........... 8

      C.    "Copying" of Original Works Into Memory Can Be a
            Transformative Use ...................................................... 10

      D.    Making the HDL Works Available To Print-Disabled
            Individuals is An Additional Transformative Use ........ 12

III.  MANY NON-EXPRESSIVE USES ARE
      TRANSFORMATIVE............................................................ 14

      A.    The Copyright Act Does Not Confine Fair Use Protection
            to "Expressive" Uses..................................................... 14

      B.    Courts Have Repeatedly Recognized that Transformative
            Uses Need Not Be "Expressive."................................... 16

IV.   A TRANSFORMATIVE USE CAN BE CAPABLE OF
      SERVING THE SAME PURPOSE AS THE ORIGINAL..... 20

i

# TABLE OF CONTENTS

**Page**

V.    LAW AND POLICY COUNSEL AGAINST CONFINING
      A FAVORABLE HOLDING TO NON-COMMERCIAL
      USES .................................................................................. 22

CONCLUSION ................................................................................ 26

CERTIFICATE OF SERVICE ........................................................ 29

ii

# TABLE OF AUTHORITIES

**Page**

## FEDERAL COURT CASES

*A.V. v. iParadigms, LLC,*
  562 F.3d 630 (4th Cir. 2009) .................................................. 11, 12, 17, 20

*Am. Geophysical Union v. Texaco Inc.,*
  60 F.3d 913 (2d Cir. 1994) ..................................................... 23

*American Institute of Physics v. Winstead PC,*
  No. 3:12-cv-01230-M (N.D. Tex. Feb. 27, 2013) ...................... 18

*Authors Guild, Inc. v. HathiTrust,*
  902 F. Supp. 2d 445 (S.D.N.Y. 2012) .............................. 10, 13

*Berlin v. E. C. Publications Inc.,*
  329 F.2d 541 (2d Cir. 1964) ....................................................... 5

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
  448 F.3d 605 (2d Cir. 2006) ..................................................... 16

*Blanch v. Koons,*
  467 F.3d 244 (2d Cir. 2006) ........................................... *passim*

*Bond v. Blum,*
  317 F.3d 385 (4th Cir. 2003) ................................................... 18

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994) ....................................... 7, 8, 14, 19, 22

*Cariou v. Prince, the Second Circuit,*
  No. 11-1197, 2013 WL 1760521 (2d Cir. Apr. 25, 2013) .............. 16, 23

*Folsom v. Marsh,*
  9 F.Cas. 342 (C.C.D. Mass. 1841) .......................................... 15

*Golan v. Holder,*
  132 S. Ct. 873 (2012) ................................................................ 4

*Harper & Row Publishers, Inc. v. Nation Enters.,*
  471 U.S. 539 (1985) ................................................................. 4

*Kelly v. Arriba Soft Corp.,*
  336 F.3d 811 (9th Cir. 2003) .......................................... *passim*

*Núñez v. Caribbean International News Corp.,*
  235 F.3d 18 (1st Cir. 2000) ..................................................... 21

iii

*Online Policy Group v. Diebold, Inc.*,
   337 F. Supp. 2d 1195 (N.D. Cal. 2004) .................................................... 19

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ........................................................ 9, 10, 12

*Rosemont Enters., Inc. v. Random House, Inc.*,
   366 F.2d 303 (2d Cir. 1966) ................................................................ 5, 23

*Sega Enters. Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 (9th Cir. 1992) .................................................................. 24

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
   203 F.3d 596 (9th Cir. 2000) ................................................................... 24

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) .................................................................... 7, 8, 17

*Stern v. Does*,
   CV 09-01986, 2011 WL 997230 (C.D. Cal. Feb. 10, 2011) ................... 19

*Stern v. Weinstein*,
   11-55436, 2013 WL 1137390 (9th Cir. Mar. 20, 2013) ......................... 19

*Stewart v. Abend*,
   495 U.S. 207 (1990) ................................................................................... 8

*Sundeman v. Seajay Soc'y, Inc.*,
   142 F.3d 194 (4th Cir. 1998) .................................................................... 23

## FEDERAL STATUTORY AUTHORITIES

17 U.S.C.
   § 107............................................................................................... 14, 15

## FEDERAL RULES AND REGULATIONS

Fed. R. App.
   P. 29(c)(5) ................................................................................................. 1

## CONSTITUTIONAL PROVISIONS

U.S. Const.
   Art. I, § 8, cl. 8.................................................................................... 4, 7

## LEGISLATIVE MATERIALS

H.R. Rep. No. 94-1476 (1976) ..................................................................... 8

iv

# ADDITIONAL AUTHORITIES

3 Boswell's Life of Johnson (G. Hill ed. 1934)............................................ 22

Computer &Communications Industry Association, *Fair Use in the U.S. Economy* (2010),
http://www.ccianet.org/CCIA/files/ccLibraryFiles/Filename
/000000000354/fair-use-study-final.pdf................................................... 24

