# 12-4547-CV

## United States Court of Appeals

*for the*

## Second Circuit

―――――――――――――――

AUTHORS GUILD, INC., AUSTRALIAN SOCIETY OF AUTHORS
LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS,
ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES
SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON,

*(For Continuation of Caption See Inside Cover)*

―――――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF *AMICI CURIAE* OF 133 ACADEMIC
AUTHORS IN SUPPORT OF DEFENDANTS-APPELLEES
AND AFFIRMANCE**
**(The full list of *Amici* appear in Appendix A)**

JENNIFER M. URBAN
SAMUELSON LAW, TECHNOLOGY
  & PUBLIC POLICY CLINIC
University of California, Berkeley,
  School of Law
396 Simon Hall
Berkeley, California 94720
(510) 642-7338

*Attorney for Amici Curiae*

*On the Brief:*
Professor Pamela Samuelson and
David Hansen, Digital Library Fellow
University of California, Berkeley

AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND
COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK
FAGLITTERAER FORFATTERO OG OVERSETTERFORENING,
WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK GRUNDSTROM,
HELGE RONNING, JACK R. SALAMANCA,

*Plaintiffs-Appellants,*

v.

HATHITRUST, CORNELL UNIVERSITY, MARY SUE COLEMAN, President,
University of Michigan, MARK G. YUDOF, President, University of California,
KEVIN REILLY, President, University of Wisconsin System,
MICHAEL MCROBBIE, President, Indiana University,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE,
BLAIR SEIDLITZ, COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

INTERESTS OF AMICI ..........................................................................1

SUMMARY OF ARGUMENT ..................................................................2

ARGUMENT ..........................................................................................5

I.   The District Court Correctly Ruled that the Authors Guild Lacks Associational Standing under the Copyright Act. ..................................5

II.   The Authors Guild Also Lacks Associational Standing Under Prudential Standing Rules Applicable in Article III Courts. ...............................11

III.   The Interests of Academic Authors in Fair Use and the Continued Availability of the HathiTrust Corpus Diverge from the Authors Guild's Claimed Interests, Reinforcing the Wisdom of Limiting Associational Standing in This Case. ...................................................................18

CERTIFICATE OF COMPLIANCE WITH FRAP 32(a) .....................................26

APPENDIX A ......................................................................................28

# TABLE OF AUTHORITIES

## CASES

*ABKO Music Inc. v. Harrisongs Music, Ltd.*,
  944 F.2d 971 (2d Cir. 1991) ............................................................... 7

*Am. Inst. of Physics v. Winstead PC*, Case No. 3:12-cv-01230-M,
  Minute Order (N.D. Tex. May 22, 2013) ...................................... 22

*Ass'n for Info. Media & Equip. v. Regents of the Univ. of California*,
  CV 10-9378 CBM MANX, 2011 WL 7447148 (C.D. Cal. Oct. 3, 2011) ... 15

*Ass'n for Info. Media & Equip. v. Regents of the Univ. of California*,
  2:10-CV-09378-CBM, 2012 WL 7683452 (C.D. Cal. Nov. 20, 2012)........ 15

*Authors Guild v Google Inc.*,
  770 F. Supp.2d 666 (S.D.N.Y. 2011) ........................................... 20

*Authors Guild v. Google, Inc.*, Case Nos. 05 Civ. 8136 & 10 Civ. 2977,
  2012 WL 1951790 (S.D.N.Y. May 31, 2012) .............................. 13

*A.V. ex rel Vanderhye v. iParadigms, LLC*,
  562 F.3d 630 (4th Cir. 2009) ........................................................ 22

*Bano v. Union Carbide Corp.*,
  361 F.3d 696 (2d Cir. 2004) ........................................................ 11

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605(2d Cir. 2006) ........................................... 22, 23, 24

*Cambridge Univ. Press v. Becker*,
  863 F.Supp.2d 1190 (N.D. Ga. 2012)........................................... 17

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1992).................................................................... 22

*CBS Broad., Inc. v. EchoStar Comms. Corp.*,
  450 F.3d 505(11th Cir. 2006) ....................................................... 8

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
  697 F.2d 27(2d Cir. 1982) ........................................................... 7

*Elk Grove Unified Sch. Dist. v. Newdow*,
   542 U.S. 1 (2004)........................................................................................ 13

*Getty Images (USA), Inc. v. Advernet*,
   797 F.Supp.2d 399 (S.D.N.Y. 2011) ............................................................ 17

*HarperCollins Publishers LLC v. Open Road Integrated Media, LLP*,
   No. 1:2011-cv-09499, complaint (S.D.N.Y., Dec. 23, 2011)....................... 16

*Hulex Music v. Santy*,
   698 F. Supp. 1024 (D.N.H. 1988)................................................................. 10

*Hunt v. Washington State Advertising Commission*,
   432 U.S. 333 (1977)...................................................................................... 12

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) ........................................................................ 22

*Mullen v. Soc'y of Stage Directors & Choreographers*,
   No. 06 C 6818, 2007 WL 2892654 (N.D. Ill. Sept. 30, 2007) ....................... 8

*Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*,
   990 F. Supp. 245 (S.D.N.Y. 1997) ......................................................... 13, 18

*Nat'l Ass'n. of Freelance Photographers v. Associated Press*, 97 CIV. 2267
   (DLC), 1997 WL 759456 (S.D.N.Y. Dec. 10, 1997) ................................... 14

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ...................................................................... 22

*Plunket v. Doyle*, No. 09 Civ. 11006,
   2001 WL 175252 (S.D.N.Y. Feb. 22, 2001) .................................................. 7

*Random House, Inc. v. Rosetta Books, LLC*,
   283 F.3d 490 (2d Cir. 2002) ........................................................................ 16

*Righthaven LLC v. Hoehn*,
   ___F.3d ___, 2013 WL 1908876 (9th Cir., May 9, 2013) ............................. 9

*Silvers v. Sony Pictures Entm't, Inc.*,
   402 F.3d 881 (9th Cir. 2005) .......................................................................... 7

*Southern Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois*, 326 F.3d 919 (7th Cir. 2003) .............................. 10

*The Football Association Premier League Ltd. v. YouTube, Inc.*, No. 07-cv-3583 (LLS),slip op. (S.D.N.Y., May 15, 2013) ........................ 14

*United Food & Commercial Workers Union Local, 751 v. Brown Grp. Inc.*, 517 U.S. 544 (1996).............................................................................. 12, 17

## STATUTES

17 U.S.C. § 107 ........................................................................................ 22

17 U.S.C. § 201(d) (2006) ........................................................................ 17

17 U.S.C. § 501(b) (2006) ..................................................................... 6, 9

29 U.S.C. § 1132(a)(1) (2006) .................................................................. 9

FED. R. CIV. PROC. R. 23 (2013)............................................................. 10

## LEGISLATIVE MATERIALS

H.R. Rep. 94-1476, 94th Cong., 2d Sess. .............................................. 8

## OTHER AUTHORITIES

Jess Davis, *Patent Attys' USPTO Applications Protected By Fair Use*, LAW360, May 22, 2013, http://www.law360.com/articles/442985/ patent-attys-uspto-applications-protected-by-fair-use. ......................... 22-23

Authors Guild, Inc., Comments in Response to the U.S. Copyright Office Notice of Inquiry Regarding Orphan Works and Mass Digitization, Feb. 4, 2013, http://www.copyright.gov/orphan/comments/noi_10222012/ Authors-Guild.pdf............................................................................... 20-21

Authors Guild, Inc., *Model Trade Book Contract and Guide* (2000) ................................................................................. 16

Ariel Katz, *The Orphans, the Market, and the Copyright Dogma: A Modest Solution for a Grand Problem*, 27 Berkeley Tech. L.J. 1285(2013) ..................................................................... 21

Brian Lavoie & Lorcan Dempsey, *Beyond 1923: Characteristics of Potentially In-Copyright Print Books in Library Collections*, D-LIB MAG., Nov./Dec. 2009, http://www.dlib.org/dlib/november09/lavoie/11lavoie.html ..................... 19

Martin P. Levin, *The Contemporary Guide to Negotiating the Author-Publisher Contract*, 54 N.Y. L. Sch. L. Rev. 447, 455 (2009/2010) ....................................................................... 16

Maria A. Pallante, *The Curious Case of Copyright Formalities*, *Keynote Address*, 28 Berkeley Tech. L.J. (forthcoming 2013), http://www.law.berkeley.edu/files/Pallante-BerkeleyKeynote.pdf........ 15-16

## INTERESTS OF AMICI

*Amici Curiae* are academic authors who have two main interests that motivated us to file this brief.[1] First, we care deeply about the sound development of U.S. copyright law and fair use as it applies to scholarly works, such as those typically found in the research libraries of nonprofit educational institutions and now in the HathiTrust corpus. Second, we want the HathiTrust digital library to continue to provide access to our books and those of other academic authors because this promotes the progress of science in keeping with the constitutional purpose of copyright law. These interests diverge significantly from the interests represented by the Authors Guild in its assertion of associational standing. Accordingly, we have a strong interest in a sound conception of associational standing for this and similar cases and focus our discussion in this brief on that issue.

