# 12-4547-cv

-----------------------------

## United States Court of Appeals for the Second Circuit
-----------------------------

THE AUTHORS GUILD, INC., THE AUSTRALIAN SOCIETY OF AUTHORS LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS,
*(caption continued inside cover)*

-----------------------------

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

===================================================================

**Brief For Amici Curiae Association on Higher Education And Disability, Marilyn J. Bartlett, Center For Applied Special Technology, Center For Law and Education, Melissa Chafee, Council of Parents Attorneys and Advocates, Disability Rights Advocates, Everyone Reading, Inc., Everyone Reading Illinois, Eye to Eye, Inc., International Dyslexia Association, and Society for Disability Studies, In Support of Intervenor Defendants-Appellees National Federation of the Blind, et al.**

===================================================================

JO ANNE SIMON, P.C.
356 FULTON STREET
BROOKLYN, NEW YORK 11201
(718) 852-3528
JoAnne@JoAnneSimon.com
*Attorneys for Amici Curiae*

<u>On the Brief</u>
Jo Anne Simon
Mary J. Goodwin
Amy F. Robertson

_____
*(caption continued)*

ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES
SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON,
THE AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND
COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK
FAGLITTERAER FORFATTERO OG VERSETTERFORENING, THE
WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK GRUNDSTROM,
HELGE RONNING, JACK R. SALAMANCA,

*Plaintiffs-Appellants,*

v.

HATHITRUST, CORNELL UNIVERSITY, MARY SUE COLEMAN,
President, University of Michigan, MARK G. YUDOF, President, The
University of California, KEVIN REILLY, President, The University of
Wisconsin System, MICHAEL MCROBBIE, President, Indiana University,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, GEORGINA
KLEEGE, BLAIR SEIDLITZ & COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES…………………………………………..….……..ii

INTERESTS OF THE AMICI CURIAE……………………………….……….1

PRELIMINARY STATEMENT……………………………………….……….7

STATEMENT OF FACTS……………………………………………….…..9

SUMMARY OF ARGUMENT………………………….………………..18

ARGUMENTS………………………………………...………………..18

    I.    Students with Disabilities are entitled to equal access to all aspects of education, including library collections………………….………..18

    II.    Copyright law and expanding federal disability rights protections complement each other in the form of the Chafee Amendment and the Fair Use Doctrine …………………………………..……….………23

CONCLUSION……………………………………………….……………. 25

CORPORATE DISCLOSURE STATEMENT……………………...………26

CERTIFICATE OF COMPLIANCE………………………...…………27

CERTIFICATE OF SERVICE……………………………………………………………….28

# **TABLE OF AUTHORITIES**

**CASES:**                                                                      **Page(s)**

Argenyi v. Creighton University,
    703 F.3d 441 (8th Cir. 2013)……………………………………………..19

Authors Guild, Inc. v. HathiTrust,
    902 F. Supp. 2d 445 (S.D.N.Y. 2012)………………………7, 16, 17, 21, 24

Bartlett v. N.Y. S. Bd of Law Examiners,
    970 F.Supp. 1094 (S.D.N.Y. 1997)…………………………...………………11

**STATUTES:**

17 U.S.C. § 121……………………………………………...…..………13, 23

17 U.S.C. § 121(a)…………………………………………...……………24

17 U.S.C. § 121(c)…………………………………………….…15, 24

17 U.S.C. §121(d)(1)………………………………………….…………24

20 U.S.C. § 1400……………………………………………….………14

20 U.S.C. § 1400 (c)(1)…………………………………………………5

20 U.S.C. § 1412(23)…………………………………………...…………15

20 U.S.C. § 1413(a)(6)…………………………………………...…………15

20 U.S.C. § 1414(d)(3)(B)(iii)………………………………………………15

20 U.S.C. § 1474(c)(1)………………………………………...…………15

20 U.S.C. § 1474(e)………………………………..…………………………15

20 U.S.C. § 11401(b)(1)(A)…………………..……………………...…………………….9

29 U.S.C. § 794……………………………………………….…...…………8, 19

42 U.S.C. § 12101……...………………………………………..………………….8

42 U.S.C. § 12101(a)(3)…………………..………………...………………19

42 U.S.C. § 12101(a)(8)……………………………………………………….8

42 U.S.C. § 12101(b)(1)…………………………………….…...……………19

42 U.S.C. § 12117(b)……………………………………...…………………20

42 U.S.C. § 12132…………………………………...………………………19

42 U.S.C. § 12181(7)(J)……………………………………….…...……………19

## REGULATIONS:

28 C.F.R. § 35.104……………………………………………...…………20

28 C.F.R. § 35.130(b)(1)(iii)…………………………………...………20

28 C.F.R. § 35.160(a)(1)…………………………………...…………19

28 C.F.R. § 35.160(b)(1)…………………………………………20

28 C.F.R. § 35.160(b)(2)…………………………………………20

28 C.F.R. § 36.303……………………………….…………………20

34 C.F.R. § 104……………………………………………………19

34 C.F.R. § 104.4(b)(1)(iii)……………..…………………………...………20

34 C.F.R. § 104.43(a)……………..…...…………………………………16

34 C.F.R. § 300.172(b)(3)…………………………………...………………………15

34 C.F.R. § 300.210(b)(3)…………………………………...………………………15

**OTHER AUTHORITIES:**

142 Cong. Rec. S9763, S9764 (daily ed. Sept. 3, 1996)…………….....…………..23

71 Fed. Reg. 46540 (Aug. 14, 2006)…………………………...………………15

AHEAD Position Statement on Issues of Textbook Access (Dec. 2006),
    http://ahead.org/resources/e-text/position-statement.....................................16

