# 12-4547-cv

## United States Court of Appeals

*for the*

## Second Circuit

AUTHORS GUILD, INC., AUSTRALIAN SOCIETY OF AUTHORS
LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS,
ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES
SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON,
AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND
COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK
FAGLITTERAER FORFATTERO OG OVERSETTERFORENING,
WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK GRUNDSTROM,
HELGE RONNING, JACK R. SALAMANCA,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**FINAL FORM BRIEF AND SPECIAL APPENDIX
FOR PLAINTIFFS-APPELLANTS**

EDWARD H. ROSENTHAL
JEREMY S. GOLDMAN
ANNA KADYSHEVICH
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

*Attorneys for Plaintiffs-Appellants*

v.

HATHITRUST, CORNELL UNIVERSITY, MARY SUE COLEMAN, President,
University of Michigan, MARK G. YUDOF, President, University of California,
KEVIN REILLY, President, University of Wisconsin System,
MICHAEL MCROBBIE, President, Indiana University,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE,
BLAIR SEIDLITZ, COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The undersigned, counsel for Plaintiffs-Appellants, certifies that none of the Plaintiffs-Appellants have any parent corporation and no publicly-held corporation owns 10% or more of any of the Plaintiffs-Appellants' stock.

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By: _____ s/ Edward H. Rosenthal _____

       Edward H. Rosenthal
       Jeremy S. Goldman
       Anna Kadyshevich

488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................1

JURISDICTIONAL STATEMENT .........................................................3

STATEMENT OF ISSUES PRESENTED AND STANDARD OF REVIEW ........4

STATEMENT OF THE CASE.................................................................5

STATEMENT OF FACTS ......................................................................7

    The Mass Digitization Program.......................................................7

    HathiTrust  .....................................................................................9

    The Orphan Works Project ............................................................10

SUMMARY OF ARGUMENT ..............................................................11

ARGUMENT .......................................................................................12

I. THE CLAIM TO ENJOIN THE ORPHAN WORKS PROJECT IS RIPE .........12

    A.    The Claim to Enjoin the OWP is Ripe Under *Abbott Labs* and Its Progeny...........................................................................14

        1.    The Issues Presented by the OWP Are Fit for Judicial Decision ...................................................................14

        2.    Refusal to Rule on the Legality of the OWP Creates a Serious Hardship to the Authors ...............................15

    B.    The Copyright Act Does Not Permit Defendants to Copy, Distribute and Display Full Copies of Copyright-Protected Books ...............................................................................17

II. THE DISTRICT COURT ERRED IN DETERMINING THAT THE MASS DIGITIZATION PROGRAM MAKES FAIR USE OF AUTHORS' COPYRIGHT-PROTECTED BOOKS ....................................18

A.     The District Court Erred in Failing to Consider the Express Limitations of Section 108 In its Evaluation of Fair Use ..................18

      1.     Congress Specifically Addressed the Fair Use of Library Copying in Section 108..............................................................19

           (a)     The Gentlemen's Agreement of 1935 ............................19

           (b)     Technological Change Prompts the Need for Specific Limitations on Copying by Libraries and Archives.........................................................................20

           (c)     The Limits of Library Copying Under Section 108 .......21

           (d)     The Fair Use Savings Clause...........................................23

           (e)     Congress Balances the Incredible Promise and Inherent Risk Brought by the Digital Revolution .........24

      2.     The Mass Digitization Program Exceeds the Express Limitations of Section 108.........................................................25

           (a)     The Libraries are Using Books for a Commercial Purpose in Violation of Section 108(a) .........................25

           (b)     The Libraries are Not Exempt Under Sections 108(b) or (c) for Digitizing Virtually Every Book in Their Collection Without Regard to Any Book's Physical Condition or Commercial Availability ...........26

           (c)     The Libraries' Creation, Storage and Wide Dissemination of at Least Five Digital Copies Exposes the Authors' Books to Security Risks.............27

           (d)     The MDP is Not Permitted By Sections 108(d) or (e) Because the Digital Copies Are Made Without a User Request .................................................................29

B.     The Mass Digitization Program Does Not Constitute Fair Use Under Section 107 of the Copyright Act.............................................29

      1.     The Libraries' Violations of Section 108 Should Weigh Heavily Against a Finding of Fair Use .....................................29

2.      The Four Factors Enumerated in Section 107 Weigh Against Fair Use....................................................................30

(a)     Purpose and Character of the Use ...................................30

(i)     The Libraries' Preservation Purpose is Not Transformative .......................................................31

(ii)    Even if Copying Millions of Books to Facilitate Search is Transformative, There is No Justification for Storing Multiple Copies of the Image and Text Files Online......................32

(iii)   Making Digital Copies of Copyrighted Works Available for Print-Disabled Users is Not Transformative ...............................................33

(b)     Nature of the Copyrighted Works ...................................35

(c)     Amount and Substantiality of the Use............................35

(d)     The Effect of the Use Upon the Market for or Value of the Work ...........................................................38

(i)     Each Unlicensed Digital Copy Represents a Lost Sale ...........................................................38

(ii)    The Works are Exposed to Unlimited Piracy.......40

(iii)   The Authors Will Lose Licensing Revenues .......40

III.  THE DISTRICT COURT ERRED IN FINDING THAT THE ASSOCIATIONAL PLAINTIFFS LACK STATUTORY STANDING ..................................................................................44

IV.  HATHITRUST IS NOT AN "AUTHORIZED ENTITY" AND THE BOOKS ARE NOT IN A "SPECIALIZED FORMAT" UNDER SECTION 121 ..........................................................................47

A.      The Legislative History of the Chafee Amendment Supports a Narrow Definition of "Authorized Entity" and "Specialized Formats" ............................................................................48

B.    HathiTrust's Provision of Access to the Print-Disabled Does Not Comply With the Chafee Amendment or Fair Use.......................49

    1.    HathiTrust is Not an Authorized Entity....................................49

    2.    The Digitized Texts and Images are Not in Specialized Formats..........................................................................................50

    3.    The HDL's Uses For the Blind Are Not Protected Fair Use..................................................................................................50

CONCLUSION ..................................................................................................52

CERTIFICATE OF COMPLIANCE.......................................................... i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ..........................................................26

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967)........................................................................14

*American Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994) ........................................................passim

*Authors Guild v. Google, Inc.*,
770 F. Supp. 2d 666 (S.D.N.Y. 2011) ......................................10, 15

*Authors Guild v. Google, Inc.*,
282 F.R.D. 384 (S.D.N.Y. 2012) ....................................................44

*Banff, Ltd. v. Federated Dept. Stores, Inc.*,
841 F.2d 486 (2d Cir. 1988) ............................................................16

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)......................................................................passim

*Cartoon Network, LP, LLLP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008) ............................................................37

*Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*,
150 F.3d 132 (2d Cir. 1998) ................................................29, 34, 35

*CBS Broad., Inc. v. EchoStar Comms. Corp.*,
450 F.3d 505 (11th Cir. 2006) .........................................................46

*Chevron U.S.A. v. Traillour Oil Co.*
987 F.2d 1138 (5th Cir. 1993) .........................................................15

*Desiderio v. National Ass'n of Securities Dealers, Inc.*,
191 F.3d 198 (2d Cir. 1999) ............................................................16

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
697 F.2d 27 (2d Cir. 1982) ..............................................................46

*Ehrenfeld v. Mahfouz*,
  489 F.3d 542 (2d Cir. 2007) ...............................................................14

*Encyclopaedia Britannica Educational Corp. v. Crooks*,
  542 F. Supp. 1156 (W.D.N.Y. 1982)....................................................26

*Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*,
  528 U.S. 167 (2000)................................................................................17

*Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock*,
  93 F.3d 68 (2d Cir. 1996) ....................................................................14

*Golan v. Holder*,
  132 S. Ct. 873 (2012)............................................................................15

*Harper & Row Publishers, Inc. v. Nation Enter.*,
  471 U.S. 539 (1985)..............................................................................29

*Hunt v. Wash. State. Apple Adver. Comm'n*,
  432 U.S. 333 (1977)..............................................................44, 45, 46

*Infinity Broad. Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998) .........................................................32, 36

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ......................................................33, 37

*Lawton v. Bd. of Med. Examiners*,
  143 Cal. App. 2d 256 (1956) ...............................................................43

*Matthew Bender & Co., Inc. v. West Pub. Co.*,
  240 F.3d 116 (2d Cir. 2001) ...............................................................15

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992)..............................................................................30

*Olan Mills, Inc. v. Linn Photo Co.*,
  795 F. Supp. 1423 (N.D. Iowa 1991), *rev'd on other grounds*, 23 F.3d
  1345 (8th Cir. 1994)..............................................................................46

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
  461 U.S. 190 (1983)..............................................................................15

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ...............................................................33

*Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*,
   288 F.3d 478 (2d Cir. 2002) ...................................................................49

*Reed Elsevier, Inc v. Muchnick*,
   559 U.S. 154 (2010)................................................................................47

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)..........................................................................38, 51

*Southern Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of
   Illinois*,
   326 F.3d 919 (7th Cir. 2003) .................................................................46

*Thomas v. Union Carbide Agr. Prods. Co.*,
   473 U.S. 568 ..........................................................................................16

*Town of Rye, N.Y. v. Skinner*,
   907 F.2d 23 (2d Cir. 1990) .....................................................................14

**STATUTES**

17 U.S.C. § 101 .................................................................................................34

17 U.S.C. § 107 ...........................................................................................passim

17 U.S.C. § 108 ...........................................................................................passim

17 U.S.C. § 121 ...........................................................................................passim

17 U.S.C. § 501(b) .................................................................................4, 12, 45

17 U.S.C. § 502(a) ............................................................................................17

28 U.S.C. § 1291 ................................................................................................3

28 U.S.C. § 1338(a) ...........................................................................................3

Americans With Disabilities Act, 42 U.S.C. § 12101 ......................................49

LEGISLATIVE HISTORY

142 CONG. REC. S. 9763, 9764, Sept. 3, 1996 ........................................48

H.R. REP. NO. 94-1476 (1976) .................................................21, 23, 51

S. REP. NO. 91-519 (1969) .........................................................20

S. REP. NO. 105-190 (1998) ........................................................25

OTHER AUTHORITIES

Eric Pfanner, *Google Has Deal in France For Book-Scanning Project*, N.Y.
    TIMES, June 12, 2012 ..........................................................42, 43

Final CONTU Report (July 31, 1978) ................................................37

*Intellectual Property and the National Information Infrastructure*, Sept.
    1995 ...........................................................................48, 49

Laura N. Gasaway, *America's Cultural Record*, 40 HOUS. L. REV. 643
    (2003) .........................................................................28

MARY RASENBERGER & CHRIS WESTON, OVERVIEW OF THE LIBRARIES AND
    ARCHIVES EXCEPTION IN THE COPYRIGHT ACT (2005) ................................19, 20

Nicole Perlroth, *Some Victims of Online Hacking Edge Into the Light*, N.Y.
    TIMES, February 20, 2013 ......................................................40

Office of the Register of Copyrights, *Legal Issues in Mass Digitization*
    (2011) .........................................................................18

PETER B. HIRTLE ET AL., COPYRIGHT & CULTURAL INSTITUTIONS (2009) ..............24

Peter B. Hirtle, *Digital ILL and the Open Library*, October 23, 2007 ..................22

Pierre Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105 (1990)........31

RECOMMENDATION OF THE REGISTER OF COPYRIGHTS (October 27, 2003).......19, 22

REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS,
    LIBRARY REPRODUCTION OF COPYRIGHTED WORKS (17 U.S.C. 108)
    (1983) .........................................................................24, 30

REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW (1961) ................................... 20

*Statement of the AAP*, Feb. 8, 1996 .................................................................. 39, 48

## PRELIMINARY STATEMENT

Plaintiffs-Appellants, authors and rights organizations from six countries (collectively, the "Authors"), brought this action for copyright infringement to enjoin the Defendants-Appellees, a group of state university libraries (the "Libraries") from continuing to engage in their extraordinary and unprecedented mass digitization program ("Mass Digitization Program" or "MDP").  The Libraries, in partnership with Google Inc. ("Google"), have digitized, reproduced and made various uses of millions of copyright-protected books without seeking or obtaining the permission of the books' authors or other rights-holders.  The Authors would label the MDP an exercise in eminent domain, but that would give the program too much credit: states must compensate owners for taking their property; neither the Libraries nor Google have offered or paid authors a penny for taking their literary property.

The Libraries went where other libraries dared not go.  The Library of Congress declined Google's invitation to participate in the MDP.  Harvard University also turned Google down.  Google's luck changed when it approached the University of Michigan ("UM"), which, unlike Harvard, enjoys the protection of sovereign immunity.  Google found in UM a partner willing to allow the technology giant to digitally replicate millions of copyright-protected books in return for delivering a vast and free digital library to UM.

This mass digital taking also enabled UM to leverage its sovereign immunity to pursue another, even more aggressive seizure of property rights: UM's Orphan Works Project ("OWP").  When the Authors filed this lawsuit, UM was on the

verge of making complete, unauthorized digital versions of "orphan works" – copyrighted works whose authors or other owners UM purportedly could not readily locate – available for viewing and downloading by tens of thousands of UM students, faculty and other library users.  This bold attempt to circumvent Congress's role in balancing the rights of copyright owners and users failed miserably.  Shortly after the Authors filed suit, owners of many "orphan works" were quickly identified. UM then "suspended" the program, but only *after this suit was filed and owners of purported orphan works were located.*  At the same time, UM announced that it planned to re-launch the program once problems with the identification process were fixed.  This simple step, temporarily "suspending" but never abandoning their project that would deprive authors of their literary property rights, has effectively denied rights-holders their day in court.  The District Court held that the Orphan Works Project was not ripe for adjudication.

Thus, Google and the Libraries have succeeded in inverting copyright's protections.  Authors and their heirs from all over the world must now keep an eye on a state university website for news of the possible forfeiture of their rights.  If one of their works appears on an "orphan works" list, they bear the burden of "opting out" to prevent the seizure of their literary rights.  If they sue to stop the entire project, the state library may neatly sidestep the legal issue by "suspending" the project.  This plainly is not just, and copyright-owners and users alike are being deprived of the benefits of legal clarity on the propriety of state-run orphan works projects.

Even if the Libraries agreed to permanently shelve the irredeemably flawed Orphan Works Project, the continued digitization, reproduction, online storage and

2

use of millions of copyright-protected books constitute additional violations of the Authors' exclusive right to control their works.  In dismissing the Authors' claims arising from the MDP under the flag of "fair use," the District Court disregarded that Congress, in Section 108 of the Copyright Act, set forth specific, detailed rules governing the circumstances under which libraries may reproduce entire books. The District Court also ignored the Libraries' failure to comply with the specific provisions and restrictions in Section 121 of the Copyright Act, which Congress enacted to facilitate access to print-disabled readers without jeopardizing the rights of authors.  Moreover, the District Court failed to take into account that the Libraries could have accomplished the goals the District Court found to be transformative without keeping multiple copies of the entire digital library online, where the works are susceptible to ongoing security risks that are inherent to the digital format, including theft and widespread distribution.

The Libraries' actions subvert the fundamental premises of copyright law and, unless enjoined, threaten to decimate existing and developing markets for literary works.  Congress has long debated, weighed and balanced the competing interests of copyright creators, libraries and users.  It is up to Congress, not the Libraries, to determine if this balance needs to be changed.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1338(a) (original jurisdiction) because it arises under the copyright laws of the United States.  A-71.  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because the Order issued on October 10, 2012 and

the Judgment entered on October 12, 2012 granted summary judgment dismissing all of the claims in the case.

The Notice of Appeal was timely filed on November 8, 2012. A-1366-37.

## STATEMENT OF ISSUES PRESENTED AND STANDARD OF REVIEW

1.    Did the District Court err when it held that the Authors' claim with respect to the Libraries' OWP is not ripe for judicial review because the Libraries "suspended" the OWP shortly after this lawsuit was commenced?

Standard of Review: *De Novo*

2.    Did the District Court err when it held that the Libraries' unauthorized digitization, copying, storage and use of millions of copyright-protected literary works as part of the MDP funded and operated by Google is fair use under the Copyright Act, notwithstanding that the MDP far exceeds the special exemptions granted to libraries in Section 108 of the Copyright Act?

Standard of Review: *De Novo*

3.    Did the District Court err by failing to recognize that the Libraries' online storage of multiple copies of the unauthorized digital library goes far beyond what is necessary to accomplish any transformative purpose of the MDP?

Standard of Review: *De Novo*

4.    Did the District Court err when it held that Section 501(b) of the Copyright Act precludes an association of authors from bringing a copyright claim on behalf of its members to enjoin the Libraries from digitizing and making various use of their members' works without authorization?

Standard of Review: *De Novo*

4

5.      Did the District Court err when it held that the Libraries' mass digitization activities are permitted under Section 121 of the Copyright Act despite the fact that the Libraries are not "authorized entities" and the works were not provided in "specialized formats" as required by that statute?

<u>Standard of Review:</u>  *De Novo*

## **STATEMENT OF THE CASE**

Plaintiff-Appellant The Authors Guild, Inc. ("The Authors Guild") is a not-for-profit corporation that, along with its predecessor organization, has been a leading advocate for authors' copyright and contractual interests for the past 100 years.  The Authors Guild and seven other authors' rights organizations from around the world, along with twelve individual authors, commenced this action for copyright infringement in the United States District Court for the Southern District of New York (Baer, J.) in the Fall of 2011.  The defendants are UM, the University of California, the University of Wisconsin, Indiana University, Cornell University, and HathiTrust,[1] a UM service in which the defendant Libraries and other institutions participate.

The Authors brought this lawsuit to enjoin UM's Orphan Works Project and the Libraries' unauthorized digitization and use of more than seven million copyright-protected literary works as part of a mass digitization program undertaken in partnership with Google.  The Authors sought declaratory and prospective injunctive relief, but did not seek monetary damages against the

---

[1] In the case of each defendant other than Cornell and HathiTrust, the named defendant is the President of the university.

