# 12-4547-cv

## United States Court of Appeals

*for the*

## Second Circuit

AUTHORS GUILD, INC., AUSTRALIAN SOCIETY OF AUTHORS
LIMITED, UNION DES ECRIVAINES ET DES ECRIVAINS QUEBECOIS,
ANGELO LOUKAKIS, ROXANA ROBINSON, ANDRE ROY, JAMES
SHAPIRO, DANIELE SIMPSON, T.J. STILES, FAY WELDON,
AUTHORS LEAGUE FUND, INC., AUTHORS' LICENSING AND
COLLECTING SOCIETY, SVERIGES FORFATTARFORBUND, NORSK
FAGLITTERAER FORFATTERO OG OVERSETTERFORENING,
WRITERS' UNION OF CANADA, PAT CUMMINGS, ERIK GRUNDSTROM,
HELGE RONNING, JACK R. SALAMANCA,

*Plaintiffs-Appellants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REDACTED FINAL FORM REPLY BRIEF
## FOR PLAINTIFFS-APPELLANTS

EDWARD H. ROSENTHAL
JEREMY S. GOLDMAN
ANNA KADYSHEVICH
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

*Attorneys for Plaintiffs-Appellants*

v.

HATHITRUST, CORNELL UNIVERSITY, MARY SUE COLEMAN, President,
University of Michigan, MARK G. YUDOF, President, University of California,
KEVIN REILLY, President, University of Wisconsin System,
MICHAEL MCROBBIE, President, Indiana University,

*Defendants-Appellees,*

NATIONAL FEDERATION OF THE BLIND, GEORGINA KLEEGE,
BLAIR SEIDLITZ, COURTNEY WHEELER,

*Intervenor Defendants-Appellees.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................1

I.   THE LIBRARIES IGNORE THE DEVASTATING IMPACT THAT WOULD RESULT FROM A DATA BREACH ...........................................4

    A.   The Risks of a Data Breach Are Real ...........................................4

    B.   A Data Breach Would Devastate the Literary Market........................5

    C.   The Issues Raised by Mass Digitization Should Be Left to Congress ..................................................................................6

II.   THE AUTHORS' CLAIM WITH RESPECT TO THE ORPHAN WORKS PROJECT IS JUSTICIABLE ...........................................8

    A.   The OWP is Fit for Review...............................................10

    B.   "Delayed" Review of the OWP Results in No Review at All ............10

    C.   The Authors Have Standing to Bring the OWP Claim ......................11

III.   MASS DIGITIZING AND USING MILLIONS OF BOOKS IS NOT FAIR USE.................................................................12

    A.   The Libraries' Uses are Not Transformative .....................................13

    B.   Analyzing the "Nature of the Work" Does Little to Advance the Inquiry ...............................................................17

    C.   The Libraries Took (and Gave) Far Too Much of the Copyrighted Works ...........................................................18

        1.   Search Does Not Require the Libraries to Retain Multiple Copies of the Image and Text Files ...........................................18

2.    Preservation Does Not Require Every Library Book to Be Digitized and Stored Online .................................................18

3.    Providing Equal Access to the Blind Does Not Mean Remote, Instant Access to Every Book in the Library .............20

D.    The Libraries' Activities Threaten Enormous and Unprecedented Harm to Authors.........................................................22

1.    The Libraries Harmed the Value of the Authors' Copyrights By Violating the Protections Afforded to Authors Under Sections 108 and 121 .......................................23

2.    There is a Ready Market to License the Authors' Books.........24

3.    The Risk of a Data Breach Threatens Appellants' Copyrights .................................................................................26

IV    THE ASSOCIATIONAL PLAINTIFFS HAVE STANDING TO PURSUE COPYRIGHT CLAIMS ON BEHALF OF THEIR MEMBERS .................................................................................26

CONCLUSION ........................................................................................30

CERTIFICATE OF COMPLIANCE........................................................ i

# TABLE OF AUTHORITIES

**Page(s)**

C**ASES**

*A.V. v. iParadigms,*
   LLC, 562 F.3d 630 (4th Cir. 2009) .................................................................. 15

*Abbott Labs v. Gardner*,
   387 U.S. 136 (1967) ......................................................................................... 12

*ABKO Music, Inc. v. Harrisongs Music, Ltd.*,
   944 F.2d 971 (2d Cir. 1991) ............................................................................. 27

*Alliance of America Insurers v. Cuomo*,
   854 F.2d 591 (2d Cir. 1988) ............................................................................. 10

*Am. Geophysical Union v. Texaco, Inc.*,
   60 F.3d 913 (2d Cir. 1994) ............................................................................... 12

*Am. Optometric Soc., Inc. v. Am. Bd. of Optometry, Inc.*,
   No. 10 Civ. 3983, 2012 WL 2135350 (C.D. Cal. June 12, 2012) ..................... 28

*Authors Guild v. Google, Inc.*,
   770 F. Supp. 2d 666 (S.D.N.Y. 2011) .............................................................. 11

*Banff, Ltd. v. Federated Dept. Stores, Inc.*,
   841 F.2d 486 (2d Cir. 1988) ............................................................................. 11

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) ........................................................................ 1, 15, 16, 17

*Capitol Records, L.L.C. v. ReDigi, Inc.*,
   No. 12 Civ. 95, 2013 WL 1286134 (S.D.N.Y. Mar. 30, 2013) ........................... 7

*Cariou v. Prince*,
   714 F. 3d 694 (2d Cir. 2013) ............................................................................ 15

*Comer v. Cisneros*,
   37 F.3d 775 (2d Cir. 1994) ............................................................................... 11

*Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*,
   697 F.2d 27 (2d Cir. 1982) ............................................................................... 27