Jennifer Howard, *Google Begins To Scale Back Its Scanning of Books From University Libraries*, The Chronicle of Higher Education, March 9, 2012, http://chronicle.com/article/Google-Begins-to-Scale-Back/131109/. ................................................................ 25

Bernard Knight, USPTO General Counsel, *USPTO Position on Fair Use Copies of NPL Made in Patent Examination*, January 19, 2012,
http://www.uspto.gov/about/offices/ogc/USPTOPositiononFairUse
_of_CopiesofNPLMadeinPatentExamination.pdf. .................................... 17

Edward Lee, *Technological Fair Use*, 83 S. Cal. L. Rev. 797 (2010), *available at*
http://clhc.usc.edu/assets/docs/contribute/SCalLRev83_4Lee.pdf ......... 24

Pierre N. Leval, *Toward a Fair Use Standard*,
103 Harv. L. Rev. 1105 (1990)................................................ 5, 14, 15, 17

## INTEREST OF *AMICI CURIAE*

The Electronic Frontier Foundation ("EFF") is a nonprofit, member-supported civil liberties organization that has worked for more than 20 years to protect consumer interests, innovation, and free expression in the digital world.

EFF's mission is to ensure that the civil liberties and due process guaranteed by our Constitution and laws do not diminish as communication, commerce, government, and much of daily life move online. EFF and its more than 18,000 members have a strong interest in assisting the courts and policymakers in striking the appropriate balance between copyright law and the public interest. EFF has contributed its expertise to many cases regarding copyright law and the Internet, as amicus curiae, as party counsel, and as court-appointed attorneys *ad litem*.[1]

Public Knowledge is a non-profit public interest organization that defends citizens' rights in the emerging digital culture. Public Knowledge promotes balanced intellectual property policies that ensure that the public can access knowledge while protecting the legitimate interests of authors.

---

[1] Pursuant to FRAP 29(c)(5), Amici state that no counsel for a party authored this brief in whole or in part, and no person or entity other than Amici and their counsel made a monetary contribution to the preparation or submission of this brief. All parties in this matter have consented to the filing of this brief.

The Center for Democracy & Technology ("CDT") is a nonprofit public interest group that seeks to promote free expression, privacy, individual liberty, and technological innovation on the open, decentralized Internet. CDT advocates balanced copyright policies that provide appropriate protections to creators without curtailing the unique ability of the Internet and digital media to empower users, speakers, and innovators. Fair use plays a critical role in achieving that balance.

## ARGUMENT

The fair use doctrine plays the essential role of ensuring that copyright serves, rather than thwarts, innovation.[2] That role has never been more important. In this age of digital media and online communication, copying is an integral and inescapable part of many valuable new technologies. Email, web browsers, search engines, DVRs, and so on, all carry out their functions by copying data to the memory of a device, such as a computer or smart phone. Indeed, every time someone visits a webpage on the Internet, a copy of that webpage may be stored in memory automatically so that it can be accessed more quickly and efficiently in the future. At the same time, add-on innovators depend on intermediate copying in order to create services and technologies that build on existing works—including helping

---

[2] To minimize any redundancy in the briefing from *amicus curiae*, this brief will focus on the issues of non-expressive transformative uses and commercial fair uses raised by Plaintiffs-Appellants and the amicus Associated Press in their respective briefing.

2

people find and organize those works. These forms of copying and socially useful innovation are the product of a fair use doctrine that hews to its fundamental purpose: ensuring that copyright spurs, rather than impedes, the progress of science and the useful arts.

The doctrine serves precisely that purpose with respect to the HathiTrust Digital Library ("HDL"). The HDL promotes the progress of science via the creation and spread of knowledge and learning. The HDL not only assures the preservation of millions of digitized volumes from the collections of many of the nation's leading research libraries, it also provides scholars and students with an unparalleled ability to search, access, and build on the vast repository of knowledge of those who came before them. HDL's crucial service required and continues to require extensive copying—but it is not the kind of copying copyright law was intended to prevent or punish.

And, while that copying is not always "expressive," it is most assuredly "transformative." Accordingly, Amici urge the Court to affirm the District Court's decision that the HDL is engaged in a lawful fair use. However, we also urge the Court to firmly reject the amicus Associated Press's ("AP's") request that the Court tailor its decision so as not to impinge on the AP's business model. In particular, the AP suggests that "expressive" "non-commercial" uses, rather than technologically transformative uses, should be the "core" of fair use. (AP Br. at 12-22.) If adopted, this view would sharply curtail the essential role fair use plays in

3

facilitating online innovation and expression, from services that allow users to find, organize and share public information, to services that depend on making intermediate copies, to personal consumer uses such as time-shifting.  Copyright law could become a roadblock to the very benefits it was designed to promote.

## I.    Technologies Like the HDL Advance The Core Values of Copyright Law.

### A.    The Purpose of Copyright Law is to Spur the Creation and Dissemination of Knowledge to the Benefit of the Public.