*Amici* teach at universities such as those served by HathiTrust and many of us have used the HathiTrust corpus in the course of our research. *Amici* also are authors of scholarly works, many of which have been digitized and included in the

---

[1] Pursuant to Fed. R. App. P. 29(c)(5) and Rule 29.1 of the Local Rules of the United States Court of Appeals for the Second Circuit, *Amici* hereby state that none of the parties to this case nor their counsel authored this brief in whole or in part; no party or any party's counsel contributed money intended to fund preparing or submitting the brief; and no one else other than *Amici* and their counsel contributed money that was intended to fund preparing or submitting this brief.

Pursuant to Fed. R. App. P. 29(c)(4) and 29(a), *Amici* hereby state that all parties have consented to the filing of this brief, and we rely on that consent as our source of authority to file.

-1-

HathiTrust repository. We believe that the digitization of scholarly works from major research library collections and uses of those works that HathiTrust enables do not infringe copyrights. The names, affiliations,[2] and a list of representative publications of individual *Amici* are listed in Appendix A.

## SUMMARY OF ARGUMENT

The HathiTrust digital library contains over 7.3 million potentially in-copyright books. The complaint in this case has demanded that the court impound the in-copyright books in this repository and enjoin the use of all 7.3 million of these books, although the Authors Guild and its co-plaintiffs have identified only 116 works in which they claim to hold copyrights. Relying on an exceptionally broad conception of associational standing, the plaintiffs have asserted an entitlement to litigate this case and to attain injunctive relief that goes far beyond what the law allows.

The Authors Guild's broad theory of associational standing is wrong for two reasons. First, the Copyright Act itself prohibits suits by non-rightsholders. Recognizing the dangers of allowing non-rights holders to litigate claims that would implicate the rights of absent parties, Congress decided that only the legal or beneficial holder of an exclusive right under a copyright may bring suit under the

---

[2] Affiliations are provided for identification purposes only.

Act. The Guild does not claim to hold such an interest in its members' copyrights; the district court therefore correctly held that the Authors Guild does not have associational standing to bring broad claims of infringement under the Act.

Second, the Authors Guild's theory of standing violates prudential limits on associational standing that have been developed carefully by courts over time. To ensure fair and efficient adjudication of claims, Article III courts have prohibited third party associations from pursuing claims when those claims would require more than the limited participation of individual association members. In the copyright context, proof of being a copyright holder is an essential element of the claim. Because the works in the HathiTrust corpus likely implicate the rights of a very large number of third parties—including ourselves, co-authors, publishers, and other transferees—it would take involved participation by individual association members to prove who holds the rights in the works which the Guild claims to represent.

Academic authors' interests in the continued existence of the HathiTrust digital library illustrate why it was prudent for Congress and the courts to limit associational standing in cases like this. If the Authors Guild were allowed to continue this suit on the basis of its associational claims, public access to millions of scholarly works would be placed under a cloud of uncertainty as the Guild pursued this large but indeterminate set of claims. Those claims would consume a

substantial amount of judicial resources, time, and effort on the part of individual authors and publishers who would need to sort out (and in some cases litigate separately) who holds the rights to individual works on which the Guild bases its right to sue.

Academic authors—whose works are likely more typical of those in the HathiTrust corpus than works of the Authors Guild and its members —would be harmed by this outcome because we typically benefit from HathiTrust, both because it makes our books more accessible to the public than ever before and because we use HathiTrust in conducting our own research. HathiTrust's fair use defense is more persuasive to us than the Authors Guild's theory of infringement. If granted, the Guild's request for an injunction to stop HathiTrust from making its corpus available would directly harm academic author interests. In short, a "win" for the Authors Guild would be a "loss" for academic authors. This divergence in the interests of academic authors and of the Guild and its members, which may also affect the fair use calculus, is an additional reason why this Court should limit the Guild's standing to the copyrights it actually holds.

## ARGUMENT

### I.    The District Court Correctly Ruled that the Authors Guild Lacks Associational Standing under the Copyright Act.

The HathiTrust digital library presently contains more than 7.3 million potentially in-copyright books from the collections of major research libraries, such as the University of Michigan's. The Authors Guild claims not only that the repository itself, but also the very limited uses of these works that HathiTrust allows, are copyright infringements. HathiTrust contends that it has made only fair uses of the works. Although the Guild and its co-plaintiffs have identified themselves as rights holders of only 116 copyrights implicated in this lawsuit, the Guild has sought an injunction that would forbid all unauthorized uses of "Plaintiffs' *or any other copyrighted works.*" *See* Pl. First Amd. Compl., Dkt_4, Demand for Relief (emphasis added) ("Compl.").

The Guild wants, more specifically, to stop HathiTrust from enabling researchers to conduct electronic searches on the whole corpus to find out which books in the physical collections of member-libraries mention the topic they are investigating, from preserving books so that future generations can have access to them even if the physical books have deteriorated, and from enabling blind and print-disabled persons from being able to get full-text access to books from HathiTrust members' collections.

As its justification for asserting that it can speak for the authors of millions of other works in the HathiTrust library—most of which, we believe, were written by academic authors like ourselves—the Authors Guild has relied on an expansive theory of associational standing that, if allowed, would enable special interest organizations, like the Authors Guild, to aggressively pursue large-scale copyright litigation against HathiTrust in a way that harms the interests of other authors like ourselves, as well as the public, while avoiding evidentiary requirements that all other copyright litigants must satisfy. In effect, the Authors Guild is seeking to pursue litigation and obtain relief on a class-wide basis without satisfying the rigors of the class action certification process.

But this is not permissible under U.S. copyright law. Section 501(b) of the Copyright Act could not be plainer: only "[t]he legal or beneficial owner of an exclusive right . . . [can] institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b) (2006). Based on that unambiguous language, the district court correctly held that associations such as the Authors Guild lack standing to bring suits on behalf of their members. Opinion and Order dated October 10, 2012, Dkt_156, at 8. ("Op.").

Despite the Guild's attempts to conflate the statutory standing question with the prudential and constitutional questions of standing noted below,[3] decisions from the Second Circuit and other circuits have concluded that the statute is clear; only a person with a copyright interest—and not third parties—may sue for infringement. *See ABKO Music Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991) ("[T]he Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf."); *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 n.3 (2d Cir. 1982) ("We do not believe that the Copyright Act permits holders of rights under copyrights to choose third parties to bring suits on their behalf. . . . [T]he Copyright Law is quite specific in stating that only the 'owner of an exclusive right under a copyright' may bring suit."); *Plunket v. Doyle*, No. 09 Civ. 11006, 2001 WL 175252, at *5 (S.D.N.Y. Feb. 22, 2001) (explaining that standing is limited to "(1) owners of copyrights and (2) persons who have been granted exclusive licenses by owners of copyrights"). *See also Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) ("[U]nder

---

[3] *See* (Op. at 8); Pl-Appellant's Br. at 44-48 (asserting that "[t]he flaw in the District Court's analysis is that statutory standing under the Copyright Act is satisfied through the first prong of the 3-part *Hunt* test for associational standing.") As the district court explained in its opinion, this "once again fails to answer the question of whether Congress has precluded associational standing in the text of the Copyright Act itself, a question of statutory interpretation and one that Plaintiffs have repeatedly sidestepped or obfuscated." (Op. at 5 n.7). The district court "gave Plaintiffs numerous opportunities to address this issue, which included a letter to the parties dated July 12, 2012. Plaintiffs failed to respond to Defendants' argument that the text of the Copyright Act precludes associational standing." *Id.*

traditional principles of statutory interpretation, Congress' explicit listing of who may sue for copyright infringement should be understood as an exclusion of others from suing for infringement."); *Mullen v. Soc'y of Stage Directors & Choreographers*, No. 06 C 6818, 2007 WL 2892654, *4 (N.D. Ill. Sept. 30, 2007) ("[I]f USA [a guild] sought a declaratory judgment of copyright infringement or damages for copyright infringement against Plaintiffs, it would surely fail for lack of standing because it is [not] an 'owner' nor is it a 'beneficial owner' (e.g. a licensee) of any copyright at issue under the Copyright Act.").[4]