Bradley University,
    OCR Docket # 0510-2043 (Region V, 2010)………………………………14

California State University, Fullerton,
    OCR Docket # 09-03-2166 (Region IX, 2003)……………..………………14

Florida Atlantic University,
    OCR Docket # No. 04-06-2127 (Region IV, 2006)…………….....…………13

"Frequently Asked Questions about the June 29, 2010 Dear Colleague Letter,"
    U.S. Department of Education (May 26, 2011),
    http://www2.ed.gov/about/offices/list/ocr/docs/
    dcl-ebook-faq-201105.pdf........................................................................8, 22

Higher education and disability: Education needs a coordinated approach to
    improve its assistance to schools in supporting students.
    (No. GAO-10-33), http://www.gao.gov/products/GAO-10-33.....................10

"Higher Education's Obligations Under Section 504 and Title II
    of the ADA," U.S. Department of Education,
    http://www2.ed.gov/about/offices/list/ocr/docs/auxaids.html......................20

H.R. Rep. No. 94-1476 at 73 (1976)…………………..………………..…………25

H.R. Rep. 101–485(II), at 108 (1990)…………………………..………………21

Joint "Dear Colleague" Letter: Electronic Book Readers,
U.S. Department of Education & U.S. Department of Justice
(June 29, 2010), http://www2.ed.gov/about/offices/list/ocr/
letters/colleague-20100629.html…………………………………...………21

<u>Mott Community College</u>,
OCR Docket # 15-11-2074 (Region IX, 2011)…………….………………14

Overview of the Office for Civil Rights, U.S. Department of Education,
http://www2.ed.gov/about/offices/list/ocr/aboutocr.html............................20

Report of the Advisory Commission on Accessible Instructional Materials
in Postsecondary Education for Students with Disabilities
(December 6, 2011), http://www2.ed.gov/about/bdscomm/list/
aim/publications.html....................................................9, 10, 11, 12,13, 14, 17

Report of the ARL Joint Task Force on Services to Patrons with Print Disabilities,
(Nov. 2012), http://www.arl.org/focus-areas/copyright-ip/2342-
report-of-the-arl-joint-task-force-on-services-to-patrons-with-print-
disabilities-nov-2-2012…………………………………...…………………16

Report of the Wounded Warrior Project,
http://www.woundedwarriorproject.org/programs/
policy-government-affairs/key-policy-priorities/objective-2-economic-
empowerment/initiative-2.aspx…………………………….…………………11

*Returning Veterans on Campus with War Related Injuries and the Long Road
Back Home,* Journal of Postsecondary Education and Disability (2009)…..11

*The Post-High School Outcomes of Young Adults With Disabilities up to 8
Years After High School. A Report From the National Longitudinal
Transition Study-2 (NLTS2)* (NCSER 2011-3005). Menlo Park, CA:
SRI International, www.nlts2.org/reports....................................................11

# INTERESTS OF AMICI CURIAE[1]

The **Association on Higher Education And Disability** ("AHEAD") is a not-for-profit organization committed to full participation and equal access for persons with disabilities in higher education.  Its membership includes faculty, staff and administrators at approximately 2,000 colleges and universities, not-for-profit service providers and professionals, and college and graduate students planning to enter the field of disability practice.   AHEAD members strive to ensure that institutions of higher education comply with applicable disability rights protections and provide reasonable accommodations to both students and employees, including the conversion of instructional and other related scholarly materials to accessible formats. Through its participation in national coalitions such as the Reading Rights Coalition, and its leadership on the issue of access to textbooks by people with disabilities, AHEAD has become a nationally-recognized voice advocating for accessible instructional materials.  The outcome of this case is of significant importance to AHEAD members and the students they serve.

---

[1]  The parties in this case have verbally consented to the filing of the *amici's* brief. Pursuant to Fed. R. App. Proc. § 29(c)(5), *amici* state that no counsel for any party has authored this brief in whole or in part, and no person or entity other than *amici*, their members, or their counsel contributed monetarily to the preparation or submission of this brief.

**Marilyn J. Bartlett, Ph.D, J.D.** is an adult with dyslexia who experiences significant difficulties with processing the written word fluently and accurately. Throughout her life, however, she has been able to learn and comprehend with significant ease when text is presented verbally. While researching and writing her Ph.D. dissertation in the late 1970's, she hired a reader to assist her but was hindered by the limited availability of such human assistance. Access of the sort provided through the HathiTrust Digital Library would have given her equal access to the research opportunities available to her peers. As a tenured professor of Education, she has limited independent access to research because of the limited resources available in digital form; thus her interest in the outcome of this matter is substantial.