5

Libraries, most of which likely are immune from damages due to their sovereign status.

The Libraries answered the amended complaint in December 2011[2] and, shortly thereafter, filed a motion for partial judgment on the pleadings on the ground that the Plaintiff associations (the "Associational Plaintiffs") lacked standing to assert copyright claims based upon the rights of their members and that the Authors' claims with respect to the OWP were not ripe because the Libraries suspended the project shortly after the lawsuit was filed (and after it became clear that the Libraries' list of orphan candidates included works whose owners easily could be found, including several Authors). The Libraries also argued that the Authors lacked standing to challenge the OWP because none of the works owned by the Authors had actually been made available to the Libraries' users.

The Authors then moved for partial judgment on the pleadings on the ground that the Libraries' admissions in their answer established that none of the Libraries' affirmative defenses, including the defense of fair use, could stand as a matter of law. Following briefing and oral argument, the District Court reserved decision on the various motions and the parties each proceeded to file motions for summary judgment. Oral argument was held on August 6, 2012.

In an Opinion and Order dated October 10, 2012 ("Op."), the District Court granted the motions by the Libraries and Intervenors for summary judgment. SPA-

---

[2] In December 2011, the National Federation of the Blind and three individuals (the "Intervenors") filed a motion to intervene on behalf of defendants in the case, which was granted without opposition. No claims were asserted against the Intervenors.

1-23.  In its decision, the District Court determined that the MDP is protected by fair use and that making works available for the visually-disabled is permitted by Section 121 of the Copyright Act.  The District Court also held that the Associational Plaintiffs located in the United States, Canada and Australia did not have statutory standing to assert claims on behalf of their members and that the Authors' claims with respect to the OWP were not ripe for adjudication.

## STATEMENT OF FACTS

**The Mass Digitization Program**

The genesis of the Mass Digitization Program is the "Google Library Project," pursuant to which Google sought to "create an online database of all of the world's books, beginning with agreements with major libraries in the United States."  A-1171-72.  Unlike similar efforts to create digital archives by entities such as Microsoft [A-1176.3(¶8)], Google did not limit its digital library to public domain books, but instead decided to digitize *all* books, including those protected by copyright.  CA-186.  To this end, Google approached the Library of Congress ("LOC") and asked permission to scan all of its books.  A-1176.2.  The LOC declined, citing "copyright issues relevant to mass scanning" and offered to let Google scan public domain works only.  *Id.*

Apparently frustrated by the refusal of the LOC, and then Harvard [CA-191(119:12-14)], to permit Google to scan in-copyright works, Google met with defendant UM and other Libraries and offered to digitize as much of their library collections as possible.  CA-186(54:8-21).  Google then began to work with

7

various libraries, including UM, to "digitally scan from their collections so that users worldwide could search for them in Google."  A-1171-72.

Each of the Libraries entered into "Cooperative Agreements" with Google [CA-259-340] that allowed Google to convert millions of books in the Libraries' print collections into digital format.  *E.g.*, CA-218(¶2.4).  Each digital replica would include a set of image files representing every page of the work and a text file of the book's words generated through an optical character recognition process.  *Id.*(¶2.5).  Google assumed virtually all of the Libraries' expenses for the project, including providing trucks to transport the books, setting up scanning centers, and "reimbursing" the Libraries millions of dollars for their staff's labor in pulling books off the shelves. CA-219(¶3.2); CA-169(p.64); CA-176(pp.138-140); CA-196(151:19-25); CA-364-65.

The Cooperative Agreements permit Google to keep a digital copy of every work scanned [CA-220-21(¶¶4.5-4.6)], positioning Google as the only search engine that permits users to search the content from millions of "offline" materials protected by copyright.  CA-214(117:4-20).  Thus, the Libraries provide an enormous commercial and competitive benefit to Google, which uses the digital works to increase traffic to its search engine, improve the experience of Google users, and generate additional revenue through advertising on search result pages. CA-159(52:3-25); CA-192(pp.131-132); CA-154(98:3-99:12); CA-214(117:4-20); A-1166-67(¶88).  In exchange, the Libraries receive their own digital copies of the works to store and use.  A-112(¶52).  Given the high costs of digitization, the value to the Libraries resulting from their partnership with Google can be measured in

8

the hundreds of millions of dollars.  CA-210-11(57:20-58:5); A-112(¶53); CA-187-88(99:4-8,102:11).

The Libraries did not discriminate when determining which books to digitize.  CA-62-63(#29-43).  For the most part, Google had unfettered discretion to select whichever works it wanted.  *Id.*  A majority of books were selected via "bulk pulls," a process by which all of the books in a particular library building were pulled shelf-by-shelf in bar code order, placed onto carts and loaded onto Google's trucks.  A-1086(#2); A-1105(#2); CA-148; CA-151-52(65:8-24; 77:19-78:25).  No attempt was made to limit Google's scanning to books that were no longer protected by copyright, or were unpublished, out-of-print, damaged or deteriorating.  A-111-12(¶50); CA-208-09(pp.47-50); CA-149-51(68:18-70:15, 76:3-77:12); CA-175; CA-179(135:2-16; 152:16-153:9).  None of the "fair use" factors set forth in 17 U.S.C. § 107 were considered – for example, no one considered the nature of the book, whether the book was available for purchase, the importance of the book to any educational or scholarly purpose, or the harm that scanning might cause to the author or rights-holder.  A-1253-54(145:20-149:14); A-1270(227:13-229:14).  And no one asked any copyright owner for permission to copy his or her book.  A-1176.25(#173).

## HathiTrust

On October 13, 2008, UM and other schools announced the launch of the HathiTrust Digital Library (the "HDL"), a shared digital repository for the millions of books digitized as part of the Google Library Project and other mass digitization programs.  A-114(¶62).  In addition to the copies retained by Google, four digital

copies of each book are maintained in the HDL, with two such copies stored on servers located in Michigan and Indiana and two additional copies stored on backup tapes.  A-115(¶¶64-66).

**The Orphan Works Project**

The issue of whether special rules should be applied to increase the availability and utility of orphan works has been the subject of discussion and debate for many years, as well as the subject of various legislative solutions proposed in, but not yet enacted by, Congress.  *See Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 677 (S.D.N.Y. 2011) (the "Google Books" case).  Indeed, a mechanism to help resolve the orphan works issue was one of the key aspects of the attempted settlement of the Google Books case.  *Id.*  But the Amended Settlement Agreement ("ASA") was rejected by Judge Chin, who stated that "the establishment of a mechanism for exploiting unclaimed books is a matter better suited for Congress than this Court."  *Id.*  The court observed that requiring authors to "opt out" is "incongruous with the purpose of the copyright laws to place the onus on copyright owners to come forward to protect their rights when Google copied their works without first seeking their permission."  *Id*. at 682.

Unhappy with Judge Chin's decision, UM decided to take the law into its own hands by unilaterally initiating its own program.  A-1260-61(141:22-144:20).  Under the Orphan Works Project, if UM is unable to locate the copyright holder of a book, the book is included on a list of "orphan candidates" published on UM's website.  A-117(¶74).  If no copyright owner emerges and claims rights in the book

10

within 90 days, the book is made available for display and download to tens of thousands of UM students, faculty and library users.  *Id.*; A-1262(146:7-20).

After UM published its first list of orphan candidates, various copyright holders whose works had been listed as orphan candidates and were about to be made available for free by UM came forward.  A-1264; 1266(159:12-19; 173:8-23); A-1286-87(241:24-242:14); A-208(¶23).  The OWP was suspended after the Authors filed this action and shortly before the first supposed orphan works were to have been made available to UM users.  UM admitted that it had made "a number of errors, some of them serious," resulting in several books whose authors could have been easily located being wrongfully included in this list of orphan candidates.  A-1169.

## SUMMARY OF ARGUMENT

As shown in **Point I** below, the Authors' claim regarding to the Orphan Works Project is ripe for judicial review.  UM has made clear that it intends to proceed with releasing copyright-protected books to the public.  UM's alleged re-evaluation of its process for identifying orphan candidates does not affect the ripeness of the OWP claim, as there is no way to make the unauthorized publication of the full text of copyright-protected books permissible.

**Point IIA** demonstrates that in its fair use analysis, the District Court failed to consider the express limitations of Section 108 of the Copyright Act, in which Congress carefully balanced the rights of authors and libraries by brokering a compromise provision that details the circumstances under which libraries may digitize copyrighted-protected books.  The District Court ignored that the Mass

11

Digitization Project runs roughshod over almost every limitation imposed by that provision, a fact that must weigh heavily against a finding of fair use. While Section 108 includes a fair use "savings clause," that general provision cannot be read to swallow the specific rules of Section 108. In **Point IIB**, the Authors show that even if the Copyright Act is interpreted to disregard or discount Section 108, the MDP does not meet the standard of fair use set forth in Section 107. Moreover, even if certain of the Libraries' uses are deemed transformative, their online storage of multiple digital duplicates of the books goes far beyond what is necessary to fulfill that purpose.

**Point III** demonstrates that the District Court erred in holding that Section 501(b) of the Copyright Act precludes the Associational Plaintiffs from bringing this lawsuit for prospective, injunctive relief on behalf of their members who are the legal or beneficial owners of copyrights the Libraries are infringing.

Finally, **Point IV** discusses the problems with the District Court's analysis of the defenses asserted by the Intervenors, who represent the interests of the visually-impaired. The Authors do not object to the use of the HDL by the blind, but the digital books are not being used in accordance with the carefully-negotiated safeguards of Section 121 of the Copyright Act.

## ARGUMENT

## I

## THE CLAIM TO ENJOIN THE ORPHAN WORKS PROJECT IS RIPE

At the time this litigation was commenced, UM was on the verge of making the full text of supposedly orphaned copyrighted works available for viewing and

download by tens of thousands of UM users.  While UM abruptly "suspended" the Orphan Works Project in the face of irrefutable evidence that it included works owned by easily-identifiable individuals, including Plaintiffs, UM has made clear that it will reinstate the OWP, including releasing works to the public, after making adjustments to the identification process.  A-1286-87(241:24-242:14); A-1264(158:20-25, 161:6-10); A-118(¶78).  The District Court declined to hear the Authors' challenge to the legality of the OWP, finding that the claim was not ripe because the court could not know "what the program will look like should it come to pass and whom it will impact."  SPA-11.  The District Court suggested that when the Libraries released details of a new OWP, the Authors could request relief.  *Id.*

The District Court misses the fundamental point of the Authors' claim, which will not change based upon the particular procedures that UM ultimately employs to identify orphan works.  A-1286-87(241:24-242:14) (UM characterizing "errors" in OWP process as "errors in execution of management," meaning that steps that had been designed were not followed, so "closer management" is required).  Any iteration of the OWP under which copyrighted works are made available for public view and download violates the Copyright Act.  The pure legal question that was presented to the District Court is the same as it will always be:  Is it ever lawful to take an entire copyright-protected book and make it widely available for display and download without permission?

13

**A.     The Claim to Enjoin the OWP is Ripe Under *Abbott Labs* and Its Progeny**

Two elements determine whether a claim is ripe for judicial review: "(1) 'the fitness of the issues for judicial decision' and (2) 'the hardship to the parties of withholding court consideration.'" *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 546 (2d Cir. 2007) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).  Under this standard, the claim to enjoin the OWP was ripe for adjudication.

**1.     The Issues Presented by the OWP Are Fit for Judicial Decision**

Under the first prong of the analysis, questions that are "purely legal" weigh in favor of judicial review.  *See Abbott Labs.*, 387 U.S. at 149.  The legality of the OWP does not depend upon the specific means the Libraries ultimately employ to identify orphan candidates or the time the Libraries wait before making works available.  Rather, any iteration of the OWP that results in the publication of complete copyrighted works is an infringement of copyright.  Because these issues "may be decided without further factual development," they are fit for judicial review.  *Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock*, 93 F.3d 68, 72 (2d Cir. 1996); *see also Town of Rye, N.Y. v. Skinner*, 907 F.2d 23, 24 (2d Cir. 1990) (notwithstanding uncertainty of funding for airport project, challenge to project was fit for review because "there is nothing else for the FAA to do in evaluating the [project's] environmental impact").

Delayed resolution of this issue would impede one of the primary goals of copyright law, which is to clarify the boundaries of the Copyright Act and allow the parties to proceed accordingly, without the continuing threat of both

infringement and litigation.  *See Matthew Bender & Co., Inc. v. West Pub. Co.*, 240 F.3d 116, 122 (2d Cir. 2001) ("[C]opyright law benefits from the resulting clarification of the doctrine's boundaries.") (quoting *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 140 F.3d 70, 75 (1st Cir. 1998)).  *See also Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 202 (1983) (challenge to statute is ripe where "delayed resolution would frustrate one of the key purposes of the [] Act") (internal quotation omitted); *Chevron U.S.A. v. Traillour Oil Co.* 987 F.2d 1138, 1154 (5th Cir. 1993) (finding ripeness where, *inter alia*, "judicial resolution . . . is consistent with the purpose of Declaratory Judgment Act itself," which is "to settle actual controversies before they ripen into violations of law or breach of some contractual duty") (internal quotations omitted).  Despite clear indications by courts and the Copyright Office that the treatment of orphan works should be left to Congress,[3] the Libraries insist that the OWP is legal.  Thus, the impact of the OWP is sufficiently direct and immediate, and of a legal nature that is fit for review.

### 2.    Refusal to Rule on the Legality of the OWP Creates a Serious Hardship to the Authors

The District Court declined to hear the Authors' challenge to the OWP, holding that they would suffer no hardship from litigating this claim "after

---

[3] In the Google Books case, Judge Chin held that "[t]he establishment of a mechanism exploiting unclaimed works is a matter more suited for Congress."  770 F. Supp. 2d at 677; *see also Golan v. Holder*, 132 S. Ct. 873, 893-94 (2012) (despite "the difficulties would-be users of copyrightable materials may face in identifying or locating copyright owners," orphan works issues are appropriately addressed by "overarching legislation").

Defendants release the details of their new OWP and a revised list of Orphan Work Candidates." SPA-11. This conclusion ignores the fact that UM refused to suspend the program until after the Authors had commenced litigation, and owners of supposed orphan works had been identified. A-1169. Given the expense of litigation and the sovereign immunity of the Libraries, there is nothing to stop the Libraries from reinstituting the OWP and then, if owners of the listed works come forward, suspending it again.

This Court has held that "[a]s a general rule, in a case involving an allegation that defendant has engaged in illegal activity, a court's power to hear and decide the matter is not terminated when defendant voluntarily ceases its illegal conduct. That is, such cessation does not necessarily make a case moot." *Desiderio v. National Ass'n of Securities Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999). Indeed, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 581 (1985) (quoting *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143 (1974) (internal quotations omitted)); *see also Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 493 (2d Cir. 1988) (based on defendant's "intention and ability" to use the potentially infringing marks at issue "there is an actual controversy ripe for adjudication"). Rather, "if the injury is certainly impending, that is enough." *Thomas*, 473 U.S. at 581 (quotations omitted).

Authors and other copyright owners should not be required to play an expensive game of "Whac-A-Mole" in order to protect their copyrights. It is simply not fair to require copyright owners to wait to see what the Libraries will do, then bring new claims against defendants immune from monetary damages,

16

and then face the possibility that the Libraries will again seek to end any litigation by suspending the OWP while they seek to work out additional bugs in their program.[4]

### B. The Copyright Act Does Not Permit Defendants to Copy, Distribute and Display Full Copies of Copyright-Protected Books

Given its determination that the OWP was not ripe for adjudication, the District Court did not reach the issue of whether any publication of orphan works without permission would violate copyright law. Plainly, existing copyright law does not permit the copying and distribution of the entirety of copyright-protected works to tens of thousands of users, irrespective of whether it might be difficult to locate the rights-holder.[5] The Libraries are not entitled unilaterally to impose their own solution to this complex issue.

---

[4] The court also did not consider the Libraries' contention that Plaintiffs lacked standing to challenge the OWP or that their claims were moot because no orphan work was ever published. However, an allegation of an "imminent" injury is sufficient for standing under Article III. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 180 (2000). Indeed, Section 502 of the Copyright Act explicitly gives courts the power to issue injunctions to *prevent* infringement of a copyright. 17 U.S.C. § 502(a). UM has indicated that it could reinstate the OWP at any time. *See Friends of the Earth, Inc.*, 528 U.S. at 189 ("A case might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness.") (quotations omitted).

[5] The Authors do not seek to enjoin the OWP to the extent it complies with Section 108(h) of the Copyright Act, pursuant to which libraries are permitted to reproduce and distribute certain out-of-print works that are in the last twenty years of their copyright term provided that various statutory conditions are met.

17

**II**

**THE DISTRICT COURT ERRED IN DETERMINING THAT THE
MASS DIGITIZATION PROGRAM MAKES FAIR USE
OF AUTHORS' COPYRIGHT-PROTECTED BOOKS**

Two fundamental analytical errors fueled the District Court's conclusion that the Mass Digitization Program is protected fair use. *First*, the court wrongly interpreted Section 108's "fair use savings clause" in a manner that effectively reads Section 108 out of the Copyright Act by failing to weigh as an important part of its fair use analysis the fact that the Libraries violated nearly every privilege accorded to them under Section 108. *Second*, in analyzing whether the Mass Digitization Program is fair use under Section 107, the District Court failed to consider whether the Libraries could have made the uses the court found to be transformative – facilitating search and access for the print-disabled – without keeping multiple copies of the Authors' works online and subjecting them to unauthorized access and widespread distribution.