*Harper & Row Publishers, Inc. v. Nation Enter.*,
    471 U.S. 539 (1985)..................................................................................2, 17, 22

*Hunt v. Wash. State. Apple Adver. Comm'n.*,
    432 U.S. 333 (1977)..................................................................................26, 27, 28

*Infinity Broad. Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998) ......................................................................13

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v.
    Brock*, 477 U.S. 274 (1986) ......................................................................28

*Itar-Tass Russian News Agency v. Russian Kurier*,
    No. 95 Civ. 2144, 1997 WL 109481 (S.D.N.Y. Mar. 10, 1997), *aff'd in
    part, rev'd in part*, 153 F.3d 82 (2d Cir. 1998) ........................................29

*Itzcovitz v. Selective Service Local Bd. No. 6*,
    447 F.2d 888 (2d Cir. 1971) ......................................................................11

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) .....................................................................15

*Kirtsaeng v. John Wiley & Sons*,
    133 S. Ct. 1351 (2013)...............................................................................7

*Mullen v. Soc'y of Stage Directors & Choreographers*,
    06C6818, 2007 WL 2892654 (N.D. Ill. Sept. 30, 2007) ...........................27

*Ocasek v. Hegglund*,
    116 F.R.D. 154 (D. Wyo. 1987) ...............................................................27

*On Davis v. The Gap, Inc.*,
    246 F.3d 152 (2d Cir. 2001) ......................................................................14

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ...................................................................15

*Righthaven LLC v. Hoehn*,
    Nos. 11-16751, 11-16776, 2013 WL 1908876 ..........................................27

*Silvers v. Sony Pictures Entertainment, Inc.*,
    402 F.3d 881(9th Cir. 2005) ......................................................................27

*Sony Corp of Am. v. Universal City Studios, Inc.*,
464 U.S. 417,451 (1984)...................................................................22

*Southern Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois*,
326 F.3d 919 (7th Cir. 2003) ..........................................................28

*The Authors Guild v. Google, Inc.*,
282 F.R.D. 384 (S.D.N.Y. 2012) ....................................................10

*U.S. v. Swartz*,
No. 11-CR-10260 (D. Mass. July 14, 2011)......................................4

*U.S. v. W.T. Grant Co.*,
345 U.S. 629 (1953)...........................................................................9

*UMG Recordings, Inc. v. MP3.com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000) ..............................................13

*Warth v. Seldin*,
422 U.S. 490 (1975)..........................................................................28

*WNET, Thirteen v. Aereo, Inc.*,
712 F.3d 676 (2d Cir. 2013) .............................................................7

## STATUTES

17 U.S.C. § 107(4) ............................................................................22

17 U.S.C. §108(b) ......................................................................18, 23

17 U.S.C. § 501(b) .....................................................................26, 27

17 U.S.C. § 502(a) .............................................................................9

## OTHER AUTHORITIES

45 C.F.R. §§ 164.302-164.318...........................................................7

122 CONG. REC. H10875 (daily ed. Sep. 22, 1976) .............................21

*2013 Data Breach Investigations Report, at* www.verizonenterprise.com/
DBIR/2013/.......................................................................................4

*Copyright and Copy-Reliant Technology*, 103 Nw. U. L. Rev. 1607, 1646-47 (2009) ......................................................................................................16

David Nimmer, Nimmer On Copyright § 13.05[A][1][b] (2011) ........................15

Joseph Addison, The Spectator, No. 166 (Sept. 10, 1711) ...................................14

Maria A. Pallante, *The Next Great Copyright Act* (Mar. 4, 2013) ......................3, 7

## PRELIMINARY STATEMENT

The Libraries have put most of the world's valuable copyright-protected literary works at risk by working with Google to digitize millions of books and then store the unauthorized collection on computer servers connected to the Internet.[1]  The Libraries, Intervenors and Amici argue that the uses they make of this massive repository of digital books are transformative and serve the ultimate goals of copyright by promoting the "Progress of Science and Useful Arts."  While the Authors strenuously disagree with the contention that these uses are transformative, that debate is largely beside the point: no use merits putting millions of books at risk of widespread digital theft.  One cannot fairly claim to serve the goals of copyright while jeopardizing the literary marketplace.

These risks are certain to multiply.  If the District Court's ruling becomes accepted law, others inevitably will engage in their own unauthorized book digitization programs, putting more books within the reach of digital thieves on countless more servers.  *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (court must consider adverse impact if conduct becomes "unrestricted and widespread").  Absent a legal obligation, these actors are unlikely to implement the security measures necessary to safeguard intellectual property that does not belong to them, especially when armed with a decision that the public

---

[1] Capitalized terms, unless otherwise defined herein, are defined in the Authors' opening brief ("AB").  "LB" refers to the Libraries' brief and "IB" refers to the Intervenors' brief.

interest in disseminating information easily trumps the interests of copyright holders. *See Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 559 (1985) ("[T]o propose that fair use be imposed whenever the social value [of dissemination] . . . outweighs any detriment to the artist, would be to propose depriving copyright owners of their right in the property precisely when they encounter those users who could afford to pay for it.") (alteration in original).

In their attempt to settle a separate lawsuit (the so-called "Google Books case), The Authors Guild, Google, publishers, many of the Libraries, the NFB and groups representing the interests advocated by Amici participated in the creation of a settlement agreement that would have permitted certain of the uses that the Libraries claim are transformative, including indexing of the book database and providing access to the visually disabled users. That agreement, however, included critical measures designed to protect copyright holders and the market for their works including commercial-level, auditable security backed up by financial accountability. This type of security provision is not only vital; it is common sense. It is precisely the sort of provision that any sensible legislative approach to addressing the issues raised by mass book digitization would include.