The Copyright Clause of the Constitution empowers Congress "[t]o promote the Progress of Science . . . by securing for limited Times to Authors . . . the exclusive Right to their . . .Writings."  U.S. CONST., art. I, § 8, cl. 8.  The Progress of Science "refers broadly to the creation and spread of knowledge and learning."  *Golan v. Holder*, 132 S. Ct. 873, 888 (2012) (internal quotation marks omitted).  That progress is achieved not only by increasing the economic incentives of authors to create, but also by ensuring that others are able to build on and share those works.  *See, e.g.*, *id*.; *Harper & Row Publishers, Inc. v. Nation Enters*., 471 U.S. 539, 558 (1985) ("[I]t should not be forgotten that the Framers intended copyright itself to be the engine of free expression . . . the ultimate aim [of copyright law] is . . . to stimulate [the creation of useful works] for the general public good") (citation omitted).

4

The Second Circuit, among others, has stressed that copyright must serve the public interest:

> [T]he law of copyright "is intended to motivate the creative activity of authors and inventors by the provision of a special reward . . . . The monopoly created by copyright thus rewards the individual author in order to benefit the public."

*Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1108 (1990)) (ellipsis in original). Thus, "courts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry." *Rosemont Enters., Inc. v. Random House, Inc.,* 366 F.2d 303, 307 (2d Cir. 1966) (quoting *Berlin v. E. C. Publications Inc*., 329 F.2d 541, 544 (2d Cir. 1964)).

## B.   The HDL Furthers The Purpose of Copyright and Serves the Public Interest.

The HathiTrust Digital Library furthers the fundamental aims of copyright law—fostering the creation and dissemination of new ideas—without unduly encroaching on (and, in fact, in many cases promoting) the economic interests of authors. The HDL furthers these aims in numerous ways, including:

- Allowing scholars and researchers to identify and locate books relevant to their topics of interest through the HDL's search

functionality.  Research that in the past may have taken weeks or
months can now be accomplished in minutes or hours.

- Promoting greater visibility for authors' works through the HDL's
  search functionality, thereby expanding the audience for those
  works and driving additional revenue to the authors when these
  new audiences purchase their works.

- Providing print-disabled individuals with unprecedented equal
  access to the wealth of written works stored in the HDL.

- Enabling new forms of analytical research.  The HDL is a database
  of human knowledge that can be mined to identify linguistic,
  cultural and political trends for analysis.

More generally, by fostering the *dissemination* of ideas, the HDL spurs the
further *creation* of knowledge and creative works, thus producing a positive
feedback loop that advances the aims of copyright law to the benefit of the
public.

## II. A Flexible Fair Use Doctrine Exists to Prevent the Stifling of Innovation and to Foster the Development of Positive New Technologies Like the HDL.

Against the background set forth above, the Court should view with
skepticism the notion, advanced by Appellants and especially amicus
Associated Press, that fair use should be narrowly construed to either
exclude the HDL's activities or confine its protection to the facts of this
case.

**A.    Fair Use Is A Robust and Flexible Doctrine That Was Designed to Adapt to New Technologies.**

As the Supreme Court has recognized, fair use helps ensure that copyright serves, rather than thwarts, the public interest in promoting expression and innovation.  "From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I, § 8, cl. 8) (alteration in original); *see also Blanch*, 469 F.3d at 251 ("The ultimate test of fair use . . . is whether the copyright law's goal of promoting the Progress of Science and the Useful Arts . . . would be better served by allowing the use than by preventing it . . .") (citations and quotations omitted).

As the Court has also noted, fair use was designed to adapt to technological change.  The massive project that has resulted in the HDL was made possible only recently by advances in computer scanning, indexing, data storage, and optical character recognition (OCR) technologies.  The drafters of the Copyright Act of 1976 could not have anticipated these new technologies when they codified fair use in the Act.  Indeed, the impossibility of anticipating every new technology is precisely why Congress and the courts have established a flexible fair use doctrine.  *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 n. 31 (1984) (noting that Congress rejected "a rigid, bright line approach" to fair

7

use).  Rather than create a list of specific exceptions, Congress codified fair use as an "equitable rule of reason" which is to be applied in light of the overall purposes of the statute.  *Id.*  This ensures that a "rigid application of the copyright statute" does not "stifle the very creativity which that law is designed to foster."  *Campbell*, 510 U.S. at 577 (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).

And as the Supreme Court has recognized, that flexibility is particularly crucial to the continuing achievement of copyright's aims "during a period of rapid technological change."  *See Sony*, 464 U.S. at 448 n. 31 (quoting H.R. Rep. No. 94-1476, at 65-66 (1976)).

Accordingly, several courts have recognized that the technological uses of the works at issue in this case—for purposes such as searching and indexing, intermediate copying and the like—are transformative uses under the fair use doctrine.  In addition, making the HDL works available in their entirety for display to print-disabled individuals—a service that only recently became possible with the development of new technologies—also constitutes a transformative use.