Congress chose to limit standing in copyright cases because it recognized "the need in infringement actions to safeguard the rights of all copyright owners and to avoid a multiplicity of suits." H.R. Rep. 94-1476, 94th Cong., 2d Sess., at 159 (1976). Hence, it decided that "Subsection (b) of section 501 enables the owner of a particular right to bring an infringement action *in that owner's name alone*." *Id.* (emphasis added). So concerned was Congress that copyright holders with an actual interest receive notice about litigation regarding their works, it

---

[4] The Authors Guild cites *CBS Broad., Inc. v. EchoStar Comms. Corp.*, 450 F.3d 505, 518 n.25 (11th Cir. 2006) as contrary authority. *See* Pl.-Appellant's Br. at 46. *CBS Broadcasting* does not interpret Section 501(b), but rather addresses two separate issues: 1) whether individual broadcasters, as non-exclusive licensees, had the right to sue under a special exception created for them in Section 501(e), and 2) whether associations of broadcasters met the three-part *Hunt* test, described below, for constitutional and prudential standing. The court did not address whether the associations, which it concluded had met the *Hunt* test, therefore also satisfied statutory standing requirements.

included a lengthy provision in the remainder of Section 501(b) detailing ways that courts may and must notify parties who would likely be affected. *See* 17 U.S.C. § 501(b) (stating that the court may require a plaintiff to notify "any person shown . . . to have or claim an interest in the copyright," and stating that the court "*shall* require that such notice be served upon any person whose interest is likely to be affected by a decision in the case." (emphasis added)).

These provisions would be rendered meaningless if the Authors Guild's theory of associational standing is permitted. No other potential claimants or persons whose interests are likely to be affected—including academic authors such as ourselves—can be sufficiently notified because neither the court nor anyone else can know which specific copyrighted works actually form the basis of the suit.

Although Congress rejected third-party suits in copyright litigation, it still left open a number of avenues through which copyright owners could collectively assert their rights, including by transferring to others a slice of their rights so those other parties can assert rights on their behalf. Section 201 of the Act allows copyright owners to freely divide their exclusive rights among third parties— including associations like the Authors Guild—thereby allowing those parties to bring suit.[5] *See Righthaven LLC v. Hoehn*, ___F.3d ___, 2013 WL 1908876, *2

---

[5] The Authors Guild attempts to liken Section 501(b) to a statutory standing provision found in ERISA, which allows "plan participants and beneficiaries" to bring suit. 29 U.S.C. § 1132(a)(1) (2006). *See* Pl-Appellant's Br. at 46-47. Courts

(9th Cir., May 9, 2013) (explaining that for standing under Section 501(b), a litigant must hold some portion of one of the exclusive rights enumerated in Section 106, and not just a "bare right to sue"). Associations can also bring infringement litigation by naming members as real parties in interest. *See Hulex Music v. Santy*, 698 F. Supp. 1024, 1029 (D.N.H. 1988) (noting that the American Society of Composers, Authors and Publishers (ASCAP) helped facilitate the suit for its named members, but refusing to join ASCAP itself as a party).

Finally, class action law allows groups of plaintiffs to join together to make their claims collectively. *See* FED. R. CIV. PROC. R. 23 (2013). Unlike the Authors Guild's associational theory, however, class action litigation must comply with rigorous safeguards to protect absent but potentially interested parties (such as the interests of academic authors in litigation such as this one). For example, to maintain a class action suit, plaintiffs must show that the class is being adequately represented, harm to the class is sufficiently homogenous, there is commonality in facts at issue and questions presented, and that plaintiffs' claims are typical of other members of the class. FED. R. CIV. PROC. R. 23(a). In this suit, the Authors

---

interpreting this section of ERISA have allowed third parties to bring suit on behalf of association (in most cases, union) members. *See Southern Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois*, 326 F.3d 919 (7th Cir. 2003). However, unlike copyright suits where multiple copyright holders with varying interests both in the same work and in larger-scale combinations of works—such as the digital corpus of the HathiTrust—ERISA suits focus on particular claims with a discrete and a defined set of potential claimants.

Guild seeks to use associational standing to litigate and obtain relief on the functional equivalent of a class-wide basis, while avoiding the rigorous requirements and protections of class action law. This Court should not allow this evasion.

Without a plaintiff who holds a real interest in specifically identified copyrighted works, infringement suits such as this harm the rights of many copyright holders—including *Amici*—without adequate notice to those copyright holders that their works will be affected by the outcome of the litigation. For this reason, Congress and the courts interpreting the Act have rejected third party standing under the Act. This Court should affirm the district court's ruling that the Authors Guild lacks standing under the Copyright Act to proceed with their suit except as to copyrights it holds.

## II.    The Authors Guild Also Lacks Associational Standing Under Prudential Standing Rules Applicable in Article III Courts.

Over the years, courts have developed a set of prudential rules that are routinely considered when associations such as the Authors Guild seek to bring lawsuits on behalf of their members. In addition to upholding the District Court's ruling on the inadequacy of the Guild's associational standing under U.S. copyright law, this Court should rule that the Guild lacks standing to sue on behalf of its

-11-

members under the prudential rules on associational standing applicable to causes of action of all kinds.

As the Second Circuit has so aptly observed, "[a]ssociational standing carves only a narrow exception from the ordinary rule that a litigant must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 715 (2d Cir. 2004). To qualify for that narrow exception, courts have required that associational plaintiffs show, among other things, that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Advertising Commission*, 432 U.S. 333, 343 (1977). The Supreme Court described this requirement as "prudential," meaning that it is a self-imposed judicial restraint "best seen as focusing on . . . matters of administrative convenience and efficiency." *United Food & Commercial Workers Union Local*, *751 v. Brown Grp. Inc.*, 517 U.S. 544, 555–56 (1996).[6]

The district court's conclusion that the Authors Guild satisfied this standard on the grounds that this suit would only require a "limited amount of individual proof" on the part of associational members was in error. (Op. at 6) (citing *Nat'l*

---

[6] The Authors Guild must also show that "its members would otherwise have standing to sue in their own right" and that "the interests it seeks to protect are germane to the organization's purpose" *Hunt v. Washington State Advertising Commission*, 432 U.S. 333, 343 (1977). These two aspects of the test are constitutional in nature.

*Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*, 990 F. Supp. 245, 249 (S.D.N.Y. 1997)). The court borrowed heavily from the reasoning of a decision in the related Google Books litigation, (Op. at 6) (citing *Authors Guild v. Google, Inc.*, Case Nos. 05 Civ. 8136 & 10 Civ. 2977, 2012 WL 1951790, at *6 (S.D.N.Y. May 31, 2012),[7] without analyzing in detail what proof would be required for the associations to establish their claims of infringement. Because of the uniqueness of each in-copyright work in the HathiTrust repository and the high volume of individualized evidence that would be required to prove, among other things, which Guild members held copyrights in which works in the HathiTrust repository, this Court should conclude that the Authors Guild cannot satisfy the prudential test for associational standing.[8]

Concerns about judicial efficiency and the need for (or not) individualized proof as to who holds copyright has often been a consideration in class action

---

[7] *Authors Guild v. Google, Inc.* is currently on appeal regarding the issue of class certification. One of the issues before the Court in that appeal is whether there are common questions—and more importantly, common answers to those questions— regarding the infringement claims the Authors Guild class representative plaintiffs have asserted. *See Authors Guild v. Google, Inc.,* No. 12-3200-cv (2d Cir. 2012).