The **Center for Applied Special Technology** (CAST) is a not-for-profit educational organization whose mission is to expand educational opportunities for all students, especially those with disabilities, through Universal Design for Learning. Universal Design for Learning is a framework for teaching, learning, and the development, selection, and use of curriculum materials that takes into consideration individual learning differences. Through its work supporting the National Instructional Materials Accessibility Standard (NIMAS), national technical assistance related to Accessible Instructional Materials (AIM) and The Advisory Commission on Accessible Instructional Materials in Postsecondary

2

Education for Students with Disabilities, CAST has sustained a strong commitment to ensuring equitable access to instructional materials for all students with print disabilities.

The **Center for Law and Education** (CLE) is a national advocacy organization that works with parents, advocates and educators to improve the quality of education for all students, and in particular, students from low-income families and communities.  Throughout its history, CLE has been a recognized leader in advancing the rights of students with disabilities – from federal policy through state and local implementation. Firmly rooted in both disability rights and school reform, CLE has focused increasingly on bringing the two together – to help ensure, for example, that specialized instruction and/or support services provided through individualized education programs (IEPs) or Section 504 plans, assessment policies and practices, including accommodations, and placement decisions are aimed at overcoming the barriers for all students with disabilities to meet high standards, rather than being vehicles for lowered expectations.

**Melissa Chafee** is the mother of two dyslexic sons, each of whom are consumers of alternative text and whose studies have been limited by the dearth of books available for their course work and research needs.  Those needs will only become greater and their options more limited in pursuit of graduate education. Mrs. Chafee desires that her sons and individuals like them have access to printed

3

resources that are equally effective and equally as easy to access as students without these disabilities, which has thus far been elusive. Mrs. Chafee is an Orton-Gillingham trained learning specialist and the former president of the Rhode Island Branch of the International Dyslexia Association. She joins the *amici* as an advocate for all people with dyslexia, and in honor of her father-in-law, the late Sen. John Chafee, whose goal for this signature legislation–full and meaningful access to print–would be given new life through the HathiTrust Digital Library. Thus, *Amicus* Melissa Chafee has a significant interest in the outcome of this matter.

The **Council of Parent Attorneys and Advocates** (COPAA) is a not-for-profit organization for parents of children with disabilities, their attorneys and advocates. COPAA does not undertake individual representation for children with disabilities, but provides training and resources for advocates and attorneys to help each child obtain the free appropriate public education ("FAPE") and special education services and supports guaranteed by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C § 1400 *et seq*., and other statutes. The primary goal of COPAA is to secure appropriate educational services for children with disabilities, echoing a Congressional finding that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and

4

economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1) (2008).

**Disability Rights Advocates ("DRA")** is a not-for-profit legal center founded twenty years ago to enforce the rights of people with disabilities, in particular under.  A major focus of DRA's work for the last decade has involved class action litigation on behalf of students and others who are blind or have other print disabilities.  An additional focus of DRA's work has been access to technology for men and women with print disabilities.  Accordingly, the district court's decision is of great importance to DRA and the constituency it represents.

**Everyone Reading, Inc.** (formerly known as the New York Branch of the International Dyslexia Association) is a not-for-profit organization that provides public information, referrals, training and support to professionals, families and affected individuals regarding the impacts to and treatment of people with dyslexia and related learning disorders. Its members believe in targeted educational interventions and the provision of accommodations for students with dyslexia at all levels of education, including access to printed text through electronic means. It is a member of the Reading Rights Coalition.

**Everyone Reading Illinois** ("ERI"), formerly known as the Illinois Branch of the International Dyslexia Association, is a not-for-profit organization that is dedicated to improving the lives of individuals with dyslexia and related learning

5

disabilities through support for such individuals and their families, professional development for teachers, and increased public awareness. ERI strives to eliminate educational inequities and create excellent learning opportunities for all affected students, including the use of technology and accessing printed text through electronic resources. As a result, this Court's decision is of tremendous import to ERI and the individuals and families it supports.

**Eye to Eye, Inc.**, a non-profit 501(c)3 organization, pairs school-aged children (mentees) diagnosed with learning disabilities (LD) and Attention-Deficit/Hyperactivity Disorder (ADHD) with similarly labeled high school and college students (mentors) for after-school mentoring programs across twenty states. Many of Eye to Eye's mentors and mentees are users of adaptive software technology and as such have a significant interest in the outcome of this case.

The **International Dyslexia Association (IDA)** is a 501(c)(3) non-profit, scientific and educational organization dedicated to the study and treatment of dyslexia, and related language-based learning disabilities. IDA is the oldest such organization in the U.S. with approximately 8,500 members individuals with dyslexia, their families, and professionals in the field. IDA has 43 branches throughout the U.S. and Canada, and has 21 Global Partners in 18 countries. Many of its members and the individuals they serve regularly use and need greater access to electronic text and will be affected by the outcome of this case.