**A.    The District Court Erred in Failing to Consider the Express Limitations of Section 108 In its Evaluation of Fair Use**

In *American Geophysical Union v. Texaco Inc.*, this Court recognized that "Congress has thus far provided scant guidance for resolving fair use issues involving photocopying, *legislating specifically only as to library copying*[.]"  60 F.3d 913, 917 (2d Cir. 1994) (emphasis added).  Thus, as the Copyright Office recently recognized, "[a]ny review of mass book digitization would need to consider, if not compare, the activities that currently are, or should be, permissible for libraries under Section 108."  Office of the Register of Copyrights, *Legal Issues in Mass Digitization* (2011), http://www.copyright.gov/docs/massdigitization/

18

USCOMassDigitization_October2011.pdf; *see also* RECOMMENDATION OF THE REGISTER OF COPYRIGHTS (October 27, 2003) 51, *at* http://www.copyright.gov/ 1201/docs/registers-recommendation.pdf ("2003 Copyright Office Recommendation") ("Because §108 was enacted specifically to address reproduction by libraries and archives, and was amended by the Digital Millennium Copyright Act to address certain digital issues, analysis of noninfringing archival and preservation activities logically begins with that section.").[6]

### 1. Congress Specifically Addressed the Fair Use of Library Copying in Section 108

Congress added Section 108 to U.S. copyright law after decades of contentious debate and negotiation among stakeholders in the literary marketplace, including academics, authors, librarians, and publishers.[7] Given the absence of *any* prior case law applying Section 108, in order to properly adjudicate the novel and important issues raised by the MDP, it is critical to understand the competing interests – of libraries and rights-holders – that Congress carefully balanced when it enacted and then amended Section 108.

### (a) The Gentlemen's Agreement of 1935

---

[6] The Copyright Office's interpretations of Section 108, discussed throughout this brief, should be given deference. *See WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 284 (2d Cir. 2012).

[7] For an excellent description of the legislative history and background of Section 108, *see* MARY RASENBERGER & CHRIS WESTON, OVERVIEW OF THE LIBRARIES AND ARCHIVES EXCEPTION IN THE COPYRIGHT ACT (2005), *at* http://section108.gov/docs/108BACKGROUNDPAPER%28final%29.pdf ("SECTION 108 OVERVIEW").

The story begins with the "Gentlemen's Agreement," a non-binding, voluntary agreement entered into by a publishing association and a libraries' committee in 1935. *See* SECTION 108 OVERVIEW at 3. The agreement, prompted by the advent of early photo-duplication technology, permitted libraries to "deliver a single photographic reproduction or reduction of a part thereof" upon the written request of a library patron. *Id.* at 4. For over thirty years, the Gentlemen's Agreement helped define the extent to which a library could permissibly reproduce a copyright-protected work in its collection, and it provides the basis for today's Sections 108(d) and (e) governing library copying in response to user requests. *Id.* at 3-6.

      **(b)**      **Technological Change Prompts the Need for Specific Limitations on Copying by Libraries and Archives**

A far more transformative technological change, the proliferation of high-speed photocopiers, provided the impetus for the introduction and eventual passage of Section 108. Although both librarians and rights-holders initially opposed a statutory scheme governing library photocopying, each side content with its own view of "fair use," the Copyright Office pushed for new legislation with the general concept that "photocopying should not be permitted where it would compete with the publisher's market." REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW 26 (1961) ("1961 Copyright Report"). Libraries supported a blanket right to photocopy works for noncommercial purposes, S. REP. NO. 91-519, at 8-9 (1969), but Congress rejected that approach, instead opting for a regime, embodied in Section 108 of the Copyright Act, that carefully delineates the rules under which

libraries may duplicate and distribute copyrighted works without permission, and within Congress's calculation of what constitutes fair uses when it comes to library copying.

### (c)    The Limits of Library Copying Under Section 108

"[S]ection 108 of the Copyright Act narrowly circumscribes the conditions under which libraries are permitted to make copies of copyrighted works." *Texaco*, 60 F.3d at 931.

In **Section 108(a)**, Congress laid out three threshold requirements to qualify for the Section 108 exemptions: (1) you must be a "library or archives," (2) any copying and distribution must be "made without any purpose of direct or indirect commercial advantage," and (3) any copies must bear proper notice.  The statute does not define what constitutes "direct or indirect commercial advantage," but Congress indicated that it intended to prohibit libraries from making copies in response to a patron request with the knowledge that the copies were to be used for that *patron*'s commercial advantage.  *See* H.R. REP. NO. 94-1476, at 74 (1976) (copies made for "indirect commercial advantage" include "photocopying done *by or for* libraries or archival collections within industrial, profit-making, or proprietary institutions") (emphasis added).  Congress further explained that "[i]t would not be possible for a non-profit institution, by means of contractual arrangements with a commercial copying enterprise, to authorize the enterprise to carry out copying and distribution functions that would be exempt if conducted by the non-profit institution itself."  *Id.*

21

In **Section 108(b)**, Congress carefully delineated when a library may permissibly copy books in its collection for preservation purposes. Notably, Congress declined to grant libraries a general preservation right, instead allowing preservation copying only where a work is *unpublished*, and only after the library has determined that a copy of that work is not available for purchase at a fair price. *See* 17 U.S.C. §108(b). *See* 2003 Copyright Office Recommendation at 52 ("Section 108(c) does not authorize generalized preservation activities; it is limited by its terms.").

Under **Section 108(c)**, Congress permitted libraries to make one copy (later increased to three) of a book in their collection, but only to replace a book that is (or was) damaged, deteriorating, lost or stolen, and only *after* the library had made a determination that it could not obtain a new copy of the book at a fair price. Congress included this requirement in order to protect and promote the book publishing market. *See* Peter B. Hirtle, *Digital ILL and the Open Library*, October 23, 2007, *at* http://blog.librarylaw.com/librarylaw/2007/10/digital-ill-and.html ("The rationale for this requirement was that activity in the [out-of-print] market for a particular title might encourage a publisher to reprint that work.").

Finally, in **Sections 108(d) and (e)**, libraries may respond to requests from users by providing copies of either all or part of specific copyrighted works that are held in their collections. The exemption applies only where "the user makes his or her request" for a particular work found in the library's collection. 17 U.S.C §§ 108(d) & (e). Moreover, where a copy of an "entire work" is requested by a user, a library is permitted to make a reproduction only after the library "has first determined, on the basis of a reasonable investigation, that a copy [] of the

22

copyrighted work cannot be obtained at a fair price[.]"  *Id.*  User-requested copies also must become "the property of the user," meaning libraries may not rely on Section 108(d) or (e) to add copies to their collections.[8]

### (d)    The Fair Use Savings Clause

Congress also included in Section 108 a "fair use savings clause," providing that "[n]othing in this section . . . in any way affects the right of fair use as provided by section 107[.]"  17 U.S.C. § 108(f)(4).  Congress's primary intent in including this provision was to address the isolated creation of copies made by or at the request of individual library patrons under circumstances that are not specifically addressed in Section 108.  *See* H.R. REP. NO. 94-1476, at 78 (1976) ("Nothing in section 108 impairs the applicability of fair use to a wide variety of situations involving photocopying or other reproduction by a library of copyrighted material in its collection, *where the user requests the reproduction for legitimate scholarly or research purposes.*") (emphasis added).  The House Judiciary Report's example of fair use "beyond" Section 108 is illustrative:  "In the case of music, for example, it would be fair use for a scholar doing musicological research to have a library supply a copy of a portion of a score or to reproduce portions of a phonorecord of a work."  *Id.*  In a comprehensive report issued in 1983 at the direction of Congress, the Copyright Office adopted the same limited view of Section 108(f)(4):

---

[8] A global "backstop" in Section 108(g) allows only "isolated and unrelated" copies to be made "on separate occasions," and expressly forbids libraries from "engaging in the related or concerted reproduction or distribution of multiple copies [] of the same material" or "the systematic reproduction or distribution of single or multiple copies[.]"  17 U.S.C. §§ 108(g)(1) & 108(g)(2).

The Copyright Office does not believe that Congress intended that there should <u>never</u> be fair use photocopying "beyond" § 108. *On certain infrequent occasions, such copying may be permitted. But fair use privileges are not available on a broad and recurring basis once the copying permitted by § 108 has occurred.* Section 108 was enacted to make lawful some types of copying which would otherwise be infringements of copyright, fair use notwithstanding. This means that much of "108" photocopying would be infringing but for the existence of that section, thus *leaving section 107 often clearly unavailable as a basis for photocopying not authorized by section 108.*

REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS, LIBRARY REPRODUCTION OF COPYRIGHTED WORKS (17 U.S.C. 108) 96 (1983) (the "1983 REPORT") (underline in original; italics added for emphasis).

> **(e)    Congress Balances the Incredible Promise and Inherent Risk Brought  by the Digital Revolution**

The digital age prompted the 1998 passage of the Digital Millennium Copyright Act ("DMCA"), which included amendments to Section 108 that are highly relevant to this dispute. *First*, Congress removed the prohibition against libraries making copies of books in "machine-readable" format, for the first time allowing copies of certain works to be made in digital format; *providing*, *however*, that such digital copies may not be "made available to the public in that format outside the premises of the library[.]" 17 U.S.C. § 108(c)(2). *Second*, Congress increased the number of exempt copies from one to three, so that "[i]f the library has one copy on a server and one copy on a backup tape, then only one patron at a time would be able to generate a third copy by copying the server copy to a local machine." PETER B. HIRTLE ET AL., COPYRIGHT & CULTURAL INSTITUTIONS 115 (2009), at http://ssrn.com/abstract=1495365.

24

Congress placed these restrictions on digital copying "in recognition of the risk that uncontrolled public access to the copies [] in digital formats could substantially harm the interests of the copyright owner by facilitating immediate, flawless and widespread reproduction and distribution of additional copies [] of the work."  S. REP. NO. 105-190, at 61-62 (1998).  Unlike Section 107, which was not amended to account for the unique risks posed by digital technology, in amending Section 108 Congress sought to "strike[] the appropriate balance, permitting the use of digital technology by libraries and archives while guarding against the potential harm to the copyright owner's market from patrons obtaining unlimited access to digital copies from any location."  *Id.*

## 2.    The Mass Digitization Program Exceeds the Express Limitations of Section 108

The Libraries are vastly exceeding the special exemptions granted to them under Section 108.

### (a)    The Libraries are Using Books for a Commercial Purpose in Violation of Section 108(a)

While the Authors do not dispute the District Court's suggestion that the MDP has scholarship and research purposes, at least two elements of the program reveal its commercial character.  *See Texaco*, 60 F.3d at 922 (systematic photocopying and archiving of journal articles to facilitate "research in the sciences . . . might well serve a broader public purpose" but does not constitute fair use).  *First*, the participation by the Libraries in the Google Library Project provided enormous commercial and competitive benefits to Google, which uses the digital works to increase traffic to the Google website, improve the experience of Google

25

users, and generate additional revenue through advertising sold on Google's search result pages.  *See supra* pp. 7-8.

*Second*, in exchange for allowing Google to keep copies of the digitized books for its own commercial purposes, the Libraries received their own "free" digital copies, avoiding the need to buy digital copies of the books from the Authors and millions of other copyright holders.  *See supra* p. 8.  *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001) ("Commercial use is demonstrated by a showing that repeated and exploitative unauthorized copies of copyrighted works were made to save the expense of purchasing authorized copies."); *Encyclopaedia Britannica Educational Corp. v. Crooks*, 542 F. Supp. 1156, 1169 (W.D.N.Y. 1982) ("It is totally unreasonable to expect educational institutions to pay for licensing agreements or videotape copies marketed by the plaintiffs when these same works can be obtained and copied with the proper equipment for nothing.").

The District Court essentially ignored the relationship between the Libraries and Google, stating without explanation that Google's commercial use of the material is relevant only to the parallel Google Books case pending before Judge Chin.  SPA-19 n.27.  However, *this lawsuit* challenges the propriety of the Libraries delivering millions of copyright-protected books to Google, and therefore these commercial purposes must be considered in weighing the commercial purpose of the Mass Digitization Program.

> **(b)    The Libraries are Not Exempt Under Sections 108(b) or (c) for Digitizing Virtually Every Book in Their Collection Without Regard to Any Book's Physical Condition or Commercial Availability**

Given that all of the Authors' works are published books and neither the Libraries nor Google could identify any digitized works that are unpublished [CA-207-08(45:3-46:8)], the Libraries' unauthorized reproduction and storage does not fall within the narrow exception allowing copying for preservation purposes. 17 U.S.C. § 108(b). There also is no question that the Libraries have exceeded the express limitations for replacement copying set forth in Section 108(c). The Libraries did not limit the MDP to books that were lost, stolen, damaged or deteriorating, nor did they check whether a new copy of a book could be obtained at a fair price before digitizing it. CA-62-63(#29-43). Accordingly, the MDP does not comply with Section 108's requirement that works be copied only for "replacement" purposes, and not until "the library or archives has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price." 17 U.S.C. § 108(c)(1).

### (c)  The Libraries' Creation, Storage and Wide Dissemination of at Least Five Digital Copies Exposes the Authors' Books to Security Risks

The digitization process results in the creation of *at least five digital copies of each work*,[9] including (1) a copy kept by Google for its own commercial purposes, (2) a copy hosted on HDL's primary server in Michigan, (3) a copy hosted on HDL's secondary server in Indiana, (4) a tape backup copy stored on

---

[9] As the Libraries admit that each digital copy includes "a set of image and OCR files," it is more accurate to state that the Libraries have created at least *ten copies* of each work, comprising five sets of image files (i.e., photographic reproductions of the printed pages) and five sets of text files containing the text of the book. A-112(¶52).

UM's campus, and (5) a second tape backup copy stored on UM's campus.  CA-212(64:17-65:9); A-1107-15(#3).  Accordingly, the Libraries have made more than the three copies they are entitled to make under Section 108(c).

The Libraries also are storing and disseminating copies of the digitized books far beyond the physical library walls, in violation of Section 108's prohibition against making digital copies "available to the public in that format outside the premises of the library or archives in lawful possession of such copy." 17 U.S.C. § 108(c)(2).  Each copy is connected to a "campus network," and the primary and mirror HathiTrust sites include World Wide Web servers, compounding the risks of exposure.  A-1107-15(#3).  *See* Laura N. Gasaway, *America's Cultural Record*, 40 HOUS. L. REV. 643, 656 (2003) (Congress intended that any digital copies "could be used only within the library premises and not on a campus network or the World Wide Web").  Furthermore, HathiTrust grants remote access to the complete image and text files to nearly one hundred HathiTrust administrators and researchers located throughout the country.  A-1107-15(#3); A-1280-81(pp.190-194).  As opined by Professor Benjamin Edelman, who submitted a report on the digital security risks inherent in the MDP, these and other facts raise a significant risk of breach and unauthorized access.  A-1205-23; CA-127-45.[10]

---

[10] The District Court brushed aside Professor Edelman's detailed expert report, citing to Professor Edelman's statement that he does not "know about *all* of the security systems that [the Libraries] have."  SPA-19-20 (emphasis added).  However, Professor Edelman's expert report was not submitted to establish the Libraries' lack of particular security controls, but to describe the inherent insecurity of storing files in digital format, especially on a system connected to an online campus network.

28

### (d)    The MDP is Not Permitted By Sections 108(d) or (e) Because the Digital Copies Are Made Without a User Request

The Libraries and Google selected books for digitization pursuant to a Cooperative Agreement calling for millions of books, including in-print books that are commercially-available, to be scanned *en masse*. The Libraries do not and could not contend that the works were requested by any particular library "user," as required for Sections 108(d) or (e) to apply. Moreover, once a digital copy is created, it is reproduced, disseminated to and retained by multiple parties, including Google and HathiTrust. The copies certainly do not become "the property of the user," but are generated to grow the size of the HDL and the Google Books database. Thus, the MDP is not permitted under Sections 108(d) or (e).

## B.    The Mass Digitization Program Does Not Constitute Fair Use Under Section 107 of the Copyright Act

### 1.    The Libraries' Violations of Section 108 Should Weigh Heavily Against a Finding of Fair Use

Although Section 107 of the Copyright Act sets forth four factors that courts traditionally apply to analyze whether a challenged activity constitutes fair use, the Supreme Court has made clear that the Section 107 factors "are not meant to be exclusive." *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 560 (1985); *see Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) ("[T]he four listed statutory factors in § 107 guide but do not control our fair use analysis and 'are to be explored, and the results weighed together, in light of the purposes of copyright.'") (quoting *Campbell*, 510 U.S. at 577). This

case presents the unusual circumstance in which the conduct at issue – library copying – is specifically addressed by another statute, Section 108, which therefore should guide the fair use analysis.  As demonstrated above, the Libraries exceeded many of the express limitations of Section 108, and these violations should weigh heavily against a finding of fair use.