The Libraries' position in this case, and the District Court's decision, present a short-sighted view that fails to acknowledge the risks of technological innovation

and the role of authors in the copyright balance. As the Register of Copyrights

recently observed:

> As the first beneficiaries of the copyright law, authors are not a counterweight to the public interest but are instead at the very center of the equation. . . . A law that does not provide for authors would be illogical – hardly a copyright law at all. And it would not deserve the respect of the public.

Maria A. Pallante, *The Next Great Copyright Act*, 26 (Mar. 4, 2013) ("Pallante

Lecture").

The Authors are the creators who fill the shelves of the Libraries. They have

no interest in impeding research, allowing rare books to disappear or preventing

the visually-disabled from accessing books. But permitting the Libraries to

continue their MDP in its current form – allowing remote access to the database,

digitizing books that are not in need of preservation, unnecessarily retaining

multiple copies of the library and providing Google with copies for its own

commercial purposes – threatens to destabilize the careful equilibrium of copyright

law by depriving writers of valuable licensing opportunities and exposing their

intellectual property to security risks.

It is not the place of the Libraries or Google to roll the dice with the world's

literary property, subjecting it to a risk of theft and dissemination caused by an

outside agent or even internal incompetence, such as the errors in the ill-conceived

"orphan works" program that triggered this lawsuit. Far too much is at stake.

# I

## THE LIBRARIES IGNORE THE DEVASTATING IMPACT THAT WOULD RESULT FROM A DATA BREACH

### A.    The Risks of a Data Breach Are Real

The risks of data breaches are real and on the rise,[2] leading many information security professionals to acknowledge that the question is not if, but when, a breach will occur.  A day barely passes without reports of damaging cyberattacks on even the most sophisticated technology companies, including Google.  There are people who specifically target digital libraries and similar databases, and they have succeeded.  Two months before the filing of this lawsuit, an activist was indicted for hacking into a proprietary database of journal articles by sneaking into a network interface closet in the MIT library, hooking his laptop directly into the network and downloading *over 4.8 million articles*, with the intent to disseminate the archive throughout the Internet.  *See* Indictment, *U.S. v. Swartz*, No. 11-CR-10260 (D. Mass. July 14, 2011).

Even if the Libraries have thus far avoided a data breach, there is no assurance they will succeed in the future.  Security could be compromised by increased pressure from hackers, foreign governments or private actors determined to disrupt American interests, budget cuts, a disgruntled employee or mistakes that

---

[2] *See, e.g., 2013 Data Breach Investigations Report*, *at* www.verizonenterprise.com/DBIR/2013/.

lead to the release of copyright-protected materials.[3]  If not for the commencement of this lawsuit, the Libraries' carelessness in implementing their OWP would have led to the public release of many copyright-protected books. *See* A-1169 (UM admitting to identifying "a number of errors, some of them serious"); A-1264; 1266(159:12-19; 173:8-23); A-208(¶ 23).

## B.    A Data Breach Would Devastate the Literary Market

The HathiTrust Digital Library is a 450+ terabyte database that contains more than 10 million digitized books, the vast majority of which are protected by copyright.  A-1174.  Losing the HDL to a data breach, especially if accomplished by hackers with the intent to distribute the books in accordance with their ethic that "[a]ll information should be free," *See* STEVEN LEVY, HACKERS 27 (2010), would devastate the economic interests of authors.  *See* Edelman Report, A-1205-23; CA-127-45; A-206(¶16).  Indeed, a 2010 study showed that publishers lost almost $3 billion in sales as a result of e-book piracy.  GINI GRAHAM SCOTT, THE BATTLE AGAINST INTERNET BOOK PIRACY 12 (2013).  Pirates and hackers have caused tremendous damage to the music, television and motion picture business.  The

---

[3] ███████████████████████████████████████████████████████

████████████████ *See* CA-198-99(174:23-178:17). ████████

████████████████████████████████████████████ CA-343-44; CA-353(pp. 2-3; 12).
*See also* Edelman Report, A-1205-23; CA-127-45.  Although the Libraries argue that Professor Edelman does not fully understand HathiTrust's particular security apparatus, they do not dispute his main point that the digital format is insecure and that a breach would likely lead to devastating loss.

Libraries and Amici describe the damage that could be caused to physical copies of books because of floods or other disasters, but give no consideration at all to the damage to the authors who created those books that would result if their intellectual property was stolen from HathiTrust and widely disseminated.

## C.    The Issues Raised by Mass Digitization Should Be Left to Congress

As the self-appointed custodians of the world's largest database of digitized copyright-protected books, the Libraries wield tremendous power and responsibility in ensuring the security of the intellectual property they amassed without authorization.  But without legislation that specifically addresses the unique problems raised by mass digitization, the Libraries are under no legal obligation to implement security measures to protect the Authors' intellectual property, and the Libraries' sovereign immune status likely would preclude the Authors from recovering any damages from the Libraries in the event of a data breach.

The problem of entrusting institutions with third-party data is not unique to copyright.  For example, when Congress passed the Health Insurance Portability and Accountability Act ("HIPPA"), it recognized that shifting health records from paper to electronic format not only promised to improve the efficiency of healthcare delivery, but also posed a significant threat to the privacy and security of patients.  Accordingly, Congress required the promulgation of a "Security

Rule," which establishes strict security requirements and accountability for any entity – *including states* – that processes and stores electronic health records. *See* 45 C.F.R. §§ 106 and 164.302-164.318. Any MDP must be governed by similar rules.

Only Congress is equipped to strike the right balance between the promise and dark underbelly of mass digitization. Congressional decisions in the face of rapid technological change "reflect the work ethic of Congress when legislating copyright law for a new era. Congress looks to the equities of the statute as a whole and not just to the immediate interests before it." Pallante Lecture at 3.