**B.    Searching and Indexing is a Transformative Use.**

It is well-established that technological uses like the HDL are "transformative" because they serve a new and different, albeit functional, purpose.  In particular, and as the District Court in this case recognized, numerous appellate courts have found that using works for the specific

8

technological purpose of indexing and search—both as they are used in this case and even where they display the works—are transformative.[3]

For example, in *Perfect 10, Inc. v. Amazon.com, Inc*., the product at issue was a Google search engine that provided the results from image searches in the form of smaller "thumbnail" images, which were lower-resolution versions of full-sized images from various websites on the Internet.  508 F.3d 1146, 1165-66 (9th Cir. 2007).  The Ninth Circuit held that Google's indexing and searching of the images was "highly transformative" because it was using the images "in a new context to serve a different purpose."  *Id*. at 1165.  The Court reasoned that the "search engine transforms the image into a pointer directing a user to a source of information . . . provid[ing] social benefit by incorporating an original work into a new work, namely, an electronic reference tool."  *Id*.  The Court further noted that a search engine may be "more transformative" than an expressive use such as a parody because a "search engine provides an entirely new use for the original work, while a parody typically has the same entertainment purpose as the original work."  *Id*.

In an earlier case, *Kelly v. Arriba Soft Corp*., the Ninth Circuit similarly determined that the use of exact replica thumbnails for image searching served a different function than the original images, and therefore

---

[3] The AP concedes that "the search index results [produced by the HDL]" do not even constitute "*prima facie* infringement at all."  (AP Br. at 9.)

qualified as a transformative fair use, even though the use was not

expressive.  336 F.3d 811, 818 (9th Cir. 2003).  The Court found that even

making an exact copy of a work may be transformative so long as the copy

served a different function than the original work.  *Id*. at 818-9.  The Court

recognized that the accused "search engine functions as a tool to help index

and improve access to images on the internet and their related websites."  *Id*.

at 818.

In this case, as in *Perfect 10* and *Arriba*, the indexing and searching

functions of the HDL are "highly transformative" because, *inter alia*, they

use the copyrighted works "in a new context to serve a different purpose."

*Perfect 10*, 508 F.3d at 1165.  As the District Court recognized, the HDL

"allows scholars to identify relevant works far more efficiently," and serves

the "entirely different purpose" of "superior search capabilities" which have

"already given rise to new methods of academic inquiry such as text

mining."  *Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445, 459-60

(S.D.N.Y. 2012).  Clearly, the HDL "benefit[s] the public by enhancing

information-gathering techniques," and "improve[s] access" to the

copyrighted works.  *Arriba*, 336 F.3d at 818, 820.

## C.    "Copying" of Original Works Into Memory Can Be a Transformative Use.

Similarly, contrary to the AP's suggestion that the "mass digitization

and retention of copyrighted works" for use in creating the index does not

10

constitute fair use (AP Br. at 9-10), several Circuit Courts of Appeals have established that such copying is in fact a noninfringing fair use that benefits the public.

In *A.V. v. iParadigms, LLC*, the accused product was a new online technology system designed to "evaluate[ ] the originality of written works in order to prevent plagiarism" by comparing the students' written works against, *inter alia*, previous student papers.  562 F.3d 630, 634 (4th Cir. 2009).  Copies of the student works were archived in a database to be used to evaluate the originality of other students' works in the future.  *Id*.  The Fourth Circuit found that the defendant's use was transformative even though the "archiving process does not *add* anything to the work [and instead] merely stores the work unaltered and in its entirety."  *Id*. at 639 (emphasis in original).  The Court reasoned that:

> The use of a copyrighted work need not alter or augment the work to be transformative in nature.  Rather, it can be transformative in function or purpose without altering or actually adding to the original work . . . . [defendant's] use of plaintiffs' works had an entirely different function and purpose than the original works; the fact that there was no substantive alteration to the works does not preclude the use from being transformative in nature.

*Id*.  The Court recognized that the defendant's use of the works for the transformative purpose of detecting and preventing plagiarism would not be possible without copying and storing those works.  *See, e.g., id*. at 638-40.

11

Similarly, the *Perfect 10* court determined that automatic local "caching" (*i.e.*, saving a copy) by internet browsers of full-size original images was a transformative fair use, reasoning:

> The copying function performed automatically by a user's computer to assist in accessing the Internet is a transformative use. Moreover, as noted by the district court, a cache copies no more than is necessary to assist the user in Internet use. It is designed to enhance an individual's computer use, not to supersede the copyright holders' exploitation of their works. Such automatic background copying has no more than a minimal effect on Perfect 10's rights, but a considerable public benefit.

508 F.3d at 1169-70. The Ninth Circuit recognized that such antecedent copying was necessary to allow the users to efficiently access the Internet—a publicly beneficial technological use that outweighs any potential harm such copying might have on the authors' rights.

In this case, as in *iParadigms*, the storage of works by the HDL "does not *add* anything to the work [and instead] merely stores the work unaltered and in its entirety." 562 F.3d at 639. But because the works must be copied in order to make the HDL's searching and indexing tools possible—uses that the District Court has found to be transformative fair uses—this copying constitutes a fair use as well.