[8] The Supreme Court has explained that prudential concerns also underlie a related rule "barring adjudication of generalized grievances more appropriately addressed in the representative branches." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004). This rule provides an additional prudential reason that this Court should reject the Authors Guild's claims for lack of standing. Because the Guild's complaint and its requested relief are so broad and would affect so many non-parties, the intended result is more appropriately characterized as legislative than adjudicatory in nature.

cases. Just weeks ago, in *The Football Association Premier League Ltd. v. YouTube, Inc.*, No. 07-cv-3583 (LLS), slip op. (S.D.N.Y., May 15, 2013), a District Court judge observed that "copyright claims are poor candidates for class-action treatment" because copyright claims often have only "superficial similarities." *Id.* at 3. Like the claims the Guild brought against HathiTrust, that class action suit involved claims of widespread infringement of millions of works whose copyrights were held by a diverse set of plaintiffs, which in that case were allegedly uploaded to YouTube. *Id.* at 1-2. Specifically identifying the "validity and ownership of the copyright" as among the issues that "arise from facts peculiar to each protected work and each claimed infringement of it, in a compartmented case differing from every other one," *Id.* at 6, the court concluded that it could not allow the suit to proceed based in part on concerns regarding administrative efficiency and the difficulty of handling so many diverse claims of infringement in one suit. *Id.* at 7 "Each claim presents particular factual issues of copyright ownership, infringement, fair use, and damages, among others." *Id.*

Very similar considerations have led courts to reject associational standing in copyright suits similar to this one. *See Nat'l Ass'n. of Freelance Photographers v. Associated Press*, 97 CIV. 2267 (DLC), 1997 WL 759456 (S.D.N.Y. Dec. 10, 1997) (finding that the National Association of Freelance Photographers lacked associational standing for prudential and constitutional reasons because "any

-14-

judicial determination on the claims in this lawsuit requires proof regarding individual claimants, for example, whether given payment checks were effective to transfer copyright."); *Ass'n for Info. Media & Equip. v. Regents of the Univ. of California*, CV 10-9378 CBM MANX, 2011 WL 7447148 *4 (C.D. Cal. Oct. 3, 2011) ("In order to establish a claim for copyright infringement, individual copyrights owners' participation is necessary. This is because having the rights over a copyright is essential to establishing a copyright infringement claim. . . . Therefore, Plaintiff AIME, as a matter of law, has failed to establish associational standing because it cannot meet the [prudential standard for associational standing]."); *Ass'n for Info. Media & Equip. v. Regents of the Univ. of California*, 2:10-CV-09378-CBM, 2012 WL 7683452 * 3 (C.D. Cal. Nov. 20, 2012) (rejecting associational standing under amended complaint).

The present case also involves the rights of a large number of diverse copyright holders. The logistical challenges of sorting out which works in the HathiTrust repository were authored by associational members and which were not would itself be a difficult task. Proving precisely who holds rights in the works at issue in this case is even more complex. While reference to copyright registration certificates is an important start, many published works that are the subject of this litigation are subject to contracts between publishers and authors that are not publicly available. *See* Maria A. Pallante, *The Curious Case of Copyright*

*Formalities*, *Keynote Address*, 28 Berkeley Tech. L.J. (forthcoming 2013), http://www.law.berkeley.edu/files/Pallante-BerkeleyKeynote.pdf (explaining challenges regarding incentivizing the public recordation of copyright transfers). At a minimum the court would need to review those contracts, which would require that individual association members produce and testify regarding them for several reasons.

First, these contracts may contain complicated reversion of rights clauses based on current sales figures or the out-of-print status of the book, see Martin P. Levin, *The Contemporary Guide to Negotiating the Author-Publisher Contract*, 54 N.Y. L. Sch. L. Rev. 447, 455 (2009/2010), which the court would be forced to interpret by referring to individualized evidence regarding each work. Second, publishing contracts can be unclear about who holds electronic rights to publish, an unanticipated development in many contracts. *See Random House, Inc. v. Rosetta Books, LLC,* 283 F.3d 490 (2d Cir. 2002); *see also HarperCollins Publishers LLC v. Open Road Integrated Media, LLP,* Case No. 1:2011-cv-09499, complaint (S.D.N.Y., Dec. 23, 2011) (contesting whether Jean Craighead George—an Authors Guild member—holds the rights to publish the electronic version of her popular book *Julie of the Wolves*). *See also* Levin, *supra* (suggesting that authors should negotiate contracts that would revert certain portions of electronic rights to the author after a variety of trigger events) (citing Authors Guild, Inc., *Model*

*Trade Book Contract and Guide* 37 (2000)). Interpreting contested clauses would require the participation of associational members and third parties such as publishers, and would likely lead to separate, embedded disputes regarding some works. Third, in many cases, contracts are missing or incomplete. *See Cambridge Univ. Press v. Becker*, 863 F.Supp.2d 1190, 1363 (N.D. Ga. 2012) (dismissing 17 of 75 infringement claims for failure to produce contracts that proved ownership). *See also Getty Images (USA), Inc. v. Advernet*, 797 F.Supp.2d 399 (S.D.N.Y. 2011) (dismissing 35 of 37 infringement claims for failure to produce evidence of ownership). When no agreement is available, individual testimony by association members would almost certainly be required. This is especially true in cases of joint authorship or in cases where, as the Copyright Act permits, the exclusive rights to the work were divided among many different parties. *See* 17 U.S.C. § 201(d) (2006).

In sum, the question of who holds rights is often complex and requires much more than simple reference to copyright registration certificates, even in cases when those are available. Other related questions regarding these claims, such as assignment, waiver, and fair use all require even more individual participation.

The prudential test for associational standing is rooted in a desire to promote administrative convenience and efficiency. *United Food & Commercial Workers Union Local*, *751*, 517 U.S. at 555–56. Given the uniqueness of each claim in this

-17-

case and the large amount of individualized proof required, there is no efficiency to be gained, and much to be lost, by hearing all associational members' claims together in one suit. Therefore, we urge this Court to hold that the Authors Guild does not have standing based on its members' interests, and that the district court erred in holding that the associational plaintiffs' claims would satisfy this prudential test.[9]

## III.    The Interests of Academic Authors in Fair Use and the Continued Availability of the HathiTrust Corpus Diverge from the Authors Guild's Claimed Interests, Reinforcing the Wisdom of Limiting Associational Standing in This Case.

One additional powerful reason to limit associational standing in this case is that if the Authors Guild is allowed to pursue this lawsuit under its broad conception of associational standing, the interests of academic authors would be harmed because public access to millions of scholarly works for research purposes would be placed under a cloud of uncertainty as a special interest group pursues its

---

[9] The district court also concluded that "where an association seeks an injunction or declaration that an entire practice is unlawful, courts have concluded that the individual proof required is limited." (Op. at 6) (citing *Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*, 990 F. Supp. 245, 250 (S.D.N.Y. 1997) for the point that "associational standing would facilitate adjudication better than 'requiring duplicative proof' from each member). Far from being "duplicative" the claims involved here would require highly individualized proof regarding a diverse set of circumstances.

-18-

indiscriminate and indeterminate set of claims seeking to restrict and control access to the works in the HathiTrust digital library.

The majority of the works in the HathiTrust corpus were created by academic authors whose interests are more similar to *Amici* than those of the associational plaintiffs in this case. The HathiTrust is built from the collections of several major academic research libraries, (Compl. ¶ 1–2; Pls.' 56.1 Statement, Dkt_116, ¶ 62; Defs.' 56.1 Statement, Dkt_113, ¶¶ 30–31). Those collections—and therefore the vast majority of the contents of the HathiTrust digital library—were assembled to serve a scholarly audience. *See* Brian Lavoie & Lorcan Dempsey, *Beyond 1923: Characteristics of Potentially In-Copyright Print Books in Library Collections*, D-LIB MAG., Nov./Dec. 2009, http://www.dlib.org/dlib/november09/lavoie/11lavoie.html (reporting that 93% of the collections of three major academic partners in the Google Books project— from which a large portion of the HathiTrust scans were created—are nonfiction and that 78% of those are aimed at a scholarly audience).

Academic authors are typically motivated to create scholarly works to share the knowledge they contain with the world, thereby promoting the progress of science in keeping with the constitutional purpose of copyright. This was recognized by a District Court judge in a related case who observed that " '[a]cademic authors, almost by definition, are committed to maximizing access to

knowledge. The [Authors] Guild…, by contrast, [is] institutionally committed to maximizing profits.' " *Authors Guild v Google Inc.*, 770 F. Supp.2d 666, 679 (S.D.N.Y. 2011) (internal citation omitted).

Because such a large portion of the corpus is likely authored by academic authors, it is particularly important that this Court recognizes how their views on the merits of the case diverge markedly from those of the Authors Guild. *Amici* would be harmed if Plaintiffs prevailed and the injunction sought in this case were imposed on works created by academic authors that are in the HathiTrust corpus.