6

The **Society for Disability Studies (SDS)** is a not-for-profit scholarly organization dedicated to the cause of promoting disability studies as an academic discipline. According to its Mission Statement, the Society for Disability Studies seeks through research, artistic production, teaching and activism to augment understanding of disability in all cultures and historical periods, to promote greater awareness of the experiences of disabled people, and to advocate for social change.

## PRELIMINARY STATEMENT

Comprehensive digitization of the type undertaken by the HathiTrust Digital Library ("HDL") would provide desperately needed access to printed materials in the collections of college and university libraries, collections that remain for the most part inaccessible to students and scholars with print disabilities. Thus, *amici* urge the Court to affirm the district court's ruling[2] in full.

The individual Intervenor Defendants have each testified that their course of study in postsecondary education has been significantly shaped, if not controlled, by a lack of access to their educational institution's libraries. Expert George Kerscher testified that he was forced to abandon the course of study of his dreams,

---

[2] Authors Guild, Inc. v. HathiTrust, 902 F. Supp. 2d 445 (S.D.N.Y. 2012) (hereinafter "HathiTrust").

7

computer science, by the utter lack of access to the texts and research materials necessary to pursue that degree.

Their stories are far too familiar to the *amici* herein. *Amici* are individuals and parents of individuals with print disabilities,[3] and organizations who provide expertise, advocacy, and representation of individuals with print disabilities, all potential users of the access created by the HDL.

The Americans with Disabilities Act[4] and Section 504 of the Rehabilitation Act of 1973[5] express a national commitment to ensure that persons with disabilities can pursue on an equal basis "those opportunities for which our free society is justifiably famous,"[6] and no longer be consigned to second class citizenship. The HDL makes those opportunities real for students and scholars with print disabilities. In contrast, Plaintiffs-Appellants Authors Guild, Inc. *et al.* (collectively "the Guild") seek to shut down those opportunities by enjoining the HDL, foreclosing those with print disabilities from the equal enjoyment of the

---

[3] The term "individuals with print disabilities" is used herein to refer to those who cannot effectively read print because of a visual, physical, perceptual, developmental, cognitive or learning disability. See*,* Kerscher Declaration, Dkt_79, (¶6). The U.S. Departments of Justice and Education have referred to print disabilities as those disabilities that "make it difficult for students to get information from printed sources." See, fn. 51, *infra*.

[4] 42 U.S.C. § 12101, *et seq.*

[5] 29 U.S.C. § 794.

[6] 42 U.S.C. § 12101(a)(8).

libraries of HDL participants and thus their equal participation in the life's blood of the academy.

*Amici*, all of whom have long histories of advocacy on behalf of individuals with print disabilities seeking access to copyrighted materials, submit this brief in support of Intervenor Defendants-Appellees National Federation of the Blind, *et al*. (collectively "NFB"), urging that this Court affirm the district court's ruling and preserve and promote equal educational and research opportunities for students and scholars with print disabilities.

## STATEMENT OF FACTS

The need for accessible text is great and becoming greater. Each year, hundreds, if not thousands, of students with print disabilities are denied access to the materials they need to have an equal opportunity to pursue the educations for which they are qualified because those materials are not available in accessible format.  In recognition of this persistent problem, when it passed the Higher Education Opportunity Act of 2008, Congress called for the creation of the Advisory Commission on Accessible Instructional Materials in Postsecondary Education for Students with Disabilities (the "AIM Commission").[7]

In its report, the AIM Commission stated

---

[7]  20 U.S.C. § 11401(b)(1)(A). The AIM Report issued December 6, 2011, is available at http://www2.ed.gov/about/bdscomm/list/aim/publications.html

> [B]arriers that would deny students with disabilities their rights to full and complete access to their educational experience are unacceptable in a society that values achievement through education. . . . Among the[] barriers are instructional materials, technologies and operating systems. . . [C]hallenges . . . to making these necessary items accessible are more significant due to the limited resources of campus disability resource/service (DR/S) offices, the increasing complexity and modalities of emerging instructional materials and the delivery systems employed to utilize these materials.  It is critical that these and other obstacles be removed.[8]

The U.S. Government Accountability Office reported in 2009 that of the approximately 19.2 million postsecondary students in the U.S., approximately 10.8% or 2.1 million had disabilities that had been disclosed and documented to their institutions.[9]  In addition, military veterans of the wars in Iraq and Afghanistan are seeking postsecondary degrees in increasing numbers and with signature injuries including Traumatic Brain Injuries, Post-Traumatic Stress Disorder as well as sensory impairments, their needs for accessible text cannot be

---

[8] AIM Report at 11.
[9] AIM Report at 15, *citing*, United States Government Accountability Office. (2009). Higher education and disability:  Education needs a coordinated approach to improve its assistance to schools in supporting students.  (No. GAO-10-33). Washington, D.C.: US Government Accountability Office. Available at http://www.gao.gov/products/GAO-10-33.

ignored.[10]  Because of the acquired nature of these disorders, traditional skills such as Braille familiarity are lacking; the burden on technology is therefore greater.[11]

In our nation's colleges and universities, the largest number of individuals who use electronic means to access print are those with dyslexia[12] and related learning disabilities.[13]  Within the 10.8% of students referenced in the AIM Report, roughly 30% have dyslexia and related learning disabilities, 20% have attention disorders (often co-morbid with learning disorders), 15% have psychological disorders, 6.5% have mobility impairments, 2.5% have traumatic brain injuries and approximately 2.75% are blind or visually impaired.[14]  Retention rates for students with disabilities are troublingly low, roughly 34.8 % at four year institutions, as compared with 51.2% for the general student population.[15]

---

[10]  See, for example, Report of the Wounded Warrior Project, http://www.woundedwarriorproject.org/programs/policy-government-affairs/key-policy-priorities/objective-2-economic-empowerment/initiative-2.aspx (Last visited May 31, 2012).