The District Court, however, interpreted the savings clause in Section 108(f)(4) so broadly as to render Section 108 meaningless.  *See* SPA- 22 n.32 ("I need not decide if the MDP fits within the parameters of 17 U.S.C. § 108 because it unquestionably fits within the definition of fair use.") (citing 17 U.S.C. § 108(f)(4)).  This was an improper interpretation of Section 108(f)(4).  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 385 (1992) (holding that "[a] general 'remedies' saving clause cannot be allowed to supersede the specific substantive pre-emption provision").  As the Copyright Office observed, "permitting 'post-108' reliance on fair use as if no § 108 copying had occurred" comes "dangerously close to reading § 108 out of the statute."  1983 REPORT at 98.  Given that Congress deemed Section 108 "necessary to exempt much library photocopying from copyright liability, and since Congress did not likely intend to construct complex mechanisms in most of the section only to render them moot via subsection (f)(4), that result is implausible."  *Id.*

### 2.  The Four Factors Enumerated in Section 107 Weigh Against Fair Use

#### (a)  Purpose and Character of the Use

The most important step in weighing the first factor – an examination of the purpose and character of the use – is determining "whether the new work merely

30

'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with *new expression, meaning, or message*; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (citations omitted; emphasis added). For the reasons set forth below, the Libraries' use of the Authors' copyrighted works is not transformative. Moreover, to the extent that there is any transformative or other legitimate purpose to the Libraries' actions, the making of multiple copies of the works and then storing the full text and image files online where they are susceptible to theft and widespread distribution goes far beyond what is needed to satisfy such purpose.[11]

### (i)    The Libraries' Preservation Purpose is Not Transformative

The Libraries attempt to justify their retention of multiple copies as necessary for "preservation," but the District Court correctly recognized that the Libraries' "argument that preservation on its own is a transformative use is not strong." SPA-15 n.19. As this Court held in *Texaco*, a research library does not transform a journal article when it makes an "archival" photocopy of it for the purpose of "future retrieval and reference." 60 F.3d at 919. The mechanical conversion of printed books into digital form is not transformative because it does not add any "new information, new aesthetics, [or] new insights and understandings," to the books. Pierre Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990). Rather, "photocopying merely transforms *the*

---

[11] The question of whether the MDP "is of a commercial nature," 17 U.S.C. § 107(1), is addressed at Point II.A.2.(a), *supra.*

*material object* embodying the intangible article that is the copyrighted original work." *Texaco*, 60 F.3d at 924 (emphasis added); *see Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (retransmission of radio broadcast, which merely repackages the original, is not transformative because it adds "neither new expression, new meaning nor new message") (quotation omitted). Given that one of the core functions of academic libraries is to "preserve" books "not just for current students and faculty, but also for future generations" [A-663-64(¶¶11,17)], a library does not "transform" a print book that was acquired for preservation purposes by digitizing it for the exact same purpose. Here, "the predominant archival purpose of the copying tips the first factor against the copier, despite the benefit of a more usable format." *Texaco*, 60 F.3d at 924.

> **(ii)    Even if Copying Millions of Books to Facilitate Search is Transformative, There is No Justification for Storing Multiple Copies of the Image and Text Files Online**

In light of the weakness of the Libraries' preservation argument, the District Court focused its finding that the Libraries' conduct was fair use almost exclusively on the search engine feature of HathiTrust. SPA-15-17. The Authors maintain, as they did below, that the Libraries have no right to copy and use millions of books without authorization or payment. If the Libraries want to scan print books in order to create indices or to facilitate text mining or other research tools, they should be required to ask for and obtain permission for their copying.

But more importantly for purposes of this appeal, to the extent that any of the Libraries' goals fit within the rubric of fair use, the Libraries should be permitted to do no more than is necessary to accomplish that particular purpose.

32

*See Campbell,* 510 U.S. at 589.  As discussed below at Point II.B.2.(c), the District Court erred by failing to recognize that the Libraries are able to facilitate text searching and to provide access to the print-disabled without creating and storing so many digital copies online.

The Ninth Circuit cases cited by the District Court that address the legality of copying web pages for the purpose of creating a search index, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) and *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003), are distinguishable because copyright owners who publish material on the Internet do so because they want their content to be found and viewed.  For all intents and purposes, such owners have provided an implied license to search engines to copy and index their contents.  Moreover, unlike HathiTrust's perpetual storage of high resolution image files and text files of every book, the Web pages copied by a search engine are incidental to the search function.  As noted by one court, after copying full size images onto its server for the purpose of creating "thumbnails," the search engine deleted the original copy from its server.  *See Kelly*, 336 F.3d at 815.  Thus, even if ingesting a copyrighted work into a search engine is transformative, it does not follow that the permanent storage of the original content is also transformative.

### (iii)  Making Digital Copies of Copyrighted Works Available for Print-Disabled Users is Not Transformative

The District Court's holding that "[t]he use of digital copies to facilitate access for print-disabled persons is also transformative" demonstrates a fundamental misapplication of the term "transformative" as it has been used by this

Court in the context of fair use.  The Copyright Act grants copyright owners exclusive control over any "derivative work," which is defined as

> a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, *transformed,* or adapted.

17 U.S.C. §§ 101 (emphasis added), 106(2).  The Second Circuit distinguishes between a transformation that is merely derivative and one that falls within the rubric of fair use as follows: "Although derivative works that are subject to the author's copyright transform an original work into a new mode of presentation, such works – unlike works of fair use – take expression for purposes that are not 'transformative.'"  *Castle Rock*, 150 F.3d at 143.  Providing the digital text of a book so that it can be translated to speech for consumption by a print-disabled person transforms only the "mode of presentation," not the expression itself.  *Id*.

The District Court held that the use of the Authors' works is transformative on the ground that "[p]rint-disabled individuals are not considered to be a significant market or potential market to publishers and authors."  SPA-18.  "As a result," reasoned the District Court, "the provision of access for them was not the intended use of the original work (enjoyment and use by sighted persons) and this use is transformative."  *Id*.  Although the Authors concede that it is common practice in the publishing industry for authors to forgo royalties that are generated through the sale of books manufactured in specialized formats for the blind, the Authors strongly object to the District Court's suggestion that they write only for the "enjoyment and use [of their works] by sighted persons."  *Id*.  Authors write

34

books to be read (or listened to), regardless of the "mode of consumption." *Castle Rock*, 150 F.3d at 133.  Moreover, to the extent that sales to the print-disabled are relevant to the fair use analysis, it should be considered in connection with the market harm factor, not whether adapting a book for the visually-disabled changes the book's expression.  Finally, for the same reasons set forth above, to the extent that making copyrighted works available to the print-disabled is transformative, the Libraries do not need to leave multiple copies of the entirety of their digital library online in order to meet any legitimate purpose.

### (b)    Nature of the Copyrighted Works

The second statutory factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586.  Here, the works digitized as part of the MDP include every conceivable type of book – fiction and non-fiction, obscure academic works and bestsellers; yet no consideration was given to the nature of the books copied. *See supra* p. 9.  Rather, the vast majority of the books were "selected" because they happened to be on a shelf in a library.  A-1105-06.  Under the unusual circumstances of this case, where the Libraries indiscriminately scanned millions of books in assembly-line fashion, they cannot meet their burden of showing that the nature of the copyrighted work favors a finding of fair use.

### (c)    Amount and Substantiality of the Use

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," or whether "the quantity and value

35

of the materials used are reasonable in relation to the purpose of the copying."
*Campbell*, 510 U.S. at 586 (internal quotation marks and citations omitted).  This
factor "recognizes that the more of a copyrighted work that is taken, the less likely
the use is to be fair, and that even a less substantial taking may be unfair if it
captures the essence of the copyrighted work."  *Infinity*, 150 F.3d at 109.  "Though
not an absolute rule, 'generally, it may not constitute a fair use if the entire work is
reproduced.'"  *Id.* (quoting 4 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER
ON COPYRIGHT, § 13.05[A][3] at 13-178 (1997)).

Here, the third fair use factor takes on particular significance because
truckloads of books were digitized in their entirety.  The District Court held that
"entire copies were necessary to fulfill the Libraries' purposes of facilitation of
searches and access for print-disabled individuals."  SPA-19.  There are three
fundamental problems with this finding.

*First*, the court did not address the Libraries' archival storage of books for
"preservation" purposes.  Even if the Libraries' preservation activities were
transformative (which they are not), the Libraries digitized and are storing millions
of books (including best-selling, commercially-available books) that have no
legitimate need to be "preserved."  CA-189-90(108:17-110:2).

*Second*, even if it is necessary to digitize an entire work in order to index the
contents for facilitating search, the third factor weighs heavily against the Libraries
because they are unnecessarily retaining complete image and text files comprising
every page of every book.  *See, e.g.*, *Campbell,* 510 U.S. at 589 (while defendants'
use of lyrical excerpts from Roy Orbison's song "Oh Pretty Woman" was justified
to achieve a parodic purpose, case was remanded to determine whether the

repetition of the original's iconic bass riff was excessive).  Here, the record shows that once a book's text is recorded in the index, the image and text files are no longer necessary for the operation of the search engine.  CA-202-04(228:15-236:12).[12]  Although the Libraries may argue that fair use permits them to make an intermediate copy of a work for purposes of enabling full text search or so-called "non-consumptive research,"

> [t]o satisfy the criteria of fair use, any copies created for such research purposes should be destroyed upon completion of the research project for which they were created. Should the individual or institution carrying on this research desire to retain the copy for archival purposes or future use, it should be required to obtain permission to do so from the copyright proprietor.

Final CONTU Report (July 31, 1978), p. 39, *available at* http://digital-law-online.info/CONTU/PDF/index.html.  *See also Kelly*, 336 F.3d at 815 (once the search engine created a thumbnail version of the indexed image, the full-sized originals were deleted).[13]  The Libraries' permanent storage of multiple copies is the exact opposite of copies that are "intermediate" or retained for a "transitory duration."  *Cf. Cartoon Network, LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 129-30 (2d Cir. 2008) (a bit of data that remains in computer buffer for no more than 1.2 seconds is not "fixed . . . for a period of more than transitory duration").

---

[12] Significantly, HathiTrust has contracted to provide copies of its search index to four private companies.  A-1071-75(#2).  As HathiTrust does not provide these companies with the image or text files, there is no question that the search feature can operate without HathiTrust retaining copies of the actual books.  CA-202-04(228:15-236:12).

[13] Contrary to the suggestion of the District Court, [SPA-19 n.26], the Authors do not seek to have the digitized books in the HDL destroyed, but rather to have them taken offline and stored under lock and key.

*Third*, the Authors do not object to the print-disabled obtaining access to the full digital copies created as part of the MDP, provided they are retained and disseminated in accordance with the Chafee Amendment – by an "authorized entity" and in a "specialized format."  *See infra* Point IV.  However, even if this Court were to hold that HathiTrust in its current configuration satisfies these criteria, the Libraries still have not demonstrated their need to retain the digital *image* files in order to facilitate access to the print-disabled, as the assistive technology uses *text* files to convert the text from the book into speech.  A-184-90(¶¶19-40).

Thus, the third factor also weighs heavily against the Libraries.

### (d)    The Effect of the Use Upon the Market for or Value of the Work

Under the fourth factor, "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4), the copyright holder need not show either "actual present harm" or "with certainty that future harm will result," but rather must show "by a preponderance of the evidence that *some* meaningful likelihood of future harm exists."  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984) (emphasis in original).  The District Court erred in failing to recognize the actual and potential harm to the Authors caused by the Libraries' unlicensed mass digitization.

### (i)    Each Unlicensed Digital Copy Represents a Lost Sale

The Libraries' digitization and archiving of the Authors' works caused actual harm to the Authors' own market and potential market for book sales.  The majority of their books are in-print and commercially available for purchase.  A-

1176.25(#174).  Many are available for sale in digital format.  *Id.*  Each digital copy of a book that the Libraries created – for preservation, archiving or any other purpose – rather than purchasing it through lawful channels, represents a lost sale to the book's rights-holders.  A-1176.19(#128); A-216-17; A-224-31(¶¶10-19, Exs. B-D) (exemplifying revenue lost due to the Libraries' unlicensed copying); A-1022(163:1-10).

The District Court refused to account for the Authors' lost sales, suggesting that the argument "ignores the fact that purchase of an additional copy would not have allowed either full-text searches or access for the print-disabled individuals, two transformative uses that are central to the MDP."  SPA-19.  However, as shown above, the Libraries did not need to retain full copies of the digitized books to facilitate searches.  To the extent the Libraries elected to retain copies for non-transformative archival purposes, a use the District Court again overlooked in the context of market harm, the Libraries could and should have purchased additional copies.

The Authors do not object to giving print-disabled users access to digitized books, but challenge the Libraries' provision of those copies because (a) the Libraries are not providing access in accordance with the Chafee Amendment [*see infra* Point IV]; and (b) HathiTrust provides not only text files, but also *image files*, to persons with print disabilities for the purpose of rendering large-print versions of the books – a use that does "directly compete with and impair important growth businesses of publishers for [] large-type books[.]"  *AAP Statement*, Feb. 8, 1996, *at* http://judiciary.house.gov/legacy/441.htm.

39

### (ii)    The Works are Exposed to Unlimited Piracy

With neither a legislative mandate nor an agreement from rights-holders, the Libraries expose the Authors' property to immense security risks by digitizing, copying, transferring, storing and allowing various levels of online access to millions of copyright-protected books. *See supra* Points II.A.1.(e) (discussing Congressional recognition of digital security risks) and II.A.2.(c) (security risks caused by MDP). A breach has the potential to cannibalize the book market through the same type of widespread Internet piracy that decimated the music industry. *See* Edelman Report, A-1205-23; CA-127-45. The Authors have no right to audit the Libraries' security systems and, in the event of a breach, the Authors may not seek indemnification from the Libraries due to their sovereign immune status. Although a breach has yet to occur, the Libraries are playing with fire.[14]

And even if these Libraries exercise care, the Court must consider "whether unrestricted and wide-spread conduct of the sort engaged in by defendant . . . would result in a substantially adverse impact on the potential market." *Campbell*, 410 U.S. at 590. Under the District Court's ruling, far less sophisticated providers now may attempt to engage in their own mass digitization programs, subjecting the Authors' property to whatever security measures such providers do or do not employ. A-1214(¶25).

### (iii)    The Authors Will Lose Licensing Revenues

---

[14] For confidential facts concerning HathiTrust's security, *see* CA-201(198:13-200:19) and CA-316-62. *See also* Nicole Perlroth, *Some Victims of Online Hacking Edge Into the Light*, N.Y. TIMES, February 20, 2013, at A1.

It is well established that the "impact on potential licensing opportunities for traditional, reasonable or likely to be developed markets should be legally cognizable when evaluating a secondary user's 'effect upon the potential market for or value of the copyrighted work.'" *Texaco*, 60 F.3d at 930. The undisputed evidence establishes that the Libraries' activities will harm the Authors by undermining existing and emerging licensing opportunities.

In *Texaco*, the Second Circuit considered whether a corporate library's systematic photocopying of scientific journal articles for research and archival purposes was fair use. 60 F.3d at 915. In analyzing whether it was appropriate for the district court to have considered the increase in publishers' revenue that would result if Texaco's unauthorized copying was not permitted as fair use, the Second Circuit observed that "the publishers still have not established a conventional market for the direct sale and distribution of individual articles[.]" *Id.* at 930. Nevertheless, the court found that "they have created, primarily through [the Copyright Clearance Center ("CCC")], a workable market for institutional users to obtain licenses for the right to produce their own copies of individual articles via photocopying." *Id.*

Here, too, there are several existing and likely to be developed "workable market[s]" for the Libraries to obtain licenses to digitize, store and make various uses of the copyrighted books in their collections. *See* Gervais Report, A-625(¶9) (stating that "collective management systems provide a market-based mechanism by which libraries could compensate authors and rightsholders in exchange for a license to mass digitize and make various uses of copyrighted books in their collections"). In the United States, organizations like the CCC "presently license

41

the same general type of copyrighted content as the material copied through the Google Library Project." *Id.* The CCC has existing licenses with academic institutions like the Libraries that allow for the rights of thousands of works to be collectively negotiated. A-633(¶34).[15]

Collective licensing systems in other countries, including the resident nations of several Authors and their representative associations, provide additional mechanisms by which the Libraries could have obtained licenses to digitize and use thousands of books of foreign authors. For example, Associational Plaintiffs from the U.K., Quebec, Sweden and Norway submitted testimony showing that they could have negotiated the digitization rights either directly or by acting as an intermediary for their members. A-238-39(¶9); A-290(¶7); A-303(¶7); A-325(¶7). Authors and their representatives in Norway and Sweden, including Associational Plaintiffs in this litigation, have entered into or are finalizing license agreements to permit their national libraries to digitize entire collections of books in exchange for royalty payments. A-303-27(¶¶7&10, Ex. A); A-325-33(¶¶7&10, Ex. A). In France, Google announced last year that "it had an industrywide book-scanning agreement in place to cover works that are out of print but still under copyright – a category that covers most of the world's books," and that Google was "interested

---

[15] The District Court incorrectly found that "the CCC has no plans to provide for or develop" a "license for the uses to which The Libraries put the works[.]" SPA-21. In fact, the representative from the CCC testified that "[w]hen we authorize a digitization and reproduction, which is one of the rights that we can authorize under various of our licenses, what is then done with the end result, whether it's read, it's used for nonconsumptive research or any other purpose, we would not know." CA-15(19:7-13).

in exporting these deals elsewhere."  Eric Pfanner, *Google Has Deal in France For Book-Scanning Project*, N.Y. TIMES, June 12, 2012, at B5.

Similar licensing schemes for mass digitization are likely to develop in the United States.  *See* A-632(¶33).  For example, although Judge Chin ultimately rejected the settlement agreement entered into by The Authors Guild and others in the Google Books case, the proposed resolution provides more compelling evidence that "there is a ready market or means to pay for the use" that the Libraries are making.  *Texaco*, 60 F.3d at 931.  A-205-06(¶¶14-17).  The ASA exemplifies how a mass digitization licensing system could operate; it permitted Google and the Libraries to digitize and make various display and non-display uses of books while providing a mechanism to compensate the millions of affected authors and ensure that their intellectual property rights were secure.  *Id.*

Finally, the District Court should not have been persuaded by the report submitted by Dr. Waldfogel, who opined that it would be prohibitively expensive to develop a market for mass digitization uses.  *First*, the report is predicated on the remarkable notion that it is permissible to steal goods if it is too expensive to buy them.  However, "[b]ecause obedience to the law might be inconvenient or expensive is not a valid excuse for flouting a statute."  *Lawton v. Bd. of Med. Examiners*, 143 Cal. App. 2d 256, 262-63 (1956).  *Second*, Dr. Waldfogel's "sticker shock" inducing estimate that it would cost $569 million to obtain the necessary licenses is grossly exaggerated because it wrongly assumes that the Libraries would have to obtain a separate license for each and every work, when in fact, as shown above, there are existing mechanisms that would allow the Libraries to obtain licenses for thousands of works at once.  *Third*, given that the Libraries

43

have large acquisition budgets and spend significant sums to build their collections [CA-157(25:3-25)], the fact that obtaining licenses to digitize and use millions of copyrighted books will require a significant financial outlay should not weigh in favor of fair use.  *Finally*, contrary to the District Court's suggestion that the report considered a market for licenses of each of the Libraries' uses, in fact Dr. Waldfogel analyzed only whether "specifically the ability to *search* digitized books [] could be undertaken as a viable and licensed commercial enterprise." CA-84-5(¶4) (emphasis added).