Until Congress addresses these issues, courts must defer to the choices already made by Congress – including in Sections 108 and 121 of the Copyright Act. *See Kirtsaeng v. John Wiley & Sons*, 133 S. Ct. 1351, 1357 (2013) ("Whether copyright owners should, or should not, have more than ordinary commercial power to divide international markets is for Congress to decide. We do no more here than try to determine what decision Congress has taken."); *WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676, 695 (2d Cir. 2013) (noting that "unanticipated technological developments" may require legislative action); *Capitol Records, L.L.C. v. ReDigi, Inc.*, No. 12 Civ. 95, 2013 WL 1286134, at *11 (S.D.N.Y. Mar.

30, 2013) ("It is left to Congress, not this Court" to determine whether first sale

principles should apply to digital copies).[4]

## II

## THE AUTHORS' CLAIM WITH RESPECT TO
## THE ORPHAN WORKS PROJECT IS JUSTICIABLE

It is not surprising that the Libraries bury their response to the claims based

on the OWP in the back of their brief, and why the critical issues raised by the

OWP are not addressed at all by the Intervenors and are barely mentioned by

Amici.  This is because the OWP is fundamentally inconsistent with the refrain of

those briefs that (apart from the print disabled) no one is able to view the books

digitized by the Libraries.

The undisputed fact is that if the Authors had not commenced this lawsuit,

UM would have made available for viewing and download the full texts of

copyrighted works, including those of Appellants ALF and Salamanca, which UM

mistakenly identified as "orphan works."  A-102; A-105(¶¶13, 29).  These books

would have been made available to the vast UM community, both on the library

premises (where the general public is welcome) and remotely via the Internet.  A-

101-17(¶¶3, 73, 74).  Books made available through the OWP would be susceptible

to instant and widespread duplication and dissemination, causing rightsholders to

---

[4] The Authors refer to the Brief by *Amicus Curiae* AAP for a comprehensive discussion of recent analysis by the Copyright Office of issues raised by mass digitization and addressing possible reforms of Section 108 and orphan works.

suffer enormous harm without any hope of compensation.  A-486-87; A-510-33(¶¶7-10, Exs. C&D); A-336-38; A-385-89(¶¶12-18, Exs. D&E).

It was only after the filing of this suit that the Libraries suspended the OWP.  A-1169.  While the Libraries claim that they have no "current" plan to reinstate the program, the record shows the opposite.  *See, e.g.*, A-118(¶78) ("Once we create a more robust, transparent, and fully documented process, we will proceed with the work because we remain as certain as ever that our proposed uses of orphan works are lawful…").

The Authors should not be required to wait for the Libraries to reinstate the OWP for a determination that any program that displays and distributes copyrighted books is unlawful.  The Libraries' plea that no books were released as part of the OWP is besides the point, as the Copyright Act specifically provides for injunctive relief to "prevent or restrict the infringement" *before* it occurs.  *See* 17 U.S.C. § 502(a).  Given the Libraries' stated intent to proceed with the OWP, their suspension of the program does not deprive the court of its power to determine the legality of the practice.  *See U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations . . . and, of course, it can be utilized even without a showing of past wrongs.").

### A.    The OWP is Fit for Review

Arguing against prudential ripeness, the Libraries claim that any review of the OWP is unfit because details of future "implementation" are speculative.  LB at 56-57.  The validity of the OWP, however, is a legal question that can and should be decided now.  The Authors submit that any iteration of a program that systematically permits copyrighted works to be viewed and downloaded by thousands of users violates the Copyright Act.  *See Alliance of America Insurers v. Cuomo*, 854 F.2d 591, 599 (2d Cir. 1988) (finding plaintiffs' claims ripe because "for the purpose of preventing irreparable injury, the Court will be in no better position later to adjudicate plaintiffs' claims than it is now").  Under these circumstances, the court need not do a case-by-case analysis of fair use.  *The Authors Guild v. Google, Inc.*, 282 F.R.D. 384, 390 (S.D.N.Y. 2012) ("The Court could effectively assess the merits of the fair-use defense with respect to each of these categories without conducting an evaluation of each individual work.").

### B.    "Delayed" Review of the OWP Results in No Review at All

The Libraries turn copyright law on its head by requiring authors to either monitor the OWP list to opt out, thereby extinguishing any claims on the basis of standing or mootness, or wait until their works are displayed before they can bring a claim.  *See* LB at 59-60.  As explained by Judge Chin, an "opt out" regime is "incongruous with the purpose of the copyright laws" because it "place[s] the onus

on copyright owners to come forward to protect their rights when Google copied their works without first seeking their permission." *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 682 (S.D.N.Y. 2011); *see also Itzcovitz v. Selective Service Local Bd. No. 6,* 447 F.2d 888, 889-90 (2d Cir. 1971) (error to require aggrieved party to engage in a "cul de sac" of procedures before claim is ripe). Forcing authors to endure delay and uncertainty creates significant hardship and frustrates the purposes of the Copyright Act.

### C.    The Authors Have Standing to Bring the OWP Claim

While the District Court did not reach the issue, the Libraries argue that the Authors lack standing to assert challenges to the OWP. Mirroring their ripeness argument, they contend that because it is unknown which books will be included in a future iteration of the OWP, none of the Authors can be certain that their works will be affected, and therefore they lack any immediate injury. LB at 59-60 (citing 17 U.S.C. § 501(b)). This argument fails because courts must assess standing based on the facts as they existed at the time of the filing of the complaint. *See, e.g., Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994). The Libraries acknowledge that several of the Authors' works were identified as orphan candidates and that they had the "intention and ability" to make those books available through the OWP. LB at 60 n.29. *See Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 493 (2d Cir. 1988) (claim justiciable where defendant

has the "intention and ability" to proceed with infringing conduct).  Moreover, thousands of works whose copyrights are held by members of the Associational Plaintiffs have been copied and are under threat to be included in the OWP.