### D.    Making the HDL Works Available To Print-Disabled Individuals is An Additional Transformative Use.

The AP concedes that "the search index results," which do not display any copyright material, "do not constitute a *prima facie* infringement at all."

12

(AP Br. at 9.)  But then the AP goes on to instruct this Court to "confine its analysis to cases where the end product displays no copyrightable material," and invites the Court to make it "very clear that its holding is confined to the context where the reproduction is not made accessible to any member of public and the end product does not provide any access to copyrightable material at all."  (AP Br. at 8, 10-11.)

The AP's proposal to draw a distinction between permissible and impermissible searching of copyrighted works based solely on whether or not any part of the original work is displayed in the search results is entirely unsupported by the case law.  That is why the District Court found just the opposite—determining instead that one of the key transformative uses of the HDL was making copyrighted works accessible *for display in their entirety* to print-disabled individuals.  *Authors Guild*, 902 F. Supp. 2d at 461 ("The use of digital copies to facilitate access for print-disabled persons is also transformative.").  The District Court recognized that such access puts "print-disabled individuals on equal footing with sighted individuals."  *Id*. Notably, the ability to display such works to print-disabled individuals (*e.g*., in Braille or read out loud) only recently became possible as a result of advancements in technology.

Accordingly, rather than "confining" its holding of fair use to situations where the end product displays no copyrightable material, this

13

Court should recognize that the "display" of copyrighted works—both for this purpose and others—can properly constitute a transformative fair use.

## III. Many Non-Expressive Uses Are Transformative.

### A. The Copyright Act Does Not Confine Fair Use Protection to "Expressive" Uses.

As the case law outlined above suggests, the AP's contention that the "core" of transformative use is new "expressive" uses, (AP Br. at 12-13), is simply wrong.  While fair use often protects new expressive uses—including many of those discussed in Judge Leval's "Towards a Fair Use Standard," as well as the parody at issue in *Campbell*—it is entirely improper to confine fair use, as the AP proposes, solely to expressive uses based on these cases.[4] For example, it is hardly "telling," as the AP suggests (AP. Br. at 14), that an article written in 1990 does not include examples of transformative functional uses that are directly analogous to the factual circumstances of this case.  Judge Leval cannot have been expected to anticipate and address

---

[4] The AP's brief focuses on cases addressing the distinct context of commentary and parody/satire (*e.g.*, *Campbell* and *Blanch*).  But the fact that those specific cases focus on new expressive uses (because expression forms the core of parody/satire and commentary) in no way establishes that new expressive uses are the core of all fair use.  For example, while "comment" is one of the uses enumerated in the 17 U.S.C. § 107 preamble, it is only one of many.  Indeed, even *Campbell* recognized that "[t]he central purpose of th[e] investigation [into the purpose and character of the use] is to see . . . whether the new work . . . adds something new, with a further ***purpose*** or different character."  *Campbell*, 510 U.S. at 579 (emphasis added).   The AP's improper attempt to fossilize fair use law should not be countenanced.

14

technologies that would not exist for another twenty years.  In fact, recognizing this, Judge Leval emphasized in his article, "Toward a Fair Use Standard," that "it is not easy 'to lay down any general principles applicable to all cases.'" 103 Harv. L. Rev. at 1135 (quoting *Folsom v. Marsh*, 9 F.Cas. 342, 344 (C.C.D. Mass. 1841) (No. 4901) (Story, J)).

  The statute governing fair use, 17 U.S.C. § 107, itself identifies a number of examples of fair use that apply directly in this case yet are not necessarily "expressive" uses, including "teaching," "scholarship," and "research."  17 U.S.C. § 107.  Section 107 also provides that making "multiple copies [of a work] for classroom use" is an example of fair use. *Id*.  This use does not imbue any new expression into the work being distributed, but does serve the new functional purpose of educating and disseminating knowledge to students.  In fact, giving the terms used in the statute their plain meaning (under the standard principles of statutory construction), the HDL falls squarely within the express language of Section 107 because its primary uses are for teaching, scholarship, and research.  It is clear that non-expressive uses are as much a part of fair use as expressive uses.

### B.    Courts Have Repeatedly Recognized that Transformative Uses Need Not Be "Expressive."

In addition, the AP's central claim—that transformation must include new expression to support fair use—is flatly contradicted by decisions from this Court and other Courts.