This lawsuit is not the first time the Authors Guild has inadequately represented the interests of academic authors. In a related case, the Authors Guild and a handful of its members are pursuing a class action lawsuit against Google for digitizing the very same books as are at issue in the *HathiTrust* case. In that case, a District Court judge ruled that the plaintiffs and their counsel had inadequately represented the interests of academic authors in negotiating the settlement of this class action lawsuit and cited this inadequacy as among the reasons the settlement should be rejected. *Authors Guild*, 770 F. Supp.2d at 679. The court noted that academic authors tend to favor open access, for example, as a solution to the "orphan works" problem. *Id.*, n. 16. The Authors Guild, in contrast, supports an approach to orphan works in which users must pay a licensing fee regardless of whether there is an owner available to collect those funds. *See* Authors Guild, Inc.,

Comments in Response to the U.S. Copyright Office Notice of Inquiry Regarding

Orphan Works and Mass Digitization, Feb. 4, 2013,

http://www.copyright.gov/orphan/comments/noi_10222012/Authors-Guild.pdf.

*See also* Ariel Katz, *The Orphans, the Market, and the Copyright Dogma: A*

*Modest Solution for a Grand Problem*, 27 Berkeley Tech. L.J. 1285, 1335–36

(2013) (arguing that collective licensing does nothing to address the root of the

orphan works problem because functioning markets for orphans do not and cannot

exist; if anything, licensed access for orphan works would "decrease, rather than

enhance, access to and dissemination of orphan works"). Indeed, the Guild has

argued that it is never permissible under the Copyright Act to allow the public to

freely view and download copies of orphan works. Pl-Appellants' Br. at 13. *Amici*

fundamentally disagree with the Authors Guild on the application of fair use in this

case, in particular as to the copyright implications of non-expressive uses of

copyrighted works, such as text-mining. Rather, *Amici* agree with the District

Court below that the non-expressive uses of the HathiTrust digital library now

permitted for research purposes do not infringe copyrights.[10]

---

[10] See (Op. at 16 n.22) ("Mass digitization allows new areas of non-expressive computational and statistical research, often called 'text mining.' One example of text mining is research that compares the frequency with which authors used 'is' to refer to the United States rather than 'are' over time." (citing Brief of Digital Humanities and Law Scholars as Amici Curiae in Support of Defendants' Motion for Summary Judgment, Dkt_123, at 7 ("[I]t was only in the latter half of the

Academic authors such as *Amici* more generally find HathiTrust's fair use defense more persuasive than the Authors Guild's theory of infringement. Weighing together the four statutory factors in 17 USC § 107 in light of the purposes of copyright, as the Supreme Court directed in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569,578 (1992), *Amici* believe that HathiTrust qualifies as a fair user and its digital library serves the underlying goals of copyright.

Making digital copies of works to create search tools that facilitate new forms of academic research, to provide materials held by libraries in formats accessible to registered students with print disabilities, and to preserve copies of works held by libraries for cultural heritage, are all transformative uses that support a finding of fair use. *Amici* agree with the findings of the court below that HathiTrust's use of the works are transformative because the use and purpose of the copying was entirely different, and clearly distinguishable from, the original work. (Op. at 16-17) (citing *A.V. ex rel Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 640 (4th Cir. 2009); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003)). *See also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006); *Am. Inst. of Physics v. Winstead PC*, Case No. 3:12-cv-01230-M, Minute Order (N.D. Tex. May 22, 2013) (written order forthcoming); Jess

─────────────

Nineteenth Century that the conception of the United States as a single, indivisible entity was reflected in the way a majority of writers referred to the nation.")).

Davis, *Patent Attys' USPTO Applications Protected By Fair Use*, Law360, May

22, 2013, http://www.law360.com/articles/442985/patent-attys-uspto-applications-

protected-by-fair-use (reporting that the court in *American Inst. of Physics* agreed

with intervener-defendant U.S. Patent and Trademark Office that copying and

distribution of articles to facilitate otherwise lawful uses falls " 'comfortably

within' the right to make incidental and necessary copies.")

Most of the books scanned in the HathiTrust corpus are non-fiction scholarly

works, which also supports a finding of fair use. Although HathiTrust has made

copies of entire works, because its uses are transformative, the third factor is not

dispositive, and also favors fair use. *Bill Graham*, 448 F.3d at 612. As the court

below found, making copies of entire works does not weigh against fair use if it

was necessary to do so in order to make the transformative use at issue. (Op. at 18–

19); *Arriba Soft* 336 F.3d at 821.

Finally, the court below was correct in finding that there is unlikely to be

any harm to the market for the original works because HathiTrust only displays the

name, page numbers, and frequency of occurrence of in-copyright works in which

the particular search term can be found, not the copy of the actual text itself, other

than full text copies provided to qualifying blind and print disabled students. (Op.

at 3). In addition, there is no real prospect of market usurpation in the cases where

HathiTrust consortium libraries make available an entire work in accessible format

to the circumscribed group of print disabled students that have registered with their university libraries because the number of users are very small, there is no existing licensing market for accessible format versions of many of these scholarly works, and the prospect of a future licensing market being developed for print disabled students seems remote. (Op. at 19-21). *See also Bill Graham Archives*, 448 F.3d at 614-15 (copyright holders cannot preempt transformative markets).

Indeed, academic authors such as *Amici* who create the scholarly works that form the majority of the HathiTrust corpus benefit from the greater accessibility to their works made possible by HathiTrust. Accordingly*, Amici* consider that HathiTrust's uses fall squarely within the core of fair use and further the goal of access to knowledge, which lies at the heart of academic endeavor.

By contrast, the Authors Guild seeks to enjoin use of the digital copies of academic works in the HathiTrust's corpus, and to put an end to the development of full text search facilities and other innovative research tools made possible by those digitized copies. The Authors Guild's challenge would harm us by restricting access to our works and put at risk the myriad public benefits of the HathiTrust digital library. For these reasons, we disagree with the Authors Guild's understanding and views on fair use, which fundamentally conflict with our own, and we urge this Court to consider this factor as it interprets statutory and prudential rules that limit associational standing in cases such as this.

## CONCLUSION

Because the Authors Guild holds only a small number of copyrights implicated in this litigation, we urge this Court, first, to affirm the lower court's ruling that the Authors Guild lacks standing under the Copyright Act to pursue the broad claims it has made in this lawsuit, and, second, to recognize that judicially-developed prudential rules of standing caution against granting associational standing in this case. Denial of associational standing is especially warranted because most of the in-copyright works in the HathiTrust digital library were written by scholars motivated to share the knowledge their works contain, and because scholars benefit from HathiTrust's fair use by using its digital library for research. *Amici* and scholars like *Amici* would be harmed, rather than benefited, if the Guild were granted standing and succeeded in pursuing the injunction it requests.

Dated: June 4, 2013

/s/ Jennifer M. Urban

JENNIFER M. URBAN
SAMUELSON LAW, TECHNOLOGY&
  PUBLIC POLICY CLINIC
University of California, Berkeley,
  School of Law
396 Simon Hall
Berkeley, California 94720
510-642-7338

*Attorney for Amici Curiae*

**CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(d) because this brief contains **6,150** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

/s/ Jennifer M. Urban

JENNIFER M. URBAN
SAMUELSON LAW, TECHNOLOGY &
    PUBLIC POLICY CLINIC
University of California, Berkeley,
    School of Law
396 Simon Hall
Berkeley, California 94720
510-642-7338

*Attorney for Amici Curiae*

**APPENDIX A**

## APPENDIX A

## List of 133 academic authors as *Amici Curiae*

Affiliation is provided for identification purposes only. The views stated here are those of the signers and do not reflect the position, if any, of the named institutions.