[11] *Returning Veterans on Campus with War Related Injuries and the Long Road Back Home,* Journal of Postsecondary Education and Disability (2009), 22(2), at 45.

[12] In Bartlett v. N.Y. S. Bd of Law Examiners, the district court (Sotomayor, J.) rather poetically captured the nature of the impacts of dyslexia: "For those of us for whom words sing, sentences paint pictures, and paragraphs create panoramic views of the world, the inability to identify and process words with ease would be crippling." 970 F.Supp. 1094, 1099 (S.D.N.Y. 1997).

[13] AIM Report at 15-16.

[14] Id.

[15] Id., *citing,* Newman, L., Wagner, M., Knokey, A.-M., Marder, C., Nagle, K., Shaver, D., Wei, X., with Cameto, R., Contreras, E., Ferguson, K., Greene, S., & Schwarting, M.  (2011). *The Post-High School Outcomes of Young Adults With*

It is not sufficient simply to provide human readers or audio recordings of print materials.  Putting aside the fact that such accommodations would be impossible on the scale required for scholarly research, books that are accessible as narrated recordings are unsuitable for academic and research use because students cannot navigate their way through the book, but must listen to a slow, linear reading.  This is a consistent problem identified by students and higher education disability service providers alike.

In contrast, print-disabled students and scholars can read digital books using screen-access software with a text-to-speech program or a refreshable Braille display.  Unfortunately, far too few digital books exist and even fewer may be purchased in accessible formats out of the box.  Only about 200,000 digital books are available for loan through specialized libraries, and none of these services comes close to meeting the needs of students with print disabilities. Only a small fraction of the books produced each year are created in an accessible format;[16] the vast majority of digital books are the result of *ad hoc* scanning and converting of print texts by disability services personnel at colleges and universities, a cumbersome, labor intensive, unnecessarily expensive, and often inaccurate

---

*Disabilities up to 8 Years After High School.  A Report From the National Longitudinal Transition Study-2 (NLTS2)* (NCSER 2011-3005).  Menlo Park, CA: SRI International. Available at www.nlts2.org/reports.
[16] AIM Report at 18.

process necessitated only because the publishing industry refuses to provide easy access to instructional materials, such as is provided to library materials through the HDL.[17]

Universities have been largely unsuccessful in addressing this problem.[18] The AIM Commission heard testimony from more than 50 witnesses about the persistent needs of students and faculty with disabilities for accessible instructional materials and those who provide support to them at the postsecondary level.  The Commission identified barriers to success including the lack of accessible materials, delays inherent in converting print materials to electronic files that are accessible to and usable by students with disabilities, difficulties relying on publishers, limited capacities of disability services offices to keep pace with the volume of requests, and disagreements over publisher-asserted copyright issues, including whether the institution is an "authorized entity" under the Chafee Amendment,17 U.S.C. § 121.[19] The AIM Report points out that the increasing presence of inaccessible technologies on campuses "create[s] unintended and nearly impenetrable barriers while the availability of products and services that can

---

[17] Id.
[18] Florida Atlantic University, OCR Docket # No. 04-06-2127 (Region IV, 2006 ). ("The University's response to OCR was that it processes the complainant's request as quickly as possible, but the complainant must submit the textbook requests well in advance of the semester in which the textbooks are required.")
[19] AIM Report at 23-25.

13

be accessed by all students, including those with disabilities, can open doors."[20]

As a result, universities struggle to provide accessible assigned texts on a timely

basis, jeopardizing their ability to meet their obligations[21] under the ADA and

section 504.[22]  Most cannot even begin to make the full resources of their libraries

accessible to print-disabled scholars and students.

 The need for electronic access to instructional and research materials begins

in the elementary and secondary years.  Children with disabilities who are

protected by the Individuals with Disabilities Education Act ("IDEA")[23] are

increasingly exposed to electronic means of print access, and their reliance on

these mechanisms will increase pressure on the postsecondary community to

---

[20] AIM Report at 21.