The fourth factor, like all of the factors in this fair use analysis, weighs against the Libraries.  Accordingly, the fair use defense must fail in its entirety.

## III

## THE DISTRICT COURT ERRED IN FINDING THAT THE ASSOCIATIONAL PLAINTIFFS LACK STATUTORY STANDING

The District Court properly found that the Associational Plaintiffs satisfy each of the following elements necessary to establish associational standing under the 3-part test set forth by the Supreme Court in *Hunt v. Wash. State. Apple Adver. Comm'n*.: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. 333, 343 (1977).  *See* SPA-6; *see also The Authors Guild v. Google, Inc.*, 282 F.R.D. 384, 389 (S.D.N.Y. 2012) (Chin, J.) (holding that The Authors Guild and other associational plaintiffs have standing to bring copyright claims on behalf of their members against Google for claims arising from the MDP).

44

The District Court erred, however, in proceeding to hold that, despite having found that the Associational Plaintiffs satisfied the Article III and prudential requirements to bring a claim on behalf of their members, the Associational Plaintiffs from the U.S., Canada and Australia lack "statutory standing" under Section 501(b) of the Copyright Act.  That section provides that "the legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b).  The District Court interpreted this provision as imposing an "explicit limit" on who may maintain a claim for copyright infringement, thus precluding associations from bringing copyright lawsuits on behalf of their members because the associations are not the "legal or beneficial owner[s]" of the copyrights at issue.

The flaw in the District Court's analysis is that statutory standing under the Copyright Act is satisfied through the first prong of the 3-part *Hunt* test for associational standing.  The Associational Plaintiffs are suing only on behalf of their members who "would otherwise have standing to sue in their own right" because they are the "legal or beneficial owner[s]" of copyrights in works that have been infringed by the Libraries.  Thus, the real parties-in-interest are the members with copyright ownership who have standing under the Copyright Act; their associations have standing to bring claims on their behalves as long as the *Hunt* test is satisfied.

Although the District Court correctly observes that "Courts in the Second Circuit have not explicitly addressed the issue of whether associational standing is permissible under the Copyright Act" [SPA-8], the Eleventh Circuit considered

this very question and held that an association that satisfies the *Hunt* test may assert copyright claims on behalf of its members who have standing to sue in their own right under the Copyright Act. *See CBS Broad., Inc. v. EchoStar Comms. Corp.*, 450 F.3d 505, 518 n.25 (11th Cir. 2006) (association of television network affiliates with *Hunt* standing may bring copyright claims on behalf of their members who satisfy the standing requirements under 17 U.S.C. § 501(e)); *see also Olan Mills, Inc. v. Linn Photo Co.*, 795 F. Supp. 1423, 1428 (N.D. Iowa 1991), *rev'd on other grounds*, 23 F.3d 1345 (8th Cir. 1994) (association has standing under *Hunt* to bring copyright claim on behalf of its member photographers who are the legal or beneficial owners of their copyrights).[16]

A decision by Judge Posner in the Seventh Circuit is also highly instructive in demonstrating the District Court's error. In *Southern Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois*, 326 F.3d 919 (7th Cir. 2003), the Seventh Circuit held that a union had associational and "statutory" standing under ERISA to bring a claim on behalf of its members against a welfare fund. Like the "legal or beneficial owner" limitation in the Copyright Act, ERISA restricts the right to sue to "plan participants and beneficiaries." 29 U.S.C. § 1132(a)(1). Notwithstanding this limitation, the court held that the union could

---

[16] In *Olan Mills*, 795 F. Supp. at 1428, the court held that cases like *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 (2d Cir. 1982), upon which the District Court relied, are inapposite because they do not address the issue presented here: whether an association with standing under *Hunt* may bring a copyright claim on behalf of its members who meet the Copyright Act's statutory standing requirements and therefore would have standing to sue in their own right. *Eden* and its progeny addressed the standing of licensees and managers to sue in their own right.

46

bring the ERISA claim on behalf of its members, reasoning that "we do not think that by confining the right to sue under section 1132(a)(1) to plan participants and beneficiaries Congress intended to prevent unions from suing on behalf of participants. The union in such a case is not seeking anything for itself; the real plaintiffs in interest are plan participants." *Id.* at 922. Here, "the real plaintiffs in interest" are the copyright owners/members of the Associational Plaintiffs. Those groups should be permitted to assert claims on behalf of their members, recognizing that any injunction will extend only to those members who can prove their legal or beneficial copyright ownership. *See generally Reed Elsevier, Inc v. Muchnick*, 559 U.S. 154 (2010) (holding that court has subject matter jurisdiction over case even though some of the plaintiffs had not satisfied requirement that they register their works).

## IV

## HATHITRUST IS NOT AN "AUTHORIZED ENTITY" AND THE BOOKS ARE NOT IN A "SPECIALIZED FORMAT" UNDER SECTION 121

The Authors recognize the considerable societal value of providing individuals with print-disabilities ready access to library books, including the works digitized as part of the Mass Digitization Program. The Authors did not file this lawsuit against any users of the HDL, and the Authors have no wish to prevent people with print-disabilities from gaining privileged access to the digitized copies of the Authors' books. However, the way in which the Libraries are presently reproducing and making available digitized texts to the print-disabled neither qualifies as fair use nor falls within the special exemption accorded to "authorized entities" in the so-called Chafee Amendment.

47

**A.    The Legislative History of the Chafee Amendment Supports a Narrow Definition of "Authorized Entity" and "Specialized Formats"**

In 1996, Senator John Chafee sponsored an amendment to the Copyright Act that exempts a narrowly-defined group of "authorized entities" from claims of copyright infringement for reproducing and distributing copyrighted works in "specialized formats exclusively for use by blind or other persons with disabilities."  17 U.S.C. § 121.  As Senator Chafee explained on the Senate floor, the amendment provides that "groups that produce specialized formats for the blind," which includes a "handful" of non-profit organizations like the National Library Service for the Blind, "no longer are required to gain permission from the copyright holder before beginning production.  142 CONG. REC. S. 9763, 9764, Sept. 3, 1996 ("It includes a *very narrow definition* of those who are eligible to undertake such production.") (emphasis added).

The Chafee Amendment was supported by interest groups representing both the blind and rightsholders, including Intervenor NFB and the Association of American Publishers ("AAP").  The AAP worked with groups representing the blind to ensure that the amendment would not "create an infrastructure that would directly compete with and impair important growth businesses of publishers for (1) large-type books and (2) books on tape of CD."  *Statement of the AAP*, Feb. 8, 1996, *available at* http://judiciary.house.gov/legacy/441.htm.  The AAP's goal was achieved by "tighten[ing] the definitions" [*id.*] contained in a previous proposal, which would have permitted any "non-profit organization" to make copies for the blind in both large type and audio formats.  *See Intellectual Property and the*

48

*National Information Infrastructure*, Sept. 1995, at 228, *available at*
http://www.uspto.gov/web/offices/com/doc/ipnii/rec.pdf.

**B.    HathiTrust's Provision of Access to the Print-Disabled Does Not Comply With the Chafee Amendment or Fair Use**

The District Court held that "[t]he provision of access to previously-published non-dramatic literary works within the HDL fits squarely within the Chafee Amendment, although Defendants certainly may rely on fair use . . . to justify copies made outside of these categories or in the event that they are not authorized entities."  SPA-23.  This holding was in error for three reasons.

**1.    HathiTrust is Not an Authorized Entity**

Works that qualify for Section 121 status may be reproduced and distributed only by an "authorized entity," defined as "a nonprofit organization or a governmental agency that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities."  17 U.S.C. § 121(d)(1).  The District Court found that because the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") imposes certain equal access obligations on "public entities" and places of "public accommodation," every library is potentially an "authorized entity" under the Chafee Amendment.  SPA-22.  However, this broad application of the ADA swallows the "very narrow definition" of "authorized entity" in Section 121.  *See Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 489 (2d Cir. 2002) (rejecting blind student's interpretation of futility exception that would swallow the exhaustion requirement in Individuals with Disabilities Education Act).  It simply cannot be that every library in the country is one of the

49

"handful of nonprofit organizations" that Congress intended to exempt from copyright infringement.

### 2.    The Digitized Texts and Images are Not in Specialized Formats

Authorized entities may reproduce and distribute works only in "specialized formats," defined as "braille, audio, or digital text which is *exclusively for use by blind or other persons with disabilities*."  17 U.S.C. § 121(d)(1) (emphasis added). The record is clear that the HDL goes far beyond this limitation, granting "privileged access" to the complete images and text of the scanned books.  A-1037-39; A-1074-75(#2(l)); A-1280-81(pp.190-194).  This fact alone negates the possibility that the HDL provides a "specialized format exclusively for use by blind" because people without print disabilities are using the same format as the general population.  Moreover, even if the text files in the HDL did constitute a "specialized format," which they do not, Defendants unquestionably violate Section 121 by storing and permitting persons with print disabilities to view the high resolution images of every scanned page of every book in the HDL.  *Compare* 17 U.S.C. § 121(d)(4)(B) (permitting only "print instructional materials" to be reproduced into "large print book" format), *with* A-1284(214:12-21) (testifying that HathiTrust provides the print-disabled with access to the image files "to have them, for example, enlarged").

### 3.    The HDL's Uses For the Blind Are Not Protected Fair Use

There is no support for the District Court's suggestion that, even without the special privileges granted in the Chafee Amendment, Congress intended fair use to permit the preemptive digitization, replication and storage of millions of

copyrighted books in a digital format that includes universally-readable image and text files, even when no particular book has been requested by a print-disabled individual.  Indeed, the very reason that groups representing the blind pushed for the Chafee Amendment was to eliminate the need to obtain advance permission from publishers.  Plainly this provision would not have been necessary if fair use permitted these acts without permission.

As discussed above, the District Court erred in finding that HathiTrust's provision of access to the blind is a transformative use of the copyrighted books. *See supra* pp. 33-35.  Moreover, the District Court improperly relied on the legislative history of Section 107 in finding that Defendants' uses for the print-disabled constitute fair use.  The House and Senate Reports discussed by the Supreme Court in *Sony* and cited by the District Court do not support the proposition that the MDP, which digitized millions of books into universally-accessible formats without any request from a blind person, is fair use.  *See* H.R. REP. NO. 94-1476, at 73 (1976) ("While *the making of multiple copies* or phonorecords of a work for general circulation *requires the permission of the copyright owner*, a problem addressed in [a previous proposed section addressing copies for the blind], the making of a *single copy* or phonorecord by *an individual* as a free service for a blind persons would properly be considered a fair use under section 107.") (emphasis added).

The Authors do not seek a remedy that would foreclose the print-disabled from gaining access to the digital library, but one that would require any access to be facilitated in accordance with the statutory scheme established by Congress.

## <u>CONCLUSION</u>

For the above-stated reasons, Plaintiffs-Appellants respectfully request that this Court vacate the Judgment of the District Court.

Dated:  New York, New York
July 11, 2013

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By: _____ s/ Edward H. Rosenthal _____
Edward H. Rosenthal
Jeremy S. Goldman
Anna Kadyshevich

488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

*Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

As counsel of record to the Plaintiffs-Appellants, I hereby certify that this brief complies with the type – volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  I am relying upon the word count of the word-processing system (Microsoft Word) used to prepare the brief, which indicates that 13,894 words appear in the brief.

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By: _____ s/ Edward H. Rosenthal _____
    Edward H. Rosenthal
    Jeremy S. Goldman
    Anna Kadyshevich

488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

*Attorneys for Plaintiffs-Appellants*

**SPECIAL APPENDIX**

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Opinion and Order of the Honorable Harold Baer,
  dated October 10, 2012, Appealed From ............... SPA-1

Judgment, dated October 12, 2012, Appealed From.. SPA-24

SPA-1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
THE AUTHORS GUILD, INC., et al.,       :
                                       :

      Plaintiffs,              :

         - against -        :      **11 CV 6351 (HB)**

                                         :      **OPINION &**
HATHITRUST, et al.,              :      **ORDER**
                                       :

      Defendants.           :
-----------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

      Before the Court are two motions for judgment on the pleadings and three motions for

summary judgment. Defendants include HathiTrust;[1] Mary Sue Coleman, President of the

University of Michigan ("UM"); Mark G. Yudof, President of the University of California; Kevin

Reilly, President of the University of Wisconsin System; Michael McRobbie, President of Indiana

University; and Cornell University (collectively, the "Universities"). Plaintiffs, consisting of

individuals and associational organizations, assert claims for copyright infringement for the alleged

unauthorized reproduction and distribution of books owned by the Universities. The individual

plaintiffs are Trond Andreassen, Pat Cummings, Erik Grundström, Angelo Loukakis, Helge

Rønning, Roxana Robinson, André Roy, Jack R. Salamanca, James Shapiro, Danièle Simpson, T.J.

Stiles, and Fay Welson, and the associational organizations are The Authors Guild, Inc. ("Authors

Guild"), The Australian Society of Authors Limited, Authors' Licensing and Collecting Society

("ALCS"), Union des Écrivaines et des Écrivains Quebecois ("UNEQ"), Sveriges Författarförbund

("SFF"), Norsk Faglitterær Forfatter-og Oversetterforening ("NFF"), and The Writers' Union of

Canada ("TWUC") (collectively, "Associational Plaintiffs"). The Authors League Fund ("Authors'

Fund") does not seek associational standing, but asserts a claim based on its direct ownership of

copyrights. I granted the motion to intervene as defendants by the National Federation of the Blind,

Georgina Kleege, Blair Seidlitz, and Courtney Wheeler (collectively, "Defendant Intervenors") on

consent in January 2012.

      Defendants' motion for judgment on the pleadings, filed in December 2011, seeks the

dismissal of the Associational Plaintiffs on standing grounds to the extent they asserted the rights of

---

[1] "HathiTrust" is the name of the service of University of Michigan ("UM") in which the Universities and other
institutions participate under agreements with UM. Defs.' J. Pleadings 1 n.1. The Universities consist of UM, the
University of California, the University of Wisconsin, Indiana University, and Cornell University.

their members and sought dismissal of claims involving the Orphan Works Project ("OWP") as not
ripe for adjudication. For the reasons set forth below, Defendants' motion for judgment on the
pleadings is GRANTED in part and DENIED in part. Plaintiffs' motion for judgment on the
pleadings insofar as it seeks a ruling that fair use and other defenses are unavailable to the
Defendants as a matter of law is DENIED. In June 2012, Defendants, Defendant Intervenors and
Plaintiffs each filed motions for summary judgment. Defendants' and Defendant Intervenors'
motions for summary judgment are GRANTED, and Plaintiffs' motion for summary judgment is
DENIED.

Also before the Court are two unopposed motions for leave to file briefs as amici, brought
by the American Library Association, Association of College and Research Libraries, and
Association of Research Libraries (the "Library Amici"), and the Digital Humanities and Law
Scholars (the "Digital Humanities Amicus"). Both motions are GRANTED.[2]

## BACKGROUND[3]

Defendants have entered into agreements with Google, Inc. ("Google"), that allow Google to
create digital copies of works in the Universities' libraries in exchange for which Google provides
digital copies to Defendants (the "Mass Digitization Project" or "MDP"). Compl. ¶ 1–2; Pls.' 56.1
¶ 62; Defs.' 56.1 ¶¶ 30–31.[4] The HathiTrust partnership is in the process of creating "a shared
digital repository that already contains almost 10 million digital volumes, approximately 73% of
which are protected by copyright." Compl. ¶ 2; *see also* Pls.' 56.1 ¶ 77; Defs.' 56.1 ¶ 42. After
digitization, Google retains a copy of the digital book that is available through Google Books, an
online system through which Google users can search the content and view "snippets" of the books.
Compl. ¶ 51; Pls.' 56.1 ¶ 12. Google also provides a digital copy of each scanned work to the
Universities, which includes scanned image files of the pages and a text file from the printed work.
Compl. ¶ 52; Pls.' 56.1 ¶ 87; Defs.' 56.1 ¶ 30. According to Plaintiffs, this process effectively
creates two reproductions of the original. Compl. ¶ 52. After Google provides the Universities with
digital copies of their works, the Universities then "contribute" these digital copies to the HathiTrust
Digital Library ("HDL"). *Id.* ¶ 63. The Complaint alleges that in total, twelve unauthorized digital

---

[2] Courts have discretion to allow amicus briefs. *Jamaica Hosp. Med. Ctr., Inc. v. United Health Grp., Inc.*, 584 F. Supp.
2d 489, 497 (E.D.N.Y. 2008). Although Plaintiffs initially did not consent to the filing by the Digital Humanities
Amicus, at oral argument they stated that they had no objection. Aug. 6, 2012 Tr. 3:5–6.

[3] Because I have before me both motions for judgment on the pleadings and motions for summary judgment, I cite to
both the Complaint and the parties' Rule 56.1 Statements, where appropriate.

[4] References to the "Complaint" are to the first amended complaint.

copies are created during this digitization process. *Id.* ¶ 72. Google's use of the digital works is the subject of a separate lawsuit.

For works with known authors, Defendants use the works within the HDL in three ways: (1) full-text searches; (2) preservation; and (3) access for people with certified print disabilities. Defs.' 56.1 ¶ 48.  The full-text search capabilities allow users to search for a particular term across all the works within the HDL. *Id.* ¶ 49. For works that are not in the public domain or for which the copyright owner has not authorized use, the full-text search indicates only the page numbers on which a particular term is found and the number of times the term appears on each page. *Id.* ¶ 50.