The bottom line is that the Authors satisfy constitutional standing and both prongs of the test set forth by the Supreme Court in *Abbott Labs v. Gardner*, 387 U.S. 136 (1967).  The issue of the validity of the OWP is fit for judicial decision and the Authors will suffer considerable hardship if a decision is withheld.  This Court should remand the case to the District Court for a determination of the legality of the OWP.

**III**

**MASS DIGITIZING AND USING MILLIONS OF
BOOKS IS NOT FAIR USE**

The Libraries admit to copying the Authors' and millions of other copyright-protected books for three purposes: (1) preservation, (2) access for the blind and (3) text searching.  As shown below, their argument that each of these uses is a "transformative" fair use is flawed, and application of the four factors in Section 107 demonstrates that the Libraries cannot meet their burden of proof.  *See Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 918 (2d Cir. 1994) (secondary user carries burden of proving all issues in dispute).

## A.    The Libraries' Uses are Not Transformative

Contrary to the Libraries' claims, neither copying books for purposes of preservation nor making books more accessible to the blind is "transformative." This Court has made clear that converting a book from print to digital format and "preserving" it in on a hard drive does not transform the book.  *See Texaco,* 60 F.3d at 923 (archiving material for "future retrieval and reference" "merely transforms the material object embodying the intangible article that is the copyrighted original work"); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) ("space shifting" CDs to Internet storage is not transformative).  Similarly, converting the text of a book from a print format to a format that can be accessed by a person with print disabilities is not transformative. *See Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 n.2 (2d Cir. 1998) (changing "format of [radio] broadcasts so that they are available by telephone rather than radio . . . though useful, is not technically a transformation").

Without legal authority, the Libraries argue that their preservation use is transformative because it purportedly serves a different purpose than originally intended by the author.  They contend that "Authors do not write books to be preserved; they write them to be read."  LB at 29.  This statement is false.  As expressed by renowned essayist Joseph Addison, authors do write to preserve their work:  "Books are the Legacies that a great Genius leaves to Mankind, which are

13

delivered down from Generation to Generation as Presents to the Posterity of those who are yet unborn." Joseph Addison, THE SPECTATOR, No. 166 (Sept. 10, 1711), *reprinted in* THE SPECTATOR: A NEW EDITION (Henry Morley, ed., 1891). In Section 108, Congress specifically reserved for authors the market for the preservation of their books, and the key players in that market are academic institutions like the Libraries. The Libraries' unauthorized preservation "offers itself as a market substitute and in that fashion harms the market value of the original" and thus "argues strongly against a finding of fair use." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 175-76 (2d Cir. 2001).

The Libraries, echoing the District Court, also argue that distributing unaltered copies of books to the blind is transformative because the final product is consumed by a person with impaired eyesight. *See* LB at 27. Nothing "new," however, is added to the content of such books. The Libraries' suggestion that authors do not write for the benefit of people with print disabilities is, once again, an erroneous and insulting proposition. Authors write books to be consumed by, and sold to, as many people as possible, including people with vision impairments who are not capable of reading print books. The fact that authors have not traditionally sought royalties for books sold in specialized formats for the blind demonstrates compassion by authors, not evidence that authors they do want the blind to consume their books using assistive technology.

14

In any event, merely articulating a new "purpose" for a copyrighted work, without changing or adding anything new, is not enough to render the work transformative.  *See Campbell*, 510 U.S. at 579 (a transformative use "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message").  The phrase "with a different purpose or different character" does not stand on its own, but rather modifies the ultimate requirement that the secondary use "adds something new."  If a "different purpose" were enough, a secondary user could always claim transformation by articulating some different purpose for making a copy.  "Such a strategy empties the term of meaning – for the 'transformative' moniker to guide, rather than follow, the fair use analysis, it must amount to more than a conclusory label."  4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.05[A][1][b] (2011).

The Authors strongly disagree with the reasoning of several of the cases cited by the Libraries that the search engine functions at issue in *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) and *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), or the copying and archiving of student term papers in *A.V. v. iParadigms,* LLC, 562 F.3d 630 (4th Cir. 2009), are "transformative" uses.  While each secondary user may have used the work for a new purpose, in no case did the copier add "new expression, meaning or message."  *See Cariou v. Prince*, 714 F. 3d 694, 706 (2d Cir. 2013) (while a work need not "comment on the

original or its author to be considered transformative," it still must "alter the original with 'new expression, meaning or message.'") (citing *Campbell*, 510 U.S. at 579).[5]  Moreover, none of those cases presented any risk of potential market harm.

In any event, the question with respect to HathiTrust's search engine is not whether it is transformative to merely *scan* a book for the purpose of generating an index of words that can be searched or analyzed.[6]  Rather, the question is whether it is fair for HathiTrust to make and keep multiple copies (and to allow Google to retain copies for its own commercial purposes) of the image and text files, even though there is no search-related purpose served by the retention of such files after they are ingested into the search index.  *See* LB at 37; CA-203(230:14-231:10).

Accordingly, Libraries have not demonstrated that their uses are transformative.  Although this does not end the fair use inquiry, the other factors

---

[5] Intervenors rely on *Bill Graham Archives* to argue that a new purpose is enough to demonstrate a transformative use.  But there, the images of seven copyrighted posters were significantly reduced in size and used as historical references to enhance a new, expressive and independently-copyrightable biographical anthology.