The Second Circuit has recognized that using a work for an entirely different purpose constitutes a fair use—even if that use does not transform the expression of the underlying work.  For example, in *Bill Graham Archives v. Dorling Kindersley Ltd.*, the Second Circuit affirmed the district court's conclusion that the use of unaltered copyrighted concert posters in their entirety "to document and represent the actual occurrence" of the concerts in a biography was a fair use because it served a different purpose from the original use's "purposes of artistic expression and promotion."  448 F.3d 605, 609-11 (2d Cir. 2006).  The Court recognized that defendant actually "***minimized the expressive value of the reproduced images*** by combining them with a prominent timeline, textual material, and original graphical artwork."  *Id*. at 611 (emphasis added).  Similarly, in *Cariou v. Prince*, the Second Circuit recently declined the plaintiff's invitation to interpret fair use as requiring new expression that comments on the original.  No. 11-1197, 2013 WL 1760521, at *6 (2d Cir. Apr. 25, 2013) ("Prince's

16

work could be transformative even without commenting on Cariou's work").[5]

Indeed, non-expressive uses are by definition farther afield from the original work, and thus may be *more* transformative.  *See, e.g.*, *iParadigms,* 562 F.3d at 640 (copying and archiving of student papers that "was **completely unrelated to expressive content** and was instead aimed at detecting and discouraging plagiarism" was accordingly transformative because it served a "different" purpose) (emphasis added); *see also Arriba*, 336 F.3d at 818.

It should not be surprising that court after court has rejected the AP's reasoning because accepting the AP's position could lead to absurd results. Consider, for example, the ongoing litigation regarding the submission of articles as prior art in the patent application process.[6]  Citing several of the

---

[5] In *Sony Corp. v. Universal City Studios*, the Supreme Court held that the home taping of broadcast television for "time shifting" purposes was a fair use, even though there was no new expression in the copied television shows.  464 U.S. at 448-56.  In fact, the AP actually advances the position of the ***dissent*** in *Sony* in making its argument.  In his dissent, Justice Blackman argued that time shifting could not be fair use because home users were using the copies for their "original purpose."  *Id.* at 480 (Blackman, J. dissenting).  The majority rejected this argument.  *Id.* at 448; *see also* Leval, *supra*, 103 Harv. L. Rev. at 1111 and n. 29 (noting that a majority of the Supreme Court in *Sony* rejected the view that a fair use "must employ the quoted matter in a different manner or for a different purpose from the original").

[6] *See* Bernard Knight, USPTO General Counsel, *USPTO Position on Fair Use Copies of NPL Made in Patent Examination* (January 19, 2012),

above cases, the United States Patent and Trademark Office (USPTO) has explained why those submissions are protected fair uses: because, *inter alia*, the copies were made for the distinct purpose of documenting that certain features of an applicant's claim were in the prior art.  (Memorandum of Law In Support of USPTO'S Motion for Judgment on the Pleadings or Partial Summary Judgment on Its Fair Use Defense and Counterclaim (Dkt. 61), *American Institute of Physics v. Winstead PC*, No. 3:12-cv-01230-M (N.D. Tex. Feb. 27, 2013) at 10) (prior art articles are "submitted to the USPTO . . . to show what information was known at the time of the applicant's alleged invention to permit the USPTO to determine if the alleged invention was, at that time, novel and nonobvious."); *see also id*. at 13 (the articles provide "the background context against which the USPTO measures the novelty and nonobviousness of the alleged invention—a process that clearly promotes the 'useful arts.'").

Like the AP's articles, these scholarly works were selected and organized because they contained certain information, and were submitted *in toto* for an entirely different but not particularly "expressive" purpose: to document that information's existence.  Under the AP's unsupported theory, that distinct purpose might not be sufficiently "expressive" to pass muster. *See also Bond v. Blum*, 317 F.3d 385, 395 (4th Cir. 2003) (literary works

---

*available at* http://www.uspto.gov/about/offices/ogc/USPTOPositionon FairUse_of_CopiesofNPLMadeinPatentExamination.pdf.

submitted as evidence in court for the purpose of factual content instead of expression were fair use); *Stern v. Does*, CV 09-01986, 2011 WL 997230, at **9-10 (C.D. Cal. Feb. 10, 2011), *aff'd sub nom*, *Stern v. Weinstein*, 11-55436, 2013 WL 1137390 (9th Cir. Mar. 20, 2013) (forwarding listserv post in email was a transformative use, since it was for the purpose of informing others of the post); *Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1203 (N.D. Cal. 2004) (use of exact reproductions of copyrighted works was transformative when used as factual support for criticism of author).

In sum, the case law is replete with examples of non-expressive transformative uses.  That is as it should be, because any other rule would embody the categorical reasoning that the courts have rejected.  *See, e.g*., *Campbell*, 510 U.S. at 577 (fair use analysis "is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis.").  The Court should not accept the AP's invitation to provide an advisory opinion on what is or is not the "core" of fair use (AP Br. at 7), and needlessly contradict its own holdings, the holdings of the Supreme Court, and the holdings of other courts.

**IV.    A Transformative Use Can Be Capable of Serving the Same Purpose as the Original.**

Contrary to the AP's assertion (AP Br. at 22-27), no court has held that a new work must not even be *capable* of serving the same purpose as the original in order to qualify as a transformative functional use.