**Francesca Allegri**
Head of User Services
Health Sciences Library
University of North Carolina at Chapel Hill
*Editor of: Educational Services in Health Sciences Libraries. Current Practice in Health Sciences Librarianship* (volume 2) (Medical Library Association and Scarecrow Press, 1995)

**Ronald Aminzade**
Professor of Sociology
University of Minnesota
*Author of*: *Ballots and Barricades: Class Formation and Republican Politics in France, 1830-1871* (Princeton University Press, 1993)

**Steve F. Anderson**
Associate Professor
University of Southern California
*Author of: Technologies of History: Visual Media and the Eccentricity of the Past* (Dartmouth, 2011)

**Zoe Argento**
Assistant Professor
Roger Williams University School of Law

**Patricia Aufderheide**
University Professor
School of Communication
American University
*Author of: Communications Policy and the Public Interest* (Guilford Press, 1999)

**Donald A. Barclay**
Interim University Librarian
University of California, Merced
*Author of: Into the Wilderness Dream* (University of Utah Press, 1994)

**Elizabeth Popp Berman**
Assistant Professor of Sociology
University at Albany, State University of New York
*Author of: Creating the Market University: How Academic Science Became an Economic Engine* (Princeton University Press, 2012)

**Professor Mario Biagioli**
School of Law and Science & Technology Studies Program
University of California, Davis
*Author of: Galileo's Instruments of Credit: Telescopes, Images, Secrecy* (University of Chicago Press, 2006)

**Christine L. Borgman**
Professor & Presidential Chair in Information Studies
University of California, Los Angeles
*Author of: From Gutenberg to the Global Information Infrastructure: Access to Information in the Networked World* (MIT Press, 2000)

**Geoffrey C. Bowker**
Professor
Director, Evoke Laboratory
Department of Informatics
Donald Bren School of Information and Computer Sciences
University of California, Irvine
*Author of: Sorting Things Out: Classification and its Consequences* (with Susan Leigh Star) (MIT Press, 1999)

**Danah Boyd**
Microsoft Research and New York University
*Author of: It's Complicated: The Social Lives of Networked Teens* (Yale University Press, forthcoming 2014)

**Oren Bracha**
Professor of Law
The University of Texas School of Law
*Author of:* "Early American Printing Privileges: The Ambivalent Origins of
Authors' Copyright in America", *in Privilege and Property: Essays on the History
of Copyright* 89 (Ronan Deazley, Martin Kretschmer & Lionel Bentley eds.,
OpenBook Publishers, 2010)

**Annemarie Bridy**
Associate Professor
College of Law
University of Idaho

**Dan L. Burk**
Chancellor's Professor of Law
University of California, Irvine
*Author of*: *The Patent Crisis and How the Courts Can Solve It* (with Mark A.
Lemley) (University of Chicago Press, 2009)

**L Jean Camp**
Professor
School of Informatics and Computing
Indiana University
*Author of: Trust and Risk in Internet Commerce* (MIT Press, 2000)

**Michael A. Carrier**
Professor of Law
Rutgers Law School – Camden
*Author of*: *Innovation for the 21st Century: Harnessing the Power of Intellectual
Property and Antitrust Law* (Oxford University Press, 2009)

**Michael W. Carroll**
Professor of Law and Director,
Program on Information Justice and Intellectual Property
American University, Washington College of Law

**Danielle Keats Citron**
Lois K. Macht Research Professor and
Professor of Law
University of Maryland School of Law

30

**Julie E. Cohen**
Professor
Georgetown University Law Center
*Author of: Configuring the Networked Self* (Yale University Press, 2012)

**Danielle Conway**
Michael J. Marks Distinguished Professor of Business Law
William S. Richardson School of Law
University of Hawaii at Manoa

**Robert Cook-Deegan, MD**
Genome Ethics, Law & Policy
Institute for Genome Sciences & Policy and
Sanford School of Public Policy
Duke University
*Author of: The Gene Wars: Science, Politics, and the Human Genome* (WW Norton, 1994; 1996)

**Jonathan Culler**
Class of 1916 Professor of English and Comparative Literature
Cornell University
*Author of*: *On Deconstruction: Theory and Criticism after Structuralism* (Cornell University Press, 1982; London: Routledge, 1983; revised 25th anniversary ed., Cornell University Press, 2007, Routledge, UK, 2008)

**Robert Darnton**
Carl H. Pforzheimer University Professor
Harvard University.
*Author of: The Case For Books: Past, Present, and Future* (Public Affairs, 2009)

**Peter Decherney**
Associate Professor of English and Cinema Studies
University of Pennsylvania
Author of: Hollywood's Copyright Wars: From Edison to the Internet (Columbia University Press, 2012)

**David L. Dill**
Professor
Department of Computer Science
Stanford University
*Author of: Trace theory for automatic hierarchical verification of speed-independent circuits* Vol. 430 (MIT press, 1989)

**Peter DiCola**
Associate Professor
Northwestern University School of Law
*Author of: Creative License: The Law and Culture of Digital Sampling* (with Kembrew McLeod) (Duke University Press, 2011)

**J. Stephen Downie, PhD**
Professor and Associate Dean for Research
Graduate School of Library and Information Science
University of Illinois at Urbana-Champaign

**Joseph Dumit**
Professor of Science & Technology Studies
University of California, Davis
*Author of: Drugs for Life: How Pharmaceutical Companies Define Our Health* (Duke University Press, 2012)

**Professor EC Ejiogu**
Senior Researcher
Centre for Africa Studies (CAS)
University of the Free State, South Africa
*Author of: The Roots of Political Instability in Nigeria* (Ashgate, 2011)

**Jeffrey L. Elman**
Distinguished Professor of Cognitive Science & Dean of Social Sciences
University of California, San Diego
*Author of*: *Rethinking Innateness* (with E.A. Bates, M.H. Johnson, A. Karmiloff-Smith, D. Parisi, & K. Plunkett) (MIT Press, 1996)

**James Evans**
Associate Professor
Department of Sociology
University of Chicago
*Author of:* "Communication and the Evolution of Cognition," *to appear in Scaffolding in Evolution, Cognition and Culture* (Linda Caporael, James Griesemer and William Wimsatt, eds., MIT Press, forthcoming 2013)

**Frank E. Fee Jr., Ph.D.**
Associate Professor Emeritus
School of Journalism and Mass Communication
University of North Carolina at Chapel Hill

**Malcolm M. Feeley**
Professor of Law
University of California at Berkeley
*Author of: The Process is the Punishment* (New York: Russell Sage Foundation, 1979)

**Edward Feigenbaum**
Kumagai Professor of Computer Science (Emeritus)
Stanford University
*Author of*: *The Fifth Generation: Artificial Intelligence and Japan's Computer Challenge to the World* (Addison Wesley, 1983)

**Jacob G. Foster**
Research Associate
Department of Sociology
University of Chicago

**Ian T. Foster**
Professor of Computer Science
The University of Chicago
*Author of: The Grid: Blueprint for a New Computing Infrastructure* (with C. Kesselman) (Morgan Kaufmann, 1999)

**Barbara Friedman, Ph.D.**
Associate Professor
School of Journalism and Mass Communication
University of North Carolina at Chapel Hill
*Author of*: *From the Battlefront to the Bridal Suite: Media Coverage of British War Brides*, 1942-1946 (University of Missouri Press, 2007)

**Roberto Garvía**
Professor
Comparative Sociology Group
Departament of Social Sciences
Universidad Carlos III de Madrid

**Laura N. Gasaway**
Paul B. Eaton Distinguished Professor of Law Emeritus
University of North Carolina School of Law
*Author of: Copyright Questions and Answers for Information Professionals: from the Columns of Against the Grain* (Purdue University Press, 2012)

**Llewellyn Joseph Gibbons**
University of Toledo College of Law
*Author of: Mastering Trademark and Unfair Competition Law* (co-authored) (Carolina Academic Press 2013)

**Anne Gilliland**
Scholarly Communications Officer
University of North Carolina at Chapel Hill
*Author of:* "The OhioLINK/OCLC Collection Analysis Project: A Preliminary Report" *in Assessment of Library Collections in a Consortial Envoronment: Experiences from Ohio* (George Lupone, ed.,  Routledge, 2009)

**Robert J. Glushko**
Adjunct Full Professor
School of Information
University of California, Berkeley
*Author of: Document Engineering* (with Time McGrath) (MIT Press, 2005)

**Andrew Gold**
Professor
DePaul University College of Law

34

**Kenneth W. Graham**
Professor of Law (Emeritus)
School of Law
University of California, Los Angeles
*Author of: Federal Practice and Procedure: Evidence, Vol. 21-30A* (with Charles Alan Wright) (West Publishing, 1978-2000)

**Bronwyn H. Hall**
Professor of the Graduate School
Department of Economics
University of California, Berkeley
*Editor of*: *Handbook of the Economics of Innovation* (with Nathan Rosenberg) (2010)

**John R. Hall**
Distinguished Professor of Sociology
University of California, Davis,
*Author of: Apocalypse: From Antiquity to the Empire of Modernity* (Polity, 2009)

**James A. Harrell, Ph.D.**
Professor Emeritus of Geology
Department of Environmental Sciences
The University of Toledo

**Jeffrey Haydu**
Professor of Sociology
University of California, San Diego
*Author of: Citizen Employers: Business Communities and Labor in Cincinnati and San Francisco*, 1870–1916 (Cornell University Press, 2008)

**Carla Hesse**
Professor of History and Dean of Social Sciences
University of California, Berkeley
*Author of: Publishing and Cultural Politics in Revolutionary Paris* (California 1991).