[21] See, <u>Mott Community College</u>, OCR Docket # 15-11-2074 (Region IX, 2011) *(College was required to develop and implement procedures to ensure that students who require text to be converted to an alternative format will be provided alternative media materials that are equal in quality and are received at the same time as educational materials provided to students without disabilities).*

[22] See, <u>Bradley University</u>, OCR Docket # 0510-2043 (Region V, 2010) *(The University discriminated against the Complainant based on disability when it failed to provide him with the following agreed upon auxiliary aids, including textbooks on CD; screen reader software in the University's computer lab, and assistance with accessing library resources and test scanning.);* <u>California State University, Fullerton</u>, OCR Docket # 09-03-2166 (Region IX, 2003).*(Delay in provision of texts and materials in alternative format denied student equal opportunity as required under the ADA and Section 504).*

[23] 20 U.S.C. § 1400, *et seq.*

provide greater access as well. For its part, Congress has continually supported

expanding access to electronic text.[24] Braille instruction and adaptations for a

child's reading and writing skills must be considered under IDEA.[25]  In 2004, new

provisions were added to IDEA to improve the quality and delivery of accessible

instructional materials to students with disabilities who need such materials.[26]  The

IDEA regulations further underscore the responsibility of states and districts to

ensure that students with disabilities who need instructional materials in accessible

formats receive these materials in a timely manner.[27]  The U.S. Department of

Education has stated that timely access to appropriate and accessible instructional

materials is an inherent component of the obligation to provide a free, appropriate

public education and ensure participation in the general education curriculum.[28]

Congress also amended the Chafee Amendment to promote increased access to

accessible instructional materials in the context of elementary and secondary

education.[29]

---

[24] *See,* 20 U.S.C § 1474(c)(1) which provides federal funding for educational media activities designed provide educational value "in the classroom setting to children with disabilities;" including "video description . . . and "providing free educational materials, including textbooks, in accessible media for visually impaired and print disabled students in elementary schools and secondary schools, postsecondary schools, and graduate schools."

[25] 20 U.S.C. § 1414(d)(3)(B)(iii).

[26] *See* 20 U.S.C. §§ 1412(23), 1413(a)(6), 1474(e).

[27] 34 C.F.R. § 300.172(b)(3); 34 C.F.R. § 300.210(b)(3).

[28] 71 Fed. Reg. 46540, 46618 (Aug. 14, 2006).

[29] 17 U.S.C. § 121(c).

Although there is much promise in the future for "born accessible" materials–those created to be accessible from their inception[30]–existing print library collections are simply not accessible to students and scholars with print disabilities.

The HDL includes over 10 million digital texts,[31] including digital copies of the print library collections of several universities,[32] permitting students and scholars with print disabilities to read and perform research in a manner as effective as that of nondisabled scholars. The college library is the central repository of and engine for the continuation of academic thought and investigation.  Access to the library collection is a fundamental component of the benefits offered by a higher education academic program. This is an important aspect of equal educational opportunity and comparable aids, benefits, and services under Section 504 and ADA.[33] The quality of and access to postsecondary library

---

[30]  See, Position Statement on Issues of Textbook Access, http://ahead.org/resources/e-text/position-statement, last visited May 31, 2013. Accessibility of text requires that content, platforms and devices all be accessible. A barrier in any one of the three will cause a fatal disruption to access. Report of the ARL Joint Task Force on Services to Patrons with Print Disabilities, Nov 2012. http://www.arl.org/focus-areas/copyright-ip/2342-report-of-the-arl-joint-task-force-on-services-to-patrons-with-print-disabilities-nov-2-2012. Last visited May 31, 2013.
[31] HathiTrust, 902 F. Supp. 2d. at 448.
[32] Id.
[33] 34 CFR § 104.43(a) (forbidding discrimination in "any academic, research…or any other postsecondary educational aid, benefit or service[s]…"

facilities are key elements considered by accreditation agencies. The barrier of

print has shut out students and scholars with print disabilities from an equal

opportunity to access this key element of a higher education.  Without digitized

materials, the ability of scholars with print disabilities to achieve outcomes

commensurate with their interests and their peers is severely limited, and in many

cases, foreclosed.

The HDL permits equal access for students and scholars with print

disabilities without harm to the copyright holders.  As the district court found,

"[s]ince the digital texts in the HDL became available, print-disabled students have

had full access to the materials through a secure system intended solely for

students with certified disabilities." [34]  Moreover, there is no question that no viable

market exists for accessible library collections.[35] Thus, there is no market to harm.

The publishing industry has continually and actively worked to frustrate the

creation of such a market, failing repeatedly to make new products accessible,

when the technology not only exists, but is well-known to them.[36]

In sum, the HDL permits the universities involved to make their print

resources available to all scholars and students equally, regardless of print-

---

[34] HathiTrust, 902 F. Supp. 2d at 449.(internal citations omitted).
[35] Id. at 464.
[36] See, generally, AIM Report.

17

disability, and therefore to satisfy their legal obligations under federal anti-discrimination laws.

## SUMMARY OF ARGUMENT

Students and scholars with print disabilities are entitled, under federal anti-discrimination law, to equal access to university programs and activities, including library resources. Titles II and III of the ADA and section 504 prohibit disability discrimination and require covered entities to ensure effective communication. These statutes and their implementing regulations require universities to make materials available to students and scholars with disabilities in accessible formats, access that is impossible in the absence of comprehensive digitization such as that provided by the HDL.