In an eloquent oral argument by Mr. Goldstein[5] as well as in Mr. Kerscher's[6] declaration, Defendant Intervenors spelled out where blind scholars stood before digitalization: "Prior to the development of accessible digital books, the blind could access print materials only if the materials were converted to braille or if they were read by a human reader, either live or recorded." Kerscher Decl. ¶ 19; *see also* Aug. 6, 2012 Tr. 41:23–55:25. Absent a program like the MDP, print-disabled students accessed course materials through a university's disability student services office, but most universities are able to provide only reading that was actually required. Kerscher Decl. ¶¶ 32, 36. Print-disabled individuals read digital books independently through screen access software that allows text to be conveyed audibly or tactilely to print-disabled readers, which permits them to access text more quickly, reread passages, annotate, and navigate, just as a sighted reader does with text. *Id.* ¶¶ 20–21, 23. Since the digital texts in the HDL became available, print-disabled students have had full access to the materials through a secure system intended solely for students with certified disabilities. Wilkin Decl. ¶ 105. Many of these works have tables of contents, which allow print-disabled students to navigate to relevant sections with a screen reader just as a sighted person would use the table of contents to flip to a relevant portion. Kerscher Decl. ¶ 34. In other words, academic participation by print-disabled students has been revolutionized by the HDL.

Four of the HathiTrust Universities (all except Indiana University) have also agreed to participate in the OWP, an initiative to "identify and make available to University students, faculty and library patrons full copies of so-called 'orphan works'—works that are protected by copyright but whose rights holders theoretically cannot be located by procedures established by the

---

[5] Daniel Goldstein of Brown Goldstein & Levy, LLP, attorney for the National Federation of the Blind.

[6] George Kerscher, Ph.D., Senior Officer of Accessible Technology at Learning Ally (formerly known as Recording for the Blind & Dyslexic), which creates recorded copies of print materials for print-disabled persons, and Secretary General of the DAISY Consortium (Digital Accessible Information System) and President of the International Digital Publishing Forum (IDPF), which are international organizations that work to promote accessibility in electronic publishing.

HathiTrust." Compl. ¶ 3. The original process to determine which works would be included as orphan works ("Orphan Works") involved a decision as to whether a work was commercially available for sale, and if not, an attempt to contact the copyright holder. *Id.* ¶ 74; Pls.' 56.1 ¶ 114; Defs.' 56.1 ¶ 79. If that attempt failed, then HathiTrust would list the bibliographical information for the work on the HathiTrust Orphan Candidates webpage for ninety days, after which time the work would have become available for "Full view" on HathiTrust to UM students, professors, and other authenticated users and visitors to libraries at UM's campuses. Compl. ¶ 74; Pls.' 56.1 ¶ 114. UM intended to allow "access to orphan works for the purpose of online review, with the number of users permitted to view a given work limited at any one time to the number of copies held by the UM library." Defs.' 56.1 ¶ 81. Other schools subsequently announced participation in this project. Compl. ¶ 75. After the filing of the original complaint in this action, UM announced that the OWP would be temporarily suspended because the procedures used to identify Orphan Works had apparently allowed many works to make their way onto the Orphan Works Lists in error. *Id.* ¶ 78; Defs.' 56.1 ¶¶ 83–84. UM has not yet provided a new process for identifying Orphan Works, or even a timeline for when that might happen, "although it continues to study ways to improve the orphan identification process." Defs.' 56.1 ¶ 84.

By their Complaint, Plaintiffs seek (1) a declaration that the systematic digitization of copyrighted materials without authorization violates Sections 106 and 108 of the Copyright Act, (2) an injunction to prevent the reproduction, distribution, or display of Plaintiffs' or other copyrighted works except as provided by § 108, (3) an injunction to prohibit Defendants' provision of works to Google for digitization without authorization, (4) a declaration that the OWP will infringe the copyrights of Plaintiffs and others, (5) an injunction that prohibits Defendants from proceeding with the OWP, and (6) the impoundment of all unauthorized digital copies within Defendants' possession.

### MOTIONS FOR JUDGMENT ON THE PLEADINGS
### I. DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants seek dismissal of the Associational Plaintiffs on standing grounds to the extent they assert the rights of their members. Defendants argue that the Associational Plaintiffs are precluded from representation of their members on both constitutional and statutory bases. The Associational Plaintiffs respond that they are ideally suited to represent the largely identical copyright claims of their members. Pls.' Opp'n to Defs.' J. Pleadings 4. They do not, however, address the crux of Defendants' argument, which is that the Copyright Act simply does not include

4

**SPA-5**

this type of standing.[7] I hold that the Associational Plaintiffs have satisfied Article III standing requirements and that the issues pertaining to the rights of their members are therefore justiciable. As a matter of statutory standing under the Copyright Act, however, the domestic Associational Plaintiffs are precluded from enforcing those rights. The issue of statutory standing for the foreign associations has not been properly presented to the Court, and I decline to speculate on the operation of those foreign laws.

Defendants further seek dismissal of claims involving the OWP as not ripe for adjudication. Plaintiffs' claims concern the OWP as it may exist in the future, not as it existed before HathiTrust abandoned the original program. As I later explain, I do not know and cannot anticipate whether the features of that hypothetical program will raise the same issues that possibly defeated the first OWP, assuming there will even be a renewed OWP.

**A. Legal Standard**

"A Rule 12(c) motion for judgment on the pleadings based upon a lack of subject matter jurisdiction is treated as a Rule 12(b)(1) motion to dismiss the complaint." *United States v. Comprehensive Cmty. Dev. Corp.*, 152 F. Supp. 2d 443, 448–49 (S.D.N.Y. 2001). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.*

**B. Constitutional and Prudential Standing of the Associational Plaintiffs**

For reasons similar to those stated by the court in the suit against Google brought by many of the same associations, the constitutional basis for standing is satisfied. *Author's Guild v. Google, Inc.*, Nos. 05 Civ. 8136 & 10 Civ. 2977, 2012 WL 1951790, at *6 (S.D.N.Y. May 31, 2012). To assert standing as a representative of its members, an association must meet the constitutional requirements described by the Supreme Court in *Washington State Apple Advertising Commission v. Hunt*, 432 U.S. 333, 343 (1977). In *Hunt*, the Supreme Court explained that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have

_____

[7] I gave Plaintiffs numerous opportunities to address this issue, which included a letter to the parties dated July 12, 2012. Plaintiffs failed to respond to Defendants' argument that the text of the Copyright Act precludes associational standing. At oral argument on the parties' motions for summary judgment, I again questioned Plaintiffs about their position with respect to Defendants' statutory standing argument. Plaintiffs' attorney responded that, "the question of whether or not a third prong of the *Hunt* Test as to whether the individual author has itself have to have a right is prudential." Aug. 6, 2012 Tr. 22: 19–22. While I agree that the third prong of the *Hunt* test is prudential, this once again fails to answer the question of whether Congress has precluded associational standing in the text of the Copyright Act itself, a question of statutory interpretation and one that Plaintiffs have repeatedly sidestepped or obfuscated.

5

standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* Defendants challenge the first and third prongs.

As to the first prong, Defendants argue that the Associational Plaintiffs "have not made any specific allegations with respect to any copyright works held by their members." Defs.' Mem. J. Pleadings 9. In *Building 7 Construction Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Devopment, Inc.*, 448 F.3d 138, 145 (2d Cir. 2006), the Second Circuit held that plaintiffs asserting associational standing need not "name names" in the complaint. Defendants' argument that this case is distinguishable solely because it involved a different statute is unpersuasive.

As to the third prong, Defendants argue that the individual participation of the Associational Members will be required to demonstrate that Plaintiffs hold valid copyrights and to evaluate the fair-use defense. Defs.' Mem. J. Pleadings 10–13. "[T]he third prong of the associational standing test is 'prudential,' not constitutional, and is 'best seen as focusing on . . . matters of administrative convenience and efficiency.' " *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F. 3d 218, 229 (2d Cir. 2011) (quoting *United Food & Commercial Workers Union Local 751 v. Brown Grp. Inc.*, 517 U.S. 544, 555–56 (1996)). "[T]he fact that a limited amount of individuated proof may be necessary does not in itself preclude associational standing." *Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*, 990 F. Supp. 245, 249 (S.D.N.Y. 1997); *see also N.Y. State Nat'l Org. of Women v. Terry*, 886 F.2d 1339 (2d Cir. 1989). Where an association seeks an injunction or declaration that an entire practice is unlawful, courts have concluded that the individual proof required is limited. *Nat'l Ass'n of Coll.*, 900 F. Supp. at 250 (explaining that associational standing would facilitate adjudication better than "requiring duplicative proof" from each member). The recent decision in *Google*, 2012 WL 1951790, at *5–6, addressed nearly identical arguments about the third prong of *Hunt*. The *Google* Court concluded that the limited amount of individual proof required to establish copyright ownership and the fair-use defense was insufficient to defeat associational standing. *Id.* Likewise, the Associational Plaintiffs here satisfy the *Hunt* test; both Article III and the prudential third prong of *Hunt* are satisfied.

**C. Statutory Standing of the Associational Plaintiffs**

Copyright is a "creature of statute." *Stewart v. Abend*, 495 U.S. 207, 251 (1990). It "does not exist at common law—it originated, if at all, under the acts of [C]ongress." *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 663 (1834). As a result, "[n]o one can deny that [Congress has] the power to

prescribe the conditions on which such right shall be enjoyed." *Id.* at 663–64. Congress may define standing as to a particular cause of action more narrowly than what is constitutionally permitted.[8] The unfortunate nomenclature is somewhat misleading. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 (1998) ("[A]n issue of statutory standing . . . has nothing to do with whether there is case or controversy under Article III."); *see also* Radha Pathak, *Statutory Standing and the Tyranny of Labels*, 62 OKLA. L. REV. 89, 91 (2009). Whether Congress intended to provide statutory standing to associations is determined by the language of congressional enactments.[9]

The Court has subject-matter jurisdiction over the members' individual copyright enforcement actions because the Associational Plaintiffs satisfy constitutional and prudential standing requirements and are therefore "entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). As to the issue of statutory standing—and as will be discussed more fully below—the domestic Associational Plaintiffs simply may not assert the cause of action on which the third-party enforcement of its members' copyrights depend. Put another way, those Associational Plaintiffs can win on behalf of only themselves, but can lose on behalf of their members as well.

Even though Defendants have successfully raised a fair-use defense as to the MDP and the HDL (discussed later), the questions of statutory standing and the merits of this case do not overlap and will be discussed separately. *Cf. Steel Co.*, 523 U.S. at 97 n.2 ("[D]epending upon the asserted basis for lack of statutory standing, [the merits inquiry and the statutory standing inquiry] are sometimes identical, so that it would be exceedingly artificial to draw a distinction between the two."); *Roberts v. Hamer*, 655 F.3d 578, 580 (6th Cir. 2011) ("The question [of whether a party has statutory standing] is closely related to the merits inquiry (oftentimes overlapping it) and is

---

[8] *Compare Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997) (holding that Title II of the Americans with Disabilities Act ("ADA") "evinces a congressional intention to define standing to bring a private action . . . as broadly as is permitted by Article III" (citation omitted)), *with Small v. Gen. Nutrition Cos., Inc.*, 388 F. Supp. 2d 83, 92 (E.D.N.Y. 2005) (declining to extend Title II's broad standing provision to Title III based on statutory language and limiting standing to a plaintiff who "himself must currently be suffering or be about to suffer discrimination"). Title II of the ADA provides a remedy to "any person alleging discrimination on the basis of disability." 42 U.S.C. § 12133. Title III provides a cause of action "to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination." 42 U.S.C. § 12188(a)(1).

[9] *See N.Y. Metro Area Postal Union v. Potter*, No. 00 Civ. 8538, 2003 WL 1701909, at *2 (S.D.N.Y. Mar. 31, 2003) (concluding labor organization lacked standing to pursue claim under the Family and Medical Leave Act provision that provided a private right of action to an "eligible employee"); *see also United Food & Commercial Worker Union, Local 1564 of N.M. v. Albertson's, Inc.*, 207 F.3d 1193, 1201 (10th Cir. 2001) (concluding that Congress intended to bar labor organizations from suing on behalf of their members in Fair Labor Standards Act cases); *Reid v. Dep't of Commerce*, 793 F.2d 277, 282 (Fed. Cir. 1986) (concluding that labor organization did not have standing to bring suit under Civil Service Act provision allowing for suits by "an employee").

analytically distinct from the question whether a federal court has subject-matter jurisdiction to decide the merits of a case.").

**1. Statutory Standing Under U.S. Law**

Although Article III is satisfied, the Authors Guild, the Australian Society of Authors Limited, and TWUC (collectively, "U.S. Associational Plaintiffs") lack statutory standing.[10] The Copyright Act's standing clause explicitly limits who may enforce copyright claims: "the legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). Courts in the Second Circuit have not explicitly addressed the issue of whether associational standing is permissible under the Copyright Act, but the language from several Second Circuit decisions suggests that there is no statutory standing for associations. *See ABKO Music Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991) ("[T]he Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf."); *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 n.3 (2d Cir. 1982); *Plunket v. Doyle*, No. 09 Civ. 11006, 2001 WL 175252, at *5 (S.D.N.Y. Feb. 22, 2001) (explaining that standing is limited to "(1) owners of copyrights and (2) persons who have been granted exclusive licenses by owners of copyrights" (internal quotation and citation omitted)).

The limited case law available outside of this Circuit also suggests that statutory standing for associations is not permitted.[11] In *Silvers v. Sony Pictures Entertainment Inc.*, the court observed that although "[t]he statute does not say expressly that *only* a legal or beneficial owner . . . is entitled to sue . . . Congress' explicit listing of who *may* sue for copyright infringement should be understood as an *exclusion of others* from suing for infringement." 402 F.3d 881, 885, 890 (9th Cir. 2005) (en banc) (concluding that the language and history of the Act precluded assignment of an accrued copyright claim by a party that was neither a legal or beneficial owner of the copyright); *see also Mullen v. Soc'y of Stage Directors & Choreographers*, No. 06 C 6818, 2007 WL 2892654, *4

---

[10] Certain of the foreign associations claim that they have standing by operation of foreign law. That argument is addressed *infra* in Motions for Judgment on the Pleadings Section II.C.2.

[11] In both *Olan Mills, Inc. v. Linn Photo Co.*, 795 F. Supp. 1423, 1427 (N.D. Iowa 1991), *rev'd on other grounds*, 23 F.3d 1345 (8th Cir. 1994), and *Google*, 2012 WL 1951789, at *6, the courts concluded that the constitutional standing requirements were satisfied as to associations that asserted copyright claims. The issue of whether Congress intended to provide a cause of action to associations, and so whether there was statutory standing, was not before the court in either case. Although courts must raise Article III standing requirements *sua sponte*, *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006), there is no similar requirement that they raise a statutory standing problem, which speaks to whether or not the elements of the cause of action are satisfied. Radha Pathak, *Statutory Standing and the Tyranny of Labels*, 62 OKLA. L. REV. 89, 114–15 (2009).

(N.D. Ill. Sept. 30, 2007) ("[I]f USA [a guild] sought a declaratory judgment of copyright infringement or damages for copyright infringement against Plaintiffs, it would surely fail for lack of standing because it is [not] an 'owner' nor is it a 'beneficial owner' (e.g. a licensee) of any copyright at issue under the Copyright Act.").

The Copyright Act is based on Congress's power "[t]o promote the Progress of Science . . . , by securing for limited Times to Authors . . . the exclusive Right to . . . their . . . Writings." U.S. Const. art. I, § 8, cl. 8. The basic purpose of copyright—to provide a limited monopoly for authors primarily to encourage creativity—further suggests that Congress did not intend for third-party enforcement of those rights. *See Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) ("The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors."); *see also Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) ("When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose."). Regardless of whether associational standing is constitutional, I am convinced that Congress did not intend for associations to enforce the rights of their members, and so the U.S. Associational Plaintiffs lack standing under the Copyright Act.[12]

### 2. Statutory Standing Under Foreign Law

Under the "national treatment" principle of the Berne Convention, Berne Convention art. 5(1), and the Universal Copyright Convention ("UCC"), "an author who is a national of one of the member states of either Berne or the UCC, or one who first publishes his work in any such member state, is entitled to the same copyright protection in each other member state as such other state accords to its own nationals." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 89 (2d Cir. 1998) (quoting NIMMER ON COPYRIGHT § 1.05 (1998)). The Second Circuit in *Itar-Tass* affirmed the district court's holding that a reporters' organization had standing to assert claims on behalf of its members after noting that Russian copyright law "authorizes the creation of organizations 'for the collective administration of the economic rights of authors . . . in cases where the individual exercise thereof is hampered by difficulties of a practical nature.' " *Id.* at 90–94 (quoting Russian Copyright Law, art. 44(1)). The Second Circuit wrote, "UJR, the reporters' organization, may well be able in this litigation to protect the rights of the reporters whose articles

---

[12] My conclusion that the Copyright Act precludes associational standing in no way curtails the right of associations who own their own copyrights from asserting infringement claims as to those copyrights. Four of the Associational Plaintiffs, the Authors Guild, ALF, TWUC and ASA, assert a right to sue because they own and control copyrights that were digitized by Defendants.

were copied." *Id.* Although not explicit, the Second Circuit's decision in *Itar-Tass* supports the view that whether a foreign association has satisfied the statutory standing requirements necessary to assert a claim is determined by foreign law.