[6] Even Appellees' own Amicus Curiae doubts that search is properly considered transformative. *See* Matthew Sag, *Copyright and Copy-Reliant Technology*, 103 Nw. U. L. Rev. 1607, 1646-47 (2009) (equating a search engine as transformative "seems to be stretching the concept of transformation beyond its natural utility").

must be viewed in light of this conclusion, as well as the fact that there is a strong commercial element to the MDP.[7]

## B. Analyzing the "Nature of the Work" Does Little to Advance the Inquiry

The Libraries ask the Court to weigh the Second Factor in their favor because the majority of the corpus of the HDL is non-fiction and academic, but there is no basis in logic or law for their position. What is the "nature" of 10 million books? The Supreme Court has made clear that the "[c]reation of a nonfiction work, even a compilation of pure fact, entails originality." *Harper*, 471 U.S. at 547. Moreover, several million books in the database, including 76% of the books at issue in this litigation, are works of fiction, SPA-12, and are at "the core of intended copyright protection." *Campbell*, 510 U.S. at 586. Finally, the Libraries should not be permitted to indiscriminately copy every book in their collections without regard to the nature of the book, and then justify the copying by pointing to the nature of only a portion of what they took.

---

[7] In their opening brief, the Authors demonstrated that while the Libraries may be nonprofit educational institutions, there are a number of factors ignored by the District Court that imbue the MDP with a commercial character, including Google's participation and profit motive. AB at 25-26. In response, the Libraries dedicate a single conclusory sentence to the issue. LB at 32 ("[T]he Libraries are nonprofit organizations, making non-commercial uses for the purpose of teaching, research and scholarship.").

**C.    The Libraries Took (and Gave) Far Too Much of the Copyrighted Works**

The Libraries argue that they only took as much as needed to fulfill their three goals.  But an examination of the full extent of each use shows that the Libraries "took" vastly more than they needed.

### 1.    Search Does Not Require the Libraries to Retain Multiple Copies of the Image and Text Files

As noted above, scanning all the books in a library may be necessary to make the library searchable, but once the books have been indexed, there is no need to keep the digitized books that were generated as an intermediate step in the process.  Search cannot justify the retention of the books.  *See* AB at 37-38.

### 2.    Preservation Does Not Require Every Library Book to Be Digitized and Stored Online

The Libraries do not attempt to demonstrate that each and every book in their collections is in need of preservation.  LB at 36.  As the Libraries demonstrate in their opening brief, Congress did not grant Libraries a general right of preservation, instead limiting the exemption to *un*published works (§ 108(b)) and works that are at risk of loss and are unavailable for purchase on the market (§ 108(c)).  AB at 22.  The Libraries admit to copying entire collections without regard to these conditions.  *Id.* at 26-27.

The Libraries argue that if the undiscriminating copying is not justified by preservation, it is justified by making books "discoverable by scholars and

accessible to the print disabled." LB at 36. But search does not require the retention of the intermediate copies, and providing access to the print-disabled does not require the online storage of multiple copies.

*Second*, the Libraries and Amici complain that Section 108 does not allow them to take advantage of new technology that expedites and reduces the cost of mass digitization. They contend that if the Libraries had been forced to follow Section 108(c)'s mandate to check every book's physical condition and commercial availability, it would have been difficult to achieve their preservation goals. However, as courts in the Second Circuit recently made clear, a secondary user will either commit or avoid copyright infringement depending on whether the "technical architecture" it employs follows the statutory language. *Compare Aereo*, 712 F.3d at 694 (endorsing complex architecture that was, as a technological matter, unnecessary, but was specifically designed to avoid violating copyright), *with ReDigi Inc.*, 2013 WL 1286134, at *5, 10 (rejecting architecture that attempted to comply with spirit of first sale doctrine but violated language of statute).

Finally, there is no legitimate reason for storing preservation copies on servers connected to the Internet. Any such copies must be stored offline, where the dangers of unauthorized access, theft and dissemination would be considerably reduced.

### 3. Providing Equal Access to the Blind Does Not Mean Remote, Instant Access to Every Book in the Library

Even if this Court accepts the District Court's conclusion that "[t]he provision of equal access to copyrighted information for print-disabled individuals is mandated by the ADA" and that HathiTrust is an "authorized entity" under Section 121, SPA-22,[8] neither the Intervenors nor Libraries explain why "equal access" means providing instant, remote access to every page of every book in the collection of the library – a level of access which exceeds that which is granted to any other person, and directly violates specific limitations in Sections 108 and 121.

For example, a library is permitted to copy and distribute an entire work in response to a user request only *after* the library has made a "reasonable investigation" that another copy, new or used, is unavailable for purchase at a fair price. 17 U.S.C. §108(e). A sighted user frequently must wait for access to a particular book because it has been checked out of the library or is being used by another reader, in which case he or she would have to wait for its return or perhaps request an inter-library loan, or because it has been lost or stolen, in which case the

---

[8] For the reasons set forth in the Authors' opening brief, HathiTrust is not an "authorized entity." In fact, UM admits that there are only 32 people certified with print disabilities. (A-1039). Tellingly, only *after* the filing of this lawsuit did HathiTrust add enabling access to "persons with print disabilities" to its Mission and Goals. *Compare* Mission and Goals (Nov. 5, 2011), *at* http://goo.gl/UuKME, *with* Mission and Goals (current), *at* http://goo.gl/rSSoI. The District Court did not reach the question of whether the digitized books are specialized formats. But if digital text on a screen is enough to constitute a "specialized format," that definition would be meaningless.

library would be required to follow the Section 108(c) procedures. Thus, to the extent that the ADA permits or requires copies to be made accessible to the print disabled, equal access would mean allowing such individuals to access and, if the proper conditions are met, obtain lawful copies of books they request, *at the library*, like everyone else. Finally, by allowing print-disabled users to access the database remotely, the digitized books are being "made available to the public in that format outside the premises of the library," in violation of Section 108(c). As the architect of the 1976 Copyright Act recognized, unauthorized copies made to accommodate people with disabilities should be permitted as fair use only "*as long as clear-cut constraints are imposed and enforced*." 122 CONG. REC. H10875 (daily ed. Sep. 22, 1976) (statement of Rep. Kastenmeier, Chairman of the House Judiciary Subcommittee) (copies for disabled individuals should remain "within the confines of the institution," which "would have to insure that the master and work copy would remain in the hands of a limited number of authorized personnel within the institution, would be responsible for assuring against its unauthorized reproduction or distribution, or its performance or retention for other than educational purposes within the institution").