For example, in *iParadigms,* one of the cases that the AP claims supports its argument, the archived student papers (as they were used with the software) were preserved in their entirety, and were therefore capable of serving the same purpose as the original papers.  562 F.3d at 639.  In fact, the *iParadigms* Court specifically noted that "[t]he use of a copyrighted work need not alter or augment the work to be transformative in nature. Rather, it can be transformative in function or purpose without altering or actually adding to the original work."  *Id.*  The fact that the new use is capable of serving the same purpose as the original is irrelevant to the fair use analysis; the analysis instead focuses on whether the new use can serve a new (and potentially additional) functional purpose.

Similarly, in *Arriba*, the Ninth Circuit did not hold that Arriba's use of thumbnails was transformative because those thumbnails were not *capable* of being used for the same purpose as the original images.[7]  Rather, the Court determined that the use was transformative because it served a new and additional purpose:  "function[ing] as a tool to help index and improve

_____

[7] The Court merely noted that it would be "unlikely" for anyone to use the images for the same purpose.  336 F.3d at 819.

20

access to images on the internet and their related websites." 336 F.3d at 818; *see also id*. at 819 ("Arriba's use of the images serves a different function than Kelly's use—improving access to information on the internet versus artistic expression.").

The *Arriba* Court analogized the search engine at issue in the case to the work at issue in *Núñez v. Caribbean International News Corp*., 235 F.3d 18 (1st Cir. 2000).  336 F.3d at 818-9.  In *Núñez,* the First Circuit determined that using a photograph in a news article that was originally intended for a modeling portfolio—even though the photograph as used in the news article was still "capable" of serving the same aesthetic and promotional purposes as the photo in a modeling portfolio—was a "transformative use."  235 F.3d at 22-3.  The *Arriba* Court reasoned that, despite the fact that the photograph at issue in *Núñez* itself was unaltered, "[b]y putting a copy of the photograph in the newspaper, the work was transformed into news, creating a new meaning or purpose for the work"— which constituted an *additional* functional purpose.  336 F.3d at 819.

Indeed, the very premise of the AP's assertion that "capability" is part of the Court's analysis for determining whether a functional use is transformative is flawed.  To the extent that courts give *any* consideration at all to a new work's capability to serve the same purpose as the original, that analysis would be subsumed within the fourth factor of the fair use test—the effect of the use upon the potential market for the value of the copyrighted

work.  That factor considers whether the new work "usurps" the market for the original work, not whether it is merely "capable" of serving the same purpose as the original.  *Blanch*, 467 F.3d at 258.  Accordingly, the Court should disregard the AP's "capability" analysis.

## V.    Law and Policy Counsel Against Confining A Favorable Holding to Non-Commercial Uses.

The AP asks the Court to "confine" any holding to "non-commercial" uses.  (AP Br. at 22.)  But the Supreme Court has been very clear that lack of commerciality is not the touchstone of fair use. This Court should decline the AP's invitation to depart from this settled principle.

In *Campbell*, the Supreme Court considered and rejected the idea that commercial use should be presumptively unfair.  The Court explained that a narrow focus on commerciality would "swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107" (including news reporting, comment, criticism, teaching, scholarship, and research) which "are generally conducted for profit."  *Campbell*, 510 U.S. at 584 (citation omitted).  As the Court noted: "[n]o man but a blockhead ever wrote, except for money."  *Id.* (quoting 3 Boswell's Life of Johnson, 9 (G. Hill ed. 1934)).

The Second Circuit has echoed that reasoning, holding that: "Congress 'could not have intended' a rule that commercial uses are presumptively unfair . . . Instead, 'the more transformative the new work, the less will be the significance of other factors, like commercialism, that may

weigh against a finding of fair use.'"  *Prince*, 2013 WL 1760521, at *7
(quoting *Campbell*, 510 U.S. at 579, 584); *see also Am. Geophysical Union
v. Texaco Inc.*, 60 F.3d 913, 921 (2d Cir. 1994) ("Since many, if not most,
secondary users seek at least some measure of commercial gain from their
use, unduly emphasizing the commercial motivation of a copier will lead to
an overly restrictive view of fair use.").

       In particular, fair use should not turn on commerciality where, as here,
a use confers a significant public benefit.  In *Blanch*, for example, the
Second Circuit held that the first factor favored the defendant despite his
commercial and profitable use of the plaintiff's image in a "pop art"
painting, noting that, "[c]ourts are more willing to find a secondary use fair
when it produces a value that benefits the broader public interest." 467 F.3d
at 253 (quoting *Texaco*, 60 F.3d at 922); *see also Rosemont*, 366 F.2d at 307
("[W]e conclude that whether an author or publisher has a commercial
motive or writes in a popular style is irrelevant to a determination of whether
a particular use of copyrighted material in a work which offers some benefit
to the public constitutes a fair use."); *Sundeman v. Seajay Soc'y, Inc.*, 142
F.3d 194, 203 (4th Cir. 1998) ("Courts should also consider the public
benefit resulting from a particular use notwithstanding the fact that the
alleged infringer may gain commercially.  This public benefit typically
involves the development of art, science, and industry.") (citations, internal
quotation marks omitted).