**Harry Hochheiser**
Assistant Professor
University of Pittsburgh
*Author of: Research Methods in Human-Computer Interaction* (with J. Lazar. and
J. Feng) (Wiley, 2010)

**Clifton Hood**
George E. Paulsen Professor of American History and Government,
Department of History
Hobart and William Smith Colleges (Geneva, NY)
*Author of: 722 Miles: The Building of the Subways and How They Transformed
New York* (Simon and Schuster, 1992; paperback ed., Johns Hopkins University
Press, 2004)

**Alan Hyde**
Distinguished Professor and Sidney Reitman Scholar
Rutgers University School of Law
*Author of: Bodies of Law* (Princeton University Press, 1997)

**Lewis Hyde**
Richard L. Thomas Professor of Creative Writing
Kenyon College
*Author of: Common as Air* (Farrar, Straus & Giroux, 2010)

**Judith Innes**
Professor Emerita
University of California, Berkeley
*Author of: Planning with complexity: an Introduction to collaborative rationality*
(Routledge 2010)

**Tonja Jacobi**
Professor of Law
Northwestern University School of Law
*Author of:* "The New Separation of Powers: Integrating the Study of American
Politics" (with Rui de Figueiredo and Barry R. Weingast), *in Handbook of
Political Economy* (Barry R. Weingast and Donald Wittman, eds., Oxford
University Press, 2006)

**Adrian Johns**
Allan Grant Maclear Professor
Department of History Chair
 Committee on Conceptual and Historical Studies of Science
University of Chicago
*Author of: The Nature of the Book* (University of Chicago Press, 1998)

**Victoria Johnson**
Associate Professor of Organizational Studies
University of Michigan
*Author of: Backstage at the Revolution: How the Royal Paris Opera Survived the End of the Old Regime* (University of Chicago Press, 2008)

**Douglas W. Jones**
Associate Professor of Computer Science
University of Iowa
*Author of: Broken Ballots: Will your vote count?* (with Barbara Simons) (Center for the Study of Language and Information, 2012)

**Russell Jones**
Professor of the Graduate School
Department of Plant and Microbial Biology
University of California, Berkeley
*Author of: The Molecular Life of Plants* (with Helen Ougham, Howard Thomas, and Susan Waaland) (Wiley-Blackwell, 2012)

**Steven Justice**
Professor of English
 University of California, Berkeley
*Author of: Writing and Rebellion: England in 1381* (University of California Press, 1994)

**Stephen Kalberg**
Associate Professor
Boston University

**Ariel Katz**
Associate Professor, Innovation Chair in Electronic Commerce
Faculty of Law
University of Toronto

37

**Molly Keener**
Associate Librarian, Scholarly Communication
Wake Forest University

**Christopher M. Kelty**
Associate Professor of Anthropology and Information Studies
Institute for Society and Genetics
University of California, Los Angeles
*Author of: Two Bits: The cultural significance of free software* (Duke University Press, 2008)

**Anne Klinefelter**
Associate Professor of Law and Director of the Law Library
University of North Carolina at Chapel Hill
*Author of: Privacy and Library Public Services: Or, I Know What You Read Last Summer*, 26 Legal Reference Services Q. 253-279 (2007), *reprinted in Public Services in Law Libraries: Evolution and Innovation in The Twenty-First Century* (Barbara Bintliff & Lee F. Peoples, eds., Haworth, 2007)

**Iga Kozlowski**
Graduate Student
Department of Sociology
Northwestern University

**Richard Lachmann**
Professor of Sociology,
University at Albany, State University of New York
*Author of: Capitalists in Spite of Themselves* (Oxford University Press, 2000)

**Lisa Lampert-Weissig**
Professor, English Literature and Comparative Medieval Studies
Katzin Professor in Jewish Civilization
University of California, San Diego
*Author of: Gender and Jewish Difference from Paul to Shakespeare* (University of Pennsylvania Press, 2004)

**Hannah Landecker**
Associate Professor
Department of Sociology
University of California, Los Angeles
*Author of: Culturing Life: How Cells Became Technologies* (Harvard University Press, 2007)

**Thomas C. Leonard**
University Librarian
Professor, Graduate School of Journalism
University of California, Berkeley
*Author of: News for All: America's Coming-of-Age with the Press* (Oxford University Press, 1995)

**Lawrence Lessig**
Roy L. Furman Professor of Law and Leadership
Harvard Law School.
*Author of:* REMIX (2009)

**Harry Lewis**
Gordon McKay Professor of Computer Science
Harvard University

**Jessica Litman**
John F. Nickoll Professor of Law and Professor of Information
University of Michigan
*Author of: Digital Copyright: protecting intellectual property on the Internet* (Prometheus Books, 2001)

**Lyn H. Lofland**
Research Professor of Sociology (Emerita title)
University of California, Davis

**Lydia Pallas Loren**
Kay Kitagawa & Andy Johnson-Laird IP Faculty Scholar and
 Professor of Law
Lewis & Clark Law School
*Author of: Copyright in a Global Information Economy* (with Julie E. Cohen) (3d ed., Aspen Publishers, 2010)

**Gary Lupyan**
Assistant Professor of Psychology
University of Wisconsin, Madison

**Lisa A. Macklin**
Director, Scholarly Communications Office
Emory University Libraries
*Author of: Digital imaging of photographs: A practical approach to workflow
design and project management* (American Library Association, 1999)

**Michael J. Madison**
Professor of Law
University of Pittsburgh School of Law
*Author of: The Law of Intellectual Property* (co-authored with Craig Nard, Mark
McKenna and David Barnes) (3d ed., Aspen Publishers, 2011)

**John Markoff**
Distinguished University Professor
University of Pittsburgh
*Author of: The Abolition of Feudalism: Peasants, Lords, and Legislators in the
French Revolution* (Penn State University Press 1996)

**Jerome McGann**
University Professor
University of Virginia
*Author of*: *Radiant Textuality: Literature after the World Wide Web* (Palgrave
Macmillan, 2001)

**Stephen McJohn**
Professor
Suffolk University Law School
*Author of: Intellectual Property Law: Examples and Explanations* (4th ed. Aspen
Pub. 2012)

**Kembrew McLeod**
Professor
Communication Studies
University of Iowa
*Author of: Creative License: The Law and Culture of Digital Sampling* (with Peter
DiCola) (Duke University Press, 2011)

40

**Tara McPherson**
Associate Professor
School of Cinematic Arts
University of Southern California

**J. Hillis Miller**
UCI Distinguished Research Professor Emeritus
Departments of Comparative Literature and English
University of California, Irvine
*Author of: Reading for Our Time:* Adam Bede *and* Middlemarch *Revisited*
(Edinburgh University Press, 2012)

**Charles Nesson**
Weld Professor of Law
Harvard Law School
*Author of:* Brief on behalf of Joel Tenenbaum in the First Circuit Court of Appeals,
http://joelfightsback.com/wp-content/uploads/12-2146-Reply.pdf

**Mary Beth Norton**
Mary Donlon Alger Professor of American History & Stephen H. Weiss
Presidential Fellow
History Department
Cornell University
*Author of*: *In the Devil's Snare: The Salem Witchcraft Crisis of 1692* (Alfred A.
Knopf, 2002).