Furthermore, whether characterized as "fair use" under section 107 of the Copyright Act or as a permissible format under the Chafee Amendment, the HDL provides required access -- and permits universities to comply with their anti-discrimination obligations -- in a fashion entirely consistent with copyright law.

Accordingly, *amici* urge this Court to affirm the decision below.

## ARGUMENT

### I.    Students with Disabilities are entitled to equal access to all aspects of education, including library collections.

The ADA was passed "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with

disabilities."[37]  In enacting the ADA, Congress found "discrimination against individuals with disabilities persists in such critical areas as . . . education."[38] Accordingly, title III of the ADA – which prohibits discrimination by places of public accommodation -- specifically covers "undergraduate or postgraduate private school[s], [and] other place[s] of education."[39]  Title II of the ADA prohibits discrimination in the programs and activities which are provided by public entities[40] and thus title II applies to public educational institutions.  Section 504 applies to "any program or activity receiving Federal financial assistance,"[41] and its implementing regulations recognize its applicability to postsecondary education.[42]

The ADA and section 504 require that students with disabilities have access to the same information contained in printed text that is available to students without disabilities. In other words, communications with students and scholars with disabilities must be "as effective as communications with others."[43]  Where necessary to do this, they must provide auxiliary aids and services, including

---

[37] 42 U.S.C. § 12101(b)(1).
[38] 42 U.S.C. § 12101(a)(3).
[39] 42 U.S.C. § 12181(7)(J).
[40] 42 U.S.C. § 12132.
[41] 29 U.S.C. § 794.
[42] See, e.g., 34 C.F.R. pt. 104 (regulations of the Department of Education implementing section 504).
[43] 28 C.F.R. § 35.160(a)(1). See also, Argenyi v. Creighton University, 703 F.3d 441 (8th Cir. 2013).

"qualified readers, taped texts, audio recordings, Brailled materials, large print

materials, or other effective methods of making visually delivered materials

available to individuals with visual impairments," [44] so that students with

disabilities have an equal opportunity to achieve the same result or the same level

of achievement as others.[45]  Title III imposes similar obligations on private

colleges and universities.[46]

The U.S. Department of Justice and U.S. Department of Education jointly

enforce the laws as they apply to education and access for individuals with print

disabilities.[47]   In a 1998 publication on the obligation of institutions of higher

learning to provide auxiliary aids and services, the Department of Education stated,

"[n]o aid or service will be useful unless it is successful in equalizing the

opportunity for a particular student with a disability to participate in the education

program or activity."[48]  As the district court correctly held, "Congress imposed on

---

[44] 28 C.F.R. §§ 35.160(b)(1)(obligation to provide auxiliary aids and services); 35.104 (defining auxiliary aids and services). Public entities must give "primary consideration" to the communication access preferences of the individual. 28 C.F.R. § 35.160(b)(2). The universities making up the HDL are all public universities.
[45] See, 28 C.F.R. § 35.130(b)(1)(iii) and 34 C.F.R. § 104.4(b)(1)(iii).
[46] 28 C.F.R. § 36.303.
[47] See, 42 U.S.C. § 12117(b); http://www2.ed.gov/about/offices/list/ocr/aboutocr.html (U.S. Department of Education).
[48] http://www2.ed.gov/about/offices/list/ocr/docs/auxaids.html (last visited June 2, 2013).

20

institutions an obligation to provide equal access and recognized that 'technological advances . . . may require public accommodations to provide auxiliary aids and services in the future which today they would not be required because they would be held to impose undue burdens on such entities.'"[49]

   As demonstrated in the Facts section above, print-disabled students and scholars do not currently have the equal access to university library programs, including instructional and research materials as required by the ADA.  In the absence of comprehensive digitization, such students and scholars will not be able to freely identify and peruse research sources, use tables of contents to navigate materials, or have access to resources with the same speed and efficiency as nondisabled peers.  Rather, they will be stranded in the existing ad hoc system, depending on readers or narrated and unnavigable audiobooks, or waiting for item-by-item scanning and optical character recognition processing while their peers quickly assess, review, and absorb necessary research materials.  In other words, truly equal access demands a project like the HDL.

   In connection with a "Dear Colleague" letter on the subject of electronic book readers,[50] the U.S. Departments of Justice and Education issued a list of

---

[49] HathiTrust, 902 F. Supp. 2d at 456 (quoting H.R. Rep. 101–485(II), at 108 (1990), 1990 U.S.C.C.A.N. 303, 391).
[50] Joint departmental guidance issued in the form of a "Dear Colleague Letter" dated June 29, 2010 may be found at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100629.html.

Frequently Asked Questions[51] to assist postsecondary institutions in complying

with the law.  In assessing whether a given technology provides equally effective

educational benefits, the Departments advised the institutions to ask several crucial

questions:

> Are all the educational opportunities and benefits .
> . . equally available to students with disabilities . . .?;

> Are the educational opportunities and benefits
> provided to students with disabilities in as timely a
> manner as those provided to students without disabilities
> . . .?;

> Will it be more difficult for students with
> disabilities to obtain the educational opportunities and
> benefits than it is for students without disabilities (i.e.
> does the ease of use for students with disabilities meet
> the requirement that students with disabilities be
> provided benefits and opportunities in an equally
> effective and equally integrated manner)?[52]

Where the technology in question is print, the resounding answers for student with

disabilities are "No, the benefits are not equal nor are they equally timely; yes, it is

far more difficult."