Four of the Associational Plaintiffs, ALCS, UNEQ, NFF and SFF, assert that they have standing to sue on behalf of their members under foreign law.[13] In total, the parties provide about three paragraphs of analysis on this issue. Defendants object that UNEQ, NFF and SFF lack standing because they have submitted interrogatories that admit that they are not the legal or beneficial owner of any works alleged to have been infringed by Defendants. Defs.' Reply to Defs.' J. Pleadings 4 n.4 (citing *Itar-Tass*, 153 F.3d at 91; Petersen Decl. ¶¶ 4–6; Petersen Decl. Ex. C UNEQ: Canada, at 5–6; Petersen Decl. Ex. D SFF: Sweden, at 5–6; Petersen Decl. Ex. E NFF: Norway, at 5–6). However, Defendants do not challenge the actual foreign law basis for the assertion of statutory standing by these three associations, *see Itar-Tass*, 153 F.3d at 93, nor do they offer any other argument as to why ALCS does not have statutory standing. As I explained earlier, Article III is satisfied as to the Associational Plaintiffs and the statutory standing requirements are "closely related to the merits inquiry . . . and analytically distinct from the question whether a federal court has subject-matter jurisdiction." *Roberts*, 655 F.3d at 580. I decline to raise any other objections to the statutory standing of UNEQ, NFF, SFF or ALCS *sua sponte*, and Defendants' motion for judgment on the pleadings is denied as to these associations. *Cf. 181 East 73rd Street Co. v. 181 East 73rd Tenants Corp.*, 954 F.2d 45, 49 n.9 (2d Cir. 1992) ("This argument was not made by the parties and we decline to raise it *sua sponte*.").

---

[13] *See* Petersen Decl. Ex. F ALCS: UK at 5 ("Plaintiff has the right, by virtue of a mandate executed by certain of its members, including members whose works were digitized and reproduced by Defendants without authorization, to bring an action on behalf of such members against Defendants for infringing such members' copyrights."); Rosenthal Decl. Ex. C ALCS: U.K., Copyright, Designs and Patents Act (1988) § 101A (permitting a non-exclusive licensee to bring an action for copyright infringement if the "infringing act was directly connected to a prior licensed act of the licensee" and the license is in writing and "expressly grants the non-exclusive licensee a right of action under this section"); Rosenthal Decl. Ex. D UNEQ: Québec, Professional Syndicates Act, R.S.Q., ch. S-40, § 9(11) ("Professional syndicates may appear before the courts and acquire, by gratuitous or onerous title, any property suited to their particular objects . . . and in particular . . . (11) exercise before any court of law, all the rights of their members with respect to acts directly or indirectly prejudicial to the collective interest of the profession which they represent."); Rosenthal Decl. Ex. E NFF: Norwegian Copyright Act §§ 38a, 38b (permitting an organization, "in the absence of any objection from the rightholder, [to] demand that a user who has not entered into [] an agreement . . . be prohibited by a court judgment from unlawfully exploiting a work"); Rosenthal Decl. Ex. F SFF: Sweden Member Agreement §§ 1, 2, 5 ("[T]he Author assigns the Organization, or the one the Organization puts in its stead, the right to independently manage the copyright of the Author's published works.").

**D. Ripeness of the Orphan Works Project**

The Complaint requests a declaration that the "distribution and display of copyrighted works through the HathiTrust Orphan Works Project will infringe the copyrights of Plaintiffs and others likely to be affected" and an injunction that prohibits the OWP. Compl. Demand for Relief (a)(ii), (b)(iii). Plaintiffs seek a ruling on the OWP as it *will* exist, and not specifically as it existed at the moment that the initial complaint was filed. *See also* Pls.' Mem. J. Pleadings 24–25 ("Absent an injunction, Defendants will proceed with the OWP and infringe the copyrights of Plaintiffs, the Associational Plaintiffs' members and other unsuspecting authors and rights holders."). Adjudication as to the OWP is not ripe for judicial review.[14]

"Article III of the Constitution limits the jurisdiction of the federal courts to cases or controversies 'of sufficient immediacy and reality' and not 'hypothetical or abstract dispute[s].' " *See, e.g.*, *Hayes v. Carlin Am., Inc.*, 168 F. Supp. 2d 154, 159 (S.D.N.Y. 2001) (internal citations omitted). "Ripeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005). The determination of whether a claim is ripe is a two-prong inquiry that requires courts to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

The claims here are not fit for adjudication. Were I to enjoin the OWP, I would do so in the absence of crucial information about what that program will look like should it come to pass and whom it will impact. *Hayes*, 168 F. Supp. 2d at 160 (concluding that a claim seeking declaratory judgment that plaintiff was the holder of the right to collect royalties during the copyright renewal term for works in their original term was not ripe because the court did not know whether a dispute would remain, whether it would involve the same parties, or what the relevant facts would be once the renewal term was reached). In addition, Plaintiffs suffer no hardship from litigation of this claim after Defendants release the details of their new OWP and a revised list of Orphan Work Candidates. If and when that time comes, they can request relief. "In assessing the possible hardship to the parties resulting from withholding judicial resolution, we ask whether the challenged action

---

[14] Because I conclude that my review of the OWP is precluded on ripeness grounds, I need not address Defendants other arguments in opposition to my review of the OWP. Defendants argue that all of the Plaintiffs lack standing as to the OWP because the program was discontinued before any works became available and at the time that Plaintiffs filed the initial complaint, they failed to identify any of their works that were included in the program. Finally, Defendants argue that the OWP claims are moot.

creates a direct and immediate dilemma for the parties. The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." *Connecticut v. Duncan*, 612 F.3d 107, 115 (2d Cir. 2010) (quoting *Simmonds v. INS*, 326 F.3d 351, 360 (2d Cir. 2003)). The "mere possibility" that one of Plaintiffs' works might be included on a future list of orphan works or made available is not enough. Defendants' motion for judgment on the pleadings as to the OWP is granted.

## II. PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiffs' motion for partial judgment on the pleadings seeks a ruling that "Defendants' admitted systematic reproduction, distribution, and use of millions of copyright-protected books are not shielded by the First Amendment, the fair-use defense, or any other provision of the Copyright Act." Pls.' Mem. J. Pleadings 1.

### A. Legal Standard

A motion for judgment on the pleadings enables the moving party to have the court rule preferably in its favor based on the merits of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). The court applies the same standard in a Rule 12(c) motion as it does in a Rule 12(b)(6) motion, and the court must accept as true the allegations contained in the pleading and draw all reasonable inferences in favor of the non-moving party. *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011). "A party is entitled to judgment on the pleadings only if it is clear that no material issues of fact remain to be resolved and that it is entitled to judgment as a matter of law." *Citibank, N .A. v. Morgan Stanley & Co. Int'l, PLC*, 724 F. Supp. 2d 407, 414 (S.D.N.Y. 2010).

### B. Availability of Fair-Use Defense

Section 107 provides a defense to a claim of copyright infringement on the grounds of fair use. Section 108 of the Copyright Act accords libraries the right to make a limited number of copies of certain works for specified purposes, and it explicitly states that "[n]othing in this section . . . in any way affects the right of fair use as provided by section 107." 17 U.S.C. § 108(f)(4). In spite of the clear language that Section 108 provides rights to libraries *in addition* to fair-use rights that might be available, Plaintiffs argue that I should find that the Section 107 fair-use defense is precluded by Section 108 in this case.[15]

---

[15] Plaintiffs also argue that this program is "systematic" in violation of Section 108(g). Pls.' Reply to Pls.' J. Pleadings 11. Defendants respond that "systematic" means reproducing a single work repeatedly, rather than reproducing all the works in their libraries. Defs.' Opp'n to Pls.' J. Pleadings (citing 17 U.S.C. § 108(g) (prohibiting systematic reproduction of "the same material")). I agree.

SPA-13

In support of their argument, Plaintiffs first argue that "the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 344 (1992). Because Section 108 provides "highly-specific rules governing the extent to which libraries are permitted to make digital copies of works in their collection," Plaintiffs argue that Section 107 is unavailable as a defense. Pls.' Mem. J. Pleadings 21. However, the doctrine that the specific governs the general applies when "applying a general provision . . . would undermine *limitations* created by a more specific provision." *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996) (emphasis added); *see also Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1521 (9th Cir. 1993) (rejecting argument that Section 117, which permits the owner of a computer program to make certain copies, preempts the fair-use defense under Section 107). Here, fair use does not undermine Section 108, but rather supplements it.

Plaintiffs also argue that the legislative history suggests that fair use is not available as a defense for Defendants. They cite a 1983 Report on Section 108, in which the Copyright Office stated: "[M]uch of '108' photocopying would be infringing but for the existence of that section, thus leaving section 107 often clearly unavailable as a basis for photocopying not authorized by section 108." Pls.' Mem. J. Pleadings 22–23 (quoting REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS, LIBRARY REPRODUCTION OF COPYRIGHTED WORKS (17 U.S.C. 108), at 96 (1983)).[16] Defendants respond that the Report merely concludes that courts should take "into account the '108' copying that has already occurred" when they evaluate the assertion of fair use for library photocopying. LIBRARY REPRODUCTION OF COPYRIGHTED WORKS 98.[17]

The briefs submitted by Defendant Intervenors and the Library Amici, to whom I granted leave to file a memorandum as amici curiae, further convince me that fair use is available as a defense for the Defendants, and nothing Plaintiffs submitted convinces me that fair use is unavailable as a defense, or that the manner of reproduction is prohibited simply because it does not fall within Section 108.

---

[16] Plaintiffs also cite the Second Circuit's decision in *Universal City Studios, Inc. v. Colrey*, 273 F.3d 429 (2d Cir. 2001), in support of this reading of the Copyright Act. In that case, the Second Circuit analyzed a fair-use savings clause contained in the Digital Millennium Copyright Act ("DMCA") in evaluating a claim under Section 1201 for circumventing technical measures that control access to a copyrighted work. The savings clause there indicated that "[n]othing in this section shall affect rights, remedies, limitations or defenses to copyright infringement, including fair use, under this title." 17 U.S.C. § 1201(c). The Second Circuit interpreted the clause as meaning that fair use was available as a defense to a claim of copyright infringement for material obtained by the circumvention, but not to the unlawful circumvention itself. *Corley*, 273 F.3d at 443.

[17] This does not suggest that Congress intended to preclude the fair-use defense where a library's actions fall outside of Section 108. *See* H.R. Rep. No. 94-1476, at 78–79 (1976) ("Nothing in section 108 impairs the applicability of the fair-use doctrine to a wide variety of situations involving photocopying or other reproduction by a library of copyrighted material in its collections, where the user requests the reproduction for legitimate scholarly or research purposes.").

**C. Availability of Other Defenses**

Plaintiffs barely address the other proposed defenses asserted by Defendants to protect the MDP and OWP. In one paragraph, Plaintiffs argue that Section 108 prevents libraries from asserting other potential rights and defenses besides fair use, including Sections 109 (first sale), 110 (exemptions of certain performances and displays), and 121 (reproductions for the blind) and the First Amendment. Pls.' Mem. J. Pleadings 23. No case law is cited. Plaintiffs' motion for judgment on the pleadings that Defendants have no defenses available to them as a matter of law is denied.

## MOTIONS FOR SUMMARY JUDGMENT

### I. LEGAL STANDARD

A district court may not grant summary judgment if there exists a genuine issue of material fact. *See Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "For summary judgment purposes, a 'genuine issue' exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor." *Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co.*, 421 F. Appx. 52, 53 (2d Cir. 2011) (internal citations omitted). "Fair use is a mixed question of law and fact." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985). Courts resolve fair use at the summary judgment stage where there are no genuine issues of material fact. *See Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998); *see also Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 117 (2d Cir. 1998) (affirming district court's grant of summary judgment where defendant asserted fair-use defense).

### II. FAIR USE

To establish a *prima facie* case of copyright infringement, a plaintiff must demonstrate "ownership of a valid copyright" and "copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Plaintiffs identify 116 works (the "Identified Works") as to which they assert direct ownership of the copyrights and allege that Defendants copied the works. Defendants concede that Plaintiffs have established a *prima facie* case of infringement as to some of these works.[18] Fair use is one defense to the establishment of a *prima facie* case of copyright infringement; it permits copies made for purposes

---

[18] Defendants challenge Plaintiffs' allegation that they have established a *prima facie* case of infringement as to several of the foreign works because Plaintiffs fail to provide proof of ownership under foreign law or proof that the works do not qualify as United States works. *See, e.g.*, Defs.' Opp'n to Pls.' 56.1 ¶¶ 138, 140, 143. Defendants also challenge several of the other claims of copyright ownership. *See, e.g., id.* ¶ 142 (challenging ownership by Robinson because the copyright registrations "were not obtained within five years after the first publication of the work").

of scholarship, teaching, and research. 17 U.S.C. § 107. It is Defendants' burden to establish this affirmative defense to Plaintiffs' claims of copyright infringement. *See Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 918 (2d Cir. 1994). A defendant need not prevail with respect to each of the four enumerated fair-use factors to succeed on a fair-use defense. *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004). Rather, the factors are "explored and weighed together, in light of copyright's purpose." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 569 (1994). "The ultimate focus is the goal of copyright itself, whether 'promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it.' " *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, No. 11 Civ. 1006, 2012 WL 1759944, at *3 (S.D.N.Y. May 17, 2012) (quoting *Castle Rock Entm't*, 150 F.3d at 141; U.S. Const. art, 1, § 8, cl. 8). Plaintiffs, Defendants, and Defendant Intervenors have each filed motions for summary judgment that argue that there is no genuine issue of material fact as to the fair-use factors.

**A. Purpose and Character of the Use**

The first fair-use factor considers the "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The MDP was undertaken with several goals in mind. The MDP allows scholars to identify relevant works far more efficiently. Defs.' 56.1 ¶¶ 18–23. In addition, the program helps Defendants preserve their collections in the face of normal deterioration during circulation, natural disasters, or other catastrophes that decimate library collections, as well as loss due to theft or misplacement. *Id.* ¶¶ 2, 11–13, 15.[19] The program provides print-disabled individuals with "access to the wealth of information within library collections." *Id.* ¶¶ 61–66; *see also* Defendant Intervenors 56.1 ¶ 1. Where the purpose of the use is for scholarship and research—uses explicitly mentioned in the preamble to Section 107—the Second Circuit has concluded that the first factor "tilt[s] in the defendants' favor." *NXIVM Corp.*, 364 F.3d at 477.[20]

---

[19] The argument that preservation on its own is a transformative use is not strong. *See Texaco*, 60 F.3d at 924 ("[T]he predominant archival purpose of the copying tips the first factor against the copier."). However, the Supreme Court's decision in *Sony Corp. of America v. Universal City Studios, Inc.*, a case in which the Court held that private copying of television broadcasts for later viewing was a protected fair use, focused on the noncommercial nature of the use. 464 U.S. 417, 449, 454 (1984). Likewise, the preservation purposes of the Defendants are noncommercial in nature. *See* H.R. Rep. No. 94-1476, at 73 (1976) ("The efforts of the Library of Congress, the American Film Institute, and other organizations to rescue and preserve this irreplaceable contribution to our cultural life are to be applauded, and the making of duplicate copies for purposes of archival preservation certainly falls within the scope of 'fair use.' ").

[20] As explained in Motions for Summary Judgment Section III, *infra*, to the extent that the copying allows print-disabled individuals access to "previously published, non-dramatic literary work[s]" on an equal footing with sighted individuals, it is also potentially permitted under the Chafee Amendment. *See* 17 U.S.C. § 121. The ADA also provides strong support for the conclusion that the provision of access to print-disabled persons is a protected fair use.

The character of the use also suggests that the first prong is satisfied. Several university libraries have entered into agreements with Google whereby Google converts the hard-copy works in their libraries into digital format. Defs.' 56.1 ¶ 30. For works that are not in the public domain or for which an author has not "expressly authorized use," a search for a particular term reveals the pages on which the term is found and the number of times the term is found on each page. *Id.* ¶ 50. No actual text from the book is revealed, *id.* ¶ 52, except to print-disabled library patrons at UM.[21]

Transformative uses are likely to satisfy the first factor. *Campbell*, 510 U.S. at 575 ("The central purpose of this investigation is to see . . . whether the new work merely supersede[s] the objects of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.' ") (internal citations and quotation marks omitted). A transformative use may be one that actually changes the original work. However, a transformative use can also be one that serves an entirely different purpose. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) (affirming district court's conclusion that the use of entire copyrighted concert posters in a book "to document and represent the actual occurrence" of the concerts was different from the "dual purposes of artistic expression and promotion of the original use"). The use to which the works in the HDL are put is transformative because the copies serve an entirely different purpose than the original works: the purpose is superior search capabilities rather than actual access to copyrighted material. The search capabilities of the HDL have already given rise to new methods of academic inquiry such as text mining.[22]

Several courts have upheld wholesale copying of works where the use and purpose for the copies was clearly distinguishable from those of the original. *See A.V. v. iParadigms, LLC*, 562 F.3d 630, 640 (4th Cir. 2009) (concluding that copying and archiving of student papers "was completely unrelated to expressive content and instead aimed at detecting and discouraging plagiarism"); *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (finding that Google's copying

---

[21] Other Defendants in HathiTrust may provide such access in the future. For a description of the way in which UM's provision of access to print-disabled individuals has already revolutionized access for its users, see *supra* Background and see *infra* Motions for Summary Judgment Section III.