In sum, even if the Court determines that some taking was justified in light of the Libraries' purposes, in each instance the Libraries took and used more than

was necessary.  Accordingly, the Third Factor weighs heavily in favor of the Authors.

## D. The Libraries' Activities Threaten Enormous and Unprecedented Harm to Authors

With respect to the Fourth Factor, the Libraries seem to argue that in order to show the adverse "effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4), the Authors were required to present concrete evidence of damages in the form of lost book sales or documented business plans that were disrupted by the MDP.  LB at 38.  However, "[a]ctual present harm need not be shown" as "such a requirement would leave the copyright holder with no defense against predictable damage."  *Sony Corp of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984); *Harper*, 471 U.S. at 567 ("Rarely will a case of copyright infringement present such clear-cut evidence of actual damage.").  Rather, "[w]hat is necessary is a showing by a preponderance of the evidence that *some* meaningful likelihood of future harm exists."  *Sony*, 464 U.S. at 451.  The Authors have met their burden of showing the likelihood of damage, devastating in scope, that is likely to result from the Libraries' copyright infringement.

1.    **The Libraries Harmed the Value of the Authors' Copyrights By Violating the Protections Afforded to Authors Under Sections 108 and 121**

When assessing the likely of impact mass digitization on the market for the Authors' works, it is important to understand that the Court is not working on a blank slate.  In Sections 108 and 121, discussed at length in the Authors' opening brief, Congress enacted specific exemptions to permit libraries and "authorized entities" that service the blind to make copies of books to service their respective constituents, but limited the rights of those institutions by embedding in the statute specific requirements, each of which is designed to protect the economic interests of copyright holders.  *See, e.g.*, 17 U.S.C. §108(b) (maximum of three preservation copies; digital copies within library only), §108(c) (maximum three replacement copies only of books lost or in poor physical condition; no copies until *after* a library has confirmed that a new copy is unavailable on the market; digital copies within library only), §108(e) (no user-requested copies without "reasonable investigation" that no copies are commercially available); §108(h) (no use of orphan works until last twenty years of copyright term); §121 (copies can be made only by an "authorized entity" in "specialized formats . . . exclusively for use by blind"; large print formats exempted only for print instructional materials).

Following the lead of the District Court, the Libraries disregard these restrictions, which are the product of decades of discussions and debate among

representative academics, archivists, authors, educators, librarians, and publishers.
Now, many of those same interest groups ask the Court to ignore that legislative
compromise under the banner of "fair use," suggesting that any potential harm to
the literary market is speculative, and that any interests that authors may have are
outweighed by the societal interest of preserving books, providing "equal access"
to the blind and making libraries searchable.  However, by breaking the rules, the
Libraries have threatened and devalued the market interests of the Authors.  And
by invoking the fair use savings clause in §108(f)(4) as a means to brush aside
these violations, the District Court violated a cardinal rule of statutory
interpretation that the "specific governs the general."  While the Libraries note that
the purpose of that canon is to avoid "applying a general provision when doing so
would *undermine* limitations created by a more specific provision," LB at 46-47
(quoting *Vanity Corp. v. Howe*, 516 U.S. 489, 511(1996) (emphasis added)), that is
precisely the effect here – the District Court's application of fair use sanctions
conduct that undermines specific limitations present to protect authors.

### 2.    There is a Ready Market to License the Authors' Books

This case presents a circular reasoning problem recognized by this Court in
*Texaco*.  The Authors claim that every book copied is a lost sale.  The Libraries
respond that it is not a lost sale if the Court decides it is fair use.  But the Court's
determination of whether it is fair use depends in part on whether there is a lost

sale. The Court resolved the circularity in *Texaco* by looking to see whether market forces could react to facilitate a licensing scheme for the challenged use.

In *Texaco*, the Court looked to the Copyright Clearance Center ("CCC") as a market player that would be able to administer a licensing system for the copying of science journal articles. *Texaco*, 70 F.3d at 930. Here, the Libraries claim that it would be economically impossible for them to obtain licenses for all of the books they wished to digitize. LB at 39-40. As an initial matter, this economic plight is disingenuous given that the Libraries are institutions with substantial financial resources, and their chief benefactor and partner is Google, ████ ████████████████████████████████████████████ CA-157(25:3-25:25); CA-210-11(57:20-58:5).

But the fact of the matter is that neither Google nor the Libraries ever tried to seek a license: not from any of the twelve named Authors; not from the eight plaintiff authors' rights associations representing tens of thousands of authors across the world; and not from the CCC, which may not have a specific license aimed at using books for search, preservation and uses for the blind, but certainly does have a general license that covers the use of digital books. CA-15(19:7-13). Indeed, the design of a workable licensing structure with binding security requirements already exists, as demonstrated by the rejected Google Settlement

Agreement, which involved many of these Libraries, the National Federation of the Blind and other stakeholders.  A-205-06(¶¶14-17).