This is the right approach. Every day, technology companies and inventors working out of their garages make intermediate copies as they test and develop their innovative technologies—technologies that may have commercial value, but will also promote the spread of knowledge and learning. Courts have repeatedly found such uses to be fair. *See, e.g., Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1523 (9th Cir. 1992) (finding fair use even though defendant "may gain commercially," and noting that defendant's use of the copyrighted works "has led to an increase in the number of independently designed video game[s] . . . It is precisely this growth in creative expression, based on the dissemination of other creative works and the unprotected ideas contained in those works, that the Copyright Act was intended to promote."); *Sony Computer Entm't, Inc. v. Connectix Corp*., 203 F.3d 596, 602–606 (9th Cir. 2000) (defendant's "intermediate copying and use of [plaintiff's] copyrighted BIOS" firmware was a fair use in part because defendant's product "creates a new platform, the personal computer, on which consumers can play games designed for [plaintiff's product]. This innovation affords opportunities for game play in new environments…"); *see generally* Computer & Communications Industry Association, *Fair Use in the U.S. Economy*, 11-29 (2010), http://www.ccianet.org/CCIA/files/ccLibraryFiles/Filename /000000000354/fair-use-study-final.pdf (detailing the economic contributions of industries relying on fair use); Edward Lee, *Technological*

*Fair Use*, 83 S. Cal. L. Rev. 797, 820-21 (2010), *available at*

http://clhc.usc.edu/assets/docs/contribute/SCalLRev83_4Lee.pdf.

In this case, for example, in order to generate much of the repository of digital content that became a part of the HDL, Google had to scan millions of hard-copy books from university libraries around the world—a massive undertaking that has taken nearly a decade and required a substantial investment of human capital, expensive specialized scanning equipment, and vast quantities of digital database storage. A non-commercial institution—like an individual research library—would not have the resources to undertake a project of that scope on its own.[8]

These cases all demonstrate that there is no need to strictly tie a finding of fair use to noncommerciality. The benefits the HDL provides to the public—increasing access to literature and knowledge, preserving works that might otherwise be lost, enabling new forms of analytical research, and providing print-disabled individuals with access to these works—would still strongly support fair use even if the HDL had a commercial aspect. Making

_____

[8] With respect to the 600,000 volumes at the University of Wisconsin digitized by Google, the university library director stated "[i]t would have been next to impossible for the library to come up with the resources to digitize that amount of material." Jennifer Howard, *Google Begins To Scale Back Its Scanning of Books From University Libraries*, The Chronicle of Higher Education, March 9, 2012, http://chronicle.com/article/Google-Begins-to-Scale-Back/131109/. With respect to the half a million volumes in the University of Texas Latin American collection, the university library director stated, "We figured we could do it in a hundred years." *Id.* "Google did it in two." *Id.*

non-commerciality the touchtone of fair use—as the AP urges—would unnecessarily narrow the fair use doctrine, to the detriment of the public.

## CONCLUSION

The Plaintiffs-Appellants and the Associated Press ask this Court to accept a woefully cramped view of fair use that is unsupported by Supreme Court and Second Circuit precedent. If adopted, this view would sharply curtail the essential role fair use plays in facilitating technology innovation and expression. Such a view would improperly restrict the use of existing non-infringing technologies—for example, products that allow users to find, organize and share public information; products that depend on making intermediate copies; and even personal consumer uses such as time-shifting. And, it would discourage both the legitimate technology innovators who depend on a robust and flexible fair use doctrine, and the investors who help fund the development of new technologies. In short, it would thwart, rather than preserve, the key purposes of copyright.

Accordingly, Amici urge the Court to reject that view and affirm the District Court's judgment that the Libraries' use of the copyrighted works is a transformative fair use protected by copyright law.

Dated:  June 4, 2013                Respectfully Submitted,


                                    FARELLA BRAUN + MARTEL LLP

                                    By: */s/ Roderick M. Thompson*
                                        RODERICK M. THOMPSON

                                     Roderick M. Thompson
                                     Stephanie P. Skaff
                                     Deepak Gupta
                                     Rochelle L. Woods
                                     Farella Braun + Martel LLP
                                     235 Montgomery Street, 17th Floor
                                     San Francisco, CA  94104

                                    Counsel of Record for *Amici Curiae* the
                                    Electronic Frontier Foundation, Public
                                    Knowledge, and the Center for Democracy
                                    & Technology

27

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32 of the Federal Rules of Appellate Procedure, I certify that:

1.      This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 6,285 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

2.      This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2002 in 14-point Times New Roman.


Dated:   June 4, 2013

                                        */s/ Roderick M. Thompson*
                                        RODERICK M. THOMPSON

28

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of June, 2013, a true and correct copy of the foregoing Brief for the Electronic Frontier Foundation, Public Knowledge, and the Center for Democracy and Technology as *Amici Curiae* Supporting Appellees was served on all counsel of record in this appeal via CM/ECF pursuant to Second Circuit Rule 25.1(h)(1)-(2).

Dated:   June 4, 2013

/s/ Rochelle Woods
Rochelle L. Woods