**Tyler T. Ochoa**
Professor
High Tech Law Institute
Santa Clara University School of Law
*Author of: Understanding Intellectual Property Law* (with Donald S. Chisum,
Shubha Ghosh, and Mary LaFrance) (2d ed., LexisNexis 2011)

**Michael A. Olivas**
William B. Bates Distinguished Chair in Law
University of Houston Law Center
*Author of*: *Suing Alma Mater: Higher Education and the Courts* (Johns Hopkins
University Press, 2013)

41

**Pamela Oliver, PhD**
Professor of Sociology
University of Wisconsin-Madison
*Author of: The Critical Mass in Collective Action: A Micro-Social Theory* (with Gerald Marwell) (Cambridge University Press. 1993)

**Victoria F. Phillips**
Professor
Director, Glushko-Samuelson Intellectual Property Law Clinic
American University, Washington College of Law

**Beth Plale**
Professor of Computer Science
Indiana University, Bloomington

**Thomas Pogge**
Leitner Professor of Philosophy and International Affairs
Yale University
*Author of:* WORLD POVERTY AND HUMAN RIGHTS (2d ed., Polity Press, 2008)

**Malla Pollack**
*Author of: Callman on Unfair Competition, Trademarks and Monopolies* (co-authored) (4th ed. Thomson Reuters); *What Is Congress Supposed to Promote? Defining 'Progress" in Article I, Section 8, Clause 8 of the U.S. Constitution, or Introducing the Progress Clause*, 80 Nebraska L. Rev. 754 (2001)

**Hoifung Poon**
Researcher
Microsoft Research

**Stephen Ramsay**
Associate Professor
Department of English
University of Nebraska-Lincoln

**Eustáquio J. Reis**
Instituto de Pesquisa Econômica Aplicada (IPEA), Rio de Janeiro, Brasil
*Author of: The Dynamics of Deorestarion and Economic Growth in Brazilian Amazon* (with Clive Granger, Likke Andersen, Seteven Wunder, and Diana Weinhold) (Cambridge University Press. 2002)

**Jenn Riley**
Head, Carolina Digital Library and Archives
University of North Carolina at Chapel Hill
*Author of: Metadata for Digital Resources: Implementation, Systems Design, and Interoperability* (with Muriel Foulonneau) (Chandos, 2008)

**Michael Risch**
Associate Professor of Law
Villanova University School of Law

**William G. Roy**
Professor
Department of Sociology
University of California, Los Angeles
*Author of: Reds, Whites and Blues: Social Movements, Folk Music, and Race in America* (Princeton University Press, 2010).

**Sara Sampson**
Clinical Assistant Professor of Law and Deputy Director of the Law Library
University of North Carolina at Chapel Hill
*Author of: Ohio Legal Research* (with K. Hall), (Carolina Academic Press, 2009).

**Joshua D. Sarnoff**
Professor of Law and
Director, Center for Intellectual Property Law and Information Technology
DePaul University College of Law

**AnnaLee Saxenian**
Dean, School of Information
University of California, Berkeley
*Author of: Regional Advantage: Culture and Competition in Silicon Valley and Route 128* (Harvard University Press, 1996)

**Carly Elizabeth Schall, PhD.**
Department of Sociology
Vanderbilt University

**Niels Schaumann**
Dean and Professor of Law
California Western School of Law

**Lea Shaver**
Associate Professor
Indiana University
McKinney School of Law
*Editor of: Access to Knowledge in Brazil: New Research on Intellectual Property, Innovation, and Development* (Bloomsbury Academic, 2011)

**Stuart M. Shieber**
James O. Welch, Jr. and Virginia B. Welch Professor of Computer Science
Harvard University
*Author of*: *Prolog and Natural-Language Analysis* (CSLI Publications, 1987; Microtome Publishing, 2002)

**Jessica Silbey**
Professor of Law
Suffolk University Law School
*Editor of: Law and Justice on the Small Screen* (with Peter Robson) (Hart Publishing, 2012)

**Kevin L. Smith**
Director of Copyright and Scholarly Communications
Duke University Libraries
*Author of: Owning and Using Scholarship: A Handbook on Intellectual Property for Scholars* (University of Chicago Press, forthcoming)

**Eugene H. Spafford, Ph.D.**
Professor
Department of Computer Science
Purdue University

**Dr. Lynette Spillman**
Professor of Sociology
University of Notre Dame
*Author of: Solidarity in Strategy: Making Business Meaningful in American Trade Associations* (University of Chicago Press, 2012)

**Peter Stamatov**
Associate Professor of Sociology
Yale University
*Author of: The Origins of Global Humanitarianism: Religion, Empires, and Advocacy* (Cambridge University Press, 2013)

**Philip B. Stark**
Professor and Chair
Department of Statistics
University of California, Berkeley
*Author of:* "A Primer of Frequentist and Bayesian Inference in Inverse Problems" *in Large Scale Inverse Problems and Quantification of Uncertainty* (with L. Tenorio) (Biegler et al., eds.) (John Wiley & Sons, 2010)

**Katherine J. Strandburg**
Professor of Law
New York University
*Editor of: Research Handbook on Intellectual Property and Trade Secrecy* (with Rochelle C. Dreyfuss) (Edward Elgar, 2011).

**Peter Suber**
Director of the Harvard Office for Scholarly Communication and
Director of the Harvard Open Access Project
Harvard University
*Author of: Open Access* (MIT Press, 2012)

**Peter P. Swire**
C. William O'Neill Professor of Law
Ohio State University
*Author of: None of Your Business: World Data Flows, Electronic Commerce, and the European Privacy Directive* (with Robert Litan) (Brookings Institution Press, 1998)

45

**Stefan Tanaka**
Professor of Communication
Director, Center for the Humanities
University of California, San Diego
*Author of: Japan's Orient: Rendering Pasts into History* (University of California Press, 1993)

**David S. Touretzky**
Research Professor of Computer Science
Carnegie Mellon University
*Author of: Common Lisp: A Gentle Introduction to Symbolic Computation* (The Benjamin/Cummings Publishing Company, 1990) (reprinted with minor corrections, Dover Publications, 2013)

**Vilna Bashi Treitler**
Professor of Sociology
Baruch College and The Graduate Center
City University of New York
*Author of*: *The Ethnic Project: Transforming Racial Fiction into Ethnic Factions* (Stanford University Press, 2013)

**Jeffrey D. Ullman**
Professor (emeritus)
Stanford University
*Author of: Principles of Database Systems* (2 volumes) (Computer Science Press, 1988, 1989).

**Siva Vaidhyanathan**
Chair, Department of Media Studies
Robertson Professor
University of Virginia
Department of Media Studies
& School of Law
*Author of: The Googlization of everything: (and Why We Should Worry)* (University of California Press, 2011)

**Molly Shaffer Van Houweling**
Professor of Law
University of California, Berkeley

**Todd J. Vision**
Associate Professor of Biology
University of North Carolina at Chapel Hill
*Author of:* "Computational tools and resources for plant genomics" (with McLaysaght, A.) *in Handbook of Plant Biotechnology* (Christou, P. & Klee, H., eds. John Wiley & Sons, 2004)

**Eric von Hippel**
T. Wilson Professor of Innovation
MIT Sloan School of Management
*Author of: Democratizing Innovation* (MIT Press, 2005)

**Thomas Wasow**
Professor of Linguistics and
Clarence Irving Lewis Professor of Philosophy
Stanford University
*Author of: Postverbal Behavior* (CSLI Publications, 2002)

**Alan Weinstein**
Professor of the Graduate School
Department of Mathematics
University of California, Berkeley
*Author of: Lectures on the Geometry of Quantization (Berkeley Mathematical Lecture Notes)* (with Sean Bates) (American Mathematical Society, 1997)

**Jim Whitehead**
Professor
Computer Science
University of California, Santa Cruz
*Editor of: Collaborative Software Engineering* (with Ivan Mistrík, John Grundy, and André van der Hoek) (Springer, 2010)

**Melissa Wilde**
Associate Professor of Sociology
University of Pennsylvania
*Author of: Vatican II: A Sociological Analysis of Religious Change* (Princeton University Press, 2007)

47

**John Willinsky**
Kholsa Family Professor of Education
Stanford University
*Author of: The Access Principle: The Case for Open Access to Research and Scholarship* (MIT Press, 2006)

**Jane K. Winn**
Charles I. Stone Professor
University of Washington School of Law

**Terry Winograd**
Professor Emeritus of Computer Science
Stanford University
*Author of: Understanding Computers and Cognition: A New Foundation for Design* (with Fernando Flores) (Ablex, 1986; Addison-Wesley, 1987)

**Richard Wittman**
Associate Professor
Department of the History of Art & Architecture
University of California, Santa Barbara
*Author of*: *Architecture, Print Culture, and the Public Sphere in Eighteenth-Century France* (Routledge, 2007).

**Spencer D. Wood**
Associate Professor
Department of Sociology, Anthropology and Social Work
Kansas State University

**Jonathan Zittrain**
Professor of Law
Harvard Law School and
Professor of Computer Science
Harvard School of Engineering and Applied Sciences
*Author of: The Future Of The Internet -- And How To Stop It* (Yale University Press, 2008)