There is no question that the current means of access to academic libraries is

appallingly limited and that enabling students with print disabilities to engage in

---

[51] "Frequently Asked Questions about the June 29, 2010 Dear Colleague Letter"
may be found at http://www2.ed.gov/about/offices/list/ocr/docs/dcl-ebook-faq-
201105.pdf.
[52] Id.

22

research on an equal footing with non-disabled peers is required by the letter and

goals of the ADA and section 504.  The district court correctly applied the ADA to

the issues presented, holding that (1) the ADA requires that a university make its

existing library collections available to blind and print-disabled students and

scholars; (2) the university libraries may be authorized entities under the Chafee

Amendment, 17 U.S.C. § 121, because the ADA makes equal access to libraries a

primary mission of universities; and that (3) the creation of an accessible digital

library from a print collection for use by those with print disabilities that the

institution is required to serve is a "fair use."

## II.    Copyright law and expanding federal disability rights protections complement each other in the form of the Chafee Amendment and the Fair Use Doctrine.

As noted above, the Chafee Amendment provided previously unprecedented

access to people with print disabilities while protecting rights holders.  Indeed, its

goal was to "end the unintended censorship of blind individuals' access to current

information" that is "readily available to sighted individuals in libraries."[53]  The

Chafee Amendment continues to provide the necessary protection to individuals

with print disabilities while protecting rights holders.

The Chafee Amendment provides that an "authorized entity" may reproduce

and distribute certain materials "in specialized formats exclusively for use by blind

---

[53] 142 Cong. Rec. S9763, S9764 (daily ed. Sept. 3, 1996).

or other persons with disabilities."[54]  "Authorized entities" include those with "a primary mission to provide specialized services relating to  . . . education . . . of blind or other persons with disabilities." [55]

Congress has not sought to *limit* this protection, but rather has *expanded* its reach–in the 2004 reauthorization of the IDEA–to ensure that it provided increased access to the elementary and secondary education market as well. [56]

The district court correctly held that the University of Michigan was an "authorized entity" under the Chafee Amendment and that the ADA makes equal access for individuals with disabilities a primary mission of institutions such as the participants in the HDL.  Moreover, as the court noted, the University of Michigan's mission and that of its retention of a digitized copy of the works was to ensure equal access on par with nondisabled library users.[57]  The district court was also correct that the HDL collection is in a specialized format and that such a format need not preclude occasional use by those without print disabilities.

Similarly, in establishing protected "fair use" of copyrighted material, the 1976 House Judiciary Committee singled out "the making of copies or phonorecords of works in the special forms needed for the use of blind persons" as

---

[54] 17 U.S.C. § 121(a).
[55] 17 U.S.C. § 121(d)(1).
[56] 17 U.S.C. § 121(c).
[57] HathiTrust at *15.

24

an example of fair use,[58] underscoring and advancing the longstanding federal

public policy of increasing access to individuals with disabilities. The HDL

achieves this goal.

## CONCLUSION

For the reasons set forth above and in the brief of Intervenor Defendants-

Appellees NFB, *Amici* respectfully request this Court to affirm the decision of the

district court.

Dated:        Brooklyn, NY
              June 4, 2013

                                        Respectfully submitted,

                                        JO ANNE SIMON, P.C.
                                        356 FULTON STREET, 3RD FLOOR
                                        BROOKLYN, NY 11201

                                        By: _____/s/_____
                                        JO ANNE SIMON, ESQ. (JS-2793)

                                        *Attorneys for Amicus Curiae*

On the Brief:
Jo Anne Simon
Mary J. Goodwin
Amy F. Robertson,
        Fox & Robertson, P.C.
        104 Broadway, Suite 400
         Denver, CO 80203

---

[58] *Copyright Law Revision*, H. R. Rep. No. 94-1476 at 73 (1976) ("House Report").

25

## **Corporate Disclosure Statement**

Pursuant to Fed. R. App. P. 26.1, *amici* certify that they have no parent corporations and that no corporations own 10% or more of any stock in *amici*.

Respectfully submitted,

_____/s/_____

Jo Anne Simon

June 4, 2013

## CERTIFICATE OF COMPLIANCE

Jo Anne Simon, the attorney for the amici, certifies pursuant to Fed.R.App.P. 32(a)(7)(C)(i):

(1) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,446 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), for which I am relying upon the word count of the word-processing system (Microsoft Word) used to prepare the brief; and

(2) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in Times New Roman Font in Size 14.

Dated:    Brooklyn, New York
          June 4, 2013

_____/s/_____
                Jo Anne Simon

**<u>Certificate of Service</u>**

I hereby certify that on June 4, 2013, a copy of the foregoing was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

_____/s/_____

Jo Anne Simon

June 4, 2013