[22] Mass digitization allows new areas of non-expressive computational and statistical research, often called "text mining." One example of text mining is research that compares the frequency with which authors used "is" to refer to the United States rather than "are" over time. *See* Digital Humanities Amicus Br. 7 ("[I]t was only in the latter half of the Nineteenth Century that the conception of the United States as a single, indivisible entity was reflected in the way a majority of writers referred to the nation.").



of Internet content to make it searchable was transformative because "a search engine transforms the image into a pointer directing a user to a source of information"); *Kelly v. Arriba Soft Corp.*, 336 F. 3d 811, 819 (9th Cir. 2003) (finding that copying to produce exact replicas of artistic works displayed in thumbnail form on the internet to facilitate searches was transformative because it was "unrelated to any aesthetic purpose").[23] Plaintiffs' argument that the use is not transformative merely because defendants have not added anything "new" misses the point. *Perfect 10*, 508 F.3d at 1164 ("[E]ven making an exact copy of a work may be transformative so long as the copy serves a different function than the original work.").[24]

Plaintiffs also argue that Defendants are not shielded from charges of copyright infringement by virtue of their status as educational non-profits. The cases they cite in support of this claim are cases where the use being made by the non-profit was not transformative, as it is here. *See, e.g.*, *Encyclopedia Britannica Educ. Corp. v. Crooks*, 542 F. Supp. 1156, 1179 (W.D.N.Y. 1982) (concluding that fair use did not protect the actions of defendants, a non-profit educational organization, who videotaped plaintiff's television programs, copied them, and distributed them to be shown in schools). Likewise, Plaintiffs' argument that Defendants had a primarily "commercial" purpose when they allowed Google to digitize their libraries is without merit. Although Plaintiffs quote *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001), for the point that Defendants cannot make "unauthorized copies of copyrighted works . . . to save the expense of purchasing authorized copies," this argument too is off the mark as to what Defendants use the copies for. While additional copies might have sufficed were Defendants' goal solely preservation, the purchase of additional paper copies, or even electronic copies, would not have allowed Defendants to create a searchable inventory of their works or provide access to print-disabled individuals on an equal footing with sighted individuals.  Defendants satisfy the first factor not

---

[23] Although Plaintiffs assert that the decisions in *Perfect 10* and *Arriba Soft* are distinguishable because in those cases the works were already available on the internet, Aug. 6, 2012 Tr. 19:2–4, I fail to see why that is a difference that makes a difference. As with Plaintiffs' attempt to bar the availability of fair use as a defense at all, this argument relies heavily on the incorrect assumption that the scale of Defendants' copying automatically renders it unlawful. Further, the student papers uploaded to a website to check for plagiarism in the *iParadigms* case were not available on the internet prior to the copying. 562 F.3d at 634.

[24] The cases Plaintiffs cite are easily distinguishable. For example, in *Texaco*, 60 F.3d at 913, a corporation made photocopies of copyrighted articles for use by its researchers. The court concluded that the majority of the copies served "the same basic purpose that one would normally seek to obtain the original—to have it available on his shelf for ready reference." *Id.* at 919. Likewise, in *UMG Recordings, Inc. v MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000), the court found that conversion of CDs into computer files for use by users over the internet was not transformative because the use to which the copies were put was not different than the use for the originals.

merely because they are non-profit institutions, but because the use to which the copies have been put is transformative.

     The use of digital copies to facilitate access for print-disabled persons is also transformative.[25] Print-disabled individuals are not considered to be a significant market or potential market to publishers and authors. Def. Intervenors' MSJ 6 (citing Kerscher Decl. ¶ 17, 34). As a result, the provision of access for them was not the intended use of the original work (enjoyment and use by sighted persons) and this use is transformative. *See, e.g., Perfect 10*, 508 F.3d at 1165. Even if it were not, "[m]aking a copy of a copyrighted work for the convenience of a blind person is expressly identified by the House Committee Report as an example of a fair use, with no suggestion that anything more than a purpose to entertain or to inform need motivate the copying." *Sony Corp. of Am. v. Universal City Studios, Inc*, 464 U.S. 417, 455 n.40 (1984).

**B. Nature of the Copyrighted Works**

     "[S]ome works are closer to the core of intended copyright protection than others." *Campbell*, 510 U.S. at 586. Copying factual works is more likely fair use than copying creative works. *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006). However, where a use is transformative, the nature of the copyrighted works is not likely to "separate the fair use sheep from the infringing goats." *Campbell*, 510 U.S. at 586; *see also Harper & Row*, 471 U.S. at 546. Here, Plaintiffs identify 116 works that they allege were unlawfully digitized by Defendants as part of the MDP. Pls.' 56.1 ¶¶ 138–53. Approximately 76 percent of the identified works are fiction. Goldman Decl. ¶ 6. In the HDL as a whole, approximately 9 percent consists of prose fiction, poetry, and drama. Wilkin Decl. ¶ 67. Because the use is transformative, intended to facilitate key-word searches or access for print-disabled individuals, the second factor is not dispositive. *Bill Graham*, 448 F.3d at 612 ("[T]he second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose.").

**C. Amount of the Work Copied**

     The third fair-use factor considers whether the amount of copying was reasonable in relation to the purpose. *Sony*, 464 U.S. at 449–50. "[T]he extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586–87. The question is whether "no more was taken than necessary." *Id.* at 587. Sometimes it is necessary to copy entire works. *Bill Graham*, 448 F.3d at 613; *Arriba Soft*, 336 F.3d at 821. "Intermediate" copies may not be infringing when

---

[25] Plaintiffs suggestion at oral argument that print-disabled individuals could have "asked permission" of all the rights holders whose works comprise the HDL borders on ridiculous. Aug. 6, 2012 Tr. 11:13–12:8.

that copying is necessary for fair use. *See Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 206 (4th Cir. 1998) (finding that it was fair use to copy fragile manuscript so that the author of a critical review could study it without inflicting damage). Here, entire copies were necessary to fulfill Defendants' purposes of facilitation of searches and access for print-disabled individuals. *See Arriba Soft*, 336 F.3d at 821 ("If Arriba only copied part of the image, it would be difficult to identify it, thereby reducing the usefulness of the visual search engine."). Plaintiffs argue that Defendants did not need to retain copies to facilitate searches; however, the maintenance of an electronic copy was necessary to provide access for print-disabled individuals.[26]

**D. Impact on the Market for or Value of the Works**

The fourth factor examines "whether the secondary use usurps the market of the original work." *NXCIM Corp.*, 364 F.3d at 482. Courts consider "only those [markets] that the creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 591, 592 ("[W]hen . . . the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred."). Where a use is noncommercial, as it is here, the plaintiff must show "by a preponderance of the evidence that some meaningful likelihood of future harm exists", *Sony*, 464 U.S. at 451, a test Plaintiffs fail at least on this fact pattern.[27]

Plaintiffs allege market harm on several distinct bases. First, they argue that "[e]ach digital copy of a book that Defendants created . . . rather than [purchased] through lawful channels, represents a lost sale." Pls.' MSJ 22. This argument ignores the fact that purchase of an additional copy would not have allowed either full-text searches or access for the print-disabled individuals, two transformative uses that are central to the MDP.

Plaintiffs' second argument is that Defendants have "expose[d] Plaintiffs' property to immense security risks that have the potential to cannibalize the book market through . . . widespread internet piracy." *Id.* at 23. However, the expert economist that Plaintiffs rely on in support of this argument admitted that he was unfamiliar with the security procedures in place at the Universities. Edelman Dep. at 248:11–12 ("I don't know about all of the security systems that [the

---

[26] Not to mention that it would be a tremendous waste of resources to destroy the electronic copies once they had been made for search purposes, both from the perspective of the provision of access for print-disabled individuals and from the perspective of protecting fragile paper works from future deterioration.

[27] Plaintiffs argue that Defendants uses cannot be considered noncommercial because of their relationship with Google. Pls.' Opp'n to Defs.' MSJ 12. Although the relationship between Google and Defendants is potentially relevant to the uses of the works made by Google, that issue is not before this Court. My determination that the Defendants' uses are noncommercial relies on the uses actually made by Defendants in this case, that is, text searches, access for print-disabled persons, and preservation.

Libraries] have."). Defendants respond with a declaration from the individual in charge of security for the works in the HDL, who describes the security measures in place, Snavely Decl. ¶¶ 6–27, and notes that the Libraries have been certified as a trustworthy depository by the Center for Research Libraries. *Id.* ¶ 7; Wilkin Decl. ¶¶ 91–99. Plaintiffs' unsupported argument fails to demonstrate a meaningful likelihood of future harm.

Finally, Plaintiffs argue that "Defendants activities will harm Plaintiffs by undermining existing and emerging licensing opportunities" such as a "collective management system [which would] permit certain of the activities of the Defendants in this case while providing compensation to copyright owners." Pls.' MSJ 25–27. Plaintiffs admit that they cannot identify "any specific, quantifiable past harm, or any documents relating to such past harm." Petersen Decl. ¶¶ 2–21.[28] Plaintiffs' argument about a potential market is conjecture. *Perfect 10*, 508 F.3d at 1168 (rejecting argument that there was hypothetical harm to the market for thumbnail images on mobile phones). "Were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth factor would *always* favor the copyright owner." *Bill Graham*, 448 F.3d at 614 (citation omitted). A copyright holder cannot preempt a transformative market. *Id.* Although Plaintiffs cite the Second Circuit's decision in *Texaco*, 60 F.3d at 930, for the proposition that this Court ought to consider the "impact on potential licensing opportunities," they omit the remainder of the quote, which concludes that courts should consider "only traditional, reasonable or likely to be developed markets."[29] Because I conclude that at least two of the uses are transformative—that is, the provision of search capabilities and access for print-disabled individuals—any harm arises, if at all, to a "transformative market." *Bill Graham*, 448 F.3d at 614 ("Appellant asserts that it established a market for licensing its images, and in this case expressed a willingness to license images. . . . Neither of these arguments shows impairment to a traditional, as opposed to a transformative market."). A use that "falls within a transformative market" does not cause the copyright holder to "suffer market harm due to the loss of license fees."*Id.* at 615.

Defendants offer substantial evidence that it would be prohibitively expensive to develop a market to license the use of works for search purposes, access for print-disabled individuals, or preservation purposes. Waldfogel Decl. ¶¶ 7, 22–24 (estimating that the costs of such a license as to

---

[28] The deposition of one of the Plaintiffs, in which he states that "colloquially, one copy of my book has been stolen," May 31, 2012 Stiles Dep. Tr. 163:10, is unpersuasive because, as noted, the purchase of an additional copy would not have allowed Defendants to make the transformative uses of the works that they sought.

[29] The use in *Texaco* was also a commercial, non-transformative use by a for-profit entity. 60 F.3d at 931.

the works in the HDL would be in the neighborhood of $569 million and that the potential revenue generated would not cover these costs so it was not a "commercially viable endeavor"). This also assumes that the holder of each copyright could be identified, *id.* ¶ 24, a tenuous assumption to say the least. Plaintiffs characterize this as an argument that "it is permissible to steal the goods if it is too expensive to buy them." Pls.' MSJ 15. However, Defendants argue that the high costs will prohibit the formation of a viable market *in the first place*, and as a consequence there will be no one to buy the goods from. Although Plaintiffs assert that the Copyright Clearance Center ("CCC") could eventually develop a license for the uses to which Defendants put the works, *see* Gervais Decl., the CCC has no plans to provide for or develop such a license. Petersen Opp'n Decl. ¶ 9. Even if Congress will eventually find a way to regulate this area of the law, "it is not the [court's] job to apply laws that have not yet been written." *Sony*, 464 U.S. at 456.

The provision of access for print-disabled individuals likewise does not significantly impact a market. Kerscher Decl. ¶ 34. At oral argument, Plaintiffs repeatedly emphasized that "only 32" print-disabled students had signed up to participate in the program at the UM. *See, e.g.*, Aug. 6, 2012 Tr. 15:6–7. This argument only emphasizes that print-disabled individuals are a tiny minority, and the development of a market to provide them with access on the scale of the MDP is consequently almost impossible to fathom.[30] This argument overlooks the fact that it is minorities such as this that Congress sought to protect through enactments like the ADA.

**E. Balancing the Fair-Use Factors**

The totality of the fair-use factors suggest that copyright law's "goal of promoting the Progress of Science . . . would be better served by allowing the use than by preventing it." *Bill Graham*, 448 F.3d at 608 (quotation marks omitted). The enhanced search capabilities that reveal no in-copyright material, the protection of Defendants' fragile books, and, perhaps most importantly, the unprecedented ability of print-disabled individuals to have an equal opportunity to compete with their sighted peers in the ways imagined by the ADA protect the copies made by Defendants as fair use to the extent that Plaintiffs have established a *prima facie* case of infringement.[31] In addition to the briefs submitted by the parties, the two memoranda filed by amici further confirm that the underlying rationale of copyright law is enhanced by the HDL. *See* Library Amici Br. ("The public derives tremendous benefit from HDL, and authors stand to gain very little if the public is deprived

---

[30] Plaintiffs also argue that nonconsumptive research such as text mining, *see supra* note 22 and accompanying text, causes harm because authors might one day pay for licenses to use works in this manner. Again, the harm identified here is "speculative, and, at best, minimal." *Sony*, 464 U.S. at 454 (citation omitted).

[31] *See supra* note 18 and accompanying text.

of this resource."); Digital Humanities Amicus Br. (describing the use of metadata and text mining, which "could actually enhance the market for the underlying work, by causing researchers to revisit the original work and reexamine it in more detail"). Although I recognize that the facts here may on some levels be without precedent, I am convinced that they fall safely within the protection of fair use such that there is no genuine issue of material fact. I cannot imagine a definition of fair use that would not encompass the transformative uses made by Defendants' MDP and would require that I terminate this invaluable contribution to the progress of science and cultivation of the arts that at the same time effectuates the ideals espoused by the ADA.[32]

## III. ACCESS FOR PRINT-DISABLED INDIVIDUALS: THE ADA & COPYRIGHT LAW

The provision of equal access to copyrighted information for print-disabled individuals is mandated by the ADA and the Rehabilitation Act of 1976. The impetus for the ADA was Congress' explicit conclusion that people with disabilities historically had been denied "the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. § 12101(a)(8); Maurer Decl. ¶ 7 ("[Blind students] compete under a severe handicap. That handicap is not lack of sight, but a lack of access to information in a world in which information is the key to success."). To begin to remedy this injustice, the ADA "provide[s] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Id.* § 12101(b)(1). Congress imposed on institutions an obligation to provide equal access and recognized that "technological advances . . . may require public accommodations to provide auxiliary aids and services in the future which today they would not be required because they would be held to impose undue burdens on such entities." H.R. Rep. 101-485(II), at 108 (1990).

Under the Chafee Amendment to the Copyright Act, "authorized entit(ies)" are permitted "to reproduce or distribute copies . . . of a previously published, non-dramatic literary work . . . in specialized formats exclusively for use by the blind or other persons with disabilities." 17 U.S.C. § 121. An "authorized entity" is a nonprofit organization or governmental agency "that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities." *Id.* at § 121(d)(1). The ADA requires that libraries of educational institutions have a primary mission to reproduce and distribute

---

[32] As noted *supra* Motions for Judgment on the Pleadings Section II.B, Congress expanded the copying permitted to libraries with the enactment of Section 108. I need not decide if the MDP fits within the parameters of 17 U.S.C. § 108 because it unquestionably fits within the definition of fair use. *See* 17 U.S.C. § 108(f)(4) (stating that this section "in [no] way affects the right of fair use as provided by section 107").

their collections to print-disabled individuals, making each library a potential "authorized entity" under the Chafee Amendment. So far, only UM has made its works available to print-disabled individuals, and its Declarations make it clear that it had a primary goal to improve access for print-disabled individuals. Kerscher Decl. ¶ 30. I conclude that UM has "a primary mission" to provide access for print-disabled individuals, and it is consequently an authorized entity. The provision of access to previously published non-dramatic literary works within the HDL fits squarely within the Chafee Amendment, although Defendants may certainly rely on fair use, as explained above, to justify copies made outside of these categories or in the event that they are not authorized entities.[33]

## CONCLUSION

I have considered the parties' remaining arguments and find them to be without merit. For the foregoing reasons, Plaintiffs' motions are DENIED. Defendants' motion for judgment on the pleadings is GRANTED in part and DENIED in part: the Associational Plaintiffs have Article III standing; the U.S. Associational Plaintiffs lack statutory standing; and Plaintiffs' OWP claims are not ripe. Defendants' and Defendant Intervenors' motions for summary judgment are GRANTED: their participation in the MDP and the present application of the HDL are protected under fair use. The two unopposed motions for leave to file briefs as amici are GRANTED. The Clerk of the Court is instructed to close the seven open motions, close the case, and remove it from my docket.

**SO ORDERED.**

Date: 10/10/12
New York, New York

HAROLD BAER, JR.
**United States District Judge**

---

[33] Plaintiffs' suggestion at oral argument that the Chafee Amendment defines the outer bounds of protected copying on behalf of print-disabled individuals, Aug. 6, 2012 Tr. 21:3–4, is without merit. Nothing in the Chafee Amendment indicates an intent to preclude a fair-use defense as to copies made to facilitate access for the blind that do not fall within its ambit.

**SPA-24**

```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #:                          │
│ DATE FILED:    10/12/12         │
└─────────────────────────────────┘
```

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
THE AUTHORS GUILD, INC., et al.,

                                    Plaintiffs,                 11 **CIVIL** 6351 (HB)

                -against-                                      **JUDGMENT**

HATHITRUST, et al.,

                                    Defendants.
-----------------------------------------------------------X


    Whereas before the Court are two motions for judgment on the pleadings and three motions

for summary judgment; also before the Court are two unopposed motions for leave to file briefs as

amici, and the matter having come before the Honorable Harold Baer, Jr., United States District

Judge, and the Court, on October 10, 2012, having rendered its Opinion and Order denying

Plaintiffs' motions, granting in part and denying in part Defendants' motion for judgment on the

pleadings:  the Associational Plaintiffs have Article III standing; the U.S. Associational Plaintiffs

lack statutory standing; and Plaintiffs' OWP claims are not ripe, granting Defendants' and

Defendant Intervenors' motions for summary judgment: their participation in the MDP and the

present application of the HDL are protected under fair use, and granting the two unopposed motions

for leave to file briefs as amici, it is,

        **ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated in the

Court's Opinion and Order dated October 10, 2012, Plaintiffs' motions are denied; Defendants'

motion for judgment on the pleadings is granted in part and denied in part: the Associational

Plaintiffs have Article III standing; the U.S. Associational Plaintiffs lack statutory standing; and

Plaintiffs' OWP claims are not ripe; Defendants' and Defendant Intervenors' motions for summary

judgment are granted: their participation in the MDP and the present application of the HDL are

SPA-25

protected under fair use; and the two unopposed motions for leave to file briefs as amici are granted;

accordingly, the case is closed.

**Dated:** New York, New York
October 12, 2012

**RUBY J. KRAJICK**

_____
**Clerk of Court**

BY:    _____
**Deputy Clerk**

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____