### 3.    The Risk of a Data Breach Threatens Appellants' Copyrights

Neither the Libraries nor Intervenors responded to the Authors' security-based concerns regarding the unauthorized online storage of their massive HDL. As discussed above, cyberthreats are real and the Authors have legitimate reasons to be concerned about any data breach, especially given the absence of any obligation upon the Libraries to employ security measures or accountability in the event of a breach.  These dangers– not just created by the Libraries but also by the mass digitizers who unquestionably will follow in their wake – must be weighed heavily against any societal benefits of mass digitization.

## IV

## THE ASSOCIATIONAL PLAINTIFFS HAVE STANDING TO PURSUE COPYRIGHT CLAIMS ON BEHALF OF THEIR MEMBERS

The District Court held that the Associational Plaintiffs satisfied the three-part test for constitutional and prudential standing set forth in *Hunt v. Wash. State. Apple Adver. Comm'n.*, 432 U.S. 333 (1977), SPA-6-7.  In their opening brief, the Authors further demonstrated that Section 501(b) of the Copyright Act does not require such associations to own copyrights in their own name in order to bring claims on behalf of their members.  The Libraries' response is entirely unpersuasive.

*First*, the Libraries argue that the "plain meaning" of Section 501(b) precludes associational standing.  But none of the cases cited in support of that undisputed point involve claims brought by associations, let alone associations asserting standing on the basis of *Hunt*.  Rather, they address whether a copyright holder may assign or otherwise grant a right to sue to a third party.  *See ABKO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991) (assignees); *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 32 (2d Cir. 1982) (licensee and copyright owner of derivative works); *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881(9th Cir. 2005) (assignee of an accrued claim of copyright infringement); *Righthaven LLC v. Hoehn*, Nos. 11-16751, 11-16776, 2013 WL 1908876, at *2-5 (LLC formed to receive "limited revocable assignments").[9]

In arguing that "Congress said what it meant" in drafting Section 501(b), LB at 50, and that Congress "knows how to" expand the class of those entitled to sue for copyright infringement, LB at 51, the Libraries ignore that when associations are conferred standing under *Hunt*, it is always permitted as a special exception to

---

[9] Although the Libraries cite two cases involving associations, neither addresses claims brought by the association. *See Mullen v. Soc'y of Stage Directors & Choreographers*, 06C6818, 2007 WL 2892654, at *4 (N.D. Ill. Sept. 30, 2007) (where an association was named as one of many defendants in a declaratory judgment action, the court states in passing *dicta*, with no party briefing the issue of standing under *Hunt*, that association would not have standing to assert copyright claim); *Ocasek v. Hegglund*, 116 F.R.D. 154, 157 (D. Wyo. 1987) (discussing nonparty ASCAP's standing as "ghost plaintiff").

general standing requirements – one that recognizes that "an association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 289 (1986). Associational standing does not expand the class of those entitled to sue; it merely permits an association to bring claims "solely as the representative of its members" who have standing to sue in their own right. *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

The Libraries point out that constitutional standing and statutory standing are different inquiries, but again they fail to cite any cases where the question of statutory standing, as applied to *Hunt*, is discussed. LB at 52-53. On the other hand, the Libraries fail to distinguish *Southern Illinois Carpenters Welfare Fund v. Carpenters Welfare Fund of Illinois*, 326 F.3d 919 (7th Cir. 2003), except to note that it concerns a different statute. LB at 54. However, this is a distinction without a difference. The principle underlying Judge Posner's decision is equally applicable here: express standing requirements in a statute do not preclude an association that satisfies the *Hunt* test from bringing a claim on behalf of its members who satisfy those requirements. *See Southern Illinois*, 326 F.3d at 922; *see also Am. Optometric Soc., Inc. v. Am. Bd. of Optometry, Inc.*, No. 10 Civ. 3983, 2012 WL 2135350 (C.D. Cal. June 12, 2012) ("Although the doctrine of associational standing arises out of the Supreme Court's Article III standing

28

jurisprudence, it applies to questions of statutory standing as well" and finding associational standing under the Lanham Act).

Finally, in an unprecedented case such as this one, involving mass digitization, millions of individual authors and defendants who enjoy sovereign immunity, the Associational Plaintiffs are in a uniquely-qualified position to assert claims on behalf of their members – the "legal and beneficial owners" of copyrights infringed by the Libraries.  Any question as to whether an injunction should issue with respect to any particular work can easily be addressed at the remedy stage of the case.  *Itar-Tass Russian News Agency v. Russian Kurier*, No. 95 Civ. 2144, 1997 WL 109481, at *11 (S.D.N.Y. Mar. 10, 1997) (finding that union of journalists had standing to assert claims for copyright infringement), *aff'd in part, rev'd in part*, 153 F.3d 82, 94 (2d Cir. 1998) (remanding to determine the injunctive relief and damages the association could assert).

## **CONCLUSION**

For all of the reasons set forth herein and in the Authors' opening brief, the judgment of the District Court should be reversed and the case remanded to the District Court for a determination consistent with the provisions of the Copyright Act, including the specific limitations and restrictions set forth in Sections 108 and 121.

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By:   /s/ Edward H. Rosenthal
          Edward H. Rosenthal
          Jeremy S. Goldman
          Anna Kadyshevich

488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

*Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

As counsel of record to the Plaintiffs-Appellants, I hereby certify that this reply brief complies with the type – volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  I am relying upon the word count of the word-processing system (Microsoft Word) used to prepare the brief, which indicates that 6,994 words appear in the brief.

This reply brief complies with the typeface requirements of Rule 32(a)(5) and the type style requires of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this reply brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: July 11, 2013

FRANKFURT KURNIT KLEIN & SELZ, P.C.


By:  /s/ Edward H. Rosenthal
    Edward H. Rosenthal
    Jeremy S. Goldman
    Anna Kadyshevich

488 Madison Avenue, 10th Floor
New York, New York 10022
(212) 980-0120

*Attorneys for Plaintiffs-Appellants*